**FOLEY & LARDNER LLP**
ATTORNEYS AT LAW
ONE MARITIME PLAZA, SIXTH FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3409
TELEPHONE:  415.434.4484
FACSIMILE:  415.434.4507

EILEEN R. RIDLEY, BAR NO. 151735
  email: eridley@foley.com
MICHAEL A. NARANJO, BAR NO. 221449
  email: mnaranjo@foley.com
PATRICK T. WONG, BAR NO. 233222
  email: pwong@foley.com

ATTORNEYS FOR DEFENDANTS, ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE
COMPANY, A CALIFORNIA CORPORATION; ARKANSAS BLUE CROSS AND BLUE
SHIELD, A MUTUAL INSURANCE COMPANY, AN ARKANSAS CORPORATION;
ANTHEM BLUE CROSS AND BLUE SHIELD, AN INDIANA CORPORATION; BLUE
CROSS AND BLUE SHIELD OF GEORGIA, INC., A GEORGIA CORPORATION; BLUE
CROSS AND BLUE SHIELD OF KANSAS, INC., A KANSAS CORPORATION; CAPITAL
BLUE CROSS, A PENNSYLVANIA CORPORATION; AND EMPIRE BLUECROSS
BLUESHIELD, A NEW YORK CORPORATION.

WILLIAM E. VON BEHREN (BAR NO. 106642)
  BvonBehren@mmhllp.com
SIMON MANOUCHERIAN (BAR NO. 198760)
  SManoucherian@mmhllp.com
RUSSELL G. GOMM (BAR NO. 231056)
  RGomm@mmhllp.com
JOANN V. LEE (BAR NO. 251653)
  JLee@mmhllp.com
**MESERVE, MUMPER & HUGHES LLP**
300 SOUTH GRAND AVENUE, 24TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3185
TELEPHONE:  (213) 620-0300
FACSIMILE:  (213) 625-1930

ATTORNEYS FOR DEFENDANTS
BLUE CROSS AND BLUE SHIELD OF ALABAMA, BLUE SHIELD OF CALIFORNIA,
BLUE CROSS BLUE SHIELD OF DELAWARE, BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., BLUECROSS AND BLUESHIELD OF LOUISIANA, BLUECROSS
BLUESHIELD OF MASSACHUSETTS, INC., BLUE CROSS BLUE SHIELD OF
MICHIGAN, BLUE CROSS BLUE SHIELD OF MINNESOTA, BLUE CROSS AND BLUE
SHIELD OF MISSISSIPPI, BLUE CROSS AND BLUE SHIELD OF MONTANA, INC.,
BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, BLUE CROSS AND BLUE
SHIELD OF RHODE ISLAND, BLUE CROSS AND BLUE SHIELD OF SOUTH
CAROLINA, BLUECROSS BLUESHEILD OF TENNESSEE, INC., BLUECROSS
BLUESHIELD OF VERMONT, CAREFIRST BLUECROSS BLUESHIELD, EXCELLUS,
INC., HAWAII MEDICAL SERVICE ASSOCIATION, HIGHMARK, INC., MOUNTAIN
STATE BLUE CROSS BLUE SHIELD, PREMERA BLUE CROSS, THE REGENCE
GROUP, AND WELLMARK BLUECROSS BLUESHEILD OF IOWA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

JAMES M. CADY, AN INDIVIDUAL, ON BEHALF
OF HIMSELF AND ALL OTHERS SIMILARLY
SITUATED,

　　　　　　　　PLAINTIFF,

　　　v.

ANTHEM BLUE CROSS LIFE AND HEALTH

CASE NO.: CV 08-2753 CW

**APPENDIX OF NON-CALIFORNIA
AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
COMPLAINT FOR LACK OF SUBJECT
MATTER JURISDICTION, FAILURE TO
STATE A CLAIM AND FOR MORE
DEFINITE STATEMENT**

INSURANCE COMPANY, A CALIFORNIA
CORPORATION; PREMERA BLUE CROSS, AN
ALASKA CORPORATION; BLUE CROSS AND
BLUE SHIELD OF ALABAMA, AN ALABAMA
CORPORATION; ARKANSAS BLUE CROSS
AND BLUE SHIELD, AN ARKANSAS
CORPORATION; BLUE CROSS AND BLUE
SHIELD OF ARIZONA, INC., AN ARIZONA
CORPORATION; BLUE SHIELD OF
CALIFORNIA LIFE & HEALTH INSURANCE
COMPANY, A CALIFORNIA CORPORATION;
ANTHEM BLUE CROSS AND BLUE
SHIELD, AN INDIANA CORPORATION;
CAREFIRST, INC., A MARYLAND
CORPORATION; BLUE CROSS BLUE SHIELD
OF DELAWARE, A DELAWARE CORPORATION;
BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., A FLORIDA CORPORATION;
BLUE CROSS AND BLUE SHIELD OF
GEORGIA, INC., A GEORGIA CORPORATION;
HAWAII MEDICAL SERVICE
ASSOCIATION, A HAWAII CORPORATION;
WELLMARK, INC., AN IOWA CORPORATION;
BLUE CROSS OF IDAHO, INC., AN IDAHO
CORPORATION; REGENCE BLUESHIELD OF
IDAHO, INC., AN IDAHO CORPORATION; THE
REGENCE GROUP, AN OREGON
CORPORATION; BLUE CROSS AND BLUE
SHIELD OF KANSAS, INC., A KANSAS
CORPORATION; BLUE CROSS AND BLUE
SHIELD OF LOUISIANA, A LOUISIANA
CORPORATION; BLUE CROSS AND BLUE
SHIELD OF MASSACHUSETTS, INC., A
MASSACHUSETTS CORPORATION; BCBSM
FOUNDATION, A MICHIGAN CORPORATION;
BCBSM FOUNDATION, INC., A MINNESOTA
CORPORATION; BLUE CROSS AND BLUE
SHIELD OF KANSAS CITY, A MISSOURI
CORPORATION; BLUE CROSS & BLUE
SHIELD OF MISSISSIPPI, A MISSISSIPPI
CORPORATION; BLUE CROSS AND BLUE
SHIELD OF MONTANA, INC., A MONTANA
CORPORATION; BLUE CROSS AND BLUE
SHIELD OF NORTH CAROLINA, A NORTH
CAROLINA CORPORATION; BLUE CROSS BLUE
SHIELD OF NORTH DAKOTA, A NORTH
DAKOTA CORPORATION; BLUE CROSS AND
BLUE SHIELD OF NEBRASKA, A NEBRASKA
CORPORATION; BLUECROSS BLUESHIELD
OF WESTERN NEW YORK, A NEW YORK
CORPORATION; BLUE SHIELD OF
NORTHEASTERN NEW YORK, A NEW YORK
CORPORATION; EMPIRE BLUECROSS
BLUESHIELD, A NEW YORK CORPORATION;
EXCELLUS BLUECROSS BLUESHIELD, A
NEW YORK CORPORATION; CAPITAL BLUE

**[FRCP 12(b)(1), 12(b)(6) AND (e)]**

DATE:  SEPTEMBER 25, 2008
TIME:  2:00 P.M.
DEPT.:  COURTROOM 2, 4TH FLOOR

JUDGE:  HON. CLAUDIA WILKEN

2

CROSS, A PENNSYLVANIA CORPORATION;         )
HIGHMARK BLUE CROSS BLUE SHIELD, A )
PENNSYLVANIA CORPORATION; HIGHMARK    )
BLUE SHIELD, A PENNSYLVANIA           )
CORPORATION; BLUE CROSS & BLUE        )
SHIELD OF RHODE ISLAND, A RHODE       )
ISLAND CORPORATION; BLUE CROSS AND    )
BLUE SHIELD OF SOUTH CAROLINA, A      )
SOUTH CAROLINA CORPORATION; BLUECROSS )
BLUESHIELD OF TENNESSEE, INC., A      )
TENNESSEE CORPORATION; BLUE CROSS AND )
BLUE SHIELD OF VERMONT, A VERMONT     )
CORPORATION; MOUNTAIN STATE BLUE      )
CROSS BLUE SHIELD, INC., A WEST       )
VIRGINIA CORPORATION; BLUE CROSS &    )
BLUE SHIELD OF WYOMING, A WYOMING     )
CORPORATION.                          )
                                      )
        DEFENDANTS.                   )
                                      )
                                      )
_____)

Defendants ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE

COMPANY, PREMERA BLUE CROSS, BLUE CROSS AND BLUE SHIELD OF

ALABAMA, ARKANSAS BLUE CROSS AND BLUE SHIELD, A MUTUAL INSURANCE

COMPANY, BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY,

ANTHEM BLUE CROSS AND BLUE SHIELD, CAREFIRST, INC., BLUE CROSS BLUE

SHIELD OF DELAWARE, BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., BLUE

CROSS AND BLUE SHIELD OF GEORGIA, INC., HAWAII MEDICAL SERVICE

ASSOCIATION, WELLMARK, INC., REGENCE BLUESHIELD OF IDAHO, INC., THE

REGENCE GROUP, BLUE CROSS AND BLUE SHIELD OF LOUISIANA, BLUE CROSS

AND BLUE SHIELD OF MASSACHUSETTS, INC., BCBSM FOUNDATION, BCBSM

FOUNDATION, INC., BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., BLUE

CROSS & BLUE SHIELD OF MISSISSIPPI, BLUE CROSS AND BLUE SHIELD OF

MONTANA, INC., BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, EMPIRE

BLUECROSS BLUESHIELD[1], EXCELLUS BLUECROSS BLUESHIELD, CAPITAL BLUE

---

[1] The correct name of this defendant is Empire HealthChoice Assurance, Inc.

SFCA_1446996.1

CROSS, HIGHMARK BLUE CROSS BLUE SHIELD, HIGHMARK BLUE SHIELD, BLUE
CROSS & BLUE SHIELD OF RHODE ISLAND, BLUE CROSS AND BLUE SHIELD OF
SOUTH CAROLINA, BLUECROSS BLUESHIELD OF TENNESSEE, INC., BLUE CROSS
AND BLUE SHIELD OF VERMONT, MOUNTAIN STATE BLUE CROSS BLUE SHIELD,
INC., and BLUE CROSS & BLUE SHIELD OF WYOMING hereby submit the following
attached copies of non-California authorities and authorities outside of the district and Circuit
cited in their Motion to Dismiss Complaint of plaintiff JAMES M. CADY, filed
contemporaneously herewith:

(1) *Aaron v. Aguirre*, 2007 WL 959083 (S.D. Cal. 2007), attached hereto as
**Exhibit 1**;

(2) *Aguilar v. Allstate Fire and Casualty Insurance Co.*, 2007 WL 734809 (E.D.
La. 2007), attached hereto as **Exhibit 2**;

(3) *Bell Atlantic Corp. v. Twombly* 550 U.S.   --, 127 S. Ct. 1955 (2007), attached
hereto as **Exhibit 3**;

(4) *Bailey et al. v. Patterson*, 369 U.S. 31 (1962), attached hereto as **Exhibit 4**;

(5) *Conley v. Gibson*, 355 U.S. 41 (1957), attached hereto as **Exhibit 5**;

(6) *Forsythe v. Sun Life Financial, Inc.*, 417 F. Supp. 2d 100 (D. Mass. 2006),
attached hereto as **Exhibit 6**;

(7) *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs (TOC), Inc.*, 528 U.S. 167
(2000), attached hereto as **Exhibit 7**;

(8) *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948 (S.D. Cal. 1996), attached
hereto as **Exhibit 8**;

(9) *Hastings v. Wilson,* 2007 WL 333617 (D. Minn. 2007), attached hereto as
**Exhibit 9**;

(10) *Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541 (D. Nev. 2004),
attached hereto as **Exhibit 10**;

(11) *In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162 (D. Mass. 2004),
attached hereto as **Exhibit 11**;

SFCA_1446996.1

1    (12) *Lindquist v. Farmers Ins. Co. of Ariz.*, 2008 WL 343299 (D. Ariz. 2008),

2    attached hereto as **Exhibit 12**;

3    (13) *O'Shea v. Littleton,* 414 U.S. 488 (1974), attached hereto as **Exhibit 13**;

4    (14) *Papoola v. MD-Individual Practice Ass'n*, 230 F.R.D. 424 (D. Md. 2005),

5    attached hereto as **Exhibit 14**;

6    (15) *Richardson v. Ramirez,* 418 U.S. 24 (1974), attached hereto as **Exhibit 15**;

7    (16) *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998), attached hereto

8    as **Exhibit 16**; and

9    (17) *Warth v. Seldin*, 422 U.S. 490 (1975), attached hereto as **Exhibit 17**.

10   DATED:  AUGUST 15, 2008                  **FOLEY & LARDNER LLP**

11

12

13   BY: /S/ MICHAEL J. TUTEUR
     MICHAEL J. TUTEUR (ADMITTED *PRO HAC VICE*)
     EILEEN R. RIDLEY

14   DEFENDANTS ANTHEM BLUE CROSS LIFE AND
     HEALTH INSURANCE COMPANY, A CALIFORNIA

15   CORPORATION; ANTHEM BLUE CROSS AND BLUE
     SHIELD, AN INDIANA CORPORATION; BLUE CROSS

16   AND BLUE SHIELD OF GEORGIA, INC., A GEORGIA
     CORPORATION; AND EMPIRE HEALTHCHOICE

17   ASSURANCE, INC., A NEW YORK CORPORATION

18   DATED:  AUGUST 15, 2008                  **FOLEY & LARDNER LLP**

19

20

21   BY:  /S/ PATRICK T. WONG
     JACQUELINE M. SAUE (*PRO HAC VICE* APPLICATION
     PENDING)

22   EILEEN R. RIDLEY

23   MICHAEL A. NARANJO
     PATRICK T. WONG

24   DEFENDANTS ARKANSAS BLUE CROSS AND BLUE
     SHIELD, A MUTUAL INSURANCE COMPANY, AN

25   ARKANSAS CORPORATION; BLUE CROSS AND BLUE
     SHIELD OF KANSAS, INC., A KANSAS

26   CORPORATION; AND CAPITAL BLUE CROSS, A
     PENNSYLVANIA CORPORATION

27

28

SFCA_1446996.1

1    DATED:  AUGUST 15, 2008                    MESERVE, MUMPER & HUGHES LLP

2

3
                                 BY:  /S/ RUSSELL G. GOMM
4                                    WILLIAM VON BEHREN
                                     SIMON MANOUCHERIAN
5                                    RUSSELL G. GOMM
                                     MESERVE, MUMPER & HUGHES LLP
6                                    300 SOUTH GRAND AVE., STE. 2400
                                     LOS ANGELES, CA 90071
7                                    T:  213.620.0300
                                     F:  213.625.1930
8
                                     DEFENDANTS BLUE CROSS AND BLUE SHIELD OF
9                                    ALABAMA, AN ALABAMA CORPORATION; BLUE
                                     CROSS BLUE SHIELD OF DELAWARE, A
10                                   DELAWARE CORPORATION; EXCELLUS BLUECROSS
                                     BLUESHIELD, A NEW YORK CORPORATION; BLUE
11                                   CROSS AND BLUE SHIELD OF FLORIDA, INC., A
                                     FLORIDA CORPORATION; BLUE SHIELD OF
12                                   CALIFORNIA LIFE & HEALTH INSURANCE
                                     COMPANY, A CALIFORNIA CORPORATION; HAWAII
13                                   MEDICAL SERVICE ASSOCIATION, A HAWAII
                                     CORPORATION; HIGHMARK BLUE CROSS BLUE
14                                   SHIELD, A PENNSYLVANIA CORPORATION;
                                     HIGHMARK BLUE SHIELD, A PENNSYLVANIA
15                                   CORPORATION; BLUE CROSS AND BLUE SHIELD
                                     OF LOUISIANA, A LOUISIANA CORPORATION; BLUE
16                                   CROSS AND BLUE SHIELD OF MASSACHUSETTS,
                                     INC., A MASSACHUSETTS CORPORATION; BCBSM
17                                   FOUNDATION, A MICHIGAN CORPORATION; BCBSM
                                     FOUNDATION, INC., A MINNESOTA CORPORATION;
18                                   BLUE CROSS AND BLUE SHIELD OF MONTANA,
                                     INC., A MONTANA CORPORATION; BLUE CROSS AND
19                                   BLUE SHIELD OF NORTH CAROLINA, A NORTH
                                     CAROLINA CORPORATION; PREMERA BLUE CROSS,
20                                   A WASHINGTON CORPORATION; BLUE CROSS AND
                                     BLUE SHIELD OF SOUTH CAROLINA, A SOUTH
21                                   CAROLINA CORPORATION; BLUECROSS
                                     BLUESHIELD OF TENNESSEE, INC., A TENNESSEE
22                                   CORPORATION; REGENCE BLUESHIELD OF IDAHO,
                                     AN IDAHO CORPORATION; THE REGENCE GROUP,
23                                   AN OREGON CORPORATION; BLUE CROSS AND
                                     BLUE SHIELD OF VERMONT, A VERMONT
24                                   CORPORATION; BLUE CROSS & BLUE SHIELD OF
                                     MISSISSIPPI, A MISSISSIPPI CORPORATION; BLUE
25                                   CROSS & BLUE SHIELD OF RHODE ISLAND, A
                                     RHODE ISLAND CORPORATION; WELLMARK, INC.,
26                                   AN IOWA CORPORATION; MOUNTAIN STATE BLUE
                                     CROSS AND BLUE SHIELD, INC., A WEST VIRGINIA
27                                   CORPORATION; AND CAREFIRST, INC., A MARYLAND
                                     CORPORATION

28

                                          6

SFCA_1446996.1

**EXHIBIT 1**

**Westlaw.**

Slip Copy                                                                                                                    Page 1
Slip Copy, 2007 WL 959083 (S.D.Cal.)

H Aaron v. Aguirre
S.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. California.
Erica AARON, et al., Plaintiffs,
v.
Michael AGUIRRE, et al., Defendants.
No. 06-CV-1451-H(POR).

March 8, 2007.

Stephen R. Cook, Martha K. Gooding, Howrey
Simon Arnold and White, Irvine, CA, Matthew M.
Mahoney, Seltzer CaplanMcMahon Vitek, Donald H.
McGrath, Office of the City Attorney, Criminal
Division, Peter H. Benzian, Colleen Carlton Smith,
Latham and Watkins, San Diego, CA, for
Defendants.
Michael Anthony Jenkins, Christopher D. Nissen,
Stepheney Windsor, Castle Petersen and Krause,
Newport Beach, CA, for Plaintiffs.

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN
PART DEFENDANT CITY OF SAN DIEGO
AND INDIVIDUAL DEFENDANTS' MOTION
TO DISMISS;**

**(2) GRANTING IN PART AND DENYING IN
PART DEFENDANT MICHAEL AGUIRRE'S
MOTION TO DISMISS;**

**(3) GRANTING DEFENDANT SDCERS'
MOTION TO DISMISS; AND**

**(4) GRANTING DEFENDANT KPMG'S
MOTION TO DISMISS**

MARILYN L. HUFF, United States District Judge.
**\*1** On December 13, 2006, the Court granted in part
and denied in part motions to dismiss various claims
from Plaintiffs' Second Amended Complaint
("SAC"), and granted Plaintiffs leave to amend to
attempt to cure certain deficiencies. (Doc. No. 100.)
On January 12, 2007, Plaintiffs, over 1600 individual
police officers, filed their Third Amended Complaint

("TAC") against Defendants, alleging claims under
42 U.S.C. § 1983 and various state law claims. (Doc.
No. 109.) On January 22, 2007, Defendant KPMG,
LLP ("KPMG") filed a motion to dismiss the TAC.
(Doc. No. 112.) On January 29, 2007, Defendant
Michael Aguirre filed a motion to dismiss the TAC.
(Doc. No. 115.) Defendant City of San Diego
("City") and the Individual Defendants filed a motion
to dismiss the TAC on January 29, 2007. (Doc. No.
117.) Also on January 29, 2007, Defendant San
Diego City Employees' Retirement System
("SDCERS") filed a motion to dismiss the TAC.
(Doc. No. 118.)

On January 29, 2007, Defendant Aguirre filed a
joinder to Defendant City and the Individual
Defendants' motion to dismiss. (Doc. No. 115.)
Similarly, on January 29, 2007, Defendant City and
the Individual Defendants filed a joinder to the
motions to dismiss filed by Defendant Aguirre and
Defendant SDCERS. (Doc. No. 117.) On January 31,
2007, Defendant SDCERS filed a joinder to the
motions to dismiss filed by Defendant Aguirre and by
Defendant City and the Individual Defendants. (Doc.
No. 119.)

Plaintiffs filed a response in opposition to SDCERS'
motion on February 20, 2007. (Doc. No. 124.)
Plaintiffs filed a response in opposition to Aguirre's
motion to dismiss on February 20, 2007. (Doc. No.
125.) Plaintiffs filed a response in opposition to the
City and Individual Defendants' motion to dismiss on
February 20, 2007. (Doc. No. 126.) Plaintiffs filed an
amended response in opposition to KPMG's motion
to dismiss on February 21, 2007. (Doc. No. 128.)

On February 26, 2007, Defendant Aguirre filed a
reply in support of his motion to dismiss. (Doc. No.
129.) KPMG filed a reply in support of its motion to
dismiss on February 26, 2007. (Doc. No. 130.)
SDCERS filed a reply in support of its motion to
dismiss on February 26, 2007. (Doc. No. 131.) Also
on February 26, 2007, the City and Individual
Defendants filed a reply in support of their motion to
dismiss. (Doc. No. 132.)

Pursuant to its discretion under Civil Local Rule
7.1(d)(1), the Court has submitted the motions on the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 959083 (S.D.Cal.)

papers without oral argument. After reviewing the papers and the pertinent portions of the record, and as explained below, the Court **GRANTS** in part and **DENIES** in part Defendant City of San Diego and the Individual Defendants' motion to dismiss; **GRANTS** in part and **DENIES** in part Defendant Aguirre's motion to dismiss; **GRANTS** Defendant SDCERS' motion to dismiss; and **GRANTS** Defendant KPMG's motion to dismiss. Further, as set forth below, the Court grants in part leave to amend. Plaintiffs shall file any amended complaint within 30 days of the date of this order.

### Background

*2 Plaintiffs are active and retired San Diego police officers employed at various times by the City of San Diego. (TAC ¶ 2.) Plaintiffs allege systematic underfunding of the municipal pension system, which has rendered the system actuarially unsound. (*Id.* ¶ 15.)Plaintiffs' lawsuit arises out of the underfunding of the pension fund, and Plaintiffs allege that vested retirement and compensation benefits have been unlawfully eliminated or reduced. (*Id.* ¶¶ 17-31.)Further, Plaintiffs allege that Defendants conspired to cause the system to become actuarially unsound and subsequently conspired to cover up their fraud and the City's liability. (*Id.* ¶ 16.)

Plaintiffs allege that the City engaged in bad faith labor negotiations with Plaintiffs' recognized employee organization, the San Diego Police Officers' Association ("SDPOA"), as part of a scheme to take away vested retirement benefits and compensation. (*Id.* ¶¶ 26-37.)The TAC alleges that various Defendants manipulated pension funds for pet projects and personal gain, which led to the adoption of plans to defer contributions to the pension fund by the City. (*Id.* ¶ 42.)According to Plaintiffs, Defendant Aguirre conspired to facilitate a breakdown in the labor negotiations through acts of inducement and retaliation. (*Id.* ¶ 46.)Further, the TAC alleges that he has taken actions, and conspired to take actions, to reduce and take away Plaintiffs' pension benefits and compensation. (*Id.* ¶¶ 43-58.)Unlike the earlier suit filed by the SDPOA, this action also names KMPG as a Defendant, the accounting firm that the City hired to perform audits. (*Id.* ¶ 9.) Plaintiffs allege that KPMG participated in a conspiracy to conceal the City's wrongful conduct. (*Id.* ¶¶ 59-69.)The TAC also alleges that the City,

Aguirre, City Council Defendants, and City Official Defendants retaliated against Plaintiffs because they did not accept the City's last, best, final offer ("LBFO") in labor negotiations.(*Id.* ¶¶ 70-75.)Plaintiffs allege that the retaliation consisted of salary and benefit reductions and public criticism of the SDPOA. (*Id.*)

In the TAC, Plaintiffs bring federal civil rights claims as well as state law claims against Defendant Aguirre, Defendant City, SDCERS, and KPMG. The TAC also names individual employees and elected officers as Individual Defendants, including current and former members of the San Diego City Council,[FN1] former officials of the City of San Diego,[FN2] and former board members (or trustees) of SDCERS.[FN3]Finally, the TAC names Does 1 through 100 as Defendants. (*Id.* ¶ 10.)Plaintiffs attach several reports and opinions to support the allegations in the TAC.

> FN1. The current City Council Defendants include Toni Atkins Donna Frye, Ralph Inzunza, Jim Madaffer Brian Maienschein, Scott Peters, Tony young, and Michael Zucchet. (TAC 6.) dormer City Council Defendants include Haaathis, Byron Wear, Christinelvehoe, George Stevens, Barbara Warden, Valerie Stallings, Judy McCarty, and Juan Vargas. (*Id.*)

> FN2. The City Official Defendants include Cathy Lexin, Mary Vattimo, Terri Webster, Ed Ryan, Bruce Herring, Lamont Ewell, Michael Uberuaga, and Jack McGrory, who served in executive positions, for example, as the City Manager or Treasurer. (TAC ¶ 7.)

> FN3. The SDCERS Board Member Defendants include Lexin Vattimo Webster, Ryan, and Herring, who are also named in their capacities as City 6fficials. (TAC ¶ 8.)

### Discussion

### A. Legal Standard for Motion to Dismiss

"A complaint should not be dismissed under Rule 12(b)(6) 'unless it appears beyond doubt that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir .1990) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Id.* In ruling on a Rule 12(b)(6) motion, the facts in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir.1996). Conclusory allegations of law, however, will not defeat a motion to dismiss for failure to state a claim. *See, e.g., Miranda v. Clark County,* 279 F.3d 1102, 1106 (9th Cir.2002).

**\*3** "Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."*Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n .19 (9th Cir.1990). The court may, however, consider the contents of documents specifically referred to and incorporated into the complaint. *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994). Plaintiffs' complaint incorporates several reports and opinions to support its allegations of wrongdoing.

In addition, a court ruling on a motion to dismiss may consider facts that are subject to judicial notice. A district court may take judicial notice of matters of public record, but cannot use this rule to take judicial notice of a fact that is subject to "reasonable dispute" simply because it is contained within a pleading that has been filed as a public record. *Lee v. City of Los Angeles,* 250 F.3d 668, 689-90 (9th Cir.2001); *Biagro W. Sales Inc. v. Helna Chemical Co.,* 160 F.Supp.2d 1136, 1140-41 (E.D.Cal.2001) (matters of public record include "pleadings, orders and other papers filed with the court"). Similarly, a court may take judicial notice of the *existence* of a court opinion, but not " 'the truth of the facts recited therein.' " *Lee,* 250 F.3d at 689 (quoting *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.,* 181 F.3d 410, 426-27 (3d Cir.1999)).

## B. Statute of Limitations as to § 1983 Claims

Defendant City, Individual Defendants, SDCERS, and Aguirre argue that Plaintiffs' § 1983 claims,[FN4] other than the First Amendment retaliation claim, are

barred by the applicable two year statute of limitations as to claims premised on MP 1. Plaintiffs oppose.

> FN4. Plaintiffs' § 1983 claims include: Claim One (First Amendment Retaliation); Claim Two (Contracts Clause Violations); Claim Three(violations);akings Clause Violations); Claim Four (14th Amendment Procedural Due Process and Claim Five (Conspiracy to Violate Civil Rights).

In § 1983 actions, the court applies the forum state's statute of limitations applicable to personal injury claims. *Wilson v. Garcia,* 471 U.S. 261, 275, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In California, the statute of limitations for a personal injury claim is two years. *See*Cal.Code Civ. Proc. § 335.1. The accrual of a § 1983 claim is a question of federal law.*Knox v. Davis,* 260 F.3d 1009, 1013 (9th Cir.2001). Under federal law, a § 1983 claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action."*Id.* (quoting *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir.1999)). Plaintiffs filed this action on July 18, 2006. (*See* Doc. No. 1.) Therefore, under the applicable two year statute of limitations, any claims in the Third Amended Complaint must have accrued after July 18, 2004.

In their motion, Defendants point out that the Court already dismissed Plaintiffs' claims based on MP 1 and did not allow leave to amend. Further, Defendants argue that Plaintiffs' amended allegations in the TAC do not salvage the time barred claims. Defendants argue that Plaintiffs' representative, the SDPOA, and SDPOA officials were involved in the implementation of MP 1 and were aware of those proposals' effect upon SDCERS funding levels. Further, Defendants argue that SDCERS board members warned of the consequences of MP1, and they state that information regarding the funding crisis has been publicly available since at least 2002. Accordingly, Defendants argue that the statute of limitations began to run before July 18, 2004, making Plaintiffs' claims time barred. In response, Plaintiffs argue that Defendants fail to identify a specific underfunding date following MP1· to commence the limitations period. Further, they argue that the date they should have known of the injury is a question of fact, and they assert the continuing violation theory.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 959083 (S.D.Cal.)

Next, without discussion, they assert that the complaint alleges fraudulent concealment. Finally, Plaintiffs assert, again without explanation, that Defendants are estopped from asserting statute of limitations as a defense because of an earlier ruling in state court.

*4 In the TAC, Plaintiffs include allegations purportedly tolling the statute of limitations as to MP 1. (TAC ¶¶ 103-11.)According to Plaintiffs, SDCERS, along with the SDCERS board, the City, City Council Defendants, and City Official Defendants, concealed the detrimental effect of MP1 by adopting MP2, which put off the City's required balloon payment. (*Id.* ¶¶ 105-06.)Plaintiffs allege that they did not learn of the damage caused by MP 1 until they became aware of the grand scheme of Defendants in early 2005. (*Id.* ¶ 107.)Further, Plaintiffs allege that rank and file police officers did not become aware of the dangers of MP1 until 2005, even if insiders knew of the consequences earlier. (*Id.* ¶ 106.)

Manager's Proposal 1, or MP1, was implemented in 1996 and contained provisions granting additional retirement benefits while reducing annual funding percentages. (*See, e.g, id.,* Ex. K at 14; Ex. G at 9.) MP1 also contained a provision requiring the City to make a balloon payment if the ratio of fund assets to liabilities fell below 82.3 percent. (*Id.,* Ex. K at 14.) When MP1 was implemented, the plan was more than 90% funded. (*Id.*) After a downturn in the market, however, the funding ratio dropped to 77.3% in Fiscal Year 2002. (*Id.*)

As indicated in the Court's order regarding motions to dismiss the SAC, although Plaintiffs state that they did not know that Defendants were scheming to underfund the pension plan until early 2005, (*see id.* ¶ 107), numerous exhibits Plaintiffs attach to the TAC demonstrate the contrary. Plaintiffs' representative, the SDPOA, was involved in the meet and confer process leading to the implementation of MP1. (*Id.,* Ex. J at 10, 25.) In March 1996, the City Council held a closed session for labor negotiations with three of the City's four unions, including the SDPOA, regarding MP1. (*Id.* at 10.)Additionally, Garry Collins, president of the SDPOA, signed off on MP1 in June 1996. (*See id.* at 28.)Because Plaintiffs' union and the union officials representing Plaintiffs were informed and involved in the meet and confer

process regarding MP1, and because union officials approved MP1, Plaintiffs knew of the implementation of MP 1 at the time. Moreover, a pension board member who voted against MP 1 warned of the risk MP 1 posed to the financial stability of SDCERS at a workshop regarding MP1 held on June 11, 1996. (*Id.* at 37-44.)Specifically, the board member raised concerns about transferring the costs to the next generation, whether there were any standards regarding funding levels available to fiduciaries, and whether the board had a fiduciary duty to assess the City's financial ability to pay for the new benefits.(*Id.* at 37-39.)Further, a public hearing held on June 21, 1996 regarding MP1 addressed whether the pension board needed to determine if the City would be able to meet its obligations under MP 1. (*Id.* at 44.)Even assuming, as Plaintiffs allege, that the consequences of MP1 and MP2 came to light in 2002, that date is still several years prior to the relevant statutory limitations period.

*5 Finally, Plaintiffs provide no discussion regarding their fraudulent concealment and estoppel arguments, and the Court already rejected the estoppel argument in its ruling on motions to dismiss the SAC. Accordingly, the Court rejects these arguments.

In sum, the Court concludes that MP1, implemented in 1996, is too remote in time and clearly outside the statute of limitations period. Plaintiffs knew or should have known of the alleged effect of MP1 prior to July 18, 2004. Accordingly, the Court **GRANTS** Defendants' motion on this ground, and any claims concerning the implementation of MP1 in 1996 are barred by the statute of limitations.

For the same reasons, and as indicated in the Court's previous order regarding motions to dismiss the SAC, the Court **GRANTS** Defendants' motion to dismiss as to the former members of the San Diego City Council and the former city manager whose terms expired by 2002. Any alleged acts by these former City Council members were based on the implementation of MP 1 and their acts are barred by the statute of limitations. These Defendants include Mathis, Wear, Kehoe, Stevens, Warden, Stallings, McCarty, Vargas and former city manager McGrory.

The Court declines to allow Plaintiffs further attempts to amend regarding MP 1. *See, e.g., Royal Ins. Co. of Am. v. Sw. Marine,* 194 F.3d 1009, 1016-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                      Page 5
Slip Copy, 2007 WL 959083 (S.D.Cal.)

17 & n. 9 (9th Cir.1999) (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

**C. Qualified Immunity as to First Amendment Claims**

In the order on motions to dismiss the SAC, the Court granted Defendants' motions to dismiss Plaintiffs' First Amendment retaliation claims on qualified immunity grounds, but granted Plaintiffs leave to amend.[FN5] With regard to the TAC, the Individual Defendants and Aguirre argue that they are entitled to qualified immunity as to Plaintiffs' § 1983 First Amendment retaliation claims. In support, Defendants argue that the Court should find, as it did with regard to the SAC, that Plaintiffs' amended allegations are insufficient to overcome qualified immunity. Plaintiffs oppose.

> FN5. In their reply, the City and Individual Defendants argue that they are entitled to absolute legislative immunity and qualified immunity on Plaintiffs' remaining § 1983 claims. However, Defendants did not assert these arguments in their motion. Further, in the order on motions to dismiss the SAC, the Court denied these Defendants' motions to dismiss on absolute immunity grounds and denied their motion to dismiss the remaining § 1983 claims on qualified immunity grounds.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."*Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).* To establish qualified immunity, a court must first determine whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"*Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).* If a violation of a constitutional right is established, the next question is "whether the right was clearly established."*Id.* That is, "whether it would be clear to a reasonable officer

that his conduct was lawful in the situation he confronted."*Id.* at 202.The United States Supreme Court has noted that a ruling on immunity should be made early in the proceedings. *Id.* at 200.When there are disputed issues of material fact, however, a jury must resolve the factual disputes. *Ortega v. O'Connor, 146 F.3d 1149, 1154 (9th Cir.1998); Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir.1993).*

**\*6** The First Amendment of the United States Constitution provides: "Congress shall make no law ... abridging the freedom of speech ."Regarding the right to association, "[o]ne of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means."*Lyng v. Int'l Union, 485 U.S. 360, 366, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988).* The right to association extends to unions as well as the unions' members and organizers. *Allen v. Medrano, 416 U.S. 802, 819 n. 13, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974).* The right to association encompasses the right of public employees to associate and speak freely and petition openly.*Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 464-65, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979).*

In a First Amendment retaliation claim, a plaintiff must show: "(1) he was subjected to an adverse employment action ..., (2) he engaged in speech that was constitutionally protected because it touched on a matter of public concern and (3) the protected expression was a substantial motivating factor for the adverse action."*Ulrich v. City and County of San Francisco, 308 F.3d 968, 976 (9th Cir.2002)* (citations omitted).

In the TAC, Plaintiffs allege that other labor organizations agreed to new memoranda of understanding with Defendant City, while the SDPOA went to impasse. (TAC ¶ 70.)According to Plaintiffs, Defendant City only imposed a salary reduction against the SDPOA's DROP employees. (*Id.*) Plaintiffs allege that Defendant City, City Council Defendants, City Official Defendants, and Aguirre singled out the SDPOA for not accepting the City's final offer. (*Id.* ¶ 71.)The TAC alleges that LBFO and DROP Plaintiffs were singled out and suffered retaliation because they engaged in protected speech by casting individual union votes against a collectively bargained contract. (*Id.* ¶ 72.)The TAC

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

alleges that all Plaintiffs suffered retaliation in the form of pay reduction or benefit reduction through the unilateral imposition of the 2005 LBFO. Further, Plaintiffs assert that the 2005 LBFO constituted retaliation against both the LBFO Plaintiffs and DROP Plaintiffs because it imposed wages, hours, and working conditions less favorable than those enjoyed previously. (*Id.* ¶ 73.)Plaintiffs also assert that Defendants retaliated against LBFO and DROP Plaintiffs by publicly criticizing the SDPOA. (*Id.* ¶ 74.)Finally, Plaintiffs allege that Defendants retaliated against Plaintiffs by taking at least $100 from the take home pay of each Plaintiff pursuant to the 2005 LBFO. (*Id.* ¶ 75.)

Looking at these allegations, Plaintiffs have not sufficiently remedied the deficiencies indicated by the Court in its order on the motions to dismiss the SAC. While Plaintiffs allege that the individual members engaged in protected speech by associating with the SDPOA and by casting union votes, the connection between the alleged retaliation and each individual Plaintiff's exercise of protected speech, as opposed to that of the SDPOA, is still too attenuated. Plaintiffs have not sufficiently alleged facts indicating that these individual Defendants singled out and punished individual members of the SDPOA for engaging in protected speech. Because the TAC does not sufficiently allege that any individual Defendants took actions that a reasonable official could have believed constituted a violation of each Plaintiff's First Amendment rights, the individual Defendants are entitled to qualified immunity against Plaintiffs' retaliation claim. Accordingly, after fully considering the issue, the Court **GRANTS** the Individual Defendants and Aguirre's motion to dismiss the First Amendment Retaliation claim on qualified immunity grounds. The Court will permit another attempt to amend, but Plaintiffs should remedy the deficiencies noted in this order. *See, e.g., Royal Ins. Co. of Am. ., 194 F.3d at 1016-17 & n. 9* (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

**D. California Tort Claims Act**

*7 The City, Individual Defendants, and Aguirre argue that Plaintiffs' state law claims are barred because Plaintiffs failed to comply with the procedural requirements of the California Tort Claims Act ("CTCA").*See*Cal. Gov't Code § 900 et seq. The Court has already addressed these arguments in its recent order regarding Plaintiffs' compliance with the CTCA. (Doc. No. 120.) Accordingly, the Court **DENIES** Defendants' motion to dismiss the state law claims on this ground.

**E. Violation of Public Policy Under California Government Code § 3502**

The City and Individual Defendants, joined by Aguirre and SDCERS, move to dismiss Plaintiffs' eighth claim, in which they allege a public policy violation under the Meyers-Milias-Brown Act ("MMB Act"), Cal. Gov't Code § 3502. As they argued with regard to the SAC, Defendants contend that this statute does not create a private cause of action. Similarly, Aguirre, joined by the City, Individual Defendants, and SDCERS, also moves to dismiss this claim. He argues that, because the Court did not base its previous dismissal on insufficient pleading, but rather found that Plaintiffs had not established that the statute provides for a private right of action, and because the Court did not provide Plaintiffs with leave to amend, the Court should again dismiss this claim. Plaintiffs oppose, arguing that their claim is not for violation of the MMB Act, but for violation of the public policy embodied in the MMB Act.

Where, as here, a statute does not explicitly provide for a private action, the proponent must show that the legislature intended to create such a right. *See, e.g., Agricultural Ins. Co. v.Super. Ct., 70 Cal.App.4th 385, 399-400, 82 Cal.Rptr.2d 594 (1999).* Moreover, "when neither the language nor the history of a statute indicates an intent to create a new private right to sue, a party contending for judicial recognition of such a right bears a heavy, perhaps insurmountable, burden of persuasion."*Crusader Ins. Co. v. Scottsdale Ins. Co., 54 Cal.App.4th 121, 133, 62 Cal.Rptr.2d 620 (1997).*

The MMB Act provides that employees shall have the right to form, join, and participate in the activities of an employee organization. Looking at the Act, the legislature set forth a statutory and administrative scheme to apply to labor relations with state and local government employees. *See, e.g., Glendale City Employees' Ass'n, Inc. v. City of Glendale, 15 Cal.3d 328, 336, 124 Cal.Rptr. 513, 540 P.2d 609 (1975)*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                Page 7
Slip Copy, 2007 WL 959083 (S.D.Cal.)

("The Legislature designed the [MMB Act] for the purpose of resolving labor disputes."). Further, employees may remedy violations of the MMB Act by either bringing an unfair labor practice charge with the Public Employment Relations Board, see Cal. Gov't Code §§ 3541.3(i) & 3541.5, or by bringing an action for writ of mandate in state court, depending on the type of public employee involved. See, e.g., *Coachella Valley Mosquito and Vector Control Dist. v. Cal. Pub. Employment Relations Bd., 35 Cal.4th 1072, 1077, 29 Cal.Rptr.3d 234, 112 P.3d 623 (2005).* Accordingly, as the Court found in its previous order, Plaintiffs have not met their "heavy burden" of establishing such a right of action based upon a public policy violation. See *Crusader Ins. Co. ., 54 Cal.App.4th at 133, 62 Cal.Rptr.2d 620.*

**\*8** Moreover, the cases to which Plaintiffs direct the Court do not support a tort action based on violation of public policy set forth in the MMB Act. For example, in *Castillo v. Friedman,* the court examined a statute setting forth the duty of care a landlord owes to tenants in conducting an eviction. 243 Cal.Rptr. 206, 197 Cal.App.3d Supp. 6, 14-16 (Cal.App. Dep't Super. Ct.1987). In finding that a tenant could bring a tort action based on violation of the statute, the court determined that this statute belonged to a category of statutes creating a duty or standard of conduct, "the breach of which, where it causes injury, gives rise to liability in tort."*Id. at 14.* Examining the legislative intent, the court held, "[s]uch a tenant is a member of the class for whose benefit the ordinance was enacted, and implication of a private remedy is clearly consistent with the purposes of the ordinance."*Id. at 16.* The California Court of Appeal has indicated that the Restatement (Second) of Torts provides the appropriate rule in determining whether a statute setting forth a duty of care gives rise to a civil remedy for a violation:

When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed fo assure the effectiveness of the provision, accord to an in ured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.

*Middlesex Ins. Co. v. Mann, 124 Cal.App.3d 558, 570, 177 Cal.Rptr. 495 (1981)* (quoting Restatement (Second) of Torts § 874A).

The MMB Act is not similar to the statute setting forth a standard of care in *Castillo,* and it does not meet the test set forth in *Mann.* Rather, as discussed above, employees already have at their disposal means for remedying violations of the MMB Act. Creating a tort remedy for violations of the act is not appropriate and is not required to fulfill the policy behind the statute. Finally, Plaintiffs cite to several unpublished district court opinions in which the courts simply mention, without discussion, that the plaintiffs were bringing claims for violating public policy. These cases do not lend support to Plaintiffs' position.

In sum, the Court **GRANTS** Defendants' motion to dismiss Plaintiffs' Eighth claim for relief. Because the dismissal is not based upon inadequate pleading, the Court declines to allow leave to amend, as amendment would be futile. See, e.g., *Royal Ins. Co. of Am., 194 F.3d at 1016-17 & n. 9* (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

**F. Brown Act, California Government Code § 54950 et seq.**

In their Ninth claim, Plaintiffs allege that Aguirre, the City, Council Members, City Officials, and Doe Defendants violated the Brown Act, Cal. Gov't Code § 54950 et seq., when they held closed session meetings. (TAC ¶¶ 32-41, 165-70.)The City, Individual Defendants, and Aguirre move to dismiss this claim, and Plaintiffs oppose.

**\*9** "The purpose of the Brown Act is to facilitate public participation in local government decisions and to curb misuse of democratic process by secret legislation by public bodies."*Boyle v. City of Redondo Beach, 70 Cal.App.4th 1109, 1116, 83 Cal.Rptr.2d 164 (1999).* The Brown Act requires that local legislative bodies hold "open meetings." *Id.* California Government Code § 54962 provides, "[e]xcept as expressly authorized by this chapter ... no closed session may be held by any legislative body of any local agency."Cal. Gov't Code § 54962. The Brown Act is not limited to gatherings at which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 959083 (S.D.Cal.)

action is taken by the legislative body, but "deliberative gatherings" are also included. *216 Sutter Bay Assocs. v. County of Sutter*, 58 Cal.App.4th 860, 876, 68 Cal.Rptr.2d 492 (1997) (citations omitted)."Deliberation in this context connotes not only collective decisionmaking, but also 'the collective acquisition and exchange of facts preliminary to the ultimate decision.' " *Id.* at 877, 68 Cal.Rptr.2d 492 (quoting *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors*, 263 Cal.App.2d 41, 47-48, 69 Cal.Rptr. 480 (1968)). "To prevent evasion of the Brown Act, a series of private meetings (known as serial meetings) by which a majority of the members of a legislative body commit themselves to a decision concerning public business or engage in collective deliberation on public business would violate the open meeting requirement." *Id.*

Nevertheless, exceptions exist to the prohibition against closed sessions articulated in § 54962, so long as the closed session items are described in accordance with § 54954.5. Section 54957.6, also known as the "labor negotiations exception," provides that the legislative body of a local agency "may hold closed sessions with the local agency's designated representatives regarding the salaries, salary schedules, or compensation paid in the form of fringe benefits of its represented ... employees, and, for represented employees, any other matter within the statutorily provided scope of representation."*Id.* § 54957.6(a). Before these closed sessions, however, "the legislative body of the local agency shall hold an open and public session in which it identifies its designated representatives."*Id.* In addition, a closed session may include discussion regarding any agency's available funds and funding priorities. *Id.* Another exception provides that a closed session may be held to consider "the purchase or sale of particular, specific pension fund investments."*Id.* § 54956 .81. Further, a closed session may be held concerning a conference with legal counsel regarding existing and anticipated litigation. *Id.* § 54956.9.

In the TAC, Plaintiffs allege that closed session meetings leading to the implementation of the 2005 LBFO violated the Brown Act. (TAC ¶ 38-41, 53-55.)Plaintiffs allege that Aguirre and the City Council Defendants met in closed session on or after December 7, 2004. (*Id.* ¶ 53, 69 Cal.Rptr. 480.) Further, Plaintiffs allege that Aguirre met with the

City Council Defendants and City Official Defendants. (*Id.* ¶ 54, 69 Cal.Rptr. 480.) Plaintiffs allege that these closed session meetings were convened illegally and that one of the City Attorney's reports identifies the illegal closed meetings. (*Id.* ¶ 55, 69 Cal.Rptr. 480.) Noting the labor negotiation exception in § 54957.6(a), Plaintiffs allege that this exception does not apply to the meetings among Defendants including Defendant Aguirre because he was never properly designated as a labor negotiator on behalf of the City for collective bargaining. (*Id.* ¶ 38, 69 Cal.Rptr. 480.) Viewing the allegations in the light most favorable to Plaintiffs, they have alleged a claim for violation of the Brown Act by the City Council Defendants.

**\*10** Nevertheless, the Brown Act does not regulate the conduct of persons other than members of the legislative body of local agencies. *See Wolfe v. City of Fremont*, 144 Cal.App.4th 533, 551-52, 50 Cal.Rptr.3d 524 (2006). In *Wolfe*, the California Court of Appeal examined the history and text of the Brown Act and explained that the statute focused on the conduct of legislators. *Id.* at 551, 50 Cal.Rptr.3d 524. Accordingly, the court affirmed the dismissal of claims against the city manager and police chief under the Brown Act. Additionally, the court explained, "in the absence of statutory authority, we reject the argument that we should recognize a civil cause of action for aiding and abetting a Brown Act violation. Given the purpose of the act, there is simply no need for such a claim."*Id.* at 552, 50 Cal.Rptr.3d 524. Therefore, the Brown Act claims against the City Officials and Aguirre fail, and the Court **DISMISSES** the claims against these Defendants without leave to amend. *See, e.g., Royal Ins. Co. of Am.*, 194 F.3d at 1016-17 & n. 9 (when denying leave to amend, court may consider futility of amendment). Moreover, because they left the City Council prior to the 2005 negotiations, the Court **DISMISSES** the Brown Act claims against Defendants Mathis, Wear, Kehoe, Stevens, Warden, Stallings, McCarty, and Vargas without leave to amend. *See, e.g., Id.*The Court **DENIES** Defendants' motion to dismiss as to the remaining City Council Defendants.

### G. Conversion of Trust and Conversion

In Plaintiffs' Twelfth claim, they allege conversion of trust against the City, Council Members, SDCERS,

SDCERS Board Members, and Doe Defendants. The City, Individual Defendants, and SDCERS all seek to dismiss these claims. In Plaintiffs' Thirteenth claim, they allege conversion against the City, Aguirre, Council Members, Officials, SDCERS, SDCERS board members, and Doe Defendants. The City, Individual Defendants, Aguirre, and SDCERS move to dismiss the conversion claim.

"Conversion is the wrongful exercise of dominion over the property of another."*Farmers Ins. Exchange v. Zerin*, 53 Cal.App.4th 445, 451, 61 Cal.Rptr.2d 707 (1997). Conversion contains three elements: (1) plaintiff's ownership or right of possession of the property at the time of conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. *See, e.g., AmerUS Life Ins. Co. v. Bank of Am., N.A.*, 143 Cal.App.4th 631, 642 n. 4, 49 Cal.Rptr.3d 493 (2006) (*quoting Oakdale Village Group v. Fong*, 43 Cal.App.4th 539, 543-44, 50 Cal.Rptr.2d 810 (1996)). "It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use."*Id.* (*quoting Fong*, 43 Cal.App.4th at 544, 50 Cal.Rptr.2d 810). "Where plaintiff neither has title to the property alleged to have been converted, nor possession thereof, he cannot maintain an action for conversion."*Fischer v. Machado*, 50 Cal.App.4th 1069, 1072, 58 Cal.Rptr.2d 213 (1996). Money can be subject to a claim of conversion if it is specifically identified. *Id.* at 452, 58 Cal.Rptr.2d 213. If money is not specifically identified, then the proper action is in contract or for debt. *Baxter v. King*, 81 Cal.App. 192, 194, 253 P. 172 (1927). A party need not demonstrate absolute ownership over the property, it need only show that it is "entitled to immediate possession at the time of conversion."*Farmers Ins. Exchange*, 53 Cal.App.4th at 452, 61 Cal.Rptr.2d 707 (citation omitted). A mere contractual right to payment is not enough. *Id.*

**\*11** Additionally, a cause of action for conversion of trust requires a fiduciary relationship. *See Strasburg v. Odyssey Group, Inc.*, 51 Cal.App.4th 906, 916-17, 59 Cal.Rptr.2d 474 (1996) (conversion of trust funds); *Bennett v. Hibernia*, 47 Cal.2d 540, 561, 305 P.2d 20 (1956) (conversion of trust property). A fiduciary relationship exists between a trustee who administers a pension plan and its beneficiaries.

*Masters v. San Bernardino County Employees Ret. Assn.*, 32 Cal.App.4th at 30, 43-45, 37 Cal.Rptr.2d 860 (1995).

As they did with regard to the SAC, the City and Individual Defendants argue that the Court should dismiss these claims because most Plaintiffs are active officers and are not currently entitled to any pension benefits or retiree medical benefits. Aguirre, joined by the City and Individual Defendants, contends that Plaintiffs cannot plead a cause of action for conversion. Moreover, regarding the DROP Plaintiffs, the City and Individual Defendants contend that these Plaintiffs have received all of the benefits due to them. Thus, these Defendants argue that, at most, Plaintiffs have a contractual right to payment in the future, which is insufficient to state a claim for conversion or conversion of trust.

In the TAC, Plaintiffs allege:

Defendant City, City Council Defendants City Official Defendants and Defendant Aguirre retaliated against eaA and every individually [sic] Plaintiff by illegall taking at least $100 from the take-home pay of each and every Plaintiff pursuant to the illegal 2005 LBFO. Each and every time the City issued Plaintiffs a paycheck subsequent to the implementation of the terms of the 2005 LBFO, the City unlawfully retaliated against each Plaintiff by depriving them of their rightful wages, benefits, and employment rights in existence prior to the 2005 LBFO.

(TAC ¶ 75.) Viewing the allegations in the TAC in the light most favorable to Plaintiffs, they have stated a claim for conversion, as they allege that Defendant City, City Council Defendants, City Official Defendants, and Defendant Aguirre converted money from Plaintiffs' paychecks for their own use.

Additionally, with regard to the conversion of trust claim, the TAC alleges that the City is a fiduciary to Plaintiffs because it has a Constitutional responsibility to fund the pension system in an actuarially sound manner for the sole benefit of Plaintiffs. (*See id.* ¶ 188, 37 Cal.Rptr.2d 860.) Viewing the allegations in the light most favorable to Plaintiffs, they have stated a claim for conversion of trust against the City and City Council Defendants.

Slip Copy
Slip Copy, 2007 WL 959083 (S.D.Cal.)

SDCERS, joined by the Individual Defendants, argues that Plaintiffs have failed to allege that SDCERS has improperly exercised dominion over property to which Plaintiffs had an immediate right of possession. In the conversion of trust claim, Plaintiffs allege that Defendants breached their fiduciary duty by allowing Defendant City to divert funds for unlawful uses. (TAC ¶ 185.)Further, Plaintiffs allege that SDCERS refused to enforce the City's obligation to fund the pension system. (*Id.* ¶ 186, 37 Cal.Rptr.2d 860.) With regard to the conversion claim, Plaintiffs' allegations focus on the acts of the City, City Council Defendants, City Official Defendants, and Aguirre. (*Id.* ¶¶ 75, 192, 37 Cal.Rptr.2d 860.) Viewing the allegations in the TAC in the light most favorable to Plaintiffs, they have failed to allege that SDCERS or SDCERS Board Defendants assumed control or ownership over property to which Plaintiffs had an immediate right to possession or that it applied Plaintiffs' property to its own use. *See AmerUS Life Ins. Co.,* 143 Cal.App.4th at 642 n. 4, 49 Cal.Rptr.3d 493 (*quoting Fong,* 43 Cal.App.4th at 544, 50 Cal.Rptr.2d 810). In ruling on motions to dismiss the SAC, the Court ruled that, to the extent Plaintiffs attempted to construe their conversion claims against SDCERS as being based on knowing receipt of stolen property, those claims failed. In the TAC, in the conversion of trust claim, Plaintiffs allege that SDCERS knew or should have known that it received stolen funds and that SDCERS looked the other way when the City gave it stolen funds. (TAC ¶ 187.)Taking these allegations as true for purposes of a motion to dismiss, Plaintiffs still do not allege that SDCERS or SDCERS Board Members converted any money for their own use or deprived Plaintiffs of that money. Indeed, Plaintiffs do not allege that SDCERS used any contributions from the City for anything other than for the benefit of SDCERS' members. Accordingly, Plaintiffs' conversion claims against SDCERS and SDCERS Board Defendants fail.

**\*12** In sum, the Court **DENIES** Aguirre's motion to dismiss the conversion claim. The Court **GRANTS** SDCERS' and SDCERS Board Members' motions to dismiss the conversion and conversion of trust claims with prejudice. Further, the Court **DENIES** the City and remaining Individual Defendants' motions to dismiss the conversion and conversion of trust claims. Finally, the Court declines to allow further attempts to amend. *See, e.g., Royal Ins. Co. of Am.,* 194 F.3d at 1016-17 & n. 9 (when denying leave to

amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

**H. Fraud**

In their Fourteenth claim, Plaintiffs bring an action for fraud against the City, Council Members, City Officials, and Doe Defendants. The City and Individual Defendants, joined by Aguirre, move to dismiss this claim, arguing that Plaintiffs have failed to plead fraud adequately. Plaintiffs oppose.

Under California law, a plaintiff must plead: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages ."*Okun v. Morton,* 203 Cal.App.3d 805, 828, 250 Cal.Rptr. 220 (1988). A defendant must fully understand the nature of the charge.*Stansfield v. Starkey,* 220 Cal.App.3d 59, 73, 269 Cal.Rptr. 337 (1990). Plaintiff must allege "how, when, where, to whom, and by what means the representations were tendered."*Id.* (citation omitted). Additionally, under Rule 9 of the Federal Rules of Civil Procedure, a claim of fraud "shall be stated with particularity." Fed.R.Civ.P. 9(b).

Looking at the TAC, Plaintiffs have failed to remedy the deficiencies noted by the Court in its order on motions to dismiss the SAC. Specifically, Plaintiffs fail to allege fraud with particularity. For example, Plaintiffs allege: "During labor negotiations that lead [sic] to the adoption of the 2003-2005 MOU, the City's labor negotiator represented to LBFO-Plaintiffs' employee representatives from the SDPOA that the City agreed to pick-up 10% of the contributions those Plaintiffs were required to make to SDCERS in lieu of paying those Plaintiffs a wage increase."(TAC ¶ 196.)Plaintiffs also allege: "In reliance upon these representations, the SDPOA presented LBFO-Plaintiffs with the City's pick-up offer instead of a salary increase, which was agreed upon.... Defendants knew these representations to be false and untrue when they were made to the SDPOA's leadership by the City's labor negotiator."(*Id.* ¶ 197, 269 Cal.Rptr. 337.) The TAC fails, however, to state with particularity when these representations were allegedly made and the content of some of the representations. Further, Plaintiffs fail to allege sufficient facts to support their position that

Defendants knew these representations were false. Indeed, the allegations in the TAC are nearly identical to those the Court found insufficient in the SAC.

**\*13** In sum, the allegations to which Plaintiffs direct the Court fail to specify sufficiently "how, when, where, to whom, and by what means the representations were tendered." *See Stansfield, 220 Cal.App.3d at 73, 269 Cal.Rptr. 337.* Accordingly, the Court **GRANTS** Defendants' motion to dismiss as to fraud, but will grant 30 days leave to amend. Plaintiffs must cure the deficiencies in any amended complaint. *See, e.g., Royal Ins. Co. of Am., 194 F.3d at 1016-17 & n. 9* (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

## I. Breach of Contract

In their Fifteenth claim, Plaintiffs bring a breach of contract action against Defendant City and SDCERS. In its order on motions to dismiss the SAC, the Court denied the City's motion to dismiss the breach of contract claim, but granted SDCERS' motion to dismiss with leave to amend. Defendant SDCERS, joined in part by the City and Individual Defendants, moves to dismiss this claim, again arguing that Plaintiffs have failed to allege specific contracts between Plaintiffs and SDCERS that SDCERS has breached. Plaintiffs oppose.

In a breach of contract claim, a plaintiff must allege (1) a contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages. *McDonald v. John P. Scripps Newspaper, 210 Cal.App.3d 100, 104, 257 Cal.Rptr. 473 (1989).* A third-party beneficiary, who is not a signatory to a contract, may sue for breach of contract if the contract was made for his or her direct benefit. *Tyler v. Cuomo, 236 F.3d 1124, 1135 (9th Cir.2000).*

As they did in the SAC, Plaintiffs allege that SDCERS breached several agreements. In allegations identical to those in the SAC, Plaintiffs allege that the

aforementioned conduct of the City and SDCERS constitutes a breach of multi-party agreements with Plaintiffs and contracts for which they are third-party beneficiaries including but not limited to successive

MOUs, the City Charter and Municipal Code, the retirement system trust documents, agreements between the City and SDCERS delaying full funding of the City's obligations to the retirement system, and Section 218 agreements.

(TAC ¶ 202.)Looking at the alleged sources of contract rights in the TAC, Plaintiffs have not alleged a contract between Plaintiffs and SDCERS that SDCERS has breached. Similarly, Plaintiffs do not allege a contract between SDCERS and another party under which Plaintiffs may bring suit as third party beneficiaries.

### 1. Successive MOUs

Concerning the memoranda of understanding, Plaintiffs do not allege that SDCERS was a party to any of these agreements. For example, with regard to the latest MOU, Plaintiffs allege that "[t]he last memorandum of understanding in effect between SDPOA and the City was from July 1, 2003 through June 30, 2005 ("MOU"), and contained an internal grievance procedure that has at all relevant times been inadequate and futile."(*Id.* ¶ 22.)Thus, because Plaintiffs allege that the MOUs were between the SDPOA and the City, they cannot form a basis for a breach of contract action against SDCERS. *See, e.g., Gold v. Gibbons, 178 Cal.App.2d 517, 519, 3 Cal.Rptr. 117 (1960)* ("Breach of contract cannot be made the basis of an action for damages against defendants who did not execute it and who did nothing to assume its obligations.").

### 2. The City Charter and Municipal Code

**\*14** Plaintiffs provide few allegations regarding how these pieces of legislation create enforceable contract rights between each Plaintiff and SDCERS. In the TAC, Plaintiffs allege:

Defendant Aguirre admits, "SDCERS operates as a trust under California law."Defendant Aguirre also admits, "there is no 'trust' document beyond the Munici al Code sections that discuss the SDCERS fund."SDCERS entered into a contract with each Plaintiff upon commencement of emplo ment by each Plaintiff. Under that trust document contract SDCERS is required to perform by managing and administering the fund for the sole and exclusive benefit of Plaintiffs and other SDCERS members and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

beneficiaries. Plaintiffs are required to perform by carrying out their employment responsibilities with the City and contributing funds to the system. By nature of the trust relationship, SDCERS is Plaintiffs' fiduciary.

(TAC ¶ 50.)Nowhere in the TAC, however, do Plaintiffs identify provisions of the City Charter and Municipal Code that SDCERS has allegedly breached. Thus, as indicated in its order on motions to dismiss the SAC, Plaintiffs have failed to allege sufficiently a contract claim based on these legislative acts.

As a general rule, a statutory scheme does not create contractual rights. *See, e.g., Walsh v. Bd. of Admin.,* 4 Cal.App.4th 682, 697, 6 Cal.Rptr.2d 118 (1992) ("Thus, it is presumed that a statutory scheme is not intended to create private contractual or vested rights and a person who asserts the creation of a contract with the state has the burden of overcoming that presumption."). Under California law, however, the courts have indicated "a strong preference for construing governmental pension laws as creating contractual rights for the payment of benefits."*Id.* at 698, 6 Cal.Rptr.2d 118. In *Board of Administration v. Wilson,* the California Court of Appeal examined whether legislative changes to a statutorily created pension system for state workers amounted to an unconstitutional impairment of contract. *Bd. of Admin. v. Wilson,* 52 Cal.App.4th 1109, 61 Cal.Rptr.2d 207 (1997). The retirement system board brought a mandamus action against the governor challenging the legislative changes, arguing that the enactments violated the state and federal prohibitions on impairment of contract. *Id.* at 1117-18, 61 Cal.Rptr.2d 207. The court concluded that state employees had a contractual right to an actuarially sound retirement system and determined that the alterations amounted to unconstitutional impairments of contract. *Id.* at 1131-44, 61 Cal.Rptr.2d 207. The court did not examine whether a legislatively created pension system could form the basis for a breach of contract action, however, and it did not examine whether pension statutes could create enforceable contract rights between the pension system itself and employees. Accordingly, the cases to which Plaintiffs direct the Court do not support a breach of contract claim against SDCERS. Further, to the extent Plaintiffs seek to hold SDCERS liable for breach of contract solely because it is the only entity capable of

providing an actuarially sounds pension system, they have not explained how this comports with the requirement under California law that "[b]reach of contract cannot be made the basis of an action for damages against defendants who did not execute it and, who did nothing to assume its obligations."*Gold v. Gibbons,* 178 Cal.App.2d 517, 519, 3 Cal.Rptr. 117 (1960).

### 3. Retirement System Trust Documents

**\*15** Next, the TAC references retirement system trust documents as a source of agreements allegedly breached by SDCERS. (*See*TAC ¶ 202.) As in the SAC, however, Plaintiffs do not specify particular provisions of trust documents, and in fact, they do not identify which trust documents SDCERS has allegedly breached. Accordingly, Plaintiffs' vague reference to retirement system trust documents are insufficient to state a breach of contract claim against SDCERS.

### 4. Agreements between the City and SDCERS Delaying Full Funding of the City's Obligations

Plaintiffs also allege that SDCERS has breached "agreements between the City and SDCERS delaying full funding of the City's obligations."(*Id.*) Plaintiffs have not explained to which agreements this allegation refers. Accordingly, this allegation fails to state a claim for breach of contract against SDCERS.

### 5. Section 218 Agreements

Plaintiffs also list Section 218 agreements as a source of contract rights.(*Id.*) Plaintiffs allege that, in 1981, the municipal workers of the City voted to replace Social Security benefits in return for the City providing medical benefits to retirees. (*Id.* ¶ 80, 3 Cal.Rptr. 117.) According to Plaintiffs, the City, state, and federal government entered into an agreement, pursuant to Section 218 of the Social Security Act, 42 U.S.C. § 418, to replace Social Security benefits in return for the City providing Retiree Medical Benefits for which contributions would be administered by SDCERS.(*Id.*) Plaintiffs attach to the TAC a copy of the Section 218 agreement, which is signed by the City and the State of California. (*Id.,* Ex. S.) Because neither Plaintiffs nor SDCERS are parties to the Section 218 agreement, however, Plaintiffs cannot state a breach

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                           Page 13
Slip Copy, 2007 WL 959083 (S.D.Cal.)

of contract claim against SDCERS based on this agreement. *See Gold*, 178 Cal.App.2d at 519, 3 Cal.Rptr. 117 ("Breach of contract cannot be made the basis of an action for damages against defendants who did not execute it and who did nothing to assume its obligations.").

## 6. Plaintiffs' Claims as Third Party Beneficiaries

Finally, Plaintiffs allege that they are third party beneficiaries to agreements between the City and SDCERS. (*See, e.g.,*TAC ¶ 202.) As noted above, however, Plaintiffs have not directed the Court to any agreements to which SDCERS is a party. Accordingly, Plaintiffs cannot state a claim for breach of contract against SDCERS as third party beneficiaries. Further, Plaintiffs have not provided any legal support for their argument that the California Constitution creates a contract between the City and SDCERS enforceable by Plaintiffs. Finally, as noted above, to the extent Plaintiffs seek to hold SDCERS liable for breach of contract because it is the only entity capable of providing an actuarially sounds pension system, they have not explained how this comports with the requirement under California law that "[b]reach of contract cannot be made the basis of an action for damages against defendants who did not execute it and who did nothing to assume its obligations."*Gold*, 178 Cal.App.2d at 519, 3 Cal.Rptr. 117.

**\*16** In sum, the Court **GRANTS** SDCERS motion to dismiss the breach of contract claim against it. Further, because Plaintiffs have had several opportunities to amend this claim, but still rely on the same alleged sources for the contractual rights as stated in the SAC, the Court declines to allow leave to amend. *See, e.g., Royal Ins. Co. of Am.*, 194 F.3d at 1016-17 & n. 9 (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

## J. Interference with Contractual Relations

In their Sixteenth claim, Plaintiffs bring an action for interference with contractual relations against the City, Aguirre, Council members, City Officials, SDCERS, SDCERS Board Members, KPMG, and the Doe Defendants. All Defendants move to dismiss this claim. Plaintiffs oppose.

To state a claim for interference with contractual relations, a plaintiff must show "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages."*Sole Energy, Co. v. Petrominerals Corp.*, 128 Cal.App.4th 212, 237-38, 26 Cal.Rptr.3d 798 (2005). In an action for inducing a breach of contract, an action may not be brought against a party to the contract. *Dryden v. Tri-Valley Growers*, 65 Cal.App.3d 990, 999, 135 Cal.Rptr. 720 (1977). If such an action is brought, it is in essence a breach of contract claim. *Id.*

Defendant City, Individual Defendants, SDCERS, and KPMG contend that the TAC fails to identify the contracts with which they allegedly interfered and fails to specify which Defendants are the contracting parties. Further, Defendants highlight that Plaintiffs' allegations in the TAC are virtually identical to those held insufficient in the SAC. Plaintiffs oppose.

Examining the TAC, other than adding a claim against Defendant Aguirre, the allegations are the same as those in the SAC. (*Compare*TAC ¶ 205 with SAC ¶ 155.) In the TAC, Plaintiffs allege:

Defendant Aguirre, Defendant City, City Council Defendants City Official Defendants, SDCERS, SDCERS Hoard Defendants, KPWG and Does were aware Plaintiffs are parties to or beneficiaries of the contracts and multi-party agreements alleged above, and Defendants' aforementioned conduct intentionally and purposefully interfered with these contracts, third-party beneficiary rights and multi-party agreements.

(TAC ¶ 205.)With regard to Aguirre, Plaintiffs additionally allege that he interfered with the SDPOA's membership agreements, the 2003 -2005 MOU between the SDPOA and the City, and the trust agreement with SDCERS. (*Id.* ¶ 48, 135 Cal.Rptr. 720.) Further, Plaintiffs allege that he impaired the City's contractual obligations to Plaintiffs. (*Id.* ¶ 35, 135 Cal.Rptr. 720.)

As before, other than in the allegations relating to Aguirre, Plaintiffs do not specify the particular

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

contracts with which Defendants allegedly interfered. Further, Plaintiffs do not correlate allegedly wrongful conduct on the part of particular Defendants to interference with particular contracts. Moreover, Plaintiffs do not allege that any particular Defendant proximately caused any particular contractual disruption. Instead, Plaintiffs improperly group all Defendants together in their interference with contractual relations claim.[FN6](*Id.* ¶ 205, 135 Cal.Rptr. 720.) Accordingly, Plaintiffs have failed to plead sufficiently the elements of a claim for interference with contractual relations against Defendants. Moreover, as noted in the Court's order regarding motions to dismiss the SAC, Plaintiffs' allegations do not provide a short and plain statement of the claim sufficient to provide each Defendant with fair notice of Plaintiffs' claim and the grounds on which the claim is based. *See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Accordingly, the Court **DISMISSES** Plaintiffs' Interference with Contractual Relations claim as to all Defendants. Additionally, because the Court has previously provided Plaintiffs with an opportunity to amend this claim, and because Plaintiffs failed to make substantive changes to the claim in the TAC, the Court declines to allow leave to amend. *See, e.g., Royal Ins. Co. of Am.,* 194 F.3d at 1016-17 & n. 9 (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

> FN6. As previously noted in the order on motions to dismiss the SAC, undifferentiated pleading against multiple defendants is improper. *See, e.g., In re Sagent Tech., Inc.,* 278 F.Supp.2d 1079, 1094 (N.D.Cal.2003) ("[T]he complaint fails to state a claim because plaintiffs do not indicate which individual defendant or defendants were responsible for which alleged wrongful act. Plaintiffs plead no facts showing how defendants that joined the board in late 2000 or in 2001 could be responsible for events that occurred in 1999, or how defendants that left Sagent in 2000 could have any connection with actions taken or not taken, in 2001."); *Gauvin v. Trombatore,* 682 F.Supp. 1067, 1071 (N.D.Cal.1988) (lumping together multiple defendants in one broad allegation fails to

satisfy notice requirement of Fed.R.Civ.P. 8(a)(2)).

**K. First Amendment Retaliation as to Aguirre**

*17 Aguirre, joined by the City and Individual Defendants, argues that the TAC does not state a First Amendment Retaliation claim against him. As discussed above, however, the Court dismisses the First Amendment claim against Aguirre on qualified immunity grounds.

**K. Conspiracy**

To state a claim for conspiracy under § 1983, a plaintiff must allege an agreement or meeting of the minds to violate constitutional rights. *See, e.g., Mendocino Envtl. Ctr. v. Mendocino County,* 192 F.3d 1283, 1301 (9th Cir.1999). The defendants must have intended to accomplish, by some concerted action, an unlawful objective for the purpose of harming another, which results in damage. *Id.* To be liable, each participant need not know the exact details of the plan, but must at least share in the common objective of the plan. *Id.* (citing *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1540 (9th Cir.1989)). To state a claim for a conspiracy to violate one's constitutional rights under § 1983, a "plaintiff must state specific facts to support the existence of the claimed conspiracy."*Burns v. County of King,* 883 F.2d 819, 821 (9th Cir.1989). A plaintiff meets this heightened pleading standard if she alleges "which defendants conspired, how they conspired and how the conspiracy led to a deprivation of his constitutional rights...."*Harris v. Roderick,* 126 F.3d 1189, 1196 (9th Cir.1997). The Ninth Circuit has recently reiterated that a plaintiff must plead "specific facts" to support a conspiracy allegation. *Olsen v. Idaho Bd. of Medicine,* 363 F.3d 916, 929 (9th Cir.2004); *see also Jones v. Tozzi,* 2006 WL 2472752, *13 n. 6 (E.D.Cal. Aug.24, 2006) ("The heightened pleading standard as applied to conspiracy cases does appear to still be good law in the Ninth Circuit.").

**1. Conspiracy as to Aguirre**

Aguirre, joined by the City and Individual Defendants, argues that the TAC demonstrates that, as a matter of law, there is no single conspiracy involving Aguirre and the other Defendants. Further,

Slip Copy
Slip Copy, 2007 WL 959083 (S.D.Cal.)

Page 15

Aguirre argues that Plaintiffs cannot plead a cover up conspiracy involving Aguirre and other Defendants. Accordingly, Aguirre moves to dismiss Plaintiffs' claim against him for conspiracy to violate civil rights under 42 U.S.C. § 1983. Plaintiffs oppose.

As previously indicated in the order on motions to dismiss the SAC, the documents Plaintiffs attach to the TAC are inconsistent with conspiracy allegations as to Aguirre. Moreover, allegations in certain parts of the TAC are inconsistent with allegations in other portions of the pleading. As in the SAC, Plaintiffs again allege in the TAC: "As City Attorney, Defendant Aguirre admits that Defendant City, City Council Defendants, City Official Defendants, SDCERS Board Defendants, and SDCERS conspired to commit and indeed committed numerous breaches of fiduciary duties, as set forth in various writings posted by Defendant Aguirre[.]" (TAC ¶ 43.)Plaintiffs incorporate by reference and attach to the TAC several writings by the City Attorney relating to the pension crisis. (Id . Exs. F-J, & L.) These documents indicate that Aguirre has brought to light the facts and circumstances leading up to the pension crisis. Also in the documents, Aguirre connects individuals to alleged misconduct giving rise to the pension crisis. In line with these documents, Plaintiffs allege:

**\*18** Defendant Aguirre has acknowledged that one of the primary factors that caused the retirement system financial crisis is the conduct of the individual Defendants who used retirement system funds ... to fulfill other financial obligations. Defendant Aguirre also acknowledges that the UAAL has been aggravated by those individual Defendants' use of the "waterfall provision" ... to improperly divert funds for purposes unrelated to the retirement system.

(Id. ¶ 44.)Further, Plaintiffs allege: "The City Attorney's reports, as referenced, admit that there was a conspiracy among various individual Defendants who have committed numerous breaches of fiduciary duty, fraud, and concealment."(Id. ¶ 45.)

In these portions of the TAC, Plaintiffs rely on, and make allegations consistent with, the attached documents prepared by the City Attorney. Nevertheless, even though they rely on his reports of investigations into the pension crisis as the factual basis for many of their allegations, Plaintiffs allege

that Aguirre conspired with these same Defendants. (Id. ¶¶ 45, 46, 51-57.)Further, Plaintiffs allege that the conspiracy, which began as a conspiracy to cause the pension system to be actuarially unsound, eventually morphed into a scheme to cover up the City's financial condition. (Id. ¶ 16.)Plaintiffs allege that "KPMG and the other defendants have conspired to willfully conceal the City's wrongful, fraudulent, and illegal conduct."(Id. ¶ 69.)Contrary to a scheme involving both Aguirre and KPMG, however, Plaintiffs' allegations include quotes from Aguirre in which he criticizes KPMG, stating that "KPMG has absolutely no further excuse to allow them further delay," and that KPMG "breached its fundamental duty to the city of San Diego."(Id. ¶ 62.)

In sum, Plaintiffs' conspiracy allegations as to Aguirre are inconsistent with the documents they attach to the complaint and upon which they rely for many of their conspiracy allegations. Further, their allegations regarding Aguirre taking part in a conspiracy with KPMG to conceal the City's financial condition are inconsistent with other allegations included in the TAC. Accordingly, the Court concludes that Plaintiffs have failed to state a claim for conspiracy to violate civil rights against Aguirre. Thus, the Court **GRANTS** Defendant Aguirre's motion to dismiss on this ground, but will allow one more opportunity to amend this claim to cure the deficiencies of the TAC. See, e.g., Royal Ins. Co. of Am., 194 F.3d at 1016-17 & n. 9 (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

## 2. Conspiracy as to SDCERS

SDCERS, joined by the City and Individual Defendants, argues that the SAC fails to plead facts sufficient to state a conspiracy claim against SDCERS. Plaintiffs oppose.

Looking at the SAC, Plaintiffs have again failed to meet the heightened pleading standard regarding conspiracy against SDCERS. In the TAC, Plaintiffs allege: "Unless otherwise indicated, each Defendant conspired, committed, ordered, directed, supervised, allowed, planned, ratified, concealed, organized, acted in concert with, or otherwise participated in one or more of the unlawful acts alleged in this complaint."(TAC ¶ 93.)Further, the TAC alleges:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*19** Defendants entered into agreements and conspired to eliminate and/or reduce retirement benefits including reducing the various vested retirement benefits owed to Plaintiffs. Such conspiracy took place, and continues in effect for the purpose of seeking to reduce and/or eliminate retirement benefits owed to Plaintiffs to use retirement system monies to fund other obligations or for self-dealing or personalain, to avoid making legally mandated funding contributions, to facile-fate the City's economic gain and the political gain of one or more of the individual Defendants, to cover up the breach of fiduciary duty of SDCERS Board Defendants who participated in the City's under-funding schemes and to conceal this initial conspiracy by refusing to release complete and accurate financial audits for the years beginning with 2003.

(*Id.* ¶ 94.)As in the SAC, Plaintiffs do not clarify with which Defendants SDCERS has allegedly conspired. Further, Plaintiffs have not alleged when SDCERS entered into any conspiratorial agreements, how it entered into the conspiracy, and how it participated in the conspiracy. The vague and conclusive allegations in the TAC as to SDCERS are insufficient to state a conspiracy claim. Accordingly, the Court **GRANTS** SDCERS' motion to dismiss on this ground, but the Court will allow leave to amend to cure the deficiencies in the TAC. *See, e.g., Royal Ins. Co. of Am.,* 194 F.3d at 1016-17 & n. 9 (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

## M. Section 1983 Claims as to KPMG

To maintain a § 1983 civil rights action, a plaintiff must allege: "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right."*Balistreri,* 901 F.2d at 699. Additionally, where the defendant is a private entity, a plaintiff must allege "that there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (*quoting Jackson v. Metro. Edison Co.,* 419 U.S. 345, 349, 95

S.Ct. 449, 42 L.Ed.2d 477 (1974)). The Ninth Circuit has recognized several approaches to conducting the state action determination. *George v. Pacific-CSC Work Furlough,* 91 F.3d 1227, 1230 (9th Cir.1996); *see also Lee v. Katz,* 276 F.3d 550, 554 (9th Cir.2002) (in light of Brentwood Academy, noting that satisfaction of one approach may be sufficient to find state action, absent countervailing considerations). First, a private entity's action may constitute state action where the action is traditionally and exclusively performed by the State. *Id.* Second, under the nexus approach, state action may be found where the state is extremely connected to the challenged action. *Id.* at 1230-31.Third, under the joint action approach, private actors can be state actors if they willfully participate in joint action with the state. *Id.* at 1231.Finally, under the state compulsion approach, a private entity acts as the state when some state law or custom requires a certain course of action. *Id.* at 1232.With all of the approaches, identifying the challenged action is important, as an entity may be a state actor for some purposes, but not for others. *See, e.g, Lee,* 276 F.3d at 555 n. 5 (citing George, 91 F.3d at 1250).

**\*20** KPMG argues that, because it is a private entity, Plaintiffs' § 1983 claims against it [FN7] must fail, as Plaintiffs have not alleged sufficiently that it engaged in any state action. Further, KPMG argues that, because Plaintiffs have failed to materially amend the allegations against it, the Court should dismiss the claims as it did with regard to those in the SAC. In response, Plaintiffs make several arguments. First, Plaintiffs state that KPMG is performing a public function, as the City is required to perform the auditing services it delegated to KPMG. Further, Plaintiffs argue that the question of whether KPMG is performing a public function is a question of fact. Second, Plaintiffs maintain that KPMG should be considered a state actor because it meets the joint action test described above. Third, Plaintiffs contend that they have alleged a civil rights conspiracy involving KPMG.

FN7. Plaintiffs bring two § 1983 claims against KPMG in the TAC: (1) violation of the Contracts Clause, art. I, § 10; and (2) conspiracy to violate civil rights. In their response in opposition to KPMG's motion, however, Plaintiffs argue that they have alleged facts sufficient to state a cause of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

action against KPMG for violating Plaintiffs' procedural due process rights. In the TAC Plaintiffs do not allege a procedural due process claim against KPMG. (*See* TAC ¶ t 141-48.) In any event as discussed, the ourt dismisses Claintiff's § 1983 claims against KPMG because Plaintiffs have not alleged that KPMG is a state actor.

Under the public function analysis, Plaintiffs have not alleged, and the cases to which they cite do not hold, that the auditing and accounting services at issue are functions traditionally and exclusively performed by the State. Cf. *Lee*, 276 F.3d at 554 (regulating speech in public forum is both traditional and exclusive public function). Instead, the TAC and documents Plaintiffs attach to the complaint indicate that KPMG was hired to perform an independent audit of financial statements. In support of their contention, Plaintiffs cite portions of the San Diego City Charter requiring the City to conduct auditing duties. (*See, e.g.,* TAC ¶¶ 66-67.) Most of these references, however, relate to internal auditing and accounting functions. (*See Id.* ¶ 66 (*citing* San Diego City Charter, art. VII, §§ 89 & 112).) Further, Plaintiffs cite to a sentence from art. VII, § 111 of the City Charter to support their argument that KPMG is performing a public function: "Each year the Council shall provide that an audit shall be made of all accounts and books of all the Departments of the City" (*See Id.* ¶ 66.) The next sentence of § 111, however, which Plaintiffs omit from the TAC, states: "Such audit shall be made by independent auditors who are in no way connected with the City." San Diego City Charter, art. VII, § 111. Further, Plaintiffs allege elsewhere in the TAC, as well as in the exhibits attached to the pleading, that KPMG was engaged as an outside auditor. (*See, e.g.,* TAC ¶¶ 5, 60, 67 (purpose and scope of audit); Ex. X at 12-15 (KPMG retained as outside auditor).) In short, as with regard to the SAC, because Plaintiffs have failed to explain why the auditing and accounting services at issue are those traditionally and exclusively performed by the state, they have failed to allege that KPMG is a state actor under the public function test.

Under the joint action approach, as in the SAC, Plaintiffs have not alleged in the TAC that "the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged

activity.'" *Gorenc v. Salt River Project Agric. Improvement & Power Dist.,* 869 F.2d 503, 506 (9th Cir.1989) (citing *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)). In support, Plaintiffs state that the agents and representatives of the City currently under investigation or indictment are benefitting from KPMG's delay in issuing its audit. Further, Plaintiffs contend that the City is benefitting as well because it will have to indemnify the individuals as to damages resulting from their performance of employment duties for the City. Contrary to Plaintiffs' arguments, however, the TAC alleges that City officials have complained about the timing of the KPMG audit. (*See, e.g.,* TAC ¶¶ 62-64.) Further, as noted above, the exhibits Plaintiffs attach to the complaint indicate that the City hired KPMG to perform an independent audit of financial statements. Finally, although Plaintiffs cite to one of this Court's orders regarding allegations as to the City in *San Diego Police Officers' Association v. Aguirre,* those rulings are not germane to the issue of whether KPMG is a state actor for purposes of stating a claim under § 1983.

*21 Plaintiffs also assert that conspiracy allegations in the TAC demonstrate that KPMG was a joint participant with the City, and thus, should be considered a state actor. As with regard to the SAC, however, these conspiracy allegations do not detail actions by KPMG, and even assuming they sufficiently allege a conspiracy involving some Defendants, they do not connect KPMG to the allegations making up Plaintiffs' constitutional violations. Further, as just noted, rulings by this Court as to the sufficiency of conspiracy allegations against the City in *San Diego Police Officers' Association v. Aguirre* have little relevance to the question of KPMG's status as a state actor.

Finally, Plaintiffs do not argue that KPMG is a state actor under the nexus or coercion tests. Accordingly, under any of the approaches described above, Plaintiffs have not alleged a relationship between the challenged funding actions and KPMG, let alone such a close connection that "seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Academy,* 531 U.S. at 295. Taking the

allegations as true for purposes of this motion to dismiss, they fall short of showing the close

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

relationship necessary to consider KMPG a state actor for purposes of § 1983 liability. Therefore, the Court **DISMISSES** Plaintiffs' § 1983 claim against KPMG based upon alleged violations of the Contracts Clause without leave to amend. *See, e.g., Royal Ins. Co. of Am.,* 194 F.3d at 1016-17 & n. 9 (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

Regarding Plaintiffs' § 1983 conspiracy claim against KPMG, as discussed above, to state a claim for a conspiracy to violate one's constitutional rights under § 1983, a "plaintiff must state specific facts to support the existence of the claimed conspiracy."*Burns,* 883 F.2d at 821;*Olsen,* 363 F.3d at 929. To meet this standard, a plaintiff must allege "which defendants conspired, how they conspired and how the conspiracy led to a deprivation of his constitutional rights...."*Harris,* 126 F.3d at 1196. Private parties may be held liable under § 1983 for conspiracy to violate civil rights "if they willfully participate in joint action with state officials to deprive others of constitutional rights."*Phelps Dodge Corp.,* 865 F.2d at 1540. In addition to the general pleading requirements for conspiracy claims, to allege sufficiently a conspiracy between state actors and a private party, a plaintiff must demonstrate "an agreement or meeting of the minds to violate constitutional rights."*Id.* at 1540-41 (quotations omitted); *Mendocino Envtl. Ctr.,*192 F.3d at 1301(*quoting Phelps Dodge Corp.).* To be liable, "each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."*Phelps Dodge,* 865 F.2d at 1541.

**\*22** KPMG argues that the Court should dismiss the § 1983 conspiracy claim because Plaintiffs have failed to meet the heightened pleading requirement for conspiracy. Further, KPMG argues that Plaintiffs' additional allegations in the TAC demonstrate that Plaintiffs' conspiracy claim against KPMG must fail. Plaintiffs oppose, arguing that they have stated a claim and largely relying on this Court's rulings as to the sufficiency of conspiracy allegations against the City in *San Diego Police Officers' Association v. Aguirre.*

Looking at the allegations in the TAC, Plaintiffs have failed to set forth a conspiracy claim against KPMG.

As in the SAC, Plaintiffs allege that KPMG and the City conspired to conceal the City's "true assets, liabilities, misrepresentations, fraud and misconduct."(TAC ¶ 9; *see also id.* ¶ 69.)Plaintiffs do not plead any facts to support this assertion, however. Similarly, Plaintiffs allege that KPMG and the City had a "meeting of the minds," (*id.* ¶ 69), but they do not allege any facts indicating an agreement to delay issuance of the audit report. Rather, the allegations Plaintiffs have added in the TAC demonstrate the opposite. Plaintiffs allege that City officials have criticized KPMG for delaying the audit report, not that they have agreed to the delay. (*See, e.g., id.* at 61-62.)Further, Plaintiffs include allegations in which Defendant Aguirre states that KPMG has "breached its fundamental duty to the City of San Diego."(*Id.* ¶ 62 (emphasis omitted).) In short, Plaintiffs do not allege any meeting of the minds to violate constitutional rights. Likewise, Plaintiffs have not alleged that KPMG delayed the audit report for the purpose of violating Plaintiffs' constitutional rights. See *Mendocino Envtl. Ctr.,* 192 F.3d at 1301.

Finally, as they did with regard to the SAC, Plaintiffs again largely rely on this Court's ruling denying the City's motion to dismiss the conspiracy claims in *SDPOA v. Aguirre.*KPMG is not a party in that case, and more importantly, the allegations against the City in that case are different than the allegations against KPMG here. As discussed above, Plaintiffs' allegations do not connect KPMG to any of the alleged underfunding actions and compensation decisions. Other than in conclusory language, Plaintiffs have not alleged material facts demonstrating any "meeting of the minds to violate constitutional rights" against KPMG. See *Mendocino Envtl. Ctr.,*192 F.32d at 1301.Accordingly, the Court **DISMISSES** Plaintiffs' § 1983 conspiracy claim against KPMG.

In sum, the Court **DISMISSES** Plaintiffs' § 1983 claims against KPMG, but the Court will allow Plaintiffs a further attempt to amend as to the conspiracy claim. Plaintiffs, however, must cure the deficiencies in an amended complaint. *See, e.g., Royal Ins. Co. of Am.,* 194 F.3d at 1016-17 & n. 9 (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 959083 (S.D.Cal.)

### N. Declaratory Relief as to KPMG

**\*23** KPMG argues that the Court should dismiss any claims for declaratory relief against it because none of the allegations have anything to do with KPMG. Further, they highlight that the TAC contains the same allegations as those the Court found insufficient in the SAC. Plaintiffs oppose, arguing that the declaratory relief is necessary and that the Court found similar allegations sufficient to state a claim against the City.

In their claim for declaratory relief, Plaintiffs again ask the Court to enter declaratory judgment on various alleged controversies. (*See* TAC ¶ 209. 1.) Most of the requests relate to actions by the City, and thus, do not involve KPMG. Nevertheless, in three of their requests, Plaintiffs seek declaratory judgment against "Defendants," generally. (*Id.* ¶ 209.1(b), (k) & (r).) Looking at those three requests, however, Plaintiffs do not allege that KPMG had any involvement with the disputes.

First, Plaintiffs request a determination whether any Defendant breached at fiduciary duty owed to Plaintiffs by allowing retirement fund contribution to be deferred, delayed, or diverted. (*Id.* ¶ 209.1(b).) Plaintiffs do not, however, allege that KPMG owed such a fiduciary duty to Plaintiffs or how any of KPMG's actions related to any funding decisions. Second, Plaintiffs again ask the Court to determine whether any Defendant owed fiduciary duties and to whom those duties were owed, to determine the contours of any such duties, and to determine to what extent any breaches of fiduciary duties damaged the financial soundness of the retirement fund. (*Id.* ¶ 209.1(k).) Even assuming that this broad request sets forth an actual controversy, *see* 28 U.S.C. § 2201(a), Plaintiffs do not allege KPMG owed Plaintiffs any fiduciary duties, and they do not allege how any of KPMG's activities related to damaging the financial soundness of the retirement fund. Third, Plaintiffs ask the Court to determine whether the City or other Defendants violated the Brown Act. (TAC ¶ 209.1(r).) As discussed above, the Brown Act, Cal. Gov.Code § 54950 et seq., generally requires local government bodies to conduct meetings in public. Plaintiffs do not allege, however, that KPMG is subject to the Brown Act or that it somehow violated the act. Thus, Plaintiffs provide no basis for this claim for declaratory relief against KPMG.

In sum, Plaintiffs have failed to allege facts sufficient to state a claim for declaratory relief against KPMG. Accordingly, the Court **DISMISSES** Plaintiffs' claims for declaratory relief against KPMG. Further, given that Plaintiffs did not make any substantive changes to this claim in the TAC, the Court declines to allow leave to amend. *See, e.g., Royal Ins. Co. of Am.,* 194 F.3d at 1016-17 & n. 9 (when denying leave to amend, court may consider late attempts to add new theories, futility of amendment, and prior attempts to cure deficiencies).

### O. KPMG's Request for Attorneys' Fees

In their motion, KPMG requests that the Court award KPMG its attorneys' fees pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1927.

**\*24** In an action brought under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs[.]" 42 U.S.C. § 1988(b). While a prevailing defendant may recover fees from a plaintiff under § 1988, the court must find that the plaintiff's lawsuit was frivolous, unreasonable, or without foundation. *See Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) (interpreting Title VII); *Hughes v. Rowe,* 449 U.S. 5, 14-15, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (applying *Christiansburg* standard to fee request under § 1988 and stating that, for defendant to recover fees, plaintiff's action must be groundless or without foundation).

Under 28 U.S.C. § 1927:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

An award under § 1927 requires a showing of bad faith. *See, e.g., Wages v. IRS,* 915 F.2d 1230, 1235 (9th Cir.1990) (awarding fees under § 1927 where plaintiff attempted to file amended complaint without material alterations from the one already dismissed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and where plaintiff continually moved for alterations in district court's original judgment).

The Court declines to impose an award of attorneys' fees under either provision. The Court does not find any bad faith or vexatious conduct on the part of Plaintiffs. Further, the Court does not find that Plaintiffs' allegations against KPMG are frivolous.

### *Conclusion*

For the reasons stated above, the Court **GRANTS** in part and **DENIES** in part Defendant City of San Diego and the Individual Defendants' motion to dismiss; **GRANTS** in part and **DENIES** in part Defendant Michael Aguirre's motion to dismiss; **GRANTS** Defendant SDCERS' motion to dismiss; and **GRANTS** Defendant KPMG's motion to dismiss. Further, the Court grants in part Plaintiffs leave to amend as noted in this order within 30 days of the date of this order.

IT IS SO ORDERED.

S.D.Cal.,2007.
Aaron v. Aguirre
Slip Copy, 2007 WL 959083 (S.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 2**

*Westlaw.*

Slip Copy                                                                Page 1
Slip Copy, 2007 WL 734809 (E.D.La.)

▷Aguilar v. Allstate Fire and Cas. Ins. Co.
E.D.La.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Louisiana.
Joseph AGUILAR, III, and Jean and Mackey Cutrer,
and Carla Jarius
v.
ALLSTATE FIRE AND CASUALTY INS.
COMPANY, et al.
**Civil Action No. 06-4660.**

March 6, 2007.

Jim S. Hall, Jim S. Hall & Associates, Metairie, LA,
for Plaintiffs.
Judy Y. Barrasso, Susan Muller Rogge, Barrasso
Usdin Kupperman Freeman & Sarver, LLC, New
Orleans, LA, Kendra Kekelis Hartman, Natalie J.
Spears, Richard L. Fenton, Sonnenschein, Nath &
Rosenthal, Chicago, IL, for Defendants.

*ORDER AND REASONS*

MARTIN L.C. FELDMAN, United States District
Judge.
**\*1** Before the Court is the defendants' motion to
dismiss and motion to strike the class allegations. For
the reasons that follow, the motion to strike the class
allegations is GRANTED and the motion to dismiss
is GRANTED in part and DENIED in part without
prejudice.

*Background*

Joseph Aguilar, III, Jean and Mackey Cutrer, and
Carla Jurius all suffered damage to their properties as
a result of Hurricane Katrina. On August 24, 2006,
they sued Allstate Fire and Casualty Insurance
Company, Allstate Indemnity Company, Allstate
Insurance Company, and Allstate Property and
Casualty Insurance Company, asserting that the
defendants breached insurance contracts, adjusted
claims in bad faith subjecting them to state law
penalty statutes, and "violat[ed] state and federal
laws pertaining to unfair trade practices."The
plaintiffs assert that defendants "engaged in a
wrongful scheme to delay, deny or underpay claims

by repeatedly utilizing below market unit pricing and
nonpayment or intentional underpayment of industry
standard items all in contravention of the terms of the
policies issued and the practices of the industry."The
plaintiffs style their complaint as a "class action
complaint" and identify the proposed class as:

All immovable property owners in the State of
Louisiana who were issued a property, business,
commercial and/or flood insurance policy by the
named defendants and whose policy was in full force
and effect at the time of the covered event and who
made a claim for benefits under said policy to address
the physical damages to their property which was
damaged as a result of Hurricane Katrina and its
aftermath. In addition, each class member has been
determined by the defendant to have a compensable
loss and has either been paid or in the process of
being paid by the defendant for the compensable loss
of the property. The loss payment to each class
member included a below market unit pricing on
numerous items and non-payment of industry
standard items, resulting in inadequate compensation
to the class members.

The defendants now move to dismiss the plaintiffs'
claims pursuant to Federal Rules of Civil Procedure
12(b)(6) and 12(b)(1) or, alternatively, to strike class
allegations pursuant to Rule 23(d)(4). They contend
that the plaintiffs' claims fail because (1) the
plaintiffs fail to identify any specific provisions in
their policies that the defendants have breached; (2)
the plaintiffs' claims under the state law penalty
statutes must fail because plaintiffs' breach of
insurance contract claims fail; (3) generic allegations
that the defendants violated state and federal laws
pertaining to unfair trade practices do not state a
claim; (4) the plaintiffs' purported flood insurance
claims are preempted by federal law; (5) no named
plaintiff has standing to assert a claim against
Allstate Fire and Casualty or Allstate Property and
Casualty. Finally, the defendants contend that
plaintiffs' class allegations fail as a matter of law and
must be stricken because individualized inquiries
predominate.

I.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*2** Rule 23(a) sets forth four prerequisites to any class action: (1) a class "so numerous that joinder of all members is impracticable"; (2) the existence of "questions of law or fact common to the class"; (3) class representatives with claims or defenses "typical ... of the class"; and (4) class representatives that "will fairly and adequately protect the interests of the class."Fed.R.Civ.P. 23(a). In addition to these prerequisites, a party seeking class certification under Rule 23(b)(3) must also demonstrate that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that the class action is "superior to other available methods for the fair and efficient adjudication of the controversy."Fed.R.Civ.P. 23(b)(3).

The plaintiffs bear the burden of showing that all of these Rule 23 criteria are met. *Unger v. Amedisys Inc.,* 401 F.3d 316, 320 (5th Cir.2005). A court may strike class allegations under Rule 23(d)(4) where a complaint fails to plead the minimum facts necessary to establish the existence of a class satisfying Rule 23's mandate. *See Hedgepeth v. Blue Cross & Blue Shield of Miss.,* 2006 WL 141624 (N.D.Miss. Jan. 18, 2006) (citing *Stewart v. Winter,* 669 F.2d 328, 331 (5th Cir.1982) and noting that the Fifth Circuit has upheld the power of district courts to dismiss class allegations prior to any extensive class-related discovery).

The plaintiffs filed their complaint as a class action under Rule 23(b)(3). But even assuming that the plaintiffs have met the four requirements of Rule 23(a), they have not met their burden under Rule 23(b)(3) of proving that common issues of the class predominate over individual issues, and the class certification fails for this reason.

Rule 23(a)(2) instructs that there be issues of law or fact common to the class. The commonality requirement is satisfied if at least one issue's resolution will affect all or a significant number of class members. *See James v. City of Dallas,* 254 F.3d 551, 570 (5th Cir.2001); *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999). There is a low threshold for commonality, and the fact that some plaintiffs have different claims or require individualized analysis does not defeat commonality.*James,* 254 F.3d at 570. But the analysis continues because Rule 23(b)(3) mandates

that common questions of law or fact must also "predominate over any questions affecting only individual [class] members."*Unger,* 401 F.3d at 320. This is the test of cohesion, and it is demanding. To predominate, common issues must form a significant part of individual cases. *Mullen,* 186 F.3d at 626. The predominance requirement of Rule 23(b)(3) is "far more demanding" than the commonality requirement of Rule 23(a), because it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."*Unger,* 401 F.3d at 320. Lastly, the cause of action as a whole must satisfy Rule 23(b)(3)' s predominance requirement. *Steering Committee v. Exxon Mobil Corp.,* 461 F.3d 598, 601 (5th Cir.2006).

**\*3** Recently, this Court struck similar class allegations against an insurer based on its alleged "corporate scheme and pattern and practice of bad faith and improper claims handling."*See Spiers v. Liberty Mut. Fire Ins. Co.,* C.A. No. 06-4493 (E.D.La. Nov. 21, 2006). The similarity of the allegations here compels the same result. While Allstate's general internal policies for adjusting claims may arguably be one common issue of fact, demonstrating a wrongful pattern and practice of failing to adjust claims will require an intensive review of the individual facts of each class member's damage claim, including the nature and extent of damage, the timing and adjustment of each class member's claim, how much each class member was paid for his claim and for what damage, and whether that amount was sufficient and timely. On the face of the pleading, it is clear that those individualized and highly personal issues pertaining to each class member patently overwhelm any arguably common issues, rendering the claims inappropriate for class treatment. *See Pollet v. Travelers Prop. Cas. Ins. Co.,* 2001 WL 1471724 (E.D.La. Nov. 16, 2001)(Clement, C.J.)(holding that class certification was inappropriate in an action alleging that the insurer failed to adequately compensate policyholders because of the need for individualized proof on thousands of separate insurance claims).

II.

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. Such a motion is rarely granted because it is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

viewed with disfavor. *See Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir.1982).* The complaint must be liberally construed in the plaintiff's favor and all facts pleaded in the complaint must be taken as true. *See Campbell v. Wells Fargo Bank, 781 F.2d 440, 442 (5th Cir.1986).* The Court cannot dismiss a complaint under Rule 12(b)(6)"unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir.1997)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46 (1957)*).

The plaintiffs' complaint purports to assert claims against the Allstate defendants for breach of contract and violation of state law penalty statutes, and violation of state and federal law unfair trade practices.

### A.

The Fifth Circuit has explained, "[t]o state a claim for breach of an insurance contract under Louisiana law, a plaintiff must allege a breach of a specific policy provision."*Louque v. Allstate Insurance Company, 314 F.3d 776, 782 (2003)*(citing *Bergeron v. Pan Am. Assurance Co., 731 So.2d 1037, 1045 (La.App.1999)*). The plaintiffs point to no specific policy provisions in their complaint that would prohibit anything Allstate did in the settlement of these claims. The plaintiffs argue that Allstate incorrectly interprets *Bergeron;* but if this is the case, then the Fifth Circuit is also misguided in its interpretation of *Bergeron,* and this Court does not find this to be the case. While the plaintiffs' complaint for breach of contract is vaguely and inartfully crafted, this Court must resolve all doubts regarding the sufficiency of the claim in the plaintiffs' favor. Considering the *Lowrey* standard for dismissing a plaintiff's claim, the Court declines to dismiss the breach of contract complaint, but instead will allow the plaintiffs the opportunity to amend their complaint to correct the *Bergeron* deficiencies.

### B.

*4 Louisiana Revised Statutes 22:658 and 22:1220 announce statutory penalties that may be imposed on insurance companies for improper handling of first-party property insurance claims. Section B of La. R.S. 22:1220 outlines five causes of action against an insurer: misrepresenting insurance policy provisions relating to coverage, failing to pay a settlement timely after an agreement is reduced to writing, denying coverage or attempting to settle a claim on an altered application without the insured's consent, misleading a claimant as to the prescriptive period, and arbitrarily failing to settle claims timely after receiving satisfactory proof of loss. Louisiana courts have held that "because R.S. 22:1220 is penal in nature, strict construction of the statute is required and that the five instances specified in section B are exclusive."*Armstrong v. Rabito, 669 So.2d 512, 514 (La.App.1995)*(citing *Hernandez v. Continental Casualty Co., 615 So.2d 484 (La.App.1993)); see also Hart v. Allstate Ins. Co., 437 So.2d 823 (La.1983)*. Louisiana courts have also held that unless one of the proscribed acts in 12:1220 are asserted by the plaintiff, then the claims must be dismissed.*Armstrong, 669 So.2d at 514;Boatner v. State Farm Mutual,* No. 92-C-1248 (La.App. Sept. 28, 1992).

The plaintiffs make no argument whatsoever in support for sustaining their claims under the state penalty statutes. In their complaint, the plaintiffs describe Allstate's infraction as underpaying them by "calculat[ing] using below market unit price figures for various items damaged and/or destroyed...." This assertion does not implicate La. R.S. 12:1220. Further, the plaintiffs do not dispute that each of their bad faith claims are contingent upon properly alleging breach of insurance contract claims. Thus, because the Court will allow the plaintiffs an attempt to cure their breach of contract pleading deficiencies, the Court leaves open the possibility that the plaintiffs will attempt to cure their bad faith claims deficiencies as well.

### C.

The plaintiffs also purport to assert claims for defendants' "violation[s] of both State and Federal Law concerning Unfair Business Practices."Such "bare bones" allegations are insufficiently conclusory and fail to put Allstate on notice as to what conduct supports the plaintiffs' claims. Thus, the plaintiffs have failed to state a claim upon which relief may be granted. *See Beanal v. Freeport-McMoran, Inc. 197 F.3d 161, 164 (5th Cir.1999)*. Thus, the claims must be dismissed.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

## D.

The defendants urge the Court to dismiss the plaintiffs' flood insurance claims because such claims are preempted by federal law. The plaintiffs concede that any state law claim under flood insurance policies would be preempted but they say that they have not attempted to plead any state law flood claims.

But Allstate further contends that any federal flood claims must also be dismissed. The Court agrees. It is not clear on which basis the plaintiffs may be attempting to assert a claim under their flood policies. (The plaintiffs suggest that Paragraph 5 of the complaint, which asserts that the Court has federal question jurisdiction because "a significant number of the claims are made under the National Flood Insurance Program," is "simply a jurisdictional statement.") However, to the extent the plaintiffs seek to state a claim for breach of flood insurance policies, the plaintiffs have failed to allege any of the prerequisites applicable to such claims. *See, e.g.,* 44 C.F.R. pt. 61, App. A(1), articles VII(R) and VII(J).

*5 To the extent the plaintiffs have purported to assert flood insurance claims, they are dismissed.

## E.

The plaintiffs name four defendants in their complaint: Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Insurance Company, and Allstate Property and Casualty Insurance Company. The defendants urge that the plaintiffs lack standing against Allstate Fire and Casualty and Allstate Property and Casualty because none of the named plaintiffs have or had policies with either of these companies. The plaintiffs do not dispute this; rather they say that the policies issued by these two defendants are similar to the policies issued by the other defendants and named plaintiffs will "adequately represent the contentions of class members that may have been insured by Allstate related companies...." This, again, is strikingly inartful and inadequate.

Any claims plaintiffs purport to allege against Allstate Fire and Casualty and Allstate Property and Casualty must be dismissed for lack of standing. *Grant v. Gilbert,* 324 F.3d 383, 386 (5th Cir.2003)

(citing *Lujan v. Defendants of Wildlife,* 504 U.S. 555, 560 (1992)). The plaintiffs' concession that none of the named plaintiffs were insured by either Allstate Fire and Casualty or Allstate Property and Casualty is a concession that they lack standing to sue those defendants. And their attempts to establish Article III standing "through the backdoor of a class action" is unavailing. *See Henry v. Circus Circus Casinos,* 223 F.R.D. 541, 544 (D. Nev 2004) (quoting *Alle v. Medrano,* 416 U.S. 802 (1974) (Burger, C.J., concurring in part and dissenting in part)); *see also In re Franlin Mut. Funds Fee Litig.,* 388 F.Supp.2d 451, (D.N.J.2005) ( "a named plaintiff can bring suit against a party only if the plaintiff personally suffered an injury and that injury is traceable to that party ... [i]f a plaintiff cannot trace an injury to a defendant, the plaintiff lacks standing with regard to that defendant").

Accordingly, the defendants' motion to strike class allegations is GRANTED. The defendants' motion to dismiss is GRANTED in part and DENIED in part without prejudice. The plaintiffs are granted leave to amend their claims for breach of contract and bad faith penalties within 14 days. Their claims for violations of state and federal unfair trade practices are dismissed, as are their claims against Allstate Fire and Casualty and Allstate Property and Casualty.

E.D.La.,2007.
Aguilar v. Allstate Fire and Cas. Ins. Co.
Slip Copy, 2007 WL 734809 (E.D.La.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**

Westlaw.

127 S.Ct. 1955                                                                    Page 1
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

▷Bell Atlantic Corp. v. Twombly
U.S.,2007.

Supreme Court of the United States
BELL ATLANTIC CORPORATION et al.,
Petitioners,
v.
William TWOMBLY et al.
No. 05-1126.

Argued Nov. 27, 2006.
Decided May 21, 2007.

**Background:** Consumers brought putative class
action against incumbent local exchange carriers
(ILECs) alleging antitrust conspiracy, in violation of
the Sherman Act, both to prevent competitive entry
into local telephone and Internet service markets and
to avoid competing with each other in their respective
markets. The United States District Court for the
Southern District of New York, Gerald Lynch, J., 313
F.Supp.2d 174, dismissed complaint for failure to
state a claim upon which relief could be granted. The
United States Court of Appeals for the Second
Circuit, 425 F.3d 99, reversed. The Supreme Court
granted certiorari.

**Holdings:** The Supreme Court, Justice Souter, held
that:
(1) stating a claim under Sherman Act's restraint of
trade provision requires a complaint with enough
factual matter, taken as true, to suggest that an
agreement was made;
(2) an allegation of parallel business conduct and a
bare assertion of conspiracy will not alone suffice to
state a claim under the Sherman Act;
(3) dismissal for failure to state a claim upon which
relief may be granted does not require appearance,
beyond a doubt, that plaintiff can prove no set of
facts in support of claim that would entitle him to
relief, abrogating *Conley v. Gibson*, 355 U.S. 41, 78
S.Ct. 99, 2 L.Ed.2d 80; and
(4) consumers' allegations of parallel conduct were
insufficient to state a claim.

Judgment of the Court of Appeals reversed and
remanded.

Justice Stevens filed a dissenting opinion in which
Justice Ginsburg joined in part.

West Headnotes

**[1] Antitrust and Trade Regulation 29T ⬤⟿537**

29T Antitrust and Trade Regulation
   29TVI Antitrust Regulation in General
      29TVI(B) Cartels, Combinations, Contracts,
and Conspiracies in General
         29Tk537 k. In General. Most Cited Cases
Because Sherman Act's restraint of trade provision
does not prohibit all unreasonable restraints of trade
but only restraints effected by a contract,
combination, or conspiracy, the crucial question is
whether the challenged anticompetitive conduct
stems from independent decision or from an
agreement, tacit or express. Sherman Act, § 1, 15
U.S.C.A. § 1.

**[2] Antitrust and Trade Regulation 29T ⬤⟿975**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and
Enforcement
      29TXVII(B) Actions
        29Tk973 Evidence
           29Tk975 k. Admissibility. Most Cited
Cases
While a showing of parallel business behavior is
admissible circumstantial evidence from which the
fact finder may infer agreement, it falls short of
conclusively establishing agreement or itself
constituting an offense under the Sherman Act's
restraint of trade provision. Sherman Act, § 1, 15
U.S.C.A. § 1.

**[3] Antitrust and Trade Regulation 29T ⬤⟿537**

29T Antitrust and Trade Regulation
   29TVI Antitrust Regulation in General
      29TVI(B) Cartels, Combinations, Contracts,
and Conspiracies in General
         29Tk537 k. In General. Most Cited Cases
Conscious parallelism with respect to business

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                                          Page 2
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

behavior, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions, is not in itself unlawful under Sherman Act's restraint of trade provision. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[4] Antitrust and Trade Regulation 29T ⟨⟩537**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(B) Cartels, Combinations, Contracts, and Conspiracies in General
            29Tk537 k. In General. Most Cited Cases
An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct on part of defendants is not entitled to a directed verdict. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[5] Antitrust and Trade Regulation 29T ⟨⟩977(2)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk973 Evidence
                29Tk977 Weight and Sufficiency
                    29Tk977(2) k. Restraints and Misconduct in General. Most Cited Cases
Proof of a conspiracy under Sherman Act's restraint of trade provision must include evidence tending to exclude the possibility of independent action. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[6] Federal Civil Procedure 170A ⟨⟩2484**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2484 k. Antitrust and Price Discrimination Cases. Most Cited Cases
At the summary judgment stage, an offer of conspiracy evidence by a plaintiff alleging violation of Sherman Act's restraint of trade provision must tend to rule out the possibility that the defendants were acting independently. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[7] Federal Civil Procedure 170A ⟨⟩673**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(B) Complaint
            170AVII(B)1 In General
                170Ak673 k. Claim for Relief in General. Most Cited Cases

**Federal Civil Procedure 170A ⟨⟩1772**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in General
                170Ak1772 k. Insufficiency in General. Most Cited Cases
While a complaint attacked by a motion to dismiss for failure to state a claim upon which relief can be granted does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⟨⟩1772**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)3 Pleading, Defects In, in General
                170Ak1772 k. Insufficiency in General. Most Cited Cases

**Federal Civil Procedure 170A ⟨⟩1835**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1835 k. Matters Deemed Admitted. Most Cited Cases
To survive a motion to dismiss for failure to state a claim upon which relief can be granted, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                                                Page 3
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

the allegations in the complaint are true even if
doubtful in fact. Fed.Rules Civ.Proc.Rule 12(b)(6),
28 U.S.C.A.

**[9] Federal Civil Procedure 170A** ☜══972(4) **673**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(B) Complaint
            170AVII(B)1 In General
                170Ak673 k. Claim for Relief in
General. Most Cited Cases
While, for most types of cases, the Federal Rules
eliminated the cumbersome requirement that a
claimant set out in detail the facts upon which he
bases his claim, the general rule governing pleadings
still requires a showing, rather than a blanket
assertion, of entitlement to relief; without some
factual allegation in the complaint, it is hard to see
how a claimant could satisfy the requirement of
providing not only fair notice of the nature of the
claim, but also grounds on which the claim rests.
Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**[10] Antitrust and Trade Regulation 29T** ☜══972(4)

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(4) k. Conspiracy or
Combination. Most Cited Cases
Stating a claim under Sherman Act's restraint of trade
provision requires a complaint with enough factual
matter, taken as true, to suggest that an agreement
was made; asking for plausible grounds to infer an
agreement does not impose a probability requirement
at the pleading stage, but simply calls for enough fact
to raise a reasonable expectation that discovery will
reveal evidence of illegal agreement. Sherman Act, §
1, 15 U.S.C.A. § 1.

**[11] Federal Civil Procedure 170A** ☜══972(4) **1773**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal

            170AXI(B)3 Pleading, Defects In, in
General
                170Ak1773 k. Clear or Certain Nature
of Insufficiency. Most Cited Cases
A well-pleaded complaint may proceed even if it
strikes a savvy judge that actual proof of those facts
is improbable, and that a recovery is very remote and
unlikely.

**[12] Antitrust and Trade Regulation 29T** ☜══972(4)

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(4) k. Conspiracy or
Combination. Most Cited Cases
An allegation of parallel business conduct and a bare
assertion of conspiracy will not suffice to state a
claim under Sherman Act's restraint of trade
provision; without more, parallel conduct does not
suggest conspiracy, and a conclusory allegation of
agreement at some unidentified point does not supply
facts adequate to show illegality. Sherman Act, § 1,
15 U.S.C.A. § 1.

**[13] Antitrust and Trade Regulation 29T** ☜══972(4)

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(4) k. Conspiracy or
Combination. Most Cited Cases
When allegations of parallel conduct are set out in
order to make a claim under the Sherman Act's
restraint of trade provision, they must be placed in a
context that raises a suggestion of a preceding
agreement, not merely parallel conduct that could just
as well be independent action. Sherman Act, § 1, 15
U.S.C.A. § 1.

**[14] Federal Civil Procedure 170A** ☜══972(4) **674**

127 S.Ct. 1955                                                                                    Page 4
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(B) Complaint
         170AVII(B)1 In General
            170Ak674 k. Theory of Claim. Most
Cited Cases

**Federal Civil Procedure 170A ☞1773**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)3 Pleading, Defects In, in
General
            170Ak1773 k. Clear or Certain Nature
of Insufficiency. Most Cited Cases
Dismissal for failure to state a claim upon which
relief may be granted does not require appearance,
beyond a doubt, that plaintiff can prove no set of
facts in support of claim that would entitle him to
relief, although once a claim has been stated
adequately, it may be supported by showing any set
of facts consistent with the allegations in the
complaint; abrogating *Conley v. Gibson, 355 U.S. 41,
78 S.Ct. 99, 2 L.Ed.2d 80.* Fed.Rules Civ.Proc.Rule
12(b)(6), 28 U.S.C.A.

**[15]  Antitrust and Trade Regulation 29T
☞972(4)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and
Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(2) Complaint
               29Tk972(4) k. Conspiracy or
Combination. Most Cited Cases
Consumers' allegations that, by virtue of parallel
conduct, incumbent local exchange carriers (ILECs)
entered into a contract, combination, or conspiracy to
prevent competitive entry into their local telephone
and Internet service markets, and agreed not to
compete with one another, failed to state claim for
violation of Sherman Act's restraint of trade
provision, as claim essentially rested on descriptions
of parallel conduct and not on any independent
allegation of actual agreement among the ILECs.
Sherman Act, § 1, 15 U.S.C.A. § 1.

**[16] Evidence 157 ☞11**

157 Evidence
   157I Judicial Notice
      157k11 k. Historical Facts. Most Cited Cases
Where antitrust complaint quoted portion of
statement of one defendant's chief executive officer
(CEO) to suggest that defendants conspired together,
district court was entitled to take notice of the full
contents of the published articles referenced in the
complaint, from which the truncated quotations were
drawn. Fed.Rules Evid.Rule 201, 28 U.S.C.A.

**[17] Federal Civil Procedure 170A ☞31**

170A Federal Civil Procedure
   170AI In General
      170AI(B) Rules of Court in General
         170AI(B)2 Rules of Civil Procedure
            170Ak31 k. In General. Most Cited
Cases
Broadening of a Federal Rule of Civil Procedure can
only be accomplished by the process of amending the
Federal Rules, and not by judicial interpretation.

**[18] Federal Civil Procedure 170A ☞633.1**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(A) Pleadings in General
         170Ak633 Certainty, Definiteness and
Particularity
            170Ak633.1 k. In General. Most Cited
Cases
On certain subjects understood to raise a high risk of
abusive litigation, a plaintiff must state factual
allegations with greater particularity than that
required by general rule governing pleadings.
Fed.Rules Civ.Proc.Rules 8, 9(b-c), 28 U.S.C.A.

*1958 Syllabus* [FN*]

    FN* The syllabus constitutes no part of the
opinion of the Court but has been prepared
by the Reporter of Decisions for the
convenience of the reader. See *United States
v. Detroit Timber & Lumber Co., 200 U.S.
321, 337, 26 S.Ct. 282, 50 L.Ed. 499.*

The 1984 divestiture of the American Telephone &
Telegraph Company's (AT & T) local telephone

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                   Page 5
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs were excluded. The Telecommunications Act of 1996 withdrew approval of the ILECs' monopolies, "fundamentally restructur[ing] local telephone markets" and "subject[ing] [ILECs] to a host of duties intended to facilitate market entry." *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835. It also authorized them to enter the long-distance market. "Central to the [new] scheme [was each ILEC's] obligation ... to share its network with competitive local exchange carriers (CLECs)." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823.

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high speed Internet services in this action against petitioner ILECs for claimed violations of § 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." The complaint alleges that the ILECs conspired to restrain trade (1) by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right. The District Court dismissed the complaint, concluding that parallel business conduct allegations, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

*Held:*

1. Stating a § 1 claim requires a complaint with

enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 1963 - 1970.

(a) Because § 1 prohibits "only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement," *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273. While a showing of parallel "business behavior is admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense." *Id.*, at 540-541, 74 S.Ct. 257. The inadequacy of showing parallel conduct or interdependence, without more, *1959 mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial sequence, *e.g.*, at the summary judgment stage, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538. Pp. 1963 - 1964.

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a § 1 claim. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.*, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a § 1 claim, stating a claim requires a complaint with enough

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                                      Page 6
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects <u>Rule 8(a)(2)</u>'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A parallel conduct allegation gets the <u>§ 1</u> complaint close to stating a claim, but without further factual enhancement it stops short of the line between possibility and plausibility. The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with " 'a largely groundless claim' " from " 'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.' " *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577. It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period. It is no answer to say that a claim just shy of plausible entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest. Plaintiffs' main argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley's* statement construing <u>Rule 8</u>: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>355 U.S., at 45-46, 78 S.Ct. 99</u>. The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, **\*1960** and is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Conley* described the breadth of opportunity to prove what an adequate complaint

claims, not the minimum standard of adequate pleading to govern a complaint's survival. Pp. 1964 - 1970.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short. First, the complaint leaves no doubt that plaintiffs rest their <u>§ 1</u> claim on descriptions of parallel conduct, not on any independent allegation of actual agreement among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try and avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid <u>§ 1</u> claim. This analysis does not run counter to *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                                        Page 7
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed. Pp. 1970 - 1974.

425 F.3d 99, reversed and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, except as to Part IV.

Stephen M. Shapiro, Kenneth S. Geller, Richard J. Favretto, Mayer, Brown, Rowe & Maw LLP, Washington, D.C., Laura J. Coleman, J. Henry Walker, Marc W.F. Galonsky, Ashley Watson, Atlanta, Georgia, for BellSouth Corporation.
Timothy Beyer, Brownstein Hyatt & Farber, P.C., Denver, Colorado, *1961Cynthia P. Delaney, Denver, Colorado, Counsel for Qwest Communications International Inc.
Michael K. Kellogg, Mark C. Hansen, Aaron M. Panner, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., Javier Aguilar, William M. Schur, San Antonio, Texas, for AT&T Inc. (formerly SBC Communications Inc.).
Richard G. Taranto, Farr & Taranto, Washington, D.C., Paul J. Larkin, Jr., David E. Wheeler, Robert J. Zastrow, Arlington, Virginia, Dan K. Webb, Charles B. Molster III, Winston & Strawn LLP, Chicago, Illinois, for Verizon Communications Inc. (successor-in-interest to Bell Atlantic Corporation).
Marc A. Topaz, Joseph H. Meltzer, Schiffrin & Barroway, LLP, Radnor, PA, J. Douglas Richards, Michael M. Buchman, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Respondents.For U.S. Supreme Court briefs, see:2006 WL 2474079 (Pet.Brief)2006 WL 3089915 (Resp.Brief)2006 WL 3265610 (Reply.Brief)

Justice SOUTER delivered the opinion of the Court. Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a "contract, combination ..., or conspiracy, in restraint of trade or commerce." The question in this putative class action is whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold

that such a complaint should be dismissed.

I

The upshot of the 1984 divestiture of the American Telephone & Telegraph Company's (AT & T) local telephone business was a system of regional service monopolies (variously called "Regional Bell Operating Companies," "Baby Bells," or "Incumbent Local Exchange Carriers" (ILECs)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade later, Congress withdrew approval of the ILECs' monopolies by enacting the Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, which "fundamentally restructure[d] local telephone markets" and "subject[ed] [ILECs] to a host of duties intended to facilitate market entry." AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). In recompense, the 1996 Act set conditions for authorizing ILECs to enter the long-distance market. See 47 U.S.C. § 271.

"Central to the [new] scheme [was each ILEC's] obligation ... to share its network with competitors,"Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), which came to be known as "competitive local exchange carriers" (CLECs), Pet. for Cert. 6, n. 1. A CLEC could make use of an ILEC's network in any of three ways: by (1) "purchas[ing] local telephone services at wholesale rates for resale to end users," (2) "leas[ing] elements of the [ILEC's] network 'on an unbundled basis,' " or (3) "interconnect[ing] its own facilities with the [ILEC's] network." Iowa Utilities.Bd., supra, at 371, 119 S.Ct. 721 (quoting 47 U.S.C. § 251(c)). Owing to the "considerable expense and effort" required to make unbundled network elements available to rivals at wholesale prices, Trinko, supra, at 410, 124 S.Ct. 872, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) three times revised its *1962 regulations to narrow the range of network elements to be shared with the CLECs. See Covad Communications Co. v. FCC, 450 F.3d 528, 533-534 (C.A.D.C.2006) (summarizing the 10-year-long regulatory struggle between the ILECs and CLECs).

Respondents William Twombly and Lawrence

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                          Page 8
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

Marcus (hereinafter plaintiffs) represent a putative class consisting of all "subscribers of local telephone and/or high speed internet services ... from February 8, 1996 to present." Amended Complaint in No. 02 CIV. 10220(GEL) (SDNY) ¶ 53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs,[FN1] plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

> FN1. The 1984 divestiture of AT & T's local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint ¶ 21, App. 16. Together, these ILECs allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. *Id.*, ¶ 48, App. 26.

The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs "engaged in parallel conduct" in their respective service areas to inhibit the growth of upstart CLECs. Complaint ¶ 47, App. 23-26. Their actions allegedly included making unfair agreements with the CLECs for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs' relations with their own customers. *Ibid.* According to the complaint, the ILECs' "compelling common motivatio[n]" to thwart the CLECs' competitive efforts naturally led them to form a conspiracy; "[h]ad any one [ILEC] not sought to prevent CLECs ... from competing effectively ..., the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of

such conduct." *Id.*, ¶ 50, App. 26-27.

Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs' common failure "meaningfully [to] pursu[e]" "attractive business opportunit[ies]" in contiguous markets where they possessed "substantial competitive advantages," *id.*, ¶¶ 40-41, App. 21-22, and from a statement of Richard Notebaert, chief executive officer (CEO) of the ILEC Qwest, that competing in the territory of another ILEC " 'might be a good way to turn a quick dollar but that might not make it right,' " *id.*, ¶ 42, App. 22.

The complaint couches its ultimate allegations this way:

> "In the absence of any meaningful competition between the [ILECs] in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within their respective local telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information *1963 and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.*, ¶ 51, App. 27.[FN2]

> FN2. In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language:

>> "Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                        Page 9

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

Section 1 of the Sherman Act."*Id.,* ¶ 64,
App. 30-31.

The United States District Court for the Southern
District of New York dismissed the complaint for
failure to state a claim upon which relief can be
granted. The District Court acknowledged that
"plaintiffs may allege a conspiracy by citing
instances of parallel business behavior that suggest an
agreement," but emphasized that "while
'[c]ircumstantial evidence of consciously parallel
behavior may have made heavy inroads into the
traditional judicial attitude toward conspiracy[, ...]
"conscious parallelism" has not yet read conspiracy
out of the Sherman Act entirely.' " 313 F.Supp.2d
174, 179 (2003) (quoting *Theatre Enterprises, Inc. v.
Paramount Film Distributing Corp.,* 346 U.S. 537,
541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); alterations in
original). Thus, the District Court understood that
allegations of parallel business conduct, taken alone,
do not state a claim under § 1; plaintiffs must allege
additional facts that "ten[d] to exclude independent
self-interested conduct as an explanation for
defendants' parallel behavior." 313 F.Supp.2d, at
179. The District Court found plaintiffs' allegations
of parallel ILEC actions to discourage competition
inadequate because "the behavior of each ILEC in
resisting the incursion of CLECs is fully explained by
the ILEC's own interests in defending its individual
territory." *Id.,* at 183. As to the ILECs' supposed
agreement against competing with each other, the
District Court found that the complaint does not
"alleg[e] facts ... suggesting that refraining from
competing in other territories as CLECs was contrary
to [the ILECs'] apparent economic interests, and
consequently [does] not rais[e] an inference that [the
ILECs'] actions were the result of a conspiracy." *Id.,*
at 188.

The Court of Appeals for the Second Circuit
reversed, holding that the District Court tested the
complaint by the wrong standard. It held that "plus
factors are not *required* to be pleaded to permit an
antitrust claim based on parallel conduct to survive
dismissal." 425 F.3d 99, 114 (2005) (emphasis in
original). Although the Court of Appeals took the
view that plaintiffs must plead facts that "include
conspiracy among the realm of 'plausible'
possibilities in order to survive a motion to dismiss,"
it then said that "to rule that allegations of parallel
anticompetitive conduct fail to support a plausible

conspiracy claim, a court would have to conclude that
there is no set of facts that would permit a plaintiff to
demonstrate that the particular parallelism asserted
was the product of collusion rather than
coincidence." *Ibid.*

We granted certiorari to address the proper standard
for pleading an antitrust conspiracy through
allegations of parallel conduct, 547 U.S. ----, 126
S.Ct. 2965, 165 L.Ed.2d 949 (2006), and now
reverse.

*1964 II

A

[1][2][3] Because § 1 of the Sherman Act "does not
prohibit [all] unreasonable restraints of trade ... but
only restraints effected by a contract, combination, or
conspiracy,"*Copperweld Corp. v. Independence Tube
Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d
628 (1984), "[t]he crucial question" is whether the
challenged anticompetitive conduct "stem[s] from
independent decision or from an agreement, tacit or
express,"*Theatre Enterprises,* 346 U.S., at 540, 74
S.Ct. 257. While a showing of parallel "business
behavior is admissible circumstantial evidence from
which the fact finder may infer agreement," it falls
short of "conclusively establish[ing] agreement or ...
itself constitut[ing] a Sherman Act offense." *Id.,* at
540-541, 74 S.Ct. 257. Even "conscious
parallelism," a common reaction of "firms in a
concentrated market [that] recogniz[e] their shared
economic interests and their interdependence with
respect to price and output decisions" is "not in itself
unlawful." *Brooke Group Ltd. v. Brown &
Williamson Tobacco Corp.,* 509 U.S. 209, 227, 113
S.Ct. 2578, 125 L.Ed.2d 168 (1993); see 6 P. Areeda
& H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d
ed.2003) (hereinafter Areeda & Hovenkamp) ("The
courts are nearly unanimous in saying that mere
interdependent parallelism does not establish the
contract, combination, or conspiracy required by
Sherman Act § 1"); Turner, The Definition of
Agreement Under the Sherman Act: Conscious
Parallelism and Refusals to Deal, 75 Harv. L.Rev.
655, 672 (1962) ("[M]ere interdependence of basic
price decisions is not conspiracy").

[4][5][6] The inadequacy of showing parallel conduct
or interdependence, without more, mirrors the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal. Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly Fed. S 267

ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, *e.g.,* AEI-Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss Antitrust Cases: Separating Fact from Fantasy, Related Publication 06-08, pp. 3-4 (2006) (discussing problem of "false positives" in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see *Theatre Enterprises, supra;* proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**B**

[7][8][9] This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the **\*1965** "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A.

Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"),[FN3] on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, *e.g., Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

FN3. The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See *post,* at 1979 (opinion of STEVENS, J.) (pleading standard of Federal Rules "does not require, or even invite, the pleading of facts"). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added), Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (Rule 8(a)"contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it").

[10][11][12][13] In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                                Page 11
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.[FN4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely." *Ibid.* In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit **1966** of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

> FN4. Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, *e.g.*, 6 Areeda & Hovenkamp ¶ 1425, at 167-185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N.Y.L.S. L.Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

The need at the pleading stage for allegations

plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." Cf. *DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 56 (C.A.1 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation-for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint").[FN5]

> FN5. The border in *DM Research* was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

We alluded to the practical significance of the Rule 8 entitlement requirement in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), when we explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with " 'a largely groundless claim' " be allowed to " 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.' " *Id.,* at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, " 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " 5 Wright & Miller § 1216, at 233-234 (quoting *Daves v. Hawaiian Dredging Co.,* 114 F.Supp. 643, 645

127 S.Ct. 1955                                                                                        Page 12
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

(D.Hawai 1953)); see also Dura,supra, at 346, 125 S.Ct. 1627; Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., 289 F.Supp.2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").

Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. *1967 Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528, n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." See also Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (C.A.7 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint"); Note, Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N.Y. & U. L.Rev. 1887, 1898-1899 (2003) (discussing the unusually high cost of discovery in antitrust cases); Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," post at 1975, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, e.g., Easterbrook, Discovery as Abuse, 69 B.U.L.Rev. 635, 638 (1989) ("Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries," post, at 1975; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no " 'reasonably founded hope that the [discovery] process will reveal relevant evidence' " to support a § 1 claim. Dura, 544 U.S., at 347, 125 S.Ct. 1627 (quoting Blue Chip Stamps, supra, at 741, 95 S.Ct. 1917; alteration in Dura).[FN6]

FN6. The dissent takes heart in the reassurances of plaintiffs' counsel that discovery would be " ' "phased" ' " and "limited to the existence of the alleged conspiracy and class certification." Post, at ----24. But determining whether some illegal agreement may have taken place between unspecified persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking not easily susceptible to the kind of line drawing and case management that the dissent envisions. Perhaps the best answer to the dissent's optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim: "The timing is all wrong. The plaintiff files a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                      Page 13
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not-cannot-know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define 'abusive' discovery except in theory, because in practice we lack essential information." Easterbrook, Discovery as Abuse, 69 B.U.L.Rev. 635, 638-639 (1989).

**\*1968** [14] Plaintiffs do not, of course, dispute the requirement of plausibility and the need for something more than merely parallel behavior explained in *Theatre Enterprises,Monsanto,* and *Matsushita,* and their main argument against the plausibility standard at the pleading stage is its ostensible conflict with an early statement of ours construing Rule 8. Justice Black's opinion for the Court in *Conley v. Gibson* spoke not only of the need for fair notice of the grounds for entitlement to relief but of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S.Ct. 99.

This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the

pleadings; and the Court of Appeals appears to have read *Conley* in some such way when formulating its understanding of the proper pleading standard, see 425 F.3d, at 106, 114 (invoking *Conley's* "no set of facts" language in describing the standard for dismissal).[FN7]

> FN7. The Court of Appeals also relied on Chief Judge Clark's suggestion in *Nagler v. Admiral Corp.,* 248 F.2d 319 (C.A.2 1957), that facts indicating parallel conduct alone suffice to state a claim under § 1. 425 F.3d, at 114 (citing *Nagler, supra,* at 325). But *Nagler* gave no explanation for citing *Theatre Enterprises* (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

On such a focused and literal reading of *Conley's* "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint **\*1969** does not set forth a single fact in a context that suggests an agreement. 425 F.3d, at 106, 114. It seems fair to say that this approach to pleading would dispense with any showing of a " 'reasonably founded hope' " that a plaintiff would be able to make a case, see *Dura,* 544 U.S., at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps,* 421 U.S., at 741, 95 S.Ct. 1917); Mr. Micawber's optimism would be enough.

Seeing this, a good many judges and commentators

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

have balked at taking the literal terms of the _Conley_ passage as a pleading standard. See, _e.g., Car Carriers,_ 745 F.2d, at 1106 ("_Conley_ has never been interpreted literally") and, "[i]n practice, a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under _some_ viable legal theory" (internal quotation marks omitted; emphasis and omission in original); _Ascon Properties, Inc. v. Mobil Oil Co.,_ 866 F.2d 1149, 1155 (C.A.9 1989) (tension between _Conley's_ "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); _O'Brien v. DiGrazia,_ 544 F.2d 543, 546, n. 3 (C.A.1 1976) ("[W]hen a plaintiff ... supplies facts to support his claim, we do not think that _Conley_ imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional ... action into a substantial one"); _McGregor v. Industrial Excess Landfill, Inc.,_ 856 F.2d 39, 42-43 (C.A.6 1988) (quoting _O'Brien's_ analysis); Hazard, _From Whom No Secrets Are Hid,_ 76 Tex. L.Rev. 1665, 1685 (1998) (describing _Conley_ as having "turned Rule 8 on its head"); Marcus, The _Revival of Fact Pleading Under the Federal Rules of Civil Procedure,_ 86 Colum. L.Rev. 433, 463-465 (1986) (noting tension between _Conley_ and subsequent understandings of Rule 8).

We could go on, but there is no need to pile up further citations to show that _Conley's_ "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the _Conley_ Court, the passage should be understood in light of the opinion's preceding summary of the complaint's concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief. But the passage so often quoted · fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See _Sanjuan,_ 40 F.3d, at 251 (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, _Swierkiewicz,_ 534 U.S., at 514, 122 S.Ct. 992; _National Organization for Women, Inc. v. Scheidler,_ 510 U.S. 249, 256, 114 S.Ct. 798, 127

L.Ed.2d 99 (1994); _H.J. Inc. v. Northwestern Bell Telephone Co.,_ 492 U.S. 229, 249-250, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); _Hishon v. King & Spalding,_ 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). _Conley,_ then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.[FN8]

FN8. Because _Conley's_ " 'no set of facts' " language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been "cited as authority" by this Court and others. _Post,_ at 1978.Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court's statements in the years since _Conley._ See _Dura,_ 544 U.S., at 347, 125 S.Ct. 1627 (quoting _Blue Chip Stamps v. Manor Drug Stores,_ 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)); (requiring " 'reasonably founded hope that the [discovery] process will reveal relevant evidence' " to support the claim (alteration in _Dura_ )); _Associated Gen. Contractors of Cal., Inc. v. Carpenters,_ 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("It is not ... proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); _Wilson v. Schnettler,_ 365 U.S. 381, 383, 81 S.Ct. 632, 5 L.Ed.2d 620 (1961) ("In the absence of ... an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed ... a narcotics offense"). Nor are we reaching out to decide this issue in a case where the matter was not raised by the parties, see _post,_ at 1979, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of _Conley's_ "no set of facts" language and seek clarification of the standard. Brief for Petitioners 27-28; Brief for United States as _Amicus Curiae_ 22-25; see also Brief for Respondents 17

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                              Page 15
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

(describing "[p]etitioners and their amici" as mounting an "attack on *Conley's* 'no set of facts' standard").

The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to *Conley's* "no set of facts" language. See *post*, at 1979 - 1981. Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, e.g.,*Leimer v. State Mut. Life Assur. Co.*, 108 F.2d 302, 305 (C.A.8 1940) (" '[I]f, in view of what is alleged, it can reasonably be conceived that the plaintiffs ... could, upon a trial, establish a case which would entitle them to ... relief, the motion to dismiss should not have been granted' "); *Continental Collieries, Inc. v. Shober*, 130 F.2d 631, 635 (C.A.3 1942) ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it"). Rather, these cases stand for the unobjectionable proposition that, when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. Cf. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

**\*1970 III**

[15] When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short. To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. *Supra*, at 1962 - 1963.Although in form a few stray

statements speak directly of agreement,[FN9] on fair reading these are merely legal conclusions resting on the prior allegations. Thus, the complaint first takes account of the alleged "absence of any meaningful competition between [the ILECs] in one another's markets,""the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs,""and the other facts and market circumstances alleged [earlier]"; "in light of these, the complaint concludes "that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their ... markets and have agreed not to compete with one another." Complaint ¶ 51, App. 27.[FN10] The nub of the **\*1971** complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience.[FN11]

FN9. See Complaint ¶¶ 51, 64, App. 27, 30-31 (alleging that ILECs engaged in a "contract, combination or conspiracy" and agreed not to compete with one another).

FN10. If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by Rule 8. Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred (*i.e.*, "[b]eginning at least as early as February 6, 1996, and continuing to the present,"*id.,* ¶ 64, App. 30), the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies. This lack of notice contrasts sharply with the model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss. *Post*, at 1977.Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                    Page 16
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

FN11. The dissent's quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized. See 313 F.Supp.2d 174, 182 (S.D.N.Y.2003); 425 F.3d 99, 102-104 (C.A. 2005).

We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act in all the ways the plaintiffs allege, see *id.*, ¶ 47, App. 23-24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." *Id.*, ¶ 50, App. 26-27. But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to resist the 1996 Act; as the

District Court said, "each ILEC has reason to want to avoid dealing with CLECs" and "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." 313 F.Supp.2d, at 184; cf. *Kramer v. Pollock-Krasner Foundation,* 890 F.Supp. 250, 256 (S.D.N.Y.1995) (while the plaintiff "may believe the defendants conspired ..., the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy").<sup>FN12</sup>

FN12. From the allegation that the ILECs belong to various trade associations, see Complaint ¶ 46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be "buttressed by the common sense of Adam Smith." *Post*, at 1985 - 1986, 1987 - 1988. If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

**\*1972** Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was supposedly passed in the " 'hop[e] that the large incumbent local monopoly companies ... might attack their neighbors' service areas, as they are the best situated to do so.' " Complaint ¶ 38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p. 12 (Feb.2000)). Contrary to hope, the ILECs declined " 'to enter each other's service territories in any significant way,' " Complaint ¶ 38, App. 20, and the local telephone and high speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on this state of affairs, and perceiving the ILECs to be blessed with "especially attractive business opportunities" in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." *Id.*, ¶ 40, App. 21.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                      Page 17
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

claim.[FN14]

But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, but here we have an obvious alternative explanation. In the decade preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. See _Verizon Communications Inc. v. FCC, 535 U.S. 467, 477-478, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002)_ (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

[16][17][18] In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf. Although the complaint says generally that the ILECs passed up "especially attractive business opportunit[ies]" by declining to compete as CLECs against other ILECs, Complaint ¶ 40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period,[FN13] and *1973 the complaint is replete with indications that any CLEC faced nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements of the 1996 Act, _id.,_ ¶ 47; App. 23-26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." Areeda & Hovenkamp ¶ 307d, at 155 (Supp.2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court's assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1

FN13. The complaint quoted a reported statement of Qwest's CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it " 'might be a good way to turn a quick dollar.' " ¶ 42, App. 22 (quoting Chicago Tribune, Oct. 31, 2002, Business Section, p. 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See Fed. Rule Evid. 201.

Notebaert was also quoted as saying that entering new markets as a CLEC would . not be "a sustainable economic model" because the CLEC pricing model is "just ... nuts." Chicago Tribune, Oct. 31, 2002, Business Section, p. 1 (cited at Complaint ¶ 42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it "unwise" to "base a business plan" on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p. 2 (cited at Complaint ¶ 45, App. 23).

FN14. In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished " 'by the process of amending the Federal Rules, and not by judicial interpretation.' " _Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)_ (quoting _Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)_). On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires. Fed. Rules Civ. Proc. 9(b)-(c). Here, our concern is not that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                              Page 18
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

allegations in the complaint were insufficiently "particular[ized]", *ibid.*; rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

Plaintiffs say that our analysis runs counter to *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792[, 93 S.Ct. 1817, 36 L.Ed.2d 668] (1973)." They argue that just as the prima facie case is a "flexible evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases,"*Swierkiewicz, supra,* at 512, 122 S.Ct. 992,"transpos[ing] 'plus factor' summary judgment analysis woodenly into a rigid Rule 12(b)(6) pleading standard ... would be unwise," Brief for Respondents 39. As the District Court correctly understood, however, "*Swierkiewicz*" did not change the law of pleading, but simply re-emphasized ... that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." 313 F.Supp.2d, at 181 (citation and footnote omitted). Even though Swierkiewicz'spleadings "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," the Court of Appeals dismissed his complaint for failing to allege certain additional facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. *Swierkiewicz,* 534 U.S., at 514, 122 S.Ct. 992. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyond *1974 those necessary to state his claim and the grounds showing entitlement to relief. *Id.,* at 508, 122 S.Ct. 992.

Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their

complaint must be dismissed.

* * *

The judgment of the Court of Appeals for the Second Circuit is reversed, and the cause is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice STEVENS, with whom Justice GINSBURG joins except as to Part IV, dissenting.
In the first paragraph of its 24-page opinion the Court states that the question to be decided is whether allegations that "major telecommunications providers engaged in certain parallel conduct unfavorable to competition" suffice to state a violation of § 1 of the Sherman Act. *Ante,* at 1961.The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), would adequately resolve this case. As *Theatre Enterprises* held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. *Id.,* at 540-542, 74 S.Ct. 257.

Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, however, that conduct is the product of a horizontal agreement among potential competitors, it was unlawful. Plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion that the charge is not "plausible" provide a legally acceptable reason for dismissing the complaint? I think not.

Respondents' amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners

"entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and

127 S.Ct. 1955                                                                                          Page 19
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

markets to one another." Amended Complaint in No. 02 CIV. 10220(GEL) (SDNY) ¶ 51, App. 27 (hereinafter Complaint).

The complaint explains that, contrary to Congress' expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing upon each other's markets and have refused to permit nonincumbent competitors to access their networks. The complaint quotes Richard Notebaert, the former CEO of one such ILEC, as saying that competing in a neighboring ILEC's territory "might be a good way to turn a quick dollar but that doesn't make it right." *Id.,* ¶ 42, App. 22. Moreover, respondents allege that petitioners "communicate amongst themselves" through numerous industry associations. *Id.,* ¶ 46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic *per se* violation of the Sherman Act. See Report*1975 of the Attorney General's National Committee to Study the Antitrust Laws 26 (1955).

Under rules of procedure that have been well settled since well before our decision in *Theatre Enterprises,* a judge ruling on a defendant's motion to dismiss a complaint, "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002);* see *Overstreet v. North Shore Corp., 318 U.S. 125, 127, 63 S.Ct. 494, 87 L.Ed. 656 (1943).* But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of sworn depositions or other limited discovery-and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement-the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway,"*ante,* at 1971; that "there was just no need for joint encouragement to resist the 1996 Act,"*ante,* at 1971; and that the "natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same

thing,"*ante,* at 1972.

The Court and petitioners' legal team are no doubt correct that the parallel conduct alleged is consistent with the absence of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the *presence* of the illegal agreement alleged in the complaint. And the charge that petitioners "agreed not to compete with one another" is not just one of "a few stray statements," *ante,* at 1970; it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.

Two practical concerns presumably explain the Court's dramatic departure from settled procedural law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decisionmaking. More importantly, they do not justify an interpretation of Federal Rule of Civil Procedure 12(b)(6) that seems to be driven by the majority's appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.

I

Rule 8(a)(2) of the Federal Rules requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The rule did not come about by happenstance and its language is not inadvertent. The English experience with Byzantine special pleading rules-illustrated by the hypertechnical Hilary rules of 1834 [FN1]-made obvious*1976 the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                    Page 20
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

influential New York Code of 1848, which required "[a] statement of the facts constituting the cause of action, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N.Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence").

> FN1. See 9 W. Holdsworth, History of English Law 324-327 (1926).

A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead "facts" rather than "conclusions," a distinction that proved far easier to say than to apply. As commentators have noted,

> "it is virtually impossible logically to distinguish among 'ultimate facts,' 'evidence,' and 'conclusions.' Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described." Weinstein & Distler, Comments on Procedural Reform: Drafting Pleading Rules, 57 Colum. L.Rev. 518, 520-521 (1957).

See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L.Rev. 416, 417 (1921) (hereinafter Cook) ("[T]here is no logical distinction between statements which are grouped by the courts under the phrases 'statements of fact' and 'conclusions of law' "). Rule 8 was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions." See 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, p. 207 (3d ed.2004) (hereinafter Wright & Miller) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the

distinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' ...").

Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See *Swierkiewicz*, 534 U.S., at 514, 122 S.Ct. 992 ("The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim"). Charles E. Clark, the "principal draftsman" of the Federal Rules,[FN2] put it this way:

> FN2. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 283, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988).

"Experience has shown ... that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result." The *1977 New Federal Rules of Civil Procedure: The Last Phase-Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A.B.A.J. 976, 977 (1937) (hereinafter Clark, New Federal Rules).

The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of Form 9, a complaint for negligence. As relevant, the Form 9 complaint states only: "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C.App., p. 829 (hereinafter Form 9). The complaint then describes the plaintiff's injuries and demands judgment. The asserted ground for relief-namely, the defendant's negligent driving-would have been called a " 'conclusion of law' " under the code pleading of old. See, e.g., Cook 419. But that bare allegation suffices under a system that "restrict[s] the pleadings to the task of general notice-giving and invest[s] the deposition-discovery process with a

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal. Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly Fed. S 267

vital role in the preparation for trial." <u>FN3</u> *Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947); see also *Swierkiewicz,* 534 U.S., at 513, n. 4, 122 S.Ct. 992 (citing Form 9 as an example of " 'the simplicity and brevity of statement which the rules contemplate' "); *Thomson v. Washington,* 362 F.3d 969, 970 (C.A.7 2004) (Posner, J.) ("The federal rules replaced fact pleading with notice pleading").

> FN3. The Federal Rules do impose a "particularity" requirement on "all averments of fraud or mistake,"Fed. Rule Civ. Proc. 9(b), neither of which has been alleged in this case. We have recognized that the canon of *expresio unius est exclusio alterius* applies to Rule 9(b). See *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

## II

It is in the context of this history that *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), must be understood. The *Conley* plaintiffs were black railroad workers who alleged that their union local had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient specificity. Writing for a unanimous Court, Justice Black rejected the union's claim as foreclosed by the language of Rule 8. *Id.,* at 47-48, 78 S.Ct. 99. In the course of doing so, he articulated the formulation that the Court rejects today: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.,* at 45-46, 78 S.Ct. 99.

Consistent with the design of the Federal Rules, *Conley's* "no set of facts" formulation permits outright dismissal only when proceeding to discovery or beyond would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle

him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps *Conley's* "no set of facts" language. Concluding that the phrase has been "questioned, criticized, and explained away long enough,"*ante,* at 1969, the Court dismisses it as careless composition.

**\*1978** If *Conley's* "no set of facts" language is to be interred, let it not be without a eulogy. That exact language, which the majority says has "puzzl[ed] the profession for 50 years,"*ibid.,* has been cited as authority in a dozen opinions of this Court and four separate writings.<u>FN4</u> In not one of those 16 opinions was the language "questioned," "criticized," or "explained away." Indeed, today's opinion is the first by any Member of this Court to express *any* doubt as to the adequacy of the *Conley* formulation. Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language the majority repudiates: whether it appears "beyond doubt" that "no set of facts" in support of the claim would entitle the plaintiff to relief.<u>FN5</u>

> FN4. *SEC v. Zandford,* 535 U.S. 813, 818, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002); *Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Brower v. County of Inyo,* 489 U.S. 593, 598, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)*(per curiam); McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)*(per curiam); Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)*(per curiam); Jenkins v. McKeithen,* 395 U.S. 411, 422, 89 S.Ct. 1843, 23

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                                                    Page 22
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

L.Ed.2d 404 (1969) (plurality opinion); see also *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 554, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (Brennan, J., concurring in part and dissenting in part); *Hoover v. Ronwin*, 466 U.S. 558, 587, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (STEVENS, J., dissenting); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 561, n. 1, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (Marshall, J., dissenting); *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 55, n. 6, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (Brennan, J., concurring in judgment).

FN5. See, e.g., *EB Invs., LLC v. Atlantis Development, Inc.*, 930 So.2d 502, 507 (Ala.2005); *Department of Health & Social Servs. v. Native Village of Curyung*, 151 P.3d 388, 396 (Alaska 2006); *Newman v. Maricopa Cty.*, 167 Ariz. 501, 503, 808 P.2d 1253, 1255 (App.1991); *Public Serv. Co. of Colo. v. Van Wyk*, 27 P.3d 377, 385-386 (Colo.2001) (en banc); *Clawson v. St. Louis Post-Dispatch, LLC*, 906 A.2d 308, 312 (D.C.2006); *Hillman Constr. Corp. v. Wainer*, 636 So.2d 576, 578 (Fla.App.1994); *Kaplan v. Kaplan*, 266 Ga. 612, 613, 469 S.E.2d 198, 199 (1996); *Wright v. Home Depot U.S.A.*, 111 Hawai'i 401, 406, 142 P.3d 265, 270 (2006); *Taylor v. Maile*, 142 Idaho 253, 257, 127 P.3d 156, 160 (2005); *Fink v. Bryant*, 2001-CC-0987, p. 4 (La.11/28/01), 801 So.2d 346, 349; *Gagne v. Cianbro Corp.*, 431 A.2d 1313, 1318-1319 (Me.1981); *Gasior v. Massachusetts Gen. Hospital*, 446 Mass. 645, 647, 846 N.E.2d 1133, 1135 (2006); *Ralph Walker, Inc. v. Gallagher*, 926 So.2d 890, 893 (Miss.2006); *Jones v. Montana Univ. System*, 337 Mont. 1, 7, 155 P.3d 1247, 1254 (2007); *Johnston v. Nebraska Dept. of Correctional Servs.*, 270 Neb. 987, 989, 709 N.W.2d 321, 324 (2006); *Blackjack Bonding v. Las Vegas Municip. Ct.*, 116 Nev. 1213, 1217, 14 P.3d 1275, 1278 (2000); *Shepard v. Ocwen Fed. Bank*, 361 N.C. 137, 139, 638 S.E.2d 197, 199 (2006); *Rose v. United Equitable Ins. Co.*, 2001 ND 154, ¶ 10, 632 N.W.2d 429, 434; *State ex rel. Turner v. Houk*, 112 Ohio St.3d 561, 562, 2007-Ohio-814, ¶ 5, 862 N.E.2d 104, 105(per curiam);

*Moneypenney v. Dawson*, 2006 OK 53, ¶ 2, 141 P.3d 549, 551; *Gagnon v. State*, 570 A.2d 656, 659 (R.I.1990); *Osloond v. Farrier*, 2003 SD 28, ¶ 4, 659 N.W.2d 20, 22(per curiam); *Smith v. Lincoln Brass Works, Inc.*, 712 S.W.2d 470, 471 (Tenn.1986); *Association of Haystack Property Owners v. Sprague*, 145 Vt. 443, 446, 494 A.2d 122, 124 (1985); *In re Coday*, 156 Wash.2d 485, 497, 130 P.3d 809, 815 (2006) (en banc); *Haines v. Hampshire Cty. Comm'n*, 216 W.Va. 499, 502, 607 S.E.2d 828, 831 (2004); *Warren v. Hart*, 747 P.2d 511, 512 (Wyo.1987); see also *Malpiede v. Townson*, 780 A.2d 1075, 1082-1083 (Del.2001) (permitting dismissal only "where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint" (internal quotation marks omitted)); *Canel v. Topinka*, 212 Ill.2d 311, 318, 288 Ill.Dec. 623, 818 N.E.2d 311, 317 (2004) (replacing "appears beyond doubt" in the *Conley* formulation with "is clearly apparent"); *In re Young*, 522 N.E.2d 386, 388 (Ind.1988)(per curiam) (replacing "appears beyond doubt" with "appears to a certainty"); *Barkema v. Williams Pipeline Co.*, 666 N.W.2d 612, 614 (Iowa 2003) (holding that a motion to dismiss should be sustained "only when there exists no conceivable set of facts entitling the non-moving party to relief"); *Pioneer Village v. Bullitt Cty.*, 104 S.W.3d 757, 759 (Ky.2003) (holding that judgment on the pleadings should be granted "if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief"); *Corley v. Detroit Bd. of Ed.*, 470 Mich. 274, 277, 681 N.W.2d 342, 345 (2004)(per curiam) (holding that a motion for judgment on the pleadings should be granted only " 'if no factual development could possibly justify recovery' "); *Oberkramer v. Ellisville*, 706 S.W.2d 440, 441 (Mo.1986) (en banc) (omitting the words "beyond doubt" from the *Conley* formulation); *Colman v. Utah State Land Bd.*, 795 P.2d 622, 624 (Utah 1990) (holding that a motion to dismiss is appropriate "only if it clearly appears that [the plaintiff] can prove no set of facts in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                Page 23
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

support of his claim"); *NRC Management Servs. Corp. v. First Va. Bank-Southwest,* 63 Va. Cir. 68, 70, 2003 WL 23540085 (2003) ( "The Virginia standard is identical [to the *Conley* formulation], though the Supreme Court of Virginia may not have used the same words to describe it").

**\*1979** Petitioners have not requested that the *Conley* formulation be retired, nor have any of the six *amici* who filed briefs in support of petitioners. I would not rewrite the Nation's civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process-a rulemaking process-for revisions of that order. See 28 U.S.C. §§ 2072-2074 (2000 ed. and Supp. IV).

Today's majority calls *Conley's* " 'no set of facts' " language "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Ante,* at 1969. This is not and cannot be what the *Conley* Court meant. First, as I have explained, and as the *Conley* Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts.[FN6] The "pleading standard" label the majority gives to what it reads into the *Conley* opinion-a statement of the permissible factual support for an adequately pleaded complaint-would not, therefore, have impressed the *Conley* Court itself. Rather, that Court would have understood the majority's remodeling of its language to express an *evidentiary* standard, which the *Conley* Court had neither need nor want to explicate. Second, it is pellucidly clear that the *Conley* Court was interested in what a complaint *must* contain, not what it *may* contain. In fact, the Court said without qualification that it was "appraising the *sufficiency* of the complaint." **\*1980** 355 U.S., at 45, 78 S.Ct. 99 (emphasis added). It was, to paraphrase today's majority, describing "the minimum standard of adequate pleading to govern a complaint's survival," *ante,* at 1969.

FN6. The majority is correct to say that what the Federal Rules require is a " 'showing' " of entitlement to relief. *Ante,* at 1965, n. 3. Whether and to what extent that "showing" requires allegations of fact will depend on

the particulars of the claim. For example, had the amended complaint in this case alleged *only* parallel conduct, it would not have made the required "showing." See *supra,* at 1974. Similarly, had the pleadings contained *only* an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of "bareness" with which the Federal Rules are concerned. A plaintiff's inability to persuade a district court that the allegations actually included in her complaint are "plausible" is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

We can be triply sure as to *Conley's* meaning by examining the three Court of Appeals cases the *Conley* Court cited as support for the "accepted rule" that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45-46, 78 S.Ct. 99. In the first case, *Leimer v. State Mut. Life Assur. Co. of Worcester, Mass.,* 108 F.2d 302 (C.A.8 1940), the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing the District Court's grant of the defendant's motion to dismiss, the Eighth Circuit noted that court's own longstanding rule that, to warrant dismissal, " 'it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.' " *Id.,* at 305 (quoting *Winget v. Rockwood,* 69 F.2d 326, 329 (C.A.8 1934)).

The *Leimer* court viewed the Federal Rules-specifically Rules 8(a)(2), 12(b)(6), 12(e) (motion for a more definite statement), and 56 (motion for summary judgment)-as reinforcing the notion that "there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim." 108 F.2d, at 306. The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should

127 S.Ct. 1955                                                                                    Page 24
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

determine the fate of a complaint: "No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint." *Ibid.*

The Third Circuit relied on *Leimer's* admonition in *Continental Collieries, Inc. v. Shober,* 130 F.2d 631 (1942), which the *Conley* Court also cited in support of its "no set of facts" formulation. In a diversity action the plaintiff alleged breach of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state law. The Court of Appeals reversed, concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in *Leimer*: "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." 130 F.3d, at 635.

The third case the *Conley* Court cited approvingly was written by Judge Clark himself. In *Dioguardi v. Durning,* 139 F.2d 774 (C.A.2 1944), the *pro se* plaintiff, an importer of "tonics," charged the customs inspector with auctioning off the plaintiff's former merchandise for less than was bid for it-and indeed for an amount equal to the plaintiff's own bid- and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held the lead rein in drafting, Judge Clark said that the defendant

"could have disclosed the facts from his point of view, in advance of a trial if he **\*1981** chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so firmly believes and what for present purposes defendant must be taken as admitting." *Id.,* at 775.

As any civil procedure student knows, Judge Clark's

opinion disquieted the defense bar and gave rise to a movement to revise Rule 8 to require a plaintiff to plead a " 'cause of action.' " See 5 Wright & Miller § 1201, at 86-87. The movement failed, see *ibid.;* *Dioguardi* was explicitly approved in *Conley;* and "[i]n retrospect the case itself seems to be a routine application of principles that are universally accepted," 5 Wright & Miller § 1220, at 284-285.

In light of *Leimer,* *Continental Collieries,* and *Dioguardi, Conley's* statement that a complaint is not to be dismissed unless "no set of facts" in support thereof would entitle the plaintiff to relief is hardly "puzzling," *ante,* at 1969. It reflects a philosophy that, unlike in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process. *Conley's* language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.

We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since *Conley.* For example, in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), we reversed the Court of Appeals' dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that petitioners' claims were barred by sovereign immunity. In a unanimous opinion by then-Justice Rehnquist, we emphasized that

"[w]hen a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.*" *Id.,* at 236, 94 S.Ct. 1683 (emphasis added).

The *Rhodes* plaintiffs had "alleged generally and in conclusory terms" that the defendants, by calling out the National Guard to suppress the Kent State University student protests, "were guilty of wanton, wilful and negligent conduct." *Krause v. Rhodes,* 471 F.2d 430, 433 (C.A.6 1972). We reversed the Court of Appeals on the ground that "[w]hatever the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated

127 S.Ct. 1955                                                              Page 25
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure," were not barred by the Eleventh Amendment because they were styled as suits against the defendants in their individual capacities. 416 U.S., at 238, 94 S.Ct. 1683.

We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in _Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,_ 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort to craft a standard for pleading municipal liability that accounted for "the enormous expense involved today in litigation,"_Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit,_ 954 F.2d 1054, 1057 (1992) (internal quotation marks omitted), by requiring a plaintiff to "state with factual detail and *1982 particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity." _Leatherman,_ 507 U.S., at 167, 113 S.Ct. 1160 (internal quotation marks omitted). We found this language inconsistent with Rules 8(a)(2) and 9(b) and emphasized that motions to dismiss were not the place to combat discovery abuse: "In the absence of [an amendment to Rule 9(b) ], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." _Id.,_ at 168-169, 113 S.Ct. 1160.

Most recently, in _Swierkiewicz,_ 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1, we were faced with a case more similar to the present one than the majority will allow. In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting evidentiary burdens imposed under the framework articulated in _McDonnell Douglas Corp. v. Green,_ 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See, e.g.,_Trans World Airlines, Inc. v. Thurston,_ 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the

_McDonnell Douglas_ standard.

We reversed in another unanimous opinion, holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the _McDonnell Douglas_ framework does not apply in every employment discrimination case." _Swierkiewicz,_ 534 U.S., at 511, 122 S.Ct. 992. We also observed that Rule 8(a)(2) does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage. Rather, the "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." _Id.,_ at 512, 122 S.Ct. 992; see Brief for United States et al. as _Amici Curiae_ in _Swierkiewicz v. Sorema N. A.,_ O.T.2001, No. 00-1853, p. 10 (stating that a Rule 12(b)(6) motion is not "an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint" (internal quotation marks omitted)).FN7

> FN7. See also 5 Wright & Miller § 1202, at 89-90 ("[P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings" (footnotes omitted)).

As in the discrimination context, we have developed an evidentiary framework for evaluating claims under § 1 of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See _Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,_ 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under _Matsushita,_ a plaintiff's allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct of the defendants. In order to survive a Rule 56 motion, a § 1 plaintiff "must present evidence 'that tends to exclude*1983

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                    Page 26
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

the possibility' that the alleged conspirators acted independently.' " *Id.*, at 588, 106 S.Ct. 1348 (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). That is, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action." 475 U.S., at 588, 106 S.Ct. 1348.

Everything today's majority says would therefore make perfect sense if it were ruling on a Rule 56 motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of *Swierkiewicz* that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because-in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior-the claimed conspiracy is "conceivable" but not "plausible," *ante*, at 1974. I have my doubts about the majority's assessment of the plausibility of this alleged conspiracy. See Part III, *infra*. But even if the majority's speculation is correct, its "plausibility" standard is irreconcilable with Rule 8 and with our governing precedents. As we made clear in *Swierkiewicz* and *Leatherman*, fear of the burdens of litigation does not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.

This case is a poor vehicle for the Court's new pleading rule, for we have observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,'... dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (quoting *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)); see also *Knuth v. Erie-Crawford Dairy Cooperative Assn.*, 395 F.2d 420, 423 (C.A.3 1968) ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings"). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney's fees for successful plaintiffs indicates that

Congress intended to encourage, rather than discourage, private enforcement of the law. See *Radovich v. National Football League*, 352 U.S. 445, 454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) ("Congress itself has placed the private antitrust litigant in a most favorable position .... In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws"). It is therefore more, not less, important in antitrust cases to resist the urge to engage in armchair economics at the pleading stage.

The same year we decided *Conley,* Judge Clark wrote, presciently,

> "I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of the parties. Experience has found no quick and easy short cut for trials in cases generally *and antitrust cases in particular*." Special Pleading in the "Big Case"? in Procedure-The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds.1965) (hereinafter **1984** Clark, Special Pleading in the Big Case) (emphasis added).

In this "Big Case," the Court succumbs to the temptation that previous Courts have steadfastly resisted.[FN8] While the majority assures us that it is not applying any " 'heightened' " pleading standard, see *ante*, at 1973, n. 14, I shall now explain why I have a difficult time understanding its opinion any other way.

> FN8. Our decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), is not to the contrary. There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action. Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the *Dura* complaint failed to "provide the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." *Id.*, at 347, 125 S.Ct.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                    Page 27
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

1627. Here, the failure the majority identifies is not a failure of notice-which "notice pleading" rightly condemns-but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred. That being a question not of *notice* but of *proof*, it should not be answered without first hearing from the defendants (as apart from their lawyers).

Similarly, in *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries *as alleged* were not "the type that the antitrust statute was intended to forestall." *Id.,* at 540, 103 S.Ct. 897; see *id.,* at 526, 103 S.Ct. 897 ("As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged").

### III

The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, see, *e.g.,Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 526-527, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, see *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489-490, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Rather, the theory on which the Court permits dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all. This is a mind-boggling conclusion.

As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other. The new statute was enacted to replace a monopolistic market with a competitive one. The Act did not merely require the regional monopolists to take affirmative steps to facilitate entry into new competitors, see *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004); it also permitted the existing firms to compete with each other and to expand their operations into previously forbidden territory. See 47 U.S.C. § 271. Each of the defendants decided not to take the latter step. That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision. I am even willing to entertain the majority's belief that any agreement among the companies was unlikely. But the plaintiffs allege in three places in their complaint, ¶¶ 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other. And as the Court *1985 recognizes, at the motion to dismiss stage, a judge assumes "that all the allegations in the complaint are true (even if doubtful in fact)." *Ante,* at 1965.

The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that "in form a few stray statements in the complaint speak directly of agreement," but disregards those allegations by saying that "on fair reading these are merely legal conclusions resting on the prior allegations" of parallel conduct. *Ante,* at 1970. The Court's dichotomy between factual allegations and "legal conclusions" is the stuff of a bygone era, *supra,* at 1976 - 1977. That distinction was a defining feature of code pleading, see generally Clark, The Complaint in Code Pleading, 35 Yale L.J. 259 (1925-1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See *United States v. Employing Plasterers Assn. of Chicago,* 347 U.S. 186, 188, 74 S.Ct. 452, 98 L.Ed. 618 (1954) (holding, in an antitrust case, that the Government's allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint "[w]hether these charges be called 'allegations of fact' or 'mere conclusions of the pleader' "); *Brownlee v. Conine,* 957 F.2d 353, 354 (C.A.7 1992) ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, ... so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliche

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955                                                                    Page 28
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

means, does not automatically condemn it"); *Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 3-4 (C.A.9 1963)* ("[O]ne purpose of Rule 8 was to get away from the highly technical distinction between statements of fact and conclusions of law ..."); *Oil, Chemical & Atomic Workers Int'l Union v. Delta, 277 F.2d 694, 697 (C.A.6 1960)* ("Under the notice system of pleading established by the Rules of Civil Procedure, ... the ancient distinction between pleading 'facts' and 'conclusions' is no longer significant"); 5 Wright & Miller § 1218, at 267 ("[T]he federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties"). "Defendants entered into a contract" is no more a legal conclusion than "defendant negligently drove," see Form 9; *supra,* at 1977.Indeed it is less of one.[FN9]

> FN9. The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by Rule 8 because it lacks specificity. *Ante,* at 1970 - 1971, n. 10. The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement. See *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).* Petitioners made no such motion and indeed have conceded that "[o]ur problem with the current complaint is not a lack of specificity, it's quite specific." Tr. of Oral Arg. 14. Thus, the fact that "the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies,"*ante,* at 1971, n. 10, is, for our purposes, academic.

Even if I were inclined to accept the Court's anachronistic dichotomy and ignore the complaint's actual allegations, I would dispute the Court's suggestion that any inference of agreement from petitioners' parallel conduct is "implausible." Many years ago a truly great economist perceptively observed that "[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds.1952). I am not so cynical as to accept that sentiment at face

value, but I need not do so here. Respondents' complaint *1986 points not only to petitioners' numerous opportunities to meet with each other, Complaint ¶ 46, App. 23,[FN10] but also to Notebaert's curious statement that encroaching on a fellow incumbent's territory "might be a good way to turn a quick dollar but that doesn't make it right,"*id.,* ¶ 42, App. 22. What did he mean by that? One possible (indeed plausible) inference is that he meant that while it would be in his company's economic self-interest to compete with its brethren, he had agreed with his competitors not to do so. According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert's statement, *id.,* ¶ 44, App. 22 (calling the statement "evidence of potential collusion among regional Bell phone monopolies to not compete against one another and kill off potential competitors in local phone service"), and that is how Members of Congress construed his company's behavior, *id.,* ¶ 45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs' "very apparent non-competition policy" was coordinated).

> FN10. The Court describes my reference to the allegation that the defendants belong to various trade associations as "playfully" suggesting that the defendants conspired to restrain trade. *Ante,* at 1971 - 1972, n. 12. Quite the contrary: an allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with-though not sufficient to prove-the plaintiffs' entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement. Indeed, if it were true that the plaintiffs "rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs,"*ante,* at 1970, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run. That's what his lawyers tell us anyway. See Brief for Petitioners 36. But I would think that no one would know better what Notebaert meant than Notebaert himself. Instead of permitting respondents

127 S.Ct. 1955                                                    Page 29
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

to ask Notebaert, however, the Court looks to other quotes from that and other articles and decides that what he meant was that entering new markets as a CLEC would not be a " 'sustainable economic model.' " *Ante*, at 1972 - 1973, n. 13. Never mind that-as anyone ever interviewed knows-a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject's views for posterity. But more importantly the District Court was required at this stage of the proceedings to construe Notebaert's ambiguous statement in the plaintiffs' favor.[FN11] See *Allen v. Wright*, 468 U.S. 737, 768, n. 1, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The inference the statement supports-that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to do so were the product of an agreement-sits comfortably within the realm of possibility. That is all the Rules require.

> FN11. It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants' favor at the pleading stage by citing to a rule of evidence, *ante*, at 1972 - 1973, n. 13. Under Federal Rule of Evidence 201(b), a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint. On the other hand, I surely would not have dismissed the complaint *1987 without requiring the defendants to answer the charge that they "have agreed not to compete with one another and otherwise allocated customers and markets to one another."[FN12] ¶ 51, App. 27. Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.

> FN12. The Court worries that a defendant seeking to respond to this "conclusory" allegation "would have little idea where to begin." *Ante*, at 1971, n. 10. A defendant could, of course, begin by either denying or admitting the charge.

Respondents in this case proposed a plan of " 'phased discovery' " limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25-26. Two petitioners rejected the plan. *Ibid.* Whether or not respondents' proposed plan was sensible, it was an appropriate subject for negotiation.[FN13] Given the charge in the complaint-buttressed by the common sense of Adam Smith-I cannot say that the possibility that joint discussions*1988 and perhaps some agreements played a role in petitioners' decisionmaking process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportunity to prove their claims. See Clark, New Federal Rules 977 ("[T]hrough the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of *proof*, and do not need to force the pleadings to their less appropriate function").

> FN13. The potential for "sprawling, costly, and hugely time-consuming" discovery, *ante*, at 1967, n. 6, is no reason to throw the baby out with the bathwater. The Court vastly underestimates a district court's case-management arsenal. Before discovery even begins, the court may grant a defendant's Rule 12(e) motion; Rule 7(a) permits a trial court to order a plaintiff to reply to a defendant's answer, see *Crawford-El v. Britton*, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); and Rule 23 requires "rigorous analysis" to ensure that class certification is appropriate, *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); see *In re Initial Public Offering Securities Litigation*, 471 F.3d 24 (C.A.2 2006) (holding that a district court may not certify a class without ruling that each Rule 23 requirement is met, even if a requirement overlaps with a merits issue). Rule 16

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal. Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly Fed. S 267

invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia,* "the elimination of frivolous claims or defenses," Rule 16(c)(1); "the necessity or desirability of amendments to the pleadings," Rule 16(c)(2); "the control and scheduling of discovery," Rule 16(c)(6); and "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," Rule 16(c)(12). Subsequently, Rule 26 confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See 523 U.S., at 598-599, 118 S.Ct. 1584. Indeed, Rule 26(c) specifically permits a court to take actions "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope.

In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility *vel non* without requiring an answer from the defendant. See *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 206, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) ("Rule 34 is sufficiently flexible to be adapted to the exigencies of particular litigation"). And should it become apparent over the course of litigation that a plaintiff's filings bespeak an *in terrorem* suit, the district court has at its call its own *in terrorem* device, in the form of a wide array of Rule 11 sanctions. See Rules 11(b), (c) (authorizing sanctions if a suit is presented "for any improper

purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"); see *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991) (holding that Rule 11 applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); *Atkins v. Fischer,* 232 F.R.D. 116, 126 (D.D.C.2005) ("As possible sanctions pursuant to Rule 11, the court has an arsenal of options at its disposal").

I fear that the unfortunate result of the majority's new pleading rule will be to invite lawyers' debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence. It is no surprise that the antitrust defense bar-among whom "lament" as to inadequate judicial supervision of discovery is most "common," see *ante,* at 1967-should lobby for this state of affairs. But "we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public." Clark, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend the Federal Rules-not our interpretation of them.[FN14] See *Swierkiewicz,* 534 U.S., at 515, 122 S.Ct. 992; *Crawford-El v. Britton,* 523 U.S. 574, 595, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Leatherman,* 507 U.S., at 168, 113 S.Ct. 1160.

FN14. Given his "background in antitrust law," *ante,* at 1968, n. 6, Judge Easterbrook has recognized that the most effective solution to discovery abuse lies in the legislative and rulemaking arenas. He has suggested that the remedy for the ills he complains of requires a revolution in the rules of civil procedure:

"Perhaps a system in which judges pare away issues and focus on investigation is too radical to contemplate in this country-although it prevailed here before 1938, when the Federal Rules of Civil Procedure were adopted. The change could not be accomplished without abandoning notice pleading, increasing the number of

127 S.Ct. 1955                                                                                                      Page 31
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal.
Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly
Fed. S 267

judicial officers, and giving them more authority .... If we are to rule out judge-directed discovery, however, we must be prepared to pay the piper. Part of the price is the high cost of unnecessary discovery-impositional and otherwise." <u>Discovery as Abuse, 69 B.U.L.Rev. 635, 645 (1989)</u>.

IV

Just a few weeks ago some of my colleagues explained that a strict interpretation of the literal text of statutory language is essential to avoid judicial decisions that are not faithful to the intent of Congress. <u>Zuni Public School Dist. No. 89 v. Department of Education, 550 U.S. ----, ----, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007)</u> (SCALIA, J., dissenting). I happen to believe that there are cases in which other tools of construction are more reliable than text, but I agree of course that congressional intent should guide us in matters of statutory interpretation. <u>Id., at 1534, 127 S.Ct. 1534</u> (STEVENS, J., concurring). This is a case in which the intentions of the drafters of three important sources of law-the Sherman Act, the Telecommunications Act of 1996, and the Federal Rules of Civil Procedure-all point unmistakably in the same direction, yet the Court marches resolutely the other way. Whether the Court's actions will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer. But that the Court has announced a significant new rule that does not even purport to respond **1989** to any congressional command is glaringly obvious.

The transparent policy concern that drives the decision is the interest in protecting antitrust defendants-who in this case are some of the wealthiest corporations in our economy-from the burdens of pretrial discovery. <u>Ante,</u> at 1966 - 1967. Even if it were not apparent that the legal fees petitioners have incurred in arguing the merits of their <u>Rule 12(b)</u> motion have far exceeded the cost of limited discovery, or that those discovery costs would burden respondents as well as petitioners,[FN15] that concern would not provide an adequate justification for this law-changing decision. For in the final analysis it is only a lack of confidence in the ability of trial judges to control discovery, buttressed by

appellate judges' independent appraisal of the plausibility of profoundly serious factual allegations, that could account for this stark break from precedent.

> [FN15.] It would be quite wrong, of course, to assume that dismissal of an antitrust case after discovery is costless to plaintiffs. See <u>Fed. Rule Civ. Proc. 54(d)(1)</u> ("[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs").

If the allegation of conspiracy happens to be true, today's decision obstructs the congressional policy favoring competition that undergirds both the Telecommunications Act of 1996 and the Sherman Act itself. More importantly, even if there is abundant evidence that the allegation is untrue, directing that the case be dismissed without even looking at any of that evidence marks a fundamental-and unjustified-change in the character of pretrial practice.

Accordingly, I respectfully dissent.

U.S.,2007.
Bell Atlantic Corp. v. Twombly
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal. Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly Fed. S 267

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 4**

Westlaw.

82 S.Ct. 549                                                                                     Page 1
369 U.S. 31, 43 P.U.R.3d 32, 82 S.Ct. 549, 7 L.Ed.2d 512

▷Bailey v. Patterson,
U.S.Miss. 1962.

Supreme Court of the United States
Samuel BAILEY et al., Appellants,
v.
Joe T. PATTERSON et al.
**No. 643.**

Decided Feb. 26, 1962.

Suit to enjoin enforcement of state 'peace statutes' and statutes requiring racial segregation on common carriers or in facilities maintained by them. A three-judge District Court, 199 F.Supp. 595, abstained from further proceedings pending construction of statutes by state courts, and the plaintiffs appealed. The Supreme Court held that any claim that state statute requiring racial segregation on common carriers or facilities maintained by them were constitutional was frivolous, and a three-judge District Court was not required to hear and determine the action and a direct appeal could not be taken to the Supreme Court.

Vacated and remanded.

West Headnotes

**[1] Federal Civil Procedure 170A ☞181**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak181 k. In General. Most Cited Cases
Plaintiffs, who had not been prosecuted under state breach of peace statutes or threatened with prosecution, lacked standing to maintain class action to enjoin criminal prosecutions under such statutes.

**[2] Civil Rights 78 ☞1331(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1328 Persons Protected and Entitled to Sue
            78k1331 Persons Aggrieved, and Standing in General
                78k1331(6) k. Other Particular Cases and Contexts. Most Cited Cases
        (Formerly 78k201, 78k13.6, 78k7)
Plaintiffs, as passengers using segregated transportation facilities, were aggrieved parties and had standing to enforce their rights to nonsegregated treatment. 28 U.S.C.A. §§ 1253, 1343(3), 2281; Code Miss.1942, §§ 2351, 2351.5, 2351.7, 7784, 7785, 7786, 7786-01, 7787, 7787.5.

**[3] Civil Rights 78 ☞1048**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1043 Public Accommodations
            78k1048 k. Public Conveyances. Most Cited Cases
        (Formerly 78k122, 78k7)
No state may require racial segregation of interstate or intrastate transportation facilities. 28 U.S.C.A. §§ 1253, 1343(3), 2281; Code Miss.1942, §§ 2351, 2351.5, 2351.7, 7784, 7785, 7786, 7786-01, 7787, 7787.5.

**[4] Federal Courts 170B ☞991**

170B Federal Courts
    170BIX District Courts
        170BIX(B) Three-Judge Courts
            170Bk991 k. When Required or Appropriate in General. Most Cited Cases
        (Formerly 106k101)
A three-judge court is not required when claim that a statute is unconstitutional is wholly insubstantial. 28 U.S.C.A. § 2281.

**[5] Federal Courts 170B ☞998**

170B Federal Courts
    170BIX District Courts
        170BIX(B) Three-Judge Courts
            170Bk998 k. Substantiality of Challenge to State Statutes or Actions. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

82 S.Ct. 549                                                                                              Page 2
369 U.S. 31, 43 P.U.R.3d 32, 82 S.Ct. 549, 7 L.Ed.2d 512

(Formerly 106k101, 106k1011)
Three-judge District Court is not required when prior decisions make frivolous any claim that a state statute on its face is not unconstitutional. 28 U.S.C.A. § 2281.

## [6] Federal Courts 170B ☜1008

170B Federal Courts
    170BIX District Courts
        170BIX(B) Three-Judge Courts
           170Bk1008 k. Necessity That Injunction Be Sought and Available. Most Cited Cases
    (Formerly 106k101)
Requirement of a three-judge District Court is a technical one to be narrowly construed, and comes into play only when an injunction is sought on ground of unconstitutionality of a statute. 28 U.S.C.A. § 2281.

## [7] Carriers 70 ☜2

70 Carriers
    70I Control and Regulation of Common Carriers
        70I(A) In General
           70k2 k. Constitutional and Statutory Provisions. Most Cited Cases
    (Formerly 92k82(6.1), 78k103, 78k2.1, 78k2)
State statutes requiring racial segregation on common carriers or in facilities maintained by them were unconstitutional. Code Miss.1942, §§ 2351, 2351.5, 2351.7, 7784, 7785, 7786, 7786-01, 7787, 7787.5.

## [8] Federal Courts 170B ☜477

170B Federal Courts
    170BVII Supreme Court
        170BVII(C) Review of Decisions of District Courts
           170Bk477 k. Constitution or Law of State Contravening Constitution of United States. Most Cited Cases
    (Formerly 106k385(1))
Where claim that state statutes requiring racial segregation on common carriers or facilities maintained by them were constitutional was so frivolous that three-judge District Court was not required to hear and determine action for injunction restraining enforcement of such statutes, direct appeal could not be taken to the Supreme Court. 28

U.S.C.A. §§ 1253, 2281; Code Miss.1942, §§ 2351, 2351.5, 2351.7, 7784, 7785, 7786, 7786-01, 7787, 7787.5.

## [9] Federal Courts 170B ☜480

170B Federal Courts
    170BVII Supreme Court
        170BVII(C) Review of Decisions of District Courts
           170Bk480 k. Determination and Disposition of Cause. Most Cited Cases
    (Formerly 106k385(1))
Although action for injunction restraining enforcement of unconstitutional statute was one which did not require a three-judge District Court and did not entitle parties to a direct appeal to Supreme Court, Supreme Court had jurisdiction to determine authority of the court below and to make such corrective order as might be appropriate to enforcement of limitations which statute imposed. 28 U.S.C.A. §§ 1253, 2281.

**550 *32 Constance Baker Motley, Jack Greenberg, James M. Nabrit III and R. Jess Brown, for appellants.
Dugas Shands and Edward L. Cates, Asst. Attys. Gen. of Mississippi, and Charles Clark, Sp. Asst. Atty. Gen., for appellee Patterson.
Thomas H. Watkins, for appellee City of Jackson, Mississippi, and others.
Junior O'Mara, for appellee Greyhound Corp. and others.

PER CURIAM.
Appellants, Negroes living in Jackson, Mississippi, brought this civil rights action, 28 U.S.C. s 1343(3), 28 U.S.C.A. s 1343(3), in the United States District Court for the Southern District of Mississippi, on behalf of themselves and others similarly situated, seeking temporary and permanent injunctions to enforce their constitutional rights to nonsegregated service in interstate and intrastate transportation, alleging that such rights had been denied them under color of state statutes, municipal ordinances, and state custom and usage.[FN*] A three-judge District Court was convened, 28 U.S.C. s 2281, 28 U.S.C.A. s 2281, and, Circuit Judge Rives dissenting, abstained from further proceedings pending construction of the challenged laws by the state courts. 199 F.Supp. 595. Plaintiffs have appealed, 28 U.S.C. s 1253, 28

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

U.S.C.A. s 1253; N.A.A.C.P. v. Bennett, 360 U.S. 471, 79 S.Ct. 1192, 3 L.Ed.2d 1375. We denied a motion to stay the prosecution of a number of criminal cases pending disposition of this appeal. 368 U.S. 346, 82 S.Ct. 282.

> FN* The statutes in question are Miss.Code 1942, Tit. 11, ss 2351, 2351.5, 2351.7, and Tit. 28, ss 7784, 7785, 7786, 7786-01, 7787, 7787.5.

[1][2] Appellants lack standing to enjoin criminal prosecutions under Mississippi's breach-of-peace statutes, since they do not allege that they have been prosecuted or threatened with prosecution under them. They cannot **33** represent a class of whom they are not a part.**551McCabe v. Atchison, T. & S.F.R. Co., 235 U.S. 151, 162-163, 35 S.Ct. 69, 71, 59 L.Ed. 169. But as passengers using the segregated transportation facilities they are aggrieved parties and have standing to enforce their rights to nonsegregated treatment.Mitchell v. United States, 313 U.S. 80. 93,61 S.Ct. 873, 876, 85 L.Ed. 1201;Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222.

[3][4][5][6] We have settled beyond question that no State may require racial segregation of interstate or intrastate transportation facilities.Morgan v. Commonwealth of Virginia, 328 U.S. 373, 66 S.Ct. 1050, 90 L.Ed. 1317;Gayle v. Browder, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114;Boynton v. Com. Virginia, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206. The question is no longer open; it is foreclosed as a litigable issue.Section 2281 does not require a three-judge court when the claim that a statute is unconstitutional is wholly insubstantial, legally speaking nonexistent. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152;Bell v. Waterfront Comm., 2 Cir., 279 F.2d 853, 857-858. We hold that three judges are similarly not required when, as here, prior decisions make frivolous any claim that a state statute on its face is not unconstitutional.Willis v. Walker, D.C., 136 F.Supp. 181;Bush v. Orleans Parish School Board, D.C., 138 F.Supp. 336;Kelley v. Board of Education, D.C., 139 F.Supp. 578. We denied leave to file petitions for mandamus in Bush, 351 U.S. 948, 76 S.Ct. 854, 100 L.Ed. 1472, and from a similar ruling in Booker v. Tennessee Board of Education, 351 U.S. 948,76 S.Ct. 856,100 L.Ed. 1472. The reasons for convening an extraordinary court are inapplicable in such cases, for the policy behind the three-judge requirement-that a single judge ought not to be empowered to invalidate a state statute under a federal claim-does not apply. The three-judge requirement is a technical one to be narrowly construed, Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800. The statute comes into play only when an injunction is sought 'upon the ground of the unconstitutionality' of a statute. There is no such ground when the constitutional issue presented is essentially fictitious.

*34 [7][8][9] This case is therefore not one 'required * * * to be heard and determined by a district court of three judges,'28 U.S.C. s 1253, 28 U.S.C.A. s 1253, and therefore cannot be brought here on direct appeal. However, we have jurisdiction to determine the authority of the court below and 'to make such corrective order as may be appropriate to the enforcement of the limitations which that section imposes,'Gully v. Interstate Natural Gas Co., 292 U.S. 16, 18, 54 S.Ct. 565, 566, 78 L.Ed. 1088;Oklahoma Gas & Elec. Co. v. Oklahoma Packing Co., 292 U.S. 386, 392, 54 S.Ct. 732, 734, 78 L.Ed. 1318;Phillips v. United States, 312 U.S. 246, 254, 61 S.Ct. 480, 484, 85 L.Ed. 800. Accordingly, we vacate the judgment and remand the case to the District Court for expeditious disposition, in light of this opinion, of the appellants' claims of right to unsegregated transportation service.

Vacated and remanded.

U.S.Miss. 1962.
Bailey v. Patterson
369 U.S. 31, 43 P.U.R.3d 32, 82 S.Ct. 549, 7 L.Ed.2d 512

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 5**

Westlaw.

78 S.Ct. 99                                                                                      Page 1
355 U.S. 41, 78 S.Ct. 99, 41 L.R.R.M. (BNA) 2089, 9 Fair Empl.Prac.Cas. (BNA) 439, 1 Empl. Prac. Dec. P 9656,
2 L.Ed.2d 80, 33 Lab.Cas. P 71,077

▶CONLEY v. GIBSON
U.S. 1957.

Supreme Court of the United States
J. D. CONLEY et al., Petitioners,
v.
Pat J. GIBSON, General Chairman of Locals 6051
and 28, etc., et al.
No. 7.

Argued Oct. 21, 1957.
Decided Nov. 18, 1957.

Action for declaratory judgment and for other relief.
The United States District Court for the Southern
District of Texas, Houston Division, 138 F.Supp. 60,
rendered judgment dismissing the complaint.
Plaintiffs appealed. The United States Court of
Appeals for the Fifth Circuit, 229 F.2d 436, affirmed.
The plaintiffs brought certiorari. The Supreme Court,
Mr. Justice Black, held that complaint, filed by Negro
railway employees against their union, sufficiently
alleged breach of union's statutory duty to represent
fairly and without hostile discrimination all of the
employees in the union.

Reversed and remanded to District Court with
direction.

West Headnotes

**[1] Labor and Employment 231H** ☞1209(1)

231H Labor and Employment
    231HXII Labor Relations
        231HXII(D) Bargaining Representatives
            231Hk1207 Duty to Act Impartially and
Without Discrimination; Fair Representation
                231Hk1209 Discrimination
                    231Hk1209(1) k. In General. Most
Cited Cases
    (Formerly 232Ak219 Labor Relations)
An exclusive bargaining agent under the Railway
Labor Act is obligated to represent all employees in
the bargaining unit fairly and without discrimination
because of race, and the courts have power to protect
employees against such invidious discrimination.

Railway Labor Act, s 1 et seq., as amended 45
U.S.C.A. s 151 et seq.

**[2] Federal Courts 170B** ☞459

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts of
Appeals
            170Bk455 Decisions Reviewable and
Grounds for Issuance
                170Bk459 k. Labor Relations and
Standards; Employers' Liability. Most Cited Cases
    (Formerly 106k383(1))
Where case raised an important question concerning
protection of employee rights under Railway Labor
Act, the Supreme Court granted certiorari. Railway
Labor Act, § 1 et seq. as amended 45 U.S.C.A. § 151
et seq.

**[3] Labor and Employment 231H** ☞1535

231H Labor and Employment
    231HXII Labor Relations
        231HXII(H) Alternative Dispute Resolution
            231HXII(H)2 Matters Subject to
Arbitration
                231Hk1525 Particular Disputes
                    231Hk1535 k. Discrimination. Most
Cited Cases
    (Formerly 232Ak416.6, 232Ak416 Labor
Relations)
Suit by Negro railway employees against their
bargaining agent to enforce their statutory right not to
be unfairly discriminated against by agent in
bargaining involved no dispute between employees
and employer and the collective bargaining
agreement would be at most only incidentally
involved, and consequently provision in Railway
Labor Act, giving jurisdiction to railroad adjustment
board in dispute between employees and carrier
growing out of interpretation of application of
agreement did not deprive the court of jurisdiction.
Railway Labor Act, § 3, subd. 1(i) as amended 45
U.S.C.A. § 153, subd. 1(i).

**[4] Labor and Employment 231H** ☞1219(5)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

78 S.Ct. 99                                                                                        Page 2
355 U.S. 41, 78 S.Ct. 99, 41 L.R.R.M. (BNA) 2089, 9 Fair Empl.Prac.Cas. (BNA) 439, 1 Empl. Prac. Dec. P 9656,
2 L.Ed.2d 80, 33 Lab.Cas. P 71,077

231H Labor and Employment
  231HXII Labor Relations
    231HXII(D) Bargaining Representatives
      231Hk1207 Duty to Act Impartially and
Without Discrimination; Fair Representation
        231Hk1219 Actions for Breach of Duty
          231Hk1219(5) k. Parties; Standing.
Most Cited Cases
    (Formerly 232Ak760 Labor Relations)
In action by Negro railway employees against their
railway union to enforce their statutory right not to be
unlawfully discriminated against by the union in
bargaining, the railway was not an indispensable
party. Railway Labor Act, § 1 et seq. as amended 45
U.S.C.A. § 151 et seq.

**[5] Federal Civil Procedure 170A** ☞1773

170A Federal Civil Procedure
  170AXI Dismissal
    170AXI(B) Involuntary Dismissal
      170AXI(B)3 Pleading, Defects In, in
General
        170Ak1773 k. Clear or Certain Nature
of Insufficiency. Most Cited Cases
A complaint should not be dismissed for failure to
state a claim unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief. Fed.Rules
Civ.Proc. rule 12, 28 U.S.C.A.

**[6] Labor and Employment 231H** ☞1219(8)

231H Labor and Employment
  231HXII Labor Relations
    231HXII(D) Bargaining Representatives
      231Hk1207 Duty to Act Impartially and
Without Discrimination; Fair Representation
        231Hk1219 Actions for Breach of Duty
          231Hk1219(8) k. Pleading. Most
Cited Cases
    (Formerly 232Ak764 Labor Relations)
Complaint, filed by Negro railway employees against
their union, sufficiently alleged breach of union's
statutory duty to represent fairly and without hostile
discrimination all of the employees in the union, and
adequately set forth the claim and gave the union fair
notice of its basis. Fed.Rules Civ.Proc. rule 8(a) (2),
28 U.S.C.A.

**[7] Labor and Employment 231H** ☞1209(1)

231H Labor and Employment
  231HXII Labor Relations
    231HXII(D) Bargaining Representatives
      231Hk1207 Duty to Act Impartially and
Without Discrimination; Fair Representation
        231Hk1209 Discrimination
          231Hk1209(1) k. In General. Most
Cited Cases
    (Formerly 232Ak219 Labor Relations)
Under Railway Labor Act, bargaining agent cannot
discriminate among those whom it represents either
in negotiating the collective agreement or in making
day to day adjustments in the agreement and other
working rules and in resolving new problems not
covered by existing agreement and in protecting
employee rights already secured by agreement.
Railway Labor Act, § 1 et seq. as amended 45
U.S.C.A. § 151 et seq.

**[8] Labor and Employment 231H** ☞1209(1)

231H Labor and Employment
  231HXII Labor Relations
    231HXII(D) Bargaining Representatives
      231Hk1207 Duty to Act Impartially and
Without Discrimination; Fair Representation
        231Hk1209 Discrimination
          231Hk1209(1) k. In General. Most
Cited Cases
    (Formerly 232Ak219 Labor Relations)
The fact that under the Railway Labor Act aggrieved
railway employees can file their own grievances with
railroad adjustment board or can sue employer for
breach of contract furnishes no sanction for union's
alleged discrimination in refusing to represent Negro
members of union. Railway Labor Act, § 1 et seq. as
amended 45 U.S.C.A. § 151 et seq.

**[9] Labor and Employment 231H** ☞1209(1)

231H Labor and Employment
  231HXII Labor Relations
    231HXII(D) Bargaining Representatives
      231Hk1207 Duty to Act Impartially and
Without Discrimination; Fair Representation
        231Hk1209 Discrimination
          231Hk1209(1) k. In General. Most

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

78 S.Ct. 99
355 U.S. 41, 78 S.Ct. 99, 41 L.R.R.M. (BNA) 2089, 9 Fair Empl.Prac.Cas. (BNA) 439, 1 Empl. Prac. Dec. P 9656, 2 L.Ed.2d 80, 33 Lab.Cas. P 71,077

Page 3

Cited Cases
    (Formerly 232Ak219 Labor Relations)
Once railway union undertakes to bargain or present grievances for some of the employees it represents it cannot refuse to take similar action in good faith for other employees just because they are Negroes. Railway Labor Act, § 1 et seq. as amended 45 U.S.C.A. § 151 et seq.

**[10] Federal Civil Procedure 170A ⛭623**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak623 k. Nature and Purpose. Most Cited Cases
Under the federal rules, the purpose of pleading is to facilitate a proper decision on the merits. Fed.Rules Civ.Proc. rules 8(a)(2)(f), 12(c, e, f), 15, 16, 26-37, 56, 28 U.S.C.A.

**100 *42 Mr. Joseph C. Waddy, Washington, D.C., for petitioners.
Mr. Edward J. Hickey, Jr., Washington, D.C., for respondent.

Mr. Justice BLACK delivered the opinion of the Court.
[1] Once again Negro employees are here under the Railway Labor Act [FN1] asking that their collective bargaining agent be compelled to represent them fairly. In a series of cases beginning with Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, this Court has emphatically and repeatedly ruled that an exclusive bargaining agent under the Railway Labor Act is obligated to represent all employees in the bargaining unit fairly and without discrimination because of race and has held that the courts have power to protect employees against such invidious discrimination.[FN2]

FN1. 44 Stat. 577, as amended, 45 U.S.C. s 151 et seq., 45 U.S.C.A. s 151 et seq.

FN2. Tunstall v. Brotherhood of Locomotive Firemen & Enginemen, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22; Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96

L.Ed. 1283; Cf. Wallace Corp. v. National Labor Relations Board, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216; Syres v. Oil Workers International Union, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785.

This class suit was brought in a Federal District Court in Texas by certain Negro members of the Brotherhood of Railway and Steamship Clerks, petitioners here, on behalf of themselves and other Negro employees similarly situated against the Brotherhood, its Local Union No. 28 and certain officers of both. In summary, the complaint *43 made the following allegations relevant to our decision: Petitioners were employees of the Texas and New Orleans Railroad at its Houston Freight House. Local 28 of the Brotherhood was the designated bargaining agents under the Railway Labor Act for the bargaining unit to which petitioners belonged. A contract existed between the Union and the Railroad which gave the employees in the bargaining unit certain protection from discharge and loss of seniority. In May 1954, the Railroad purported to abolish 45 jobs held by petitioners or other Negroes all of whom were either discharged or demoted. In truth the 45 jobs were not abolished at all but instead filled by whites as the Negroes were ousted, except for a few instances where Negroes were rehired to fill their old jobs but with loss of seniority. Despite repeated pleas by petitioners, the Union, acting according to plan, did nothing to protect them against these discriminatory discharges and refused to give them protection comparable to that given white employees. The complaint then went on to allege that the Union had failed in general to represent Negro employees **101 equally and in good faith. It charged that such discrimination constituted a violation of petitioners' right under the Railway Labor Act to fair representation from their bargaining agent. And it concluded by asking for relief in the nature of declaratory judgment, injunction and damages.

[2] The respondents appeared and moved to dismiss the complaint on several grounds: (1) the National Railroad Adjustment Board had exclusive jurisdiction over the controversy; (2) the Texas and New Orleans Railroad, which had not been joined, was an indispensable party defendant; and (3) the complaint failed to state a claim upon which relief could be given. The District Court granted the motion to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

dismiss holding that Congress had given the Adjustment Board exclusive jurisdiction over *44 the controversy. The Court of Appeals for the Fifth Circuit, apparently relying on the same ground, affirmed. 229 F.2d 436. Since the case raised an important question concerning the protection of employee rights under the Railway Labor Act we granted certiorari. 352 U.S. 818, 77 S.Ct. 37, 1 L.Ed.2d 44.

[3] We hold that it was error for the courts below to dismiss the complaint for lack of jurisdiction. They took the position that s 3 First (i) of the Railway Labor Act conferred exclusive jurisdiction on the Adjustment Board because the case, in their view, involved the interpretation and application of the collective bargaining agreement. But s 3 First (i) by its own terms applies only to 'disputes between an employee or group of employees and a carrier or carriers.'[FN3]This case involves no dispute between employee and employer but to the contrary is a suit by employees against the bargaining agent to enforce their statutory right not to be unfairly discriminated against by it in bargaining.[FN4]The Adjustment Board has no *45 power under s 3 First (i) or any other provision of the Act to protect them from such discrimination. Furthermore, the contract between the Brotherhood and the Railroad will be, at most, only incidentally involved in resolving this controversy between petitioners and their bargaining agent.

FN3. In full, s 3 First (i) reads:
'The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on the date of approval of this Act (June 21, 1934), shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.' 48 Stat. 1191, 45 U.S.C. s 153 First (i), 45 U.S.C.A. s 153, subd. 1(i).

FN4. For this reason the decision in Slocum v. Delaware, L. & W.R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795, is not applicable here. The courts below also relied on Hayes v. Union Pacific R. Co., 9 Cir., 184 F.2d 337,certiorari denied340 U.S. 942, 71 S.Ct. 506, 95 L.Ed. 680, but for the reasons set forth in the text we believe that case was decided incorrectly.

Although the District Court did not pass on the other reasons advanced for dismissal of the complaint we think it timely and proper for us to consider them here. They have been briefed and argued by both parties and the respondents urge that the decision below be upheld, if necessary, on these other grounds.

[4] As in the courts below, respondents contend that the Texas and New Orleans Railroad Company is an indispensable party which the petitioners have failed to join as a defendant. On the basis of the allegations made in the complaint and the relief demanded by petitioners we believe that contention is unjustifiable. We cannot see how the **102 Railroad's rights or interests will be affected by this action to enforce the duty of the bargaining representative to represent petitioners fairly. This is not a suit, directly or indirectly, against the Railroad. No relief is asked from it and there is no prospect that any will or can be granted which will bind it. If an issue does develop which necessitates joining the Railroad either it or the respondents will then have an adequate opportunity to request joinder.

[5][6][7] Turning to respondents' final ground, we hold that under the general principles laid down in the Steele, Graham, and Howard cases the complaint adequately set forth a claim upon which relief could be granted. In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts *46 in support of his claim which would entitle him to relief.[FN5]Here, the complaint alleged, in part, that petitioners were discharged wrongfully by the Railroad and that the Union, acting according to plan, refused to protect their jobs as it did those of white employees or to help them with their grievances all because they were Negroes. If these allegations are proven there has

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

355 U.S. 41, 78 S.Ct. 99, 41 L.R.R.M. (BNA) 2089, 9 Fair Empl.Prac.Cas. (BNA) 439, 1 Empl. Prac. Dec. P 9656, 2 L.Ed.2d 80, 33 Lab.Cas. P 71,077

been a manifest breach of the Union's statutory duty to represent fairly and without hostile discrimination all of the employees in the bargaining unit. This Court squarely held in Steele and subsequent cases that discrimination in representation because of race is prohibited by the Railway Labor Act. The bargaining representative's duty not to draw 'irrelevant and invidious'[FN6] distinctions among those it represents does not come to an abrupt end, as the respondents seem to contend, with the making of an agreement between union and employer. Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract. The bargaining representative can no more unfairly discriminate in carrying out these functions than it can in negotiating a collective agreement.[FN7] A contract may be fair and impartial on its face yet administered in such a way, with the active or tacit consent of the union, as to be flagrantly discriminatory against some members of the bargaining unit.

> FN5. See, e.g., Leimer v. State Mutual Life Assur. Co., 8 Cir., 108 F.2d 302;Dioguardi v. Durning, 2 Cir., 139 F.2d 774;Continental Collieries v. Shober, 3 Cir., 130 F.2d 631.

> FN6.Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 203, 65 S.Ct. 226, 232.

> FN7. See Dillard v. Chesapeake & Ohio R. Co., 4 Cir., 199 F.2d 948;Hughes Tool Co. v. National Labor Relations Board, 5 Cir., 147 F.2d 69, 74, 158 A.L.R. 1165.

**\*47** [8][9] The respondents point to the fact that under the Railway Labor Act aggrieved employees can file their own grievances with the Adjustment Board or sue the employer for breach of contract. Granting this, it still furnishes no sanction for the Union's alleged discrimination in refusing to represent petitioners. The Railway Labor Act, in an attempt to aid collective action by employees, conferred great power and protection on the bargaining agent chosen by a majority of them. As individuals or small groups the employees cannot begin to possess the bargaining power of their representative in negotiating with the employer or in presenting their grievances to him. Nor may a minority choose another agent to bargain in their behalf. We need not pass on the Union's claim that it was not obliged to handle any grievances at all because we are clear that once to undertook to bargain or present grievances for some of the employees it represented it could not refuse to take similar action in good **\*\*103** faith for other employees just because they were Negroes.

[10] The respondents also argue that the complaint failed to set forth specific facts to support its general allegations of discrimination and that its dismissal is therefore proper. The decisive answer to this is that the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim'[FN8] that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. The illustrative forms appended to the Rules plainly demonstrate this. Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures **\*48** established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.[FN9] Following the simple guide of Rule 8(f) that 'all pleadings shall be so construed as to do substantial justice,' we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits. Cf. Maty v. Grasselli Chemical Co., 303 U.S. 197, 58 S.Ct. 507, 82 L.Ed. 745.

> FN8.Rule 8(a)(2), 28 U.S.C.A.

> FN9. See, e.g., Rule 12(e) (motion for a more definite statement); Rule 12(f) (motion to strike portions of the pleading); Rule 12(c) (motion for judgment on the pleadings); Rule 16 (pre-trial procedure and formulation of issue); Rules 26-37 (depositions and discovery); Rule 56 (motion for summary judgment): Rule 15 (right to amend).

78 S.Ct. 99                                                                                      Page 6
355 U.S. 41, 78 S.Ct. 99, 41 L.R.R.M. (BNA) 2089, 9 Fair Empl.Prac.Cas. (BNA) 439, 1 Empl. Prac. Dec. P 9656,
2 L.Ed.2d 80, 33 Lab.Cas. P 71,077

The judgment is reversed and the cause is remanded to the District Court for further proceedings not inconsistent with this opinion.

It is so ordered.

Reversed and remanded with direction.

U.S. 1957.
Conley v. Gibson
355 U.S. 41, 78 S.Ct. 99, 41 L.R.R.M. (BNA) 2089, 9 Fair Empl.Prac.Cas. (BNA) 439, 1 Empl. Prac. Dec. P 9656, 2 L.Ed.2d 80, 33 Lab.Cas. P 71,077

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 6**



417 F.Supp.2d 100                                                                                     Page 1
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

▷Forsythe v. Sun Life Financial, Inc.
D.Mass.,2006.

United States District Court,D. Massachusetts.
Eric FORSYTHE, Individually and on Behalf of all
Others Similarly Situated, Plaintiff,
v.
SUN LIFE FINANCIAL, INC., et al., Defendants.
**No. CIV.A. 04-10584-GAO.**

Jan. 19, 2006.

**Background:** Putative class action was brought by
mutual fund shareholders against mutual fund
company's investment adviser and its trustees,
principal underwriter and others for violations of
Investment Company Act (ICA) and Investment
Advisers Act (IAA). Defendants moved to dismiss.

**Holdings:** The District Court, O'Toole, J., held that:
(1) sections of Investment Company Act concerning
destruction and falsification of reports and records,
breach of fiduciary duties, and violation of
subchapter did not provide an implied private right of
action;
(2) with respect to IAA derivative claim,
shareholders failed to adequately allege why demand
should be excused on basis of futility;
(3) state law claims for breaches of fiduciary duty or
unjust enrichment were derivative, and thus subject
to the demand requirement;
(4) pleadings were sufficient to state claim against
mutual fund company's investment adviser, and
principal underwriter under ICA for a breach of
fiduciary duties based on payments of excessive
compensation; and
(5) shareholders did not have standing to sue on
behalf of mutual funds they did not own despite the
fact that they owned shares in other funds in the fund
complex.

Motion granted in part and denied in part.

West Headnotes

**[1] Action 13 ⬡⟳3**

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most
Cited Cases
A private right of action, like all substantive federal
law, must be created by Congress.

**[2] Action 13 ⬡⟳3**

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most
Cited Cases
A statute may imply the existence of a private
enforcement cause of action if it indicates Congress'
intent to create both a private right and a private
remedy under the statute.

**[3] Action 13 ⬡⟳3**

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most
Cited Cases
Without a finding of a congressional intention to
create a private remedy, however, courts may not
infer one, regardless of how desirable that might be
as a policy matter or how compatible it might be with
the purpose or objective of the statute.

**[4] Action 13 ⬡⟳3**

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most
Cited Cases
A private right of action may be implied by statutory
text that contains "rights-creating" language.

**[5] Action 13 ⬡⟳3**

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most
Cited Cases
Generally, statutes that focus on the persons or
conduct to be regulated and not on the persons to be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

protected by the regulation create no implication of an intent to confer rights on a particular class of persons; moreover, when Congress has expressly provided a method of enforcing substantive rules, it may ordinarily be inferred that Congress correspondingly intended not to provide others.

**[6] Action 13 ☞3**

13 Action
   13I Grounds and Conditions Precedent
      13k3 k. Statutory Rights of Action. Most Cited Cases
Courts should be cautious about finding an implied private right of action where Congress has provided within a statutory scheme a narrow ground for private enforcement but left the rest of the statute's provisions to agency enforcement.

**[7] Action 13 ☞3**

13 Action
   13I Grounds and Conditions Precedent
      13k3 k. Statutory Rights of Action. Most Cited Cases

**Securities Regulation 349B ☞218**

349B Securities Regulation
   349BI Federal Regulation
      349BI(H) Investment Companies
         349Bk218 k. Civil Effects of Violations; Rights and Liabilities. Most Cited Cases
Sections of Investment Company Act (ICA) concerning destruction and falsification of reports and records, Securities and Exchange Commission (SEC) actions for breach of fiduciary duties, and violation of subchapter did not provide an implied private right of action for mutual fund shareholders; sections described prohibited conduct, focusing only on the persons regulated by the statute, rather than a class of persons benefited by the regulation. Investment Company Act of 1940, §§ 34(b), 36, 48(a), 15 U.S.C.A. §§ 80a-33, 80a-35(a), 80a-47(a).

**[8] Corporations 101 ☞211(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k211 Pleading
            101k211(4) k. Sufficiency of Allegations as to Demand and Refusal. Most Cited Cases

**Corporations 101 ☞211(5)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k211 Pleading
            101k211(5) k. Excuse for Failure to Allege Demand. Most Cited Cases
In shareholder derivative actions in federal court, shareholder must plead with particularity that either demand was made or that demand would have been futile. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[9] Corporations 101 ☞206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k206 Refusal of Corporation, Officers, or Stockholders to Act
            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases

**Corporations 101 ☞640**

101 Corporations
   101XVI Foreign Corporations
      101k640 k. Subjection to Same Requirements as Imposed by Home State. Most Cited Cases
In considering whether demand should be excused in shareholder derivative action because it would be futile, a federal court must look to the law of the state of incorporation of the entity on whose behalf the plaintiff purports to sue. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[10] Corporations 101 ☞320(5)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

101k320 Actions Between Shareholders and Officers or Agents

101k320(5) k. Failure of Action by Corporation and Demand That Action Be Brought. Most Cited Cases

Under Massachusetts law, demand is excused for futility in shareholder derivative action only when there is a particularized showing that a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested.

**[11] Corporations 101 ☞320(7)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k320 Actions Between Shareholders and Officers or Agents
                101k320(7) k. Bill, Petition, or Complaint in General. Most Cited Cases

In shareholder derivative action against Massachusetts business trust under the Investment Advisers Act (IAA), mutual fund shareholders failed to adequately allege that the majority of the board of trustees was "interested" so that demand would be excused on basis of futility under Massachusetts law; there were no particular allegations that any of the non-officer trustee defendants acted out of bias or self-interest in approving the challenged transactions and no particularized allegations, beyond the mere fact of approval of the transactions, that the trustee defendants were actively involved in the wrongfulness of any actions. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.; M.G.L.A. c. 182, § 2B.

**[12] Corporations 101 ☞320(5)**

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k320 Actions Between Shareholders and Officers or Agents
                101k320(5) k. Failure of Action by Corporation and Demand That Action Be Brought. Most Cited Cases

With respect to a derivative action against a Massachusetts business trust, allegations that do not go beyond asserting that the trustees had approved

transactions that are alleged to have been wrongful are insufficient to excuse demand under Massachusetts law on basis of futility without further evidence of bias or self interest on the part of the trustees. M.G.L.A. c. 182, § 2B.

**[13] Corporations 101 ☞202**

101 Corporations
    101IX Members and Stockholders
        101IX(C) Suing or Defending on Behalf of Corporation
            101k202 k. Right to Sue or Defend in General. Most Cited Cases

Under Massachusetts law, if the wrong underlying claim results in harm to a plaintiff shareholder only because the corporate entity has been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative.

**[14] Corporations 101 ☞206(2)**

101 Corporations
    101IX Members and Stockholders
        101IX(C) Suing or Defending on Behalf of Corporation
            101k206 Refusal of Corporation, Officers, or Stockholders to Act
                101k206(2) k. Necessity of Demanding Action. Most Cited Cases

Mutual fund shareholders' state law claims against mutual fund company's investment adviser, and principal underwriter for breaches of fiduciary duty or unjust enrichment were derivative, and thus subject to the demand requirement; any injury caused by the alleged state law wrongs committed by the defendants would occur primarily and directly to funds and only indirectly to the shareholders by virtue of their status as investors. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[15] Securities Regulation 349B ☞215**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk215 k. Advisers', Management, and Underwriting Contracts. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

An investment adviser or manager may be liable for a breach of its fiduciary duty under Investment Company Act (ICA) if it charged a fee so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. Investment Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-35(b).

**[16] Securities Regulation 349B ☜219.1**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk219 Actions
                349Bk219.1 k. In General. Most Cited Cases
In order to state a claim against a mutual fund's investment adviser or manager under Investment Company Act (ICA) for a breach of its fiduciary duty, plaintiff need only set forth a short and plain statement that gives fair notice of the claim of breach of fiduciary duty with respect to the receipt of compensation or other material payments made by the fund or its shareholders; plaintiff need not plead in a high degree of factual detail any of the *Gartenberg* factors, but complaint is not sufficient if it rests solely on general and conclusory legal assertions that the fees charged were excessive. Investment Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-35(b); Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.

**[17] Securities Regulation 349B ☜215**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk215 k. Advisers', Management, and Underwriting Contracts. Most Cited Cases

**Securities Regulation 349B ☜219.1**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk219 Actions
                349Bk219.1 k. In General. Most Cited Cases
Mutual fund shareholders' pleadings were sufficient

to state claim against mutual fund company's investment adviser, and principal underwriter under Investment Company Act (ICA) for a breach of fiduciary duties based on payments of excessive compensation; complaint alleged that the defendants caused mutual fund company to pay improper "kickbacks" to brokers in exchange for steering clients into company's funds via "shelf space arrangements," to pay excessive commissions under the guise of "soft dollars," to engage in improper "directed brokerage" arrangements, and to make improper "hard dollar" revenue sharing payments that were then reimbursed out of company's assets, complaint also contained illustrating allegations regarding those types of arrangements with one particular broker-dealer, as well as allegations that a large number of other broker-dealers were similarly involved, and complaint gave adequate notice of how those arrangements were alleged to have benefited the defendants while at the same time harming the company's funds and their investors. Investment Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-35(b); Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.

**[18] Securities Regulation 349B ☜219.1**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk219 Actions
                349Bk219.1 k. In General. Most Cited Cases
Mutual fund trustees were not proper defendants with respect to mutual fund shareholders' claim under Investment Company Act (ICA) for a breach of fiduciary duty based on payments of excessive compensation where there were no allegations that the annual compensation received by the trustees was in exchange for "advisory services" or in some way represented advisory fees that were to be paid to the adviser but instead were diverted to the trustees. Investment Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-35(b).

**[19] Securities Regulation 349B ☜219.1**

349B Securities Regulation
    349BI Federal Regulation
        349BI(H) Investment Companies
            349Bk219 Actions
                349Bk219.1 k. In General. Most Cited

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

417 F.Supp.2d 100                                                    Page 5
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

Cases

Former security holders may not bring a breach of fiduciary duty claim under Investment Company Act (ICA) on behalf of an investment company that they formerly held shares in, but no longer do. Investment Company Act of 1940, § 36(b), 15 U.S.C.A. § 80a-35(b).

[20] Corporations 101 ⬳207

101 Corporations
    101IX Members and Stockholders
        101IX(C) Suing or Defending on Behalf of Corporation
            101k206.5 Persons Entitled to Sue or Defend
                101k207 k. In General. Most Cited Cases

Shareholders did not have standing to sue on behalf of mutual funds they did not own despite the fact that they owned shares in other funds in the fund complex. U.S.C.A. Const. Art. 3, § 2, cl. 1.

[21] Federal Civil Procedure 170A ⬳103.7

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.7 k. Class Actions. Most Cited Cases

Fact that a suit may be a class action adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent. U.S.C.A. Const. Art. 3, § 2, cl. 1.

*103 Richard A. Acocelli, Weiss & Yourman, New York City, Jerald Bien-Willner, Bernstein Litowitz Berger & Grossman LLP, San Diego, CA, Nancy F. Gans, Moulton & Gans, PC, Boston, MA, Robert S. Gans, Bernstein Litowitz, Berger & Grossman LLP, San Diego, CA, for Plaintiffs.Kim E. Levy, Milberg, Weiss, Bershad & Schulman LLP, New York City, Marshall N. Perkins, Law Offices of Charles J. Piven, P.A, Baltimore, MD, and Janine L. Pollack, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, Michael Reese, Milberg, Weiss, Bershad & Schulman LLP, J. Erik Sandstedt, Bernstein Litowitz, Berger & Grossman LLP, Steven G. Schulman,

Milberg Weiss, Bershad Hynes & Lerach LLP, James E. Tullman, Weiss & Yourman, New York City, for Plaintiffs.

Abigail K. Hemani, Goodwin Procter LLP, James Rehnquist, Goodwin Procter, LLP, Jonathan A. Shapiro, Wilmer Cutler Pickering Hale and Dorr LLP, Allison H. Stiles, Goodwin Procter LLP, Boston, Matthew A. Stowe, Wilmer Cutler, Pickering Hale and Dorr LLP, Boston, MA, Defendants.

Michelle H. Blauner, Shapiro Haber & Urmy LLP, Alison V. Douglass, Goodwin Procter LLP, John J. Falvey, Jr., Testa, Hurwitz & Thibeault, LLP, Edward F. Haber, Shapiro Haber & Urmy LLP, Boston, MA, for Movants.

*MEMORANDUM AND ORDER*

O'TOOLE, District Judge.

**I. Background**

This case is a putative class action brought by four named plaintiffs-Eric Forsythe, the City of Chicago Deferred Compensation Plan, Larry R. Eddings, and Richard Koslow-who either now own or have owned mutual funds within the Massachusetts Financial Services (MFS) fund complex. They purport to bring their claims as a class action (with the exception of Count V, styled as a derivative action) on behalf of a class defined as "all persons or entities who held shares, units, or like interests in any of the MFS Funds between March 24, 1999 and March 31, 2004 inclusive ... and were damaged thereby [excepting the defendants and others closely related to the defendants]." The claims are stated directly on behalf of the class under the Investment Company Act (ICA) of 1940, 15 U.S.C. §§ 80a-1 -80a-64, and the common law and derivatively under the Investment Advisers Act (IAA) of 1940, 15 U.S.C. §§ 80b-1-80b-21. The consolidated amended complaint [FN1] names the following persons or entities as defendants: (1) Massachusetts Financial Services Company (MFS Company), the investment adviser to the MFS Funds, (2) MFS Distributors, Inc. (MFS Distributors), MFS Company's wholly-owned registered broker-dealer, (3) Sun Life Financial,*104 Inc., the ultimate parent company of MFS Company (Sun Life), and (4) twelve trustees of various MFS Funds (the Trustee Defendants).[FN2]

FN1. For ease of reference, the consolidated

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

amended complaint in this case will be referred to as simply "the complaint" and cited as "Compl."

FN2. The complaint also names the MFS Funds as nominal defendants and John Doe defendants 1-100, who are described as "Trustees and/or officers charged with overseeing the MFS Fund Complex during the class period, and any other wrongdoers later discovered."

In general terms, the complaint makes the following allegations: The defendants participated in a scheme during the class period whereby they made substantial payments to brokers in exchange for the brokers' steering unwitting clients to invest in the MFS Funds. The practices engaged in were sometimes referred to by the defendants as buying "shelf space" and satisfying "strategic alliances." The plaintiffs allege that such arrangements existed between the defendants and many brokerage houses.[FN3] The defendants are alleged to have compensated the brokers by means of a variety of methods including wrongful utilization of "directed brokerage,"[FN4] payment of excessive commissions in the form of "soft dollars" beyond what was allowed by law, and payments of cash or "hard dollars" to brokers (sometimes referred to as "revenue sharing") that were allegedly reimbursed from fund assets. These schemes are alleged to have violated provisions of the Security and Exchange Commission's Rule 12b-1 on allowable marketing fees. See 17 C.F.R. § 270.12b-1. In March 2004 these "shelf space"/"strategic alliance" schemes were the subject of an SEC regulatory enforcement action against and settlement with MFS Company for failure adequately to disclose the arrangements to the MFS Boards and to MFS shareholders.

FN3. The plaintiffs name ten brokerages as alleged participants in this type of scheme but allege that the defendants had "shelf space" arrangements with more than 100 brokerages.

FN4. "Directed brokerage" is alleged to involve steering the defendants' securities trading business on behalf of the funds under management (and thus commissions) to brokers who agreed to more aggressively

push MFS Funds.

The plaintiffs further allege that the defendants used assets of the MFS Funds to engage in these schemes and charged excessive and improper fees, allegedly motivated by the prospect that if the schemes were successful, more investors would be steered into MFS Funds and thus the fees that the defendants would collect would increase as the amount of assets under management increased. The plaintiffs allege that as a result the defendants reaped substantial profits, while the MFS Funds and their shareholders received no benefit.

Additionally, the plaintiffs allege that these schemes created insurmountable conflicts of interest for MFS Company as investment adviser to the MFS Funds because it was not motivated to act in the best interests of fund investors but instead was concerned with increasing its own management fees.[FN5] Because these arrangements were not disclosed to investors, the plaintiffs assert that MFS Funds' prospectuses, annual statements, and similar public filings were materially false and misleading. Finally, the plaintiffs allege that the Trustee Defendants who oversaw the MFS Funds failed properly to supervise and monitor the investment adviser MFS Company because of their dependence on and control by the investment adviser.

FN5. The plaintiffs also claim that the defendants should be held liable for aiding and abetting a breach of fiduciary duty by brokers who sold MFS Funds, because the various schemes caused the brokers to violate their obligations to act in the best interests of their clients.

**\*105** The defendants have moved to dismiss the entire complaint on various grounds. I conclude that the motion to dismiss ought to be granted in part and denied in part as set forth below.

**II. Counts I, II and IV are dismissed because there is no implied private right of action under ICA § 34(b), § 36(a) or § 48(a).**

In Count I, the plaintiffs purport to assert a claim on behalf of the class against MFS Company and the Trustee Defendants for alleged violations of § 34(b) of the ICA, 15 U.S.C. § 80a-33(b),[FN6] based upon

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

materially false and misleading statements in annual reports, semi-annual reports, registration statements and other filings and public statements. In Count II, the plaintiffs assert claims, again on behalf of the class, against MFS Company, the Trustee Defendants, and MFS Distributors for alleged breaches of their fiduciary duties under § 36(a) of the ICA, 15 U.S.C. § 80a-35(a).[FN7] Count IV alleges violations of § 48(a) of the ICA, 15 U.S.C. § 80a-47(a), by Sun Life and MFS Company.[FN8] Count IV alleges that MFS Company acted as a "control person" of both the Trustee Defendants and MFS Distributors (the wholly-owned broker dealer of MFS Company) and thus is liable for having caused the violations of the ICA alleged in Counts I (§ 34(b), II § 36(a), and III § 36(b)). Similarly, the plaintiffs allege that as a parent of MFS Company, Sun Life is liable for MFS Company's breaches of those same provisions. The defendants argue that Counts I, II, and IV should be dismissed because the statutes at issue may not be enforced by a private right of *106 action.[FN9] I agree.

> FN6. ICA § 34(b) provides: "It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter or the keeping of which is required pursuant to section 80a-30(a) of this title. It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading. For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document." 15 U.S.C. § 80a-33(b).

> FN7. ICA § 36(a) provides: The [SEC] is authorized to bring an action in the proper district court of the United States, or in the United States court of any territory or other

place subject to the jurisdiction of the United States, alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts-

> (1) as officer, director, member of any advisory board, investment adviser, or depositor; or

> (2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

> If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80a-1(b) of this title. 15 U.S.C. § 80a-35(a).

> FN8. ICA § 48(a) provides: "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder." 15 U.S.C. 80a-47(a).

> FN9. Any liability arising under § 48(a) would necessarily, by the terms of the statute, be secondary and require proof of a primary violation of the ICA by another person. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 264 (S.D.N.Y.2003). In light of my ruling here as to the § 34(b) and § 36(a) claims and my dismissal, *infra,* of the § 36(b) claim against the Trustee Defendants,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

417 F.Supp.2d 100                                                                                           Page 8
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

the only remaining potential claims under Count IV are that Sun Life has § 48(a) liability for causing a violation of § 36(b) by MFS Company and that MFS Company has § 48(a) liability for causing a violation of that same statutory section by MFS Distributors.

Neither § 34(b), § 36(a), nor § 48(a) expressly provides for enforcement by a private right of action. To bring these claims, the plaintiffs must show that there is an *implied* private right of action under each statute. For the following reasons, I conclude that there is no such implied private right of action and that Counts I, II, and IV should therefore be dismissed.

[1][2][3] In *Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) and *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Supreme Court clarified the law regarding implied private rights of action. *See Bonano v. East Caribbean Airline Corp.*, 365 F.3d 81, 84, 86 n. 4 (1st Cir.2004). A private right of action, like all substantive federal law, must be created by Congress. *See Sandoval*, 532 U.S. at 286, 121 S.Ct. 1511; *Bonano*, 365 F.3d at 86. A statute may imply the existence of a private enforcement cause of action if it indicates Congress' intent to create both a private right and a private remedy under the statute. *See Gonzaga Univ.*, 536 U.S. at 283-84, 122 S.Ct. 2268, *Sandoval*, 532 U.S. at 286, 121 S.Ct. 1511; *Bonano*, 365 F.3d at 84. Without a finding of a congressional intention to create a private remedy, however, courts may not infer one, regardless of how desirable that might be as a policy matter or how compatible it might be with the purpose or objective of the statute. *Sandoval*, 532 U.S. at 286-87, 121 S.Ct. 1511.

[4][5][6] Finding a congressional intention to imply a private right of action, like other tasks of statutory interpretation, depends in the first instance on the text and structure of the statute. *See, Gonzaga Univ.*, 536 U.S. at 283-84, 122 S.Ct. 2268, *Sandoval*, 532 U.S. at 288-89, 121 S.Ct. 1511, *Bonano*, 365 F.3d at 84-85. Thus, a private right of action may be implied by statutory text that contains "rights-creating" language. *Gonzaga Univ.*, 536 U.S. at 283-84, 122 S.Ct. 2268; *Sandoval*, 532 U.S. at 288-89, 121 S.Ct. 1511. Generally, however, statutes that focus on the

persons or conduct to be regulated and not on the persons to be protected by the regulation create "no implication of an intent to confer rights on a particular class of persons." *See Sandoval*, 532 U.S. at 289, 121 S.Ct. 1511. Moreover, when Congress has expressly provided a method of enforcing substantive rules, it may ordinarily be inferred that Congress correspondingly intended not to provide others. *See Sandoval*, 532 U.S. at 290, 121 S.Ct. 1511, *Bonano*, 365 F.3d at 85; *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) ("Obviously ... when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."). In particular, courts should be cautious about finding an implied private right of action where Congress has provided within a statutory scheme a narrow ground for private enforcement but left the rest of the statute's provisions to agency enforcement. *See Bonano*, 365 F.3d at 85-86 (the existence of a narrow express private right of action in the Federal Aviation Act **\*107** that exhibits an overall Congressional preference for public enforcement bolsters conclusion that implying a private right of action would be improper).[FN10]

FN10. The plaintiffs argue that the Supreme Court's recent decision in *Jackson v. Birmingham Board of Educ.*, 544 U.S. 167, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) has limited the holding in *Sandoval*. The plaintiffs misread *Jackson;* it does not narrow *Sandoval* in the manner they assert it does. The statute at issue in *Jackson* does include the important rights-creating language that was found lacking in the analysis in cases such as *Sandoval* and *Bonano*. *See Jackson*, 125 S.Ct. at 1503-04 (Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded ..."). The *Jackson* court itself said, "In step with *Sandoval*, we hold that Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *See Jackson*, 125 S.Ct. at 1507. The plaintiffs' argument that *Jackson* somehow nullifies the broad change that *Sandoval* wrought in the approach to finding implied private rights of action is wrong. *See In re Mut. Funds Inv. Litig.*, 384 F.Supp.2d 845, 868 n.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

24 (D.Md.2005) (rejecting a similar argument).

[7] Neither § 34(b), § 36(a), nor § 48(a) contains the "rights-creating language" necessary to find an implied private right of action. Those statutes simply describe prohibited conduct, focusing only on the persons regulated by the statute, rather than a class of persons benefited by the regulation. Moreover, with the limited exception of the private cause of action expressly created by Congress under § 36(b), discussed below, the responsibility for the overall enforcement of the ICA statutory scheme is not given to private individuals but rather to the SEC. See 15 U.S.C. § 80a-41. Section 36(a) in particular not only lacks "rights-creating language" but also specifically authorizes only the SEC-not private litigants-to take enforcement action. Therefore I conclude, as many other courts have recently done in similar mutual fund cases, that § 34(b), § 36(a), and § 48(a) do not provide an implied private right of action for mutual fund shareholders.[FN11]

> FN11. See *In re Davis Selected Mut. Funds Litig.*, Civ. No. 04-4186(MGC), 2005 WL 2509732, at *2 (S.D.N.Y Oct. 11, 2005); *In re Dreyfus Mut.Funds Fee Litig*, Master File No. 04-0128., slip op., at 12-14 (W.D.Pa. Sept. 28, 2005); *In re Franklin Mut. Funds Fee Litig.*, 388 F.Supp.2d 451, 464-68 (D.N.J.2005); *In re Lord Abbett Mut. Funds Fee Litig.*, 385 F.Supp.2d 471, 486-87 (D.N.J.2005); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F.Supp.2d 222, 229-33 (S.D.N.Y.2005); see also *Stegall v. Ladner*, 394 F.Supp.2d 358, 367-71 (D.Mass.2005) (no implied private right of action under § 36(a)); *In re Mut. Funds Inv. Litig.*, 384 F.Supp.2d 845, 868-70 (D.Md.2005) (no implied private right of action under § 34(b) and § 36(a)); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F.Supp.2d at 243, 259 (S.D.N.Y.2003) (§ 34(b) does not provide an implied private right of action); *White v. Heartland High-Yield Mun. Bond Fund*, 237 F.Supp.2d 982, 986-88 (E.D.Wis.2002) (§ 22 and § 34(b) do not provide an implied private right of action); *Dorchester Investors v. Peak Int'l Ltd.*, 134 F.Supp.2d 569, 581 (S.D.N.Y.2001) (§ 34(b) does not provide an implied private right of

action).

It is true that prior to *Sandoval*, various courts, including the First Circuit, had held that there were implied private rights of action under various provisions of the ICA. See *Lessler v. Little*, 857 F.2d 866, 871 (1st Cir.1988) (finding implied private right of action under ICA § 17(a)(2)); see also *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 434 n. 4 (2d Cir.2002) (citing cases that had previously recognized implied private rights of action under the ICA). However, as the *Olmsted* court explained, the courts deciding those prior cases acted in accordance with then-existing principles governing the discernment of a private right of action. *108 283 F.3d at 433-34.[FN12]* *Sandoval* represented a break with those prior lines of decision and instructed that courts should no longer infer a private right of action simply to "make effective [a statute's] purpose." 532 U.S. at 287, 121 S.Ct. 1511; see also Olmsted, 283 F.3d at 434. Other courts addressing the same argument in cases very similar to this case have discounted pre-*Sandoval* precedent in concluding there is no implied private right of action under § 34(b), § 36(a) and § 48(a). See *In re Lord Abbett*, 385 F.Supp.2d 471, 486 (D.N.J.2005); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F.Supp.2d 222, 233 (S.D.N.Y.2005); cf. *In re Franklin Mut. Funds Fee Litig.*, 388 F.Supp.2d 451, 467 (D.N.J.2005). The First Circuit has also recognized, albeit in the context of another statute, that *Sandoval* "changed the legal landscape" and thus cast doubt on the validity of at least some of the prior precedents finding implied private rights of action. See *Bonano*, 365 F.3d at 86 n. 4. In this case, as well, the plaintiffs' reliance on outdated precedent should be rejected in light of more recent guidance.

> FN12. Some of the cases were decided prior to 1975, when courts merely needed to find that a federal statute was "enacted for the benefit of a special class" to find an implied private right of action, while others were decided under the regime of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), in which "legislative intent" was only one factor in the implied private right of action analysis. See *Olmsted*, 283 F.3d at 434.

The plaintiffs argue that even under the *Sandoval*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

method of analysis their claims should be upheld because the general statutory intent and structure of the ICA shows it was enacted for the global purpose of "protection of investors," despite the fact that the statutes do not contain any rights-creating language indicating an intent to create a private right of action. Such an argument is out of step with *Sandoval, Bonano* and the many cases decided post-*Sandoval* refusing to imply private rights of action under the ICA. Looking at the text and structure of § 34(b), § 36(a), and § 48(a), it is clear that there is no implication of a private right of action.

## III. Count V (Derivative Claim under the IAA) is dismissed for failure to comply with **Fed.R.Civ.P. 23.1.**

In Count V, the plaintiffs purport to state a claim under § 215 of the IAA, 15 U.S.C. § 80b-15, derivatively on behalf of all the named MFS Funds against MFS Company in its role as investment adviser to the MFS Funds. The allegations are that MFS Company violated its fiduciary duty to the MFS Funds, imposed by § 206 of the IAA, 15 U.S.C. § 80b-6, by (1) charging improper Rule 12b-1 marketing fees, (2) making improper undisclosed payments of "soft dollars," (3) making unauthorized use of "directed brokerage" to satisfy *quid pro quo* "shelf space" arrangements, and (4) charging excessive and improper commission payments to brokers. The plaintiffs claim that as a result of these breaches of duty, the MFS Funds are entitled to rescind their investment advisory contracts with the MFS Company and recover all fees paid in connection with such agreements.

That this claim is derivative in nature is conceded by the plaintiffs. The defendants argue that because the plaintiffs have failed to comply adequately with Fed.R.Civ.P. 23.1, Count V should be dismissed. The plaintiffs respond that any demand that the trustees who oversee the MFS Funds bring the claims would be futile and demand thus be excused. For the reasons set forth below, I conclude that the plaintiffs have failed adequately to plead that demand would be futile, and this count should therefore be dismissed.

**\*109 [8]** Shareholder derivative actions in federal court are governed by Fed.R.Civ.P. 23.1. *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); *Gonzalez*

*Turul v. Rogatol Distribs., Inc.,* 951 F.2d 1, 2 (1st Cir.1991). Under this rule, the shareholder must plead with particularity that either demand was made or that demand would have been futile. *Gonzalez-Turul,* 951 F.2d at 2; *see also* Fed.R.Civ.P. 23.1. In this Circuit, the requirements of Rule 23.1 are "vigorously enforce[d]" and a court should dismiss derivative actions when plaintiffs do not comply. *Gonzalez-Turul,* 951 F.2d at 2; *see Grossman v. Johnson,* 674 F.2d 115, 125 (1st Cir.1982); *Heit v. Baird,* 567 F.2d 1157, 1160 (1st Cir.1977); *see also Landy v. D'Alessandro,* 316 F.Supp.2d 49, 59-60 (D.Mass.2004). Allegations necessary for a finding of demand futility must be particularly set forth in the complaint. A shareholder may not plead in general terms hoping that, by discovery or otherwise, he can later establish a case for demand futility. *See Gonzalez-Turul,* 951 F.2d at 3; *see also Grossman,* 674 F.2d at 123, 125. Although the general standards applicable to motions to dismiss still apply to the extent that the court must take as true all well-pleaded allegations and make all reasonable inferences in favor of the plaintiff, the court must not accept mere conclusions or generalized allegations of control, acquiescence, wrongful participation, or the like. Instead, the plaintiff must allege with particularity facts that would support such a conclusion. *See Gonzalez-Turul,* 951 F.2d at 3; *Landy,* 316 F.Supp.2d at 60-75; *see also Grossman,* 674 F.2d at 124; *Heit,* 567 F.2d at 1161.

[9] In considering whether demand should be excused because it would be futile, a federal court must look to the law of the state of incorporation of the entity on whose behalf the plaintiff purports to sue. *See Kamen,* 500 U.S. at 97-108, 111 S.Ct. 1711; *Gonzalez Turul,* 951 F.2d at 2. Here, the plaintiffs assert derivative claims on behalf of the MFS Funds, which are all organized as Massachusetts business trusts. *See* Compl. ¶ 42. Therefore, Massachusetts law regarding demand and demand futility will govern the analysis of the plaintiffs' allegations.

[10] Massachusetts takes a narrow view of demand futility; demand is excused only when there is a particularized showing that "a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested." *Harhen v. Brown,* 431 Mass. 838, 730 N.E.2d 859, 865 (2000); *see also In re Mut. Funds Inv. Litig.,* 384 F.Supp.2d 845, 847

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(D.Md.2005); *In re Eaton Vance Mut. Funds,* 380 F.Supp.2d at 239.[FN13]    With respect to a Massachusetts business trust that is an investment company registered under the ICA, a trustee is presumptively "deemed to be independent and disinterested when making any determination or taking any action as trustee" if the trustee is not an "interested person" as that term is defined in the ICA. *See*\*110 Mass. Gen. Laws ch. 182, § 2B. Thus, in order to show that demand would have been futile, the plaintiffs must allege with particularity that a majority of the trustees were "interested" within the ICA definition. *See In re Eaton Vance Mut. Funds,* 380 F.Supp.2d at 239; *ING Principal Protection Funds Derivative Litig.,* 369 F.Supp.2d 163, 171-72 (D.Mass.2005).

> FN13. The new Massachusetts Business Corporation Act, which became effective in July 2004, includes a "universal demand" requirement which applies in *all derivative cases,* meaning there is no longer a futility exception to the requirement, even if the directors are deemed to be "interested" with respect to the subject matter of the demand. *See* Mass. Gen. Laws ch. 156D, § 7.42 ("No shareholder may commence a derivative proceeding" until written demand is made and certain time periods have elapsed); *see ING Principal Protection Funds Derivative Litig.,* 369 F.Supp.2d 163, 170 (D.Mass.2005); *Demoulas v. Demoulas Super Markets, Inc.,* Civ. No. 033741 BLS, 2004 WL 1895052, at *1 (Mass.Super. Aug. 2, 2004). The defendants do not argue that this statute applies; the initial complaint was filed prior to the enactment of that statute and the statute is not retroactive.

[11] According to the complaint, there are twelve trustees on the relevant boards of trustees that oversee the MFS Funds. *See* Compl. ¶ 25-37. All trustees are named as Trustee Defendants. The plaintiffs allege that three trustees, who served on all the boards, were officers of MFS Company. *See* Com pl. ¶¶ 25-27. Trustees who are officers of the adviser would be considered "interested" under the ICA. *See* 15 U.S.C. § 80a-2(a)(3)(D). However, in order to find a majority of the board "interested" under the ICA, it would be necessary for the plaintiffs to allege with particularity that at least four

more trustees sitting on each board at the time the complaint was filed were "interested." The plaintiffs' only argument on this score is that the remaining nine Trustee Defendants on each board should all be viewed as "interested" because they were "controlled" by the investment adviser MFS Company and thus within the ICA's definition. *See* 15 U.S.C. § 80a-2(a)(3)(C) ("affiliated person" includes "any person directly or indirectly controlling, controlled by, or under common control, with such other person"); 15 U.S.C. § 80a-2(a)(19) ("interested person" of another person/entity includes any "affiliated person"); *see also In re Eaton Vance Mut. Funds,* 380 F.Supp.2d at 239 (a trustee is an interested person if he is "controlled by" the Investment Adviser as defined in the ICA). However, under the ICA there is a statutory presumption that a natural person is not a "controlled person," subject to specific rebuttal. *See* 15 U.S.C. § 80a-2(a)(9); *see Krantz v. Fidelity Mgmt. & Research Co.,* 98 F.Supp.2d 150, 154-55 (D.Mass.2000).

The plaintiffs contend that the allegations in the complaint, taken as true, support an inference that, because of the "close-knit" structure of the MFS organization, even the supposedly independent Trustee Defendants felt their duty of loyalty was to MFS Company, not the funds and their investors. *See* Compl. ¶¶ 44, 45, 91, 135. The First Circuit has held that in making an allegation of control of a fund's Board of Trustees by an investment adviser, a plaintiff must make "particularized allegations and [present] specific facts." *See Grossman,* 674 F.2d at 124. Here, the allegations by the plaintiffs are not particularized. The allegations in ¶ 44 and ¶ 135 are little more than conclusions that (1) the MFS Funds all function as part of one unitary organization and thus have no independent will apart from MFS Company and (2) although the trustees may be voted out by shareholders, the trustees know that event is extremely unlikely so long as MFS Company supports the trustees. The allegation in ¶ 45 may be sufficient to demonstrate that MFS Company, MFS Distributors, and the MFS Funds all have a cooperative relationship, but it does not demonstrate anything more about how the Trustee Defendants themselves were interested. Finally, as to ¶ 91, the presence of MFS officers as trustees on the board is not enough, without any additional facts regarding board operations, to allege with particularity that each of the non-affiliated Trustee Defendants was controlled by MFS Company. The plaintiffs'

417 F.Supp.2d 100                                                                                    Page 12
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

conclusory assertion that these officers were put in place to "ensure that the Trustees toed the line" will not suffice.

The plaintiffs also argue that they have alleged that each Trustee Defendant personally**111** benefited from the wrongdoing alleged in the complaint. They rely on allegations that the Trustee Defendants served for indefinite terms at the pleasure of the investment adviser defendant, *see* Compl. ¶ 91, received substantial compensation (ranging from $100,000-200,000 annually) for their duties overseeing the one-hundred twelve funds in the MFS fund complex, *see* Compl. ¶ 140, and were self-interested in alleged improper kickbacks paid to brokers to steer clients into the MFS Funds because they would lose their positions if the funds did not grow. *See* Compl. ¶ 139. These allegations are insufficient to excuse demand. First, the factual allegation that the Trustee Defendants serve indefinite terms does not, without more, warrant the conclusion that they serve "at the pleasure" of MFS Company, particularly in light of the acknowledged fact that the shareholders retain the right to vote out a trustee. The complaint's allegation that these Trustee Defendants are intimidated into doing the bidding of MFS Company is a conclusion without articulated factual support. *See* Compl. ¶ 135. In addition, board membership by itself does not warrant a conclusion that the trustee is "interested," even though the trustee is well compensated and was appointed by the defendant. *See Demoulas v. Demoulas Super Markets, Inc.,* Civ. No. 033741BLS, 2004 WL 1895052, at *15 (Mass.Super. Aug. 2, 2004); *see also In re Eaton Vance Mut. Funds,* 380 F.Supp.2d at 240; *In re Alliancebernstein Mut. Fund Excessive Fee Litig.,* Civ. No. 4885(SWK), 2005 WL 2677753, at *8 (S.D.N.Y. Oct. 19, 2005). In the mutual fund context, other courts have similarly concluded that the fact that trustees receive substantial compensation for their service on multiple boards within a fund complex is not in itself sufficient to establish that they were under the "control" of the adviser. *See Krantz,* 98 F.Supp.2d at 155, 157; *see also In re Mut. Funds Inv. Litig.,* 384 F.Supp.2d at 868-69. Likewise, the Massachusetts courts have held that the receipt of "usual and customary director's fees and benefits" does not render a director interested. *See Harhen,* 730 N.E.2d at 864 n. 5. Finally, the plaintiffs' allegation that the Trustee Defendants were "interested" because the wrongful scheme alleged would lead to fund growth, thus permitting them to maintain their positions and salaries, depends on a series of general inferential conclusions-that the alleged wrongful "kickback" arrangements were necessary to maintain fund growth, that if growth stagnated the MFS Funds would be disbanded or merged, and if this occurred as to one of the many MFS Funds the Trustee Defendants oversaw they would lose their positions-that are nowhere supported by particularized factual allegations.

[12] It is not enough to allege simply that the Trustee Defendants approved the advisory fees and other distributions that are alleged to have been wrongful. *See* Compl. ¶¶ 89-95, 136, 137, 138. Allegations that do not go beyond asserting that the trustees had approved transactions that are alleged to have been wrongful are insufficient to excuse demand without further evidence of bias or self interest on the part of the trustees. *See Grossman,* 674 F.2d at 124-25; *ING Principal Protection,* 369 F.Supp.2d at 172. Here there are no particular allegations that any of the non-officer Trustee Defendants acted out of bias or self-interest in approving the challenged transactions. Similarly, there are also no particularized allegations, beyond the mere fact of approval, that the Trustee Defendants were actively involved in the wrongfulness of any actions.

For the foregoing reasons, I conclude that the plaintiffs have failed to adequately allege that the majority of the board of **112** trustees was "interested" so that demand would be excused under Massachusetts law. Therefore, since it is undeniable that the plaintiffs have not made demand on the boards of trustees, their failure to allege with particularity that demand would be futile requires that their derivative claim under the IAA set forth in Count V should be dismissed. *See* Fed.R.Civ.P. 23.1.

**IV. Counts VI-IX (state law claims) are dismissed.**

In Counts VI, VII, VIII, and IX, the plaintiffs purport to state on behalf of all class members four separate claims under state law for alleged breaches of fiduciary duty or unjust enrichment. Despite the plaintiffs' characterization of these claims as "direct" claims, they are properly regarded as derivative.

[13] Under Massachusetts law,[FN14] if the wrong underlying claim results in harm to a plaintiff shareholder only because the corporate entity has

been injured, with the plaintiff's injury simply being his proportionate share of the entity's injury, the harm to the shareholder is indirect and his cause of action is derivative. *See Bessette v. Bessette, 385 Mass. 806, 434 N.E.2d 206, 208 (1982); Jackson v. Stuhlfire, 28 Mass.App.Ct. 924, 547 N.E.2d 1146, 1148 (1990); see also Lapidus v. Hecht, 232 F.3d 679, 683 (9th Cir.2000)* (applying Massachusetts law); *Stegall v. Ladner, 394 F.Supp.2d 358, 364 (D.Mass.2005)* (SAME); *In re Eaton Vance Mut. Funds, 380 F.Supp.2d at 233-34; In re Franklin Mut., 388 F.Supp.2d at 462* (under Mass. law, the issue turns on whether the shareholders suffered an injury distinct from the injury suffered by the corporation).

> FN14. The parties do not address which state's law should apply to this issue. However, their arguments, premised on Massachusetts law, implicitly recognize the fact that I must look to the law to the Funds' state of organization, Massachusetts, for resolution of this issue of "shareholder standing." *See Stegall, at 363; In re Alliancebernstein, 2005 WL 2677753, at \*3; see also* Compl. ¶ 42 (MFS Funds are all organized under Massachusetts law).

[14] Here, any injury caused by the alleged state law wrongs committed by the defendants would occur primarily and directly to the MFS Funds and only indirectly to the plaintiffs by virtue of their status as investors. These claims should have been brought as derivative claims, with appropriate compliance with Rule 23.1.

The plaintiffs' argument that this result is somehow altered by the "unique nature" of mutual funds, relying on *Strigliabotti v. Franklin Resources, Inc., Civ. No. C 04-00883 SI, 2005 WL 645529, at \* 7-8 (N.D.Cal. Mar. 7, 2005)*, is unavailing. In *Strigliabotti*, the court decided that the injuries the plaintiffs allegedly suffered from excessive payment of 12b-1 distributions and advisory fees by the funds at issue were direct injuries under California law. However, that authority is not controlling, and I find its reasoning unpersuasive. The approach taken in that case ignores the fact that the injuries claimed by the plaintiffs here would be suffered only by reason of a precedent wrong to the MFS Funds.

The plaintiffs' remaining arguments on this score are similarly unpersuasive and do not merit extended discussion.[FN15] **\*113** Therefore, I conclude that all of the state law claims are properly viewed as derivative claims.

> FN15. The plaintiffs argue that the class members have sustained separate and distinct injury because the rates paid by classes are different and, therefore, the shareholders falling within each class are directly impacted by the payments. This is a *non sequitur*. If the facts are as alleged, it simply means that the shareholders of different classes may suffer their indirect injuries to a differing extent. Besides, this argument is also inconsistent with the claims stated in the complaint that make no effort to distinguish between the classes of shareholders but rather allege that all investors were similarly injured. *See In re Eaton Vance, 380 F.Supp.2d at 235-36.* The plaintiffs also argue that a direct action is necessary to vindicate the rights of class members no longer holding their shares. This argument is unavailing because such a result occurs in all derivative actions, where it is the fund that benefits directly from any remedy (because it was the fund that was injured directly), not the individual shareholders. *See Ross v. Bernhard, 396 U.S. 531, 538-39, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)* ("The proceeds of the [derivative] action belong to the corporation," not to the former shareholders.). Present shareholders find the value of their shares proportionately increased by a damage recovery by the fund; past shareholders, who have become present non-shareholders, do not.

Counts VI through IX were improperly brought as direct claims when they are in fact derivative claims, and they must be dismissed. Even if the claims were to be viewed as derivative claims, they would all be subject to the demand requirement of Fed.R.Civ.P. 23.1. For the reasons discussed above in relation to the IAA claim under Count V, the plaintiffs have failed to comply with Rule 23.1 because they failed either to make the demand required by that rule or to allege adequately the futility of such demand. All

417 F.Supp.2d 100                                                                                    Page 14
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

four of these counts must be dismissed.

**V. Count III states a claim under § 36(b) of the ICA.**

**A. Adequacy of the Complaint**

In Count III, the plaintiffs assert claims against MFS Company (the investment adviser), MFS Distributors (the principal underwriter), and the Trustee Defendants for alleged breaches of fiduciary duty under § 36(b) of the ICA, 15 U.S.C. § 80a-35(b). The plaintiffs allege that the defendants violated § 36(b) by their improper collection of purported Rule 12b-1 marketing fees, their concomitant failure to reduce advisory fees proportionately to the benefit received by MFS Company from these payments, and their use of MFS Fund assets to make undisclosed payments of "soft dollars" and excessive commissions in violation of Rule 12b-1 in exchange for preferential marketing services, despite the fact that the payments at issue benefited only the defendants and not the MFS Funds or their investors. Compl. ¶ 160. The plaintiffs also contend that the defendants wrongfully inflated their advisory fees in an amount that would reimburse them for further revenue sharing payments ostensibly made out of the assets of MFS Company and MFS Distributors. Compl. ¶ 160. All of this, the plaintiffs allege, demonstrates that the plaintiffs charged advisory fees so disproportionately large that they bore no reasonable relationship to the services rendered, could not have been the product of arm's length bargaining, and thus violated the fiduciary duty imposed by § 36(b). Compl. ¶¶ 160, 161. The defendants have moved to dismiss this claim on the grounds that it fails to state a claim upon which relief can be granted.

[15][16] Under § 36(b), a security holder of a registered investment company (such as the MFS Funds here) may bring an action "on behalf of such company" against an investment adviser of that investment company or "any affiliated person of such investment adviser" for a breach of the statutorily created fiduciary duty "with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof." 15 U.S.C. § 80a-35(b). **\*114** In Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923 (2d Cir.1982), the Second Circuit set forth a standard that has since

been widely cited by other courts in addressing claims under § 36(b). According to Gartenberg, an investment adviser or manager may be liable for a breach of its fiduciary duty under § 36(b) if it charged a fee "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Id. at 928. The Gartenberg court proposed six factors typically to be considered, including (1) the nature and quality of services provided to fund shareholders; (2) the profitability of the fund to the adviser-manager; (3) fall-out benefits; (4) economies of scale; (5) comparative fee structures; and (6) the independence and conscientiousness of the trustees. See Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 409 (2d Cir.1989) (citing Gartenberg, 694 F.2d at 929-30). The First Circuit has not expressly adopted the so-called Gartenberg factors nor has it established a specific pleading standard for § 36(b) claims. My judgment, previously stated elsewhere, is that Gartenberg (if it were to be followed in this Circuit) does not establish a heightened pleading standard for § 36(b) claims and the plaintiffs' failure to plead facts that specifically address the Gartenberg factors is not in itself a ground for dismissal. See Wicks v. Putnam Inv. Mgmt., LLC, Civ. No. 04-10988, 2005 WL 705360, at *4 (D.Mass. Mar. 28, 2005). This conclusion is consistent with recent instruction from the Supreme Court and the First Circuit that heightened pleading standards should not be applied unless such a heightened standard is mandated either by statute or rule of civil procedure. See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512-13, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 66 (1st Cir.2004). Because there is no heightened pleading standard for claims under § 36(b), the plaintiffs here need only comply with the usual notice pleading requirements of Fed.R.Civ.P. 8.

Under Rule 8, a complaint is sufficient as long as it contains a "short and plain statement of the claim showing that the pleader is entitled to relief" that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." See Educadores, 367 F.3d at 66 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); see also Fed.R.Civ.P. 8(a). A court should dismiss a complaint on a Rule 12(b)(6) motion only if "it is clear that no relief could be granted under any set of facts that could be proved

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

417 F.Supp.2d 100                                                                                    Page 15
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

consistent with the allegations." *See Educadores, 367 F.3d at 66* (citing *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).* Of course, as the defendants correctly point out, the liberality of Rule 8 should not be read to mean that there are not some minimal standards that must be met. The complaint should at least set forth basic facts as to who did what to whom, when, where and-if relevant to the case-why. *See Educadores, 367 F.3d at 68.* Additionally, in evaluating a motion to dismiss for failure to state a claim a court must "eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets." *See id. at 68.* While a plaintiff need not plead facts in evidentiary detail, a complaint will be deemed insufficient if all it does is "parrot[ ] the language of a statutory cause of action, without providing some factual support." *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 240 (1st Cir.2004).*

In sum, the following principles apply: (1) a § 36(b) plaintiff need only set forth a "short and plain statement" that gives **115 "fair notice" of the claim of breach of fiduciary duty with respect to the receipt of compensation or other material payments made by the fund or its shareholders; and (2) the plaintiff need not plead in a high degree of factual detail and failure to plead specifically any of the *Gartenberg* factors is not itself a ground for dismissal; but (3) a § 36(b) complaint is not sufficient if it rests solely on general and conclusory legal assertions that the fees charged were excessive.

[17] The defendants contend that the complaint's § 36(b) claim should be dismissed because it does not allege conduct sufficient to sustain a claim under the statute. First, although the defendants describe the plaintiffs' claim as nothing more than one for non-disclosure of certain practices, the complaint can reasonably be read as alleging that the nondisclosed practices were themselves wrongful under § 36(b). The defendants are correct that § 36(b) is not a general vehicle for bringing claims for any and all purported breaches of fiduciary duty; claims under the statute must allege some connection between the wrongs alleged and excessive compensation of an investment adviser or affiliated persons. *See, e.g., Stegall, 394 F.Supp.2d at 374-77* (describing how both the so-called "broad" and "narrow" view of § 36(b) liability both require that the breach of

fiduciary duty was in some way tied to excessive compensation). Thus, to the extent that plaintiffs argue that the complaint, properly understood, is "not limited to excessive fees and charges, but also includes Defendants' breach of fiduciary duty [by failing to adequately inform investors about conflicts of interest involving compensation received by MFS Company] in connection with the fees they charged, which is an independent violation of § 36(b)," Pls.' Opp'n to Mot. to Dismiss at 36, they are incorrect. *See Stegall, 394 F.Supp.2d at 376; see also Migdal v. Rowe Price-Fleming, Int'l, Inc., 248 F.3d 321, 328-29 (4th Cir.2001).*

On the other hand, I am unwilling to conclude at this stage of the case, based only on pleadings, that a claim under § 36(b) may not attack the lawfulness of the types of distributions that the plaintiffs allege were wrongful here-excessive Rule 12b-1 fees, soft dollar payments, and excessive broker commissions-despite the fact that such payments may not be "advisory fees" in the most literal sense. *See Meyer v. Oppenheimer Mgmt. Corp., 764 F.2d 76, 82-83 (2d Cir.1985)* (expressly rejecting the proposition that § 36(b) "deals only with compensation for *advisory* services" to mutual funds, noting the broad scope of the language of § 36(b), which applies to payments made to any "affiliated person" of the investment adviser) (emphasis in original); *Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861, 866 (2d Cir.1990)* (§ 36(b) applies to claims related to excessive payments other than purely advisory fees-"the costs of 12b-1 plans ... as well as advisory fees are subject to review under Section 36(b)"); *In re Alliancebernstein, 2005 WL 2677753, at *5; In re Eaton Vance Mut. Funds, 380 F.Supp.2d at 236-37; ING Principal Protection, 369 F.Supp.2d at 167-69; Pfeiffer v. Bjurman, Barry & Assocs., Civ. No. 03-9741 DLC, 2004 WL 1903075, at *4 (S.D.N.Y. Aug. 26, 2004); cf. Krinsk, 875 F.2d at 412-13* (allegation of improper Rule 12b-1 fees could not be brought separately under Rule 12b-1 because it was part of cognizable § 36(b) excessive compensation claim); *Pfeiffer v. Integrated Fund Servs., Inc., 371 F.Supp.2d 502, 508-09 (S.D.N.Y.2005)* (holding such claims are cognizable but dismissing claim because there were improper defendants named).

I conclude that Count III sufficiently comports with Rule 8's pleading standard. **116 It alleges wrongful conduct specific to the defendants in some factual

417 F.Supp.2d 100
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

Page 16

detail. In addition, it alleges that the defendants have caused the MFS Funds to pay improper "kickbacks" to brokers in exchange for steering clients into MFS Funds via "shelf space arrangements," to pay excessive commissions under the guise of "soft dollars," to engage in improper "directed brokerage" arrangements, and to make improper "hard dollar" revenue sharing payments that were then reimbursed out of MFS Fund assets. *See* Compl. ¶¶ 46-51, 97-104, 106-07, 109-13, 161. There are also illustrating allegations regarding these types of arrangements with one particular broker-dealer, as well as allegations that a large number of other broker-dealers were similarly involved. *See* Compl. ¶¶ 40, 56-75, 82-83. The plaintiffs also give adequate notice of how these arrangements are alleged to have benefited the defendants while at the same time harming the MFS Funds and their investors. *See* Com pl. ¶¶ 3-4, 48, 52, 79, 84, 94, 102-03, 108, 163. The plaintiffs allege that as the MFS Funds grew the defendants failed to pass on economies of scale from that growth by failing to reduce fees accordingly. *See* Compl. ¶¶ 102-03. Finally, the plaintiffs allege that the advisory fees MFS Company received were wrongfully inflated by shifting to the MFS Funds and their investors costs that should rightfully have been borne by the MFS Company. *See* Compl. ¶ 105.

The defendants also argue, relying on cases such as *Migdal*, 248 F.3d at 326-27 and *Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140, 143-44 (3d Cir.2002), that the § 36(b) claim should be dismissed because the plaintiffs have failed alleged sufficient facts that, if proven, would demonstrate that the services rendered by the defendants were disproportionate to the fees charged. This argument is unpersuasive. This is not a case like the cited cases where the plaintiffs only alleged the fees were high but made no allegations regarding services rendered and the relationship between the two. Here, although the plaintiffs do not make any allegations regarding the quality of services rendered, that factor may be irrelevant to their theory of excessiveness. The plaintiffs' contention is that the fees were excessive because they were unauthorized and taken from fund assets to the benefit of the defendants only, not the funds. The plaintiffs' theory is that fees that amount to "something for nothing" are inherently excessive. At least one court has concluded in a different § 36(b) context that the wrongful retention of monies by an investment adviser that were in essence "something for nothing" could represent a

disproportional relationship between fees and services. *See Jones v. Harris Assocs., L.P.*, Civ. No. 04 C 8305, 2005 WL 831301, at *3 (N.D.Ill. April 7, 2005). For present purposes, the plaintiffs' pleading of this claim is sufficient to survive a motion to dismiss.

**B. Limits on the Surviving § 36(b) Cause of Action**

The defendants assert that even if the complaint adequately states a claim under § 36(b), the claim as stated is overbroad in two respects: the complaint can be understood to claim damages for greater period than is allowed by the statute, and it appears to claim damages against the Trustee Defendants, who are not proper defendants under the statute. I agree, and the § 36(b) claim will be limited accordingly.

As to the damages period, the plaintiffs generally allege, for all the claims, a class period beginning March 14, 1999 and ending March 31, 2004. *See* Compl. ¶ 128. The plaintiffs do not allege any separate damages period applicable to their § 36(b) claim. The text of § 36(b) limits recovery *117 to "actual damages" and further provides that "[no] award of damages shall be recoverable for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3). Therefore, this lawsuit having been filed on March 25, 2004, the damages period applicable to the § 36(b) claim thus begins on March 25, 2003.

[18] The defendants also argue that the Trustee Defendants are not proper defendants because they are not alleged to be "recipients" of the allegedly excessive fees or commissions. By its terms, an action under § 36(b) may only be brought against the "recipient of [the allegedly wrongful] compensation or payments." 15 U.S.C. § 80a-35(b)(3). The plaintiffs argue that any dismissal of the Trustee Defendants at this point is premature-instead being a matter for summary judgment-and that the Trustee Defendants could possibly be held liable as "indirect" recipients of the fees. The only allegations in the complaint that could be viewed as supporting such a theory of indirect receipt are the allegations recounting the Trustee Defendants' compensation and the allegations that, in general, they failed in their fiduciary duties. This is insufficient. I agree with the reasoning of the courts that have recently addressed this issue in the context of nearly identical sets of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

417 F.Supp.2d 100

417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

allegations against other mutual fund trustees that the trustees are not proper § 36(b) defendants where, as here, there are no allegations that the annual compensation received by the Trustee Defendants was in exchange for "advisory services" or in some way represented advisory fees that were to be paid to the MFS Company but instead were diverted to the Trustee Defendants. *See In re Dreyfus Mut. Funds Fee Litig.,* Master File No. 04-0128, slip. op. at 12-14 (W.D.Pa. Sept. 28, 2004); *In re Eaton Vance Mut. Funds,* 380 F.Supp.2d at 238; *In re Alliancebernstein,* 2005 WL 2677753, at *6-7; *cf. Green v. Fund Asset Mgmt., L.P.,* 147 F.Supp.2d 318, 329-30 (D.N.J.2001) (dismissing § 36(b) against officers of funds because the officers were not "recipients" of compensation alleged to be wrongful under the statute where plaintiffs' only allegation of receipt was regular salary paid to the directors).

Accordingly, the § 36(b) claim that survives as Count III is limited in terms of the damages that may be recovered as described above and is only properly asserted against MFS Company and MFS Distributors.

**VI. The plaintiffs have no standing to assert the surviving § 36(b) claim as to non-owned funds.**

The plaintiffs purport to assert their § 36(b) claims on behalf of a class consisting of shareholders of sixty-two funds within the MFS fund complex. However, only two of the four named plaintiffs-Eric Forsythe and Richard Koslow-owned shares in only two of the sixty-two MFS Funds-Massachusetts Investors Trust and MFS Utilities Fund-at the time this lawsuit was filed. *See* Compl. ¶¶ 20, 22. Thus, the defendants argue that the plaintiffs lack standing to assert any § 36(b) claim except on behalf of those two funds. I agree.

[19] Under § 36(b), only the SEC and "security holders" in an investment company are entitled to bring a claim "on behalf of" the company. *See* 15 U.S.C. § 80a-35(b). "Security holders" means current security holders. Former security holders may not bring a claim on behalf of an investment company that they formerly held shares in, but no longer do. The only claims that are sufficient under § 36(b) are the claim by Eric Forsythe on behalf of *118 the Massachusetts Investors Trust Fund and the claim by Richard Koslow on behalf of the MFS Utilities Fund.

All other claims the complaint purports to state on behalf of the various MFS Funds, either never owned by any plaintiff or only formerly owned by a plaintiff, should be dismissed due to a lack of standing.[FN16]

> **FN16.** Plaintiff City of Chicago Deferred Compensation Plan claims to have formerly held shares in (1) MFS High Income Fund, (2) MFS Growth Opportunity Fund, and (3) Massachusetts Investors Growth Stock Fund. Plaintiff Larry Eddings claims to have formerly held shares in (1) MFS Capital Opportunities Fund, (2) MFS Strategic Income Fund, (3) Massachusetts Investors Growth Stock Fund (the same as plaintiff City of Chicago), (4) Massachusetts Investors Trust (the same as plaintiff Eric Forsythe), (5) MFS Total Return Fund, (6) MFS High Income Fund, and (7) MFS Emerging Growth Fund.

This conclusion follows not only from the plain statutory language, but also from the unique nature of the § 36(b) cause of action. As the Supreme Court explained in *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 535, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984), the § 36(b) cause of action is an "unusual cause of action." In the broadest sense, it is a "derivative" cause of action because it is brought "on behalf of" an investment company to vindicate the rights of the investment company and any recovery flows to the investment company, not the shareholder plaintiff. *See id.* at 535 n. 11, 104 S.Ct. 831. Nevertheless § 36(b) is not like the traditional derivative cause of action because the fund itself does not have the power to bring an action under the statute. *See id.* at 535-42, 104 S.Ct. 831. Instead, Congress explicitly gave the right to enforce violations of the statute to shareholders and to the SEC but not to the investment company itself. *See id.* The Supreme Court made clear in *Daily Income Fund* that the shareholder suing under § 36(b) sues on behalf of a fund, though not in substitution for the fund. Any recovery belongs to the fund, not the shareholder. Consistent with the statutory language, a plaintiff must hold a present interest in each fund on behalf of which he purports to bring a § 36(b) claim.

The plaintiffs cite various cases which they assert demonstrate that they have standing to sue on behalf

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

417 F.Supp.2d 100
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

of MFS Funds they have no ownership interest in, alleging that the MFS Funds have engaged in a common course of wrongful conduct and thus, like the security holders, ERISA plan beneficiaries, and the like in those cases, they should be able to proceed with this case. *See* Pls.' Opp'n to Mot. to Dismiss at 23-26. Those cases are inapposite. For the most part they concern class certification issues, most of them dealing with injuries alleged to have occurred directly to groups of plaintiffs under other securities laws or under ERISA, not § 36(b). Furthermore, as this court and others have held in the mutual fund context, it is appropriate to treat each MFS Fund as a separate and distinct entity in the § 36(b) context and a plaintiff may not use the corporate structure of the broader investment company to confer standing. *See Wicks,* 2005 WL 705360, at *3; *see also Stegall,* 394 F.Supp.2d at 362-63; *In re Eaton Vance Corp. Sec. Litig.,* 219 F.R.D. 38, 40-41 (D.Mass.2003).[FN17]

> **FN17.** Since each MFS Fund should be properly treated as a separate and distinct entity, the plaintiffs' alternative argument that they have standing by reason of an ongoing financial interest in all of the MFS Funds, including those they own no shares in, is precluded.

[20][21] Standing is a threshold inquiry and is particularly important in securities litigation, where strict application of standing principles is needed to avoid vexatious litigation and abusive discovery. *See* **\*119***Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *In re Bank of Boston Corp. Sec. Litig.,* 762 F.Supp. 1525, 1531 (D.Mass.1991). A plaintiff may not avoid the standing inquiry merely by styling his suit as a class action, *see In re Bank of Boston,* 762 F.Supp. at 1531, and courts have traditionally resolved questions of standing before reaching issues of class certification. *See In re Alliancebernstein,* 2005 WL 2677753, at *9; *In re Eaton Vance Corp. Sec. Litig.,* 220 F.R.D. 162, 165-69 (D.Mass.2004).[FN18] As the Supreme Court has instructed, the fact "[t]hat a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174,

135 L.Ed.2d 606 (1996) (citations and internal quotation marks omitted). Other judges in this district have relied on this same reasoning in holding that plaintiffs have no standing to sue on behalf of mutual funds they did not own despite the fact that they owned shares in other funds in the fund complex. *See Stegall,* 394 F.Supp.2d at 361-63; *In re Eaton Vance Corp.,* 219 F.R.D. at 40-41; *Nenni v. Morgan Stanley Dean Witter & Co.,* Civ. No. 98-12454-REK, 1999 U.S. Dist. LEXIS 23351, at *5-6 (D.Mass. Sept. 29, 1999).

> **FN18.** I agree with the reasoning of the court in *In re Eaton Vance Corp.,* 220 F.R.D. at 168-69 (addressing a similar issue of non-ownership of mutual funds upon whose behalf a plaintiff purported to sue) and the court in *In re Alliancebernstein,* 2005 WL 2677753, at *9 (addressing a nearly identical issue to that faced here) that this is a straightforward securities case and this case does not present special concerns discussed in *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) that led the Supreme Court to conclude that in rare exceptions the consideration of class certification should precede the standing inquiry.

To sum up: the plaintiffs have no standing to sue under § 36(b) "on behalf of" other funds in the MFS fund complex simply because they style their case as a class action. The cause of action that remains open to them, based on § 36(b), limits eligible plaintiffs to those who hold shares in the funds on whose behalf they purport to make a claim. Here, only two named plaintiffs meet that requirement as to two mutual MFS Funds. The plaintiffs may not rely on the rules-based class action procedural device as a method to "bootstrap themselves into standing they lack" merely because in theory some member of the putative class, if it were to be certified, might have a claim because they owned shares in the other MFS Funds at the time the suit was brought. *See In re Eaton Vance Corp.,* 220 F.R.D. at 169.[FN19]

> **FN19.** The plaintiffs also argue that under the so-called "juridical links" doctrine, they have standing to pursue claims on behalf of all other shareholders of MFS Funds in which they did not own shares because the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

417 F.Supp.2d 100
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

collective prosecution of the action would be the most efficient means to resolve the dispute. However, this doctrine, developed in the context of class certification analysis under Fed.R.Civ.P. 23, should properly remain in the analysis of adequacy and typicality of plaintiffs for which it was originally conceived. In the separate and distinct inquiry into a plaintiff's standing undertaken here, the juridical links doctrine is not relevant. *See In re Eaton Vance Corp.,* 220 F.R.D. at 169-71; *see also In re Franklin Mut.,* 388 F.Supp.2d at 462 n. 7; *cf. Raines v. Byrd,* 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (courts must carefully inquire into whether standing exists and "put aside the natural urge to proceed to the merits of [an important dispute]" and "settle" it for the sake of convenience and efficiency).

Therefore, the remaining § 36(b) claim is limited to the claims brought on behalf of the two MFS Funds in which plaintiffs **\*120** Eric Forsythe and Richard Koslow have standing, Massachusetts Investors Trust and MFS Utilities Fund. To the extent Count III purports to state a claim "on behalf of" other MFS Funds under § 36(b), it is dismissed. Plaintiffs Larry R. Eddings and the City of Chicago Deferred Compensation Plan are also dismissed from the case because the complaint lacks any allegation that they had an ownership interest in any MFS Fund when the case was initiated.

**VII. Conclusion**

For the foregoing reasons, the defendants' motion to dismiss (Dk.# 73) is GRANTED in part and DENIED in part. All of plaintiffs' claims except Count III, brought under § 36(b) of the ICA, are dismissed for the reasons set forth above. Plaintiffs Eddings and the City of Chicago Deferred Compensation Plan are dismissed from the case. As to Count III, the plaintiffs are only permitted to assert a claim on behalf of the two MFS Funds in which they owned shares at the time of bringing this action, Massachusetts Investors Trust and MFS Utilities Fund. The damages period for the surviving claims is limited to the period beginning on March 25, 2003. The claims against the Trustee Defendants under § 36(b) are dismissed.

It is SO ORDERED.

D.Mass.,2006.
Forsythe v. Sun Life Financial, Inc.
417 F.Supp.2d 100, Fed. Sec. L. Rep. P 93,668

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 7**

Westlaw.

120 S.Ct. 693                                                                                    Page 1
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

▷Friends of the Earth, Inc. v. Laidlaw
Environmental Services (TOC), Inc.
U.S.,2000.

Supreme Court of the United States
FRIENDS OF THE EARTH, INCORPORATED, et
al., Petitioners,
v.
LAIDLAW ENVIRONMENTAL SERVICES
(TOC), INC.
No. 98-822.

Argued Oct. 12, 1999.
Decided Jan. 12, 2000.

Environmental groups brought action pursuant to
citizen suit provision of Clean Water Act (CWA)
against holder of National Pollutant Discharge
Elimination System (NPDES) permit, alleging, inter
alia, violation of mercury discharge limits, and
seeking declaratory and injunctive relief, civil
penalties, costs, and attorney fees. The United States
District Court for the District of South Carolina,
Joseph F. Anderson, Jr., J., 956 F.Supp. 588, found
numerous permit violations, imposed penalty of
$405,800, and denied request for declaratory and
injunctive relief. Appeal was taken. The Court of
Appeals for the Fourth Circuit, 149 F.3d 303, vacated
and remanded with instructions to dismiss. Certiorari
was granted. The Supreme Court, Justice Ginsburg,
held that: (1) groups had standing to bring citizen suit
seeking both injunctive relief and civil penalties; (2)
action was not rendered moot by permit holder's
compliance with permit limits or its shut down of
facility, absent showing that violations could not
reasonably be expected to recur; and (3) Supreme
Court would not address groups' request for
attorneys' fees.

Judgment of Court of Appeals reversed and
remanded.

Justice Stevens filed concurring opinion.

Justice Kennedy filed concurring opinion.

Justice Scalia filed dissenting opinion in which

Justice Thomas joined.

West Headnotes

[1] Environmental Law 149E ☜659

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek659 k. Notice Requirements. Most
Cited Cases
    (Formerly       199k25.15(4.1)       Health    and
Environment)
Purpose of notice to the alleged violator, under Clean
Water Act's citizen suit provision, is to give violator
an opportunity to bring itself into complete
compliance with the Act and thus render unnecessary
a citizen suit. Federal Water Pollution Control Act, §
505(a), (b)(1)(A), (g), as amended, 33 U.S.C.A. §§
1365(a), (b)(1)(A), (g).

[2] Environmental Law 149E ☜650

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek649 Persons Entitled to Sue or Seek
Review; Standing
            149Ek650 k. In General. Most Cited Cases
    (Formerly       199k25.15(4.1)       Health    and
Environment)
Citizens lack statutory standing under Clean Water
Act's citizen suit provision to sue for violations that
have ceased by the time the complaint is filed.
Federal Water Pollution Control Act, § 505(a), as
amended, 33 U.S.C.A. § 1365(a).

[3] Federal Civil Procedure 170A ☜103.2

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

Federal Civil Procedure 170A ☜103.3

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693

528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.3   k.   Causation;
Redressability. Most Cited Cases
To satisfy Article III's standing requirements, a plaintiff must show: (1) it has suffered an injury in fact that is concrete and particularized and is actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S.C.A. Const. Art. 3, § 2, cl. 1.

[4] Associations 41 &#8364;&#8764;20(1)

41 Associations
   41k20 Actions by or Against Associations
      41k20(1) k. In General. Most Cited Cases
An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. U.S.C.A. Const. Art. 3, § 2, cl. 1.

[5] Environmental Law 149E &#8364;&#8764;652

149E Environmental Law
   149EXIII Judicial Review or Intervention
      149Ek649 Persons Entitled to Sue or Seek Review; Standing
         149Ek652 k. Organizations, Associations, and Other Groups. Most Cited Cases
      (Formerly 199k25.15(4.1) Health and Environment)
Environmental groups alleged sufficient injury in fact to establish standing to seek injunctive relief in action against holder of National Pollutant Discharge Elimination System (NPDES) permit for alleged violation of mercury discharge limits, pursuant to citizen suit provision of Clean Water Act (CWA), even if there was no resulting injury to the environment, as group members alleged that, although they would like to use affected river for recreational purposes, they would not do so due to permit holder's alleged discharges. U.S.C.A. Const. Art. 3, § 2, cl. 1.; Federal Water Pollution Control

Act, § 505(a, g), as amended, 33 U.S.C.A. § 1365(a, g).

[6] Environmental Law 149E &#8364;&#8764;651

149E Environmental Law
   149EXIII Judicial Review or Intervention
      149Ek649 Persons Entitled to Sue or Seek Review; Standing
         149Ek651 k. Cognizable Interests and Injuries, in General. Most Cited Cases
      (Formerly 199k25.15(3.3) Health and Environment)
Environmental plaintiffs adequately allege injury in fact, for standing purposes, when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity. U.S.C.A. Const. Art. 3, § 2, cl. 1.

[7] Environmental Law 149E &#8364;&#8764;652

149E Environmental Law
   149EXIII Judicial Review or Intervention
      149Ek649 Persons Entitled to Sue or Seek Review; Standing
         149Ek652 k. Organizations, Associations, and Other Groups. Most Cited Cases
      (Formerly 199k25.15(4.5) Health and Environment)
Environmental groups had standing to seek civil penalties in action against holder of National Pollutant Discharge Elimination System (NPDES) permit for allegedly ongoing violation of mercury discharge limits, pursuant to citizen suit provision of Clean Water Act (CWA), even though such penalties are paid to government, not private plaintiffs, since penalties would encourage permit holder to discontinue current violations and deter it from committing future ones. U.S.C.A. Const. Art. 3, § 2, cl. 1.; Federal Water Pollution Control Act, § 505(a, g), as amended, 33 U.S.C.A. § 1365(a, g).

[8] Federal Civil Procedure 170A &#8364;&#8764;103.2

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                                    Page 3
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

Interest. Most Cited Cases
A plaintiff must demonstrate standing separately for
each form of relief sought.

**[9] Federal Courts 170B ☞13.25**

170B Federal Courts
 170BI Jurisdiction and Powers in General
  170BI(A) In General
   170Bk12 Case or Controversy Requirement
    170Bk13.25 k. Land, Land Use, and
Environment. Most Cited Cases
Neither National Pollutant Discharge Elimination
System (NPDES) permit holder's substantial
compliance with its permit nor its subsequent
shutdown of hazardous waste incinerator facility
from which it discharged pollutants rendered moot
environmental groups' citizen suit, under Clean Water
Act, seeking civil penalty for violation of permit's
mercury discharge limits, absent clear showing that
violations could not reasonably be expected to recur,
notwithstanding groups' failure to appeal district
court's denial of injunctive relief. Federal Water
Pollution Control Act, § 505(a, g), as amended, 33
U.S.C.A. § 1365(a, g).

**[10] Federal Courts 170B ☞12.1**

170B Federal Courts
 170BI Jurisdiction and Powers in General
  170BI(A) In General
   170Bk12 Case or Controversy Requirement
    170Bk12.1 k. In General. Most Cited
Cases
A defendant's voluntary cessation of a challenged
practice does not deprive a federal court of its power
to determine the legality of the practice under the
mootness doctrine; if it did, the courts would be
compelled to leave the defendant free to return to his
old ways.

**[11] Federal Courts 170B ☞12.1**

170B Federal Courts
 170BI Jurisdiction and Powers in General
  170BI(A) In General
   170Bk12 Case or Controversy Requirement
    170Bk12.1 k. In General. Most Cited
Cases
A case might become moot based on a defendant's

voluntary conduct if subsequent events made it
absolutely clear that the allegedly wrongful behavior
could not reasonably be expected to recur, but the
heavy burden of persuading the court that the
challenged conduct cannot reasonably be expected to
start up again lies with the party asserting mootness.

**[12] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
 170AII Parties
  170AII(A) In General
   170Ak103.1 Standing
    170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
In a lawsuit brought to force compliance, it is the
plaintiff's burden to establish standing by
demonstrating that, if unchecked by the litigation, the
defendant's allegedly wrongful behavior will likely
occur or continue, and that the threatened injury is
certainly impending.

**[13] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
 170AII Parties
  170AII(A) In General
   170Ak103.1 Standing
    170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

**Federal Courts 170B ☞12.1**

170B Federal Courts
 170BI Jurisdiction and Powers in General
  170BI(A) In General
   170Bk12 Case or Controversy Requirement
    170Bk12.1 k. In General. Most Cited
Cases
There are circumstances in which the prospect that a
defendant will engage in or resume harmful conduct
may be too speculative to support standing, but not
too speculative to overcome mootness.

**[14] Federal Courts 170B ☞13**

170B Federal Courts
 170BI Jurisdiction and Powers in General
  170BI(A) In General
   170Bk12 Case or Controversy Requirement

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                              Page 4
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

170Bk13 k. Particular Cases or Questions, Justiciable Controversy. Most Cited Cases
When a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action, despite the fact that she would have lacked initial standing had she filed the complaint after the transfer.

[15] Federal Civil Procedure 170A ☞103.2

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
If a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.

[16] Federal Courts 170B ☞12.1

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
                170Bk12.1 k. In General. Most Cited Cases
District courts cannot retain jurisdiction over cases in which one or both of the parties plainly lacks a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died, notwithstanding the sunk costs to the judicial system.

[17] Environmental Law 149E ☞695

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek694 Determination, Judgment, and Relief
            149Ek695 k. In General. Most Cited Cases
    (Formerly 199k25.15(12) Health and Environment)
Under Clean Water Act's citizen suit provision, the district court has discretion to determine which form of relief is best suited, in the particular case, to abate current violations and deter future ones. Federal Water Pollution Control Act, § 505(a), as amended,

33 U.S.C.A. § 1365(a).

[18] Injunction 212 ☞1

212 Injunction
    212I Nature and Grounds in General
        212I(A) Nature and Form of Remedy
            212k1 k. Nature and Purpose in General. Most Cited Cases
A federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.

[19] Environmental Law 149E ☞223

149E Environmental Law
    149EV Water Pollution
        149Ek223 k. Penalties and Fines. Most Cited Cases
    (Formerly 149Ek702, 199k25.7(24) Health and Environment)
Denial of injunctive relief in action brought under Clean Water Act's citizen suit provision does not necessarily mean that the district court has concluded there is no prospect of future violations for civil penalties to deter. Federal Water Pollution Control Act, § 505(a, g), as amended, 33 U.S.C.A. § 1365(a, g).

[20] Federal Civil Procedure 170A ☞2582

170A Federal Civil Procedure
    170AXXVII Judgment
        170AXXVII(D) On Trial of Issues
            170Ak2582 k. Nature and Extent of Relief in General. Most Cited Cases
Federal courts should aim to ensure the framing of relief no broader than required by the precise facts.

[21] Environmental Law 149E ☞700

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek699 Injunction
            149Ek700 k. In General. Most Cited Cases
    (Formerly 199k25.15(2.1) Health and Environment)
A district court in a Clean Water Act citizen suit properly may conclude that an injunction would be an excessively intrusive remedy, because it could

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                              Page 5
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

entail continuing superintendence of the permit holder's activities by a federal court, which is a process burdensome to court and permit holder alike. Federal Water Pollution Control Act, § 505(a), as amended, 33 U.S.C.A. § 1365(a).

**[22] Federal Courts 170B ☞460.1**

170B Federal Courts
　　170BVII Supreme Court
　　　　170BVII(B) Review of Decisions of Courts of Appeals
　　　　　　170Bk460 Review on Certiorari
　　　　　　　　170Bk460.1 k. In General. Most Cited Cases
Supreme Court would not address plaintiff's entitlement to attorneys' fees under catalyst theory, on appeal from dismissal for mootness of citizen suit under Clean Water Act, but would have district court address request for fees in the first instance, where district court had stayed time for petition for attorneys' fees until time for appeal had expired or, if either party appealed, until appeal was resolved. Federal Water Pollution Control Act, § 505(d), as amended, 33 U.S.C.A. § 1365(d).

**\*\*696 \*167 Syllabus [FN\*]**

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Defendant-respondent Laidlaw Environmental Services (TOC), Inc., bought a facility in Roebuck, South Carolina, that included a wastewater treatment plant. Shortly thereafter, the South Carolina Department of Health and Environmental Control (DHEC), acting under the Clean Water Act (Act), 33 U.S.C. § 1342(a)(1), granted Laidlaw a National Pollutant Discharge Elimination System (NPDES) permit. The permit authorized Laidlaw to discharge treated water into the North Tyger River, but limited, among other things, the discharge of pollutants into the waterway. Laidlaw began to discharge various pollutants into the waterway; these discharges, particularly of mercury, an extremely toxic pollutant, repeatedly exceeded the limits set by the permit.

On April 10, 1992, plaintiff-petitioners Friends of the Earth and Citizens Local Environmental Action Network, Inc. (referred to collectively here, along with later joined plaintiff-petitioner Sierra Club, as "FOE"), notified Laidlaw of their intention to file a citizen suit against it under the Act, 33 U.S.C. § 1365(a), after the expiration of the requisite 60-day notice period. DHEC acceded to Laidlaw's request to file a lawsuit against the company. On the last day before FOE's 60-day notice period expired, DHEC and Laidlaw reached a settlement requiring Laidlaw to pay $100,000 in civil penalties and to make "every effort" to comply with its permit obligations.

On June 12, 1992, FOE filed this citizen suit against Laidlaw, alleging noncompliance with the NPDES permit and seeking declaratory and injunctive relief and an award of civil penalties. Laidlaw moved for summary judgment on the ground that FOE lacked Article III standing to bring the lawsuit. After examining affidavits and deposition testimony from members of the plaintiff organizations, the District \*\*697 Court denied the motion, finding that the plaintiffs had standing. The District Court also denied Laidlaw's motion to dismiss on the ground that the citizen suit was barred under § 1365(b)(1)(B) by DHEC's prior action against the company. After FOE initiated this suit, but before the District Court rendered judgment on January 22, 1997, Laidlaw violated the mercury discharge limitation in its permit 13 times and committed 13 monitoring and 10 reporting violations. In issuing its judgment, the \*168 District Court found that Laidlaw had gained a total economic benefit of $1,092,581 as a result of its extended period of noncompliance with the permit's mercury discharge limit; nevertheless, the court concluded that a civil penalty of $405,800 was appropriate. In particular, the District Court found that the judgment's "total deterrent effect" would be adequate to forestall future violations, given that Laidlaw would have to reimburse the plaintiffs for a significant amount of legal fees and had itself incurred significant legal expenses. The court declined to order injunctive relief because Laidlaw, after the lawsuit began, had achieved substantial compliance with the terms of its permit.

FOE appealed as to the amount of the District Court's civil penalty judgment, but did not appeal the denial of declaratory or injunctive relief. The Fourth Circuit vacated the District Court's order and remanded with

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                                    Page 6
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

instructions to dismiss the action. Assuming, *arguendo*, that FOE initially had standing, the appellate court held that the case had become moot once Laidlaw complied with the terms of its permit and the plaintiffs failed to appeal the denial of equitable relief. Citing *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210, the court reasoned that the only remedy currently available to FOE, civil penalties payable to the Government, would not redress any injury FOE had suffered. The court added that FOE's failure to obtain relief on the merits precluded recovery of attorneys' fees or costs because such an award is available only to a "prevailing or substantially prevailing party" under § 1365(d). According to Laidlaw, the entire Roebuck facility has since been permanently closed, dismantled, and put up for sale, and all discharges from the facility have permanently ceased.

*Held:* The Fourth Circuit erred in concluding that a citizen suitor's claim for civil penalties must be dismissed as moot when the defendant, after commencement of the litigation, has come into compliance with its NPDES permit. Pp. 703-712.

(a) The Constitution's case-or-controversy limitation on federal judicial authority, Art. III, § 2, underpins both standing and mootness doctrine, but the two inquiries differ in crucial respects. Because the Fourth Circuit was persuaded that the case had become moot, it simply assumed that FOE had initial standing. See *Arizonans for Official English v. Arizona,* 520 U.S. 43, 66-67, 117 S.Ct. 1055, 137 L.Ed.2d 170. But because this Court concludes that the Court of Appeals erred as to mootness, this Court has an obligation to assure itself that FOE had Article III standing at the outset of the litigation. Pp. 703-704.

(b) FOE had Article III standing to bring this action. This Court has held that to satisfy Article III's standing requirements, a plaintiff must show "injury in fact," causation, and redressability. *169Lujan v. Defenders of Wildlife,* 504 U.S.555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351. An association has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members'

participation in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383. The relevant showing for Article III standing is not injury to the environment but injury to the plaintiff. To **698 insist on the former rather than the latter is to raise the standing hurdle higher than the necessary showing for success on the merits in a citizen's NPDES permit enforcement suit. Here, injury in fact was adequately documented by the affidavits and testimony of FOE members asserting that Laidlaw's pollutant discharges, and the affiants' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests. See, *e.g., Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636. These submissions present dispositively more than the mere "general averments" and "conclusory allegations" found inadequate in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695, or the " 'some day' intentions" to visit endangered species halfway around the world held insufficient in *Defenders of Wildlife,* 504 U.S., at 564, 112 S.Ct. 2130. Pp. 704-706.

(c) Laidlaw argues that FOE lacked standing to seek civil penalties payable to the Government, because such penalties offer no redress to citizen plaintiffs. For a plaintiff who is injured or threatened with injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description. Insofar as they encourage defendants to discontinue current violations and deter future ones, they afford redress to citizen plaintiffs injured or threatened with injury as a result of ongoing unlawful conduct. The Court need not explore the outer limits of the principle that civil penalties provide sufficient deterrence to support redressability, because the civil penalties sought here carried a deterrent effect that made it likely, as opposed to merely speculative, that the penalties would redress FOE's injuries-as the District Court reasonably found when it assessed a penalty of $405,800. *Steel Co.* is not to the contrary. That case held that private plaintiffs may not sue to assess penalties for wholly past violations, 523 U.S., at 106-107, 118 S.Ct. 1003, but did not address standing to seek penalties for violations ongoing at the time of the complaint that could continue into the future if undeterred, see *id., at* 108, 118 S.Ct. 1003.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                    Page 7
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

Pp. 706-708.

(d) FOE's civil penalties claim did not automatically become moot once the company came into substantial compliance with its permit. A defendant's voluntary cessation of a challenged practice ordinarily does \*170 not deprive a federal court of its power to determine the legality of the practice. _City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152._ If it did, courts would be compelled to leave the defendant free to return to its old ways. Thus, the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. _United States v. Concentrated Phosphate Export Assn., 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344._ The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness. _Ibid._ The Court of Appeals incorrectly conflated this Court's case law on initial standing, see, _e.g.,Steel Co.,_ with its case law on mootness, see, _e.g.,City of Mesquite._ Such confusion is understandable, given this Court's repeated description of mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." _E.g., Arizonans, 520 U.S., at 68, n. 22, 117 S.Ct. 1055._ Careful reflection, however, reveals that this description of mootness is not comprehensive. For example, a defendant claiming that its voluntary compliance moots a case bears a formidable burden. By contrast, it is the plaintiff's burden, in a \*\*699 lawsuit brought to force compliance, to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue and that the threatened injury is certainly impending. _Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135._ The plain lesson is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness. Further, if mootness were simply "standing set in a time frame," the exception to mootness for acts that are "capable of repetition, yet evading review" could not exist. See, _e.g., Olmstead v. L.C., 527 U.S. 581, 594, n. 6, 119 S.Ct. 2176, 144 L.Ed.2d 540._ Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum. See, _e.g., Steel Co., 523 U.S., at 109, 118 S.Ct. 1003._ Standing doctrine ensures, among other things, that the resources of the federal courts are devoted to disputes in which the parties have a concrete stake. Yet by the time mootness is an issue, abandonment of the case may prove more wasteful than frugal. Courts have no license to retain jurisdiction over cases in which one or both of the parties plainly lacks a continuing interest, see, _e.g.,Arizonans, 520 U.S., at 67, 117 S.Ct. 1055,_ but the foregoing examples highlight an important difference\*171 between the two doctrines, see generally _Honig v. Doe, 484 U.S. 305, 329-332, 108 S.Ct. 592, 98 L.Ed.2d 686_ (REHNQUIST, C. J., concurring).

Laidlaw's argument that FOE doomed its own civil penalty claim to mootness by failing to appeal the denial of injunctive relief misconceives the statutory scheme. Under _§ 1365(a),_ the district court has discretion to determine which form of relief is best suited to abate current violations and deter future ones. See _Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91._ Denial of injunctive relief does not necessarily mean that the district court has concluded there is no prospect of future violations to deter. Indeed, it meant no such thing in this case; the District Court denied injunctive relief, but expressly based its award of civil penalties on the need for deterrence. A district court properly may conclude that an injunction would be too intrusive, because it could entail continuing and burdensome superintendence of the permit holder's activities by a federal court. See _City of Mesquite, 455 U.S., at 289, 102 S.Ct. 1070._ Both Laidlaw's permit compliance and the facility closure might moot this case, but only if one or the other event made it absolutely clear that violations could not reasonably be expected to recur. _Concentrated Phosphate Export Assn., 393 U.S., at 203, 89 S.Ct. 361._ These are disputed factual matters that have not been aired in the lower courts; they remain open for consideration on remand. Pp. 708-711.

(e) This Court does not resolve FOE's argument that it is entitled to attorneys' fees on the theory that a plaintiff can be a "prevailing party" under _§ 1365(d)_

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                                      Page 8
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

if it was the "catalyst" that triggered a favorable outcome. Although the Circuits have divided as to the continuing validity of the catalyst theory following *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494, it would be premature for this Court to address the question here. The District Court stayed the time for a petition for attorneys' fees until the time for appeal had expired or until any appeal was resolved. Thus, when the Fourth Circuit addressed the availability of counsel fees, no order was before it either denying or awarding fees. It is for the District Court, not this Court, to address in the first instance any request for reimbursement of costs, including fees. Pp. 711-712.

149 F.3d 303, reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, **700 KENNEDY, SOUTER, and BREYER, JJ., joined. STEVENS, J., *post,* p. 712, and KENNEDY, J., *post,* p. 713, filed concurring opinions. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post,* p. 713.

*172 Bruce J. Terris, Washington, DC, for petitioners.
Jeffrey P. Minear, Washington, DC, for United States as amicus curiae, by special leave of the Court.
Donald A. Cockrill, Greenville, SC, for respondent.For U.S. Supreme Court briefs, see:1999 WL 311764 (Pet.Brief)1999 WL 513835 (Resp.Brief)1999 WL 623917 (Reply.Brief)

*173 Justice GINSBURG delivered the opinion of the Court.
This case presents an important question concerning the operation of the citizen-suit provisions of the Clean Water Act. Congress authorized the federal district courts to entertain Clean Water Act suits initiated by "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. §§ 1365(a), (g). To impel future compliance with the Act, a district court may prescribe injunctive relief in such a suit; additionally or alternatively, the court may impose civil penalties payable to the United States Treasury. § 1365(a). In the Clean Water Act citizen suit now before us, the District Court determined that injunctive relief was inappropriate because the defendant, after the institution of the litigation, achieved substantial compliance with the

terms of its discharge permit. 956 F.Supp. 588, 611 (D.S.C.1997). The court did, however, assess a civil penalty of $405,800. *Id.,* at 610. The "total deterrent effect" of the penalty would be adequate to forestall future violations, the court reasoned, taking into account that the defendant "will be required to reimburse plaintiffs for a significant amount of legal fees and has, itself, incurred significant legal expenses." *Id.,* at 610-611.

The Court of Appeals vacated the District Court's order. 149 F.3d 303 (C.A.4 1998). The case became moot, the appellate court declared, once the defendant fully complied with the terms of its permit and the plaintiff failed to appeal the denial of equitable relief. "[C]ivil penalties payable to the government," the Court of Appeals stated, "would not redress any injury Plaintiffs have suffered." *Id.,* at 307. Nor were attorneys' fees in order, the Court of Appeals noted, because absent relief on the merits, plaintiffs could not qualify as prevailing parties. *Id.,* at 307, n. 5.

We reverse the judgment of the Court of Appeals. The appellate court erred in concluding that a citizen suitor's claim for civil penalties must be dismissed as moot when the *174 defendant, albeit after commencement of the litigation, has come into compliance. In directing dismissal of the suit on grounds of mootness, the Court of Appeals incorrectly conflated our case law on initial standing to bring suit, see, *e.g.,Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), with our case law on postcommencement mootness, see, *e.g.,City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case. The Court of Appeals also misperceived the remedial potential of civil penalties. Such penalties may serve, as an alternative to an injunction, to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation.

I

A

In 1972, Congress enacted the Clean Water Act (Act), also known as the Federal Water Pollution

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                                                    Page 9
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

Control Act, 86 Stat. **701 816, as amended, 33 U.S.C. § 1251 *et seq.* Section 402 of the Act, 33 U.S.C. § 1342, provides for the issuance, by the Administrator of the Environmental Protection Agency (EPA) or by authorized States, of National Pollutant Discharge Elimination System (NPDES) permits. NPDES permits impose limitations on the discharge of pollutants, and establish related monitoring and reporting requirements, in order to improve the cleanliness and safety of the Nation's waters. Noncompliance with a permit constitutes a violation of the Act. § 1342(h).

[1][2] Under § 505(a) of the Act, a suit to enforce any limitation in an NPDES permit may be brought by any "citizen," defined as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. §§ 1365(a), (g). Sixty days before initiating a citizen suit, however, the would-be plaintiff must give notice of the alleged violation to the EPA, the State in which the alleged violation occurred, *175 and the alleged violator. § 1365(b)(1)(A). "[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus ... render unnecessary a citizen suit." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 60, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Accordingly, we have held that citizens lack statutory standing under § 505(a) to sue for violations that have ceased by the time the complaint is filed. *Id.,* at 56-63, 108 S.Ct. 376. The Act also bars a citizen from suing if the EPA or the State has already commenced, and is "diligently prosecuting," an enforcement action. 33 U.S.C. § 1365(b)(1)(B).

The Act authorizes district courts in citizen-suit proceedings to enter injunctions and to assess civil penalties, which are payable to the United States Treasury. § 1365(a). In determining the amount of any civil penalty, the district court must take into account "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." § 1319(d). In addition, the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court

determines such award is appropriate." § 1365(d).

### B

In 1986, defendant-respondent Laidlaw Environmental Services (TOC), Inc., bought a hazardous waste incinerator facility in Roebuck, South Carolina, that included a wastewater treatment plant. (The company has since changed its name to Safety-Kleen (Roebuck), Inc., but for simplicity we will refer to it as "Laidlaw" throughout.) Shortly after Laidlaw acquired the facility, the South Carolina Department *176 of Health and Environmental Control (DHEC), acting under 33 U.S.C. § 1342(a)(1), granted Laidlaw an NPDES permit authorizing the company to discharge treated water into the North Tyger River. The permit, which became effective on January 1, 1987, placed limits on Laidlaw's discharge of several pollutants into the river, including-of particular relevance to this case-mercury, an extremely toxic pollutant. The permit also regulated the flow, temperature, toxicity, and pH of the effluent from the facility, and imposed monitoring and reporting obligations.

Once it received its permit, Laidlaw began to discharge various pollutants into the waterway; repeatedly, Laidlaw's discharges exceeded the limits set by the permit. In particular, despite experimenting with several technological fixes, Laidlaw consistently failed to meet the permit's stringent 1.3 ppb (parts per billion) daily average limit on mercury discharges. The District Court later found that Laidlaw **702 had violated the mercury limits on 489 occasions between 1987 and 1995. 956 F.Supp., at 613-621.

On April 10, 1992, plaintiff-petitioners Friends of the Earth (FOE) and Citizens Local Environmental Action Network, Inc. (CLEAN) (referred to collectively in this opinion, together with later joined plaintiff-petitioner Sierra Club, as "FOE") took the preliminary step necessary to the institution of litigation. They sent a letter to Laidlaw notifying the company of their intention to file a citizen suit against it under § 505(a) of the Act after the expiration of the requisite 60-day notice period, *i.e.,* on or after June 10, 1992. Laidlaw's lawyer then contacted DHEC to ask whether DHEC would consider filing a lawsuit against Laidlaw. The District Court later found that Laidlaw's reason for requesting that DHEC file a lawsuit against it was to bar FOE's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

proposed citizen suit through the operation of 33 U.S.C. § 1365(b)(1)(B). 890 F.Supp. 470, 478 (D.S.C.1995). DHEC agreed to file a lawsuit against Laidlaw; the company's lawyer**177** then drafted the complaint for DHEC and paid the filing fee. On June 9, 1992, the last day before FOE's 60-day notice period expired, DHEC and Laidlaw reached a settlement requiring Laidlaw to pay $100,000 in civil penalties and to make " 'every effort' " to comply with its permit obligations. *Id.,* at 479-481.

On June 12, 1992, FOE filed this citizen suit against Laidlaw under § 505(a) of the Act, alleging noncompliance with the NPDES permit and seeking declaratory and injunctive relief and an award of civil penalties. Laidlaw moved for summary judgment on the ground that FOE had failed to present evidence demonstrating injury in fact, and therefore lacked Article III standing to bring the lawsuit. Record, Doc. No. 43. In opposition to this motion, FOE submitted affidavits and deposition testimony from members of the plaintiff organizations. Record, Doc. No. 71 (Exhs. 41-51). The record before the District Court also included affidavits from the organizations' members submitted by FOE in support of an earlier motion for preliminary injunctive relief. Record, Doc. No. 21 (Exhs. 5-10). After examining this evidence, the District Court denied Laidlaw's summary judgment motion, finding-albeit "by the very slimmest of margins"-that FOE had standing to bring the suit. App. in No. 97-1246(C.A.4), pp. 207-208 (Tr. of Hearing 39-40 (June 30, 1993)).

Laidlaw also moved to dismiss the action on the ground that the citizen suit was barred under 33 U.S.C. § 1365(b)(1)(B) by DHEC's prior action against the company. The United States, appearing as *amicus curiae,* joined FOE in opposing the motion. After an extensive analysis of the Laidlaw-DHEC settlement and the circumstances under which it was reached, the District Court held that DHEC's action against Laidlaw had not been "diligently prosecuted"; consequently, the court allowed FOE's citizen suit to proceed.**178** 890 F.Supp., at 499.[FN1] The record indicates that after FOE initiated the suit, but before the District Court rendered judgment, Laidlaw violated the mercury discharge limitation in its permit 13 times. 956 F.Supp., at 621. The District Court also found that Laidlaw had committed 13 monitoring and 10 reporting violations during this period. *Id.,* at 601. The last recorded mercury

discharge violation occurred in January 1995, long after the complaint was filed but about two years before judgment was rendered. *Id.,* at 621.

> FN1. The District Court noted that "Laidlaw drafted the state-court complaint and settlement agreement, filed the lawsuit against itself, and paid the filing fee." 890 F.Supp., at 489. Further, "the settlement agreement between DHEC and Laidlaw was entered into with unusual haste, without giving the Plaintiffs the opportunity to intervene." *Ibid.* The court found "most persuasive" the fact that "in imposing the civil penalty of $100,000 against Laidlaw, DHEC failed to recover, or even to calculate, the economic benefit that Laidlaw received by not complying with its permit." *Id.,* at 491.

**\*\*703** On January 22, 1997, the District Court issued its judgment. 956 F.Supp. 588 (D.S.C.). It found that Laidlaw had gained a total economic benefit of $1,092,581 as a result of its extended period of noncompliance with the mercury discharge limit in its permit. *Id.,* at 603. The court concluded, however, that a civil penalty of $405,800 was adequate in light of the guiding factors listed in 33 U.S.C. § 1319(d). 956 F.Supp., at 610. In particular, the District Court stated that the lesser penalty was appropriate taking into account the judgment's "total deterrent effect." In reaching this determination, the court "considered that Laidlaw will be required to reimburse plaintiffs for a significant amount of legal fees." *Id.,* at 610-611. The court declined to grant FOE's request for injunctive relief, stating that an injunction was inappropriate because "Laidlaw has been in substantial compliance with all parameters in its NPDES permit since at least August 1992." *Id.,* at 611.

**\*179** FOE appealed the District Court's civil penalty judgment, arguing that the penalty was inadequate, but did not appeal the denial of declaratory or injunctive relief. Laidlaw cross-appealed, arguing, among other things, that FOE lacked standing to bring the suit and that DHEC's action qualified as a diligent prosecution precluding FOE's litigation. The United States continued to participate as *amicus curiae* in support of FOE.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                    Page 11

528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

On July 16, 1998, the Court of Appeals for the Fourth Circuit issued its judgment. 149 F.3d 303. The Court of Appeals assumed without deciding that FOE initially had standing to bring the action, id., at 306, n. 3, but went on to hold that the case had become moot. The appellate court stated, first, that the elements of Article III standing-injury, causation, and redressability-must persist at every stage of review, or else the action becomes moot. Id., at 306. Citing our decision in Steel Co., the Court of Appeals reasoned that the case had become moot because "the only remedy currently available to [FOE]-civil penalties payable to the government-would not redress any injury [FOE has] suffered." 149 F.3d, at 306-307. The court therefore vacated the District Court's order and remanded with instructions to dismiss the action. In a footnote, the Court of Appeals added that FOE's "failure to obtain relief on the merits of [its] claims precludes any recovery of attorneys' fees or other litigation costs because such an award is available only to a 'prevailing or substantially prevailing party.' "Id., at 307, n. 5 (quoting 33 U.S.C. § 1365(d)).

According to Laidlaw, after the Court of Appeals issued its decision but before this Court granted certiorari, the entire incinerator facility in Roebuck was permanently closed, dismantled, and put up for sale, and all discharges from the facility permanently ceased. Respondent's Suggestion of Mootness 3.

We granted certiorari, 525 U.S. 1176, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999), to resolve the inconsistency between the Fourth Circuit's decision in this *180 case and the decisions of several other Courts of Appeals, which have held that a defendant's compliance with an injunction after the commencement of litigation does not moot claims for civil penalties under the Act. See, e.g.,Atlantic States Legal Foundation, Inc. v. Stroh Die Casting Co., 116 F.3d 814, 820 (C.A.7), cert. denied, 522 U.S. 981, 118 S.Ct. 442, 139 L.Ed.2d 379 (1997); Natural Resources Defense Council, Inc. v. Texaco Rfg. and Mktg., Inc., 2 F.3d 493, 503-504 (C.A.3 1993); Atlantic States Legal Foundation, Inc. v. Pan American Tanning Corp., 993 F.2d 1017, 1020-1021 (C.A.2 1993); Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1135-1136 (C.A.11 1990).

II

A

The Constitution's case-or-controversy limitation on federal judicial authority, Art. **704 III, § 2, underpins both our standing and our mootness jurisprudence, but the two inquiries differ in respects critical to the proper resolution of this case, so we address them separately. Because the Court of Appeals was persuaded that the case had become moot and so held, it simply assumed without deciding that FOE had initial standing. See Arizonans for Official English v. Arizona, 520 U.S. 43, 66-67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (court may assume without deciding that standing exists in order to analyze mootness). But because we hold that the Court of Appeals erred in declaring the case moot, we have an obligation to assure ourselves that FOE had Article III standing at the outset of the litigation. We therefore address the question of standing before turning to mootness.

[3][4] In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), we held that, to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and *181 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

[5] Laidlaw contends first that FOE lacked standing from the outset even to seek injunctive relief, because the plaintiff organizations failed to show that any of their members had sustained or faced the threat of any "injury in fact" from Laidlaw's activities. In support of this contention Laidlaw points to the District Court's finding, made in the course of setting the penalty amount, that there had been "no demonstrated proof of harm to the environment"

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                        Page 12
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

from Laidlaw's mercury discharge violations. 956
F.Supp., at 602; see also ibid. ("[T]he NPDES
permit violations at issue in this citizen suit did not
result in any health risk or environmental harm.").

The relevant showing for purposes of Article III
standing, however, is not injury to the environment
but injury to the plaintiff. To insist upon the former
rather than the latter as part of the standing inquiry
(as the dissent in essence does, post, at 713-714) is to
raise the standing hurdle higher than the necessary
showing for success on the merits in an action
alleging noncompliance with an NPDES permit.
Focusing properly on injury to the plaintiff, the
District Court found that FOE had demonstrated
sufficient injury to establish standing. App. in No.
97-1246(CA4), at 207-208 (Tr. of Hearing 39-40).
For example, FOE member Kenneth Lee Curtis
averred in affidavits that he lived a half-mile from
Laidlaw's facility; that he occasionally drove over the
North Tyger River, and that it looked and smelled
polluted; and that he would like to fish, camp, swim,
and picnic in and near *182 the river between 3 and
15 miles downstream from the facility, as he did
when he was a teenager, but would not do so because
he was concerned that the water was polluted by
Laidlaw's discharges. Record, Doc. No. 71 (Exhs. 41,
42). Curtis reaffirmed these statements in extensive
deposition testimony. For example, he testified that
he would like to fish in the river at a specific spot he
used as a boy, but that he would not do so now
because of his concerns about Laidlaw's discharges.
Ibid. (Exh. 43, at 52-53; Exh. 44, at 33).

Other members presented evidence to similar effect.
CLEAN member Angela Patterson attested that she
lived two miles from the facility; that before Laidlaw
operated**705 the facility, she picnicked, walked,
birdwatched, and waded in and along the North
Tyger River because of the natural beauty of the area;
that she no longer engaged in these activities in or
near the river because she was concerned about
harmful effects from discharged pollutants; and that
she and her husband would like to purchase a home
near the river but did not intend to do so, in part
because of Laidlaw's discharges. Record, Doc. No. 21
(Exh. 10). CLEAN member Judy Pruitt averred that
she lived one-quarter mile from Laidlaw's facility and
would like to fish, hike, and picnic along the North
Tyger River, but has refrained from those activities
because of the discharges. Ibid. (Exh. 7). FOE

member Linda Moore attested that she lived 20 miles
from Roebuck, and would use the North Tyger River
south of Roebuck and the land surrounding it for
recreational purposes were she not concerned that the
water contained harmful pollutants. Record, Doc. No.
71 (Exhs. 45, 46). In her deposition, Moore testified
at length that she would hike, picnic, camp, swim,
boat, and drive near or in the river were it not for her
concerns about illegal discharges. Ibid. (Exh. 48, at
29, 36-37, 62-63, 72). CLEAN member Gail Lee
attested that her home, which is near Laidlaw's
facility, had a lower value than similar homes located
farther from the facility, and that she believed the
pollutant discharges accounted *183 for some of the
discrepancy. Record, Doc. No. 21 (Exh. 9). Sierra
Club member Norman Sharp averred that he had
canoed approximately 40 miles downstream of the
Laidlaw facility and would like to canoe in the North
Tyger River closer to Laidlaw's discharge point, but
did not do so because he was concerned that the
water contained harmful pollutants. Ibid. (Exh. 8).

[6] These sworn statements, as the District Court
determined, adequately documented injury in fact.
We have held that environmental plaintiffs
adequately allege injury in fact when they aver that
they use the affected area and are persons "for whom
the aesthetic and recreational values of the area will
be lessened" by the challenged activity. Sierra Club
v. Morton, 405 U.S. 727, 735, 92 S.Ct. 1361, 31
L.Ed.2d 636 (1972). See also Defenders of Wildlife,
504 U.S., at 562-563, 112 S.Ct. 2130 ("Of course, the
desire to use or observe an animal species, even for
purely esthetic purposes, is undeniably a cognizable
interest for purposes of standing.").

Our decision in Lujan v. National Wildlife
Federation, 497 U.S. 871, 110 S.Ct. 3177, 111
L.Ed.2d 695 (1990), is not to the contrary. In that
case an environmental organization assailed the
Bureau of Land Management's "land withdrawal
review program," a program covering millions of
acres, alleging that the program illegally opened up
public lands to mining activities. The defendants
moved for summary judgment, challenging the
plaintiff organization's standing to initiate the action
under the Administrative Procedure Act, 5 U.S.C. §
702. We held that the plaintiff could not survive the
summary judgment motion merely by offering
"averments which state only that one of [the
organization's] members uses unspecified portions of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                      Page 13
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action." 497 U.S., at 889, 110 S.Ct. 3177.

In contrast, the affidavits and testimony presented by FOE in this case assert that Laidlaw's discharges, and the affiant members' reasonable concerns about the effects of *184 those discharges, directly affected those affiants' recreational, aesthetic, and economic interests. These submissions present dispositively more than the mere "general averments" and "conclusory allegations" found inadequate in National Wildlife Federation. Id., at 888, 110 S.Ct. 3177. Nor can the affiants' conditional statements-that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it-be equated with the speculative **706 "'some day' intentions" to visit endangered species halfway around the world that we held insufficient to show injury in fact in Defenders of Wildlife. 504 U.S., at 564, 112 S.Ct. 2130.

Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), relied on by the dissent, post, at 714, does not weigh against standing in this case. In Lyons, we held that a plaintiff lacked standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat from the policy. 461 U.S., at 107, n. 7, 103 S.Ct. 1660.In the footnote from Lyons cited by the dissent, we noted that "[t]he reasonableness of Lyons' fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct," and that his "subjective apprehensions" that such a recurrence would even take place were not enough to support standing. Id., at 108, n. 8, 103 S.Ct. 1660.Here, in contrast, it is undisputed that Laidlaw's unlawful conduct-discharging pollutants in excess of permit limits-was occurring at the time the complaint was filed. Under Lyons, then, the only "subjective" issue here is "[t]he reasonableness of [the] fear" that led the affiants to respond to that concededly ongoing conduct by refraining from use of the North Tyger River and surrounding areas. Unlike the dissent, post, at 714, we see nothing "improbable" about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic

harms. The proposition is entirely*185 reasonable, the District Court found it was true in this case, and that is enough for injury in fact.

[7] Laidlaw argues next that even if FOE had standing to seek injunctive relief, it lacked standing to seek civil penalties. Here the asserted defect is not injury but redressability. Civil penalties offer no redress to private plaintiffs, Laidlaw argues, because they are paid to the Government, and therefore a citizen plaintiff can never have standing to seek them.

[8] Laidlaw is right to insist that a plaintiff must demonstrate standing separately for each form of relief sought. See, e.g., Lyons, 461 U.S., at 109, 103 S.Ct. 1660 (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief); see also Lewis v. Casey, 518 U.S. 343, 358, n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[S]tanding is not dispensed in gross."). But it is wrong to maintain that citizen plaintiffs facing ongoing violations never have standing to seek civil penalties.

We have recognized on numerous occasions that "all civil penalties have some deterrent effect." Hudson v. United States, 522 U.S. 93, 102, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997); see also, e.g.,Department of Revenue of Mont. v. Kurth Ranch, 511 U.S. 767, 778, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). More specifically, Congress has found that civil penalties in Clean Water Act cases do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits; they also deter future violations. This congressional determination warrants judicial attention and respect. "The legislative history of the Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it imposed civil penalties. ... [The district court may] seek to deter future violations by basing the penalty on its economic impact." Tull v. United States, 481 U.S. 412, 422-423, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively *186 abates that conduct and prevents its recurrence provides a form of redress. Civil

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                      Page 14
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

penalties can fit that description. To the extent that they encourage**707 defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.

The dissent argues that it is the *availability* rather than the *imposition* of civil penalties that deters any particular polluter from continuing to pollute. *Post*, at 718-719. This argument misses the mark in two ways. First, it overlooks the interdependence of the availability and the imposition; a threat has no deterrent value unless it is credible that it will be carried out. Second, it is reasonable for Congress to conclude that an actual award of civil penalties does in fact bring with it a significant quantum of deterrence over and above what is achieved by the mere prospect of such penalties. A would-be polluter may or may not be dissuaded by the existence of a remedy on the books, but a defendant once hit in its pocketbook will surely think twice before polluting again.[FN2]

> FN2. The dissent suggests that there was little deterrent work for civil penalties to do in this case because the lawsuit brought against Laidlaw by DHEC had already pushed the level of deterrence to "near the top of the graph." *Post*, at 718. This suggestion ignores the District Court's specific finding that the penalty agreed to by Laidlaw and DHEC was far too low to remove Laidlaw's economic benefit from noncompliance, and thus was inadequate to deter future violations. 890 F.Supp. 470, 491-494, 497-498 (D.S.C.1995). And it begins to look especially farfetched when one recalls that Laidlaw itself prompted the DHEC lawsuit, paid the filing fee, and drafted the complaint. See *supra*, at 702, n. 1.

We recognize that there may be a point at which the deterrent effect of a claim for civil penalties becomes so insubstantial or so remote that it cannot support citizen standing. The fact that this vanishing point is not easy to ascertain does not detract from the deterrent power of such penalties in the ordinary case. Justice Frankfurter's observations for *187 the Court, made in a different context nearly 60 years

ago, hold true here as well:

"How to effectuate policy-the adaptation of means to legitimately sought ends-is one of the most intractable of legislative problems. Whether proscribed conduct is to be deterred by *qui tam* action or triple damages or injunction, or by criminal prosecution, or merely by defense to actions in contract, or by some, or all, of these remedies in combination, is a matter within the legislature's range of choice. Judgment on the deterrent effect of the various weapons in the armory of the law can lay little claim to scientific basis." *Tigner v. Texas*, 310 U.S. 141, 148, 60 S.Ct. 879, 84 L.Ed. 1124 (1940).[FN3]

> FN3. In *Tigner* the Court rejected an equal protection challenge to a statutory provision exempting agricultural producers from the reach of the Texas antitrust laws.

In this case we need not explore the outer limits of the principle that civil penalties provide sufficient deterrence to support redressability. Here, the civil penalties sought by FOE carried with them a deterrent effect that made it likely, as opposed to merely speculative, that the penalties would redress FOE's injuries by abating current violations and preventing future ones-as the District Court reasonably found when it assessed a penalty of $405,800. 956 F.Supp., at 610-611.

Laidlaw contends that the reasoning of our decision in *Steel Co.* directs the conclusion that citizen plaintiffs have no standing to seek civil penalties under the Act. We disagree. *Steel Co.* established that citizen suitors lack standing to seek civil penalties for violations that have abated by the time of suit. 523 U.S., at 106-107, 118 S.Ct. 1003. We specifically noted in that case that there was no allegation in the complaint of any continuing or imminent violation, and that no basis for such an allegation appeared to exist. *Id.*, at 108, 118 S.Ct. 1003; see also *Gwaltney*, 484 U.S., at 59, 108 S.Ct. 376 ("the harm sought to be addressed by *188 the citizen suit lies in the **708 present or the future, not in the past"). In short, *Steel Co.* held that private plaintiffs, unlike the Federal Government, may not sue to assess penalties for wholly past violations, but our decision in that case did not reach the issue of standing to seek penalties for violations that are ongoing at the time of the complaint and that could continue into the future

120 S.Ct. 693                                                                                Page 15
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

if undeterred.[FN4]

[FN4]. In insisting that the redressability requirement is not met, the dissent relies heavily on *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). That reliance is sorely misplaced. In *Linda R. S.,* the mother of an out-of-wedlock child filed suit to force a district attorney to bring a criminal prosecution against the absentee father for failure to pay child support. *Id., at 616, 93 S.Ct. 1146.* In finding that the mother lacked standing to seek this extraordinary remedy, the Court drew attention to "the special status of criminal prosecutions in our system,"*id., at 619, 93 S.Ct. 1146,* and carefully limited its holding to the "unique context of a challenge to [the nonenforcement of] a criminal statute,"*id., at 617, 93 S.Ct. 1146.* Furthermore, as to redressability, the relief sought in *Linda R. S.*-a prosecution which, if successful, would automatically land the delinquent father in jail for a fixed term, *id., at 618, 93 S.Ct. 1146,* with predictably negative effects on his earning power-would scarcely remedy the plaintiff's lack of child support payments. In this regard, the Court contrasted "the civil contempt model whereby the defendant 'keeps the keys to the jail in his own pocket' and may be released whenever he complies with his legal obligations." *Ibid.* The dissent's contention, *post,* at 716, that "precisely the same situation exists here" as in *Linda R. S.* is, to say the least, extravagant.

Putting aside its mistaken reliance on *Linda R. S.,* the dissent's broader charge that citizen suits for civil penalties under the Act carry "grave implications for democratic governance," *post,* at 715, seems to us overdrawn. Certainly the Federal Executive Branch does not share the dissent's view that such suits dissipate its authority to enforce the law. In fact, the Department of Justice has endorsed this citizen suit from the outset, submitting *amicus* briefs in support of FOE in the District Court, the Court of Appeals, and this Court. See *supra,* at 702, 703.As we

have already noted, *supra,* at 701, the Federal Government retains the power to foreclose a citizen suit by undertaking its own action. 33 U.S.C. § 1365(b)(1)(B). And if the Executive Branch opposes a particular citizen suit, the statute allows the Administrator of the EPA to "intervene as a matter of right" and bring the Government's views to the attention of the court. § 1365(c)(2).

***189 B**

Satisfied that FOE had standing under Article III to bring this action, we turn to the question of mootness.

[9][10][11] The only conceivable basis for a finding of mootness in this case is Laidlaw's voluntary conduct-either its achievement by August 1992 of substantial compliance with its NPDES permit or its more recent shutdown of the Roebuck facility. It is well settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite,* 455 U.S., at 289, 102 S.Ct. 1070. "[I]f it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.' "*Id.,* at 289, n. 10, 102 S.Ct. 1070 (citing *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). In accordance with this principle, the standard we have announced for determining whether a case might been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). The "heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Ibid.*

The Court of Appeals justified its mootness disposition by reference to *Steel Co.,* which held that citizen plaintiffs lack standing to seek civil penalties for wholly past violations. In relying on *Steel Co.,* the Court of Appeals confused mootness with standing. The confusion is understandable, given this Court's repeated statements that the doctrine of mootness ****709** can be described as "the doctrine of standing

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English,* 520 U.S., at 68, n. 22, 117 S.Ct. 1055 (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), in turn **\*190** quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)) (internal quotation marks omitted).

[12][13] Careful reflection on the long-recognized exceptions to mootness, however, reveals that the description of mootness as "standing set in a time frame" is not comprehensive. As just noted, a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur. *Concentrated Phosphate Export Assn.,* 393 U.S., at 203, 89 S.Ct. 361. By contrast, in a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the "threatened injury [is] certainly impending." *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (citations and internal quotation marks omitted). Thus, in *Lyons,* as already noted, we held that a plaintiff lacked initial standing to seek an injunction against the enforcement of a police chokehold policy because he could not credibly allege that he faced a realistic threat arising from the policy. 461 U.S., at 105-110, 103 S.Ct. 1660. Elsewhere in the opinion, however, we noted that a citywide moratorium on police chokeholds-an action that surely diminished the already slim likelihood that any particular individual would be choked by police-would not have mooted an otherwise valid claim for injunctive relief, because the moratorium by its terms was not permanent. *Id.,* at 101, 103 S.Ct. 1660. The plain lesson of these cases is that there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness.

[14][15] Furthermore, if mootness were simply "standing set in a time frame," the exception to

mootness that arises when the defendant's allegedly unlawful activity is "capable of repetition, yet evading review," could not exist. When, for example,**\*191** a mentally disabled patient files a lawsuit challenging her confinement in a segregated institution, her postcomplaint transfer to a community-based program will not moot the action, *Olmstead v. L.C.,* 527 U.S. 581, 594, n. 6, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), despite the fact that she would have lacked initial standing had she filed the complaint after the transfer. Standing admits of no similar exception; if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum. See *Steel Co.,* 523 U.S., at 109, 118 S.Ct. 1003 (" 'the mootness exception for disputes capable of repetition yet evading review ... will not revive a dispute which became moot before the action commenced' ") (quoting *Renne v. Geary,* 501 U.S. 312, 320, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991)).

We acknowledged the distinction between mootness and standing most recently in *Steel Co.*:

"The United States ... argues that the injunctive relief does constitute remediation because 'there is a presumption of [future] injury when the defendant has voluntarily ceased its illegal activity in response to litigation,' even if that occurs before a complaint is filed.... This makes a sword out of a shield. The 'presumption' the Government refers to has been applied to refute**\*\*710** the assertion of mootness by a defendant who, when sued in a complaint that alleges present or threatened injury, ceases the complained-of activity.... It is an immense and unacceptable stretch to call the presumption into service as a substitute for the allegation of present or threatened injury upon which initial standing must be based." 523 U.S., at 109, 118 S.Ct. 1003.

[16] Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To **\*192** abandon the case at an advanced stage may prove more wasteful than frugal. This argument from sunk costs [FN5] does not license courts to retain jurisdiction over cases in which one or both of the parties plainly lack

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                 Page 17

528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died. See, *e.g.,* *DeFunis v. Odegaard,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974)*(per curiam)* (non-class-action challenge to constitutionality of law school admissions process mooted when plaintiff, admitted pursuant to preliminary injunction, neared graduation and defendant law school conceded that, as a matter of ordinary school policy, plaintiff would be allowed to finish his final term); *Arizonans,* 520 U.S., at 67, 117 S.Ct. 1055 (non-class-action challenge to state constitutional amendment declaring English the official language of the State became moot when plaintiff, a state employee who sought to use her bilingual skills, left state employment). But the argument surely highlights an important difference between the two doctrines. See generally *Honig v. Doe,* 484 U.S. 305, 329-332, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (REHNQUIST, C. J., concurring).

> FN5. Of course we mean sunk costs to the judicial system, not to the litigants. *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) (cited by the dissent, *post,* at 721), dealt with the latter, noting that courts should use caution to avoid carrying forward a moot case solely to vindicate a plaintiff's interest in recovering attorneys' fees.

[17][18][19][20][21] In its brief, Laidlaw appears to argue that, regardless of the effect of Laidlaw's compliance, FOE doomed its own civil penalty claim to mootness by failing to appeal the District Court's denial of injunctive relief. Brief for Respondent 14-17. This argument misconceives the statutory scheme. Under § 1365(a), the district court has discretion to determine which form of relief is best suited, in the particular case, to abate current violations and deter future ones. "[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *193 *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Denial of injunctive relief does not necessarily mean that the district court has concluded there is no prospect of future violations for civil penalties to deter. Indeed, it meant no such thing in this case. The District Court denied injunctive relief, but expressly based its award of civil penalties on the need for deterrence. See 956

F.Supp., at 610-611. As the dissent notes, *post,* at 717, federal courts should aim to ensure " 'the framing of relief no broader than required by the precise facts.' "*Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). In accordance with this aim, a district court in a Clean Water Act citizen suit properly may conclude that an injunction would be an excessively intrusive remedy, because it could entail continuing superintendence of the permit holder's activities by a federal court-a process burdensome to court and permit holder alike. See *City of Mesquite,* 455 U.S., at 289, 102 S.Ct. 1070 (although the defendant's voluntary cessation of the challenged practice does not moot the case, **711 "[s]uch abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice").

Laidlaw also asserts, in a supplemental suggestion of mootness, that the closure of its Roebuck facility, which took place after the Court of Appeals issued its decision, mooted the case. The facility closure, like Laidlaw's earlier achievement of substantial compliance with its permit requirements, might moot the case, but-we once more reiterate-only if one or the other of these events made it absolutely clear that Laidlaw's permit violations could not reasonably be expected to recur. *Concentrated Phosphate Export Assn.,* 393 U.S., at 203, 89 S.Ct. 361. The effect of both Laidlaw's compliance and the facility closure on the prospect of future violations is a disputed factual matter. FOE points out, for example-and Laidlaw does not appear to contest-that Laidlaw retains its *194 NPDES permit. These issues have not been aired in the lower courts; they remain open for consideration on remand.[FN6]

> FN6. We note that it is far from clear that vacatur of the District Court's judgment would be the appropriate response to a finding of mootness on appeal brought about by the voluntary conduct of the party that lost in the District Court. See *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994) (mootness attributable to a voluntary act of a nonprevailing party ordinarily does not justify vacatur of a judgment under review); see also *Walling v.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                    Page 18
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

*James V. Reuter, Inc.,* 321 U.S. 671, 64
S.Ct. 826, 88 L.Ed. 1001 (1944).

C

[22] FOE argues that it is entitled to attorneys' fees
on the theory that a plaintiff can be a "prevailing
party" for purposes of 33 U.S.C. § 1365(d) if it was
the "catalyst" that triggered a favorable outcome. In
the decision under review, the Court of Appeals
noted that its Circuit precedent construed our
decision in *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct.
566, 121 L.Ed.2d 494 (1992), to require rejection of
that theory. 149 F.3d, at 307, n. 5 (citing *S-1 & S-2 v.
State Bd. of Ed. of N. C.,* 21 F.3d 49, 51 (C.A.4 1994)
(en banc)). Cf. *Foreman v. Dallas County,* 193 F.3d
314, 320 (C.A.5 1999) (stating, in dicta, that "[a]fter
*Farrar*... the continuing validity of the catalyst theory
is in serious doubt").

*Farrar* acknowledged that a civil rights plaintiff
awarded nominal damages may be a "prevailing
party" under 42 U.S.C. § 1988. 506 U.S., at 112, 113
S.Ct. 566.   The case involved no catalytic effect.
Recognizing that the issue was not presented for this
Court's decision in *Farrar,* several Courts of Appeals
have expressly concluded that *Farrar* did not
repudiate the catalyst theory. See *Marbley v. Bane,*
57 F.3d 224, 234 (C.A.2 1995); *Baumgartner v.
Harrisburg Housing Authority,* 21 F.3d 541, 546-550
(C.A.3 1994); *Zinn v. Shalala,* 35 F.3d 273, 276
(C.A.7 1994); *Little Rock School Dist. v. Pulaski
County Special Sch. Dist., # 1,* 17 F.3d 260, 263, n. 2
(C.A.8 1994); *Kilgour v. Pasadena,* 53 F.3d 1007,
1010 (C.A.9 1995); *195 Beard v. Teska,* 31 F.3d
942, 951-952 (C.A.10 1994); *Morris v. West Palm
Beach,* 194 F.3d 1203, 1207 (C.A.11 1999). Other
Courts of Appeals have likewise continued to apply
the catalyst theory notwithstanding *Farrar. Paris v.
United States Dept. of Housing and Urban
Development,* 988 F.2d 236, 238 (C.A.1 1993);
*Citizens Against Tax Waste v. Westerville City
School,* 985 F.2d 255, 257 (C.A.6 1993).

It would be premature, however, for us to address the
continuing validity of the catalyst theory in the
context of this case. The District Court, in an order
separate from the one in which it imposed civil
penalties against Laidlaw, stayed the time for a
petition for attorneys' fees until the time for appeal
had expired or, if either party appealed, until the

appeal was resolved. See 149 F.3d at 305 (describing
order staying time for attorneys' fees petition). In the
opinion accompanying its order on penalties, the
District Court stated**712 only that "this court has
considered that Laidlaw will be required to reimburse
plaintiffs for a significant amount of legal fees," and
referred to "potential fee awards." 956 F.Supp., at
610-611.   Thus, when the Court of Appeals
addressed the availability of counsel fees in this case,
no order was before it either denying or awarding
fees. It is for the District Court, not this Court, to
address in the first instance any request for
reimbursement of costs, including fees.

* * *

For the reasons stated, the judgment of the United
States Court of Appeals for the Fourth Circuit is
reversed, and the case is remanded for further
proceedings consistent with this opinion.

*It is so ordered.*
Justice STEVENS, concurring.
Although the Court has identified a sufficient reason
for rejecting the Court of Appeals' mootness
determination, it is important also to note that the
case would not be moot *196 even if it were
absolutely clear that respondent had gone out of
business and posed no threat of future permit
violations. The District Court entered a valid
judgment requiring respondent to pay a civil penalty
of $405,800 to the United States. No postjudgment
conduct of respondent could retroactively invalidate
that judgment. A record of voluntary postjudgment
compliance that would justify a decision that
injunctive relief is unnecessary, or even a decision
that any claim for injunctive relief is now moot,
would not warrant vacation of the valid money
judgment.

Furthermore, petitioners' claim for civil penalties
would not be moot even if it were absolutely clear
that respondent's violations could not reasonably be
expected to recur because respondent achieved
substantial compliance with its permit requirements
after petitioners filed their complaint but before the
District Court entered judgment. As the Courts of
Appeals (other than the court below) have uniformly
concluded, a polluter's voluntary postcomplaint
cessation of an alleged violation will not moot a
citizen-suit claim for civil penalties even if it is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                    Page 19
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

sufficient to moot a related claim for injunctive or declaratory relief.[FN*] This conclusion is consistent with the structure of the Clean Water Act, which attaches liability for civil penalties at the time a permit violation occurs. 33 U.S.C. § 1319(d) ("Any person who violates *197 [certain provisions of the Act or certain permit conditions and limitations] shall be subject to a civil penalty ..."). It is also consistent with the character of civil penalties, which, for purposes of mootness analysis, should be equated with punitive damages rather than with injunctive or declaratory relief. See Tull v. United States, 481 U.S. 412, 422-423, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). No one contends that a defendant's postcomplaint conduct could moot a claim for punitive damages; civil penalties should be treated the same way.

FN* Comfort Lake Assn. v. Dresel Contracting, Inc., 138 F.3d 351, 356 (C.A.8 1998); Atlantic States Legal Foundation, Inc. v. Stroh Die Casting Co., 116 F.3d 814, 820(C.A.7), cert. denied, 522 U.S. 981, 118 S.Ct. 442, 139 L.Ed.2d 379 (1997); Natural Resources Defense Council v. Texaco Refining & Mktg., Inc., 2 F.3d 493, 502-503 (C.A.3 1993); Atlantic States Legal Foundation, Inc. v. Pan Am. Tanning Corp., 993 F.2d 1017, 1020-1021 (C.A.2 1993); Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1134-1137 (C.A.11 1990); Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 890 F.2d 690, 696-697 (C.A.4 1989). Cf. Powell v. McCormack, 395 U.S. 486, 496, n. 8, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) ("Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests").

The cases cited by the Court in its discussion of the mootness issue all involved requests for injunctive or declaratory relief. In only one, Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), did the plaintiff seek damages, and **713 in that case the opinion makes it clear that the inability to obtain injunctive relief would have no impact on the damages claim. Id., at 105, n. 6, 109, 103 S.Ct. 1660.

There is no precedent, either in our jurisprudence, or in any other of which I am aware, that provides any

support for the suggestion that postcomplaint factual developments that might moot a claim for injunctive or declaratory relief could either moot a claim for monetary relief or retroactively invalidate a valid money judgment.

Justice KENNEDY, concurring.

Difficult and fundamental questions are raised when we ask whether exactions of public fines by private litigants, and the delegation of Executive power which might be inferable from the authorization, are permissible in view of the responsibilities committed to the Executive by Article II of the Constitution of the United States. The questions presented in the petition for certiorari did not identify these issues with particularity; and neither the Court of Appeals in deciding the case nor the parties in their briefing before this Court devoted specific attention to the subject. In my view these matters are best reserved for a later case. With this observation, I join the opinion of the Court.

*198 Justice SCALIA, with whom Justice THOMAS joins, dissenting.

The Court begins its analysis by finding injury in fact on the basis of vague affidavits that are undermined by the District Court's express finding that Laidlaw's discharges caused no demonstrable harm to the environment. It then proceeds to marry private wrong with public remedy in a union that violates traditional principles of federal standing-thereby permitting law enforcement to be placed in the hands of private individuals. Finally, the Court suggests that to avoid mootness one needs even less of a stake in the outcome than the Court's watered-down requirements for initial standing. I dissent from all of this.

I

Plaintiffs, as the parties invoking federal jurisdiction, have the burden of proof and persuasion as to the existence of standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (hereinafter Lujan ); FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). The plaintiffs in this case fell far short of carrying their burden of demonstrating injury in fact. The Court cites affiants' testimony asserting that their enjoyment of the North Tyger River has been diminished due to "concern" that the water was polluted, and that they "believed" that Laidlaw's mercury exceedances had reduced the value of their

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

homes. *Ante,* at 704-705. These averments alone cannot carry the plaintiffs' burden of demonstrating that they have suffered a "concrete and particularized" injury, *Lujan,* 504 U.S., at 560, 112 S.Ct. 2130. General allegations of injury may suffice at the pleading stage, but at summary judgment plaintiffs must set forth "specific facts" to support their claims. *Id.,* at 561, 112 S.Ct. 2130. And where, as here, the case has proceeded to judgment, those specific facts must be " 'supported adequately by the evidence adduced at trial,' "*ibid.*(quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 115, n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). In this case, the affidavits themselves are *199 woefully short on "specific facts," and the vague allegations of injury they do make are undermined by the evidence adduced at trial.

Typically, an environmental plaintiff claiming injury due to discharges in violation of the Clean Water Act argues that the discharges harm the environment, and that the harm to the environment injures him. This route to injury is barred in the present case, however, since the District Court concluded after considering all the evidence that there had been "no demonstrated proof of harm to the environment,"**714 956 F.Supp. 588, 602 (D.S.C.1997), that the "permit violations at issue in this citizen suit did not result in any health risk or environmental harm,"*ibid.,* that "[a]ll available data ... fail to show that Laidlaw's *actual* discharges have resulted in harm to the North Tyger River,"*id.,* at 602-603, and that "the overall quality of the river exceeds levels necessary to support ... recreation in and on the water,"*id.,* at 600.

The Court finds these conclusions unproblematic for standing, because "[t]he relevant showing for purposes of Article III standing ... is not injury to the environment but injury to the plaintiff." *Ante,* at 704. This statement is correct, as far as it goes. We have certainly held that a demonstration of harm to the environment is not *enough* to satisfy the injury-in-fact requirement unless the plaintiff can demonstrate how he personally was harmed. *E.g.,Lujan, supra,* at 563, 112 S.Ct. 2130. In the normal course, however, a lack of demonstrable harm to the environment will translate, as it plainly does here, into a lack of demonstrable harm to citizen plaintiffs. While it is perhaps possible that a plaintiff could be harmed even though the environment was not, such a plaintiff

would have the burden of articulating and demonstrating the nature of that injury. Ongoing "concerns" about the environment are not enough, for "[i]t is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions,"*Los Angeles v. Lyons,* 461 U.S. 95, 107, n. 8, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). At the very least, in *200 the present case, one would expect to see evidence supporting the affidavits' bald assertions regarding decreasing recreational usage and declining home values, as well as evidence for the improbable proposition that Laidlaw's violations, even though harmless to the environment, are somehow responsible for these effects. Cf. *Gladstone, supra,* at 115, 99 S.Ct. 1601 (noting that standing could be established by "convincing evidence" that a decline in real estate values was attributable to the defendant's conduct). Plaintiffs here have made no attempt at such a showing, but rely entirely upon unsupported and unexplained affidavit allegations of "concern."

Indeed, every one of the affiants deposed by Laidlaw cast into doubt the (in any event inadequate) proposition that subjective "concerns" actually affected their conduct. Linda Moore, for example, said in her affidavit that she would use the affected waterways for recreation if it were not for her concern about pollution. Record, Doc. No. 71 (Exhs. 45, 46). Yet she testified in her deposition that she had been to the river only twice, once in 1980 (when she visited someone who lived by the river) and once after this suit was filed. Record, Doc. No. 62 (Moore Deposition 23-24). Similarly, Kenneth Lee Curtis, who claimed he was injured by being deprived of recreational activity at the river, admitted that he had not been to the river since he was "a kid," *ibid.*(Curtis Deposition, pt. 2, p. 38), and when asked whether the reason he stopped visiting the river was because of pollution, answered "no," *id.,* at 39. As to Curtis's claim that the river "looke[d] and smell[ed] polluted," this condition, if present, was surely not caused by Laidlaw's discharges, which according to the District Court "did not result in any health risk or environmental harm." 956 F.Supp., at 602. The other affiants cited by the Court were not deposed, but their affidavits state either that they *would* use the river if it were not polluted or harmful (as the court subsequently found it is not), Record, Doc. No. 21 (Exhs. 7, *201 8, and 9), or said that the river looks polluted (which is also incompatible with the court's findings), *ibid.* (Exh. 10). These affiants have

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                           Page 21
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

established nothing but "subjective apprehensions."

The Court is correct that the District Court explicitly found standing-albeit "by the very slimmest of margins," and as "an awfully close call." App. in No. 97-1246 (C.A.4), pp. 207-208 (Tr. of Hearing 39-40 (June 30, 1993)). That cautious finding, **715 however, was made in 1993, long before the court's 1997 conclusion that Laidlaw's discharges did not harm the environment. As we have previously recognized, an initial conclusion that plaintiffs have standing is subject to reexamination, particularly if later evidence proves inconsistent with that conclusion. *Gladstone,* 441 U.S., at 115, and n. 31, 99 S.Ct. 1601; *Wyoming v. Oklahoma,* 502 U.S. 437, 446, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). Laidlaw challenged the existence of injury in fact on appeal to the Fourth Circuit, but that court did not reach the question. Thus no lower court has reviewed the injury-in-fact issue in light of the extensive studies that led the District Court to conclude that the environment was not harmed by Laidlaw's discharges.

Inexplicably, the Court is untroubled by this, but proceeds to find injury in fact in the most casual fashion, as though it is merely confirming a careful analysis made below. Although we have previously refused to find standing based on the "conclusory allegations of an affidavit," *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the Court is content to do just that today. By accepting plaintiffs' vague, contradictory, and unsubstantiated allegations of "concern" about the environment as adequate to prove injury in fact, and accepting them even in the face of a finding that the environment was not demonstrably harmed, the Court makes the injury-in-fact requirement a sham. If there are permit violations, and a member of a plaintiff environmental organization lives near the offending plant, it would be difficult not to satisfy today's lenient standard.

#### *202 II

The Court's treatment of the redressability requirement-which would have been unnecessary if it resolved the injury-in-fact question correctly-is equally cavalier. As discussed above, petitioners allege ongoing injury consisting of diminished enjoyment of the affected waterways and decreased property values. They allege that these injuries are caused by Laidlaw's continuing permit violations. But the remedy petitioners seek is neither recompense for their injuries nor an injunction against future violations. Instead, the remedy is a statutorily specified "penalty" for past violations, payable entirely to the United States Treasury. Only last Term, we held that such penalties do not redress any injury a citizen plaintiff has suffered from past violations. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 106-107, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The Court nonetheless finds the redressability requirement satisfied here, distinguishing *Steel Co.* on the ground that in this case petitioners allege ongoing violations; payment of the penalties, it says, will remedy petitioners' injury by deterring future violations by Laidlaw. *Ante,* at 706-707. It holds that a penalty payable to the public "remedies" a threatened private harm, and suffices to sustain a private suit.

That holding has no precedent in our jurisprudence, and takes this Court beyond the "cases and controversies" that Article III of the Constitution has entrusted to its resolution. Even if it were appropriate, moreover, to allow Article III's remediation requirement to be satisfied by the indirect private consequences of a public penalty, those consequences are entirely too speculative in the present case. The new standing law that the Court makes-like all expansions of standing beyond the traditional constitutional limits-has grave implications for democratic governance. I shall discuss these three points in turn.

#### *203 A

In *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), the plaintiff, mother of an illegitimate child, sought, on behalf of herself, her child, and all others similarly situated, an injunction against discriminatory application of Art. 602 of the Texas Penal Code.**716 Although that provision made it a misdemeanor for "any parent" to refuse to support his or her minor children under 18 years of age, it was enforced only against married parents. That refusal, the plaintiff contended, deprived her and her child of the equal protection of the law by denying them the deterrent effect of the statute upon the father's failure to fulfill his support obligation. The Court held that there was no Article III standing.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693    Page 22

528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

There was no " 'direct' relationship," it said, "between the alleged injury and the claim sought to be adjudicated," since "[t]he prospect that prosecution will, at least in the future, result in payment of support can, at best, be termed only speculative." *Id.,* at 618, 93 S.Ct. 1146. "[Our cases] demonstrate that, in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Id., at 619, 93 S.Ct. 1146.*

Although the Court in *Linda R.S.* recited the "logical nexus" analysis of *Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968),* which has since fallen into desuetude, "it is clear that standing was denied ... because of the unlikelihood that the relief requested would redress appellant's claimed injury." *Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 79, n. 24, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).* There was no "logical nexus" between nonenforcement of the statute and Linda R. S.'s failure to receive support payments because "[t]he prospect that prosecution will ... result in payment of support" was "speculative," *Linda R. S., supra, at 618, 93 S.Ct. 1146*-that is to say, it was uncertain whether the relief would prevent the injury.[FN1]   Of *204 course precisely the same situation exists here. The principle that "in American jurisprudence ... a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another" applies no less to prosecution for civil penalties payable to the State than to prosecution for criminal penalties owing to the State.

> FN1. The decision in *Linda R.S.* did not turn, as today's opinion imaginatively suggests, on the father's short-term inability to pay support if imprisoned. *Ante,* at 708, n. 4. The Court's only comment upon the imprisonment was that, unlike imprisonment for civil contempt, it would not condition the father's release upon payment. The Court then continued: "The prospect that prosecution will, at least in the future"-*i.e.,* upon completion of the imprisonment- "result in payment of support can, at best, be termed only speculative." *Linda R. S., 410 U.S., at 618, 93 S.Ct. 1146.*

The Court's opinion reads as though the only purpose

and effect of the redressability requirement is to assure that the plaintiff receive *some* of the benefit of the relief that a court orders. That is not so. If it were, a federal tort plaintiff fearing repetition of the injury could ask for tort damages to be paid not only to himself but to other victims as well, on the theory that those damages would have at least some deterrent effect beneficial to him. Such a suit is preposterous because the "remediation" that is the traditional business of Anglo-American courts is relief specifically tailored to the plaintiff's injury, and not *any* sort of relief that has some incidental benefit to the plaintiff. Just as a "generalized grievance" that affects the entire citizenry cannot satisfy the injury-in-fact requirement even though it aggrieves the plaintiff along with everyone else, see *Lujan, 504 U.S., at 573-574, 112 S.Ct. 2130,* so also a generalized remedy that deters all future unlawful activity against all persons cannot satisfy the remediation requirement, even though it deters (among other things) repetition of this particular unlawful activity against these particular plaintiffs.

Thus, relief against prospective harm is traditionally afforded by way of an injunction, the scope of which is limited by the scope of the threatened injury. *Lewis v. Casey, 518 U.S. 343, 357-360, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); Lyons, 461 U.S., at 105-107, and n. 7, 103 S.Ct. 1660.*In seeking to overturn that tradition by **717 giving an individual *205 plaintiff the power to invoke a public remedy, Congress has done precisely what we have said it cannot do: convert an "undifferentiated public interest" into an "individual right" vindicable in the courts. *Lujan, supra, at 577, 112 S.Ct. 2130; Steel Co., 523 U.S., at 106, 118 S.Ct. 1003.* The sort of scattershot redress approved today makes nonsense of our statement in *Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 222, 94 S.Ct. 2925 (1974),* that the requirement of injury in fact "insures the framing of relief no broader than required by the precise facts." A claim of particularized future injury has today been made the vehicle for pursuing generalized penalties for past violations, and a threshold showing of injury in fact has become a lever that will move the world.

B

As I have just discussed, it is my view that a plaintiff's desire to benefit from the deterrent effect of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                    Page 23
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

a public penalty for past conduct can never suffice to establish a case or controversy of the sort known to our law. Such deterrent effect is, so to speak, "speculative as a matter of law." Even if that were not so, however, the deterrent effect in the present case would surely be speculative as a matter of fact.

The Court recognizes, of course, that to satisfy Article III, it must be "likely," as opposed to "merely speculative," that a favorable decision will redress plaintiffs' injury, *Lujan, supra,* at 561, 112 S.Ct. 2130. See *ante,* at 704.Further, the Court recognizes that not *all* deterrent effects of *all* civil penalties will meet this standard–though it declines to "explore the outer limits" of adequate deterrence, *ante,* at 707. It concludes, however, that in the present case "the civil penalties sought by FOE carried with them a deterrent effect" that satisfied the "likely [rather than] speculative" standard. *Ibid.* There is little in the Court's opinion to explain why it believes this is so.

The Court cites the District Court's conclusion that the penalties imposed, along with anticipated fee awards, provided**206** "adequate deterrence." *Ante,* at 703, 707; 956 F.Supp., at 611. There is absolutely no reason to believe, however, that this meant "deterrence adequate to prevent an injury to these plaintiffs that would otherwise occur." The statute does not even *mention* deterrence in general (much less deterrence of future harm to the particular plaintiff) as one of the elements that the court should consider in fixing the amount of the penalty. (That element can come in, if at all, under the last, residual category of "such other matters as justice may require." 33 U.S.C. § 1319(d).) The statute does require the court to consider "the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, [and] the economic impact of the penalty on the violator...." *Ibid.,* see 956 F.Supp., at 601. The District Court meticulously discussed, in subsections (a) through (e) of the portion of its opinion entitled "Civil Penalty," *each one* of those specified factors, and then–under subsection (f) entitled "Other Matters As Justice May Require," it discussed "1. Laidlaw's Failure to Avail Itself of the Reopener Clause," "2. Recent Compliance History," and "3. The Ever-Changing Mercury Limit." There is no mention whatever–in this portion of the opinion or anywhere else–of the

degree of deterrence necessary to prevent future harm to these particular plaintiffs. Indeed, neither the District Court's final opinion (which contains the "adequate deterrence" statement) nor its earlier opinion dealing with the preliminary question whether South Carolina's previous lawsuit against Laidlaw constituted "diligent prosecution" that would bar citizen suit, see 33 U.S.C. § 1365(b)(1)(B), displayed *any awareness* that deterrence of *future injury to the plaintiffs* was necessary to support standing.

**\*\*718** The District Court's earlier opinion did, however, quote with approval the passage from a District Court case which began: " 'Civil penalties seek to deter pollution by discouraging**\*207** future violations. To serve this function, the amount of the civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business.' " App. 122, quoting *PIRG v. Powell Duffryn Terminals, Inc.,* 720 F.Supp. 1158, 1166 (D.N.J. 1989). When the District Court concluded the "Civil Penalty" section of its opinion with the statement that "[t]aken together, this court believes the above penalty, potential fee awards, and Laidlaw's own direct and indirect litigation expenses provide adequate deterrence under the circumstances of this case,"956 F.Supp., at 611, it was obviously harking back to this general statement of what the statutorily prescribed factors (and the "as justice may require" factors, which in this case did not include particularized or even generalized deterrence) were designed to achieve. It meant no more than that the court believed the civil penalty it had prescribed met the statutory standards.

The Court points out that we have previously said " 'all civil penalties have some deterrent effect,' " *ante,* at 706 (quoting *Hudson v. United States,* 522 U.S. 93, 102, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)). That is unquestionably true: As a general matter, polluters as a class are deterred from violating discharge limits by the *availability* of civil penalties. However, none of the cases the Court cites focused on the deterrent effect of a single *imposition* of penalties on a particular lawbreaker. Even less did they focus on the question whether that particularized deterrent effect (if any) was enough to redress the injury of a citizen plaintiff in the sense required by Article III. They all involved penalties pursued by the government, not by citizens. See *id.,* at 96, 118 S.Ct.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

488; _Department of Revenue of Mont. v. Kurth Ranch,_ 511 U.S. 767, 773, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); _Tull v. United States,_ 481 U.S. 412, 414, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

If the Court had undertaken the necessary inquiry into whether significant deterrence of the plaintiffs' feared injury was "likely," it would have had to reason something like this: Strictly speaking, no polluter is deterred by a penalty for **\*208** past pollution; he is deterred by the _fear_ of a penalty for _future_ pollution. That fear will be virtually nonexistent if the prospective polluter knows that all emissions violators are given a free pass; it will be substantial under an emissions program such as the federal scheme here, which is regularly and notoriously enforced; it will be even higher when a prospective polluter subject to such a regularly enforced program has, as here, been the object of public charges of pollution and a suit for injunction; and it will surely be near the top of the graph when, as here, the prospective polluter has already been subjected to _state_ penalties for the past pollution. The deterrence on which the plaintiffs must rely for standing in the present case is the marginal increase in Laidlaw's fear of future penalties that will be achieved by adding federal penalties for Laidlaw's past conduct.

I cannot say for certain that this marginal increase is zero; but I can say for certain that it is entirely speculative whether it will make the difference between these plaintiffs' suffering injury in the future and these plaintiffs' going unharmed. In fact, the assertion that it will "likely" do so is entirely farfetched. The speculativeness of that result is much greater than the speculativeness we found excessive in _Simon v. Eastern Ky. Welfare Rights Organization,_ 426 U.S. 26, 43, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), where we held that denying § 501(c)(3) charitable-deduction tax status to hospitals that refused to treat indigents was not sufficiently likely to assure future treatment of the indigent plaintiffs to support standing. And it is much greater than the speculativeness**\*719** we found excessive in _Linda R.S. v. Richard D.,_ discussed _supra,_ at 715-716, where we said that "[t]he prospect that prosecution [for nonsupport] will ... result in payment of support can, at best, be termed only speculative," 410 U.S., at 618, 93 S.Ct. 1146.

In sum, if this case is, as the Court suggests, within the central core of "deterrence" standing, it is impossible to imagine what the "outer limits" could possibly be. The Court's expressed reluctance to define those "outer limits" **\*209** serves only to disguise the fact that it has promulgated a revolutionary new doctrine of standing that will permit the entire body of public civil penalties to be handed over to enforcement by private interests.

C

Article II of the Constitution commits it to the President to "take Care that the Laws be faithfully executed," Art. II, § 3, and provides specific methods by which all persons exercising significant executive power are to be appointed, Art. II, § 2. As Justice KENNEDY'S concurrence correctly observes, the question of the conformity of this legislation with Article II has not been argued-and I, like the Court, do not address it. But Article III, no less than Article II, has consequences for the structure of our government, see _Schlesinger,_ 418 U.S., at 222, 94 S.Ct. 2925, and it is worth noting the changes in that structure which today's decision allows.

By permitting citizens to pursue civil penalties payable to the Federal Treasury, the Act does not provide a mechanism for individual relief in any traditional sense, but turns over to private citizens the function of enforcing the law. A Clean Water Act plaintiff pursuing civil penalties acts as a self-appointed mini-EPA. Where, as is often the case, the plaintiff is a national association, it has significant discretion in choosing enforcement targets. Once the association is aware of a reported violation, it need not look long for an injured member, at least under the theory of injury the Court applies today. See _supra,_ at 700-702. And once the target is chosen, the suit goes forward without meaningful public control.[FN2] The availability of civil penalties vastly disproportionate**\*210** to the individual injury gives citizen plaintiffs massive bargaining power-which is often used to achieve settlements requiring the defendant to support environmental projects of the plaintiffs' choosing. See Greve, The Private Enforcement of Environmental Law, 65 Tulane L.Rev. 339, 355-359 (1990). Thus is a public fine diverted to a private interest.

FN2. The Court points out that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                                           Page 25
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

Government is allowed to intervene in a citizen suit, see *ante,* at 708, n. 4; 33 U.S.C. § 1365(c)(2), but this power to "bring the Government's views to the attention of the court,"*ante,* at 708, n. 4, is meager substitute for the power to decide whether prosecution will occur. Indeed, according the Chief Executive of the United States the ability to intervene does no more than place him on a par with John Q. Public, who can intervene-whether the Government likes it or not-when the United States files suit. § 1365(b)(1)(B).

To be sure, the EPA may foreclose the citizen suit by itself bringing suit. 33 U.S.C. § 1365(b)(1)(B). This allows public authorities to avoid private enforcement only by accepting private direction as to when enforcement should be undertaken-which is no less constitutionally bizarre. Elected officials are entirely deprived of their discretion to decide that a given violation should not be the object of suit at all, or that the enforcement decision should be postponed.[FN3] See § 1365(b)(1)(A) (providing that citizen plaintiff need only wait **720 60 days after giving notice of the violation to the government before proceeding with action). This is the predictable and inevitable consequence of the Court's allowing the use of public remedies for private wrongs.

FN3. The Court observes that "the Federal Executive Branch does not share the dissent's view that such suits dissipate its authority to enforce the law," since it has "endorsed this citizen suit from the outset." *Ante,* at 708, n. 4. Of course, in doubtful cases a long and uninterrupted history of Presidential acquiescence and approval can shed light upon the constitutional understanding. What we have here-acquiescence and approval by a single administration-does not deserve passing mention.

III

Finally, I offer a few comments regarding the Court's discussion of whether FOE's claims became moot by reason of Laidlaw's substantial compliance with the permit limits. I do not disagree with the conclusion that the Court reaches. Assuming that the plaintiffs

had standing to pursue civil penalties in the first instance (which they did not), their claim *211 might well not have been mooted by Laidlaw's voluntary compliance with the permit, and leaving this fact-intensive question open for consideration on remand, as the Court does, *ante,* at 711, seems sensible.[FN4] In reaching this disposition, however, the Court engages in a troubling discussion of the purported distinctions between the doctrines of standing and mootness. I am frankly puzzled as to why this discussion appears at all. Laidlaw's claimed compliance is squarely within the bounds of our "voluntary cessation" doctrine, which is the basis for the remand. *Ante,* at 710.[FN5] *212 There is no reason to engage in an interesting academic excursus upon the differences between mootness and standing in order to invoke this obviously applicable rule.[FN6]

FN4. In addition to the compliance and plant-closure issues, there also remains open on remand the question whether the current suit was foreclosed because the earlier suit by the State was "diligently prosecuted." See 33 U.S.C. § 1365(b)(1)(B). Nothing in the Court's opinion disposes of the issue. The opinion notes the District Court's finding that Laidlaw itself played a significant role in facilitating the State's action. *Ante,* at 702, n. 1, 707, n. 2. But there is no incompatibility whatever between a defendant's facilitation of suit and the State's diligent prosecution-as prosecutions of felons who confess their crimes and turn themselves in regularly demonstrate. Laidlaw was entirely within its rights to prefer state suit to this private enforcement action; and if it had such a preference it would have been prudent-given that a State must act within 60 days of receiving notice of a citizen suit, see § 1365(b)(1)(A), and given the number of cases state agencies handle-for Laidlaw to make sure its case did not fall through the cracks. South Carolina's interest in the action was not a feigned last minute contrivance. It had worked with Laidlaw in resolving the problem for many years, and had previously undertaken an administrative enforcement action resulting in a consent order. 890 F.Supp. 470, 476 (D.S.C.1995). South Carolina has filed an *amicus* brief arguing that allowing citizen suits to proceed despite ongoing state

Case 4:08-cv-02753-CW    Document 77-8    Filed 08/15/2008    Page 27 of 28

120 S.Ct. 693                                                                    Page 26
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

enforcement efforts "will provide citizens and federal judges the opportunity to relitigate and second-guess the enforcement and permitting actions of South Carolina and other States." Brief for South Carolina as *Amicus Curiae* 6.

FN5. Unlike Justice STEVENS' concurrence, the opinion for the Court appears to recognize that a claim for civil penalties is moot when it is clear that no future injury to the plaintiff at the hands of the defendant can occur. The concurrence suggests that civil penalties, like traditional damages remedies, cannot be mooted by absence of threatened injury. The analogy is inapt. Traditional money damages are payable to compensate for the harm of past conduct, which subsists whether future harm is threatened or not; civil penalties are privately assessable (according to the Court) to deter threatened future harm to the plaintiff. Where there is no threat to the plaintiff, he has no claim to deterrence. The proposition that impossibility of future violation does not moot the case holds true, of course, for civil-penalty suits by the government, which do not rest upon the theory that some particular future harm is being prevented.

FN6. The Court attempts to frame its exposition as a corrective to the Fourth Circuit, which it claims "confused mootness with standing." *Ante,* at 708. The Fourth Circuit's conclusion of nonjusticiability rested upon the belief (entirely correct, in my view) that the only remedy being pursued on appeal, civil penalties, would not redress FOE's claimed injury. 149 F.3d 303, 306 (1998). While this might be characterized as a conclusion that FOE had no standing to pursue civil penalties from the outset, it can also be characterized, as it was by the Fourth Circuit, as a conclusion that, when FOE declined to appeal denial of the declaratory judgment and injunction, and appealed only the inadequacy of the civil penalties (which it had no standing to pursue) the *case as a whole became moot.* Given the Court's erroneous conclusion that

civil penalties can redress private injury, it of course rejects both formulations-but neither of them necessitates the Court's academic discourse comparing the mootness and standing doctrines.

**721 Because the discussion is not essential-indeed, not even relevant-to the Court's decision, it is of limited significance. Nonetheless, I am troubled by the Court's too-hasty retreat from our characterization of mootness as "the doctrine of standing set in a time frame." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68, n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). We have repeatedly recognized that what is required for litigation to continue is essentially identical to what is required for litigation to begin: There must be a justiciable case or controversy as required by Article III."Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). A court may not *213 proceed to hear an action if, subsequent to its initiation, the dispute loses "its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract propositions of law." *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969)*(per curiam).* See also *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); *Steffel v. Thompson,* 415 U.S. 452, 459, n. 10, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Because the requirement of a continuing case or controversy derives from the Constitution, *Liner v. Jafco, Inc.,* 375 U.S. 301, 306, n. 3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964), it may not be ignored when inconvenient, *United States v. Alaska S.S. Co.,* 253 U.S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808 (1920) (moot question cannot be decided, "[h]owever convenient it might be"), or, as the Court suggests, to save "sunk costs," compare *ante,* at 710, with *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 480, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) ("[R]easonable caution is needed to be sure that mooted litigation is not pressed forward ... solely in order to obtain reimbursement of sunk costs").

It is true that mootness has some added wrinkles that standing lacks. One is the "voluntary cessation" doctrine to which the Court refers. *Ante,* at 708. But it is inaccurate to regard this as a reduction of the basic requirement for standing that obtained at the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

120 S.Ct. 693                                                                   Page 27
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L.
Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly
Fed. S 37

beginning of the suit. A genuine controversy must exist at both stages. And just as the initial suit could be brought (by way of suit for declaratory judgment) before the defendant actually violated the plaintiff's alleged rights, so also the initial suit can be continued even though the defendant has stopped violating the plaintiff's alleged rights. The "voluntary cessation" doctrine is nothing more than an evidentiary presumption that the controversy reflected by the violation of alleged rights continues to exist. *Steel Co., 523 U.S., at 109, 118 S.Ct. 1003.* Similarly, the fact that we do not find cases moot when the challenged conduct is "capable of repetition, yet evading review" does not demonstrate that the requirements for mootness and for standing differ. "Where the conduct has ceased for the time being *214 but there is a demonstrated probability that it will recur, a real-life controversy between parties with a personal stake in the outcome continues to exist." *Honig v. Doe,* 484 U.S. 305, 341, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (SCALIA, J., dissenting) (emphasis deleted).

Part of the confusion in the Court's discussion is engendered by the fact that it compares standing, on the one hand, with mootness *based on voluntary cessation,* on the other hand. *Ante,* at 709. The required showing that it is "absolutely clear" that the conduct "could not reasonably be expected to recur" is *not* the threshold showing required for mootness, but the heightened showing required in a particular category of cases where we have sensibly concluded that there is reason to be skeptical that cessation of violation means **722 cessation of live controversy. For claims of mootness based on changes in circumstances other than voluntary cessation, the showing we have required is less taxing, and the inquiry is indeed properly characterized as one of "'standing set in a time frame.'" See *Arizonans, supra,* at 67, 68, n. 22, 117 S.Ct. 1055 (case mooted where plaintiff's change in jobs deprived case of "still vital claim for prospective relief"); *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (case mooted by petitioner's completion of his sentence, since "throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision" (internal quotation marks omitted)); *Lewis, supra,* at 478-480, 116 S.Ct. 2174 (case against State mooted by change in federal law that eliminated parties' "personal stake" in the outcome).

In sum, while the Court may be correct that the parallel between standing and mootness is imperfect due to realistic evidentiary presumptions that are by their nature applicable only in the mootness context, this does not change the underlying principle that "'[t]he requisite personal interest that must exist at the commencement of the litigation ... must continue throughout its existence....'" *215Arizonans, supra,* at 68, n. 22, 117 S.Ct. 1055 (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)).

* * *

By uncritically accepting vague claims of injury, the Court has turned the Article III requirement of injury in fact into a "mere pleading requirement," *Lujan,* 504 U.S., at 561, 112 S.Ct. 2130; and by approving the novel theory that public penalties can redress anticipated private wrongs, it has come close to "mak[ing] the redressability requirement vanish,"*Steel Co., supra,* at 107, 118 S.Ct. 1003. The undesirable and unconstitutional consequence of today's decision is to place the immense power of suing to enforce the public laws in private hands. I respectfully dissent.

U.S.,2000.
Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.
528 U.S. 167, 120 S.Ct. 693, 49 ERC 1769, 163 A.L.R. Fed. 749, 145 L.Ed.2d 610, 68 USLW 4044, 30 Envtl. L. Rep. 20,246, 00 Cal. Daily Op. Serv. 289, 2000 Daily Journal D.A.R. 375, 2000 CJ C.A.R. 142, 13 Fla. L. Weekly Fed. S 37

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 8**



926 F.Supp. 948                                                                                          Page 1
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

▷Gen-Probe, Inc. v. Amoco Corp., Inc.
S.D.Cal.,1996.

United States District Court,S.D. California.
GEN-PROBE, INC., Plaintiff,
v.
AMOCO CORPORATION, INC., et al., Defendants.
**No. 95-0998J.**

April 24, 1996.

Patentee brought action against various competitors and university, alleging unfair competition, conspiracy to commit unfair competition, violation of California's Cartwright Act, and patent infringement. On various pretrial motions, the District Court, Jones, J., held that: (1) patentee was not entitled to expedite and consolidate discovery; (2) university did not have Eleventh Amendment immunity as to inducement of patent infringement claim; (3) university was entitled to immunity with regard to other claims; (4) prior lawsuit that survived motions for summary judgment could not be considered sham litigation for purposes of exception to *Noerr* immunity; (5) patentee's complaint failed to give fair notice of what its claims were or grounds of various infringement claims; and (6) patentee's action for inducement of infringement and unfair competition would be stayed until conclusion of competitor's state court action to secure patent rights.

Motions granted in part and denied in part.

West Headnotes

**[1] Equity 150 65(2)**

150 Equity
    150I Jurisdiction, Principles, and Maxims
        150I(C) Principles and Maxims of Equity
            150k65 He Who Comes Into Equity Must Come with Clean Hands
                150k65(2) k. Nature of Unconscionable Conduct. Most Cited Cases
Doctrine of unclean hands did not apply to university's action against patentee seeking declaration of coinventorship and conversion of

damages, so as to entitle patentee to expedited discovery in related unfair competition action to prepare unclean hands defense; misconduct patentee complained of was university's filing of its lawsuit with funding by patentee's competitor, and patentee did not claim misconduct by university during transactions forming basis for university's complaint.

**[2] Equity 150 65(1)**

150 Equity
    150I Jurisdiction, Principles, and Maxims
        150I(C) Principles and Maxims of Equity
            150k65 He Who Comes Into Equity Must Come with Clean Hands
                150k65(1) k. In General. Most Cited Cases
Equitable defense such as unclean hands may be asserted against legal claims in general, and against conversion in particular.

**[3] Action 13 57(6)**

13 Action
    13III Joinder, Splitting, Consolidation, and Severance
        13k54 Consolidation of Actions
            13k57 Actions Which May Be Consolidated
                13k57(6) k. Actions in Different Courts. Most Cited Cases
Patentee that brought unfair competition action against university and competitor based on competitor's funding of university's state court action seeking declaration of coinventorship and conversion damages was not entitled to consolidate discovery in the two actions, where patentee's motion to amend to add unfair competition claim was rejected in related action, state action was more advanced procedure and most of common discovery related to allegations that failed to state viable claim.

**[4] Federal Civil Procedure 170A 1829**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal

170AXI(B)5 Proceedings
    170Ak1827 Determination
      170Ak1829 k. Construction of
Pleadings. Most Cited Cases

**Federal Civil Procedure 170A ☜1835**

170A Federal Civil Procedure
    170AXI Dismissal
      170AXI(B) Involuntary Dismissal
        170AXI(B)5 Proceedings
          170Ak1827 Determination
            170Ak1835 k. Matters Deemed
Admitted. Most Cited Cases
In ruling on motion to dismiss for failure to state a claim, complaint should be liberally construed in favor of plaintiff, and its factual allegations taken as true. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☜1832**

170A Federal Civil Procedure
    170AXI Dismissal
      170AXI(B) Involuntary Dismissal
        170AXI(B)5 Proceedings
          170Ak1827 Determination
            170Ak1832 k. Matters Considered in
General. Most Cited Cases
Documents referred to in complaint forming basis of plaintiff's claims may be considered in ruling on motion to dismiss for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[6] Federal Courts 170B ☜269**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
        170Bk268 What Are Suits Against States
          170Bk269 k. State Officers or
Agencies, Actions Against. Most Cited Cases
Whether state entity is arm of the state for purposes of Eleventh Amendment immunity is determined by application of five factor test: whether money judgment would be satisfied out of state funds; whether entity performs central governmental functions; whether entity may sue or be sued; whether entity has power to take property in its own name or only in name of state; and corporate status of

entity. U.S.C.A. Const.Amend. 11.

**[7] Federal Courts 170B ☜269**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
        170Bk268 What Are Suits Against States
          170Bk269 k. State Officers or
Agencies, Actions Against. Most Cited Cases
University did not have Eleventh Amendment immunity as to inducement of patent infringement claims, arising out of university's licensing of allegedly infringing patent applications, where third party was obligated to pay university's liabilities arising from such licensing. U.S.C.A. Const.Amend. 11.

**[8] Federal Courts 170B ☜266.1**

170B Federal Courts
    170BIV Citizenship, Residence or Character of Parties, Jurisdiction Dependent on
      170BIV(A) In General
        170Bk266 Waiver of Immunity
          170Bk266.1 k. In General. Most Cited Cases
University's coinventorship claim in federal court did not waive its Eleventh Amendment immunity with regard to patentee's state law unfair competition claim arising from different transactions. U.S.C.A. Const.Amend. 11.

**[9] Patents 291 ☜310.1(5)**

291 Patents
    291XII Infringement
      291XII(C) Suits in Equity
        291k309 Pleading
          291k310.1 Original Bill
            291k310.1(5) k. Infringement and
Injury, Loss or Damage. Most Cited Cases
Patentee's allegation that university's licensing agreement granted licensee right to immediately begin producing products covered by patent application and that application infringed its patent was sufficient to state claim against university for inducement of infringement.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                    Page 3
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

**[10] Patents 291 ☞312(1.1)**

291 Patents
 291XII Infringement
  291XII(C) Suits in Equity
   291k312 Evidence
    291k312(1) Presumptions and Burden
of Proof
     291k312(1.1) k. In General. Most
Cited Cases
Intent to cause present acts of infringement, as
required for claim of inducement of infringement,
could not be inferred from licensing agreement
effective at future date and conditioned upon success
of putative licensor's attempt to establish ownership
interest in patent.

**[11] Antitrust and Trade Regulation 29T
☞905(2)**

29T Antitrust and Trade Regulation
 29TXI Antitrust Exemptions and Defenses
  29Tk905 Efforts to Influence Government
Action
   29Tk905(2) k. Petitioning Government.
Most Cited Cases
  (Formerly 265k12(16.5))
*Noerr* antitrust immunity bars any claim, federal or
state, common law or statutory, that has as its
gravamen constitutionally-protected petitioning
activity. U.S.C.A. Const.Amend. 1.

**[12] Antitrust and Trade Regulation 29T
☞905(1)**

29T Antitrust and Trade Regulation
 29TXI Antitrust Exemptions and Defenses
  29Tk905 Efforts to Influence Government
Action
   29Tk905(1) k. In General. Most Cited
Cases
  (Formerly 265k12(16.5))
If *Noerr* immunity as developed with regard to
federal antitrust claims goes beyond constitutional
basis for immunity, its application to state law claims
must be in more limited form. U.S.C.A.
Const.Amend. 1.

**[13] Antitrust and Trade Regulation 29T
☞905(2)**

29T Antitrust and Trade Regulation
 29TXI Antitrust Exemptions and Defenses
  29Tk905 Efforts to Influence Government
Action
   29Tk905(2) k. Petitioning Government.
Most Cited Cases
  (Formerly 265k12(16.5))

**Antitrust and Trade Regulation 29T ☞905(3)**

29T Antitrust and Trade Regulation
 29TXI Antitrust Exemptions and Defenses
  29Tk905 Efforts to Influence Government
Action
   29Tk905(3) k. Litigation; Sham Litigation.
Most Cited Cases
  (Formerly 265k12(16.5))
Competitor's prior lawsuits and application to
administrative agencies that were allegedly baseless
or false could be protected by *Noerr* immunity in
patentee's action for unfair competition and violations
of California's Cartright Act, absent allegation that
prior lawsuits and applications contained knowingly
false statements or allegations establishing knowing
falsity of the statements. West's Ann.Cal.Bus. &
Prof.Code §§ 16700-16804.

**[14] Malicious Prosecution 249 ☞38**

249 Malicious Prosecution
 249V Actions
  249k38 k. Nature and Form of Remedy. Most
Cited Cases
Under California law, only tort of malicious
prosecution may be maintained for any
communication made by interested party in initiation
or course of judicial or quasi-judicial proceeding.

**[15] Antitrust and Trade Regulation 29T
☞905(3)**

29T Antitrust and Trade Regulation
 29TXI Antitrust Exemptions and Defenses
  29Tk905 Efforts to Influence Government
Action
   29Tk905(3) k. Litigation; Sham Litigation.
Most Cited Cases
  (Formerly 265k12(16.5))
Prior lawsuit that survived motions for summary

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                              Page 4
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

judgment could not be considered sham litigation for purposes of exception to *Noerr* immunity.

**[16] Antitrust and Trade Regulation 29T ☞972(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(3) k. In General. Most Cited Cases
        (Formerly 265k28(6.2))
While allegation that suit was brought in order to inflict harm upon market rival might provide adequate basis for asserting antitrust or unfair competition claim, simply alleging that lawsuit is brought for purpose of inducing settlement negotiations is insufficient.

**[17] Antitrust and Trade Regulation 29T ☞905(3)**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk905 Efforts to Influence Government Action
            29Tk905(3) k. Litigation; Sham Litigation. Most Cited Cases
        (Formerly 265k12(16.5))
Competitor's alleged conspiracy to bring lawsuit seeking transfer of patent rights and for third party to fund that litigation was not agreement to commit unlawful act that could support patentee's unfair competition and Cartright Act claims, where acts alleged were protected under *Noerr* immunity. West's Ann.Cal.Bus. & Prof.Code §§ 16700-16804.

**[18] Patents 291 ☞226.6**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k226.5 Substantial Identity of Subject Matter
                291k226.6 k. Comparison with Claims of Patent. Most Cited Cases
To prove actual patent infringement, plaintiff must

show that defendant made, used or sold product or process encompassed by at least one valid claim of patent, or that accused product or process performed substantially the same function as substantially the same way to achieve substantially the same result as at least one claim of patent, provided that accused product or process incorporates every element or substantially equivalent of element of claim. 35 U.S.C.A. § 271(a).

**[19] Patents 291 ☞259(1)**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k259 Contributory Infringement; Inducement
                291k259(1) k. In General. Most Cited Cases
To prove contributory inducement of patent infringement, plaintiff must show that defendant sold material component of patent invention, knowing that component was especially adapted for use in invention and that it was not staple article of commerce suitable for substantial noninfringing use. 35 U.S.C.A. § 271(c).

**[20] Patents 291 ☞259(1)**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k259 Contributory Infringement; Inducement
                291k259(1) k. In General. Most Cited Cases
To prove active inducement of infringement, plaintiff must show both act by defendant actually calculated to induce another to infringe, and culmination of defendant's acts in direct infringement by another. 35 U.S.C.A. § 271(b).

**[21] Patents 291 ☞310.1(5)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k309 Pleading
                291k310.1 Original Bill
                    291k310.1(5) k. Infringement and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948

926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

Page 5

Injury, Loss or Damage. Most Cited Cases

Federal Rules do not require plaintiff in patent infringement case to plead with particularly specific patent claims that have been infringed, but Rules do require that defendant be given fair notice of what plaintiff's claim is and grounds upon which it rests.

**[22] Patents 291 ☞310.1(1)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k309 Pleading
                291k310.1 Original Bill
                    291k310.1(1) k. In General. Most Cited Cases

Patentee's complaint in patent infringement case failed to give fair notice of what its claims were or grounds of various claims; each of five defendants was accused with each of three different types of infringement, and complaint contained conclusory assertion of entitlement to relief. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

**[23] Antitrust and Trade Regulation 29T ☞905(3)**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk905 Efforts to Influence Government Action
            29Tk905(3) k. Litigation; Sham Litigation. Most Cited Cases
    (Formerly 265k28(1.2))

**Antitrust and Trade Regulation 29T ☞69**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(B) Actions and Proceedings
            29Tk66 Defenses
                29Tk69 k. Privilege or Immunity. Most Cited Cases
    (Formerly 382k864 Trade Regulation)

Patentee's state law claims against competitor for unfair competition, conspiracy to commit unfair competition in violation of Cartwright Act, based on allegation that competitor agreed to fund lawsuits against it in exchange for licenses to any rights obtained if lawsuits proved successful, conspired to misrepresent facts to federal agency and published its belief it would obtain interest in patents were barred by *Noerr* immunity.

**[24] Antitrust and Trade Regulation 29T ☞428**

29T Antitrust and Trade Regulation
    29TIV Trade Secrets and Proprietary Information
        29TIV(B) Actions
            29Tk428 k. Pleading. Most Cited Cases
    (Formerly 382k864 Trade Regulation)

Patentee's allegation that competitor duplicitously obtained confidential information that it later refused to return and instead used it to infringe its patents was sufficient to state claim for unfair competition.

**[25] Action 13 ☞69(3)**

13 Action
    13IV Commencement, Prosecution, and Termination
        13k67 Stay of Proceedings
            13k69 Another Action Pending
                13k69(3) k. Actions in State and Federal Courts. Most Cited Cases

Patentee's action for inducement of infringement and unfair competition would be stayed until conclusion of competitor's state court action to secure patent rights, where patentee would be deprived of any ownership interest in patents in suit if competitor were to succeed in state action, and patentee failed to show how it would be prejudiced from stay.

\*950 Mary S. Consalvi, Lyon and Lyon, La Jolla, CA, for Gen-Probe Inc.

John H. L'Estrange, Jr., Wright and L'Estrange, San Diego, CA, Charles E. Lipsey, Robert D. Bajefsky, Gerson S. Panitch, Howard W. Levine, Finnegan, Henderson, Farabow, Garrett and Dunner, Washington, DC, for Amoco Corporation, Amoco Technology Company, Gene-Trak Systems, Inc., and Vysis Inc.

Robert Berliner, Robbins, Berliner and Carson, Los Angeles, CA, for Regents of the University of California, Eric Stanbridge, PhD.

\*951 ORDER DENYING PLAINTIFF'S MOTION TO EXPEDITE AND CONSOLIDATE DISCOVERY; GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS;

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                      Page 6
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

GRANTING DEFENDANTS' MOTION TO STAY

JONES, District Judge.

I. INTRODUCTION

On November 17, 1995, Plaintiff Gen-Probe, Inc. ("Gen-Probe") filed an amended complaint naming as Defendants Amoco Corporation ("AC"), Amoco Technology Company ("ATC"), Gene-Trak Systems, Inc. ("Gene-Trak"), Gene-Trak Systems Industrial Diagnostics Corp. ("GTSID"), and Vysis, Inc. ("Vysis") (collectively, "Amoco"); [FN1] the Center for Neurologic Study, Richard A. Smith, and Ivor Royston (collectively, "CNS"); and The Regents of the University of California and Eric Stanbridge (collectively, the "Regents"). All defendants are charged with unfair competition, conspiracy to commit unfair competition, and violation of the Cartwright Act (Cal.Bus. & Prof.Code §§ 16700-16804). Amoco is charged with directly infringing, contributory infringing, and inducing the infringement of, U.S. Patents Nos. 4,851,330 (the " '330 patent") and 5,288,611 (the " '611 patent").[FN2] CNS and the Regents are charged with inducement of Amoco's infringement.

> FN1. Gene-Trak Systems, Inc., Gene-Trak System Industrial Diagnostics Corp., and Vysis, Inc. are subsidiaries of Amoco Technology Company, Inc.

> FN2. In addition, AC and ATC are alleged to be liable for the infringing acts of Gene-Trak, GTSID, and Vysis, under an alter ego theory; and Vysis is charged with successor liability for Gene-Trak's infringement.

Before the Court are Plaintiff's Motion to Expedite and Consolidate Discovery, Defendants Amoco and Regents' Motions to Stay, and Defendants CNS, Amoco, and Regents' Motions to Dismiss.[FN3] For the reasons stated below, the Court denies the Plaintiff's discovery motion; grants the motions to stay; grants CNS' motion to dismiss; and grants in part the Regents and Amoco's motions to dismiss.

> FN3. Amoco obtained a new hearing date of February 20, 1996 to resubmit its Rule 12 motions in response to the amended

complaint. Plaintiff thereafter sought an emergency hearing on a motion to expedite and consolidate discovery. The Court set up an expedited schedule to allow the following motions to be heard January 22, 1996: Plaintiff's Motion to Expedite and Consolidate Discovery, Defendants Amoco and Regents' Motions to Stay, and Defendant CNS' Motion to Dismiss. On February 13, 1996, the Court issued an Order denying the Plaintiff's discovery motion, dismissing CNS, and staying the suit. Since that time the Court has received motions to dismiss from Amoco and Regents. This Order supersedes the February 13, 1996 Order, and constitutes the Court's final ruling on all motions.

II. RELATED LITIGATION

Gen-Probe's claims are based at least in part upon ATC's funding of CNS and the Regents' lawsuits, in which CNS and the Regents seek to establish an interest in Gen-Probe's patents. *See* First Amended Complaint ¶ 20 ("The Acts of unfair competition include ... Amoco ... carrying out a pattern of inducing others to sue Gen-Probe ...").

On December 14, 1993, CNS filed Civil Action No. 671765 in Superior Court, County of San Diego, claiming ownership rights in the Gen-Probe patents because the invention was allegedly reduced to practice by Dr. Kohne under a government grant naming CNS as the beneficiary. The case is currently pending before Superior Court Judge Jeffrey T. Miller.

On October 7, 1993, the Regents filed Civil Action 93-1539 [hereinafter "Regents v. Kohne"] in this Court, seeking a declaration of co-inventorship and conversion damages. The Regents claim that collaboration between Dr. Stanbridge and Dr. Kohne (Dr. Kohne is the inventor and assignor to Gen-Probe of the '330 and '611 patents) was so significant that the invention behind the patents in suit should be considered jointly conceived. The case is currently pending before this Court with a trial date of May 14, 1996.

III. GEN-PROBE'S MOTION TO EXPEDITE AND CONSOLIDATE DISCOVERY

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                                                Page 7
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

[1] Gen-Probe argues that it needs information on Amoco's arrangements with CNS and Regents to prepare an unclean hands *952 defense in the upcoming Regents trial. The Court rejects this argument for several reasons.

[2] First, any time pressures Gen-Probe faces were brought about by its own delays. Gen-Probe attempts to blame others for its predicament, pointing to the very recent substitution of an equitable claim for restitution in the Regents case, following the dismissal of the conversion claim. However, it is well-established that equitable defenses such as unclean hands may be asserted against legal claims in general, *Fibreboard Paper Products Corp. v. East Bay Union of Machinists,* 227 Cal.App.2d 675, 728-29, 39 Cal.Rptr. 64 (1st Dist.1964), and that unclean hands may be asserted against conversion in particular, *Unilogic, Inc. v. Burroughs Corp.,* 10 Cal.App.4th 612, 621-23, 12 Cal.Rptr.2d 741 (6th Dist.1992). If Gen-Probe only now realized that it could assert this defense, it has only itself to blame.

Second, the doctrine of unclean hands would not even apply to the Regents case. The doctrine of unclean hands rests on the maxim that "he who comes into equity must come with clean hands." *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1097 (9th Cir.1985). However, it is "not every wrongful act nor even every fraud which prevents a suitor in equity from obtaining relief. The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants." *Fibreboard Paper Products Corp.,* 227 Cal.App.2d at 728-29, 39 Cal.Rptr. 64. The misconduct Gen-Probe complains of is the Regents' filing of its lawsuit with Amoco funding. Putting aside the rather serious question whether the filing of a lawsuit could be considered unclean hands, cf. *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1132, 270 Cal.Rptr. 1, 791 P.2d 587 (Cal.1990) (discussing "policy of encouraging free access to the courts"), it is apparent that the Regents' subsequent decision to file a lawsuit has no bearing whatsoever upon "the transaction concerning which the complaint [was] made," i.e., Dr. Kohne's failure to name Dr. Stanbridge as a co-inventor of the patents in suit, his exclusive license to

Gen-Probe, and the profits Gen-Probe enjoyed from the invention. For the doctrine of unclean hands to apply, Gen-Probe would have to prove misconduct by the Regents during one of the transactions forming the basis for the Regents' complaint.    *See* John Norton Pomeroy, *Equity Jurisprudence* § 399 at 95-97 (Spencer W. Symons ed., 5th ed. 1941) ("The dirt on his hands must be his bad conduct in the transaction complained of."). Gen-Probe's allegations of misconduct do not relate to these transactions. The doctrine therefore would have no application to that case.

[3] The Court also rejects Gen-Probe's arguments in favor of consolidating discovery, for three reasons. First, Judge Miller in the CNS case has rejected Gen-Probe's proposed amendment of its complaint to raise in that case the issues it seeks to raise in this action. Second, the Regents case is in a far more advanced procedural posture than this case. Third, most of the common discovery relates to allegations that this Court finds fail to state a viable claim. Thus even were the Court convinced it possessed the power to do so, it would decline to consolidate discovery in these cases, two federal and one state: comity and efficiency both weigh against consolidation.

The Court therefore denies Gen-Probe's motion in its entirety.

IV. MOTIONS TO DISMISS

A. Standard for Rule 12(b)(6) Dismissal

[4] A motion under Rule 12(b)(6) tests whether the allegations of the complaint satisfy the requirement of Rule 8(a), which calls for a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The Rules do not require an elaborate recitation of every fact a plaintiff may ultimately rely upon at trial, but only a statement sufficient to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102-03, 2 L.Ed.2d 80 (1957). The complaint should be liberally construed in favor of the plaintiff, *953 and its factual allegations taken as true. *Oscar v. Univ. Students Co-Operative Ass'n,* 965 F.2d 783, 785 (9th Cir.), *cert. denied,* 506 U.S. 1020, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                                                    Page 8
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

[5] Generally, matters outside the pleadings should not be considered. Fed.R.Civ.P. 12(b). However, documents referred to in the complaint and forming a basis for the plaintiff's claims may be considered. *Venture Associates v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir.1993).

B. Regents' Motion to Dismiss

   1. Eleventh Amendment Immunity

[6] The Regents of the University of California claim immunity from suit under the Eleventh Amendment, which has been construed to bar federal courts from hearing any claim against a state or an "arm of the state." *State Highway Comm'n v. Utah Const. Co.*, 278 U.S. 194, 199, 49 S.Ct. 104, 105-06, 73 L.Ed. 262 (1929). Whether a state entity is an arm of the state is determined by the application of a five factor test: "(1) whether a money judgment would be satisfied out of state funds, (2) whether the entity performs central governmental functions, (3) whether the entity may sue or be sued, (4) whether the entity has power to take property in its own name or only the name of the state, and (5) the corporate status of the entity." *Doe v. Lawrence Livermore Nat. Lab.*, 65 F.3d 771, 774 (9th Cir.1995) (citation omitted).

The first factor is the most significant. *Doe*, 65 F.3d at 774. In *Doe*, the Ninth Circuit carved a new "indemnification" exception to Eleventh Amendment immunity by holding that although the balance of the factors weighs in favor of immunity when the state treasury must pay judgment on the claim, the balance weighs against immunity when another entity must pay judgment on the claim because of an indemnification agreement. *Id.* at 774-76.[FN4] The *Doe* exception requires a contract obligating another party to pay the precise claim at issue. Section 2.7d of the Regents' "Exclusive License Agreement" with ATC provides ATC the option of financing the Regents' litigation "to secure legal title" to the '611 and '330 patents in return for exclusivity on the license option to those patents set forth in section 2.7a. Section 18.1 provides that ATC will indemnify the Regents for "any and all claims ... resulting from or arising out of exercise of this license or any sublicense."

> FN4. After *Doe*, while it remains true that a state may not *create* immunity by extending indemnification to otherwise unprotected officials or entities, in the Ninth Circuit it may *destroy* immunity by accepting indemnification from sources outside the state treasury.

The Regents, in their supplemental brief on the impact of the license agreement, assert that section 2.7d does not obligate ATC to pay the costs of Gen-Probe's claims against the Regents. ATC can pay the Regents' costs in the Regents v. Kohne lawsuit in return for exclusivity on a license option, but ATC is not obligated to indemnify the Regents for claims arising out of that lawsuit. Gen-Probe's contrary interpretation of this provision cannot control over the interpretation put forth by the party to the contract that would have the right to enforce the provision.[FN5]

> FN5. The doctrine of judicial estoppel would preclude the Regents from taking a contrary position in any future judicial proceedings relating to this contract. The doctrine of judicial estoppel bars a party from taking inconsistent positions in successive judicial proceedings when a prior court adopted the now inconsistent position (majority view), or when the position was asserted in order to gain tactical advantage (minority view). *See Morris v. State of Cal.*, 966 F.2d 448, 452 (9th Cir.1992) (declining to decide whether majority or minority view should be adopted in the Ninth Circuit), *cert. denied*, 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992).

[7] Section 18.1, however, may apply to Gen-Probe's inducement of infringement claims. Section 18.1 obligates the Regents to indemnify Amoco for "any and all claims ... resulting from or arising out of exercise of this license or any sublicense." The license granted in the agreement is to "any subject matter claimed in or covered by ... [pending U.S. patent applications, serial nos. 191,852 and 707,725] by Eric Stanbridge and Ulf Gobel and assigned to The Regents." License Agreement, § 1.1; *see also id.* at § 2.1. Gen-Probe alleges that the Stanbridge/Gobel *954 applications infringe the '330 patent. Opp. at 5. Because ATC would be obligated to pay the Regents' liabilities arising out of its licensing the Stanbridge/Gobel applications, the Regents does not have Eleventh Amendment immunity as to the two

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                               Page 9
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

inducement of patent infringement claims.[FN6]

> FN6. The Regents submit the Supreme Court's recent decision in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252, 96 Daily Journal D.A.R. 3499 (March 27, 1996) as relevant to the Court's analysis of the Eleventh Amendment issues in this case.
>
> *Seminole Tribe* held that the Indian Commerce Clause does not give the power to abrogate a State's sovereign immunity. *Id.* at ----, 116 S.Ct. at 1118-19. Chief Justice Rehnquist's majority opinion stated generally that exclusive federal control over a subject area does not imply the power to abrogate state sovereign immunity in that area, *id.* at ----, 116 S.Ct. at 1129-32, and that only § 5 of the Fourteenth Amendment carries with it the power to abrogate. *Id.* at ----, 116 S.Ct. at 1114-32 (citing with approval *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (§ 5 of the Fourteenth Amendment permits abrogation); overruling *Pennsylvania v. Union Gas co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989) (Interstate Commerce Clause permits abrogation)).
>
> If the issue were whether the patent code abrogates the state's immunity, then *Seminole Tribe* would apply, and would probably compel the conclusion that the patent code cannot abrogate a state's Eleventh Amendment immunity. In applying *Doe,* however, the court is attempting to discern which entities are states in the first place. *Seminole Tribe* does not affect the *Doe* exception.

[8] However, the Regents is immune from all other claims. Gen-Probe argues that because the Regents sued it in federal court in Regents v. Kohne, it should be deemed to have waived immunity in this case, citing *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931 (Fed.Cir.1993), *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994). *Genentech* was an application of the rule that filing suit in federal court constitutes consent to a full adjudication of that

controversy. *Id.* at 947. Gen-Probe's state law claims do not arise from the transactions underlying the Regents' claim for co-inventorship in Regents v. Kohne,[FN7] and therefore do not constitute the same controversy.

> FN7. *See supra* at 951-952 (rejecting applicability of unclean hands to Regents v. Kohne because of unrelatedness of these claims to the transactions underlying the claims in Regents v. Kohne).

Accordingly, only the inducement of infringement claims are not barred by Eleventh Amendment immunity, and only as against the Regents of the University of California, not Dr. Stanbridge.[FN8]

> FN8. Dr. Stanbridge claimed Eleventh Amendment immunity as a state official acting in his official capacity. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). Gen-Probe's opposition addressed only the University's claim to Eleventh Amendment immunity, and not the separate issue of Dr. Stanbridge's immunity. Pursuant to Local Rule 7.1(f)(3), failure to oppose a motion may be construed as consent to the granting of the relief requested. Dr. Stanbridge is therefore dismissed from this lawsuit with prejudice.

### 2. Motion to Dismiss under Rule 12(b)(6)

[9] The Regents also argue that the complaint fails to adequately allege inducement. However, as noted above, the license agreement between ATC and the Regents grants ATC the right to immediately begin producing products covered by the Stanbridge/Gobel patent application. Gen-Probe has alleged that this application infringes the '330 patent. These facts, if proven, could establish inducement. The inducement counts therefore may not be dismissed.

### C. CNS' Motion to Dismiss

#### 1. Motion to Dismiss Federal Claims Under Rule 12(b)(6)

[10] The federal claims against CNS are for

926 F.Supp. 948                                                                                    Page 10
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

inducement of acts of infringement by Amoco of the '330 and '611 patents. Inducement requires that the defendant "knew or should have known that his actions would induce actual infringements." *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553 (Fed.Cir.1990). No reasonable juror could infer an intent to cause present acts of infringement from a licensing agreement effective at a future date and conditioned upon success of the putative licensor's attempt to establish an ownership interest.[FN9] **\*955** The additional facts enumerated by Gen-Probe at pages 18-19 of its opposition would not alter this analysis, as they have little or no probative value on the issue of CNS' intent to cause present acts of infringement. Because the allegations in the complaint, even if proven, would not support a claim for inducement of infringement, the federal claims against CNS are dismissed for failure to state a claim.

> FN9. Because Gen-Probe's complaint references the license agreements between ATC, the Regents, and CNS, First Amended Complaint at ¶ 55, the Court may consider them despite the general rule against using matters outside the pleadings on a motion to dismiss under Rule 12(b)(6). *Venture Associates,* 987 F.2d at 431.

### 2. State Claims

Gen-Probe's state law claims against CNS are for unfair competition, conspiracy to commit unfair competition, and violation of the Cartwright Act. CNS argues that Gen-Probe's state law claims are barred by the *Noerr-Pennington* doctrine. Gen-Probe responds that the doctrine does not apply to state law claims, and that even if it did, it would not bar these claims.

#### a. Basis and Scope of the *Noerr* Immunity

The basic contours of the *Noerr-Pennington* doctrine were defined in three antitrust cases. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). *Noerr* held that the Sherman Act did not reach concerted efforts to influence the political branches of government. *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533. *Pennington* extended *Noerr* to efforts to influence administrative agencies. *Pennington,* 381 U.S. at 670-71, 85 S.Ct. at 1593-94. *California Motor Transport* extended *Noerr* to efforts to influence adjudicatory bodies. *California Motor Transport,* 404 U.S. at 513-14, 92 S.Ct. at 613-14.

These early cases gave contradictory indications as to the basis of the immunity. *Noerr* itself purported to be an exercise in statutory construction: the Court reasoned that Congress could not have intended the Sherman Act to apply where it might burden First Amendment rights. *See Noerr,* 365 U.S. at 138-39, 81 S.Ct. at 530-31. *California Motor Transport,* however, explicitly relies upon the First Amendment right to petition in extending *Noerr* immunity to efforts to influence adjudicatory bodies. 404 U.S. at 510-11, 92 S.Ct. at 611-12; *see also Bill Johnson's Restaurants, Inc. v. National Labor Relations Board,* 461 U.S. 731, 741, 103 S.Ct. 2161, 2168-69, 76 L.Ed.2d 277 (1983) (characterizing *California Motor Transport* as having "recognized that the right of access to the courts is an aspect of the First Amendment right to petition").

Although the Ninth Circuit has never directly addressed this issue, its decisions in cases involving *Noerr* imply that the immunity should be seen as rooted in the First Amendment. In *Franchise Realty Interstate Corporation v. San Francisco Local Joint Executive Board of Culinary Workers,* the Ninth Circuit set up a heightened pleading standard for claims based upon petitioning activity because of the risk that frivolous claims could have a chilling effect on the exercise of First Amendment rights. 542 F.2d 1076, 1082-83 (9th Cir.1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). The *Franchise Realty* court explicitly stated its belief in the constitutionality of the *Noerr* immunity, and patterned its method after efforts by the Supreme Court to protect First Amendment rights in other contexts. *Id.* at 1082.

The majority of courts who have considered the issue have concluded that the immunity is constitutional and rooted in the First Amendment right to petition. *See, e.g., Computer Associates Int'l, Inc. v. American Fundware, Inc.,* 831 F.Supp. 1516, 1522-23 (D.Colo.1993);[FN10] **\*956** *Sierra Club v. Butz,* 349 F.Supp. 934, 938-939 (N.D.Cal.1972); *Pacific Gas &*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Elec. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1130-37, 270 Cal.Rptr. 1, 791 P.2d 587 (1990) [*PG & E*].

FN10. *Computer Associates* also relies upon a statement in the Supreme Court's most recent decision on the *Noerr-Pennington* doctrine. In articulating a two-prong test for the doctrine's "sham" exception, the Supreme Court stated: "Whether applying *Noerr* as an antitrust doctrine *or invoking it in other contexts,* we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 58, 59, 113 S.Ct. 1920, 1927, 123 L.Ed.2d 611 (1993) (emphasis added) (citations omitted). The *Computer Associates* court found this statement, and the cases cited in support, persuasive evidence of "the [Supreme] Court's view that *Noerr-Pennington* is not limited to the antitrust arena." *Computer Associates,* 831 F.Supp. at 1522.

[11] This Court agrees, and therefore holds that *Noerr* immunity bars any claim, federal or state, common law or statutory, that has as its gravamen constitutionally-protected petitioning activity.

*Noerr* immunity therefore applies. What conduct does it protect?

Just as with the question of the basis of the immunity, the Supreme Court's seminal decisions provide contradictory indications as to the scope of the immunity. The conduct immunized in *Noerr* was a publicity campaign by certain railroads directed at securing adverse legislative results for the trucking industry. Relying upon both the people's rights to "freely inform the government of their wishes," *id.* at 138, 81 S.Ct. at 530, and upon the "right to petition," *id.* at 139, 81 S.Ct. at 530-31, the Court held that the publicity campaign could not form the basis for a Sherman Act violation, even if the campaign was deceptive. *Id.* at 145, 81 S.Ct. at 533. *California Motor Transport,* however, suggests in dictum that deceptions in the adjudicatory context would not be protected under the immunity. 404 U.S. at 513, 92 S.Ct. at 613.

The Ninth Circuit has reconciled the contradictions in these two cases by accepting them both, holding that *Noerr* immunizes a wider range of conduct in the political arena than before an adjudicatory body. *See Boone v. Redev't Agency of City of San Jose,* 841 F.2d 886, 895-96 (9th Cir.1988); *Hahn v. Codding,* 615 F.2d 830, 842 (9th Cir.1980). As to federal antitrust claims, this resolution settles the issue.

[12] However, as to other federal claims, and in applying the immunity to state law claims, courts may not go beyond the constitutional basis for the immunity. If the immunity as developed with regard to federal antitrust claims goes beyond the constitutional basis for the immunity, its application to state law claims must be in a more limited form. *Cf. Whelan v. Abell,* 48 F.3d 1247, 1253-54 (D.C.Cir.1994) (suggesting that *Noerr* as developed with regard to federal antitrust claims may not be perfectly co-extensive with First Amendment right to petition); Daniel R. Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the* Noerr-Pennington *Doctrine,* 45 U.Chi.L.Rev. 80, 102-07 (1977) (suggesting modifications to better align *Noerr* with the underlying right to petition).

But even as to state law claims, the Court is not writing upon a clean slate. The California Supreme Court has applied *Noerr* to state law claims. *See Blank v. Kirwan,* 39 Cal.3d 311, 320-321, 216 Cal.Rptr. 718, 703 P.2d 58 (1985) (applying immunity to Cartwright Act claim based upon "the First Amendment right to petition the government."); *PG & E,* 50 Cal.3d at 1130-37, 270 Cal.Rptr. 1, 791 P.2d 587.[FN11] If the California version of the immunity is broader than the version required under federal constitutional law, that broader version would apply to the state law claims in this case.

FN11. California courts have read *PG & E* as welcoming the application of *Noerr-Pennington* immunity to all torts, except malicious prosecution, where the gravamen of the complaint is the defendant's petitioning of courts or other governmental entities to take action. *See Hewlett-Packard Co. v. Repeat-O-Type Stencil Manufacturing Corp.,* 1995 WL 552168, at *5 (N.D.Cal.1995) (unfair competition);

*Ludwig v. Superior Court,* 37 Cal.App.4th 8, 21 n. 17, 43 Cal.Rptr.2d 350 (4th Dist.1995) (unfair competition); *see also Blank,* 39 Cal.3d at 320-21, 216 Cal.Rptr. 718, 703 P.2d 58 (Cartwright Act). The Court concludes that a California court faced with the same issue would find the immunity applicable to Gen-Probe's unfair competition, conspiracy to commit unfair competition, and Cartwright Act claims.

With these considerations in mind, the Court now turns to the specific exceptions and/or limitations to the immunity that Gen-Probe argues saves its claims against CNS.

### b. Knowingly False Statements

Gen-Probe argues that *Noerr* does not immunize knowingly false statements, and **\*957** therefore does not protect the conduct alleged in its complaint.

[13] *PRE* reserved the question of "whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." *PRE,* 508 U.S. at 61, 113 S.Ct. at 1929 n. 6. Ninth Circuit cases since *PRE* have permitted claims to go forward where "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy". *Liberty Lake Investments, Inc. v. Magnuson,* 12 F.3d 155, 159 (9th Cir.1993) (dictum); *Hydranautics v. Filmtec Corp.,* 70 F.3d 533, 537-38 (9th Cir.1995) (intentional fraud in procurement of patent would deprive district court judgment of infringement in favor of patent holder of legitimacy, thereby eliminating its value as evidence of patent holder's probable cause to bring that infringement action). However, the plaintiff's complaint alleges only that the lawsuits and applications to administrative agencies were baseless or false. It fails to allege that they contain knowingly false statements, and fails to provide specific allegations that would when proven establish the knowing falsity of the statements. *Boone,* 841 F.2d at 886 ("Conclusory allegations are insufficient to strip [activities] of their *Noerr-Pennington* protection.").

[14] Moreover, under California law only the tort of malicious prosecution may be maintained for any communication made by an interested party in the initiation or course of a judicial or quasi-judicial proceeding. Cal.Civ.Code § 47(2); *Silberg v. Anderson,* 50 Cal.3d 205, 215-216, 266 Cal.Rptr. 638, 786 P.2d 365 (1990).[FN12]

> FN12. Only the tort of malicious prosecution, with its requirement that the complained-of lawsuit be terminated in the party's favor, safeguards against the possibility of inconsistent findings in cases where the "baselessness" or "fraud" complained-of are the factual contentions that have a possibility of prevailing in another forum.

CNS' actions might be argued to constitute a course of conduct outside California's litigation-communication privilege. On that possibility, the Court now turns to the significance of the allegation that the CNS and Regents lawsuits were baseless.

### c. Sham Exception

*Noerr* recognized a possible exception to immunity where the petitioning activity was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor ..."*Noerr,* 365 U.S. at 144, 81 S.Ct. at 533. *California Motor Transport* applied the "sham" exception to hold that "a pattern of baseless, repetitive claims" would fit within the exception as an attempt to "interfere directly with the business relationships of a competitor" by barring "meaningful access to the agencies and courts." *Id.* at 513, 92 S.Ct. at 613; *see also id.* at 518, 92 S.Ct. at 615 (Stewart, J., concurring).

The Supreme Court revisited the sham exception in *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56-57, 113 S.Ct. 1920, 1926, 123 L.Ed.2d 611 (1993) [*PRE* ]. *PRE* set forth a two-part definition of sham litigation, containing an objective and a subjective component. To be a sham, a lawsuit must be both "objectively baseless in the sense that no reasonable litigant could reasonably expect success on the merits," and subjectively aimed at interfering with the business relationships of a competitor. *Id.* 508 U.S. at 59-61, 113 S.Ct. at 1928. Objective baselessness was equated with the common-law standard of probable cause, which "requires no more than a reasonable

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                                          Page 13
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

belief that there is a chance that a claim may be held valid upon adjudication." *Id.* 508 U.S. at 61-63, 113 S.Ct. at 1929 (internal quotation marks and citations omitted). Because the objective prong of the test must be satisfied before the court can consider evidence of the subjective prong, a finding that the lawsuit is not objectively baseless precludes liability regardless of improper motive. *Id.*

California law goes even further. Under *PG & E,* the only cause of action that can be asserted against a party for initiating litigation is a claim for malicious prosecution. *PG & E,* 50 Cal.3d at 1137, 270 Cal.Rptr. 1, 791 P.2d 587 (only malicious prosecution adequately**958** balances right of free access to the courts against the interest in being free from the cost of defending litigation). A claim for malicious prosecution requires the plaintiff to allege both: (1) "that the litigation was brought without probable cause," and (2) "that the litigation concluded in plaintiff's favor." *Id.* (remanding with instructions to affirm trial court's dismissal without leave to amend).

[15] Measured against the *PG & E* standard, Gen-Probe's claims of "sham" must fail. Both the CNS and Regents lawsuits have survived motions for summary judgment.[FN13]  A denial of summary judgment means that the nonmoving party has produced enough evidence that a rational jury could find in its favor. A party with sufficient evidence to support a jury finding in its favor has probable cause to bring a lawsuit. *See Harris Custom Builders, Inc. v. Hoffmeyer,* 834 F.Supp. 256, 261-262 (N.D.Ill.1993) ("An action that is well enough grounded, factually and legally, to survive a motion for summary judgment is sufficiently meritorious to lead a reasonable litigant to conclude that they had some chance of success on the merits."). Further, Gen-Probe has not and cannot plead that the prior litigation terminated in its favor.

> FN13. Gen-Probe contends that it would be improper for the Court to consider facts outside the pleadings in ruling on CNS' motion to dismiss. The Court disagrees. The Court may take judicial notice of the decisions in the underlying state (CNS) and federal (Regents) lawsuits pursuant to Federal Rule of Evidence 201(e) because their existence is a fact "capable of accurate

and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b); *See Transphase Systems, Inc. v. Southern Cal. Edison Co.,* 839 F.Supp. 711, 715 n. 5 (C.D.Cal.1993) (citing *Nugget Hydroelectric v. Pacific Gas and Electric,* 981 F.2d 429 (9th Cir.1992)); Charles Alan Wright et al., *Federal Practice & Procedure § 1357* (1995) (court may take into account matters of public record, orders, and items appearing in the record of the case).

Gen-Probe, however, argues for the application of a different rule because its state law claims involve multiple proceedings. In *USS-POSCO Industries v. Contra Costa County Building & Construction,* 31 F.3d 800 (9th Cir.1994) [*USS-POSCO* ], the Ninth Circuit held that the *PRE* two-step inquiry does not apply in quite the same way to the situation identified in *California Motor Transport,*"where the defendant is accused of bringing a whole series of legal proceedings.... without regard for the merits and for the purpose of injuring a market rival." 31 F.3d at 810-11.[FN14]  *California Motor Transport* sham claims, however, have two defining characteristics that Gen-Probe's claims fail to demonstrate.

> FN14. In entertaining this argument, the Court does not decide whether instituting two proceedings attacking the exclusivity of Gen-Probe's interests in the patents falls within the *PRE* or *California Motor Transport* rule because, as discussed below, under either rule the lawsuits do not constitute "sham" litigation. *Compare Ludwig v. Superior Court,* 37 Cal.App.4th 8, 29 n. 33, 43 Cal.Rptr.2d 350 (1995) (finding the *USS-POSCO* rule inapplicable where the plaintiff alleged only four acts, two of which could not have been said to be meritless).

[16] The hallmark of a *California Motor Transport* sham claim is a pattern of baseless proceedings aimed at securing, through the very process of litigation, a benefit other than the prayed-for relief. *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 380, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991) ("The 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*-as opposed to the *outcome* of

926 F.Supp. 948                                                                                                                Page 14
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

that process-as an anticompetitive weapon."). *California Motor Transport* itself dealt with multiple state and federal proceedings designed to "resist and defeat applications [by the plaintiffs] to acquire operating rights or to transfer or register those rights." 404 U.S. at 509, 92 S.Ct. at 611. Similarly, in *Hahn v. Codding* the Ninth Circuit found the exception applicable to a pattern of thirteen lawsuits when the very pendency of the lawsuits prevented the plaintiff from acquiring financing through the issuance of bonds. Hahn, 615 F.2d at 840-41. Gen-Probe alleges that CNS and Regents' claims are baseless and inconsistent, but there is nothing in the complaint that provides any reason to believe that Amoco, CNS, or Regents desire anything other than the relief sought in the lawsuits themselves: the transfer of some or all rights to the *959 patents in suit. While an allegation that suit was brought in order to inflict harm upon a market rival might provide an adequate basis for asserting an antitrust or unfair competition claim,[FN15] simply alleging that a lawsuit is brought for the purpose of inducing settlement negotiations is insufficient: this could be said of any lawsuit.

> FN15. Of course, such allegations would have to be sufficiently specific to meet the Ninth Circuit's heightened pleading standard.

The second defining characteristic of a *California Motor Transport* claim is the baselessness of the pattern of litigation. *California Motor Transport* itself dealt with "a pattern of *baseless,* repetitive claims ..."404 U.S. at 513, 92 S.Ct. at 613 (emphasis added); *see also* Hahn, 615 F.2d at 841 and 841 n. 13. *USS-POSCO* does not deviate from the requirement that the pattern of claims must be baseless as a whole; quite to the contrary, Judge Kozinski actually held that *Noerr* immunity barred an antitrust claim where the defendants had won fifteen of their twenty-nine lawsuits. USS-POSCO, 31 F.3d at 811. *See also* PRE, 508 U.S. at 58-59, 113 S.Ct. at 1927 ("Nothing in *California Motor Transport* retreated from these principles. Indeed, we recognized that recourse to agencies and to courts should not be condemned as a sham until a reviewing court has 'discern[ed] and draw[n]' the 'difficult line' separating objectively reasonable claims from 'a pattern of baseless, repetitive claims ... which leads the factfinder to conclude that the administrative and

judicial processes have been abused.' ") (quoting *California Motor Transport,* 404 U.S. at 513, 92 S.Ct. at 613).

Thus under either the *PRE* or the *USS-POSCO* test, Gen-Probe's claims against CNS must demonstrate objective baselessness. However, as noted before, both the CNS and Regents lawsuits have survived motions for summary judgment. Consequently, considering either the CNS suit alone, or the "pattern" of the CNS and Regents lawsuits,[FN16] the Court finds lacking the necessary component of objective baselessness.[FN17]

> FN16. The allegations that CNS published or sought action based upon the same allegations in communications with the U.S. Attorneys' office, the Department of Health and Human Services ("DHHS"), and the National Institute of Health ("NIH"), would not alter the analysis, for the same reason.
>
> The Court finds the papers filed by the parties insufficient to determine the import of Judge Huff's ruling dismissing CNS' counterclaim in a now-terminated federal case. The Court cannot use this ruling as a basis for questioning the state court's refusal to grant Gen-Probe's motions to dismiss the pending CNS case. At most, the ruling might be a proceeding terminated in Gen-Probe's favor, possibly providing a basis for a malicious prosecution claim if Gen-Probe can establish that the claims were brought without probable cause. That would at most constitute a third proceeding, still not bringing Gen-Probe's claim any closer to a viable claim of a pattern of baseless litigation.

> FN17. The above analysis also indicates the Court's disagreement with Gen-Probe that any of the allegations in its complaint-for example, the allegation that the litigation was brought in order to secure a better bargaining position-state a claim for unfair competition apart from protected litigation activity.

d. Conspiracy Claims

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                 Page 15
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

[17] The conspiracy to unfairly compete and Cartwright Act claims both require an agreement to commit an unlawful act. *See Wyatt v. Union Mortgage Co., 24 Cal.3d 773, 784-86, 157 Cal.Rptr. 392, 598 P.2d 45 (1979)* (civil conspiracy requires common plan to commit unlawful act); *Cal.Bus. & Prof.Code §§ 16700-16804* (banning agreements to restrain trade). CNS is charged with having conspired with Amoco to commit the acts analyzed above, and regarding Amoco's funding of the CNS and Regents litigation.

Although neither California's litigation privilege nor federal precedent on *Noerr* address this issue, the California Supreme Court has directly sanctioned third-party funding of litigation. In *PG & E*, the Court favorably reviewed cases that had applied *Noerr* to protect litigants from state tort counterclaims, and concluded that the same considerations should protect persons who induce or finance others' litigation. *PG & E, 50 Cal.3d at 1130-37, 270 Cal.Rptr. 1, 791 P.2d 587.* Given that the acts alleged to have been agreed to by CNS are protected under *Noerr* immunity as extended by the California Supreme Court, the conspiracy claims must fail.

**\*960 D. Amoco's Motion to Dismiss**

1. Motion to Dismiss Federal Claims under *Rule 12(b)(6)*

Amoco's first basis for its motion to dismiss is that "there is no evidence or even allegation that the relationship between parent and subsidiary is a 'sham' " justifying the setting aside of corporate formalities to allow plaintiff to recover against the parent. It supports this assertion with multiple declarations stating that corporate formalities were observed. The Court declines to take notice of these declarations on a motion to dismiss. *See Fed.R.Civ.P. 12(b)* (court should limit itself to pleadings). The Court further notes that the complaint adequately charges AC and ATC with alter ego liability at paragraph 60. This portion of the motion to dismiss therefore must be rejected.

[18][19][20] Amoco also moves to dismiss the patent infringement claims against them on the basis that the complaint fails to allege any acts constituting infringement on the part of these defendants. The

First Amended Complaint clearly does name each of these actors as having actually, contributorily, and by inducement of others, infringed the patents in suit. *See* First Amended Complaint at ¶ 58, 65. The Complaint does so, however, in a confusingly conclusory manner, accusing each of five defendants of three very different causes of action [FN18] on two different patents, all in one conclusory sentence, without adequately specifying the grounds for plaintiff's belief that any of these entities have infringed.[FN19]

FN18. To prove actual infringement under *35 U.S.C. § 271(a)*, the plaintiff must show that the defendant made, used, or sold a product or process encompassed by at least one valid claim of a patent (literal infringement); or that the accused product or process performs substantially the same function in substantially the same way to achieve substantially the same result as at least one claim of the patent, provided that the accused product or process incorporates every element or a substantial equivalent of every element of the claim (infringement under the doctrine of equivalents). *See 35 U.S.C. § 271(a); Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 952 (Fed.Cir.1987)* (en banc) (Nies, J., additional views), *cert. denied, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).*

To prove contributory inducement of infringement under *35 U.S.C. § 271(c)*, the plaintiff must show that the defendant sold a material component of a patented invention, knowing that the component was especially adapted for use in the invention and that it was not a staple article of commerce suitable for substantial noninfringing use. *Preemption Devices v. Minnesota Min. & Mfg. Co., 803 F.2d 1170, 1174 (Fed.Cir.1986).*

To prove active inducement of infringement under *35 U.S.C. § 271(b)*, the plaintiff must show both (1) an act by the defendant actually calculated to induce another to infringe, and (2) the culmination of the defendant's acts in a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                                          Page 16
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

direct infringement by another. *H.B. Fuller Co. v. Nat'l Starch & Chemical Corp.,* 689 F.Supp. 923, 943 (D.Minn.1988); *Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469 (Fed.Cir.1990) (plaintiff must show "actual intent to cause the acts which constitute the infringement").

FN19. "Upon information and belief, [each of the defendants] with actual knowledge of the '330 Patent, are willfully and deliberately infringing the '330 Patent or contributing to or inducing said infringement in the United States, and within this district, by making, using, selling and/or offering for sale products and/or kits without the authority of Gen-Probe and in violation of 35 U.S.C. § 271, and will continue to do so unless enjoined by the Court." First Amended Complaint at ¶ 58. Paragraph 65 similarly accuses all five defendants of the same counts with respect to the '611 patent.

[21] The Federal Rules do not require that the plaintiff plead with particularity the specific patent claims that have been infringed, but the Rules do require that the defendant be given "fair notice of [1] what the plaintiff's claim is and [2] the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. at 102-03. The plaintiff's shotgun approach is clearly deficient to serve either of these purposes.

[22] The complaint fails to provide fair notice of what the plaintiff's claims are. Each of the five defendants is accused of each of the three different types of infringement: What is labeled as "Count 1" of the complaint actually consists of Counts 1 through 3. It is unclear which of the five is accused of which type of infringement. Within each of the patent "counts," Paragraphs 58 and 65 accuse all defendants of all types of infringement. Paragraphs 59 and 66, after accusing all defendants of making infringing "reagents or kits," specify that certain *Gene-Trak* products are believed to infringe the patents in suit. Paragraphs *961 60 and 67 allege that Amoco and ATC exercised sufficient control over subsidiaries Gene-Trak and Vysis that Amoco and ATC should be liable for the infringing acts of these subsidiaries. It is unclear whether the subsequent paragraphs should be read as limiting the claims

made in paragraphs 58 and 65, or whether they simply provide supporting allegations for certain of these claims without eliminating the claims not supported by those allegations.[FN20] Even were there no other deficiencies, this confusion of which claims apply to which defendants would require that the complaint be dismissed with leave to file an amended complaint. *See Gauvin v. Trombatore,* 682 F.Supp. 1067, 1071 (N.D.Cal.1988) (lumping together of multiple defendants in one broad allegation fails to satisfy notice requirement of Rule 8(a)(2)); *Van Dyke Ford, Inc. v. Ford Motor Co.,* 399 F.Supp. 277, 284 (E.D.Wis.1975) ("Specific identification of the parties to the activities alleged by the plaintiffs is required in this action to enable the defendant to plead intelligently.").

FN20. This confusion is reflected in the parties' submissions on this motion to dismiss. Defendants' motion to dismiss does not even mention contributory and inducement infringement. The text of plaintiff's opposition papers describes their theory against Amoco and ATC as "direct infringement," but the caption of that section describes their theory as either contributory or inducement infringement. The supporting allegations pointed out in this section of the plaintiff's papers-financing of others' infringing activity, obtaining certain licensing agreements, etc.-would support only an inducement theory, not direct *or* contributory infringement.

The complaint also fails to provide fair notice of the grounds of the various claims. Rule 8(a)(2) eliminates the needless distinctions and technicalities of code pleading, but still "envisages the statement of circumstances, occurrences, and events in support of the claim ..." Advisory Committee's 1955 Report, *reprinted in* 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1201 at 67 n. 11 (1990). The *Conley* standard, that a complaint should "not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," 355 U.S. at 45-46, 78 S.Ct. at 101-02, "has never been taken literally." *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, 654 (7th Cir.1984) (Posner, J.). A motion to dismiss under Rule 12(b)(6) requires the Court to decide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                                              Page 17
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

whether the facts outlined or reasonably foreshadowed in the complaint could entitle the plaintiff to relief. A conclusory assertion of entitlement to relief is insufficient because it provides the Court no information with which to determine whether the plaintiff's grievance arises under a legal theory for which the law affords a remedy. Even under liberal notice pleading, the plaintiff must provide facts that "outline or adumbrate" a viable claim for relief, not mere boilerplate sketching out the elements of a cause of action. *Sutliff*, 727 F.2d at 654; *Roth v. United States*, 952 F.2d 611, 613 (1st Cir.1991) ("In performing the requisite tamisage and assessing sufficiency, a court must accept as true the complaint's well-plead factual averments, excluding, however, bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation.") (internal citation and quotation marks omitted); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216 at 156-59 (1990) (complaint must contain "either direct allegations on every material point necessary to sustain a recovery on any legal theory ... or allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial").

The requirements of Rule 11 further buttress this conclusion. Rule 11 requires the signatory to a complaint to certify that "the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). This certification requirement imposes "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing ..."*Business Guides, Inc. v. Chromatic Communications Enter.*, 498 U.S. 533, 551, 111 S.Ct. 922, 933, 112 L.Ed.2d 1140 (1991) (upholding sanctions against party for filing complaint of copyright infringement later disclosed to have no factual basis). The answering defendant **\*962** faces a parallel requirement to certify that "the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief." Fed.R.Civ.P. 11(b)(4). Rule 11's requirement of certification of the well-foundedness of the factual contentions of the complaint would be meaningless unless Rule 8(a)(2) required some minimum allegations of fact to support the claim. Similarly, the requirement that the defendant investigate and certify

its denials of the plaintiff's factual contentions would be meaningless if the plaintiff were not required to make any factual contentions in its complaint. In short, the purpose and design of Rule 11 compel the conclusion that Rule 8(a)(2) requires more than empty boilerplate. *See Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir.1986) (the two major problems the rule aims to resolve are "frivolous filings" and "misusing judicial procedures as a weapon for personal or economic harassment"); Advisory Committee Note to 1983 Amendment, 97 F.R.D. 198-99 (1983) (rule imposes duty to conduct "prefiling inquiry into both the facts and the law"; district courts encouraged to pay "[g]reater attention ... to pleading and motion abuses ... to streamline the litigation process by lessening frivolous claims or defenses").

As a complaint for direct or contributory infringement, the complaint is deficient as to all but Gene-Trak: it charges Gene-Trak with production of infringing products (¶ 59, 66), but is devoid of any reference to infringing products (or contributorily infringing components) produced by the other defendants. AC and ATC are adequately charged with alter ego liability (¶ 60); ATC is adequately charged with inducement infringement.[FN21] Vysis is adequately charged with successor liability for Gene-Trak's infringement (¶ 6). Beyond this, the complaint fails to state a recognizable claim for relief.

> FN21. The Regents-ATC License Agreement could provide a basis for the inducement claim as to ATC. AC, however, was never a party to those agreements.

If the plaintiff desires to replead some or all of its claims, the plaintiff's amended complaint should be revised as follows to conform with the requirements of notice pleading:

1. Each count of the complaint should be limited to one cause of action. Direct infringement, contributory infringement, and inducement of infringement are three different causes of action.

2. Defendants may be accused of a violation only by supporting allegations that specifically refer to that defendant. Each supporting allegation should be stated in a numbered paragraph limited to one transaction or occurrence. Fed.R.Civ.P. 10(b) ("All

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                                          Page 18
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

averments of a claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited in so far as practicable to a statement of a single set of circumstances ...").

3. The supporting allegations must provide the basis for the claims, keeping in mind Rule 11's requirement of an inquiry reasonable under the circumstances. Filing a patent infringement action pointing vaguely to "products and/or kits" (¶ 58 and 65) does not provide adequate notice as required by the Rules, and does not reflect the reasonable inquiry required by the Rules.

4. Supporting allegations should be plead or incorporated by reference within each count. The present complaint first rambles through 40 allegations that it labels "common to all causes of action," and then in each enumerated count realleges every allegation without differentiation between defendants and claims. This will not be adequate in the amended complaint. Each count should distinguish and identify which allegations relate to which claims, and which defendants. See Fed.R.Civ.P. 10(b) ("Each claim founded upon a separate transaction or occurrence ... shall be stated in a separate count ... whenever a separation facilitates the clear presentation of the matters set forth.").

### 2. State Claims

The state law claims against Amoco are for unfair competition, conspiracy to commit unfair competition, and violation of the Cartwright Act. Amoco argues that Gen-Probe's claims are barred by *Noerr* immunity. Having already rejected Gen-Probe's argument *963 that *Noerr* does not apply to state law claims, the Court turns directly to whether they fall within the scope of that immunity.

[23] Gen-Probe contends that Amoco engaged in a long-term plan to wrongfully obtain an interest in the '330 and '611 patents. The complaint alleges that in pursuit of this plan, Amoco executed agreements with CNS and Regents agreeing to indemnify and fund their lawsuits against Gen-Probe in exchange for licenses to any rights obtained if the lawsuits proved successful; it conspired with CNS to misrepresent facts to the NIH; it duplicitously obtained confidential information which it used to set up companies that infringe on Gen-Probe's patents; and

it published to third parties that Gen-Probe does not have title to the patents, offering licenses to the technology.

The discussion of *Noerr* with regard to CNS indicates that the allegations as to funding litigation and contacting the NIH concern activity protected by *Noerr* and by Civil Code section 47(2). The allegation that Amoco published its belief that it would obtain an interest in Gen-Probe's patents and marketed an interest in this contingency is likewise precluded by *PG & E* 's expansion of *Noerr* to include ancillary activity. *See PG & E, 50 Cal.3d at 1124, 270 Cal.Rptr. 1, 791 P.2d 587* (defendant had "conducted a marketing campaign to solicit buyers" for the contingent interest).

[24] The allegation that Amoco duplicitously obtained confidential information that it later refused to return and instead used to infringe Gen-Probe's patents, however, may state a viable claim for unfair competition.

However, the conspiracy claims-conspiracy to commit unfair competition, and Cartwright Act-are dismissed because Amoco is not alleged to have agreed with CNS or the Regents to commit any unlawful acts. *See supra,* section IV(C)(2)(d).

### V. MOTIONS TO STAY

[25] Courts within the Ninth Circuit have discretion to stay pending actions. This discretion should be exercised according to the following standard:

Where it is proposed that a pending proceeding be stayed, the competing interests which will be affected by the granting or refusal to grant a stay must be weighed. Among these competing interests are the possible damage which may result from the granting of a stay, the hardship of inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.

*Filtrol Corp. v. Kelleher, 467 F.2d 242, 244 (9th Cir.1972), cert. denied,409 U.S. 1110, 93 S.Ct. 914, 34 L.Ed.2d 691 (1973).*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                      Page 19
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

Amoco argues first that if either the Regents or CNS were to prevail, "the underlying basis for [the patent infringement claims] will disappear because the conduct alleged by Gen-Probe in this case to be infringing will be authorized by license from [the Regents] and/or CNS." However, the license agreements between ATC, the Regents, and CNS provide an option to license conditioned upon the success of the CNS or Regents litigation. Neither agreement would excuse any current acts of infringement.

Amoco's second argument is that if CNS were to succeed in its claims against Gen-Probe, Gen-Probe would be deprived of any ownership interest in the patents in suit, and would lack standing to complain even of Amoco's current acts of infringement.[FN22] In response, Gen-Probe argues that the CNS litigation is baseless, citing certain rulings against counterclaims asserted by CNS in a terminated federal case. The Court rejects this for two reasons. First, it would be an extreme affront to the state court for this Court to rule that the litigation is baseless. Second, Gen-Probe fails to explain why, if the litigation is so baseless, it has failed to *964 get the action dismissed within that forum. Because of the massive costs that proceeding with this litigation would entail for the parties and the court, and because Gen-Probe fails to make any persuasive arguments as to the prejudice it might suffer from a stay, the Court grants the defendants' motion to stay this action until the conclusion of the CNS litigation.

> FN22. Note that Amoco must be found to infringe before the Regents may be found to have induced its infringement. *Moleculon Research Corp. v. CBS, Inc.,* 872 F.2d 407, 410 (Fed.Cir.1989) ("In the absence of direct infringement, [a person] cannot be held liable for inducing infringement under section 271(b).").

## VI. CONCLUSION AND ORDER

Gen-Probe's motion to expedite and consolidate discovery is denied. Gen-Probe can obtain whatever discovery it needs in each case within the confines of that case.

Gen-Probe's state claims against The Regents of the University of California and Eric Stanbridge are dismissed with prejudice because of Eleventh Amendment immunity. The two federal claims of inducement of patent infringement against The Regents of the University of California may be barred by Eleventh Amendment immunity, but that cannot be decided without a determination of whether the Stanbridge/Gobel patent application infringes the '330 patent. Stanbridge is dismissed with prejudice from the patent infringement counts.

Gen-Probe's claims against the Center for Neurologic Study, Richard A. Smith, and Ivor Royston are dismissed with leave to amend. Gen-Probe's federal claims fail because the allegations in the complaint do not amount to a viable claim of inducement. The state claims are barred by petitioning immunity.

Gen-Probe's federal claims against Amoco Corporation, Amoco Technology Company, Gene-Trak Systems, Inc., Gene-Trak Systems Industrial Diagnostics Corp., and Vysis, Inc., are dismissed with leave to amend, except that four claims are stated as plead in the present complaint: the claims of direct infringement against Gene-Trak Systems, Inc., the claims of alter ego liability against Amoco Corporation and Amoco Technology Corporation, the claim of inducement infringement against Amoco Technology Corporation, and the claim of successor liability against Vysis. Gen-Probe's claims of conspiracy to unfairly compete and for violation of the Cartwright Act are dismissed with prejudice. The claim of unfair competition survives.

Because Gen-Probe's claims of direct infringement against Gene-Trak, and of inducement of infringement against Amoco Technology Corporation and The Regents of the University of California, require Gen-Probe to win the CNS case, the Court stays all further proceedings in this case until the termination of the CNS case. Gen-Probe is ordered to provide the Court with a copy of the judgment of that case within five days of receipt.

Gen-Probe may, within 20 days of receipt of this Court's Order lifting the stay, file an amended complaint realleging those claims that were dismissed with leave to amend, provided that the amendment cures the defects noted in this Order.

All pending motions not specifically addressed in this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

926 F.Supp. 948                                                                                    Page 20
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110 Ed. Law Rep. 154

section are hereby stricken from the calendar.

**IT IS SO ORDERED.**

S.D.Cal.,1996.
Gen-Probe, Inc. v. Amoco Corp., Inc.
926 F.Supp. 948, 1996-2 Trade Cases P 71,596, 110
Ed. Law Rep. 154

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 9**

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 333617 (D.Minn.), 39 Employee Benefits Cas. 2509

**H**Hastings v. Wilson
D.Minn.,2007.

United States District Court,D. Minnesota.
Neil HASTINGS and Jennifer Karpiuk, individually
and on behalf of all others similarly situated,
Plaintiffs,
v.
Gary L. WILSON, et al., Defendants.
**Civ. No. 05-2566 (RHK/AJB).**

Feb. 1, 2007.

Gerald D. Wells, III, Edward W. Ciolko, Joseph H.
Meltzer, Schiffrin, Barroway, Topaz & Kessler, LLP,
Radnor, PA, Robert I. Harwood, Samuel K. Rosen,
Wechsler Harwood, LLP, New York, NY, Thomas
V. Seifert, Vernon J. Vander Weide, Head Seifert &
Vander Weide, Minneapolis, MN, for Plaintiffs.
Thomas W. Tinkham, Stephen P. Lucke, Andrew J.
Holly, Dorsey & Whitney, LLP, Minneapolis, MN,
Christopher J. Rillo, Thomas S. Gigot, Groom Law
Group, Washington, DC, for Defendants Gary L.
Wilson, Douglas Steenland, Richard Anderson, Terri
L. Keimig, Timothy J. Meginnes, Michael Becker,
Robert Brodin, Hiram Cox, John H. Dasburg, and
Mickey P. Foret, Bernard L. Han, Daniel Matthews,
James G. Matthews, Thomas Momchilov.
Howard Shapiro, Robert W. Rachal, Stacey CS
Cerrone, Proskauer Rose, LLP, New Orleans, LA,
Barbara Jean D'Aquila, Cynthia A. Bremer, Flynn
Gaskins & Bennett, LLP, Minneapolis, MN, Stephen
P. Lucke, Dorsey & Whitney, LLP, Minneapolis,
MN, for Defendants Tom Goebel, Bill Johnston, Jim
MacKenzie, Steve Miller, Len Willey, Steve Wilson,
and Rick Woolley.

**MEMORANDUM OPINION AND ORDER**

RICHARD H. KYLE, United States District Judge.

**INTRODUCTION**

\*1 Plaintiffs Neil Hastings and Jennifer Karpiuk
("Plaintiffs"), two former employees of Northwest
Airlines, Inc. ("NWA"), allege that certain executives
at NWA (the "NWA Defendants") [FN1] and members

of NWA's Pilots' Retirement Board (the "Pilot
Defendants") [FN2] breached fiduciary duties owed to
them and other similarly situated individuals, causing
their retirement savings plans to lose value. The Pilot
Defendants and the NWA Defendants each move to
dismiss, arguing, respectively, that Plaintiffs lack
standing and that their claims are preempted by the
Railway Labor Act ("RLA"). For the reasons set
forth below, the Court will grant both Motions.

> FN1. The NWA Defendants are Gary L.
> Wilson, John H. Dasburg, Douglas
> Steenland, Richard H. Anderson, Terri L.
> Keimig, Timothy J. Meginnes, Michael
> Becker, Robert Brodin, Mickey P. Foret,
> Hiram Cox, Thomas Momchilov, Daniel
> Matthews, James G. Matthews, and Bernard
> L. Han. (NWA Mem. in Supp. 2 n. 1.)

> FN2. The Pilot Defendants are Steve
> Wilson, Steve Miller, Tom Goebel, Bill
> Johnston, Len Willey, Rick Woolley, and
> Jim MacKenzie. (NWA Mem. in Supp. 2 n.
> 1.)

**BACKGROUND**

**I. Plaintiffs' Retirement Funds**

Hastings and Karpiuk were members of the
International Association of Machinists and
Aerospace Workers ("IAM") and were employed by
NWA for at least some of the period between
October 2000 to September 14, 2005, when NWA
sought bankruptcy protection. (Meginnes Aff. ¶ 3,
Ex. A; see also Am. Compl. ¶¶ 15-16.)

In 1993, NWA provided shares of NWA Series C
Voting Convertible Exchangeable Preferred Stock
("Preferred Stock") to employees who were members
of the IAM, as well as to three other employee
groups,[FN3] in consideration for wage concessions.
(Am. Compl. ¶¶ 62-63; Meginnes Aff. Ex. B (the
"IAM Equity Agreement") ¶ 2. 1; Brennaman Decl. ¶
5.) NWA placed the Preferred Stock into a newly
created profit-sharing ERISA plan-the Northwest
Airlines Corporation Employee Stock Plan (the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2007 WL 333617 (D.Minn.), 39 Employee Benefits Cas. 2509

"Employee Plan"). (Am. Compl. ¶¶ 58, 62, 63; IAM Equity Agreement ¶ 2. 1; *see* Meginnes Aff. Ex. F.) The Employee Plan was divided into separate trust accounts for each of the four employee groups, and each participant in the Employee Plan had an individual interest in the assets of his or her employee group's trust account. (IAM Equity Agreement ¶ 2.3; Employee Plan ¶ 4.2.2; Am. Compl. ¶ 63.) Each employee group, upon approval by NWA, selected a trustee to administer its trust account.[FN4]

> FN3. The three other employee groups were the International Brotherhood of Teamsters ("Teamsters"), the Air Line Pilots' Association International ("ALPA"), and Management employees. (Meginnes Aff. Ex. F at 3-4.)

> FN4. These trustees are referred to herein by the employee group name, *e.g.,* the IAM Trustee. The Management Trustee was appointed by NWA. (IAM Equity Agreement ¶ 2.3.)

In accordance with the foregoing, NWA and the IAM entered into a stock plan trust agreement for NWA's IAM-represented employees (the "IAM Trust Agreement"). (*See* Meginnes Aff. Ex. I.) The IAM Trust Agreement set forth the rules governing the trust's assets, including the powers and duties assigned to the IAM Trustee. (*Id.* at ¶¶ 2.2, 2.3.)

In late 2002, the Employee Plan was terminated and the NWA stock held in it was transferred to three separate NWA-sponsored 401(k) plans (the "Retirement Savings Plans" or "RSPs"). (Am.Compl.¶ 58.) To that end, NWA and the IAM executed a letter agreement (the "IAM Merger Agreement"), pursuant to which stock held in the Employee Plan for each of the IAM and Teamsters-represented employee groups was transferred to the Retirement Savings Plan for Contract Employees (the "Contract Plan"). (Am. Compl. ¶ 58; Meginnes Aff. Ex. J (the "IAM Merger Agreement"); Meginnes Aff. Ex. E. ¶¶ 4 .1.5, 12.3.4; NWA Mem. in Supp. at 4 n. 4.) Stock held in the Employee Plan for the ALPA-represented employees was transferred to a similar plan-the Retirement Savings Plan for Pilot Employees (the "Pilots' Plan"). (*See* Meginnes Affidavit Ex. H ¶ 4.1.6.)

*2 Although IAM's stock was transferred from the Employee Plan to the Contract Plan, the IAM Trustee retained his authority over the NWA securities that he had held in the Employee Plan. (Meginnes Ex. J ¶¶ 2(b)-(d).) The ALPA Trustee, however, was not retained; instead, NWA and ALPA created a Retirement Board-made up of the Pilot Defendants-to manage the assets of the Pilots' Plan. (Am.Compl.¶ 43.)

## II. The NWA Bankruptcy and RSPs' Lost Value

In 2000, NWA began to suffer financial losses. (Am.Compl.¶ 113.) From January 1, 2001, to June 30, 2005, NWA suffered losses of $3.6 billion and its debt load increased from $4 billion to $9 billion. (*Id.*) During this same period, several Defendants sold their personal shares of NWA stock. (Am.Compl.¶ 242.) Each of the RSPs, however, retained its shares of NWA stock. (Am.Compl.¶ 245.)

On September 14, 2005, NWA filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. (Am. Compl. ¶ 168; NWA Mem. in Supp. at 10.) On that day, NWA common stock closed at $0.86 per share-down from a closing value of approximately $25.00 per share on October 1, 2000. (Am.Compl.¶ 167.)

In October 2005, Karpiuk and Hastings commenced this action against the NWA Defendants and the Pilot Defendants, alleging that (1) each failed to "prudently and loyally manage the [RSPs'] assets," (2) the NWA Defendants failed to adequately monitor the Pilot Defendants and the trustees of the several RSPs by not ensuring that they had accurate information regarding NWA's deteriorating business prospects, and (3) certain NWA Defendants and Pilot Defendants breached their duty to avoid conflicts of interest because they failed to ensure that each RSP divested its holdings of NWA stock when it appeared imprudent to continue holding it, in order to ensure that their personal NWA stock maintained a higher value. (*See* Am. Compl. ¶¶ 212-16, 227-44.)

The Pilot Defendants and the NWA Defendants each move to dismiss the Complaint under <u>Federal Rules of Civil Procedure 12(b)(1)</u> and <u>12(b)(6)</u> and argue that Plaintiffs' claims are preempted by the RLA or, in the alternative, that they did not owe a fiduciary duty to Plaintiffs. In addition, the Pilot Defendants

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                        Page 3
Not Reported in F.Supp.2d, 2007 WL 333617 (D.Minn.), 39 Employee Benefits Cas. 2509

argue that Plaintiffs lack standing to sue them for actions taken in administering the Pilots' Plan.[FN5]

> FN5. Because the Court determines that Plaintiffs lack standing to sue the Pilot Defendants for actions taken while administering the Pilot's Plan and that the RLA preempts the instant claim against the NWA Defendants, it need not address whether the Defendants owed Plaintiffs fiduciary duties.

## STANDARD OF DECISION

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court looks to the factual allegations in the Complaint.*Morgan Distrib. Co., Inc. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir.1989). All factual allegations must be accepted as true and every reasonable inference must be made in favor of the plaintiff. Fed.R.Civ.P. 12(b)(6); *Midwestern Mach ., Inc. v. Nw. Airlines, Inc.*, 167 F.3d 439, 441 (8th Cir.1999). However, the Court need not consider conclusory allegations or blindly accept the legal conclusions drawn by the plaintiff. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir.1990); *Kaylor v. Fields*, 661 F.2d 1177, 1182 (8th Cir.1981). A complaint should be dismissed under Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

*3 On a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), a defendant may challenge the plaintiff's complaint either on its face or on the truthfulness of its proffered facts. *See, e.g., Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir.1993); *Osborn v. United States*, 918 F.2d 724, 729 n. 6 (8th Cir.1990). In a facial challenge to jurisdiction, the Court must restrict its review to the pleadings and afford the non-moving party the same protections it would receive when considering a Rule 12(b)(6) motion to dismiss. *See Osborn*, 918 F.2d at 729 n. 6. In other words, the Court must presume that all of the factual allegations in the complaint are true, and it will not dismiss the claims unless the plaintiff fails to allege an essential element for subject-matter jurisdiction. *See Titus*, 4 F.3d at 593 (citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731-32 (11th Cir.1982)); *Osborn*, 918 F.2d at 729 n. 6.

## ANALYSIS

The NWA Defendants and the Pilot Defendants have separately briefed their arguments in these Motions. Because the Pilot Defendants challenge whether Plaintiffs have standing to bring the instant claims against them, the Court will analyze this issue first. *See McClain v. Am. Econ. Ins. Co.*, 424 F.3d 728, 731 (8th Cir.2005) (standing "is the threshold question in every federal case, determining the power of the court to entertain the suit") (citations omitted).

### I. Pilot Defendants' Motion to Dismiss for Lack of Standing

The Pilot Defendants argue that Plaintiffs lack standing to assert that they breached a fiduciary duty to the Pilots' Plan because Plaintiffs did not participate in the Pilots' Plan.[FN6](Pilots' Mem. in Supp. at 17-18.) Only a participant in, a fiduciary for, or a beneficiary of, an ERISA plan has standing to sue under ERISA, and this Court has jurisdiction only over lawsuits brought by a member of one of these groups. 29 U.S.C. § 1132(a)(3), (e)(1).

> FN6. The Pilot Defendants argue that Plaintiffs lack both constitutional standing and statutory standing under ERISA. Because the Court determines that Plaintiffs lack statutory standing, it will not address the Pilot Defendants' constitutional argument. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 117 (1998) ("[G]iven a choice between two jurisdictional questions-one statutory and the other constitutional-the Court has the power to answer the statutory question first.").

Plaintiffs allege that they are participants in the Contract Plan. (Am.Compl.¶ 5.) They do not contend, however, that they are participants in, beneficiaries of, or fiduciaries for, the Pilots' Plan. Accordingly, Plaintiffs' own allegations fail to support the conclusion that they have standing to sue the Pilot Defendants for their actions in administering the Pilots' Plan.

In an attempt to establish standing, Plaintiffs invoke Federal Rule of Civil Procedure 23.[FN7]Plaintiffs

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 333617 (D.Minn.), 39 Employee Benefits Cas. 2509

assert that they are class representatives for those individuals injured by each plan's "imprudent holding of [NWA] stock" and, as such, have standing to bring this action against each of the RSPs' administrators, including the Pilot Defendants. (Mem. in Opp'n to Pilots' Motion at 23.) To support this argument, Plaintiffs rely upon *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir.1998), and *Forbush v. J.C. Penney Co.*, 994 F.2d 1101 (5th Cir.1993), for the proposition that "an individual in one ERISA benefit plan can represent a class of participants in numerous other plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans."*Fallick,* 162 F.3d at 422.

> FN7.Rule 23, in general, allows an individual to represent a class of persons, provided that the person meets the class action criteria. *See*Fed.R.Civ.P. 23(a).

**\*4** Plaintiffs' argument is unpersuasive. The Eighth Circuit has held that a class representative must have individual standing against a defendant before he may represent a class against that defendant. *See Hall v. Lhaco, Inc.,* 140 F.3d 1190, 1196 (8th Cir.1998) (when a plaintiff "does not have standing to pursue his claim ... it is immaterial whether any member of the potential class would have standing to pursue [the] claim. [The plaintiff] is not a proper representative of the class where he himself lacks standing to pursue the claim."). Accordingly, Plaintiffs may not use Rule 23 to circumvent their obligation to establish standing under ERISA.

Furthermore, *Fallick* and *Forbush* do not support the proposition that an individual may represent a class of persons against a defendant whom that person lacks individual standing to sue. Unlike in the instant case, in *Fallick* and *Forbush* a single entity administered multiple ERISA plans, *including* the class representative's plan. *See Fallick,* 162 F.3d at 411;*Forbush,* 994 F.2d at 1103. The class representative was allowed to represent participants in other ERISA plans that were administered by the same defendant because the representative himself had standing to sue. *Fallick,* 162 F.3d at 423;*Forbush,* 994 F.2d at 1106. Neither case, therefore, eliminated the well-settled principle that the named plaintiff must have individual standing against the defendant. *See, e.g., Fallick,* 162 F.3d at 423 ("[a] potential class representative must

demonstrate individual standing [vis-a-vis] the defendant; he cannot acquire such standing merely by virtue of bringing a class action") (citations omitted).

Accordingly, Plaintiffs may not represent participants in the Pilots' Plan without demonstrating that they have individual standing to do so. And, because Plaintiffs have not alleged that they participated in the Pilots' Plan, they do not have standing to sue the Pilot Defendants for actions related to the administration of that Plan, and their claims against the Pilot Defendants will be dismissed.

## II. NWA Defendants' Motion to Dismiss on RLA Preemption

The NWA Defendants argue that Plaintiffs' claims should be dismissed because they are preempted by the RLA. (NWA Mem. in Supp. 19-21). The RLA requires parties to arbitrate all "minor disputes" to an adjustment board-"minor disputes" are controversies "involving the interpretation or application of [an] existing [collective bargaining agreement]."*Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 256 (1994); *accord*45 U.S.C. § 184. The adjustment board has "mandatory, exclusive, and comprehensive" jurisdiction over minor disputes, and the remedies it provides are the "complete and final means for settling the minor disputes."*Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.,* 373 U.S. 33, 38-39 (1963).

The NWA Defendants argue that Plaintiffs' claims are preempted by the RLA because the Employee Plan, the Contract Plan, the IAM Trust Agreement, the IAM Equity Agreement, and the IAM Merger Agreement (collectively referred to as the Plans and Agreements) [FN8] must each be interpreted to determine whether the NWA Defendants owed (and breached) a fiduciary duty to the Contract Plan. (NWA Mem. in Supp. at 19-21; NWA Reply Mem. at 2-5.) In response, Plaintiffs argue that their claims are not preempted because the NWA Defendants breached fiduciary duties imposed on them by ERISA, and these claims do not require interpretation of the Plans and Agreements. (Mem. in Opp'n to Pilots' Motion at 28-36.) Specifically, plaintiffs argue that the NWA Defendants owed ERISA fiduciary duties to the Contract Plan for two reasons: (1) the NWA Defendants enjoyed discretionary authority over the Contract Plan, and (2) the NWA Defendants

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2007 WL 333617 (D.Minn.), 39 Employee Benefits Cas. 2509

exercised discretionary control over the Contract Plan.[FN9] Plaintiffs' arguments are not persuasive.

> FN8. Plaintiffs do not dispute that the Plans and Agreements constitute a collective bargaining agreement between the IAM and NWA. (See Mem. in Opp'n to Pilots' Motion at 31; Mem in Opp'n to NWA Motion at 15.)

> FN9. An individual is a fiduciary of an ERISA plan if he has discretionary authority, or has exercised discretionary control, over the plan or its assets. Olson v. E.F. Hutton & Co., Inc., 957 F.2d 622, 625 (8th Cir.1992); 29 U.S.C. § 1002(21)(A).

*5 In their attempt to establish that the NWA Defendants enjoyed discretionary authority over the Contract Plan, Plaintiffs rely on several provisions within the Plans and Agreements. First, Plaintiffs cite the IAM Trust Agreement to show that the NWA Defendants were not explicitly granted the power to sell the assets in either the Employee Plan or the Contract Plan. (Mem. in Opp'n to NWA Motion at 9.) They next cite the IAM Equity Agreement for the proposition that the IAM Trustee must be approved by NWA, and they argue that this "power to appoint" the IAM Trustee vested the NWA Defendants with a fiduciary duty to the Contract Plan. (Id. at 10.) Plaintiffs' argument, therefore, fails ipso facto because they rely on the Plans and Agreements in an attempt to establish that the NWA Defendants enjoyed discretionary authority over the Contract Plan. Plaintiffs' claims clearly require an interpretation of the Plans and Agreements and, hence, are preempted.

Plaintiffs' next argument, that the NWA Defendants exercised discretionary authority over the assets of the Contract Plan also fails. (Mem. in Opp'n to NWA Motion at 13-14.) Plaintiffs' Amended Complaint is utterly devoid of any facts that support this allegation, stating only that "[the NWA Defendants] performed fiduciary functions [toward the Contract Plan] and thereby also acted as fiduciaries under ERISA." (See Am. Compl. ¶ 101.) Such a conclusory allegation-that the NWA Defendants "performed fiduciary functions"-is insufficient to survive a motion to dismiss. Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir.1981) ("[C]onclusory allegations unsupported by any factual assertions will not

withstand a motion to dismiss."). Moreover, the allegations within the Amended Complaint itself demonstrate that, while the NWA Defendants may have enjoyed discretionary authority over the Contract Plan (an allegation that requires interpretation of the collective bargaining agreement), they did not "exercise" discretionary authority because they did not take action to sell the assets of that Plan-indeed, the essence of Plaintiffs' claims is the failure on Defendants' part to sell the Plans' NWA stock. (Am.Compl.¶¶ 169, 219, 232.) Accordingly, Plaintiffs have not established that the NWA Defendants "exercised" discretionary authority over the Contract Plan. See Olson, 957 F.2d at 625 (individuals exercised discretionary authority over investment account when they traded CDs without permission from the plan participant and provided investment advice to the plan participant).

At bottom, the Court must interpret the Plans and Agreements to determine whether the NWA Defendants owed a fiduciary duty to the Contract Plan. Accordingly, the RLA preempts Plaintiffs' claims, and the Court will dismiss them.

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is ORDERED that the Pilot Defendants' Motion to Dismiss (Doc. No. 28) and the NWA Defendants' Motion to Dismiss (Doc. No. 34) are each GRANTED and Plaintiffs Neil Hastings and Jennifer Karpiuks' Amended Complaint (Doc. No. 15) is DISMISSED WITH PREJUDICE.

*6 LET JUDGMENT BE ENTERED ACCORDINGLY.

D.Minn.,2007.
Hastings v. Wilson
Not Reported in F.Supp.2d, 2007 WL 333617 (D.Minn.), 39 Employee Benefits Cas. 2509

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 10**

Westlaw.

223 F.R.D. 541
223 F.R.D. 541, 9 Wage & Hour Cas.2d (BNA) 1886

**H**Henry v. Circus Circus Casinos, Inc.
D.Nev.,2004.

United States District Court,D. Nevada.
Jerald HENRY, individually, and on behalf of all
others similarly situated; Pamela Coleman,
individually, and on behalf of all others similarly
situated, Plaintiffs,
v.
CIRCUS CIRCUS CASINOS, INC., et al.,
Defendants.
**No. CV-S-04-0747-PMP(LRL).**

Aug. 19, 2004.

**Background:** Security guards sued employer and other subsidiaries of employer's parent corporation under Fair Labor Standards Act (FLSA) and Nevada law, seeking overtime compensation, seeking to assert class and/or collective claims. Defendants other than employer moved to dismiss state claims.

**Holding:** The District Court, <u>Pro</u>, Chief Judge, held that security guards had no standing to sue subsidiaries of employer's parent corporation, other than their own employer, and security guards thus could not maintain Nevada class claims against subsidiaries other than employer.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A** ⌐━○123103.2

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. <u>Most Cited Cases</u>
Article III standing is a jurisdictional requirement.
<u>U.S.C.A. Const. Art. 3, § 2, cl. 1</u>.

**[2] Federal Civil Procedure 170A** ⌐━○123103.2

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. <u>Most Cited Cases</u>
The District Court will not assume standing.

**[3] Federal Civil Procedure 170A** ⌐━○123103.2

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or
Interest. <u>Most Cited Cases</u>

**Federal Civil Procedure 170A** ⌐━○123103.3

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.3 k. Causation;
Redressability. <u>Most Cited Cases</u>
To establish standing under Article III, a plaintiff must show: (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. <u>U.S.C.A. Const. Art. 3, § 2, cl. 1</u>.

**[4] Federal Civil Procedure 170A** ⌐━○123103.7

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.7 k. Class Actions. <u>Most Cited Cases</u>
Standing is a jurisdictional limitation on the District Court's jurisdiction that cannot be expanded by class action principles. <u>Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.</u>

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

223 F.R.D. 541
223 F.R.D. 541, 9 Wage & Hour Cas.2d (BNA) 1886

Page 2

**[5] Federal Civil Procedure 170A ⚖103.7**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.7 k. Class Actions. Most Cited Cases

A plaintiff who lacks Article III standing to sue a defendant may not establish standing through the back door of a class action. U.S.C.A. Const. Art. 3, § 2, cl. 1; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⚖103.7**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.7 k. Class Actions. Most Cited Cases

To establish Article III standing in a class action, at least one named plaintiff must have standing in his own right to assert a claim against each named defendant before he may purport to represent a class claim against that defendant. U.S.C.A. Const. Art. 3, § 2, cl. 1; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⚖103.7**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.7 k. Class Actions. Most Cited Cases

To establish Article III standing in a class action, it is not required that each named plaintiff must have a claim against each named defendant; rather, for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis. U.S.C.A. Const. Art. 3, § 2, cl. 1; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⚖184.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak184 Employees

               170Ak184.5 k. In General. Most Cited Cases

Security guards had no Article III standing to sue subsidiaries of their employer's parent corporation, other than their own employer, and security guards thus could not maintain Nevada class claims for overtime compensation against subsidiaries other than their employer. U.S.C.A. Const. Art. 3, § 2, cl. 1; West's NRSA 608.016, 608.018; Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**\*542** April A. O'Brien, Sharon Nelson, O'Brien & Nelson, Las Vegas, NV, for Plaintiffs.
Elayna Youchah, Todd L. Bice, Schreck Brignone, Las Vegas, NV, for Defendants.

*ORDER*

PRO, Chief Judge.
Presently before the Court is Defendants' Motion to Dismiss State Law Claims for Lack of Subject Matter Jurisdiction (Doc. # 6), filed on June 14, 2004. Plaintiffs filed Plaintiffs' Opposition to Defendants' Motion to Dismiss State Law Claims for Lack of Subject Matter Jurisdiction (Doc. # 10) on June 28, 2004. Defendants filed a Reply in Support of Defendants' Motion to Dismiss State Law Claims for Lack of Subject Matter Jurisdiction (Doc. # 11) on July 12, 2004.

**I. BACKGROUND**

Plaintiffs are current or former security guards for Mandalay Corp. d/b/a Mandalay Bay Resort and Casino. (Compl. ¶ 30.) Plaintiffs allege Defendant Mandalay Corp. required them to arrive fifteen minutes early for their shift for security briefings and to stay after their shift until they were relieved and that Mandalay Corp. did not compensate them for this time. (*Id.* ¶¶ 32-35.)

Mandalay Corp. is a subsidiary of Mandalay Resort Group. (*Id.* ¶ 8.) According to Plaintiffs, Mandalay Corp.'s time and wage policy is based on its parent company's policy for all its subsidiaries. (Pls.' Opp'n to Defs.' Mot. to Dismiss State Law Claims for Lack of Subject Matter Jurisdiction at 3 n. 1.) Plaintiffs thus have named as Defendants Mandalay Resort Group and its subsidiaries, partnerships, and joint ventures (collectively "Defendants"), [FN1] and pursue this action as a class and/or collective action for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

223 F.R.D. 541                                                                                           Page 3
223 F.R.D. 541, 9 Wage & Hour Cas.2d (BNA) 1886

themselves and all similarly situated Mandalay Resort Group security guards. (*Id.*) Plaintiffs assert class action claims under Nevada Revised Statutes 608.016 and 608.018 for Defendants' alleged unlawful failure to compensate them for time worked and for failure to pay overtime for shifts over eight hours. (Compl.¶¶ 53-64.) Plaintiffs also assert a similar collective action under the Fair Labor Standards Act. (*Id.* ¶¶ 65-71.) Additionally, Plaintiffs request declaratory and injunctive relief. (*Id.* ¶¶ 72-75.) Plaintiffs seek to certify as a class:

> FN1. The named Defendants are: Circus Circus Casinos, Inc. d/b/a Circus Circus Hotel and Casino-Las Vegas and Circus Circus Hotel and Casino-Reno; Slots-A-Fun, Inc. d/b/a Slots-A-Fun Casino; Edgewater Hotel Corporation d/b/a Edgewater Hotel and Casino; Colorado Belle Corp. d/b/a Colorado Hotel and Casino; New Castle Corp. d/b/a Excalibur Hotel and Casino; Ramparts, Inc. d/b/a Luxor Hotel and Casino; Mandalay Corp. d/b/a Mandalay Resort and Casino; Railroad Pass Investment Group d/b/a Railroad Pass Hotel and Casino; Jean Development Company d/b/a Goldstrike Hotel and Gambling Hall; Jean Development West d/b/a Nevada Landing Hotel and Casino; Victoria Partners d/b/a Monte Carlo Resort & Casino; Gold Strike L.V.; M.S.E. Investments, Inc.; Last Chance Investments, Inc.; Goldstrike Investments, Inc.; Diamond Gold, Inc.; Galleon, Inc.; Circus and El Dorado Joint Venture d/b/a Silver Legacy Resort Casino; and Mandalay Resort Group.

All former, present, and future security personnel employed at Mandalay Resort Group property who were or will be required to attend pre-shift briefings without remuneration for three (3) years predating the filing of the complaint.
(Pls.' Mot. to Conditionally Certify Collective Action for Purposes of Disc. and Notice and Req. to Send Notice to Putative Collective Action Members and Req. for Appointment *543 as Class Counsel Pursuant to Rule 23(g) at 4.)

## II. DISCUSSION

All Defendants other than Mandalay Corp. move to dismiss Plaintiffs' state law class action claims for lack of standing. According to Defendants, because only Mandalay Corp. employed Plaintiffs, only Mandalay Corp. could have harmed Plaintiffs through its allegedly unlawful time and wage practices. Defendants thus argue Plaintiffs have no standing to sue Defendants at which they were never employed because those Defendants could not have harmed Plaintiffs. Plaintiffs respond they have met the standing requirements because they state a claim against Mandalay Corp. According to Plaintiffs, once they have standing against one defendant, the standing issue is resolved, and the inquiry shifts to a Federal Rule of Civil Procedure 23 analysis to determine if Plaintiffs may represent a class of similarly situated persons.

The United States Court of Appeals for the Ninth Circuit has not resolved whether a plaintiff having a cause of action against a single defendant has standing to maintain a class action against the single defendant as well as an unrelated group of defendants who have engaged in similar conduct. When faced with this factual scenario, the Ninth Circuit assumed standing existed, but held that under Federal Rule of Civil Procedure 23, the named plaintiff may represent only those class members "suffering an injury similar to his own inflicted by the defendant responsible for the plaintiff's injury." *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 462, 464-66 (9th Cir.1973). The Ninth Circuit created exceptions from this rule where all injuries are the result of a conspiracy between the defendants or where all defendants are "juridically related in a manner that suggests a single resolution of the dispute would be expeditious." *Id.* at 466.

[1][2] Although the Ninth Circuit assumed standing in these circumstances, Article III standing is a jurisdictional requirement. *Cole v. Oroville Union High Sch. Dist.,* 228 F.3d 1092, 1098 (9th Cir.2000) (standing is a jurisdictional issue deriving from the "case or controversy" requirement of Article III of the United States Constitution.). The United States Supreme Court recently has held that federal courts may not assume Article III jurisdiction to address merits questions even if the court could resolve the jurisdictional questions more easily. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93-101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (holding federal courts may not assume hypothetical jurisdiction).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

223 F.R.D. 541                                                                                      Page 4
223 F.R.D. 541, 9 Wage & Hour Cas.2d (BNA) 1886

Since *La Mar,* the Ninth Circuit has indicated that "[s]tanding is a jurisdictional element that must be satisfied prior to class certification." *Lee v. State of Or.,* 107 F.3d 1382, 1390 (9th Cir.1997) (quotation omitted). Consequently, the Court will not assume standing, and will examine the standing issue on its merits.

[3] To establish standing under Article III of the United States Constitution, a plaintiff must show:

"(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky,* 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton,* 414 U.S. 488, 494-495, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *see also Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which *544 they belong and which they purport to represent").

[4][5] The Federal Rules of Civil Procedure incorporate these jurisdictional limits. Under Federal Rule of Civil Procedure 82, the Rules "shall not be construed to extend or limit the jurisdiction of the United States district courts." Standing is a jurisdictional limitation on this Court's jurisdiction that cannot be expanded by class action principles under Federal Rule of Civil Procedure 23. Consequently, a plaintiff who lacks Article III standing to sue a defendant may not establish standing "through the back door of a class action."

*Allee v. Medrano,* 416 U.S. 802, 828-829, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (Burger, C.J., concurring in part and dissenting in part). "Standing is one of the keys necessary to open the door to the federal courthouse. Rule 23 merely provides a procedural doorstop which holds the door open for qualified class members, once it has been opened by the person or persons initially seeking entry." *Matte v. Sunshine Mobile Homes, Inc.,* 270 F.Supp.2d 805, 826 (W.D.La.2003) (quoting *Chevalier v. Baird Sav. Ass'n,* 66 F.R.D. 105, 109 (E.D.Pa.1975) (emphasis in original omitted)).

[6][7] The Court concludes that to establish Article III standing in a class action, at least one named plaintiff must have standing in his own right to assert a claim against each named defendant before he may purport to represent a class claim against that defendant. This is not to say that each named plaintiff must have a claim against each named defendant, for, as Plaintiffs argue, standing would be quite difficult to achieve if that were the rule. Rather, what is required is that for every named defendant there be at least one named plaintiff who can assert a claim directly against that defendant. At that point, Article III standing is satisfied and only then will the inquiry shift to a Rule 23 analysis.[FN2]

> FN2. The Court declines to import La Mar's "juridical link" doctrine into an Article III analysis. A doctrine developed under Rule 23 based on judicial efficiency and expedience does not play a role in an Article III standing analysis. *See In re Eaton Vance Corp. Sec. Litig.,* 220 F.R.D. 162, 169-71 (D.Mass.2004).

[8] Plaintiffs do not dispute that they have no standing to pursue claims against Defendants other than Mandalay Corp. absent their purported representation of unidentified class members. Plaintiffs therefore have failed to establish standing against any of the named Defendants except Mandalay Corp. Consequently, the Court will dismiss Plaintiffs state law class claims against all Defendants except Mandalay Corp. unless Plaintiffs join named plaintiffs for these Defendants within thirty days.

**III. CONCLUSION**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

223 F.R.D. 541
223 F.R.D. 541, 9 Wage & Hour Cas.2d (BNA) 1886

IT IS THEREFORE ORDERED that Defendants'
Motion to Dismiss State Law Claims for Lack of
Subject Matter Jurisdiction (Doc. # 6) is hereby
GRANTED.

IT IS FURTHER ORDERED that Plaintiffs shall
have thirty days from the date of this Order to join
named plaintiffs who have standing to assert claims
against Defendants other than Mandalay Corp. or
Plaintiffs' state law class claims against Defendants
other than Mandalay Corp. will be dismissed.

D.Nev.,2004.
Henry v. Circus Circus Casinos, Inc.
223 F.R.D. 541, 9 Wage & Hour Cas.2d (BNA) 1886

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 11**

Westlaw.

220 F.R.D. 162                                                                    Page 1
220 F.R.D. 162

**H**In re Eaton Vance Corp. Securities Litigation
D.Mass.,2004.

United States District Court,D. Massachusetts.
In re EATON VANCE CORPORATION
SECURITIES LITIGATION
No. CIV.A. 01-10911-EFH.

April 1, 2004.

**Background:** Investors sued, inter alia, four mutual
funds for alleged violations of federal securities laws.
After investors moved for class certification, the
District Court, 219 F.R.D. 38, ruled that named
plaintiffs lacked standing to sue two mutual funds in
which they had not invested, and thus could not
represent other investors who did buy shares in those
funds. On appeal of class certification decision, the
Court of Appeals stayed case and remanded for
limited purpose of obtaining discussion of two issues.

**Holdings:** The District Court, Harrington, Senior
District Judge, held that:
(1) *Ortiz* exception to general rule requiring
resolution of Article III issues before consideration of
class certification issue did not apply;
(2) juridical link doctrine is properly confined to
analysis of prerequisites to class certification; and
(3) juridical link doctrine did not permit named
plaintiffs to satisfy typicality requirement for class
certification with respect to two mutual funds in
which named plaintiffs had not invested.

Ordered accordingly.

West Headnotes

**[1] Federal Civil Procedure 170A** ☜→165

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common Interest in
Subject Matter, Questions and Relief; Damages
Issues. Most Cited Cases
"Juridical link doctrine" answers the question of

whether two defendants are sufficiently linked so that
plaintiff with a cause of action against only one
defendant can also sue the other defendant under the
guise of class certification. Fed.Rules Civ.Proc.Rule
23, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** ☜→103.7

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.7 k. Class Actions. Most Cited
Cases

**Federal Civil Procedure 170A** ☜→175

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak175 k. Time for Proceeding and
Determination. Most Cited Cases
*Ortiz* exception providing for treatment of class
certification issue before issues of Article III standing
is limited exception that applies only in cases in
which class certification issues are logically
antecedent to Article III issues, and therefore general
rule, that standing is an inherent prerequisite to class
certification inquiry, still applies outside
circumstances triggering exception. U.S.C.A. Const.
Art. 3, § 2, cl. 1.

**[3] Federal Civil Procedure 170A** ☜→175

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak175 k. Time for Proceeding and
Determination. Most Cited Cases
*Ortiz* exception to general rule requiring resolution of
Article III issues before consideration of class
certification issue did not apply in securities class
action brought by investors against four mutual
funds, and therefore court could address named
plaintiffs' standing to sue two mutual funds in which
they had not invested before deciding whether class

220 F.R.D. 162

certification was appropriate, given that issue of class certification was not dispositive of action nor logically antecedent to Article III concerns, standing raised particular concerns in securities litigation, and it was inappropriate to allow named plaintiffs to use class action as procedural device to bootstrap themselves into standing that they otherwise lacked. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[4] Federal Civil Procedure 170A** ☞**161**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak161 k. In General. Most Cited Cases
Class certification rule is given liberal, rather than restrictive, construction, and courts are to adopt a standard of flexibility. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A** ☞**103.7**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.7 k. Class Actions. Most Cited Cases

**Federal Civil Procedure 170A** ☞**165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
"Juridical link doctrine," which answers question of whether two defendants are sufficiently linked so that plaintiff with a cause of action against only one defendant can also sue the other defendant under the guise of class certification, is not relevant to the issue of standing, and is properly confined to analysis of prerequisites to class certification. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A** ☞**187**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak187 k. Stockholders, Investors, and Depositors. Most Cited Cases
Juridical link doctrine did not apply to permit named plaintiffs in securities action against four mutual funds to satisfy typicality requirement for class certification with respect to two mutual funds in which named plaintiffs had not invested, given that all four funds were separate corporate entities and entitled to legal protections flowing from that corporate status, there was no evidence of contractual obligations or conspiracy between funds or of statute requiring common action by funds, and, even if true, facts that funds were managed by some of same individuals, invested in same set of loans, and had same signatories to their registration statements did not speak to issue of whether funds made same false and misleading statements in their published prospectuses and registration statements, and thus were of marginal relevance. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

***164** Paul J. Geller,Cauley, Geller, Bowman & Rudman LLP, Boca Raton, FL, Joel H. Bernstein, Goodkind, Labaton, Rudoff & Sucharow LLP, New York City, Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, for Consolidated Plaintiff. David J. Goldsmith, Goodkind, Labaton, Rudoff & Sucharow LLP, Richard Fooshee, Goodkind, Labaton, Rudoff & Sucharow LLP, Rochelle Feder Hansen, Bernstein, Litowitz, Berger & Grossmann, New York City, Steven E. Cauley, Cauley, Geller, Bowman & Coates, Little Rock, AK, Jeffrey A. Klafter, Klafter & Olsen LLP, White Plains, NY, Christopher J. Keller, Goodkind, Labaton, Rudoff, & Sucharow LLP, New York City, Jack Reise, Cauley, Geller, Bowman & Coates, LLP, Boca Raton, FL, John Lawlor, Mineola, NY, Theodore M. Hess-Mahan, Shapiro Haber & Urmy LLP, Boston, MA, for Plaintiffs.
Aimee E. Bierman, Kirkpatrick & Lockhart, LLP, Boston, MA, Charles Lee Eisen, Kirkpatrick & Lockhart, Washington, DC, D. Lloyd Macdonald, Kirkpatrick & Lockhart, Daniel E. Rosenfeld, Kirkpatrick & Lockhart, Boston, MA, Glenn R. Reichardt, Kirkpatrick & Lockhart, Washington, DC, J. Anthony Downs, Goodwin Procter, LLP, Stuart M. Glass, Goodwin Procter, LLP, Boston, MA, for Defendants.

## MEMORANDUM

HARRINGTON, Senior District Judge.
Put simply, this case involves the question of whether named plaintiffs can use the device of class certification to sue two defendants that have caused them no harm.

### I. BACKGROUND

The pertinent facts are taken from this Court's previous opinions in this case. *See In re Eaton Vance Corp. Sec. Litig.,* 219 F.R.D. 38, 40 (D.Mass.2003); *In re Eaton Vance Corp. Sec. Litig.,* 206 F.Supp.2d 142, 155 (D.Mass.2002). The four named plaintiffs sued several defendants, including four mutual funds, for violations of federal securities laws. The four mutual funds are each separate corporate entities. Although the named plaintiffs purchased shares in only two of the four mutual funds, they nevertheless filed a motion seeking to represent a class of investors who purchased shares in all four mutual funds.

As part of its ruling on the motion for class certification, this Court held, as an initial matter, that the four named plaintiffs lacked standing under Article III, Section 2 of the United States Constitution to sue the two mutual funds with which they had no contact, namely, the Eaton Vance Institutional Senior Floating-Rate Fund ("Institutional") and the Eaton Vance Advisers Senior Floating-Rate Fund ("Advisers"). *See In re Eaton Vance Corp. Sec. Litig.,* 219 F.R.D. at 41. The Court reasoned that the named plaintiffs had not been injured by the Institutional or Advisers funds, and therefore no case or controversy existed between the named plaintiffs personally and these two particular defendants. *Id.* The Court further ruled that without Article III standing in their own right, the named plaintiffs could not represent other investors who may have purchased shares in the Institutional or Advisers funds. *Id.* The Court then proceeded to decide the issue of class certification. This Court's decision on class certification was appealed to the United States Court of Appeals for the First Circuit. Without ruling, the Court of Appeals stayed the case and remanded to this Court "for the limited purpose of obtaining ... a discussion" of *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831, 119 S.Ct. 2295, 144

L.Ed.2d 715 (1999), and the "juridical link" doctrine-neither of which has received much, if any, comment by the First Circuit in prior case law. The following memorandum, therefore, is not a reconsideration of this Court's decision on the motion for class certification, but simply a discussion of *Ortiz* and the juridical link doctrine, as requested by the First Circuit.

[1] Before delving into the law, it should be noted at the outset that *Ortiz* and the juridical link doctrine answer two separate and distinct questions. *Ortiz* deals with timing.\*165 It speaks to whether a court should address class certification issues before Article III standing issues. The juridical link doctrine deals not with timing, but rather with substance. It answers the question of whether two defendants are sufficiently linked so that a plaintiff with a cause of action against only defendant one can also sue the other defendant under the guise of class certification. The place to start is with *Ortiz.*

### II. ORTIZ

In *Ortiz,* the Supreme Court stated that:

> Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. But the class certification issues are, as they were in *Amchem,* "logically antecedent" to Article III concerns and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about Rule 23 certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints...."

527 U.S. at 831, 119 S.Ct. 2295 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 612-13, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

[2] The Seventh Circuit has interpreted these statements broadly, holding that *Ortiz* is a "directive to consider issues of class certification prior to issues of standing." *Payton v. County of Kane,* 308 F.3d 673, 680 (7th Cir.2002). The Fifth Circuit, on the other hand, has described *Ortiz* as a "limited exception" that only applies in cases where class certification issues are "logically antecedent" to Article III issues. *Ford v. NYLCare Health Plans of*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

220 F.R.D. 162
220 F.R.D. 162

the *Gulf Coast, Inc.,* 301 F.3d 329, 333 n. 2 (5th Cir.2002); *Rivera v. Wyeth-Ayerst Labs.,* 283 F.3d 315, 319 n. 6 (5th Cir.2002). Under this reasoning, the general rule that "standing is an inherent prerequisite to the class certification inquiry," still applies. *Rivera,* 283 F.3d at 319 (quoting *Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 294 (5th Cir.2001)). The First Circuit has not interpreted this particular portion of *Ortiz.*

This Court finds the Fifth Circuit's description of *Ortiz* as a "limited exception" to be more persuasive, and joins several other post-*Ortiz* courts that have addressed Article III standing prior to analyzing class certification issues. *See Matte v. Sunshine Mobile Homes, Inc.,* 270 F.Supp.2d 805, 826 (W.D.La.2003); *Dash v. FirstPlus Home Loan Owner Trust 1996-2,* 248 F.Supp.2d 489, 503 (M.D.N.C.2003); *Miller v. Pac. Shore Funding,* 224 F.Supp.2d 977, 995-96 (D.Md.2002); *Mull v. Alliance Mortgage Banking Corp.,* 219 F.Supp.2d 895, 909 n. 10 (W.D.Tenn.2002); *Knapp v. Americredit Fin. Serv., Inc.,* 204 F.R.D. 306, 307-08 (S.D.W.Va.2001); *Caranci v. Blue Cross & Blue Shield of R.I.,* 194 F.R.D. 27, 32 (D.R.I.2000); *Doe v. Unocal Corp.,* 67 F.Supp.2d 1140, 1142 (C.D.Cal.1999).

There are several reasons why the Fifth Circuit's interpretation of *Ortiz* is persuasive. To begin with, the Supreme Court has never adopted a broad exception to jurisdictional requirements. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers."). Instead, the Supreme Court has warned that, as a general rule, questions of jurisdiction must be considered before the merits "since if there is no jurisdiction there is no authority to sit in judgment of anything else." *Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 778, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). The requirement that jurisdiction be established as a threshold matter has been described as "inflexible and without exception." *Steel Co.,* 523 U.S. at 94, 118 S.Ct. 1003; *see also People to End Homelessness, Inc. v. Develco Singles Apartments Associates,* 339 F.3d 1, 8 (1st Cir.2003) (stating that Article III standing imposes "fairly strict requirements"). This, of course, is not an absolute

rule and exceptions do exist. *See Seale v. Immigration and Naturalization Serv.,* 323 F.3d 150, 155 (1st Cir.2003). But the Supreme Court has been careful to explain or distinguish those exceptions according to the unique *166 facts and procedural circumstances of the pending case. *See Steel Co.,* 523 U.S. at 96-100, 118 S.Ct. 1003. "[N]one of [these exceptions] even approaches approval of a doctrine of 'hypothetical jurisdiction' that enables a court to resolve contested questions of law when its jurisdiction is in doubt." *Id.* at 101, 118 S.Ct. 1003.

It is also apparent from examining the context of *Ortiz* that its reach is limited. *Ortiz* was based on *Amchem.* In both cases, the Supreme Court was faced with extremely unique and complex problems associated with asbestos-related class actions. The Supreme Court described these cases as evolving from "an asbestos-litigation crisis," *Amchem,* 521 U.S. at 597, 117 S.Ct. 2231, that "defies customary judicial administration," *Ortiz,* 527 U.S. at 821, 119 S.Ct. 2295. Both cases involved the certification of a class that included so-called "exposure-only" asbestos plaintiffs, namely, individuals who had been exposed to asbestos, but had not yet become sick. A highly unusual procedural posture was also involved-one in which the complaint, joint motion for class certification, answer, and settlement agreement were filed with the district court all on the same day. *Amchem,* 521 U.S. at 601-02, 117 S.Ct. 2231. In short, *Amchem* and *Ortiz* were settlement-only cases that were "not intended to be litigated." *Id.* at 601,117 S.Ct. 2231.

In *Amchem,* the opponents of class certification argued that some of the plaintiffs lacked Article III standing because they had not yet become sick from the asbestos exposure. The Supreme Court declined to reach the Article III standing issue, and instead addressed the question of class certification first. The Court adopted this approach because "[t]he class certification issues are dispositive ... because their resolution here is logically antecedent to the existence of any Article III issues." 521 U.S. at 612, 117 S.Ct. 2231. Because the Court recognized *Amchem* as a case that "was not intended to be litigated,"*id.* at 601, 117 S.Ct. 2231, it is apparent that without class certification there would be no settlement; and without a global settlement, the case would not have proceeded as constituted. Therefore, the class certification questions were "dispositive" of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the case as a whole, and could be described as "logically antecedent" to any other issue. *Id.* at 612, 117 S.Ct. 2231. It is against this backdrop that the Supreme Court's statements in *Amchem*, which were subsequently repeated in *Ortiz*, must be evaluated.

In the present case, the issue of class certification is not "dispositive" in the same way as in *Amchem* or *Ortiz*. Regardless of this Court's ruling on class certification, the case would proceed because at least some of the named plaintiffs appear to have valid claims against some defendants, including at least one of the mutual funds. *See Pederson v. La. State Univ.*, 213 F.3d 858, 866 n. 5 (5th Cir.2000) (stating that Article III standing issues could be considered prior to class certification "[b]ecause the class certification issue presented here is not outcome determinative"). Nor is the class certification issue "logically antecedent" to Article III concerns because "the standing question would exist whether [the four named plaintiffs] filed [their] claim alone or as part of a class." *Rivera*, 283 F.3d at 319 n. 6; *see also Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J.2003) (stating that "the *Ortiz* exception treating class certification as the antecedent consideration does *not* apply if the standing issue would exist regardless of whether the named plaintiff filed his claim alone or as part of a class") (emphasis in original); *Doe*, 67 F.Supp.2d at 1142. Had the four named plaintiffs not sought class certification, this Court would be compelled to dismiss the Institutional and Advisers funds because the named plaintiffs lack Article III standing as to those two defendants.

The Fifth Circuit's interpretation of *Ortiz* is also persuasive because it conforms to pre-*Ortiz* precedent in this circuit. In *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 13 (1st Cir.1977), the named plaintiffs sought to represent a class in a suit against four insurance companies, despite the fact that the named plaintiffs had contact with only two of the insurance companies. The First Circuit acknowledged precedent from another circuit that permitted such suits. *Id.* (citing *167Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083 (3d Cir.1975)). The court, however, affirmed the district court's decision "to adhere strictly to the traditional rules" and dismiss two of the defendant insurance companies. *Id.* None of the named plaintiffs bought policies from these two companies or were ever treated by a doctor holding

such a policy. Therefore, the named plaintiffs "had at best only a tenuous right to bring this claim against these [two] companies." *Id.*

The principal counter argument raised by the named plaintiffs in this case is that once a plaintiff presents a case or controversy between himself personally and one defendant, the inquiry should shift from Article III standing to class certification in order to determine whether the plaintiff can sue other defendants that have caused the plaintiff no harm. Some courts have adopted this approach; the most prominent include a post-*Ortiz* case, *Payton*, 308 F.3d at 680, and a pre-*Ortiz* case, *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir.1998). Neither is persuasive.

The *Payton* court offered three justifications for permitting named plaintiffs to sue defendants that have caused them no harm. The first was that *Ortiz* rested on "the long-standing rule" that Article III requirements should be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs. 308 F.3d at 680. A review of the case law, however, shows that opposition to this rule has also been "long-standing." It was over thirty years ago that this rule was first rejected, *see Weiner v. Bank of King of Prussia*, 358 F.Supp. 684, 695 (E.D.Pa.1973), and many courts have continued to reject it in the decades since, *see e.g., Miller*, 224 F.Supp.2d at 996 ("In a multi-defendant action or class action, the named plaintiffs must establish that they have been harmed by each of the defendants."); *Pope v. City of Clearwater*, 138 F.R.D. 141, 145 (M.D.Fla.1991) (same); *Angel Music, Inc. v. ABC Sports, Inc.*, 112 F.R.D. 70, 74 (S.D.N.Y.1986) (stating that "[t]he courts of this circuit have expressly endorsed ... the principle that representative plaintiffs must have individual standing to assert claims against all the members of a defendant class").

The second justification offered by the *Payton* court was Supreme Court precedent which permitted a certified class action to proceed despite the fact that the named plaintiff's claims had become moot. 308 F.3d at 681. The doctrine of mootness, however, is not at issue in this case and the Supreme Court has been careful to distinguish Article III standing from other jurisdictional doctrines-such as mootness, ripeness, and political question. *See Allen v. Wright,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

468 U.S. 737, 750-51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (explaining that standing "is perhaps the most important of these doctrines" because it "has a core component derived directly from the Constitution"). In addition, the *Payton* court's mootness argument rested on the notion that a class, *once certified,* acquired "a legal status separate from and independent of the interest asserted by the named plaintiffs." 308 F.3d at 680 (quoting *Whitlock v. Johnson,* 153 F.3d 380, 384 (7th Cir.1998)). In this case, the Institutional and Advisers funds were dismissed before a class was certified. Thus, whatever "independent" legal status may exist had not yet attached. *See Cruz v. Farquharson,* 252 F.3d 530, 534 (1st Cir.2001) ("Only when a class is certified does the class acquire a legal status independent of the interest asserted by the named plaintiffs....")

The third and final justification offered in *Payton* was that certain legal principles, such as claim preclusion, apply to the class as a whole, rather than just to the named plaintiffs. *See* 308 F.3d at 681. The *Payton* court, however, recognized that other legal principles, such as the citizenship requirement of diversity jurisdiction, hinge entirely on the named plaintiffs, and not on the class as a whole. *See id.* The fact that some legal principles regard the entire class as the critical actor, while others consider the named plaintiffs to be the critical actor, does little, in this Court's view, to help satisfactorily resolve the present issue.

*Fallick* is even less convincing. In *Fallick,* the Sixth Circuit described a district court's ruling that a named plaintiff lacked standing to sue health insurance plans in which the named plaintiff never participated as "fundamentally flawed in two important respects." *168 162 F.3d at 422.* One of the flaws was that the district court "confuse[d] the issue" of a plaintiff's standing under Article III and the requirements of Rule 23. *Id.* To support this assertion, the Sixth Circuit pointed to two cases. One was a Third Circuit opinion that cited no authority for its conclusory statement that "the issue here is one of compliance with the provisions of Rule 23, not one of Article III standing." *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 122 (3d Cir.1985). In the other case, a district court explained that because civil rights were at issue, Article III concerns could be put aside so that the court could "carry out Congress' lofty goal" of

eradicating employment discrimination. *See Cooper v. Univ. of Tex. at Dallas,* 482 F.Supp. 187, 191 (N.D.Tex.1979) (Higginbotham, J.). Such an approach would be inappropriate here because the present case does not involve discrimination.

The second flaw identified by the Sixth Circuit in *Fallick* was that the district court overlooked other healthcare insurance cases that permitted a named plaintiff participating in one plan to sue other plans. 162 F.3d at 422. In support of this argument, the Sixth Circuit cited four cases, two of which were unpublished and one which did not even mention the Article III standing issues. *See Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101 (5th Cir.1993) (Higginbotham, J.); *Misch v. Cmty. Mut. Ins. Co.,* 1995 WL 1055171, 1995 U.S. Dist. LEXIS 5059 (S.D.Ohio 1995); *Sutton v. Medical Serv. Assoc. of Pa.,* 1993 WL 273429 (E.D.Pa.1993). The remaining case explained that a more lenient view of Article III standing could be taken in healthcare insurance cases involving the Employment Retirement Income Security Act ("ERISA") because circuit precedent prescribed that the "provisions granting standing to certain classes of persons under the Act" were not to be given "an unduly cramped reading." *Doe I v. Guardian Life Ins. Co. of Am.,* 145 F.R.D. 466, 472 (N.D.Ill.1992) (quoting *Sladek v. Bell Sys. Mgmt. Pension Plan,* 880 F.2d 972, 976 (7th Cir.1989)). In short, circuit precedent interpreting ERISA, a statute that is not at issue in the present case, was an important factor in the court's decision regarding Article III standing.

Although the reasoning and legal citations contained in *Payton* and *Fallick* are not persuasive when applied to the current case, this does not mean that the approach taken by the Seventh and Sixth Circuit is without merit. There may well be instances when it is necessary to create exceptions to the general rule that Article III standing should be addressed before other issues, such as when there is a "national litigation crisis" that "defies customary judicial administration," as was the situation in *Amchem* and *Ortiz.* Exceptions in other situations may also be appropriate. *See Wilder v. Bernstein,* 499 F.Supp. 980, 993 (S.D.N.Y.1980) (stating that "courts have traditionally applied a broad and accommodating concept of standing in civil rights cases in recognition of the strong public interest in effective enforcement of the civil rights statutes which is not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

always present in commercial litigation between private parties."(citation and quotation marks omitted)).

But to find an exception here is unwarranted and ill advised. The practicalities of this case advise against it. This is a securities case. As this Court has stated previously, the need for strict standing requirements "are particularly important in the area of securities litigation, in order to curb the risks of vexatious litigation and abuse of discovery." *In re Bank of Boston Corp. Sec. Litig., 762 F.Supp. 1525, 1531 (D.Mass.1991)* (Harrington, J.); *see also La Mar v. H & B Novelty & Loan Co., 489 F.2d 461, 469 (9th Cir.1973)* (stating that "courts have manifested a marked degree of restraint" regarding standing in securities cases). The problems associated with attorney-driven securities litigation have not gone unnoticed by the courts or by Congress. *See Greebel v. FTP Software, Inc., 939 F.Supp. 57, 58 (D.Mass.1996)* (stating that Congress enacted the Private Securities Litigation Reform Act of 1995 because of a belief "that the plaintiff's bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement"). Such concerns are certainly\*169 not absent in this case.[FN1]

> FN1. The Court notes that the named plaintiffs claimed at oral argument that there were "millions of members of the class." Yet not one individual who purchased shares in the Institutional or Advisers funds has come forward to represent a class of those investors.

Even more important, however, is the concern that adopting the arguments advanced by the named plaintiffs would run the risk that:

> any plaintiff could sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a claim. Plaintiffs "may not use the procedural device of a class action to bootstrap [themselves] into standing [they] lack[ ]."

*Dash, 248 F.Supp.2d at 503* (quoting *Weiner, 358 F.Supp. at 694*). The principles at the heart of Article III standing are simply too important to

permit such bootstrapping. It is commonly stated that Article III standing is critical to the separation power between the judicial and political branches. *See Raines v. Byrd, 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)*. But it is worth remembering that the separation of powers is not simply an end unto itself. It constitutes the essential and elemental structure of our form of government. Its ultimate purpose is to protect individual liberty. *See Mistretta v. United States, 488 U.S. 361, 380, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)* ("[T]he separation of governmental powers into three coordinate Branches is essential to the preservation of liberty."). The exercise of judicial power can "profoundly affect the lives, liberty and property of those to whom it extends." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 473, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)*. Adhering to the constitutional limits on that power "reflects a due regard for the autonomy of those persons likely to be most directly affected by judicial order." *Id.* Given such weighty concerns, this Court cannot put aside the requirements of Article III simply because a plaintiff decides to file a motion seeking to represent a class.

[3] In summary, the Supreme Court's aversion to creating broad exceptions to the requirements of jurisdiction, the unique factual and procedural history of *Amchem* and *Ortiz*, the lack of persuasive reasoning contained in cases that favor the named plaintiffs' arguments, the practical realities of this case, and the important principles underlying Article III convince this Court that the *Ortiz* exception should be narrowly interpreted and its applicability does not extend to the current case. This Court took the proper approach in its earlier opinion when it considered (and rejected) the plaintiffs' Article III standing as to two of the mutual funds prior to analyzing class certification. *See In re Eaton Vance Corp. Sec. Litig., 219 F.R.D. at 40-41.*

## III. *THE JURIDICAL LINK DOCTRINE*

Even if the *Ortiz* exception did apply to the current case, and courts were required to address the procedural requirements of class certification issues before the constitutional requirements of Article III, the named plaintiffs still could not represent a class of investors who purchased shares in the Institutional or Advisers funds because the named plaintiffs have

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

failed to demonstrate that their claims are typical of that class, as is required by Fed.R.Civ.P. 23(a).[FN2] This alternative view of the case involves the application of the juridical link doctrine. Before discussing the juridical link doctrine's application, the Court pauses to explain why the doctrine is better used to address Rule 23 issues, rather than in the Court's analysis of Article III standing.

> FN2. Rule 23(a) permits class actions if "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The juridical link doctrine was first conceived in dicta by the Ninth Circuit in *La Mar v. H & B Novelty & Loan Co., 489 F.2d 461, 465-66 (9th Cir.1973).* In its infancy, the doctrine had nothing to do with Article *170 III standing. In fact, La Mar was a case where standing was not at issue because the Ninth Circuit assumed it to exist. *See id.* at 464. Rather, the juridical link doctrine was used to determine whether named plaintiffs were typical of the class and could fairly and adequately protect class interests as required by Rule 23. *See id.* at 465-66. The crux of the doctrine held that "a plaintiff who has no cause of action against the defendant can not [represent] those who do have such causes of action." *Id.* at 466. The Ninth Circuit, however, suggested that there were two exceptions to this rule: one for situations where the named plaintiff's injuries "are the result of a conspiracy or concerted schemes between the defendants," and another for situations where it would be "expeditious" to combine the defendants into one action because they are "juridically related." *Id.* at 466. Hence, the juridical link doctrine was born. Over time, the doctrine came to be used not only in the class certification analysis under Rule 23, but also in the standing analysis under Article III. *See, e.g., Alves v. Harvard Pilgrim Health Care Inc., 204 F.Supp.2d 198, 205 (D.Mass.2002)* (applying juridical link doctrine to determine if a group of named plaintiffs has Article III standing to sue defendants that have caused them no harm). The First Circuit has never adopted the juridical link doctrine in either the class certification or Article III

context, although some courts within this circuit have. *See In re Pharm. Indus. Average Wholesale Price Litig., 263 F.Supp.2d 172, 193 (D.Mass.2003)* (discussing juridical link doctrine and holding that named plaintiffs who purchased a drug from one company could not sue other companies from whom the named plaintiffs purchased no drugs because doing so would allow named plaintiffs to acquire standing "through the backdoor of a class action" (quoting *Allee v. Medrano, 416 U.S. 802, 828-29, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974))*).

This Court has serious reservations about importing the juridical link doctrine into the Article III analysis. Underpinning the juridical link doctrine is the idea that "a single resolution of the dispute would be expeditious." *Alves, 204 F.Supp.2d at 205* (quoting *La Mar, 489 F.2d at 466).* Article III standing, however, does not often bend to expediency and the Supreme Court has warned against such an approach. *See Raines, 521 U.S. at 820, 117 S.Ct. 2312* (stating that an Article III standing analysis cannot be abandoned "for the sake of convenience and efficiency"); *Valley Forge, 454 U.S. at 476, 102 S.Ct. 752* (stating that Article III standing "is not merely a troublesome hurdle to be overcome if possible so as to reach the merits of a lawsuit").

[4] The juridical link doctrine's emphasis on expediency made sense in light of the fact that the doctrine was originally created to help analyze Rule 23. This is true because "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility." *Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir.1997).* The requirements of Article III, on the other hand, tend to be "inflexible and without exception." *Steel Co., 523 U.S. at 94, 118 S.Ct. 1003.* Article III imposes "fairly strict requirements," *People to End Homelessness, Inc., 339 F.3d at 8,* because "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," *Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).*

[5] This Court also is skeptical that a doctrine created to analyze Rule 23 requirements should be used in an Article III standing analysis because the Supreme Court has stated "that a suit may be a class action ...

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

adds nothing to the question of standing." *See Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Moreover, the Court has rejected, in the context of Article III standing, the basic concept supporting the juridical link doctrine: "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, *although similar,* to which he has not been subject." *Blum v. Yaretsky,* 457 U.S. 991, 999, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (emphasis added). It is clear that class certification **171** and Article III standing are separate and distinct issues, regardless of whether the named plaintiffs' injury is similar to that of unnamed plaintiffs. *See Abato v. Marcam Corp.,* 162 F.R.D. 8, 10-11 (D.Mass.1995) ("[T]he question of whether a named plaintiff has standing to assert a claim is an inquiry altogether separate from the question of whether the named plaintiff meets the ... requirement[s] of Rule 23."). In short, "[t]he 'juridical links doctrine' is not relevant to the issue of standing." *Matte,* 270 F.Supp.2d at 828.

[6] Rather, the juridical link doctrine should be confined to an analysis of Rule 23(a). Applying the juridical link doctrine in the Rule 23 context to this case, it is clear that the Institutional and Advisers funds are not sufficiently juridically linked to the other mutual funds. To begin with, it should be emphasized that the four mutual funds are each separate corporate entities and are entitled to the legal protections flowing from their corporate status. In addition, the juridical link doctrine is most commonly applied when there is a contractual obligation among the defendants, a conspiracy among the defendants or a state or local statute which requires common action by the defendants. *See Dash,* 248 F.Supp.2d at 505 (citing *Payton,* 308 F.3d at 679). There is no evidence that any of these situations exists here.

Instead, the named plaintiffs point to the fact that the four mutual funds were managed by some of the same individuals, invested in the same set of loans, and had the same signatories to the registration statements. Even if true, these facts are of marginal relevance. The ultimate issue in this case is whether the defendants made identical false and misleading statements in their published prospectuses and registration statements. The fact that the four funds are managed by the same executives, for example, tells this Court nothing about whether the four funds

actually made the same false and misleading statements. The Court also notes, as it did in its previous opinion, that it is impossible for the Court to resolve the apparent dispute between the parties over whether all the statements made by all four mutual funds were the same because the named plaintiffs failed to provide this Court with detailed documentation regarding the various prospectuses and registration statements as part of their motion for class certification. *See In re Eaton Vance Corp. Sec. Litig.,* 219 F.R.D. at 41. In the final analysis, the named plaintiffs have failed to meet their burden of establishing that class certification is appropriate, at least as it pertains to the Institutional and Advisers funds. *See Smilow v. Southwestern Bell Mobile Sys., Inc.,* 323 F.3d 32, 38 (1st Cir.2003).

IV. *CONCLUSION*

*Ortiz* created only a limited exception to the general rule that jurisdiction must be considered before other issues. This limited exception does not apply to the current case. Even if the *Ortiz* exception did apply to this case, class certification as to all four mutual funds is nevertheless inappropriate. The named plaintiffs have failed to demonstrate that the Institutional and Advisers funds are sufficiently juridically linked to the two other mutual funds so as to meet the requirements of Rule 23.

D.Mass.,2004.
In re Eaton Vance Corp. Securities Litigation
220 F.R.D. 162

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 12**

**Westlaw.**

Slip Copy                                                                                         Page 1
Slip Copy, 2008 WL 343299 (D.Ariz.)

**H**Lindquist v. Farmers Ins. Co. of Ariz.
D.Ariz.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Arizona.
Blair LINDQUIST, Plaintiff,
v.
FARMERS INSURANCE COMPANY OF
ARIZONA, et al., Defendants.
**No. CV 06-597-TUC-FRZ.**

Feb. 6, 2008.

Cory S. Fein, Cynthia B. Chapman, Michael A. Caddell, Richard D. Daly, Caddell & Chapman, Houston, TX, Jose De Jesus Rivera, Haralson Miller Pitt Feldman & McAnally PLC, Phoenix, AZ, Patrick Earl Broom, Stanley G. Feldman, Haralson Miller Pitt Feldman & McAnally PLC, Joseph William Watkins, Law Offices of Joseph W. Watkins PC, Tucson, AZ, for Plaintiff.
Brenden James Griffin, Erin Ogletree Simpson, Lewis & Roca LLP, Tucson, AZ, Steven J. Hulsman, Lewis & Roca LLP, Phoenix, AZ, for Defendants.

**ORDER**

FRANK R. ZAPATA, District Judge.
*1 Pending before the Court is Defendants Motion to Dismiss. For the reasons stated below, the motion is denied in part and granted in part.<sup>FN1</sup>

> FN1. The Court has determined that the issues have been fully and adequately briefed and that oral argument would not aid the Court in its understanding of the issues. Thus, as the Court finds that this case is appropriate for resolution without oral argument, the parties' requests for oral argument are denied.

**I. *STANDARD OF REVIEW***

The dispositive issue raised by a motion to dismiss for failure to state a claim is whether the facts as pleaded, if established, support a valid claim for relief. *See Neitzke v. Williams,* 490 U.S. 319, 328-329 (1989). In reviewing a motion to dismiss for failure

to state a claim, a court's review is limited to the contents of the complaint. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994). All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Id.* A complaint should not be dismissed unless it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Id.; see also Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007)("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do ... Factual allegations must be enough to raise a right to relief above the speculative level ....")(internal quotes and citations omitted).<sup>FN2</sup>

> FN2. The Court notes that Plaintiff, relying on *Wright v. Schock,* argues that it is premature to address Defendants' motion to dismiss as this case is still in its early stages and a motion for class certification and related discovery have yet to occur. *See*742 F.2d 541 (9th Cir.1984). However, nothing in *Wright* prohibits an early ruling on dispositive motions prior to a ruling on class certification; *Wright* leaves this issue to the discretion of the Court. *See id.*Furthermore, *Wright* affirmed the trial court's decision to grant the defendant's dispositive motion prior to a ruling on class certification. *See id.*

**II. *BACKGROUND***

Due to a water leak in his plumbing system, Plaintiff's home was damaged. At the time, Plaintiff had a homeowner's insurance policy through Farmers Insurance Company of Arizona ("Farmers Arizona").*See* Third Amended Complaint ("Complaint") at ¶ 14. As such, Plaintiff submitted an actual cash value ("ACV") claim for the damage sustained to his home to Farmers Arizona. *Id.* Although Farmers Arizona paid a portion of the claim, and properly subtracted an amount for depreciation and the deductible, it refused to pay any

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                 Page 2
Slip Copy, 2008 WL 343299 (D.Ariz.)

amount due for general contractor overhead, profit ("O & P"), and taxes (collectively "OP & T").*Id.*"Farmers Arizona's refusal was in compliance with Defendants' policy of not paying for OP & T unless and until OP & T costs are actually incurred by its insureds."*Id.*"However, Defendants' failure to pay OP & T was in contravention of the terms of Defendants' policies which requires payment of 'actual cash value' which, in repairs involving three or more trades, includes OP & T."*Id.* at ¶ 15.

Plaintiff further alleges that "Defendants withhold OP & T from other insureds who make claims under the same or similar insurance policies, even though Defendants acknowledge and accept damage estimates that include amounts for OP & T ... When Defendants issue its insurance policies, they agree to pay actual cash value, which means repair or replacement cost, less depreciation. Repair or replacement costs include any costs that an insured is reasonably likely to incur in repairing or replacing a covered loss ... Defendants routinely deduct, or fail to include OP & T when they make an actual cash value of the damage payment under their insurance policies"*Id.* at ¶¶ 16, 21, 22.Lastly, Plaintiff alleges that "Defendants' implementation of a company-wide policy (which it knows is based on incorrect, unreasonable, and bad faith interpretation of the relevant coverage provision in its insurance policy) has led to a systematic practice of attempting to undervalue claims, and a systematic practice of attempting to settle claims for less than the amount to which its insureds are entitled."*Id.* at ¶ 22.

**\*2** Based on these allegations, Plaintiff asserts claims against Farmers Arizona and its related insurance entities for breach of contract, "joint venture," and "alter ego/single business enterprise." Plaintiff also seeks to assert these claims against the Defendants on behalf of a nationwide class of similarly situated insureds.

### III. *DISCUSSION*

### A. Class Allegations: Class Definition and Predominance

Defendants argue that Plaintiff's purported class action allegations must be dismissed as he fails to satisfy two prerequisites to sustain a class action: (1) a properly defined class such that purported members

of the class can be identified by reference to objective criteria; and (2) common issues that predominate over individual issues. As the Court finds that these prerequisites have been adequately satisfied at this early stage in the litigation, Defendants' motion to dismiss the class allegations is denied.

### 1. Class Definition: Identifying the Class by Reference to Objective Criteria

As to the properly defined class prerequisite, Defendants generally argue that because a "reasonably likely" standard applies to any substantive breach of contract claim for failure to pay OP & T in this case, an objectively ascertainable class is foreclosed in this action.

In arguing that a "reasonably likely" standard applies in this case, Defendants cite to *Tritschler v. Allstate Insurance Company. See* 213 Ariz. 505, 515 (Ct.App.2006). In *Trischler,* the Arizona Court of Appeals held that "actual cash value in adjusting a property loss includes any cost that an insured would *be reasonably likely* to incur in repairing or replacing a covered loss, regardless of whether the insured intends to repair or replace the property. *And, if the cost to repair or replace the damaged properly would**likely require**the services of a general contractor, the contractor's overhead and profit fees should be included in determining actual cash value,* even when an insured ultimately elects to complete personally the needed repairs."213 Ariz. 505, 515 (Ct.App.2006)(emphasis added). As Plaintiff is specifically claiming that Farmers Arizona cheated him out of the cost stemming from general contractor's overhead and profit, "likely require" is the specific language used by *Tritchler* to cover these circumstances. *Id.* Thus, if the cost to properly repair or replace the damage to an insured's home would "likely require" the services of a general contractor, then the insurer should include overhead and profit in determining actual cash value. *Id.*

The Court notes that throughout Defendants' briefs, they refer to a "reasonably likely" (as opposed to "likely require") standard to support their arguments for dismissal of the class allegations. As *Tritschler* specifically used the term "likely require" as applied to an insurer's duty to pay for general contractor's overhead and profit, the Court will also use that same *Tritschler* language. Thus, hereinafter, the Court will

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 343299 (D.Ariz.)

only refer to a "likely require" standard when discussing Defendants' arguments regarding the standard applicable in this case that is simply the specific language used in *Tritschler.*

**\*3** As stated in Moore's Federal Practice, Defendants argue that "having a precisely defined class makes it possible for a court to determine whether the proposed class satisfies the other requirements of Rule 23 ... [T]he court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria ... A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class. In other words, the class should not be defined in terms of whether its members were treated *'properly,' 'adequately,' 'reasonably,' or 'constitutionally,'* because then class membership depends on a determination of the merits as to each potential class member. This conclusion follows from the rule that courts may not decide the underlying merits of the claims at the class certification stage."*See* 5 James Wm. Moore, et al., *Moore's Federal Practice* §§ 23.21[3][a], 23.21[3][c], 23.21[3][d] (3rg Ed.2007)(emphasis added). As Defendants argue that a "likely require" standard applies, they contend that Plaintiff's class definition must require a subjective, individualized inquiry into the "likely require" question for each and every purported member of the class. Thus, Defendants argue that the class definition in this case necessarily lacks objective ascertainability and would require the Court to impermissibly delve into the merits of each claim to determine who is a member of the class. The Court disagrees.

While Defendants correctly discuss the general rule pertaining to a proper class definition, they do not adequately show that the class definition at issue in this case falls outside of the general rule. Indeed, a review of the class definition proposed by Plaintiff shows that class members can be identified by reference to objective criteria. Plaintiff defines the class as follows:

> All policyholders (1) who own or owned real property located in the United States which was insured by Defendants, (2) who submitted to Defendants a claim for a covered loss to the

insured real property during the period from four years prior to the filing of the Original Complaint in this case to the present, (3) whose claim files indicate the anticipated involvement of a minimum of three trades to complete the repair, and (4) received a payment from Defendants which resulted from a calculation of actual cash value that withheld, or failed to include, a percentage for general contractor's overhead and profit, and sales tax.

*See* Complaint at ¶ 25. There is no reference to the "likely require" standard in the definition, and identification of class members does not require the Court to delve into the "likely require" question to determine who are members of the class. Rather, class members can be identified by objective criteria that are contained in the claim files maintained by Defendants. Defendants' files would reflect the objective information encompassed by Plaintiff's class definition which includes: the location of the real property insured by Defendants; the names of insureds who submitted a claim for a covered loss; whether the Defendants' own files indicate the anticipated involvement of at least three trades; and whether Defendants withheld OP & T from any payment. If a purported class member meets these objective criteria, they would be included in the class; if one did not meet these objective criteria, they would not be included in the class. Thus, an individualized inquiry into the merits of every potential class member is not required to determine who is a proper member of the class definition at issue in this case. *See, e.g., Melot v. Oklahoma Farm Bureau Mutual Insurance Company,* 87 P.3d 644, 647 (Okla.Ct.App.2003)(class plaintiffs asserted the same type of claims and class definition as the case at bar and class certification was affirmed; the court found that the class definition was proper as the "class definition does not state that the class is composed of those with claims for repairs involving three or more trades, but rather those where *insurer's own worksheets* indicate the need for three or more trades. Under this definition, there would be no need for the trial court to make individualized determinations, because the determinations have already been made by Insurer")(emphasis in the original); *see also Burgess v. Farmers Insurance Company, Inc.,* 151 P.3d 92 (Okla.2006)(class plaintiffs asserted analogous claims and class definition as the case at bar and class certification was affirmed); *Mills v. Foremost Insurance*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 4
Slip Copy, 2008 WL 343299 (D.Ariz.)

*Company,* 511 F.3d 1300, 2008 WL 45806 (11th Cir. Jan. 4, 2008)(holding that the district court erred in its conclusion at the motion to dismiss stage that individual issues predominated over common issues under circumstances similar to this case; remanding the case to permit discovery pertaining to class certification). Accordingly, the Court denies Defendants' motion to dismiss based on an improper class definition.[FN3]

> FN3. The Court notes that Defendants also cite *Crosby v. Social Security Administration,* 796 F.2d 576 (1st Cir.1986) and *Davoll v. Webb,* 160 F.R.D. 142 (D.Colo.1995) as two cases that exemplify the general rule that a class definition is improper if it requires an individualized inquiry into the merits of every potential class members' claims to determine who is a member of the class. However, as explained above, the class definition at issue does not require such an individualized inquiry and is based on objective criteria. Further, unlike the class definition in this case, the class definition in *Crosby* and *Davoll* actually incorporated a subjective "reasonableness" inquiry to determine who would be members of the class. *See Davoll,* 160 F.R.D. at 144 (proposed class definition in Americans with Disabilities Act case would seek to include those "who have been or will be denied *reasonable* accommodation of their disabilities by defendants")(emphasis added); *Crosby,* 796 F.2d at 578 (proposed class definition in Social Security disability case challenging the amount of time the Administration took to adjudicate cases defined the class as all claimants "who have not had a hearing held within a *reasonable* time and/or who have not had a decision rendered in such a hearing for benefits within a *reasonable* time"; the First Circuit largely denied class certification based on the "reasonable time" definition as the Supreme Court in *Heckler v. Day,* 467 U.S. 104 (1984) had recently ruled that mandatory time limits to adjudicate disability claims could not be imposed on the Administration as "it would be an unwarranted judicial intrusion into this pervasively regulated area for federal courts to issue injunctions imposing deadlines with

respect to future disability claims.") (emphasis added)(internal quotes and citations omitted). It should also be noted that some courts have found a class definition proper even where "reasonableness" was part of the class definition. *See Barnett v. Bowen,* 794 F.2d 17, 23-24 (2nd Cir.1986); *Adames v. Mitsubishi Bank, Ltd.,* 133 F.R.D. 82, 88-89 (E.D.N.Y.1989). Lastly, as discussed in the text of this Order, the Court finds *Burgess, Melot,* and *Mills* more persuasive authority.

## 2. Predominance

*4 Defendants next argue that Plaintiff's purported class action must fail as it fails to satisfy the predominance requirement of FED.R.CIV.P. 23(b)(3). As relevant to Defendants' position, Rule 23(b)(3) states that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."Similar to Defendants' arguments relating to the class definition, Defendants argue that individual questions of law or fact will predominate in this case as a "likely require" standard applies to the merits of Plaintiff's claim for OP & T pursuant to *Tritschler.*Defendants argue that whether a property loss will "likely require" the services of a general contractor such that an insured would be entitled to O & P will require a subjective, individual inquiry for every class member. As such, Defendants argue that this case is not subject to generalized proof, individual issues therefore predominate, and a class action is inappropriate.

To support their position, Defendants rely on *Schuetz v. Banc One Mortgage Corporation,* 292 F.3d 1004 (9th Cir.2002); *Mills v. Foremost Insurance Company,* 2006 WL 3313945 (M.D.Fla.2006); and *Salesin v. State Farm & Casualty Company,* 2003 WL 22299828 (Mich. .Ct.App.2003). The Court does not find these cases persuasive. *Schuetz* is a case that focuses almost exclusively on the interpretation of the Real Estate Settlement Procedures Act ("RESPA") as it applies to yield spread premiums, and has nothing to do with a homeowner's right to recover O & P under an insurance policy. *See Schuetz* at 1005-14.*Schuetz* only summarily addresses the periphery class action issue under RESPA in a few

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

brief sentences, and never states that having a "reasonableness" standard dictates that individual issues must predominate in cases falling outside of RESPA. *See id.* at 1014.In *Mills,* which is a brief, unpublished case, the district court denied standing to the purported class based on an interpretation of the home insurance contract that is contrary to *Tritschler* and the weight of authority addressing an insured's right to recover O & P; thereafter, the district court alternatively concluded that the adjustment of O & P must involve individualized inquiries that predominate over common issues. *See Mills* at 2006 WL 3313945 at *1-2.*Subsequently, as Defendants' supplemental citation of authority reflects, the district court's order in *Mills* was completely reversed by the Eleventh Circuit on January 4, 2008. *See Mills v. Foremost Insurance Company,* 511F.3d 1300, 2008 WL 45806 (11th Cir. Jan. 4, 2008)(holding that the district court erred in its interpretation of the homeowner's contract as to the entitlement to OP & T, that the district court's interpretation was contrary to the weight of authority on the issue, and erred in its conclusion at the motion to dismiss stage that individual issues predominated over common issues; remanding the case to permit discovery pertaining to class certification). Lastly, *Salesin* is also a brief, unpublished case that summarily concludes that a class action by homeowners seeking O & P necessarily involves only individualized proof that precludes a class action. *See Salesin,* 2003 WL 22299828 at *3.* Furthermore, *Salesin* appears to hold that the requirement of individualized damages determinations precludes class certification; this holding is contrary to the weight of authority that holds otherwise. *See* 2 Alba Conte, et al., *Newberg on Class Actions* § 4:26 at p. 220 (4th Ed.2003)("In most cases, the amount of damages suffered is an individual matter, but the Advisory Committee Notes state that such needed individual proof of damages will not preclude a finding of predominance."); 2 William W. Schwarzer, et al., *Federal Civil Procedure Before Trial,* § 10:429.5 (2007)("The fact that damages vary from class member to class member does not itself defeat class certification"); *In re Visa Check/MastercardMoney Antitrust Litig.,* 280 F.3d 124, 140 (2nd Cir.2001)("The predominance requirement calls only for predominance, not exclusivity, of common questions.").

*5 As previously highlighted in the class definition section, the Court finds *Burgess, Melot* and *Mills* to

be the more persuasive decisions in the context of predominance as applied to the case at bar. *See Burgess v. Farmers Insurance Company, Inc.,* 151 P.3d 92 (Okla.2006); *Melot v. Oklahoma Farm Bureau Mutual Insurance Company,* 87 P.3d 644 (Okla.Ct.App.2003); *Mills v. Foremost Insurance Company,* 511 F.3d 1300, 2008 WL 45806 (11th Cir. Jan. 4, 2008).* Similar to this case, the plaintiffs in *Burgess, Melot,* and *Mills* asserted a class action claiming that home insurers improperly excluded O & P from actual cash value payments to its insureds. *See id.*In addition, as in this case, the plaintiffs in *Burgess* and *Melot* advanced a class definition and theory of recovery claiming that they were entitled to an allowance for general contractor's O & P whenever three or more trades were required (as reflected by insurer's own records) as a general contractor would be needed under these circumstances. *See id.*Likewise, the defendant insurers in *Melot, Burgess,* and *Mills* claimed that whether an insured was entitled to an allowance for general contractor's O & P depended on the unique facts of every single property damage claim and that individualized issues necessarily predominated over common issues such that a class action was improper. *See id.*In *Burgess,* which was also a class action O & P case against Farmers Insurance, the Oklahoma Supreme Court rejected the insurer's arguments, and found that common issues predominated over individual issues; the court stated in relevant part:

At the heart of this controversy is Insureds' allegation that there is an industry standard "three trade rule," which dictates that upon a determination that three trades are implicated in the repair of property, then a general contractor is presumed to be needed to coordinate, supervise and oversee the repair and thus, a 20 per cent O & P payment is included in the calculation of the ACV settlement. Insurer denies the existence of a rigid "three trade rule" and argues that such rule, if applied, would impermissibly result in expansion of Insurer's contractual obligations. Insurer asserts that instead of following such a rule, Insurer's adjusters use complete individual discretion and follow a "common sense" approach to determine whether the property damage in each individual case requires a general contractor. Thus, Insurer claims it is a case-by-case determination whether to include the 20 per cent O & P payment at the time of the ACV settlement of the claim. While the trial court expressly avoided reaching any determination

on the merits, it examined the "three trade rule" solely for the purpose of identifying the class (class members included only those claimants with claim files reflecting that the involvement of three or more trades was anticipated in the property repair at the time of ACV adjustment) ... The trial court ultimately agreed with Insureds and determined that questions of law or fact common to members of the class predominated over questions affecting only individual members, noting that "the group requesting class certification seeks to remedy a common legal grievance" and that although damage amounts may vary, "the breach of contract, fraud and bad faith claims arise from the same or similar acts or omissions for each Class Member"... We hold the trial court did not abuse its discretion in its determination that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, as the entire class of Insureds' theory of recovery derives from the allegations that Insurer systematically failed to pay the 20 per cent general contractor's O & P when three or more trades were anticipated in the repair and that Insureds were entitled to information concerning O & P and payment for the O & P amount at the time of ACV settlement regardless of whether subsequent repair costs (if Insured elected to repair the property) included the 20 per cent amount. Insurer would have us reject class certification on the basis of a determination regarding the veracity of its defense on the merits-that Insurer in fact did not operate pursuant to an across-the-board pattern of underpayment of claims, but rather, made individual assessments as to the propriety of O & P payments on every claim. We express no opinion on the merits and our determination on class certification should not be taken as any indication of how a jury might properly decide these fact questions ... [I]n recognition of the rule that it is inappropriate to consider the merits of a claim when considering whether a class should be certified, we refrain from ruling on the merits of the alleged "three trade rule," as this is a jury question ... Insurer's assertion that the "three trade rule" is invalid and/or that it did not operate pursuant to an objective standard in the payment of O & P may still be raised ... at a trial on the merits, but it is inappropriate for us to determine its validity at this stage of the proceedings. If Insurer is successful on the merits on this issue and the jury rejects Insureds' assertions as to the Insurer's

alleged systematic underpayment of claims and failure to disclose information concerning Insureds' potential entitlement to such payments, then the result will be binding on the entire class of Insureds ... As for Insurer's argument that individual issues predominate over questions common to the class, we note that "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory"... Here, the acts or omissions of Insurer which constitute the alleged breaches of contract, bad faith and/or fraud (specifically, Insurer's alleged systematic failure to pay general contractor's O & P at the time of ACV settlement when due and failure to disclose information to Insureds concerning O & P) are the same or similar acts or omissions for each class member. Even though damages amounts may vary, common questions predominate where the acts or omissions are the same.

**\*6** *Burgess,* 151 P.3d at 93-94, 99-101 (internal citations omitted); *see also Melot,* 87 P.3d at 648-649 (under analogous circumstances as *Burgess* and the case at bar, affirming the trial court's predominance finding that " 'Plaintiffs sought to remedy a common legal grievance. The alleged breaches of contract and/or fraud are the same or similar acts for each Class Member and common questions predominate, even though damage amounts may vary' ").

The Court notes that Defendants' attempt to distinguish *Burgess* is unpersuasive. *See* Defendants' Reply Brief at 6-7 [FN4] Defendants argue that *Burgess* did not conduct the "rigorous analysis" that Rule 23 imposes on federal courts. However, as stated in *Burgess* and a review of the Oklahoma and federal class action provisions reflect, Oklahoma's class action statute essentially mirrors FED.R.CIV.P. 23. *See Burgess,* 151 P.3d at 98.The Supreme Court has stated that a class action may only be certified if a trial court is satisfied, after a "rigorous analysis," that the requirements of Rule 23 are met. *See General Telephone Co of Southwest v. Falcon,* 457 U.S. 147, 161 (1982). A review of the thorough opinion in *Burgess* shows that a "rigorous analysis" was indeed conducted. Defendants state: "As *Burgess* notes, Oklahoma courts may conditionally certify a class. That is not what federal courts do."*See* Defendants' Reply Brief at 6. Defendants cite to page 98 of the

*Burgess* opinion regarding this issue. What *Burgess* stated was: "Abuse of discretion occurs if the record fails to support the conclusion that each of the ... statutory prerequisites for class certification are met ... In a close question as to certification, the correct action is to sustain certification because if later developments occur at trial, which demonstrate that the order is ill-advised, the order may be modified prior to a determination on the merits."*Burgess,* 151 P.3d at 98.*Burgess* never stated that Oklahoma courts can conditionally certify a case where a trial court is not satisfied that all of the class action requirements have been met after a "rigorous analysis." Furthermore, a class certification order may be altered or amended before a final decision on the merits of the case. *See*FED.R.CIV.P. 23(c)(1)(C)("An order that grants or denies class certification may be altered or amended before final judgment."); 2 William W. Schwarzer, et al., *Federal Civil Procedure Before Trial,* § 10:615 (2007)("The order granting or denying class certification ... may be altered or amended before the decision on the merits."); *Id.* at § 10:629 ("A court may choose to decertify a class action on motion by a party or sua sponte ...").

> FN4. The Court also notes that in emphasizing the individualized nature of O & P determinations, Defendants argued that *Tritschler*"remanded even though *both sides* had moved for summary judgment and the plaintiff, who had testified that he 'coordinated the work of at least five different tradespeople in completing the repairs to his house,' specifically asked for an appellate court 'determin[ation] that he is entitled to overhead and profit on his claim.' " *See* Defendants' Reply Brief at 5-6. The reason the court of appeals in *Tritschler* did not rule on the merits of the O & P claim is that it was a periphery issue in the trial court that was not fully addressed by the parties; as such, it would have been inappropriate to address at the appellate level as the case was being remanded to the trial court for further proceedings. *See Tritschler,* 213 Ariz. at 516 ("Nevertheless, the parties did not focus in their motions for summary judgment on whether a general contractor would have been necessary to complete the remaining repairs. Much of the evidence we have reviewed was presented in

support of other motions before the court. Rather than rule on this matter based on this limited evidence, we remand this issue to the trial court so it may consider this matter after each party has had the opportunity to conduct discovery and present evidence on this precise issue.").

Defendants also criticize *Burgess* because it states that it is inappropriate to consider the merits of the underlying claims in the class action in deciding whether the requirements for class certification have been satisfied; Defendants state that "[f]ederal courts hold the opposite."*See* Defendants' Reply Brief at 7 n. 17. Federal courts do not hold the opposite regarding this general rule. While preliminary inquiry into the merits is sometimes appropriate to the extent necessary to evaluate class certification issues that happen to be intertwined with facts relating to the underlying merits, *Burgess* correctly states the general rule followed by federal courts that trial courts may not decide the merits of the case or consider the likelihood of success on the merits in determining whether the requirements of Rule 23 class certification are met. *See* 5 James Wm. Moore, et al., *Moore's Federal Practice* § 24.45[4] (3rg Ed.2007)("The general rule, however, is that on a motion for class certification, a court may not decide the merits of the case or consider the likelihood of success or failure on the merits. Nonetheless, courts may go beyond the pleadings and may allow discovery and hear evidence when necessary to make the factual determinations that Rule 23 requires"); Staton v. Boeing Co., 327 F.3d 938, 954 (9th Cir.2003)("Although some inquiry into the substance of a case may be necessary to ascertain satisfaction of the ... requirements of Rule 23... it is improper to advance a decision on the merits to the class certification stage.")(internal quotes and citations omitted); Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 428 (4th Cir.2003)(rejecting defendant's argument that class certification was improper as individual inquiries were required to show proximate causation; reasoning that "the sufficiency of the evidence as to proximate cause presented by Plaintiffs goes to the merits of Plaintiffs' case-an issue the Supreme Court has held courts may not consider in ruling on a motion for class certification.)(citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974)).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**\*7** Like *Burgess* and *Melot,* the issues in this case are also largely mirrored in the Eleventh Circuit's persuasive decision in *Mills. See Mills v. Foremost Insurance Company,* 511 F.3d 1300, 2008 WL 45806 (11th Cir. Jan. 4, 2008). In *Mills,* as in this case, the insurer, Foremost Insurance, filed a motion to dismiss arguing that predominance could not be satisfied as "individual issues will abound ... [because] the issue of whether general contractor overhead and profit is properly owing to each of its insureds still depends on whether the services of a general contractor would be **reasonably required** under the circumstances."*Id.* at \*8 (emphasis added). Nonetheless, the Eleventh Circuit recognized that the case could be subject to generalized proof and that common issues could predominate as:

The Millses' complaint contends that the common issue to all class members is whether Foremost improperly excluded overhead, profit, and taxes when aying the actual cash value of their hurricane damage losses. The Millses point out: (1 that Foremost's own adjusters already have prepared claims estimates of the repair costs for each class member's hurricane-damage claim; (2) that the plaintiffs accept Foremost's own adjusters' estimates as to the extent of each repair cost for each class member; and (3) that all that the class members seek to recover is a percentage of those cost estimates for overhead, profit, and sales tax line items, which they claim Foremost improperly excluded from its actual cash value payment to each class member insured with this same Policy who had not actually completed their repairs at the time of the actual cash value payment. The Millses argue that the amount due to each class member can thus be determined with relative ease through basic forensic accounting using Foremost's own claims data ... the Millse stress that proof of whether a general contractor's services or sales taxes were reasonably likely to be incurred can be determined from the face of Foremost's own adjusters' estimates, which Plaintiffs accept, and through forensic review of Foremost's own adjusters' estimates. The Millse contend that industry professionals make such determinations every day in the course of their adjusting duties. The Millses assert that the class's acceptance of the damage estimates of Foremost's own adjusters for purposes of their lawsuit obviates the need to painstakingly analyze each class member's individual circumstances.

*Id.* at 8. Despite a "reasonably required" standard, the Eleventh Circuit held that the district court erred in granting the insurer's motion to dismiss for lack of predominance of common issues; rather, the court held that at a minimum, discovery on these relevant class certification issues was required and that an evidentiary hearing may also be warranted to address these issues. *See id.* at \*8-9.

In light of *Mills, Melot,* and *Burgess,* the Court similarly finds that despite the "likely require" standard at issue, this case may be subject to generalized proof such that common issues predominate over individual issues. As such, Defendants' motion to dismiss Plaintiff's class action claims at this stage of the litigation for lack of predominance is denied. Discovery on the class certification issues pertaining to this case is certainly warranted. Subsequent to this Order, if the parties are able to stipulate or otherwise informally agree as to the scope of discovery pertaining to class certification issues, the Court will likely adopt the discovery plan advanced by the parties. However, if the parties are unable to reach an agreement, the Court will impose deadlines and will almost certainly allow any relevant class certification discovery which will shed light on the factors encompassed by FED.R.CIV.P. 23(a) and (b); *Mills, Melot,* and *Burgess* are also instructive on these discovery issues. The Court will issue a separate order setting a Rule 16 Conference.

**B. Standing and the Non-Contracting Defendants**

**\*8** Defendants argue that Plaintiff is attempting to bring a class action that is much broader than his constitutional standing in this action permits. Defendants point out that Plaintiff's property is in Arizona, his insurance contract is only with Farmers Arizona, and that he has no contract with the other named Defendants in this action (i.e., Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, and Farmers Group, Inc.-collectively referred to as the "Non-Contracting Defendants"). Thus, Defendants argue that Plaintiff is not an insured of the Non-Contracting Defendants. Nonetheless, Defendants emphasize that Plaintiff is attempting to bring a nationwide class action against the Non-Contracting Defendants for breach of insurance contracts with their insureds; these are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

insureds that did not have any contract with Farmers Arizona, but had insurance contracts with the Non-Contracting Defendants in other states not covered by Farmers Arizona. Plaintiff argues, however, that in light of his allegations supporting a joint venture, alter ego, and single business enterprise among Farmers Arizona and the Non-Contracting Defendants, he has standing to assert a nationwide class action (as opposed to a class action composed of just Farmers Arizona's insureds) for breach of contracts occurring between the Non-Contracting Defendants and their insureds in states not covered by Farmers Arizona. As correctly stated in Defendants' reply brief, Defendants "agree that plaintiff's alleged equitable theories of derivative liability give him standing to sue the Non-Contracting Defendants. But his standing to do so is limited to suing them only for alleged damages to Farmers Arizona's insureds like himself, not for alleged damages to the Non-Contracting Defendants' insureds." *See* Defendants Reply Brief at 8-9. The Court agrees with Defendants.

As commentators have explained, a plaintiff purporting to bring a class action must satisfy constitutional standing [FN4] requirements as "threshold individual standing is a prerequisite for all actions, including class actions. Such individual standing must be independently demonstrated ... and one cannot acquire individual standing by virtue of bringing a class action." *See* 1 Alba Conte, et al., *Newberg on Class Actions* § 2:5 at p. 75 (4th Ed.2003); *see also id.* at § 2:9 at p. 109 ("Care must be taken, when dealing with apparently standing-related concepts in a class action context, to analyze individual standing requirements separately and apart from Rule 23 class prerequisites. Though the concepts appear related, in that they both seek to measure whether the proper party is before the court to tender issues for litigation, they are in fact independent criteria. They spring from different sources and serve different functions. Often satisfaction of one set of criteria can exist without the other. The application of the wrong set of criteria in a particular instance may lead to an erroneous conclusion."); 5 James Wm. Moore, et al., *Moore's Federal Practice* § 23.63[1][b] at p. 23-291(3rg Ed.2007)("The named plaintiff in a class action must meet all the jurisdictional requirements to bring an individual suit asserting the same claims, including standing. That is, an actual 'case or controversy must exist between the named plaintiff and the defendants.

If a complaint includes multiple claims, at least one named class representative must have Article III standing to raise each claim ... Constitutional standing is a necessary prerequisite to class certification because without standing the court lacks the power to hear the suit ... If the named plaintiff does not have standing to bring a particular claim, the named plaintiff may not represent the class with respect to that claim").

> FN5. To establish Article III standing, a plaintiff must demonstrate: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servcs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000).

**\*9** The Supreme Court has repeatedly stated that standing is distinct from the Rule 23 class action requirements, and that standing is a threshold requirement that must be satisfied in every case. *See O'Shea v. Littleton,* 414 U.S. 488, 494 (1974)("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."); *Allee v. Medrano,* 416 U.S. 802, 828-829 (1979)(Burger, C.J., concurring in the result in part and dissenting in part)("[S]tanding must be personal to and satisfied by those who seek to invoke the power of federal courts ... a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action .")(internal quotes and citations omitted); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40 n. 20 (1976)("That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                      Page 10
Slip Copy, 2008 WL 343299 (D.Ariz.)

they purport to represent.")(quoting *Warth v. Seldin,* 422 U.S. 490, 502 (1975)).

In addition to the authority above, Defendants have cited numerous other cases generally supporting its position that despite closely interconnected business entities, this does not confer standing on a plaintiff to sue non-contracting defendants for breach of contracts with their insureds (i.e., contracts to which plaintiff was not a party); these authorities also emphasize that the "juridical links" doctrine is only appropriately applicable in the context of Rule 23 class action analysis, as opposed to the separate, threshold issue of standing.[FN6] *See, e.g., Aguilar v. Allstate Fire and Casualty Insurance Co.,* 2007 WL 734809 (E.D.La.2007)(plaintiff filed class action for breach of contract and bad faith against numerous related Allstate insurance entities alleging that they engaged in a "wrongful scheme to delay, deny or underpay claims"; holding that the named plaintiff did not have standing to sue the Allstate entities with whom he had no insurance policy); *Henry v. Circus Circus Casinos, Inc.,* 223 F.R.D. 541 (D .Nev.2004)(plaintiffs filed a time and wage class action against their employer Mandalay Corp. and related business entities; holding that the named plaintiffs only had standing against their direct employer and that the juridical links doctrine was inapplicable to standing analysis); *Forsythe v. Sun Life Financial, Inc.,* 417 F.Supp.2d 100 (D.Mass.2006)(plaintiffs who only owned shares in two of sixty-two affiliated mutual funds at issue purported to assert claims against all sixty-two funds in the "MFS fund complex"; holding that the named plaintiffs only had standing as to the two funds they owned shares in and that the juridical links doctrine did not apply to standing); *Siemers v. Wells Fargo & Co.,* 2006 WL 3041090 (N.D.Cal.2006)(holding that the juridical links doctrine was only applicable in the context of Rule 23 requirements, as opposed to standing analysis); *Papoola v. MD-Individual Practice Ass'n,* 230 F.R.D. 424 (D.Md.2005)(same); *In re Eaton Vance Corp. Sec. Litig.,* 220 F.R.D. 162 (D. Mass 2004)(same).

> FN6. As courts have recognized, the "juridical link doctrine arose out of the Ninth Circuit's decision in *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir.1973).*La Mar* held that a plaintiff without a cause of action against a specific

defendant cannot fairly and adequately protect the interests of those who do have such causes of action, for purposes of Rule 23(a). Nevertheless ... the court went on to hold that if the plaintiffs as a group-named and unnamed-have suffered an identical injury at the hands of several parties related by way of a conspiracy or concerted scheme, or otherwise juridically related in a manner that suggests a single resolution of the dispute would be expeditious, the claim could go forward ... [T]he juridical-link doctrine has been held not to apply to standing questions at the pleading stage. The doctrine, developed in the context of class certification analysis under [Rule] 23, should properly remain in the analysis of adequacy and typicality of plaintiffs for which it was originally conceived."*Siemers v. Wells Fargo & Co.,* 2006 WL 3041090, *6 (N.D.Cal.2006)(internal quotes and citations omitted).

**\*10** As Defendants correctly argue, despite his burden to establish standing, Plaintiff has failed to cite a single case supporting his position that he can seek a nationwide class action against the Non-Contracting Defendants for breach of contracts against their insureds. The three cases Plaintiff cites to support his position are not persuasive as none of them were class action cases. *See Delos v. Farmers Ins. Group, Inc.,* 93 Cal.App.3d 642 (1979); *Tran v. Farmers Group, Inc.,* 104 Cal.App.4th 1202 (2002); *Forest v. Equitable Life Assurance Society,* 2001 WL 1338809 (N.D .Cal.2001).*Delos, Tran,* and *Forest* were cases in which a single insured asserted breach of contract and related bad faith claims against the insurer with whom the insured had a contract with; in addition, the insured asserted these claims against the closely interconnected insurance entities based on theories such as joint venture, alter ego and single business enterprise. *See id.*In these three cases, the courts held that the single insured could sue both the contracting insurance company and the interconnected insurance entities as they were joint venturers, alter egos, or single business enterprises. *See id.*The claims at issue against the contracting insurer and the non-contracting insurers in these cases were all based on one contract-the contract to which plaintiff was a party to. *See id.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 11
Slip Copy, 2008 WL 343299 (D.Ariz.)

As Defendants correctly argue, the joint venture, alter ego, and single business enterprise allegations are forms of derivative liability arising from the underlying substantive cause of action. *See, e.g., Local 159 v. Nor-Cal Plumbing, Inc.,* 185 F.3d 978, 985 (9th Cir.1999)("A request to pierce the corporate veil is only a means of imposing liability for an underlying cause of action and is not a cause of action in and of itself."); *Fluorine On Call, Ltd. v. Fluorogas* Ltd, 380 F.3d 849, 861 (5th Cir.2004)("[Plaintiff] proceeded under two distinct theories of derivative liability ... -alter ego ... and single business enterprise...."); *In re Grothues,* 226 F.3d 334, 337-38 (5th Cir.2000)(alter ego theory is a remedy to enforce a substantive right, not an independent cause of action); *Samson v. Riesing,* 215 N.W.2d 662, 668-69 (Wis.1974)("Vicarious liability, imputed negligence, and joint venture are essentially doctrines that are applicable to a situation where the negligence of one party is proved and it is sought to hold another party liable, either because, from a plaintiff's view, the other party is financially responsible or, from a defendant's view, to share the burden of the liability."); *Western Oil & Gas. JV, Inc. v. Griffiths,* 91 Fed. Appx. 901, 904 (5th Cir.2003)("Like the alter-ego doctrine, the single business enterprise doctrine is an equitable remedy which applies when the corporate form is 'used as part of an unfair device to achieve an inequitable result.'This doctrine is no more viable for Western than the alter ego doctrine. Like alter ego, the single business enterprise doctrine is an equitable remedy and not a cause of action. Absent a cognizable cause of action this remedy is unavailable."); *Hennessey's Tavern, Inc. v. American Air Filter Co., Inc.,* 204 Cal.App.3d 1351, 1359 (1988) (alter ego is "not itself a claim for substantive relief," but rather is a means to "disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice."). None of the cases cited by Plaintiff (i.e., *Delos, Tran,* and *Forest* ) stand for the proposition that by entering into a contract with one defendant, a plaintiff has standing to pursue class action claims on behalf of class members who had separate contracts with that defendants' joint venturers or alter egos.

**\*11** Accordingly, based on the foregoing, the Court finds that Plaintiff has failed to meet his burden of showing that he has standing to sue the Non-Contracting Defendants for breach of contracts (and the claims arising therefrom) with their insureds. Plaintiff's standing is limited to suing Farmers Arizona and the Non-Contracting Defendants for damages to Farmers Arizona's insureds like himself. Thus, Plaintiff's purported class action may still proceed only on behalf of Farmers Arizona's insureds against Farmers Arizona and the Non-Contracting Defendants. The Court notes that Plaintiff may be able to remedy some his standing limitations by simply adding additional named plaintiffs that have pertinent claims to establish broader standing; as such, Plaintiff shall have 30 days from the filing date of this Order to name additional plaintiffs to remedy any remaining standing limitations.

**C. Remaining Issues: Sales Tax Allegations and Joint Venture**

Defendants seek to dismiss Plaintiff's allegations that he was not paid sales tax relating to the property damage claim at issue in this case. As Defendants submitted evidence in support of this motion for dismissal arguing that Plaintiff was rightfully paid all sales tax owed, the Court will treat the motion as one for summary judgment. *See*FED.R.CIV.P. 12(b). In response, Plaintiff correctly argues that a summary judgment motion is premature at this early stage of the litigation as Plaintiff has not had the opportunity to conduct any relevant discovery; Plaintiff has requested additional time to obtain discovery. Pursuant to FED.R.CIV.P. 56(f), where a party opposing a motion for summary judgment requests additional time, a court may "order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."*See also Burlington Northern Santa Fe R. Co. v. Assiniboine and Sioux Tribes of Fort Peck Reservation,* 323 F.3d 767, 763-764 (9th Cir.2003)(Rule 56(f)"provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence"; where a party has not had adequate time to conduct discovery, "district courts should grant any Rule 56(f) motion fairly freely."). Accordingly, Plaintiff's request is granted. Defendants motion to dismiss/motion for summary judgment is denied without prejudice at this time.

Defendants initially sought to dismiss Plaintiff's joint venture allegations, but subsequently withdrew this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                  Page 12
Slip Copy, 2008 WL 343299 (D.Ariz.)

motion to dismiss as indicated in their Reply Brief.
*See* Defendants' Reply Brief at 10. After withdrawing
the motion to dismiss, Defendants indicated that they
also asserted a motion for summary judgment on this
same claim. For the same reasons stated above,
Defendants motion for summary judgment pertaining
to this issue is premature. Defendants motion for
summary judgment is denied without prejudice.
Plaintiff shall have sufficient time to conduct
necessary discovery pertaining to the claims at issue.

## IV. *CONCLUSION*

**\*12** Accordingly, IT IS HEREBY ORDERED as
follows:

(1) Defendants' motions seeking to dismiss portions
of Plaintiff's case are **denied in part and granted in
part** as discussed in the text of this Order.

D.Ariz.,2008.
Lindquist v. Farmers Ins. Co. of Ariz.
Slip Copy, 2008 WL 343299 (D.Ariz.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 13**

Westlaw.

▷O'Shea v. Littleton,
U.S.Ill. 1974.

Supreme Court of the United States
Michael O'SHEA, as Magistrate of the Circuit Court
for Alexander County, Illinois, and Dorothy Spomer,
as Associate Circuit Judge for Alexander County,
Illinois, Petitioners,
v.
Ezell LITTLETON et al.
**No. 72-953.**

Argued Oct. 17, 1973.
Decided Jan. 15, 1974.

Seventeen black and two white residents of Cairo, Illinois, brought a civil rights class action charging county magistrate and associate judge of county circuit court with depriving plaintiffs and members of their class of their rights under the Constitution and civil rights acts by allegedly engaging, under color of state law, in a continuing pattern and practice of conduct consisting of illegal bond setting, sentencing, and jury fee practices in criminal cases, in which plaintiffs sought injunctive relief. The United States District Court for the Eastern District of Illinois, dismissed case for want of jurisdiction, and plaintiffs appealed. The Court of Appeals, 468 F.2d 389, reversed and remanded. Certiorari was granted. The United States Supreme Court, Mr. Justice White, held that complaint failed to satisfy the threshold requirement of the judicial article of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy, in that none of the named plaintiffs were identified as themselves having suffered any injury in manner specified, claim alleging injury was in only the most general terms and there were no allegations that any relevant state criminal statute was unconstitutional on its face or as applied or that plaintiffs had been or would be improperly charged with violating the criminal law and, furthermore, that even if complaint were considered to present an existing case or controversy no adequate basis for equitable relief had been stated since the injunctive relief sought would constitute a major continuing intrusion of equitable powers of federal court into daily conduct of state criminal proceedings and, also, in view of the

conjectural nature of the threatened injury, plaintiffs failed to establish the basic requisites of issuance of injunctive relief, i.e., substantial and immediate irreparable injury and inadequacy of legal remedies.

Reversed.

Mr. Justice Blackmun filed opinion concurring in the judgment and in Part I of the Court's opinion; Mr. Justice Douglas filed a dissenting opinion in which Mr. Justice Brennan and Mr. Justice Marshall joined.

West Headnotes

**[1] Federal Courts 170B ⟨⟩244**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(D) Pleading
         170Bk242 Sufficiency of Allegations
            170Bk244 k. Civil Rights; Equal
Protection. Most Cited Cases
     (Formerly 106k299.3(3))
Class action complaint charging state magistrate and state circuit court judge with allegedly depriving representative plaintiffs and class members of rights under the Constitution and under civil rights statutes by engaging, under color of state law, in continuing pattern and practice of conduct consisting of illegal bond, sentencing, and jury fee practices in criminal cases failed to satisfy the threshold constitutional requirement that those who seek to invoke the power of federal courts must allege an actual case or controversy since none of the named plaintiffs was identified as having himself suffered any injury in the manner specified, claim alleging injury was in only the most general terms and there were no allegations that any relevant state criminal statute was unconstitutional on its face or as applied or that plaintiffs had been or would be improperly charged with violating the criminal law. U.S.C.A.Const. art. 3, § 1 et seq.; Amends. 1, 6, 8, 13, 14; 42 U.S.C.A. §§ 1981-1983, 1985.

**[2] Federal Courts 170B ⟨⟩32**

170B Federal Courts

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669

Page 2

414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

170BI Jurisdiction and Powers in General
   170BI(A) In General
      170Bk29 Objections to Jurisdiction, Determination and Waiver
         170Bk32 k. Pleading. Most Cited Cases
(Formerly 106k281)
Those who seek to invoke the power of federal courts must allege an actual case or controversy; a plaintiff must allege some threatened or actual injury before a federal court may assume jurisdiction. U.S.C.A.Const. art. 3, § 1 et seq.

**[3] Federal Courts 170B ⟜12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
(Formerly 170Bk12, 106k281)
Although Congress may enact statutes creating legal rights, the invasion of which creates standing even though no injury would exist without the statute, such statutes do not purport to bestow the right to sue in absence of any indication that invasion of the statutory right has occurred or is likely to occur; the constitutional requirement of an actual case or controversy remains. U.S.C.A.Const. art. 3, § 1 et seq.

**[4] Federal Courts 170B ⟜12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
(Formerly 170Bk12, 106k281)
Before a federal court can constitutionally assume jurisdiction a litigant must show that he has a personal stake in the outcome so as to assure that concrete adverseness which sharpens the presentation of issues; such principle applies whether statutory issues or common law issues are sought to be litigated. U.S.C.A.Const. art. 3, § 1 et seq.

**[5] Federal Courts 170B ⟜12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
(Formerly 170Bk12, 106k281)

**Federal Courts 170B ⟜242.1**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(D) Pleading
         170Bk242 Sufficiency of Allegations
            170Bk242.1 k. In General. Most Cited Cases
(Formerly 170Bk242, 106k299.3(1))
Abstract injury is not enough to warrant assumption of jurisdiction by a federal court; to establish a case or controversy it must be alleged that plaintiff has sustained or is immediately in danger of sustaining some direct injury; the injury or threat of injury must be both real and immediate and not conjectural or hypothetical. U.S.C.A.Const. art. 3, § 1 et seq.

**[6] Federal Courts 170B ⟜12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
(Formerly 170Bk12, 106k1)
If none of the named plaintiffs purporting to represent a class meets the case or controversy requirement, none may seek relief on behalf of himself or any member of the class. U.S.C.A.Const. art. 3, § 1 et seq.

**[7] Federal Courts 170B ⟜12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
(Formerly 170Bk12, 106k281)
Past exposure to illegal conduct does not in itself

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

show a present case or controversy requiring injunctive relief if unaccompanied by any continuing, present adverse effects. U.S.C.A.Const. art. 3, § 1 et seq.

**[8] Courts 106 ☞508(7)**

106 Courts
   106VII Concurrent and Conflicting Jurisdiction
     106VII(B) State Courts and United States Courts
      106k508 Injunction by United States Court Against Proceedings in State Court
       106k508(2) Restraining Particular Proceedings
        106k508(7) k. Criminal Proceedings. Most Cited Cases
If any of the plaintiffs, who brought civil rights suit to enjoin county magistrate and associate county circuit judge from continuing to engage in allegedly continuing pattern and practice of conduct consisting of illegal bond setting, sentencing and jury fee practices in criminal cases, were presently serving an assertedly unlawful sentence, the complaint would inappropriately be seeking relief from or modification of current, existing custody; if any plaintiffs were on trial or awaiting trial in state proceedings, the complaint would be seeking injunctive relief that a federal court should not provide. U.S.C.A.Const. Amends. 1, 6, 8, 13, 14; 42 U.S.C.A. §§ 1981-1983, 1985.

**[9] Federal Courts 170B ☞12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
      170Bk12 Case or Controversy Requirement
       170Bk12.1 k. In General. Most Cited Cases
   (Formerly 170Bk12, 106k281)
Past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury; however, allegation of past wrongs does not constitute that showing of real and immediate injury, i. e., an actual case or controversy, necessary before a federal court may assume jurisdiction. U.S.C.A.Const. art. 3, § 1 et seq.

**[10] Federal Courts 170B ☞13.10**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
      170Bk12 Case or Controversy Requirement
       170Bk13.10 k. Civil Rights. Most Cited Cases
   (Formerly 170Bk13, 106k281)
The case or controversy requirement was not satisfied by general assertions or inferences that, in course of their activities to eliminate racial discrimination, plaintiffs, who brought civil rights class action alleging county magistrate and state circuit court judge were engaging in continuing pattern and practice of conduct consisting of illegal bond, sentencing, and jury fee practices in criminal cases, would be prosecuted for violating valid criminal laws. U.S.C.A.Const. art. 3, § 1 et seq.; Amends. 1, 6, 8, 13, 14; 42 U.S.C.A. §§ 1981-1983, 1985.

**[11] Constitutional Law 92 ☞980**

92 Constitutional Law
   92VI Enforcement of Constitutional Provisions
     92VI(C) Determination of Constitutional Questions
      92VI(C)2 Necessity of Determination
       92k980 k. Case or Controversy Requirement. Most Cited Cases
   (Formerly 170Bk13.15, 170Bk13, 106k281)
Where it could only be speculated whether plaintiff would be arrested for violating an ordinance or state statute, particularly in absence of allegations that unconstitutional criminal statutes were being employed to deter constitutionally protected conduct, and plaintiffs had not pointed to any imminent prosecutions contemplated against them and did not claim any constitutional right to engage in conduct proscribed by presumably permissible state laws, or that it was otherwise their intention to so conduct themselves, the threat of injury from any continuing pattern and practice of county magistrate and associate judge of county circuit court as regards illegal bond, sentencing and jury fee practices in criminal cases was too remote to satisfy the case-or-controversy requirement and permit adjudication by a federal court. U.S.C.A.Const. art. 3, § 1 et seq.; Amends. 1, 6, 8, 13, 14; 42 U.S.C.A. §§ 1981-1983, 1985.

**[12] Courts 106 ☞508(7)**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669                                                                                    Page 4
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
       106VII(B) State Courts and United States
Courts
          106k508 Injunction by United States Court
Against Proceedings in State Court
             106k508(2) Restraining Particular
Proceedings
               106k508(7) k. Criminal Proceedings.
Most Cited Cases
Even if complaint charging Illinois county magistrate
and associate judge of county circuit court with
violating the Constitution and civil rights acts by
engaging in continuing pattern and practice of
conduct consisting of illegal bond setting, sentencing,
and jury fee practices in criminal cases presented an
existing case or controversy, no adequate basis for
equitable relief had been stated since for a federal
court to issue an injunction restraining such practices
generally would constitute a major continuing
intrusion of federal courts into daily conduct of state
criminal proceedings; also, in view of conjectural
nature of threatened injury, plaintiffs had failed to
establish the basic requisites to issuance of equitable
relief, i. e., likelihood of substantial and immediate
irreparable injury and inadequacy of legal remedies.
U.S.C.A.Const. Amends. 1, 6, 8, 13, 14; 18 U.S.C.A.
§ 242; 42 U.S.C.A. §§ 1981-1983, 1985;
S.H.A.Ill.Const.1970, art. 6, § 15(e); S.H.A.Ill. ch.
38, §§ 114-5, 114-6.

**[13] Injunction 212 ☜14**

212 Injunction
    212I Nature and Grounds in General
       212I(B) Grounds of Relief
          212k14 k. Irreparable Injury. Most Cited
Cases

**Injunction 212 ☜16**

212 Injunction
    212I Nature and Grounds in General
       212I(B) Grounds of Relief
          212k15 Inadequacy of Remedy at Law
             212k16 k. In General. Most Cited Cases

**Injunction 212 ☜105(1)**

212 Injunction
    212II Subjects of Protection and Relief
       212II(H) Matters Relating to Conspiracies or
Criminal Acts
          212k105 Criminal Prosecutions
             212k105(1) k. In General. Most Cited
Cases
It is a basic doctrine of equity jurisprudence that
courts of equity should not act, and particularly
should not act to restrain a criminal prosecution,
when the moving party has an adequate remedy at
law and will not suffer irreparable injury if denied
equitable relief.

**[14] Courts 106 ☜508(7)**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
       106VII(B) State Courts and United States
Courts
          106k508 Injunction by United States Court
Against Proceedings in State Court
             106k508(2) Restraining Particular
Proceedings
               106k508(7) k. Criminal Proceedings.
Most Cited Cases
Recognition of the need for a proper balance in the
concurrent operation of federal and state courts
counsels restraint in the issuance of injunctions
against state officers engaged in the administration of
the state's criminal laws, in the absence of a showing
of irreparable injury which is both great and
immediate.

**[15] Courts 106 ☜508(1)**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
       106VII(B) State Courts and United States
Courts
          106k508 Injunction by United States Court
Against Proceedings in State Court
             106k508(1) k. In General. Most Cited
Cases
    (Formerly 106k508(11))
Principles of equity, comity, and federalism are
important factors precluding issuance of an
injunction by a federal court restraining state court
proceedings.

**[16] Courts 106 ☜508(7)**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669                                                                                                    Page 5
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

106 Courts
   106VII Concurrent and Conflicting Jurisdiction
      106VII(B) State Courts and United States
Courts
         106k508 Injunction by United States Court
Against Proceedings in State Court
            106k508(2) Restraining Particular
Proceedings
               106k508(7) k. Criminal Proceedings.
Most Cited Cases
Principles precluding equitable intervention by a federal court in state court proceedings are insured to prevent, among other things, an on-going federal audit of state criminal proceedings.

**[17] Courts 106 ☞508(7)**

106 Courts
   106VII Concurrent and Conflicting Jurisdiction
      106VII(B) State Courts and United States
Courts
         106k508 Injunction by United States Court
Against Proceedings in State Court
            106k508(2) Restraining Particular
Proceedings
               106k508(7) k. Criminal Proceedings.
Most Cited Cases
Objection to federal intervention in normal course of state criminal proceedings is to the unwarranted anticipatory interference in the state criminal process by means of continuous or piecemeal interruptions of the state proceedings by litigation in the federal courts; the object of such nonintervention is to sustain the special delicacy of the adjustment to be preserved between federal equitable power and state's administration of its own laws.

**[18] Courts 106 ☞508(7)**

106 Courts
   106VII Concurrent and Conflicting Jurisdiction
      106VII(B) State Courts and United States
Courts
         106k508 Injunction by United States Court
Against Proceedings in State Court
            106k508(2) Restraining Particular
Proceedings
               106k508(7) k. Criminal Proceedings.
Most Cited Cases
For the federal court, in suit charging county magistrate and associate judge of county circuit court with violating the Constitution and civil rights acts by engaging in alleged continuing pattern and practice of conduct consisting of illegal bond setting, sentence, and jury fee practices in criminal cases, to have issued an injunction requiring periodic reports of various types of aggregate data on actions of bail and sentencing would have constituted a form of monitoring of the operation of state court functions that is antipathetic to establish principles of comity; also, question of how compliance might be enforced further militated against the abrasive and unmanageable intercession of federal injunctive relief. U.S.C.A.Const. Amends. 1, 6, 8, 13, 14; 42 U.S.C.A. §§ 1981-1983, 1985.

**[19] Officers and Public Employees 283 ☞121**

283 Officers and Public Employees
   283III Rights, Powers, Duties, and Liabilities
      283k120 Criminal Responsibility of Officers
or Employees and of Persons Dealing with Them
         283k121 k. Offenses. Most Cited Cases
The judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress.

**\*488 \*\*672 Syllabus[FN\*]**

      FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Respondents, 17 black and two white residents of Cairo, Illinois, brought a civil rights class action against petitioners, a magistrate and a circuit court judge, who allegedly engaged under color of state law, in a continuing pattern and practice of conduct consisting of illegal bond-setting, sentencing, and jury-fee practices in criminal cases, which assertedly deprived respondents and members of their class of their rights under the Constitution and 42 U.S.C. ss 1981-1983, 1985. The District Court dismissed the action for want of jurisdiction to issue the injunctive relief sought and on the ground of judicial immunity. The Court of Appeals reversed, holding that issuance of injunctions against judicial officers was not forbidden if their conduct was intentionally racially

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

discriminatory against a cognizable class of persons. Absent sufficient remedy at law, it was held that if respondents proved their allegations, the District Court should fashion appropriate relief to enjoin petitioners from depriving others of their constitutional rights while carrying out their judicial duties in the future. Held:

1. The complaint fails to satisfy the threshold requirement of Art. III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy, where none of the named plaintiffs is identified as himself having suffered any injury in the manner specified, the claim alleging injury is in only the most general terms, and there are no allegations that any relevant state criminal statute is unconstitutional on its face or as applied or that plaintiffs have been or will be improperly charged with violating criminal law. Pp. 675-678.

(a) If none of the named plaintiffs purporting to represent a class meets the case-or-controversy requirement, none may seek relief on behalf of himself or any other member of the class. Pp. 675-676.

**\*489** (b) That requirement is not satisfied by general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws. Pp. 676-677.

**\*\*673** (c) Where it can only be speculated whether respondents will be arrested for violating an ordinance or state statute, particularly in the absence of allegations that unconstitutional criminal statutes are being employed to deter constitutionally protected conduct, and respondents have not pointed to any imminent prosecutions contemplated against them so that they do not claim any constitutional right to engage in conduct proscribed by therefore presumably permissible state laws, or that it is otherwise their intention to so conduct themselves, the threat of injury from the alleged course of conduct they attack is too remote to satisfy the case-or-controversy requirement and permit adjudication by a federal court. Pp. 676-677.

2. Even if the complaint were considered to present an existing case or controversy, no adequate basis for equitable relief has been stated. Pp. 677-680.

(a) The injunctive relief sought by respondents would constitute a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings, and would sharply conflict with recognized principles of equitable restraint, Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669. Pp. 677-679.

(b) Respondents also failed to establish the basic requisites of the issuance of equitable relief-the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law-in view of the conjectural nature of the threatened injury to which respondents are allegedly subjected, and where there are available other procedures, both state and federal, which could provide relief. Pp. 679-680.

7 Cir., 468 F.2d 389, reversed.

Robert J. O'Rourke, Chicago, Ill., for petitioners.
**\*490** Alan M. Wiseman, Chicago, Ill., for respondents.

Mr. Justice WHITE delivered the opinion of the Court.
The respondents are 19 named individuals who commenced this civil rights action, individually and on behalf of a class of citizens of the city of Cairo, Illinois, against the State's Attorney for Alexander County, Illinois, his investigator, the Police Commissioner of Cairo, and the petitioners here, Michael O'Shea and Dorothy Spomer, Magistrate and Associate Judge of the Alexander County Circuit Court, respectively, alleging that they have intentionally engaged in, and are continuing to engage in, various patterns and practices of conduct in the administration of the criminal justice system in Alexander County that deprive respondents of rights secured by the First, Sixth, Eighth, Thirteenth, and Fourteenth Amendments, and by 42 U.S.C. ss 1981, 1982, 1983, and 1985. The complaint, as amended, alleges that since the early 1960's, black citizens of Cairo, together with a small number of white persons on their behalf, have been actively, peaceably and lawfully seeking equality of opportunity and treatment in employment, housing, education, participation **\*491** in governmental decisionmaking and in ordinary day-to-day relations with white citizens and officials of Cairo, and have, as an important part of their protest, participated in, and

94 S.Ct. 669                                                                                                    Page 7
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

encouraged others to participate in, an economic boycott of city merchants who respondents consider have engaged in racial discrimination. Allegedly, there had resulted a great deal of tension and antagonism among the white citizens and officials of Cairo.

The individual respondents are 17 black and two white residents of Cairo. The class, or classes, which they purport to represent are alleged to include 'all those who, on account of their race or creed and because of their exercise of First Amendment rights, have (been) in the past and continue to be subjected to the unconstitutional and selectively discriminatory enforcement and administration of criminal justice in Alexander County,' as well as financially poor persons**674 'who, on account of their poverty, are unable to afford bail, or are unable to afford counsel and jury trials in city ordinance violation cases.'The complaint charges the State's Attorney, his investigator, and the Police Commissioner with a pattern and practice of intentional racial discrimination in the performance of their duties, by which the state criminal laws and procedures are deliberately applied more harshly to black residents of Cairo and inadequately applied to white persons who victimize blacks, to deter respondents from engaging in their lawful attempt to achieve equality. Specific supporting examples of such conduct involving some of the individual respondents are detailed in the complaint as to the State's Attorney and his investigator.

With respect to the petitioners, the county magistrate and judge, a continuing pattern and practice of conduct, under color of law, is alleged to have denied and to continue to deny the constitutional rights of respondents and members of their class in three respects: *492 (1) petitioners set bond in criminal cases according to an unofficial bond schedule without regard to the facts of a case or circumstances of an individual defendant in violation of the Eighth and Fourteenth Amendments; (2) 'on information and belief' they set sentences higher and impose harsher conditions for respondents and members of their class than for white persons, and (3) they require respondents and members of their class when charged with violations of city ordinances which carry fines and possible jail penalties if the fine cannot be paid, to pay for a trial by jury in violation of the Sixth, Eighth, and Fourteenth Amendments. Each of these

continuing practices is alleged to have been carried out intentionally to deprive respondents and their class of the protections of the county criminal justice system and to deter them from engaging in their boycott and similar activities. The complaint further alleges that there is no adequate remedy at law and requests that the practices be enjoined. No damages were sought against the petitioners in this case, nor were any specific instances involving the individually named respondents set forth in the claim against these judicial officers.

The District Court dismissed the case for want of jurisdiction to issue the injunctive relief prayed for and on the ground that petitioners were immune from suit with respect to acts done in the course of their judicial duties. The Court of Appeals reversed, holding that <u>Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967)</u>, on which the District Court relied, did not forbid the issuance of injunctions against judicial officers if it is alleged and proved that they have knowingly engaged in conduct intended to discriminate against a cognizable class of persons on the basis of race. Absent sufficient remedy at law, the Court of Appeals ruled that in the event respondents proved their allegations, the District Court should proceed to fashion appropriate injunctive relief *493 to prevent petitioners from depriving others of their constitutional rights in the course of carrying out their judicial duties in the future.<u>FN1</u> We granted certiorari. **675<u>411 U.S. 915, 93 S.Ct. 1544, 36 L.Ed.2d 306 (1973)</u>.

<blockquote>
<u>FN1.</u> While the Court of Appeals did not attempt to specify exactly what type of injunctive relief might be justified, it at least suggested that it might include a requirement of 'periodic reports of various types of aggregate data on actions on bail and sentencing.'<u>468 F.2d. at 415.</u> The dissenting judge urged that a federal district court has no power to supervise and regulate by mandatory injunction the discretion which state court judges may exercise within the limits of the powers vested in them by law, and that any relief contemplated by the majority holding which might be applicable to the pattern and practice alleged, if proven, would subject the petitioners to the continuing supervision of the District Court,
</blockquote>

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669                                                                                          Page 8
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

the necessity of defending their motivations in each instance when the fixing of bail or sentence was challenged by a Negro defendant as inconsistent with the equitable relief granted, and the possibility of a contempt citation for failure to comply with the relief awarded. Id., at 415-417.

## I

[1][2][3][4][5][6] We reverse the judgment of the Court of Appeals. The complaint failed to satisfy the threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy.Flast v. Cohen, 392 U.S. 83, 94-101, 88 S.Ct. 1942, 1949-1953, 20 L.Ed.2d 947 (1968); Jenkins v. McKeithen, 395 U.S. 411, 421-425, 89 S.Ct. 1843, 1848-1851, 23 L.Ed.2d 404 (1969) (opinion of Marshall, J.). Plaintiffs in the federal courts 'must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction.'Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973).FN2 There *494 must be a 'personal stake in the outcome' such as to 'assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Nor is the principle different where statutory issues are raised. Cf. United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). Abstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct.Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' Golden v. Zwickler, 394 U.S. 103, 109-110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969); Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); United Public Workers v. Mitchell, 330 U.S. 75, 89-91, 67 S.Ct. 556, 564-565, 91 L.Ed. 754 (1947). Moreover, if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.FN3 *495Bailey v. Patterson, 369 U.S. 31, 32-33, 82 S.Ct. 549, 550-551, 7 L.Ed.2d 512 (1962); **676Indiana Employment Division v. Burney, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973). See 3B J. Moore, Federal Practice, 23.10-1, n. 8 (2d ed. 1971).

FN2. We have previously noted that 'Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute. See, e.g., Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (White, J., concurring); Hardin v. Kentucky Utilities Co., 390 U.S. 1, 6, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).'Linda R.S. v. Richard D., 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). But such statutes do not purport to bestow the right to sue in the absence of any indication that invasion of the statutory right has occurred or is likely to occur.Title 42 U.S.C. s 1983, in particular, provides for liability to the 'party injured' in an action at law, suit in equity, or other proper proceeding for redress. Perforce, the constitutional requirement of an actual case or controversy remains. Respondents still must show actual or threatened injury of some kind to establish standing in the constitutional sense.

FN3. There was no class determination in this case as the complaint was dismissed on grounds which did not require that determination to be made. Petitioners assert that the lack of standing of the named respondents to raise the class claim is buttressed by the incongruous nature of the class respondents seek to represent. The class is variously and incompatibly defined in the complaint as those residents of Cairo, both Negro and white, who have boycotted certain businesses in that city and engaged in similar activities for the purpose of combatting racial discrimination, as a class of all Negro citizens suffering racial discrimination in the application of the criminal justice system in Alexander County (though two white persons are named respondents), and as all poor persons unable

94 S.Ct. 669                                                                                                                    Page 9
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

to afford bail, counsel, or jury trials in city ordinance cases. The absence of specific claims of injury as a result of any of the wrongful practices charged, in light of the ambiguous and contradictory class definition proffered, bolsters our conclusion that these respondents cannot invoke federal jurisdiction to hear the claims they present in support of their request for injunctive relief.

[7][8] In the complaint that began this action, the sole allegations of injury are that petitioners 'have engaged in and continue to engage in, a pattern and practice of conduct . . . all of which has deprived and continues to deprive plaintiffs and members of their class of their' constitutional rights and, again, that petitioners 'have denied and continue to deny to plaintiffs and members of their class their constitutional rights' by illegal bond-setting, sentencing, and jury-fee practices. None of the named plaintiffs is identified as himself having suffered any injury in the manner specified. In sharp contrast to the claim for relief against the State's Attorney where specific instances of misconduct with respect to particular individuals are alleged, the claim against petitioners alleges injury in only the most general terms. At oral argument, respondents' counsel stated that some of the named plaintiffs-respondents, who could be identified by name if necessary, had actually been defendants in proceedings before petitioners and had suffered from the alleged unconstitutional practices.[FN4] Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if *496 unaccompanied by any continuing, present adverse effects. Neither the complaint nor respondents' counsel suggested that any of the named plaintiffs at the time the complaint was filed were themselves serving an allegedly illegal sentence or were on trial or awaiting trial before petitioners. Indeed, if any of the respondents were then serving an assertedly unlawful sentence, the complaint would inappropriately be seeking relief from or modification of current, existing custody. See Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Furthermore, if any were then on trial or awaiting trial in state proceedings, the complaint would be seeking injunctive relief that a federal court should not provide. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); see also Part II, infra. We thus do not strain to read inappropriate meaning into the conclusory allegations

of this complaint.

FN4. Tr. of Oral Arg. 21, 23, 26.

[9][10] Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury. But here the prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners. Important to this assessment is the absence of allegations that any relevant criminal statute of the State of Illinois is unconstitutional on its face or as applied or that respondents have been or will be improperly charged with violating criminal law. If the statutes that might possibly be enforced against respondents are valid laws, and if charges under these statutes are not improvidently made or pressed, the question becomes whether any perceived threat to respondents is sufficiently real and immediate to show an existing controversy simply because they anticipate violating lawful criminal statutes and being tried for their offenses, in which event they may appear before petitioners and, if they do, will be affected by the *497 allegedly illegal conduct charged. Apparently, the proposition is that if respondents proceed to violate an unchallenged law and if they are charged, held to answer, and tried in any proceedings before petitioners, they will be subjected to the discriminatory practices that petitioners are alleged to have followed. But it seems to us that attempting to anticipate whether and when these respondents will be charged with crime and will be made to appear before either petitioner takes us into the area of speculation and conjecture. See Younger v. Harris, supra, at 41-42, 91 S.Ct. at 749. The nature of respondents' activities is **677 not described in detail and no specific threats are alleged to have been made against them. Accepting that they are deeply involved in a program to eliminate racial discrimination in Cairo and that tensions are high, we are nonetheless unable to conclude that the case-or-controversy requirement is satisfied by general assertions or inferences that in the course of their activities respondents will be prosecuted for violating valid criminal laws. We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[11] As in Golden v. Zwickler, we doubt that there is "sufficient immediacy and reality" to respondents' allegations of future injury to warrant invocation of the jurisdiction of the District Court. There, 'it was wholly conjectural that another occasion might arise when Zwickler might be prosecuted for distributing the handbills referred to in the complaint.' 394 U.S., at 109, 89 S.Ct., at 960. Here we can only speculate whether respondents will be arrested, either again or for the first time, for violating a municipal ordinance or a state statute, particularly in the absence of any allegations that unconstitutional criminal statutes are being employed to deter constitutionally protected conduct. Cf. *498 Perez v. Ledesma, 401 U.S. 82, 101–102, 91 S.Ct. 674, 685, 27 L.Ed.2d 701 (1971) (opinion of Brennan, J.). Even though Zwickler attacked a specific statute under which he had previously been prosecuted, the threat of a new prosecution was not sufficiently imminent to satisfy the jurisdictional requirements of the federal courts. Similarly, respondents here have not pointed to any imminent prosecutions contemplated against any of their number and they naturally do not suggest that any one of them expects to violate valid criminal laws. Yet their vulnerability to the alleged threatened injury from which relief is sought is necessarily contingent upon the bringing of prosecutions against one or more of them. Under these circumstances, where respondents do not claim any constitutional right to engage in conduct proscribed by therefore presumably permissible state laws, or indicate that it is otherwise their intention to so conduct themselves, the threat of injury from the alleged course of conduct they attack is simply too remote to satisfy the case-or-controversy requirement and permit adjudication by a federal court.

In Boyle v. Landry, 401 U.S. 77, 81, 91 S.Ct. 758, 760, 27 L.Ed.2d 696 (1971), the Court ordered a complaint dismissed for insufficiency of its allegations where there was no basis for inferring 'that any one or more of the citizens who brought this suit is in any jeopardy of suffering irreparable injury if the State is left free to prosecute under the intimidation statute in the normal manner.' The Court expressed the view that 'the normal course of state criminal prosecutions cannot be disrupted or blocked on the basis of charges which in the last analysis amount to nothing more than speculation about the future.' Ibid. A similar element of uncertainty about

whether the alleged injury will be likely to occur is present in this case, and a similar reluctance to interfere with the normal operation of state administration of its criminal laws in the manner sought by respondents strengthens the conclusion *499 that the allegations in this complaint are too insubstantial to warrant federal adjudication of the merits of respondents' claim.

II

[12][13][14][15]  The foregoing considerations obviously shade into those determining whether the complaint states a sound basis for equitable relief; and even if we were inclined to consider the complaint as presenting an existing case or controversy, we would firmly disagree with the Court of Appeals that an adequate basis for equitable relief against petitioners had been stated. The Court has recently reaffirmed the 'basic doctrine of equity jurisprudence that courts **678 of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.' Younger v. Harris, 401 U.S. 37, 43–44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). Additionally, recognition of the need for a proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers engaged in the administration of the State's criminal laws in the absence of a showing of irreparable injury which is "both great and immediate." Id., at 46, 91 S.Ct., at 751. See, e.g., Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). In holding that 42 U.S.C. s 1983 is an act of Congress that falls within the 'expressly authorized' exception to the absolute bar against federal injunctions directed at state court proceedings provided by 28 U.S.C. s 2283, the Court expressly observed that it did not intend to 'question or quality in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding.' Mitchum v. Foster, 407 U.S. 225, 243, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972). Those principles preclude equitable intervention in the circumstances present here.

*500 [16] Respondents do not seek to strike down a

94 S.Ct. 669
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

single state statute, either on its face or as applied; nor do they seek to enjoin any criminal prosecutions that might be brought under a challenged criminal law. In fact, respondents apparently contemplate that prosecutions will be brought under seemingly valid state laws. What they seek is an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials. The order the Court of Appeals thought should be available if respondents proved their allegations would be operative only where permissible state prosecutions are pending against one or more of the beneficiaries of the injunction. Apparently the order would contemplate interruption of state proceedings to adjudicate assertions of noncompliance by petitioners. This seems to us nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that Younger v. Harris, supra, and related cases sought to prevent.

[17][18] A federal court should not intervene to establish the basis for future intervention that would be so intrusive and unworkable. In concluding that injunctive relief would be available in this case because it would not interfere with prosecutions to be commenced under challenged statutes, the Court of Appeals misconceived the underlying basis for withholding federal equitable relief when the normal course of criminal proceedings in the state courts would otherwise be disrupted. The objection is to unwarranted anticipatory interference in the state criminal process by means of continuous or piecemeal interruptions of the state proceedings by litigation in the federal courts; the object is to sustain '(t)he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'*501Stefanelli v. Minard, 342 U.S. 117, 120, 72 S.Ct. 118, 120, 96 L.Ed. 138 (1951).FN5 See also Cleary v. Bolger, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390 (1963); Wilson v. Schnettler, 365 U.S. 381, 81 S.Ct. 632, 5 L.Ed.2d 620 (1961); Pugach v. Dollinger, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961); cf. Rea v. United States, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956).**679 An injunction of the type contemplated by respondents and the Court of Appeals would disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim ab initio, just as would the request for injunctive relief from an ongoing state prosecution against the federal plaintiff which was found to be

unwarranted in Younger.Moreover, it would require for its enforcement the continuous supervision by the federal court over the conduct of the petitioners in the course of future criminal trial proceedings involving any of the members of the respondents' broadly defined class.FN6 The Court of Appeals disclaimed any intention of requiring the District Court to sit in constant day-to-day supervision of these judicial officers, but the 'periodic reporting' system it thought might be warrantedFN7 would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity. Cf. Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966). Moreover, because an injunction against acts which might occur in the course of future criminal proceedings would necessarily impose continuing obligations of compliance, the question arises of how compliance might be enforced if the beneficiaries of the injunction were to charge that it had been disobeyed. Presumably, any member of respondents' class who appeared as an *502 accused before petitioners could allege and have adjudicated a claim that petitioners were in contempt of the federal court's injunction order, with review of adverse decisions in the Court of Appeals and, perhaps, in this Court. Apart from the inherent difficulties in defining the proper standards against which such claims might be measured, and the significant problems of proving noncompliance in individual cases, such a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state criminal proceedings is in sharp conflict with the principles of equitable restraint which this Court has recognized in the decisions previously noted.

FN5. It was noted in Stefanelli that in suits brought under 42 U.S.C. s 1983'we have withheld relief in equity even when recognizing that comparable facts would create a cause of action for damages. Compare Giles v. Harris, 180 U.S. 475, 23 S.Ct. 639, 47 L.Ed. 909, with Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281.'342 U.S., at 122, 72 S.Ct., at 121.

FN6. See n. 3, supra.

FN7. See n. 1, supra.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Respondents have failed, moreover, to establish the basic requisites of the issuance of equitable relief in these circumstances-the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law. We have already canvassed the necessarily conjectural nature of the threatened injury to which respondents are allegedly subjected. And if any of the respondents are ever prosecuted and face trial, or if they are illegally sentenced, there are available state and federal procedures which could provide relief from the wrongful conduct alleged. Open to a victim of the discriminatory practices asserted under state law are the right to a substitution of judge or a change of venue, Ill.Rev.Stat., c. 38, ss 114-5, 114-6 (1971), review on direct appeal or on postconviction collateral review, and the opportunity to demonstrate that the conduct of these judicial officers is so prejudicial to the administration of justice that available disciplinary proceedings, including the possibility of suspension or removal, are warranted.Ill.Const., Art. VI, s 15(e). In appropriate circumstances, moreover, federal habeas relief would undoubtedly be available.

**\*503** [19] Nor is it true that unless the injunction sought is available federal law will exercise no deterrent effect in these circumstances. Judges who would willfully discriminate on the ground of race or otherwise would willfully deprive the citizen of his constitutional rights, as this complaint alleges, must take account of 18 U.S.C. s 242. See Greenwood v. Peacock, supra, at 830, 86 S.Ct., at 1813;United States v. Price, 383 U.S. 787, 793-794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966); United States v. Guest, 383 U.S. 745, 753-754, 86 S.Ct. 1170, 1175-1176, 16 L.Ed.2d 239 (1966); Screws v. United States, 325 U.S. 91, 101-106, 65 S.Ct. 1031, 1035-1038, 89 L.Ed. 1495 (1945); **\*\*680**United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). Cf. Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). That section provides:

'Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined . . . or imprisoned . . . .'

Whatever may be the case with respect to civil liability generally, see Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), or civil liability for willful corruption, see Alzua v. Johnson, 231 U.S. 106, 110-111, 34 S.Ct. 27, 28-29, 58 L.Ed. 142 (1913); Bradley v. Fisher, 13 Wall. 335, 347, 350, 354, 20 L.Ed. 646 (1872), we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. Cf. Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880). On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress . . ..'Gravel v. United States, 408 U.S. 606, 627, 92 S.Ct. 2614, 2628, 33 L.Ed.2d 583 (1972).

**\*504** Considering the availability of other avenues of relief open to respondents for the serious conduct they assert, and the abrasive and unmanageable intercession which the injunctive relief they seek would represent, we conclude that, apart from the absence of an existing case or controversy presented by respondents for adjudication, the Court of Appeals erred in deciding that the District Court should entertain respondents' claim.

Reversed.

Mr. Justice BLACKMUN, concurring in part.

I join the judgment of the Court and Part I of the Court's opinion which holds that the complaint 'failed to satisfy the threshold requirement imposed by Art. III of the Constitution that those who seek to invoke the power of federal courts must allege an actual case or controversy.'Ante, at 675.

When we arrive at that conclusion, it follows, it seems to me, that we are precluded from considering any other issue presented for review. Thus, the Court's additional discussion of the question whether a case for equitable relief was stated amounts to an advisory opinion that we are powerless to render.Hayburn's Case, 2 Dall. 409, 1 L.Ed. 436 (1792); United States v. Evans, 213 U.S. 297, 301, 29 S.Ct. 507, 508, 53 L.Ed. 803 (1909); Muskrat v. United States, 219 U.S. 346, 360-361 (1911); Stearns v. Wood, 236 U.S. 75, 35 S.Ct. 229, 59 L.Ed. 475 (1915); Coffman v. Breeze Corps., 323 U.S. 316, 65 S.Ct. 298, 89 L.Ed. 264 (1945); United Public

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669                                                                                         Page 13
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754,31 S.Ct. 250, 255, 55 L.Ed. 246 (1947); Paschall v. Christie-Stewart, Inc., 414 U.S. 100, at 101-102, 94 S.Ct. 313, at 315, 38 L.Ed.2d 298.

Mr. Justice Frankfurter stated the applicable principle in speaking for the Court in International Longshoremen's & Warehousemen's Union v. Boyd, 347 U.S. 222, 223, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954):

‘On this appeal, appellee contends that the District Court should not have reached the statutory and constitutional questions-that it should have *505 dismissed the suit for want of a ‘case or controversy,’ for lack of standing on the union's part to bring this action, . . .. Since the first objection is conclusive, there is an end of the matter.'

I would adhere to that principle. Either there is no case or controversy and that is the end of the matter, or there is a **681 case or controversy and the Court may go on to a decision on the merits. In my view, the Court may not have it both ways.

Mr. Justice DOUGLAS, with whom Mr. Justice BRENNAN and Mr. Justice MARSHALL concur, dissenting.
The respondents in this case are black and indigent citizens of Cairo, Illinois. Suing in federal court, they alleged that since the early 1960's black citizens of Cairo have been actively seeking equal opportunity and treatment in employment, housing, education, and ordinary day-to-day relations with the white citizens and officials of Cairo. In this quest, blacks have engaged in a boycott of local merchants deemed to have engaged in racial discrimination.

Alleging that this quest for equality has generated substantial antagonism from white governmental officials, respondents brought a class action under 42 U.S.C. ss 1981, 1982, 1983, and 1985, seeking to represent citizens of Cairo who have been subjected in the past, and continue to be subjected, to the allegedly discriminatory and unconstitutional administration of criminal justice in Alexander County, Illinois, which includes Cairo. Among their other claims, respondents alleged that petitioners Michael O'Shea and Dorothy Spomer, both now judges in Alexander County,[FN1] engage in acts which deprive them and *506 members of their class of

their constitutional rights. These judges allegedly set bond in criminal cases without regard to the facts of individual cases and as punishment, and not merely to assure the appearance of defendants at trial; impose higher sentences and harsher conditions of sentencing on black than on white citizens; and require respondents and members of their class, when charged with violations of city ordinances which carry fines and possible jail penalties, to pay for a trial by jury if the fine cannot be paid.

> FN1. O'Shea, Magistrate of Alexander County Circuit Court when this suit was instituted. became Associate Judge in the county on July 1, 1971.

I

An injunction was sought against this conduct. The District Court referred obliquely to want of jurisdiction, but, focusing on the fact that the complaint sought review of matters of judicial discretion, concluded that the action should be dismissed because judges and magistrates are immune from liability for acts done in performance of their duties. In reversing and remanding the case to the District Court, the Court of Appeals held that the action was not barred by the doctrine of judicial immunity. The Court of Appeals also held that the complaint contained sufficiently specific factual averments to satisfy Fed.Rule Civ.Proc. 8(a).468 F.2d 389.

This Court now decides for the first time in the course of this litigation that the complaint is deficient because it does not state a ‘case or controversy’ within the meaning of Art. III.

The fact that no party has raised that issue in this closely contested case is no barrier, of course, to our consideration of it. But the reasoning and result reached by the Court are to say the least a tour de force and quite inconsistent with the allegations in the complaint, which are within constitutional requirements.

*507 We know from the record and oral argument that Cairo, Illinois, is boiling with racial conflicts. This class action brought under 42 U.S.C. ss 1981, 1982, 1983, and 1985 is to remedy vast invasions of civil rights. The Court, however, says that it is not a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669                                                                    Page 14
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

'case or controversy' because none of the named plaintiffs has alleged infringement of his rights and the fact that other members of the class may have been injured is not enough. As to the latter, Bailey v. Patterson, 369 U.S. 31, 32-33, 82 S.Ct. 549, 550-551, 7 L.Ed.2d 512, is cited in support. But in Bailey the named persons were given standing to sue, the statement that '(t)hey cannot represent **682 a class of whom they are not a part,'id., at 32-33, 82 S.Ct., at 550, being dictum and its only authority being McCabe v. Atchison, T. & S.F.R. Co., 235 U.S. 151, 162-163, 35 S.Ct. 69, 71-72, 59 L.Ed. 169, which was not a class action. Nor was the question on which the case is made to turn resolved in Indiana Employment Sec. Division v. Burney, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62. For we only held that where the named plaintiff had received relief and nothing appeared as to the relief, if any, granted to members of the class, the possible question of mootness should be resolved by the District Court. Even so, there were dissents. The upshot is that one crucial issue on which the Court makes this case turn has not been decided by the Court and was never argued here. At the very least we should have a full-dress argument on that point.

But I do not press the point, for the amended complaint is sufficiently specific to warrant a trial.

As respects O'Shea, the Magistrate, and Spomer, the Circuit Judge, the charges concerning named plaintiffs are as follows:

(1) that excessive bonds have been required in violation of the Eighth and Fourteenth Amendments because petitioners follow an unofficial bond schedule without regard to the facts of individual cases;

*508 (2) on information and belief, that petitioners set higher sentences and impose harsher conditions for respondents and members of their class than for white persons;

(3) that, where the named plaintiffs have been fined and at times sentenced to jail and cannot pay the fines, these judges have required them to pay for a trial by jury.

Moreover, the amended complaint alleges that O'Shea and Spomer 'continue to engage in a pattern

and practice' which 'has deprived and continues to deprive' the named plaintiffs and members of their class of their constitutional rights. Moreover, it is alleged that since early in the 1960's the blacks of Cairo and some whites have been actively and peaceably seeking to end discrimination in Cairo and that those activities have generated and continue to generate tension and antagonism in Cairo.

It is also alleged that the police commissioner in Cairo 'has denied and continues to deny to plaintiffs and members of their class their constitutional rights in the following ways:

'(a) Defendant has made or caused to be made or cooperated in the making of arrests and the filing of charges against plaintiffs and members of their class where such charges are not warranted and are merely for the purpose of harassment and to discourage and prevent plaintiffs and their class from exercising their constitutional rights.

'(b) Defendant has made or caused to be made or cooperated in the making of arrests and the filing of charges against plaintiffs and members of their class where there may be some colorable basis to the arrest or charge, but the crime defined in the charge is much harsher than is warranted by the *509 facts and is far more severe than like charges would be against a white person.'

These allegations support the likelihood that the named plaintiffs as well as members of their class will be arrested in the future and therefore will be brought before O'Shea and Spomer and be subjected to the alleged discriminatory practices in the administration of justice.

These allegations of past and continuing wrongdoings clearly state a case or controversy in the Art. III sense. They are as specific as those alleged in Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404, and in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, where we held that cases or controversies were presented.

**683 Specificity of proof many not be forthcoming; but specificity of charges is clear.

What has been alleged here is not only wrongs done

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669                                                                                   Page 15
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

to named plaintiffs, but a recurring pattern of wrongs which establishes, if proved, that the legal regime under control of the whites in Cairo, Illinois, is used over and over again to keep the blacks from exercising First Amendment rights, to discriminate against them, to keep from the blacks the protection of the law in their lawful activities, to weight the scales of justice repeatedly on the side of white prejudices and against black protests, fears, and suffering. This is a more pervasive scheme for suppression of blacks and their civil rights than I have ever seen. It may not survive a trial. But if this case does not present a 'case or controversy' involving the named plaintiffs, then that concept has been so watered down as to be no longer recognizable. This will please the white superstructure, but it does violence to the conception of evenhanded justice envisioned by the Constitution.

Suits under 42 U.S.C. s 1983 are exceptions to the absolute bar against federal injunctions directed at state *510 court proceedings provided in 28 U.S.C. s 2283.[FN2] See Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705. It will be much more appropriate to pass on the nature of any equitable relief to be granted after the case has been tried. It may be that when the case is ended, no injunction against any state proceeding will be asked for or will seem appropriate. Or the injunctive relief in final analysis may come down to very narrow and discrete orders prohibiting precise practices. The Court labels this an 'ongoing federal audit of state criminal proceedings.' That of course is a regime that we do not foster. But the federal Constitution is supreme and if the power of the white power-structure in Cairo. Illinois, is so great as to disregard it, extraordinary relief is demanded. I would cross the bridge of remedies only when the precise contours of the problem have been established after a trial.

> FN2. Title 28 U.S.C. s 2283 provides that:
> 'A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'

To repeat, in the instant case, there are allegations that state lower-court judges are willfully discriminating in their sentencing determinations and

are imposing excessive bail. The effects of such results may well persist quite aside from the disposition of the underlying substantive charges at trial or on appeal, and may well be functionally unreviewable. The Court of Appeals observed, 468 F.2d at 408, that the individual defendant in a criminal case will find it difficult, if not impossible, to obtain review of a sentence within statutory limits unless it is manifestly harsh or unjustified, citing the Illinois rule that 'imposition of sentence is a matter of judicial discretion, and in the absence of a manifest abuse of that discretion it will not be altered *511 by a reviewing court.' People v. Bonner, 37 Ill.2d 553, 563, 229 N.E.2d 527, 533 (1967), cert. denied, 392 U.S. 910, 88 S.Ct. 2067, 20 L.Ed.2d 1368 (1968).

Furthermore, the respondents do not primarily allege individual instances of excessively harsh treatment, on an absolute scale, of black and indigent defendants, but rather a pattern of discriminatory treatment, especially in favor of prosperous white defendants. Such allegations would amount to denials of equal protection even if blacks and poor whites were not subject to sentences which were so excessive that they constituted manifest abuses of discretion, as long as wealthy whites were at the same time receiving relatively lenient sentences from the same judges. A single instance of sentencing by itself might not strike the conscience of a reviewing court, but when coupled with a pattern of discriminatory treatment could will justify the equitable intervention of a **684 federal court. A class suit where evidence could be developed showing a pattern of discriminatory bail and sentencing decisions by the petitioners would be the one appropriate vehicle in which these claims could be developed.

Whether respondents could come forward with such evidence, and whether the Federal District Court in the exercise of its equitable discretion could frame suitable relief are, of course, questions which can be answered only after a trial on the merits. The resolution of those issues would then be properly reviewable. But the principles of abstention and comity should not bar this suit ab initio.

II

Because I believe that the complaint is sufficient to state an actual 'case or controversy,' I would reach

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 669
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

Page 16

the further question, on the merits, whether equitable relief may be warranted in the circumstances of this case. I agree, nonetheless, with my Brother BLACKMUN that the *512 Court's discussion in Part II of its opinion, whether a case for equitable relief was stated, is an advisory opinion since the Court has determined that there is no 'case or controversy' in the Article III sense.

## APPENDIX TO OPINION OF DOUGLAS, J., DISSENTING

There are seven statutes in addition to 42 U.S.C. s 1983 which the Court has recognized constitute 'express exceptions' to the policy of nonintervention in state proceedings enunciated by the anti-injunction statute: (1) The Bankruptcy Act, 11 U.S.C. s 1 et seq., specifically recognized by Congress as an exception to 28 U.S.C. s 2283. See Mitchum v. Foster, 407 U.S. 225, 233, 92 S.Ct. 2151, 2157, 32 L.Ed.2d 705. (2) The Interpleader Act of 1936, 28 U.S.C. s 2361, allowing federal courts to restrain prosecution of state court suits involving property involved in federal interpleader actions. See Treinies v. Sunshine Mining Co., 308 U.S. 66, 74, 60 S.Ct. 44, 48, 84 L.Ed. 85. (3) The 1851 Act limiting the liability of shipowners by providing for the cessation of proceedings against them when they have made a deposit equal to the value of their ships with a federal court, 46 U.S.C. s 185. See Providence & N.Y. S.S. Co. v. Hill Mfg. Co., 109 U.S. 578, 599-600, 3 S.Ct. 379, 393, 27 L.Ed. 1038. (4) The Frazier-Lemke Farm Mortgage Act, 11 U.S.C. s 203(s)(2) (1958 ed.). See Kalb v. Feuerstein, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370. (5) The Federal Habeas Corpus Act, 28 U.S.C. s 2251, permitting a stay of state court proceedings when a federal habeas action is pending. See Ex parte Royall, 117 U.S. 241, 248-249, 6 S.Ct. 734, 738, 29 L.Ed. 868. (6) Section 205(a) of the Emergency Price Control Act of 1942, 56 Stat. 33. See Porter v. Dicken, 328 U.S. 252, 255, 66 S.Ct. 1094, 1096, 90 L.Ed. 1203. (7) Legislation providing for the removal of litigation to federal courts and the simultaneous cessation of state court proceedings, 28 U.S.C. s 1446(e). See French v. Hay, 22 Wall. 250, 22 L.Ed. 857.

*513 This Court has also recognized the power of a federal court to stay proceedings in a state court to prevent relitigation of an issue already decided in a federal proceeding. See Supreme Tribe of Ben-Hur v.

Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673;Julian v. Central Trust Co., 193 U.S. 93, 112, 24 S.Ct. 399, 407, 48 L.Ed. 629. It has recognized the power of a federal court to enjoin state court proceedings to protect the jurisdiction which a federal court has already acquired over a res. See Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226;Toucey v. New York Life Ins. Co., 314 U.S. 118, 135-136, 62 S.Ct. 139, 144, 86 L.Ed. 100. And we have found it proper for a federal court to directly enjoin state court proceedings when the injunction was sought by either the United States, Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267, or by a federal agency asserting superior federal interests, see NLRB v. Nash-Finch Co., 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328.

U.S.Ill. 1974.
O'Shea v. Littleton
414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 14**

Westlaw.

230 F.R.D. 424                                                                    Page 1
230 F.R.D. 424

---

**C**Popoola v. Md-Individual Practice Ass'n, Inc.
D.Md.,2005.

United States District Court,D. Maryland.
Shade POPOOLA, et al.
v.
MD-INDIVIDUAL PRACTICE ASSOCIATION,
INC., et al.
**No. CIV.A. DKC 2003-3653.**

Aug. 16, 2005.

**Background:** Defendants in class action filed
motion to dismiss Employee Retirement Income
Security Act (ERISA) claims.

**Holdings:** The District Court, Chasanow, J., held
that:

(1) commencement of original class action by party
who was ultimately determined to lack standing
tolled the statute of limitations as to all asserted
members of the class who would have been parties
had the suit been permitted to continue as a class
action, including plaintiff, who was added after
period exceeding the three-year statute of limitations,
and

(2) "juridical link" between class action defendants,
which were common subsidiaries of the same
corporation and shared common practices and
policies, could not supply ERISA plaintiff with
standing to sue the one defendant which did not cause
plaintiff any injury.

Motion granted in part and denied in part.

West Headnotes

**[1] Labor and Employment 231H ☞632**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(K) Actions
            231HVII(K)1 In General
                231Hk632 k. Parties in General;
Standing. Most Cited Cases
ERISA claims could not be brought by a plaintiff
who was not a member of an ERISA plan. Employee

Retirement Income Security Act of 1974, § 2 et seq.,
29 U.S.C.A. § 1001 et seq.

**[2] Limitation of Actions 241 ☞126.5**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding;
Relation Back
            241k126.5 k. Class Actions, Matters
Peculiar To. Most Cited Cases
Commencement of a class action suspends the
applicable statute of limitations as to all asserted
members of the class who would have been parties
had the suit been permitted to continue as a class
action, and once the statute of limitations has been
tolled, it remains tolled for all members of the
putative class until class certification is denied, at
which point class members may choose to file their
own suits or to intervene as plaintiffs in the pending
action.

**[3] Limitation of Actions 241 ☞126.5**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding;
Relation Back
            241k126.5 k. Class Actions, Matters
Peculiar To. Most Cited Cases
Commencement of original class action by party who
was ultimately determined to lack standing tolled the
statute of limitations as to all asserted members of the
class who would have been parties had the suit been
permitted to continue as a class action, including
plaintiff, who was added after period exceeding the
three-year statute of limitations where defendants
were, before the statute of limitations would
otherwise have expired, plainly on sufficient notice
of the claims against them.

**[4] Federal Civil Procedure 170A ☞103.7**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.7 k. Class Actions. Most Cited

---

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

230 F.R.D. 424                                                              Page 2
230 F.R.D. 424

**Cases**
In a multi-defendant action or class action, the named plaintiffs must establish that they have been harmed by each of the defendants.

**[5] Federal Civil Procedure 170A ☞184.5**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)3 Particular Classes Represented
            170Ak184 Employees
               170Ak184.5 k. In General. Most Cited Cases
"Juridical link" between class action defendants, which were common subsidiaries of the same corporation and shared common practices and policies, could not supply ERISA plaintiff with standing to sue the one defendant which did not cause plaintiff any injury. U.S.C.A. Const. Art. 3, § 2, cl. 1; Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[6] Federal Civil Procedure 170A ☞165**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)1 In General
            170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
"Juridical link" doctrine answers the question of whether two defendants are sufficiently linked so that a plaintiff with a cause of action against only one defendant can also sue the other defendant under the guise of class certification.

**[7] Federal Civil Procedure 170A ☞103.7**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.7 k. Class Actions. Most Cited Cases

**Federal Civil Procedure 170A ☞165**

170A Federal Civil Procedure
   170AII Parties

170AII(D) Class Actions
   170AII(D)1 In General
      170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
Juridical link doctrine has no bearing on the issue of standing, and its application is limited to an analysis of requirements for maintaining a class action. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☞171**

170A Federal Civil Procedure
   170AII Parties
      170AII(D) Class Actions
         170AII(D)2 Proceedings
            170Ak171 k. In General; Certification in General. Most Cited Cases
Analysis of class compliance with class action rule is not appropriately undertaken on a motion to dismiss, but should be addressed in a motion pursuant to the rule. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**\*425** <u>Kieron F. Quinn</u>, <u>Martin Eugene Wolf</u>, Quinn Gordon and Wolf Chtd., Towson, MD, <u>Robert K. Jenner</u>, Janet Jenner and Suggs LLC, <u>Steven A. Adelman</u>, Janet Willoughby Gershon Getz and Jenner LLC, Baltimore, **\*426** MD, <u>Frank Paul Bland, Jr.</u>, Trial Lawyers for Public Justice, Washington, DC, for Shade Popoola, et al.
Lawrence Paul Fletcher Hill, Gordon Feinblatt Rothman Hoffberger and Hollander LLC, Baltimore, MD, for MD-Individual Practice Association, Inc., et al.

### MEMORANDUM OPINION

<u>CHASANOW</u>, District Judge.
Presently pending and ready for resolution in this class action is the motion of Defendants M.D. Individual Practice Association ("MDIPA") and Optimum Choice, Inc. ("OCI") to dismiss Plaintiffs' Fourth Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) (paper no. 59). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court grants the motion as to MDIPA, but denies the motion as to OCI.

**I. Background**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The history of this class action was recounted at length in this court's previous Memorandum Opinion, *see* paper no. 54, and most of it will not be repeated here. In the Order accompanying that Opinion, the court granted in part and denied in part Plaintiffs' motion for leave to amend, and denied without prejudice their motion for class certification. The court, reviewing the proposed third amended complaint, noted that

to the extent that the third amended complaint seeks to assert, as federal claims, the previously asserted state law claims, with Miller substituted for Popoola, the motion to amend will be granted.

It is not clear, however, whether the allegations in the motion to amend reflect simply the changes necessitated from converting the state law claims into ERISA-based claims or whether they are, as Defendants argue, expanding the original claims so greatly that they now incorporate claims not previously asserted in the earlier complaints.... It is not clear how these changes are consistent with the class claims asserted previously in state court. Nor is it clear how Plaintiffs can consider this new class to avoid the typicality and commonality problems previously cited by Judge Scriven[e]r.

Finally, the third amended complaint seeks to add Pierro as a new plaintiff, but it is unclear what relationship she has with the defendants or the proposed subclasses and whether her claims were filed too late. If Plaintiffs are seeking to add a new class representative on behalf an old class, tolling of the statute of limitations may be appropriate if the court were to find that Judge Scriven[e]r's denial of class certification was based not on the substantive claims but on the inadequacy of the named plaintiff. *See McKowan Lowe & Co., Ltd. v. Jasmine, Ltd.,* 295 F.3d 380, 387-88 (3rd Cir.2002) (discussing numerous cases holding the same)....

*Id.* at 9-10. The court concluded:
Amendment will not be permitted ... to the extent that Plaintiffs seek to expand the class definition by adding new claims or new plaintiffs not related to the former claims.... Plaintiffs will be required ... to file a fourth amended complaint that more precisely defines the class; sets forth the relationship of each Plaintiff with the defendants, with the purported class

members and with the proposed subclasses; confirms Plaintiffs' ability adequately to represent the interests of the class and act as named plaintiffs; and clarifies how the newly asserted class definition seeks to replead the state law claims as ERISA claims only and not to expand or add additional claims not previously asserted.

*Id.* at 11. Plaintiffs timely filed the required fourth amended complaint. Paper no. 56. Defendants now move to dismiss.

## II. Standard of Review

The purpose of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999). Accordingly, a 12(b)(6) motion ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Except in certain specified**427** cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

In its determination, the court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 783 (4th Cir.1999) (citing *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993)). The court must disregard the contrary allegations of the opposing party. *See A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969). The court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir.1979).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

230 F.R.D. 424
230 F.R.D. 424

"In deciding a Rule 12(b)(6) motion, the court will consider the facts stated in the complaint and the documents attached to the complaint. The court may also consider documents referred to in the complaint and relied upon by plaintiff in bringing the action." *Abadian v. Lee, 117 F.Supp.2d 481, 485 (D.Md.2000)* (citing *Biospherics, Inc., v. Forbes, Inc., 989 F.Supp. 748, 749 (D.Md.1997), aff'd, 151 F.3d 180 (4th Cir.1998)*). When doing so, the court need not convert a Rule 12(b)(6) motion to dismiss to one for summary judgment so long as it does not consider matters "outside the pleading." *See* Fed.R.Civ.P. 12(b) ("If [on a 12(b)(6) motion to dismiss,] matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 ...."); *Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 260-61 (4th Cir.1998)* (citing Rule 12(b)); *Luy v. Balt. Police Dep't, 326 F.Supp.2d 682, 688 (D.Md.2004)* ("The court may consider a document submitted by the defendant in support of a motion to dismiss, however, '[if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.' ") (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir.2004)*).

### III. Analysis

Defendants make three arguments in favor of full or partial dismissal: first, that Plaintiffs' amended complaint does not adequately address the issues raised by Judge Scrivener in her rejection of class certification; second, that Miller's claims are time-barred; and third, that Pierro cannot pursue ERISA-based claims because she was not a member of an ERISA plan. The court addresses first the validity of the named plaintiffs' claims.

### A. Pierro's Claims

[1] Plaintiffs admit that Plaintiff Pierro's claims are barred because she was not a member of an ERISA plan, whereas both counts of the complaint are predicated on participation in an ERISA plan. Accordingly, Pierro's claims will be dismissed with prejudice.

### B. Miller's Claims

Defendants argue that Miller's claim, now as the lone named plaintiff, is also barred because the statute of limitations has run on her claim, which was not filed until more than four years after the date she made her subrogation payment to OCI. Defendant MDIPA also argues that Miller has no claim against MDIPA, as she paid a subrogation claim only to OCI and in fact has no connection at all to MDIPA.

Plaintiffs respond that the three year statute of limitations on Miller's claim against OCI was tolled by (1) the pendency of the class action, and (2) the court's stay of proceedings for some seventeen months. Plaintiffs argue that Miller has a valid claim against MDIPA because that claim is "juridically linked" to her claim against OCI.

For the reasons explained below, the court finds that the statute of limitations tolled for Miller's claim against OCI. However, the **\*428** court will decline to apply juridical link doctrine to Miller, and therefore finds that Miller does not have standing to sue MDIPA.

### 1. Whether the Statute of Limitations Tolled for Miller's Claim Against OCI

[2][3] As to the pendency of the class action, Defendants recognize that, generally speaking, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action," *American Pipe and Constr. v. Utah, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)*, and that "'[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied,'" at which point "class members may choose to file their own suits or to intervene as plaintiffs in the pending action." *Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 354, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983)* (interpreting *American Pipe* ). Defendants, however, argue that this tolling does not apply when no named plaintiff has standing. They assert that, here, it did not toll for Miller because during the entire period before the addition of Miller as a named plaintiff-a period exceeding the three-year statute of limitations by over a year-there was no named plaintiff with standing to sue OCI, as, Defendants continue,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Popoola never had standing to sue OCI because her grievance was with MDPIA alone, and her interaction with OCI was mere accident. Defendants dispute Plaintiffs' reliance on the juridical link doctrine to furnish Miller with standing to sue MDIPA, noting that the doctrine has not been adopted by the Fourth Circuit.

Plaintiffs contend that (1) Popoola's standing is irrelevant because under *American Pipe,* contrary to Defendants' interpretation, the statute of limitations is tolled during the pendency of a class action regardless of whether a named plaintiff-here, Popoola-ever had standing; and (2) in any event, Popoola did, in fact, have standing to sue OCI because of the juridical link between OCI and MDIPA. Defendants, of course, argue that juridical link doctrine is as inapplicable to Popoola as it is to Miller.

Defendants argue essentially that, without a named plaintiff with standing to sue, the statute of limitations cannot be tolled. Plaintiffs and the court disagree. At least two courts addressing the issue have held the *American Pipe* rule to apply *in cases* where class action status is denied or terminated based upon the named plaintiff's lack of standing to maintain the class claims. *See Haas v. Pittsburgh Nat'l Bank,* 526 F.2d 1083, 1095-98 (3rd Cir.1975); *Rose v. Ark. Valley Envtl. & Util. Auth.,* 562 F.Supp. 1180, 1190-94 (W.D.Mo.1983) (citing *Haas* ). Both noted the concerns raised in *American Pipe* that, if the statute of limitations were to run during the pendency period, every individual class member would feel obligated to file a motion to intervene before the end of the period in order to preserve his or her rights, "depriv[ing] Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." 414 U.S. at 553, 94 S.Ct. 756; *see Haas,* 526 F.2d at 1097; *Rose,* 562 F.Supp. at 1192. Both noted that the *American Pipe* Court carefully considered, and found its decision consistent with, the twin purposes of statutes of limitations, namely, "ensuring essential fairness to defendants and ... barring a plaintiff who 'has slept on his rights,' "414 U.S. at 554, 94 S.Ct. 756 (quoting *Burnett v. New York Central R. Co.,* 380 U.S. 424, 428, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965)). The Court held that the twin purposes

are satisfied when, as here, a named plaintiff who is

found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment. Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors.

414 U.S. at 554-55, 94 S.Ct. 756; *Crown v. Parker,* 462 U.S. 345, 352-53, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (citing *American *429 Pipe* ); see *Haas,* 526 F.2d at 1097 & n. 19; *Rose,* 562 F.Supp. at 1192.

The relevant facts in *Haas* are similar to those here. Plaintiff Haas filed a complaint against three banks on November 13, 1972, alleging violations of the National Bank Act regarding the way that service charges and balances were calculated on credit cards issued by the banks. *Haas,* 526 F.2d at 1085. On January 21, 1974, the district court determined that Haas could not represent plaintiffs against one of the defendants, Equibank, because she did not hold an Equibank credit card. *Id.* Furthermore, the district court determined that certification was inappropriate and ordered summary judgment for Equibank unless a plaintiff with standing against that defendant could be added to the complaint. *Id.* at 1095. On February 19, 1974, the complaint was so amended, but the district court subsequently found that the claim against Equibank was time-barred. *Id.* at 1096. The Third Circuit reversed on this question, agreeing with plaintiffs that because the new named plaintiff, Mitchell, "was timely added after the district court determined that the class of Equibank cardholders could not be represented by Haas, the amendment which added Mitchell 'relates bank' to the initial filing of the complaint ... and therefore plaintiffs' claims against Equibank are not time-barred ...."*Id.*The court found that the plaintiffs'

timely action against all three banks provided Equibank with notice within the statutory period of the substantial nature of the claims against which they would be required to defend and also "the number and generic identities of the potential

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

plaintiffs." These plaintiffs were in existence at the time the action was originally brought and were described as claimants in the complaint. The only change effectuated by the district court's order was the prompt addition of a nominal plaintiff who held an Equibank card.

*Id.* at 1097 (quoting *American Pipe,* 414 U.S. at 555, 94 S.Ct. 756).

In *Rose,* another court addressed the same issue, with more emphatic attention to the notice concern raised in *American Pipe.* The court began by noting that "a number of lower federal courts have, since the decision in *American Pipe,* applied its rule in a variety of situations where class action status was denied or terminated" for virtually the entire range of possible reasons: lack of numerosity, inadequate representation, commonality, typicality, untimeliness, failure to meet the requirements of Rule 23(b)(2) or 23(b)(3), withdrawal of class representative, and, in *Haas,* standing. 562 F.Supp. at 1192 (citing cases). A defendant, however, suggested that lack of standing is different than other reasons for denial of class certification in that "a class action commenced by one who lacks standing cannot logically function to toll a statute of limitations." *Id.* at 1193. The court's reasoning merits quotation in full:

[I]t can hardly be said that a suit commenced by one who lacks standing is in any literal sense a "nonexistent" suit. It may be a defective suit, subject to a motion to dismiss, or perhaps even to the court's dismissal *sua sponte,* but it is for all that no less the judicial assertion of a claim, functioning to give a defendant notice of whatever causes of action are asserted therein. And where such a claim is asserted by way of a class action, and in fact covers the causes of action which a class member himself could properly bring, a defendant has received just as much notice as might have been imparted if the proceeding had been instituted by that class member. In fact, if one were to deal only in generalities, a class action which is denied or terminated because the class representative lacks "standing" might often be more likely to give a defendant actual notice of the claims of individual class members than one where denial or termination was based upon a lack of "typicality" or "commonality."

Nor, in my view, is there anything singular or peculiar with respect to "standing" that would generally prevent application of the other consideration expressed in *American Pipe*-the concern that where the determination to disallow the class action is made upon "subtle factors," a rule "requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions [to intervene]." Standing questions are one with which both skilled counsel **430** and skilled courts sometimes experience considerable difficulty, even after extensive discovery and when intimately acquainted with the facts, as vividly demonstrated by the history of the present litigation itself. I can see no more reason, as a general matter, to require a passive class member to anticipate the existence of and ultimate ruling upon that question than to require him to do so with respect to questions of "numerosity," "commonality" or "typicality."

I conclude, accordingly, that the fact that a class action is disallowed because the class representative lacks "standing" does not, *per se,* prevent application of the *American Pipe* tolling rule. *Haas v. Pittsburgh National Bank, supra.* Instead, I suggest again that the appropriate focus of inquiry should be upon the extent and character of the notice of the later individual claims which the defendant actually received from the class action.

*Id.*

Here, as in *Haas* and *Rose,* Defendants were, before the statute of limitations would otherwise have expired, plainly on sufficient notice of the claims against them. Miller's claims are virtually identical to Popoola's, and "the number and generic identities of the potential plaintiffs" have been plain to Defendants since the filing of the initial complaint. This court therefore concludes that "the commencement of the original class action by [Popoola] tolled the statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action," including Miller. *Haas,* 526 F.2d at 1098.

Defendants protest that "Plaintiffs 'may not use the procedural device of a class action to bootstrap [themselves] into standing [they] lack[ ],"*Miller v. Pac. Shore Funding, Inc.,* 224 F.Supp.2d 977, 996

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(D.Md.2002) (quoting *Weiner v. Bank of King of Prussia,* 358 F.Supp. 684, 694, 695 (E.D.Pa.1973)), and it is true that "[i]n a multi-defendant action or class action, the named plaintiffs must establish that they have been harmed by each of the defendants," *Miller,* 224 F.Supp.2d at 996, but from those truths it does not follow that the statute of limitations should not be tolled to allow a party with standing to be named.

As grounds for declining to toll the statute of limitations, Defendants point principally to *In re Crazy Eddie Sec. Litig.,* 747 F.Supp. 850 (E.D.N.Y.1990), which in turn relied heavily upon *Korwek v. Hunt,* 827 F.2d 874 (2nd Cir.1987). In *Korwek,* after a class's certification was denied, the Second Circuit found that other analogous cases had consistently held that "the *American Pipe* tolling rule does not apply to permit putative class members to file a *subsequent* class action" to prevent putative class members from "piggyback[ing] one class action onto another and thus toll[ing] the statute of limitations indefinitely." *Id.* at 877-78 (citing cases) (italics added). The court concluded: "we hold that the tolling doctrine enunciated in *American Pipe* does not apply to permit a plaintiff to file a subsequent class action following a definitive determination of the inappropriateness of class certification." In *Crazy Eddie,* too, a plaintiff filed a second, separate complaint, and the court held that "the [*Korwek*] court's reasoning is equally applicable to a class action brought *after a previous class action has been dismissed* for lack of standing.... There appears to be no good reason to encourage the *bringing* of a suit merely to extend the period in which to find a class representative." 747 F.Supp. at 856 (italics added).

By now it should be clear that *Korwek* and *Crazy Eddie* are inapposite for two reasons: first, because Miller did not file a subsequent class action, but was added as a named plaintiff in the instant, pending case; and second, because there has been no "definitive" denial of class certification, let alone dismissal. Indeed, Plaintiffs' motion for class certification was denied without prejudice, and Plaintiffs were ordered to submit an amended complaint in order to clarify for the court the very issues that will dictate whether the class can be certified. The court therefore rejects these arguments against tolling the statute of limitations.

Because the statute of limitations tolled for Miller during the pendency of the class action, the court need not consider whether the court's seventeen month stay also served to toll, or, for this issue, whether the juridical link doctrine can supply standing.

**\*431 2. Miller's Standing Against MDIPA**

[4] Although Miller can sue OCI, Plaintiffs cannot use that fact as the basis for their action against MDIPA. As noted above, "[i]n a multi-defendant action or class action, the named plaintiffs must establish that they have been harmed by each of the defendants." *Miller,* 224 F.Supp.2d at 996. Miller has not done so here: Her only connection to MDIPA is this lawsuit. The complaint does not allege any facts to show that Miller has standing to sue MDIPA.

[5] Plaintiffs' sole argument tying Miller to MDIPA is that Miller benefits from the "juridical link" between OCI and MDIPA, but, as will be explained, the court will not apply juridical link doctrine to this case.

[6] Juridical link doctrine "answers the question of whether two defendants are sufficiently linked so that a plaintiff with a cause of action against only [one defendant] can also sue the other defendant under the guise of class certification." *In re Eaton Vance Corp. Sec. Litig.,* 220 F.R.D. 162, 165 (D.Mass.2004). Plaintiffs assert that, because OCI and MDIPA are common subsidiaries of the same corporation and because they share common practices and policies, they are related "in a manner that suggests a single resolution would be expeditious." *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 466 (9th Cir.1973). Plaintiffs cite a line of cases relying upon the *La Mar* language to advocate a relaxation of Article III standing requirements in such situations. *See, e.g., Alves v. Harvard Pilgrim Health Care Inc.,* 204 F.Supp.2d 198 (D.Mass.2002); *Bromley v. Mich. Educ. Ass'n-NEA,* 178 F.R.D. 148 (E.D.Mich.1998) (citing *Thompson v. Board of Educ.,* 709 F.2d 1200 (6th Cir.1983)); *Heffler v. U.S. Fid. & Guar. Ins. Co.,* 1992 WL 50095, 1992 U.S. Dist. LEXIS 3090 (E.D.Pa. March 10, 1992); *Thillens, Inc. v. Cmty. Currency Exch. Assoc.,* 97 F.R.D. 668 (N.D.Ill.1983).

The Fourth Circuit has addressed juridical link doctrine only tangentially, in a single, unpublished

opinion, *Faircloth v. Fin. Asset Sec. Corp. Mego Mortgage Home Owner Loan Trust*, 87 Fed.Appx. 314 (4th Cir.2004), stating ambiguously that the Circuit "ha[s] yet to recognize" the doctrine, and addressing its merit only briefly before finding that, "even were we to recognize the juridical link doctrine as a basis for standing, [plaintiff] could not invoke it successfully." Another district court in this circuit rejected its application, stating that it could only be used to confer standing in cases where there exists "either a contractual obligation among all defendants, or a state or local statute which requires common action by defendants." *Dash v. FirstPlus Home Loan Trust 1996-2*, 248 F.Supp.2d 489 (M.D.N.C.2003).

[7] This court is equally skeptical. "The short answer to this argument is that the juridical links doctrine has no bearing on the issue of standing. Instead, it provides an exception to the Rule 23(a) requirement of typicality and/or adequacy of representation in class actions against multiple defendants." *Matte v. Sunshine Mobile Homes, Inc.*, 270 F.Supp.2d 805, 822 (W.D.La.2003) (internal quotation marks omitted). As explained in *Eaton Vance,*

In its infancy, the doctrine had nothing to do with Article III standing. In fact, *La Mar* was a case where standing was not at issue because the Ninth Circuit assumed it to exist. *See id.* at 464. Rather, the juridical link doctrine was used to determine whether named plaintiffs were typical of the class and could fairly and adequately protect class interests as required by Rule 23. *See id.* at 465-66. The crux of the doctrine held that "a plaintiff who has no cause of action against the defendant can not [represent] those who do have such causes of action." *Id.* at 466. The Ninth Circuit, however, suggested that there were two exceptions to this rule: one for situations where the named plaintiff's injuries "are the result of a conspiracy or concerted schemes between the defendants," and another for situations where it would be "expeditious" to combine the defendants into one action because they are "juridically related." *Id.* at 466. Hence, the juridical link doctrine was born. Over time, the doctrine came to be used not only in the class certification analysis under Rule 23, but also in the standing analysis under Article III. *See, e.g.,* [*Alves* ], 204 F.Supp.2d [at] 205.

\*432 220 F.R.D. at 169-70 (parenthetical omitted). Some courts seem to read *La Mar* uncritically,

applying juridical link doctrine to questions of standing rather than limiting it to Rule 23 analysis as the *La Mar* court did. *See, e.g., Alves*, 204 F.Supp.2d at 205; *Bromley*, 178 F.R.D. at 162-63 (citing *Thompson*, 709 F.2d at 1204-05); *Heffler*, 1992 WL 50095 at \*4, 1992 U.S. Dist. LEXIS 3090 at \*10-11; *Thillens*, 97 F.R.D. at 676. This court, however, shares Judge Harrington's concern that while juridical link doctrine may be "expeditious," "Article III standing ... does not often bend to expediency and the Supreme Court has warned against such an approach,"*Eaton Vance*, 220 F.R.D. at 170 (citing *Raines v. Byrd*, 521 U.S. 811, 820, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (Article III standing analysis cannot be abandoned "for the sake of convenience and efficiency")), and agrees that "the juridical link doctrine should be confined to an analysis of Rule 23(a)." *Id.* at 171; *see Matte*, 270 F.Supp.2d at 822; *see, e.g., Barker v. FSC Sec. Corp.*, 133 F.R.D. 548, 553 (W.D.Ark.1989) (applying *La Mar* exceptions to find commonality under Rule 23, not standing) (where defendants argued that "individualized issues predominate as to plaintiffs' negligent supervision claim ... [so] not all class members have claims against every defendant," court found that "the defendants are juridically linked, and that plaintiffs' negligent supervision claim presents common issues of law and fact").

In the other cases cited by Plaintiffs, it is clear that more than mere common ownership provides the basis for overriding the long-standing requirement that a plaintiff's injury be "traceable to the challenged action of the defendant ...."*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In *Payton v. County of Kane*, 308 F.3d 673 (7th Cir.2002), the Seventh Circuit found that a suit against nineteen counties brought by a class naming only two plaintiffs, with claims against only two of the counties, could proceed because "[t]hese putative representatives were personally injured by the operation of the very same statute that caused the injuries to all other members of the proposed class." *Id. at 682.* The court, citing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir.1998) and *Moore v. Comfed Sav. Bank*, 908 F.2d 834 (11th Cir.1990), noted that "[p]ost-*LaMar* [sic] cases from other courts have suggested that if all the defendants took part in a similar scheme that was sustained either by a contract or conspiracy, or was mandated by a uniform state rule, it is appropriate to join as defendants even parties with whom the named

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

class representative did not have direct contact." 308 F.3d at 679 (italics omitted). The court also observed that "there are cases where appropriate relief may only be obtained through one broad suit, and it will be impossible to find a named plaintiff to match each defendant." Id. at 681.

In fact, *Payton's* reliance on *Fallick* is puzzling. In *Fallick,* the court held that a plaintiff could represent a class suing ERISA plans that were all administered by the same defendant. 162 F.3d at 424. As such, there was no standing question; after all, a plaintiff sues a defendant, not a plan. Rather, the question in *Fallick* was whether plaintiff could, in accordance with Rule 23, adequately represent unnamed plaintiffs with claims against a plan other than the one of which the named plaintiff was a member. *See id.* at 421-24. Here, of course, Miller wants to sue a defendant against whom she has no claim.

*Moore* is equally unconvincing, at least as regards this case. The *Moore* court came to no conclusion as to the applicability of juridical link doctrine to its case; rather, the issue, which arose out of an objection by the appellant defendants that they should never have been joined into the case, was decided on the basis of the court's interpretation of Rule 19. *See id.* at 838-39. Furthermore, in discussing the juridical link question (before abandoning it in favor of Rule 19 analysis), the *Moore* court, after noting the exception language in *La Mar,* observed approvingly that the district court had stated that "[o]ther named plaintiffs could be supplied to match with each named defendant, but it would be unwieldy to do so.... The case is simpler and more economical with the class of plaintiffs and the named defendants" and that "[n]o court would want to have 644 separate lawsuits." *Id.* at 838. Here, of course, it could hardly be called "unwieldy" to ask that ***433** Plaintiffs name representatives who have cognizable claims against each of the two defendants.

For these reasons, the court finds that Miller has no standing to sue MDIPA.

## C. Class Certification

[8] Defendants also argue that Plaintiffs' amended complaint does not cure the defects in class definition that compelled Judge Scrivener to deny class certification for lack of typicality and commonality.

Upon initial inspection, the court disagrees, but the question of class certification is not properly before the court at this time. Plaintiffs note correctly that analysis of class compliance with Rule 23 is not appropriately undertaken on a motion to dismiss, but should be addressed in a motion pursuant to Rule 23(c)(1)(A). *See*7B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1798, at 226-27 & n. 23 (3rd ed.2005) (citing cases). As to Defendants' motion to dismiss, Plaintiffs need only show, at this juncture, that they have stated a cause of action. *See Halverson v. Convenient Food Mart, Inc.,* 458 F.2d 927, 932 (7th Cir.1972)("(I)n determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 have been met.").

## IV. Conclusion

As Pierro's claims will be dismissed, Popoola is no longer a class representative, and Miller has no standing to sue MDIPA, as discussed *supra,* currently there is no named plaintiff with a claim against MDIPA. Counsel has had ample opportunity-indeed, years-to identify a representative of those cognizably injured by MDIPA, and has not done so. Accordingly, the court will dismiss with prejudice the class claims against MDIPA. In fairness to MDIPA, *see American Pipe,* 414 U.S. at 554, 94 S.Ct. 756 (statute of limitations exist to "ensur[e] essential fairness to defendants and ... bar[ ] a plaintiff who 'has slept on his rights' "), the court will exercise its discretion not to permit amendment of the complaint *ad nauseum* until a plaintiff with proper standing is discovered. *See*Fed.R.Civ.P. 15(a).

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part: The court will dismiss with prejudice all claims against MDIPA, but allow the class claims against OCI to proceed. A separate Order will follow.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 16th day of August, 2005, by the United States District Court for the District of Maryland, ORDERED that:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1. The motion of Defendants M.D. Individual Practice Association ("MDIPA") and Optimum Choice, Inc. ("OCI"), to dismiss the complaint (paper no. 59), BE, and the same hereby IS, GRANTED IN PART as to MDIPA and DENIED IN PART as to OCI;

2. Pierro's individual claims and Plaintiffs' class claims against MDIPA BE, and the same hereby ARE, DISMISSED WITH PREJUDICE; and

3. The Clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties.

D.Md.,2005.
Popoola v. Md-Individual Practice Ass'n, Inc.
230 F.R.D. 424

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 15**

Westlaw.

94 S.Ct. 2655                                                                                                      Page 1
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

▷Richardson v. Ramirez,
U.S.Cal. 1974.

Supreme Court of the United States
Viola N. RICHARDSON, as County Clerk, etc.,
Petitioner,
v.
Abran RAMIREZ et al.
**No. 72-1589.**

Argued Jan. 15, 1974.
Decided June 24, 1974.

Convicted felons who had completed their sentences
and paroles instituted proceeding for writ of mandate
compelling election officials to register them as
voters. The California Supreme Court, 9 Cal.3d 199,
107 Cal.Rptr. 137, 507 P.2d 1345, held that provision
of California Constitution and implementing statutes
disenfranchising convicted felons denied equal
protection and certiorari was granted. The Supreme
Court, Mr. Justice Rehnquist, held that decision of
county clerks who had refused to register plaintiffs as
voters not to contest the action and those clerks'
representations that they would permit convicted
felons whose terms of incarceration and parole had
expired to register and vote did not render the case
moot, and that disenfranchisement of convicted
felons who had completed their sentences and paroles
did not deny equal protection.

Reversed and remanded.

Mr. Justice Douglas dissented and filed opinion.

Mr. Justice Marshall dissented and filed opinion in
which Mr. Justice Brennan joined and in part of
which Mr. Justice Douglas joined.

West Headnotes

**[1] Federal Courts 170B ☜513**

170B Federal Courts
   170BVII Supreme Court
      170BVII(E) Review of Decisions of State
Courts
         170Bk513 k. Determination and
Disposition of Cause. Most Cited Cases
      (Formerly 106k400)
By reason of special relationship of public officials in
a state to the court of last resort of that state, decision
of state supreme court that state constitutional
provision and implementing statutes denied equal
protection, if left standing, would leave public
officials permanently bound. U.S.C.A.Const. Amend.
14.

**[2] Federal Courts 170B ☜513**

170B Federal Courts
   170BVII Supreme Court
      170BVII(E) Review of Decisions of State
Courts
         170Bk513 k. Determination and
Disposition of Cause. Most Cited Cases
      (Formerly 106k400)
Decision of three named county clerks who had
refused to register convicted felons as voters not to
contest felons' action challenging California
constitutional provision and implementing statutes
disenfranchising convicted felons, and those clerks'
representations that they would permit convicted
felons whose terms of incarceration and parole had
expired to register and vote, did not render case moot
where action had been brought on behalf of all
convicted felons situated similarly to plaintiffs, clerk
of another county had been added as a named
defendant and relief in the nature of declaratory relief
had been granted by California Supreme Court.
West's Ann.Cal.Elections Code, §§ 310, 321, 383,
389, 390, 14240, 14246; West's Ann.Cal.Const. art.
2, §§ 1, 3; art. 20, § 11; U.S.C.A.Const. art. 3, § 1 et
seq.; Amend. 14.

**[3] States 360 ☜4.4(3)**

360 States
   360I Political Status and Relations
      360I(A) In General
         360k4.4 Powers Reserved to States
            360k4.4(3) k. Other Particular Powers.
Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

Page 2

(Formerly 360k4.6)
State was at liberty to prescribe its own rules for class actions, subject only to limits imposed by the United States Constitution.

## [4] Federal Courts 170B ☞504.1

170B Federal Courts
   170BVII Supreme Court
      170BVII(E) Review of Decisions of State Courts
         170Bk504 Nature of Decisions or Questions Involved
            170Bk504.1 k. In General. Most Cited Cases
      (Formerly 170Bk504, 106k394(1))
Where there is "an actual and acute controversy," appeal from declaratory judgment of state court presents a "case or controversy" within jurisdiction of the United States Supreme Court. U.S.C.A.Const. art. 3, § 1 et seq.; 28 U.S.C.A. § 1257.

## [5] Federal Courts 170B ☞504.1

170B Federal Courts
   170BVII Supreme Court
      170BVII(E) Review of Decisions of State Courts
         170Bk504 Nature of Decisions or Questions Involved
            170Bk504.1 k. In General. Most Cited Cases
      (Formerly 170Bk504, 106k394(1))
Mere failure of state court to award peremptory relief in a proceeding which it treats as one for declaratory judgment is not an "adequate state ground" which precludes review by the United States Supreme Court of the state court's federal constitutional holding. U.S.C.A.Const. art. 3, § 1 et seq.

## [6] Constitutional Law 92 ☞3239

92 Constitutional Law
   92XXVI Equal Protection
      92XXVI(B) Particular Classes
         92XXVI(B)7 Status as Prisoner or One Charged with or Convicted of Crime
         92k3239 k. Elections, Voting, and Political Rights. Most Cited Cases
      (Formerly 92k225.2(3.1), 92k225.2(3), 92k211)

## Elections 144 ☞18

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
      144k18 k. Power to Prescribe Qualifications. Most Cited Cases
State constitutional provision and implementing statutes disenfranchising convicted felons who have completed their sentences and paroles did not deny equal protection. West's Ann.Cal.Elections Code, §§ 310, 321, 383, 389, 390, 14240, 14246; West's Ann.Pen.Code, §§ 1203.4, 4852.01, 4852.13, 4852.16, 4852.17; West's Ann.Cal.Const. art. 2, §§ 1, 3; art. 20, § 11; U.S.C.A.Const. Amends. 14, 14, §§ 1, 2.

## [7] Constitutional Law 92 ☞3239

92 Constitutional Law
   92XXVI Equal Protection
      92XXVI(B) Particular Classes
         92XXVI(B)7 Status as Prisoner or One Charged with or Convicted of Crime
         92k3239 k. Elections, Voting, and Political Rights. Most Cited Cases
      (Formerly 92k225.2(3.1), 92k225.2(3), 92k211)
Understanding of framers of Fourteenth Amendment, as reflected in language of section of the Amendment exempting from sanction of reduced congressional representation resulting from denial of citizen's right to vote a denial of such right for "participation in rebellion, or other crime," and in the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons is of controlling significance in distinguishing such laws from other state franchise limitations which are invalid under Equal Protection Clause. U.S.C.A.Const. Amends. 14, 14, §§ 1, 2.

## [8] Constitutional Law 92 ☞3239

92 Constitutional Law
   92XXVI Equal Protection
      92XXVI(B) Particular Classes
         92XXVI(B)7 Status as Prisoner or One Charged with or Convicted of Crime
         92k3239 k. Elections, Voting, and Political Rights. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(Formerly 92k225.2(3.1), 92k225.2(3), 92k211)
Section of the Fourteenth Amendment containing equal protection clause and dealing with voting rights could not have been meant to bar outright the disenfranchisement of convicted felons as such disenfranchisement was expressly exempted from sanction of reduced congressional representation imposed by subsequent section of the Amendment for other forms of disenfranchisement. U.S.C.A.Const. Amends. 14, 14, §§ 1, 2.

[9] Constitutional Law 92 ⛆3239

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(B) Particular Classes
            92XXVI(B)7 Status as Prisoner or One Charged with or Convicted of Crime
                92k3239 k. Elections, Voting, and Political Rights. Most Cited Cases
        (Formerly 92k15)
Even if section of Fourteenth Amendment imposing sanction of reduced congressional representation for forms of disenfranchisement other than disenfranchisement for participation in crime had been made part of Fourteenth Amendment largely through accident of political exigency rather than for the relation which it bore to other sections of the Amendment, that section would be looked to for guidance in determining whether disenfranchisement of felons denied equal protection, since the former section was as much a part of the Amendment as any of the other sections and how it became part of the Amendment was less important than what it said and what it meant. U.S.C.A.Const. Amends. 14, 14, §§ 1, 2.

**2656 Syllabus[FN*]

    FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

*24 After the three individual respondents, who had been convicted of felonies and had completed their sentences and paroles, were refused registration to vote in three different California counties respectively because of their felony convictions, they brought a class petition, on behalf of themselves and all other ex-felons similarly situated, for a writ of mandate in the California Supreme Court, naming as defendants the Secretary of State and the three county election officials who had denied them registration 'individually and as representatives of the class of all other' county election officials in the State, and challenging the constitutionality of respondents' disenfranchisement on the ground, inter alia, that provisions of the California Constitution and the implementing statutes that disenfranchised ex-felons denied them equal protection. The three county officials named as defendants decided not to contest the action and told the court they would henceforth register to vote ex-felons, including respondents, whose sentences and paroles had expired. Prior to the return date of the writ, the court added to the named defendants (instead of allowing her to intervene) another county election official (petitioner here) who was the defendant in a similar action by an ex-felon pending in the State Court of Appeal. After holding that the three **2657 first-named county officials' acquiescence did not render the case moot, the California Supreme Court went on to hold that the constitutional and statutory provisions in question, as applied to ex-felons whose sentences and paroles had expired, violated the Equal Protection Clause of the Fourteenth Amendment, but did not issue the peremptory writ. Held:

1. In view of its unusual procedural history in the Supreme Court of California, the case is not moot. Pp. 2661-2664.

(a) The State Supreme Court's action in adding petitioner as a named defendant after the other named county officials decided not to contest the action, and at a time when the Secretary of *25 State (who did not join in the petition to this Court) was still a party defendant who had answered the complaint, indicates that the court considered the suit to be not only on behalf of the three named plaintiffs, but also on behalf of all ex-felons in California similarly situated, and also that the court regarded petitioner's opponent in the Court of Appeal suit, both as an unnamed member of the class of ex-felons referred to in the complaint and as one of a class actually seeking to register in petitioner's county, as a party to the Supreme Court action. Pp. 2663-2664.

(b) Being rendered in a class action in which relief in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the nature of declaratory relief was granted, the decision below is not only binding on petitioner and thus dispositive of her other suit, but also decides the federal constitutional question presented for the unnamed members of the classes represented below by petitioner and respondents, whose continuing controversy in the State Supreme Court still continues in this Court. Brockington v. Rhodes, 396 U.S. 41, 90 S.Ct. 206, 24 L.Ed.2d 209, distinguished. P. 2664.

2. California, in disenfranchising convicted felons who have completed their sentences and paroles, does not violate the Equal Protection Clause, Pp. 2665-2672.

(a) The understanding of the framers of the Fourteenth Amendment, as reflected in the express language of s 2 of the Amendment, which exempts from the sanction of reduced congressional representation resulting from the denial of citizens' right to vote, the denial of such right for 'participation in rebellion, or other crime,' and in the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons, is of controlling significance in distinguishing such laws from those other state limitations on the franchise that this Court has held invalid under the Equal Protection Clause. Pp. 2670-2671.

(b) Section 1 of the Fourteenth the Amendment "largely through the ac-Protection Clause, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement that was expressly exempted from the less drastic sanction of reduced representation that s 2 imposed for other forms of disenfranchisement. P. 2671.

(c) Even if s 2 was made part of the Amendment "largely through the accident of political exigency rather than for the relation which it bore to the other sections of Amendment," as respondents contend, this does not preclude looking to it for guidance in interpreting s 1, since s 2 is as much a part of the Amendment*26 as any of the other sections, and how it became part of the Amendment is less important than what it says and what it means. P. 2671.

9 Cal.3d 199, 107 Cal.Rptr. 137, 507 P.2d 1345, reversed and remanded.

Duncan M. James, Dist. Atty. of Mendocino County, Ukiah, Cal., for petitioner.

George J. Roth, Los Angeles, Cal., for State of California, as amicus curiae, by special leave of Court.

Martin R. Glick, San Francisco, Cal., for respondents.

**2658 Mr. Justice REHNQUIST delivered the opinion of the Court.

The three individual respondents in this case were convicted of felonies and have completed the service of their respective sentences and paroles. They filed a petition for a writ of mandate in the Supreme Court of California to compel California county election officials to register them as voters.[FN1] They claimed, on behalf of *27 themselves and others similarly situated, that application to them of the provisions of the California Constitution and implementing statutes which disenfranchised persons convicted of an 'infamous crime' denied them the right to equal protection of the laws under the Federal Constitution. The Supreme Court of California held that 'as applied to all ex-felons whose terms of incarceration and parole have expired, the provisions of article II and article XX, section 11, of the California Constitution denying the right of suffrage to persons convicted of crime, together with the several sections of the Elections Code implementing that disqualification . . . violate the equal protection clause of the Fourteenth Amendment.' Ramirez v. Brown, 9 Cal.3d 199, 216-217, 107 Cal.Rptr. 137, 149, 507 P.2d 1345, 1357 (1973). We granted certiorari, 414 U.S. 816, 94 S.Ct. 45, 38 L.Ed.2d 49 (1973).

> FN1. The petition for a writ of mandate in the Supreme Court of California also named the California Secretary of State as a respondent in his capacity of chief elections officer of the State of California. He did not join the petition for a writ of certiorari to this Court, and has filed a brief as a party respondent. Respondents here (petitioners below) also include, in addition to the three individual respondents, the League of Women Voters and three nonprofit organizations which support the interests of ex-convicts-Los Pintos, 7th Step Foundations, Inc. (California Affiliates), and Prisoners' Union.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655

Page 5

418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

Article XX, s 11, of the California Constitution has provided since its adoption in 1879 that '(l)aws shall be made' to exclude from voting persons convicted of bribery, perjury, forgery, malfeasance in office, 'or other high crimes.' At the time respondents were refused registration, former Art, II, s 1, of the California Constitution provided in part that 'no alien ineligible to citizenship, no idiot, no insane person, no person convicted of any infamous crime, no person hereafter convicted of the embezzlement or misappropriation of public money, and no person who shall not be able to read the Constitution in the English language and write his or her name, shall ever exercise the privileges of an elector *28 in this State.'[FN2]Sections 310 and 321 of the California Elections Code provide that an affidavit of registration shall show whether the affiant has been convicted of 'a felony which disqualifies (him) from voting.'[FN3]Sections 383, 389, and 390 direct the county clerk to cancel the registration of all voters who have been convicted of 'any infamous crime or of the embezzlement or misappropriation of any public money.'[FN4]**2659Sections 14240 and *29 14246 permit a voter's qualifications to be challenged on the ground that he has been convicted of 'a felony' or of 'the embezzlement or misappropriation of public money.'[FN5]California provides by statute for restoration of the right to vote to persons convicted of crime either *30 by court order after the completion of probation,[FN6] or, if a prison term was served, by executive pardon after completion of rehabilitation proceedings.[FN7] California also provides a **2660 procedure by which a person refused *31 registration may obtain judicial review of his disqualification. [FN8]

FN2. Proposition 7, passed at the November 7, 1972, general election, repealed former Art. II, s 1, of the California Constitution and added new Art. II, s 3:
'The Legislature shall prohibit improper practices that affect elections and shall provide that no severely mentally deficient person, insane person, person convicted of an infamous crime, nor person convicted of embezzlement or misappropriation of public money, shall exercise the privileges of an elector in this state.'
The Supreme Court of California concluded that the new constitutional provision was no

different in substance from the former one, and that it did not implicitly repeal the implementing sections of the California Elections Code challenged here.

FN3.Section 310 of the California Elections Code provides in relevant part that '(t)he affidavit of registration shall show:
(h) That the affiant is not disqualified to vote by reason of a felony conviction.'
Section 321 sets the form of the registration affidavit, which includes the following: '10. I am not disqualified to vote by reason of a felony conviction.'

FN4.Section 383 of the California Elections Code provides:
'The county clerk shall cancel the registration in the following cases:
'(c) Upon the production of a certified copy of a subsisting judgment of the conviction of the person registered of any infamous crime or of the embezzlement or misappropriation of any public money. . . .'
Section 389 provides:
'The county clerk shall, in the first week of September in each year, examine the records of the courts having jurisdiction in case of infamous crimes and the embezzlement or misappropriation of public money, and shall cancel the affidavits of registration of all voters who have been finally convicted of an infamous crime or of the embezzlement or misappropriation of public money. . . .'
Section 390 provides:
'The county clerk, on the basis of the records of courts in the county having jurisdiction of such offenses, shall furnish to the registrar of voters in a county where there is a registrar of voters, before the first day of September of each year, a statement showing the names of all persons convicted of infamous crimes or of the embezzlement or misappropriation of public money during the year prior to that first day of September, whose convictions have become final. The registrar of voters shall, during the first week of September in each year, cancel the affidavits of registration of such persons. The county clerk shall certify the statement under the seal of his office. . . .'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655

Page 6

418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

FN5.Section 14240 of the California Elections Code (Supp.1974) provides:

'A person offering to vote may be orally challenged within the polling place only by a member of the precinct board upon any or all of the following grounds:

'(g) That he has been convicted of a felony.

'On the day of the election no person, other than a member of a precinct board or other official responsible for the conduct of the election, shall challenge any voter or question him concerning his qualifications to vote. . . .'

Section 14246 (Supp.1974) provides:

'If the challenge is on the ground that the person challenged has been convicted of a felony or that he has been convicted of the embezzlement or misappropriation of public money, he shall not be questioned, but the fact may be proved by the production of an authenticated copy of the record or by the sworn oral testimony of two witnesses.'

FN6.Section 1203.4 of the California Penal Code (Supp.1974) provides:

'(a) In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation, or in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under this section, the defendant shall, at any time after the termination of the period of probation, if he is not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw his plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if he has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in either case, the court shall thereupon dismiss the accusations or information against the defendant and he shall thereafter be released from all penalties and disabilities resulting from the offense of which he has been convicted. The probationer shall be informed of this right

and privilege in his probation papers. . . .'

FN7.Section 4852.01 of the California Penal Code (1970) provides that a person convicted of a felony who was incarcerated may file, any time after his release from custody, a notice of intention to apply for a certificate of rehabilitation and pardon. It further provides, however:

'This chapter shall not apply to persons convicted of misdemeanors; to persons who have served time in county jails only; to persons serving a mandatory life parole; to persons committed under death sentences; or to persons in the military service.'

Section 4852.13 of the California Penal Code (1970) provides:

'If, after hearing, the court finds that the petitioner has demonstrated by his course of conduct his rehabilitation and his fitness to exercise all of the civil and political rights of citizenship, the court shall make an order declaring that the petitioner has been rehabilitated, and recommending that the Governor grant a full pardon to the petitioner. Such order shall be filed with the clerk of the court, and shall be known as a certificate of rehabilitation. The certificate shall show the date on which the original notice of intention to apply for a certificate was filed.'

Section 4852.16 provides:

'The certified copy of a certificate of rehabilitation transmitted to the Governor shall constitute an application for a full pardon upon receipt of which the Governor may, without any further investigation, issue a pardon to the person named therein, except that, pursuant to Section 1 of Article VII of the Constitution, the Governor shall not grant a pardon to any person twice convicted of felony, except upon the written recommendation of a majority of the judges of the Supreme Court.'

Section 4852.17 (Supp.1974) provides:

'Whenever a person is granted a full and unconditional pardon by the Governor, based upon a certificate of rehabilitation, the pardon shall entitle the person to exercise thereafter all civil and political rights of citizenship, including but not limited to: (1) the right to vote . . . .'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

FN8.Section 350 of the California Elections Code (1961) provides:
'If the county clerk refuses to register any qualified elector in the county, the elector may proceed by action in the superior court to compel his registration. In an action under this section, as many persons may join as plaintiffs as have causes of action.'
Respondents contended that pardon was not an effective device for obtaining the franchise, noting that during 1968-1971, 34,262 persons were released from state prisons but only 282 pardons were granted.

Each of the individual respondents was convicted of one or more felonies, and served some time in jail or prison followed by a successfully terminated parole. Respondent Ramirez was convicted in Texas; respondents Lee and Gill were convicted in California. When Ramirez applied to register to vote in San Luis Obispo County, the County Clerk refused to allow him to register. The Monterey County Clerk refused registration to respondent Lee, and the Stanislaus County Registrar of *32 Voters (hereafter also included in references to clerks) refused registration to respondent Gill.
All three respondents were refused registration because of their felony convictions.[FN9]

FN9. Respondent Ramirez was convicted in Texas of the felony of 'robbery by assault' in 1952. He served three months in jail and successfully terminated his parole in 1962. In February 1972 the San Luis Obispo County Clerk refused to allow Ramirez to register to vote on the ground that he had been convicted of a felony and spent time in incarceration. Respondent Lee was convicted of the felony of heroin possession in California in 1955, served two years in prison, and successfully terminated his parole in 1959. In March 1972 the Monterey County Clerk refused to allow Lee to register to vote on the sole ground that he had been convicted of a felony and had not been pardoned by the Governor. Respondent Gill was convicted in 1952 and 1967 of second-degree burglary in California, and in 1957 of forgery. He served some time in prison on each conviction, followed by a

successful parole. In April 1972 the Stanislaus County Registrar of Voters refused to allow Gill to register to vote on the sole ground of his prior felony convictions.

In May 1972 respondents filed a petition for a writ of mandate in the Supreme Court of California, invoking its original jurisdiction.[FN10] They named as defendants[FN11] below the three election officials of San Luis Obispo, *33 Monterey, and Stanislaus Counties who had refused to allow them to register, 'individually and as representatives of the class of all other County Clerks and Registrars of Voters who have the duty of determining for their respective counties whether any ex-felon will be denied the right to vote.'The petition for a writ of mandate challenged the constitutionality of respondents' exclusion from the voting **2661 rolls on two grounds. First, it was contended that California's denial of the franchise to the class of ex-felons could no longer withstand scrutiny under the Equal Protection Clause of the Fourteenth Amendment. Relying on the Court's recent voting-rights cases, respondents argued that a compelling state interest must be found to justify exclusion of a class from the franchise, and that California could assert no such interest with respect to ex-felons. Second, respondents contended that application of the challenged California constitutional and statutory provisions by election officials of the State's 58 counties was so lacking in uniformity as to deny them due process and 'geographical . . . equal protection.'They appended a report by respondent California Secretary of State, and the questionnaries returned by county election officials on which it was based. The report concluded that there was wide variation in the county election officials' interpretation of the challenged voting exclusions.[FN12] The Supreme*34 Court of California upheld the first contention and therefore did not reach the second one.

FN10. Paragraph VI of respondents' petition for mandamus states that the named 'Petitioners bring this action individually and on behalf of all other persons who are ineligible to register to vote in California solely by reason of a conviction of a felony other than an election code felony.'The remainder of the petition makes it clear that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

the class was further restricted to ex-felons, and the Supreme Court of California so treated it.

FN11. We refer to the named 'defendants' in the action in the Supreme Court of California, even though in that court they were actually denominated respondents according to California practice, and we refer to named 'plaintiffs' in that court, even though they were actually there denominated as petitioners. We do this for convenience of reference, in order to avoid as much as possible confusion between reference to the position of the parties in the Supreme Court of California and their position here.

FN12. The parties agree that the lack of uniformity is the result of differing interpretations of the 1966 Supreme Court of California decision in Otsuka v. Hite, 64 Cal.2d 596, 51 Cal.Rptr. 284, 414 P.2d 412, which defined 'infamous crime' as used in the California constitutional provisions. The California Secretary of State's report noted that '(m)ost' of the 49 responding counties 'have attempted to develop consistent criteria for determining which ex-felons shall be entitled to register. In some counties these policies have been formalized in writing, but in most instances a case-by-case method has been used.'The report concluded:
'2. Although the policy within most counties may be consistent, the fact that some counties have adopted different policies has created a situation in which there is a lack of uniformity across the state. It appears from the survey that a person convicted of almost any given felony would find that he is eligible to vote in some California counties and ineligible to vote in others.
'3. In order to remedy this lack of uniformity, authoritative guidelines from either the legislature or the courts are urgently needed.'

I

Before reaching respondents' constitutional

challenge, the Supreme Court of California considered whether a decision reached by the three county clerks not to contest the action, together with their representation to the court that they would henceforth permit all ex-felons whose terms of incarceration and parole had expired to register and vote, rendered this case moot. That court decided that it did not. The acquiescence of the three officials was in no way binding on election officials of the other 55 California counties in which respondents might choose to reside, and it was undisputed that there were many ex-felons among the residents of those counties who had been or would be refused registration on the ground challenged. Because the case posed a question of broad public interest, which was likely to recur and which should receive a statewide resolution, the court exercised its 'inherent discretion to resolve the issue, 'even though an event occurring during its pendency would normally render the matter moot.' . . . This rule is particularly applicable to challenges to the validity of election laws.'9 Cal.3d, at 203, 107 Cal.Rptr., at 139, 507 P.2d, at 1347. In addition to California cases, the court cited Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Goosby v. Osser, 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973)

*35 [1] As a practical matter, there can be no doubt that there is a spirited dispute between the parties in this Court as to the constitutionality of the California provisions disenfranchising ex-felons. Even though the Supreme Court of California did not in fact issue a permanent writ of mandate, and therefore its judgment is in effect a declaratory judgment, an action for such relief may stem from a controversy that is 'definite and concrete, touching the legal relations of parties having adverse legal interests.'**2662 Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 240-241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). By reason of the special relationship of the public officials in a State to the court of last resort of that State, the decision of the Supreme Court of California, if left standing, leaves them permanently bound by its conclusion on a matter of federal constitutional law. Cf. North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc., 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973).

This case in some respects presents stronger arguments for concluding that a live case or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

controversy remains than in other election cases in which we have addressed the question of mootness. Unlike Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), in which the particular candidacy was not apt to be revived in a future election, or Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969), in which the voters who had been disenfranchised because of a residence requirement would not have suffered the same fate under the amended statute, respondents here are indefinitely disenfranchised by the provisions of California law which they challenge. While the situation in Moore v. Ogilvie, supra, was described as "capable of repetition, yet evading review," 394 U.S., at 816, 89 S.Ct., at 1494, that involved here can best be described, in view of the Supreme Court of California's decision against the state officials and their obligation to follow the law as laid down by that court, as 'incapable of repetition,' and therefore evading review. There are thus the strongest sorts of practical arguments, as well as the language *36 of Moore v. Ogilvie, supra, which militate against a conclusion of mootness in this case.

But purely practical considerations have never been thought to be controlling by themselves on the issue of mootness in this Court. While the Supreme Court of California may choose to adjudicate a controversy simply because of its public importance, and the desirability of a statewide decision, we are limited by the case-or-controversy requirement of Art. III to adjudication of actual disputes between adverse parties.

The mootness problem here arises because, as it noted, the Supreme Court of California was assured by the three county clerks who were named as defendants that the three named plaintiffs would be allowed to register and vote. The three named plaintiffs resided respectively in the California counties of San Luis Obispo, Monterey, and Stanislaus, and the county clerks of those counties who were named as defendants neither defended the action in the Supreme Court of California nor sought review here. Petitioner here is the County Clerk of Mendocino County, who though of course bound by the judgment of the Supreme Court of California, since she was made a party to that action, has no concrete dispute with voters who reside in other counties. Thus if the case were limited to the named parties alone, it could be persuasively argued that

there was no present dispute on the issue of the right to register between the three named individual respondents in this Court and the one named petitioner here.

[2] We think, however, that the unusual procedural history of the case in the Supreme Court of California leads to the conclusion that the litigation before us is not moot. The individual named plaintiffs brought their action in the Supreme Court of California on behalf of themselves and all other ex-felons similarly situated, and not simply *37 those ex-felons residing in the counties in which the named plaintiffs resided. While only the county clerks of Stainslaus, Monterey and San Luis Obispo were named parties defendant, they were designated in the original complaint filed in the Supreme Court of California 'as representatives of the class of all other County Clerks.' The California Secretary of State was likewise named a party defendant. On the basis of this complaint, the Supreme Court of California **2663 issued an alternative writ of mandate directed to the three named county clerks 'individually and as representatives of the class of all other County Clerks and Registrars of Voters,' directing them to register to vote not simply the three named plaintiffs, but 'all exfelons whose term of incarceration and parole have expired and who upon application demonstrate that they are otherwise fully qualified to vote,' or in the alternative to show cause why they had not done so upon the return date of the writ. Thus, while the Supreme Court of California did not in so many words say that it was permitting respondents to proceed by way of a 'class action,' the fact that the court's process recited that the named clerks were subject to it 'individually and as representatives of the class of all other County Clerks and Registrars of Voters,' and the fact that the beneficiaries of that process were not merely the named plaintiffs but 'all ex-felons whose term of incarceration and parole (had) expired . . .' indicates that the court treated the action as one brought for the benefit of the class described in the petition for the writ of mandate.

Petitioner Viola Richardson, the County Clerk of Mendocino County, filed a complaint in intervention in the action in the Supreme Court of California, alleging that the suit as framed by the named plaintiffs was collusive, in that neither the three named county clerks nor the Secretary of State could

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

be expected to contest the claims *38 of plaintiffs. Petitioner Viola Richardson further alleged in her complaint of intervention that she was a party to a lawsuit brought against her by an ex-felon (also named Richardson) who had sought to register in Mendocino County, had been denied the right, and whose suit seeking to establish the right was then pending in the State Court of Appeal.

The county clerks actually named as defendants in the mandate action each obeyed the alternative writ issued by the Supreme Court of California, and did not contest the named plaintiffs' legal claim that they had a right to vote secured by the Equal Protection Clause of the Fourteenth Amendment which overrode the contrary provisions of the California Constitution. The Secretary of State appeared in the action and generally denied the named plaintiffs' essential claims.

The Supreme Court of California, prior to the return date of the writ, issued an order denying petitioner Richardson's motion to intervene, but instead ordered her added to the named defendants in the action along with the three other named county clerks and the Secretary of State. This action in the Supreme Court of California, coming as it did after the acquiescence of the named clerks in the counties in which the named plaintiffs resided, and yet at a time when the Secretary of State was still a party defendant who had answered the complaint, clearly indicates to us that that court considered the action to be not only on behalf of the three named plaintiffs, but also on behalf of all exfelons in California similarly situated. We are reinforced in this conclusion by the language quoted above from the alternative writ of mandate issued by the Supreme Court of California. Had the Supreme Court of California based its action on petitioner Richardson's claim that the suit was collusive, and that it might become a binding precedent in *39 her litigation then pending in the State Court of Appeal, it would seem to have been sufficient to grant the motion to intervene. But the court's action adding petitioner Richardson as a named defendant would appear to have been based on its conclusion that at least some members of the class represented by the plaintiffs in fact resided in Mendocino County, and were there seeking to exercise their right to vote. In reaching such a conclusion, of course, the Supreme Court of California had before it petitioner Richardson's

allegation that at least her opponent in the litigation pending in the Court of Appeal was not merely seeking to register to vote in **2664 Mendocino County, but had brought a lawsuit to enforce his claim.

[3] At the time petitioner Richardson was added as a party defendant, the three named plaintiffs had obtained the relief which they sought, whereas the remaining members of the class, including petitioner Richardson's opponent in the court of appeal litigation, had not. We have held that in the federal system one may not represent a class of which he is not a part, Bailey v. Patterson, 369 U.S. 31, 32-33, 82 S.Ct. 549, 550-551, 7 L.Ed.2d 512 (1962), and if this action had arisen in the federal courts there would be serious doubt as to whether it could have proceeded as a class action on behalf of the class of ex-felons denied the right to register after the three named plaintiffs had been granted that right. Indiana Employment Security Division v. Burney, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973). But California is at liberty to prescribe its own rules for class actions, subject only to whether limits may be imposed by the United States Constitution, and we interpret its action in adding petitioner Richardson as a defendant to mean that it regarded her opponent in the Court of Appeal litigation, both as an unnamed member of the class of ex-felons referred to in the mandate complaint, and as one of a class actually seeking to register in Mendocino County, *40 as a party to the action in the Supreme Court of California, albeit an unnamed one.

In Brockington v. Rhodes, 396 U.S. 41, 90 S.Ct. 206, 24 L.Ed.2d 209 (1969), we emphasized in finding the case moot that appellant's 'suit did not purport to be a class action, and he sought no declaratory relief.' Id., at 42, 90 S.Ct., at 207. We said:

'(I)n view of the limited nature of the relief sought, we think the case is moot because the congressional election is over. The appellant did not allege that he intended to run for office in any future election. He did not attempt to maintain a class action on behalf of himself and other putative independent candidates, present or future. He did not sue for himself and others similarly situated as independent voters, as he might have under Ohio law. . . . He did not seek a declaratory judgment, although that avenue too was open to him. . . .' Id., at 43, 90 S.Ct., at 208.

Here, unlike Brockington, there was a class action, and relief in the nature of declaratory relief was granted. The decision below is not only binding on petitioner Richardson, and thus dispositive of her other Court of Appeal litigation, but also decides the federal constitutional question presented for the unnamed members of the classes represented below by petitioner and respondents, whose continuing controversy led the Supreme Court of California to conclude that this case was not moot.

[4][5] The briefs of the parties before us indicate that the adverse alignment in the Supreme Court of California continues in this Court, and we therefore hold the case is not moot.[FN13]

> FN13. Our Brother MARSHALL argues in dissent that since the Supreme Court of California did not issue the peremptory writ of mandate, its opinion in this case is an advisory one which does not come within the 'case or controversy' requirement of Art. III of the Constitution. He also contends that that court's refusal to issue the peremptory writ must rest on some unarticulated state ground, which he concludes should bar review of the federal constitutional question by this Court.

The Supreme Court of California has only recently noted its policy of avoiding advisory opinions on abstract questions of law, In re M., 3 Cal.3d 16, 89 Cal.Rptr. 33, 473 P.2d 737 (1970), while in the same opinion adverting to its 'declaratory use of habeas corpus in a number of cases' such as In re Gonsalves, 48 Cal.2d 638, 311 P.2d 483 (1957). In support of its determination in the case before us that exercise of its original jurisdiction would be appropriate, the Supreme Court of California cited Young v. Gnoss, 7 Cal.3d 18, 101 Cal.Rptr. 533, 496 P.2d 445 (1972). There it had exercised its original mandamus jurisdiction to conclude that the durational residence requirements for voting imposed by California law violated the Equal Protection Clause of the Fourteenth Amendment. Saying that its 'function at this time is simply to declare the minimum that must be done to implement Dunn v. Blumstein (405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972)),'7 Cal.2d, at 27, 101 Cal.Rptr., at 539, 496 P.2d, at 451, the court refused to issue a peremptory writ of mandate in that case, just as it did here, saying that '(s)ince there is no reason to believe that any of the parties to this proceeding will not accede to our holdings herein, no purpose would be served by issuing a writ of mandate to compel such compliance with respect to the November 1972 general election. . . .' Id., at 29, 101 Cal.Rptr., at 541, 496 P.2d, at 453. United States courts of appeals, which are barred by the case-or-controversy requirement of Art. III from issuing advisory opinions, have nonetheless declined to issue peremptory writs against district judges on the assumption that the latter would abide by the opinion of the court of appeals without the compulsion of such a writ. In re United States, 257 F.2d 844 (CA5 1958); In re United States, 207 F.2d 567 (CA5 1953).

We think that the reliance of the Supreme Court of California on its earlier decision recognizing and approving the use of its original jurisdiction to grant declaratory relief, as well as its reliance on precedent in an original mandamus proceeding in which it reached the merits but declined to issue the peremptory writ where there was no question of mootness, supports our conclusion that that court's judgment in this case is for all practical purposes at least a declaratory judgment. And it is well settled that, where there is 'an actual and acute controversy,' an appeal from a declaratory judgment of a state court presents a 'case or controversy' within this Court's jurisdiction. Nashville, C. & St. L. R. Co. v. Wallace, 288 U.S. 249, 53 S.Ct. 345, 77 L.Ed. 730 (1933). Indeed, any other conclusion would unnecessarily permit a state court of last resort, quite contrary to the intention of Congress in enacting 28 U.S.C. s 1257, to invalidate state legislation on federal constitutional grounds without any possibility of state officials who were adversely affected by the decision seeking review in this Court.

We are equally unable to accept the view of the dissenters that the California court's failure here to issue the peremptory writ

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

must rest on that court's resolution of some unspecified state law question against petitioner. The mere failure of a state court to award peremptory relief in a proceeding which it treats as one for a declaratory judgment is not an 'adequate state ground' which precludes our review of its federal constitutional holding.

**\*\*2665 \*41** II

Unlike most claims under the Equal Protection Clause, for the decision of which we have only the language of the Clause itself as it is embodied in the Fourteenth **\*42** Amendment, respondents' claim implicates not merely the language of the Equal Protection Clause of s 1 of the Fourteenth Amendment, but also the provisions of the less familiar s 2 of the Amendment:

'Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number**\*43** of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.'(Emphasis supplied.)

Petitioner contends that the italicized language of s 2 expressly exempts from the sanction of that section disenfranchisement grounded on prior conviction of a felony. She goes on to argue that those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in s 1 of that Amendment that which was expressly exempted from the lesser sanction of reduced representation imposed by s 2 of the Amendment. This argument seems to us a persuasive one unless it can be shown that the language of s 2, 'except for participation in rebellion, or other crime,' was intended to have a different meaning than would appear from its face.

**\*\*2666** The problem of interpreting the 'intention' of a constitutional provision is, as countless cases of this Court recognize, a difficult one. Not only are there deliberations of congressional committees and floor debates in the House and Senate, but an amendment must thereafter be ratified by the necessary number of States. The legislative history bearing on the meaning of the relevant language of s 2 is scant indeed; the framers of the Amendment were primarily concerned with the effect of reduced representation upon the States, rather than with the two forms of disenfranchisement which were exempted from that consequence by the language with which we are concerned here. Nonetheless, what legislative history there is indicates that this language was intended by Congress to mean what it says.

A predecessor of s 2 was contained in an earlier draft of the proposed amendment, which passed the House of Representatives, but was defeated in the Senate early in 1866. The Joint Committee of Fifteen of Reconstruction**\*44** then reconvened, and for a short period in April 1866, revised and redrafted what ultimately became the Fourteenth Amendment. The Journal of that Committee's proceedings shows only what motions were made and how the various members of the Committee voted on the motions; it does not indicate the nature or content of any of the discussion in the Committee. While the Journal thus enables us to trace the evolution of the draft language in the Committee, it throws only indirect light on the intention or purpose of those who drafted s 2. See B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 104-120 (1914).

We do know that the particular language of s 2 upon which petitioner relies was first proposed by Senator Williams of Oregon to a meeting of the Joint Committee on April 28, 1866. Senator Williams moved to strike out what had been s 3 of the earlier version of the draft, and to insert in place thereof the following:

'Representatives shall be apportioned among the several states which may be included within this Union according to their respective numbers, counting the whole number of persons in each State excluding Indians not taxed. But whenever in any State the elective franchise shall be denied to any portion of its male citizens, not less than twenty-one

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655                                                    Page 13
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

years of age, or in any way abridged, except for participation in rebellion or other crime, the basis of representation in such State shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens not less than twenty-one years of age.'Id., at 102.

The Joint Committee approved this proposal by a lopsided margin, and the draft Amendment was reported to the House floor with no change in the language of s 2.

**\*45** Throughout the floor debates in both the House and the Senate, in which numerous changes of language in s 2 were proposed, the language 'except for participation in rebellion, or other crime' was never altered. The language of s 2 attracted a good deal of interest during the debates, but most of the discussion was devoted to its foreseeable consequences in both the Northern and Southern States, and to arguments as to its necessity or wisdom. What little comment there was on the phrase in question here supports a plain reading of it.

Congressman Bingham of Ohio, who was one of the principal architects of the Fourteenth Amendment and an influential member of the Committee of Fifteen, commented with respect to s 2 as follows during the floor debates in the House:

'The second section of the amendment simply provides for the equalization of representation among all the States of the Union, North, South, East, and West. It makes no discrimination.**\*\*2667** New York has a colored population of fifty thousand. By this section, if that great State discriminates against her colored population as to the elective franchise, (except in cases of crime,) she loses to that extent her representative power in Congress. So also will it be with every other State.'Cong.Globe, 39th Cong., 1st Sess., 2543 (1866).

Two other Representatives who spoke to the question made similar comments. Representative Eliot of Massachusetts commented in support of the enactment of s 2 as follows:
'Manifestly no State should have its basis of national representation enlarged by reason of a portion of citizens within its borders to which the elective franchise is denied. If political power shall be lost because of such denial, not imposed because of **\*46**

participation in rebellion or other crime, it is to be hoped that political interests may work in the line of justice, and that the end will be the impartial enfranchisement of all citizens not disqualified by crime.'Id., at 2511.

Representative Eckley of Ohio made this observation:

'Under a congressional act persons convicted of a crime against the laws of the United States, the penalty for which is imprisonment in the penitentiary, are now and always have been disfranchised, and a pardon did not restore them unless the warrant of pardon so provided.

'. . . But suppose the mass of the people of a State are pirates, counterfeiters, or other criminals, would gentlemen be willing to repeal the laws now in force in order to give them an opportunity to land their piratical crafts and come on shore to assist in the election of a President or members of Congress because they are numerous? And let it be borne in mind that these latter offenses are only crimes committed against property; that of treason is against the nation, against the whole people-the highest known to the law.' Id., at 2535.

The debates in the Senate did not cover the subject as exhaustively as did the debates in the House, apparently because many of the critical decisions were made by the Republican Senators in an unreported series of caucuses off the floor. Senator Saulsbury of Delaware, a Democrat who was not included in the majority caucus, observed:

'It is very well known that the majority of the members of this body who favor a proposition of this character have been in very serious deliberation**\*47** for several days in reference to these amendments, and have held some four or five caucuses on the subject.'Id., at 2869.

Nonetheless, the occasional comments of Senators on the language in question indicate an understanding similar to that of the House members. Senator Johnson of Maryland, one of the principal opponents of the Fourteenth Amendment, made this argument:
'Now it is proposed to deny the right to be represented of a part, simply because they are not permitted to exercise the right of voting. You do not

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

put them upon the footing of aliens, upon the footing of rebels, upon the footing of minors, upon the footing of the females, upon the footing of those who may have committed crimes of the most heinous character. Murderers, robbers, houseburners, counterfeiters of the public securities of the United States, all who may have committed any crime, at any time, against the laws of the United States or the laws of a particular State, are to be included within the basis; but the poor black man, unless he is permitted to vote, is not to be represented, and is to have no interest in the Government.'Id., at 3029.

Senator Henderson of Missouri, speaking in favor of the version of s 2 which **2668 had been reported by the Joint Committee in April, as opposed to the earlier provision of the proposal which had been defeated in the Senate, said this:

'The States under the former proposition (the corresponding provision of the original Amendment reported by the Committee of Fifteen, which passed the House of Representatives but was defeated in the Senate) might have excluded the negroes under *48 an educational test and yet retained their power in Congress. Under this they cannot. For all practical purposes, under the former proposition loss of representation followed the disfranchisement of the negro only; under this it follows the disfranchisement of white and black, unless excluded on account of 'rebellion or other crime.'Id., at 3033.

Further light is shed on the understanding of those who framed and ratified the Fourteenth Amendment, and thus on the meaning of s 2, by the fact that at the time of the adoption of the Amendment, 29 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes.[FN14]

FN14.Ala.Const., Art. 6, s 5 (1819); Calif.Const., Art. 2, s 5 (1849); Conn.Const., Art. 6, s 3 (1818); Del.Const., Art. 4, s 1 (1831); Fla.Const., Art. 6, s 4 (1838); Ga.Const., Art. 2, s 6 (1868); Ill.Const., Art. 2, s 30 (1818); Ind.Const., Art. 6, s 4 (1816); Iowa Const., Art. 2, s 5 (1846); Kan.Const., Art. 5, s 2 (1859); Ky.Const., Art. 6, s 4 (1799); La.Const., Art. 6, s 4 (1812); Md.Const., Art. 1, s 5 (1851);

Minn.Const., Art. 7, s 2 (1857); Miss.Const., Art. 6, s 5 (1817); Mo.,Const., Art. 3, s 14 (1820); Nev.Const., Art. 2, s 1 (1864); N.J.Const., Art. 2, s 1 (1844); N.Y.Const., Art. 2, s 2 (1821); N.C.Const., Art. 6, s 5 (1868); Ohio Const., Art. 4, s 4 (1802); Ore.Const., Art. 2, s 3 (1857); R.I.Const., Art. 2, s 4 (1842); S.C.Const., Art. 4 (1865); Tenn.Const., Art. 4, s 2 (1834); Tex.Const., Art. 7, s 4 (1845); Va.Const., Art. 3, s 14 (1830); W.Va.Const., Art. 3, s 1 (1863); Wis.Const., Art. 3, s 2 (1848).

More impressive than the mere existence of the state constitutional provisions disenfranchising felons at the time of the adoption of the Fourteenth Amendment is the congressional treatment of States readmitted to the Union following the Civil War. For every State thus readmitted, affirmative congressional action in the form of an enabling act was taken, and as a part of the *49 readmission process the State seeking readmission was required to submit for the approval of Congress its proposed state constitution. In March 1867, before any State was readmitted, Congress passed 'An act to provide for the more efficient Government of the Rebel States,' the so-called Reconstruction Act. Act of Mar. 2, 1867, c. 153, 14 Stat. 428. Section 5 of the Reconstruction Act established conditions on which the former Confederate States would be readmitted to representation in Congress. It provided:

'That when the people of any one of said rebel States shall have formed a constitution of government in conformity with the Constitution of the United States in all respects, framed by a convention of delegates elected by the male citizens of said State, twenty-one years old and upward, of whatever race, color, or previous condition, who have been resident in said State for one year previous to the day of such election, except such as may be disenfranchised for participation in the rebellion or for felony at common law, and when such constitution shall provide that the elective franchise shall be enjoyed by all such persons as have the qualifications herein stated for electors of delegates, and when such constitution shall be ratified by a majority of the persons voting on the question of ratification who are qualified as electors for delegates, and when such constitution shall have been submitted to Congress for examination and approval, and Congress shall have

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

approved the same, and when said State, by a vote of its legislature elected under said constitution, shall have adopted the **2669 amendment to the Constitution of the United States, proposed by the Thirty-ninth Congress, and known as article fourteen, and when said article shall have become a part of the Constitution *50 of the United States, said State shall be declared entitled to representation in Congress, and senators and representatives shall be admitted therefrom on their taking the oath prescribed by law, and then and thereafter the preceding sections of this act shall be inoperative in said State . . . .' (Emphasis supplied.)

Section 5 was introduced as a Senate amendment to the House bill, which was concerned only with the establishment of military government in the former Confederate States. Cong.Globe, 39th Cong., 2d Sess., 1360-1361 (1867). The legislative history of the Reconstruction Act was recounted by Senator Henderson of Missouri, who ultimately voted for it:
'As the bill originally came from the House it was a bald and naked proposition to establish without limitation of power or the time of its duration a purely military government for the ten States now unrepresented. This, in my judgment, was a most dangerous experiment. . . .

'The Senate, being unwilling to embark on the experiment of pure military rule, modified the House bill by adopting what is known as the Blaine or Sherman amendment. This amendment conceded military rule, as asked by the House, but put some sort of limit to its duration. It provided that when the rebel States should adopt universal suffrage, regardless of color or race, excluding none, white or black, except for treason or such crimes as were felony at the common law, the regulation of exclusion to be left to the States themselves, and should adopt the constitutional amendment proposed at the last session of Congress . . . and so soon as a sufficient number of said States should adopt it to make it a *51 part of the Constitution of the United States, then military law should cease and the States should be admitted, provided that Congress even then should see fit to receive them.'Id., at 1641.

A series of enabling acts in 1868 and 1870 admitted those States to representation in Congress. The Act admitting Arkansas, the first State to be so admitted, attached a condition to its admission. Act of June 22,

1868, c. 69, 15 Stat. 72. That Act provided:

'Whereas the people of Arkansas, in pursuance of the provisions of an act entitled 'An act for the more efficient government of the rebel States,' passed March second, eighteen hundred and sixty-seven, and the act supplementary thereto, have framed and adopted a constitution of State government, which is republican, and the legislature of said State has duly ratified the amendment to the Constitution of the United States proposed by the Thirty-ninth Congress, and known as article fourteen: Therefore,

'Be it enacted . . . That the State of Arkansas is entitled and admitted to representation in Congress as one of the States of the Union upon the following fundamental condition: That the constitution of Arkansas shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the constitution herein recognized, except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted, under laws equally applicable to all the inhabitants of said State: Provided, That any alteration of said constitution prospective in its effect may be made in regard to the time and place of residence of voters.'

*52 The phrase 'under laws equally applicable to all the inhabitants of said State' was introduced as an amendment to the House bill by Senator Drake of Missouri. Cong.Globe, 40th Cong., 2d Sess., 2600 (1868). Senator Drake's explanation of his reason for introducing his **2670 amendment is illuminating. He expressed concern that without that restriction, Arkansas might misuse the exception for felons to disenfranchise Negroes:
'There is still another objection to the condition as expressed in the bill, and that is in the exception as to the punishment for crime. The bill authorizes men to be deprived of the right to vote 'as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted.'There is one fundamental defect in that, and that is that there is no requirement that the laws under which men shall be duly convicted of these crimes shall be equally applicable to all the inhabitants of the State. It is a very easy thing in a State to make one set of laws applicable to white men, and another set of laws applicable to colored men.'Ibid.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The same 'fundamental condition' as was imposed by the act readmitting Arkansas was also, with only slight variations in language, imposed by the Act readmitting North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida, enacted three days later. Act of June 25, 1868, c. 70, 15 Stat. 73. That condition was again imposed by the Acts readmitting Virginia, Mississippi, Texas, and Georgia early in 1870. Act of Jan. 26, 1970, c. 10, 16 Stat. 62; Act of Feb. 1, 1870, c. 12, 16 Stat. 63; Act of Feb. 23, 1870, c. 19, 16 Stat. 67; Act of Mar. 30, 1870, c. 39, 16 Stat. 80; Act of July 15, 1870, c. 299, 16 Stat. 363.

**\*53** This convincing evidence of the historical understanding of the Fourteenth Amendment is confirmed by the decisions of this Court which have discussed the constitutionality of provisions disenfranchising felons. Although the Court has never given plenary consideration to the precise question of whether a State may constitutionally exclude some or all convicted felons from the franchise, we have indicated approval of such exclusions on a number of occasions. In two cases decided toward the end of the last century, the Court approved exclusions of bigamists and polygamists from the franchise under territorial laws of Utah and Idaho.Marphy v. Ramsey, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47 (1885); Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890). Much more recently we have strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision. In Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), where we upheld North Carolina's imposition of a literacy requirement for voting, the Court said, id., at 51, 79 S.Ct., at 990:

'Residence requirements, age, previous criminal record (Davis v. Beason, 133 U.S. 333, 345-347, 10 S.Ct. 299, 301-302, 33 L.Ed. 637) are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters.'

Still more recently, we have summarily affirmed two decisions of three-judge District Courts rejecting constitutional challenges to state laws disenfranchising convicted felons.Fincher v. Scott, 352 F.Supp. 117 (MDNC1972), aff'd, 411 U.S. 961,

93 S.Ct. 2151, 36 L.Ed.2d 681 (1973); Beacham v. Braterman, 300 F.Supp. 182 (S.D.Fla.), aff'd, 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969). Both District Courts relied on Green v. Board of Elections, 380 F.2d 445 (1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968), where the Court of Appeals for the **\*54** Second Circuit held that a challenge to New York's exclusion of convicted felons from the vote did not require the convening of a three-judge district court.

Despite this settled historical and judicial understanding of the Fourteenth Amendment's effect on state laws disenfranchising convicted felons, respondents argue that our recent decisions invalidating other state-imposed restrictions on the franchise as violative of the Equal Protection Clause require us to **\*\*2671** invalidate the disenfranchisement of felons as well. They rely on such cases as Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), to support the conclusions of the Supreme Court of California that a State must show a 'compelling state interest' to justify exclusion of ex-felons from the franchise and that California has not done so here.

[6][7][8][9] As we have seen, however, the exclusion of felons from the vote has an affirmative sanction in s 2 of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated in the cases on which respondents rely. We hold that the understanding of those who adopted the Fourteenth Amendment, as reflected in the express language of s 2 and in the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons, is of controlling significance in distinguishing such laws from those other state limitations on the franchise which have been held invalid under the Equal Protection Clause by this Court. We do not think that the Court's refusal to accept Mr. Justice Harlan's position in his dissents in Reynolds v. Sims, 377 U.S. 533, 589, 84 S.Ct. 1362, 1395, 12 L.Ed.2d 506 (1964), and Carrington v. Rash, 380 U.S. 89, 97, 85 S.Ct. 775, 780, 13 L.Ed.2d 675 (1965), that s 2 is the only part of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655                                                        Page 17
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

Amendment*55 dealing with voting rights, dictates an opposite result. We need not go nearly so far as Mr. Justice Harlan would to reach our conclusion, for we may rest on the demonstrably sound proposition that s 1, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which s 2 imposed for other forms of disenfranchisement. Nor can we accept respondents' argument that because s 2 was made part of the Amendment "largely through the accident of political exigency rather than through the relation which it bore to the other sections of the Amendment," we must not look to it for guidance in interpreting s 1. It is as much a part of the Amendment as any of the other sections, and how it became a part of the Amendment is less important than what it says and what it means.

Pressed upon us by the respondents, and by amici curia, are contentions that these notions are outmoded, and that the more modern view is that it is essential to the process of rehabilitating the exfelon that he be returned to his role in society as a fully participating citizen when he has completed the serving of his term. We would by no means discount these arguments if addressed to the legislative forum which may properly weigh and balance them against those advanced in support of California's present constitutional provisions. But it is not for us to choose one set of values over the other. If respondents are correct, and the view which they advocate is indeed the more enlightened and sensible one, presumably the people of the State of California will ultimately come around to that view. And if they do not do so, their failure is some evidence, at least, of the fact that there are two sides to the argument.

*56 We therefore hold that the Supreme Court of California erred in concluding that California may no longer, consistent with the Equal Protection Clause of the Fourteenth Amendment, exclude from the franchise convicted felons who have completed their sentences and paroles. The California court did not reach respondents' alternative contention that there was such a total lack of uniformity in county election officials' enforcement of the challenged state laws as to work a separate denial of equal protection, and we believe that it should have an opportunity to consider the claim before we address ourselves to it.**2672

Accordingly, we reverse and remand for further proceedings not inconsistent with this opinion.

It is so ordered.

Mr. Justice MARSHALL, with whom Mr. Justice BRENNAN joins, dissenting.
The Court today holds that a State may strip exfelons who have fully paid their debt to society of their fundamental right to vote without running afoul of the Fourteenth Amendment. This result is, in my view, based on an unsound historical analysis which already has been rejected by this Court. In straining to reach that result, I believe that the Court has also disregarded important limitations on its jurisdiction. For these reasons, I respectfully dissent.

I

A brief retracing of the procedural history of this case is necessary to a full understanding of my views. Each of the respondents, the plaintiffs below, [FN1] had been convicted*57 of a felony unrelated to voting and had fully served his term of incarceration and parole. Each applied to register to vote in his respective county-Ramirez in San Luis Obispo County, Lee in Monterey County, and Gill in Stanislaus County. All three were refused registration because, under applicable provisions of the California Constitution, 'no person convicted of any infamous crime . . . shall ever exercise the privileges of an elector.'[FN2]

FN1. The proceeding below was a petition for a writ of mandate in the California Supreme Court, hence the moving parties should properly be described as petitioners rather than plaintiffs. However, to avoid confusion, since the petitioners below are the respondents here and vice versa, the parties in the California court will be referred to herein simply as plaintiffs and defendants.

FN2. California Const., Art. II, s 1, provided, in part, that 'no person convicted of any infamous crime . . . shall ever exercise the privileges of an elector in this State.' Article II, s 1, was repealed by referendum at the November 7, 1972, general election and was replaced by a new Art. II, s 3, containing the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

same prohibition. The state implementing statutes include <u>California Elections Code ss 310, 321, 383, 389, 390, and 14240.</u>

The three named plaintiffs filed a petition for a writ of mandate in the California Supreme Court, invoking its original jurisdiction. Plaintiffs challenged the State's disenfranchisement of exfelons as being violative of the Equal Protection Clause of the Fourteenth Amendment and sought issuance of a peremptory writ of mandate to compel their registration. The complaint labeled the suit as brought 'individually and on behalf of all other persons who are ineligible to register to vote in California solely by reason of a conviction of a felony other than an election code felony' and who had fully served their terms of incarceration and parole. The complaint named, as defendants, the election officials who had refused to register them, 'individually and as representatives of the class of all other County Clerks and Registrars of Voters who have the duty of determining for their respective counties whether any ex-felon will be denied the right to vote.'

**\*58** The three named election officials did not contest the action and represented to the state court that they would permit the named plaintiffs and all similarly situated ex-felons in their counties to register and to vote. The representative of the Secretary of State of California, also named as a defendant, has similarly agreed not to contest the suit.<sup>FN3</sup> At this point in the litigation all of the named plaintiffs had been voluntarily afforded the relief they were seeking by the election officials in their respective counties.

> <u>FN3.</u> The Attorney General filed a separate petition for certiorari, No. 73-324, to review the judgment of the California Supreme Court. The Secretary of State filed a memorandum opposing that petition for certiorari. The petition was denied today, <u>418 U.S. 904, 94 S.Ct. 3194, 41 L.Ed.2d 1152.</u>

Subsequently, the petitioner in this Court, Viola Richardson, as County Clerk of Mendocino County, filed a motion to intervene in the proceedings before**\*\*2673** the California Supreme Court. She indicated to the court that she was being sued in a separate action in a lower state court by an ex-felon

seeking to register in her county and that the decision in this case would be dispositive of the legal issue in that controversy. The State Supreme Court ordered Richardson added as a named defendant in the instant action, but did not name the exfelon suing her as a plaintiff or named class representative herein.

In its opinion, the California Supreme Court found the case not to be moot and took the opportunity to address the merits of the Fourteenth Amendment issue. It indicated that, in its view, the ex-felon disenfranchisement provision of the California Constitution and its implementing statutes violated the Equal Protection Clause. The state court did not, however, afford the plaintiffs the relief they sought. The court denied the peremptory writ of mandate.

Although the California Supreme Court did not issue a writ ordering Richardson to register either the ex-felon \*59 suing her or any other potential elector in her county, she sought review of the state court's decisions by way of writ of certiorari in this Court. The election officials in the named plaintiffs' counties did not seek review and the Secretary of State filed a memorandum opposing review by this Court.

### A

There are a number of reasons why I do not believe this case is properly before us at this time. First, I am persuaded that the judgment of the California Supreme Court rests on an adequate and independent state ground.

'This Court from the time of its foundation has adhered to the principle that it will not review judgments of state courts that rest on adequate and independent state grounds. . . . Our only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights. And our power is to correct wrong judgments, not to review opinions. We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion.' <u>Herb v. Pitcairn, 324 U.S. 117, 125-126, 65 S.Ct. 459, 463, 89 L.Ed. 789 (1945).</u>

Plaintiffs sought, from the California Supreme Court, a writ of mandate compelling their registration. The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655                                                               Page 19
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

state court denied that relief. The entirety of the judgment of that court is as follows:

'The alternative writ, having served its purpose, is discharged, and the petition for peremptory writ is denied.'Ramirez v. Brown, 9 Cal.3d 199, 217, 107 Cal.Rptr. 137, 149, 507 P.2d 1345, 1357 (1973).[FN4]

> FN4. The judgment of the California Supreme Court is by custom the final paragraph of its opinion. The alternative writ referred to is merely a show-cause order, requiring the respondent to comply with the petitioner's demand or show cause why it should not be ordered to do so.

*60 The accompanying opinion indicates that the California court did not consider the case before it to be moot and that, in its view, the plaintiffs' assertion that the disenfranchisement provisions were unconstitutional was well taken. Since the court nonetheless denied plaintiffs the relief they sought, we can only conclude that it did so on independent state law grounds. Cf. Brockington v. Rhodes, 396 U.S. 41, 44, 90 S.Ct. 206, 208, 24 L.Ed.2d 209 (1969). For example, a writ of mandate, being discretionary, the state court may have declined its issuance simply because the named plaintiffs had already been registered and mandate relief seemed unnecessary.[FN5] There is certainly no indication that the decision to deny the writ was based on the state court's view on any federal question.

> FN5. See 5 B. Witkin, Cal.Proc.2d, Extraordinary Writs s 22, pp. 3796-3797, and s 123, p. 3899 (1971).

This Court creates an interesting anomaly by purporting to reverse the **2674 judgment of the California court. Since that court denied a writ of mandate to compel the registration of ex-felons, the only disposition consistent with this Court's view that the California disenfranchisement provisions are constitutional would be to affirm the judgment below. By reversing, the Court apparently directs the issuance of the peremptory writ. This anomaly demonstrates that this is a classic example of a case where 'the same judgment would be rendered by the state court after we corrected its views of federal laws,'Herb v. Pitcairn, supra, 324 U.S., at 126, 65 S.Ct., at 463; hence we can but offer an advisory

opinion here. Whether we agree or disagree with the state court's view of the constitutionality of the challenged provisions, the judgment of the state court will necessarily remain to deny the writ of mandate.

The Court is aware of this problem and purports to resolve it by speculating that the California court may *61 have afforded plaintiffs declaratory relief. Such speculation is totally unfounded. Neither the opinion nor the judgment of the court below even mentions declaratory relief. The plaintiffs did not seek a declaratory judgment. The California Constitution on its face appears to bar the State Supreme Court from issuing a declaratory judgment in an original proceeding such as the one before us, since it limits that court's original jurisdiction to 'proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition.'Calif.Const., Art. 6, s 10 (Supp.1974). Exclusive jurisdiction for suits seeking declaratory relief is vested, by statute, in the State Superior Courts.[FN6]

> FN6.Calif.Code Civ.Proc. s 1060; see 15 Cal.Jur.2d, Declaratory Relief s 13; 3 B. Witkin Cal.Proc.2d, Pleading s 705(c), p. 2329 (1971); see, e.g., Dills v. Delira Corp., 145 Cal.App.2d 124, 129, 302 P.2d 397, 400 (1956).
> The difference between 'mandamus and declaratory relief (is) that appellate courts cannot give the latter.' 5 B. Witkin, Cal.Proc.2d, Extraordinary Writs s 21, p. 3796 (1971).

This Court's basis for construing the judgment of the court below as affording declaratory relief is its argument that because the California Supreme Court is the highest court of the State, its observations on the constitutionality of the challenged disenfranchisement provisions are apt to be heeded by state officials. It is true that the opinion of the California court did indicate a view on the merits of the plaintiffs' constitutional claim. But this Court's power 'is to correct wrong judgments, not to revise opinions.'Herb v. Pitcairn, supra, at 126, 65 S.Ct., at 463.One could always argue that where a state court had commented on a matter of federal law, state officials would heed those comments. To say that such comments are a 'declaration of federal law' reviewable by this Court is a rationale that would reach every case in which the state court decision

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655                                                                                                          Page 20
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

rests on adequate *62 state grounds, rendering that doctrine a virtual nullity. The Court also cites two cases for the proposition that the California Supreme Court can issue a declaratory judgment in an original proceeding. But, on closer inspection, the cases cited by the Court, ante, at 2664 n. 13, merely demonstrate that California courts, whose jurisdiction is not limited by any equivalent to Art. III, are free to render advisory opinions.[FN7] There is little **2675 doubt *63 that many public officials would heed such an advisory opinion from the California Supreme Court and they would also heed an advisory opinion issued by this Court, but that does not free us from the constitutional limitations on our jurisdiction.

FN7. In the first case relied on by the majority, In re M., 3 Cal.3d 16, 89 Cal.Rptr. 33, 473 P.2d 737 (1970), the California Supreme Court had previously granted a writ of habeas corpus which effectively mooted the petitioner's claim for relief. The court, nonetheless, later issued an opinion on the issue posed by the case while denying further relief. In a footnote, the court observed that as a general proposition, courts should avoid advisory opinions, but, in the very next sentence, reaffirmed its inherent discretion to issue such opinions. In the accompanying text, the court noted that it could render a decision in a moot case which would not be binding on a party before it, where the case involved issues of particular public importance. Although the court referred to its 'declaratory use of habeas corpus in a number of cases,' citing B. Witkin, Cal.Crim.Proc. s 790 (1963), and In re Fluery, 67 Cal.2d 600, 63 Cal.Rptr. 298, 432 P.2d 986 (1967), the Witkin treatise refers to the court's 'declaratory use of habeas corpus' and In re Fluery, supra, in particular, as examples of the 'use of the writ to render a purely advisory opinion unnecessary to the determination of the particular controversy.'B. Witkin, Cal.Crim.Proc., Habeas Corpus and Other Extraordinary Writs s 790, p. 247 (Supp. 1967).

The second case relied on by the majority is Young v. Gnoss, 7 Cal.3d 18, 101 Cal.Rptr. 533, 496 P.2d 445 (1972), cited by the court below solely for the proposition that mandamus is an appropriate remedy to seek in an original proceeding. In that case, the petitioners had sought mandamus relief from the application of a state durational residence requirement for voting in order that they might vote in a June primary. The California Supreme Court, in a lengthy opinion, indicated that the challenged requirement was unconstitutional on the authority of our decision in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), but exercised its equitable discretion not to order a change in the residence requirements for the June primary because too little time remained for such a change to be implemented in an orderly fashion. Accordingly, mandamus relief was denied. The court recommended that the necessary changes in residence requirements be effected before the November election but did not so order to give the 'Legislature the opportunity to address itself to the problem . . ..'7 Cal.3d, at 28, 101 Cal.Rptr., at 540-541, 496 P.2d, at 452-453. The court relied on its earlier decision in Legislature v. Reinecke, 6 Cal.3d 595, 99 Cal.Rptr. 481, 492 P.2d 385 (1972), where the court had expressed its views on a legislative reapportionment problem, denied a writ of mandate, and retained jurisdiction to allow the legislature an opportunity to act before providing any judicial relief.

Each of these cases involves examples of advisory opinions rather than declaratory relief. In the latter, what the California Supreme Court did was to provide some guidance to the legislature while staying its hand and not affording judicial relief for the claimed deprivation. It seems well settled that California courts have 'inherent discretion' to issue such advisory opinions. See 2 B. Witkin, Cal.Proc.2d, Actions s 44, p. 920 (1970); id., s 42, p. 916; 5 B. Witkin, Cal.Proc.2d, Extraordinary Writs s 117, p. 3894; cf. Kirstowsky v. Superior Court, 143 Cal.App.2d 745, 749, 300 P.2d 163, 166 (1956).

Because I believe that the judgment of the California court was based on adequate and independent state grounds, I do not think we have jurisdiction to consider any other issues presented by this case.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655

418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

B

Assuming, arguendo, that the California Supreme Court did grant a declaratory judgment, I still believe that we are without jurisdiction because no case or controversy is presented. The Court seems willing to concede that the claims of the named plaintiffs may well be moot. Ante, at 2662. The Court, however, premises its *64 jurisdiction on the assumption that there is a live controversy between the named petitioner in this Court and the unnamed plaintiff class members in her own county. To reach this conclusion, it is essential for the Court to conclude that this case is, in fact, a class action and that, in the circumstances of this case, it is appropriate to look to unnamed class members to determine whether there is a live controversy.

I am forced to point out that one of the crucial premises upon which the Court bases its assumption of jurisdiction-the existence of a class action-is highly speculative. I am persuaded that the California court never treated this case as a class action. As the majority notes, the case was titled a class action by its originators and the show-cause order merely tracked the language of the complaint. But the California court was, of course, not bound by that designation. In the entirety of its lengthy opinion, the California court does not once refer to this suit as a class action, to respondents as class representatives, to the existence of unnamed parties or to any other indicia of class-action status. Rather, the state court describes the case as simply 'a proceeding for writ of mandate brought by three ex-felons to compel respondent election officials to register them as voters.'**26769 Cal.3d, at 201, 107 Cal.Rptr., at 138, 507 P.2d, at 1346. The opinion proceeds to list the three plaintiffs and, in a footnote, to explain that the only other plaintiffs were the League of Women Voters and three nonprofit organizations which support the interests of ex-felons. The opinion describes the defendants as the election officials of San Luis Obispo, Monterey, and Stanislaus Counties and the Secretary of State 'in his capacity (as) chief elections officer of California,' and notes that '(u)pon application we ordered the Mendocino County clerk (the petitioner here) joined as an additional party (defendant).'Id., at 202 n. 1, 107 Cal.Rptr., at 138, 507 P.2d, at 1346. This description of the parties *65 plainly indicates that this suit was not treated as a

class action by the state court. I think it highly inappropriate that on the basis of nothing but speculation, this case is fashioned into a class action, for the first time, in this Court.

C

Even assuming that this case is a class action, I still would not agree that it is properly before us. I do not believe that we can look beyond the named class members to find a case or controversy in the circumstances of this case. The Court seems to hold that review is not foreclosed by the possible mootness of the named plaintiffs' claim because, but for the California Supreme Court's decision, unnamed class members would still be subject to the challenged disenfranchisement, hence the case presents, as to unnamed class members, an issue capable of repetition, yet evading review. I disagree.

As the Court properly notes, a general rule of justificability is not one may not represent a class of which he is not a part. Thus, as a general proposition, a federal court will not look to unnamed class members to establish the case-orcontroversy requirement of Art. III.[FN8]But, the 'evading review' doctrine of Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), as recently applied in Dunn v. Blumstein, 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 998, 31 L.Ed.2d 274 (1972), provides a limited exception to the general rule-an exception necessary to insure that judicial review is not foreclosed in cases where intervening events threaten invariably to moot the named plaintiff's claim for relief.

FN8. The Court has held, for example, that Art. III restricts standing to bring a class action to the actual members of the class.O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). The named plaintiffs here had been disenfranchised at the time they filed suit, and there is thus no question concerning their standing to challenge the California disenfranchisement provisions.

*66 The necessity for looking beyond the named class members in this limited category of cases is evidenced by our decision in Dunn v. Blumstein, supra, in which the Court struck down a durational

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

residence requirement for voting. The suit had been brought to compel the registration of the named plaintiff and the members of the class he represented in order that they might participate in an election scheduled for August 6, 1970. The Federal District Court did not order preliminary relief in time for the August election and, by the time the District Court decided the case, the next election was scheduled for November 1970. By then, the named plaintiff would have met the challenged three-month requirement. The District Court, nonetheless, rejected the State's argument that the controversy over the validity of the three-month requirement was therefore moot.

By the time the appeal reached this Court, the only named plaintiff had also satisfied the one-year state residence requirement. We nonetheless reached the merits, observing that '(a)lthough appellee (the only named plaintiff) can now vote, the problem to voters posed by the Tennessee residence requirements is "capable of repetition, yet evading review."Moore v. Ogilvie, 394 U.S. 814, 816 (89 S.Ct. 1493, 1494, 23 L.Ed.2d 1) (1969).'405 U.S., at 333 n. 2, 92 S.Ct., at 998.Both this Court and the District Court found that, although the **2677 named plaintiff had satisfied the challenged residence requirements and would no longer be disenfranchised thereby, the case was not moot. The challenged requirement remained applicable to unnamed class members,[FN9] and the *67 issue presented was likely to evade review. Obviously the mere passage of a few months would invariably have rendered a challenge to the residence requirements by individual named plaintiffs moot-threatening virtually to foreclose judicial review.

> FN9. The Court distinguished its decision in Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969), finding a challenge to Colorado's durational residence requirement moot, on the grounds that, in Hall, there had been an intervening change in law reducing the residence requirements from six months to two while the case was on appeal. Accordingly, application of the six-month requirement was incapable of repetition as to the named plaintiff or any other member of his class, and, having never been disenfranchised thereby, the named plaintiff had no standing to challenge the two-month requirement.

A similar situation was presented in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), relied on by the California court. We there held that although a woman who was not pregnant at the time the suit was filed did not have standing to challenge the constitutionality of the Texas abortion laws, a continuing controversy over the constitutionality of those laws existed as to a named plaintiff who was pregnant when the suit was filed, even though she may not have been pregnant at later stages of the appeal. We concluded that this case provided a classic example of an issue capable of repetition, yet evading review, hence the termination of the plaintiff's pregnancy while the case was on appeal did not render the case moot-even though a woman whose pregnancy has ended is no more effected by the abortion laws than one who was not pregnant at the time the suit was filed.'(T)he . . . human gestation period is so short that . . . pregnancy will come to term before the usual appellate process is complete. If that termination makes a case moot, . . . appellate review will be effectively denied.' Id., at 125, 93 S.Ct., at 713.

There are two common threads running through these cases-in each the challenged statute would continue to be applied, but the named plaintiff's claim would inevitably mature into mootness rending resolution of the lawsuit. In Roe, the termination of pregnancy, in Dunn, the passage of the residence requirement period, and in other voting cases, the occurrence of an election, [FN10] deprived *68 the named plaintiff of a continuing controversy over the application of the challenged statute. In each instance, the mere passage of time threatened to insulate a constitutional deprivation from judicial review, and it is that danger which served as the rationale for rejecting suggestions of mootness. Where an invalid statute would thus continue to be applied simply because judicial review of a live controversy involving the named plaintiff was inveriably**2678 foreclosed-the issue would be capable of repetition yet evading review.

> FN10. The Court has found a live controversy in other voting cases in which intervening circumstances seemed to have mooted the named plaintiff's claim for relief.Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), for example, was an appeal from a decision

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

denying relief to appellants who had unsuccessfully sought to be certified, as required by state law, as independent candidates for Presidential elector on the 1968 ballot. Appellants asserted that the Illinois certification requirement violated the State's constitutional obligation not to discriminate against voters in less populous counties. By the time their appeal reached this Court, the 1968 election had already taken place, but we held the case was not moot because 'while the 1968 election is over, (the challenged burden) remains and controls future elections . . .,'id., at 816, 89 S.Ct., at 1494; see Hall v. Beals, supra, 396 U.S., at 49, 90 S.Ct., at 202, and the short span of time between the denial of certification for candidacy and actual balloting threatens to moot all future attacks on the questioned candidacy requirements. 394 U.S., at 816, 89 S.Ct., at 1494. See also Storer v. Brown, 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974); Rosario v. Rockefeller, 410 U.S. 752, 756 n. 5, 93 S.Ct. 1245, 1249, 36 L.Ed.2d 1 (1973).

Accordingly, the Southern Pacific doctrine requires the satisfaction of two tests in order to provide an answer to a suggestion of mootness. First, the claimed deprivation must, in fact, be 'capable of repetition.' This element is satisfied where, even though the named plaintiff's immediate controversy has been mooted by intervening events, either he or unnamed class members may continue to suffer the alleged constitutional deprivation in the future. The case before us clearly satisfies this first element of the Southern Pacific doctrine test. Since the California court declined to order any county clerk to *69 register ex-felons, presumably the challenged disenfranchisement provisions could continue to be applied to unnamed class members in counties other than those in which the named plaintiffs reside.[FN11]

FN11. The extent of continuing disenfranchisement is apt to be minimal. A survey conducted by the Secretary of State of California indicated that the election officials of 52 of the 58 counties in California, representing counties which contain 97.39% of the registered voters in the State, agreed with the clerks in the named plaintiffs' counties that ex-felons should not be barred from voting in their counties. Brief for Respondents 30.

Second, the issue presented must be likely to evade review, but for invocation of the Southern Pacific doctrine. It is on the 'evading review' element that the Court's analysis fails. Because the claim raised in this case concerns not a time-related but rather a status-based deprivation, there is no issue evading review and no reason to look beyond the named plaintiffs.[FN12] This is *70 not a situation where, by the time a case reaches this Court, it will always be too late to grant the named plaintiff relief. If and when an ex-felon is refused access to the voting rolls because of his past criminal record, an intervening election will not moot his claim for relief and the status giving rise to his disenfranchisement will not inevitably terminate pending review.

FN12. The Court's opinion cites our decision in Indiana Employment Security Div. v. Burney, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973), for the proposition that unnamed class members may not be looked to in cases arising from the federal system, but the case does not support that proposition. Burney concerned a constitutional challenge to the termination of unemployment insurance benefits without a prior hearing. The only named class representative received a post-termination hearing at which she obtained a reversal of the initial determination of ineligibility and full retroactive benefits. The Court remanded for consideration of mootness. The jurisdictional issue in this Court revolved around whether the case presented issues 'capable of repetition, yet evading review.' The Court did not have to find the alleged constitutional deprivation incapable of repetition, hence was not concerned with the problem of whether a future application to the named class representative was required. Rather, it appeared that the prior-hearing issue was not one which would evade review. But see id., at 542-546, 93 S.Ct., at 884-886 (dissenting opinion). The Court reasoned that a post-termination hearing, afforded as a matter of course, would not invariably moot all claims for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655

418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

relief from members of the class. If the post-termination hearing did not result in an award of retroactive payments, as it had in the named plaintiff's case, a live and continuing controversy would be presented as to the insured's claim to the benefits allegedly wrongfully withheld pending the hearing. A case had already come to this Court in just such a posture, and the Court had summarily affirmed the judgment of the three-judge court. Torres v. New York State Department of Labor, 405 U.S. 949, 92 S.Ct. 1185, 31 L.Ed.2d 228 (1972), but see 410 U.S. 971, 93 S.Ct. 1446, 35 L.Ed.2d 707 (1973) (dissenting opinion to denial of rehearing). It was a failure to satisfy the 'evading review' element of the test that led the Court to remand Burney for consideration of mootness.

There are clearly ways in which a challenge to the California disenfranchisement provisions could reach this Court. The California Supreme Court has not issued a writ of mandate compelling the registration of any ex-felon.[FN13] If such a potential voter is, in fact, **2679 refused registration, a controversy suitable for resolution by this Court will be presented. The suit brought against petitioner Richardson, by an ex-felon resident of her own county, raising the same issues as those presented by this case, is presently pending in a California intermediate appellate court.[FN14] In that case, petitioner Richardson did, in fact, deny the plaintiff registration because she was an ex-felon. Once that case completes its passage through the state courts, it could well serve as a vehicle for our review of the California disenfranchisement provisions.*71 That is, of course, but one example of how the issue presented here could properly reach this Court. This case does not therefore benefit from the Southern Pacific doctrine's authority to look to unnamed class members to establish a case of controversy.

FN13. In the absence of such an order, petitioner Richardson is under no compulsion to register ex-felons in her county nor subject to any penalty for failing to do so. See Cal.Code Civ.Proc. s 1097 (1955).

FN14. The suit against petitioner,

Richardson v. James, 1 Civ. 32283, is presently pending in Division 3 of the Court of Appeal for the First Appellate District of California.

That the California Supreme Court appears to have found the plaintiffs' claims not to be moot does not detract from this conclusion since '(e)ven in cases arising in the state courts, the question of mootness is a federal one which a federal court must resolve before it assumes jurisdiction.'North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 U.S.2d 413 (1971). Thus, unlike the Court, I am persuaded that we can look only to the named plaintiffs to satisfy the case-or-controversy requirement of Art. III.

D

The named plaintiffs here were registered only because the clerks in their counties had voluntarily abandoned an allegedly illegal practice of disenfranchising ex-felons, and we have said that '(m)ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '(t)he defendant . . . free to return to his old ways.' . . . (But a) case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'United States v. Concentrated Phosphate Export Assn., 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); accord, United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Accordingly, whether the named plaintiffs have a live controversy with the clerks in their own counties would depend on the likelihood of future disenfranchisement.[FN15] But we need not consider that question here because*72 none of the election officials in the named plaintiffs' counties sought review in this Court and none is now before us.

FN15. If claims of the named plaintiffs are moot, the proper disposition of this case would seem to be to vacate the judgment of the California Supreme Court and remand for such proceedings as that court deems appropriate. Brockington v. Rhodes, 396 U.S. 41, 44, 90 S.Ct. 206, 208, 24 L.Ed.2d 209 (1969).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

The sole petitioner before this Court is Viola Richardson. None of the named plaintiffs are residents of her county. While those named plaintiffs may or may not have a live controversy with the clerks in their own counties, they surely do not have one with petitioner Richardson. While Richardson may well have a live controversy with ex-felons in her own county over the validity of the disenfranchisement laws, those ex-felons are not before this Court, and she has no dispute with the named plaintiffs. In sum, there is no controversy between the parties before this Court. Petitioner Richardson seeks to use the named plaintiffs' controversy with their own county clerks as a vehicle for this Court to issue an advisory opinion on the issue presented by the suit brought against her by an ex-felon in her own county. Such a decision would violate the "oldest and most consistent thread in the federal law of justiciability . . . that the federal courts will not give advisory opinions."**2680Flast v. Cohen, 392 U.S. 83, 96, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968).

II

Since the Court nevertheless reaches the merits of the constitutionality of California's disenfranchisement of exfelons, I find it necessary to register my dissent on the merits as well. The Court construes s 2 of the Fourteenth Amendment as an express authorization for the States to disenfranchise former felons. Section 2 does except disenfranchisement for 'participation in rebellion, or other crime' from the operation of its penalty provision. As the Court notes, however, there is little independent legislative history as to the crucial words 'or *73 other crime'; the proposed s 2 went to a joint committee containing only the phrase 'participation in rebellion' and emerged with 'or other crime' inexplicably tacked on.[FN16] In its exhaustive review of the lengthy legislative history of the Fourteenth Amendment, the Court has come upon only one explanatory reference for the 'other crimes' provision-a reference which is unilluminating at best.[FN17]

FN16. See, e.g., Note, Restoring the Ex-offender's Right to Vote: Background and Developments, 11 Am.Crim.L.Rev. 721, 746-747, n. 158 (1973).

FN17. Statement of Rep. Eckley, quoted, ante, at 2667.

The historical purpose for s 2 itself is, however, relatively clear and, in my view, dispositive of this case. The Republicans who controlled the 39th Congress were concerned that the additional congressional representation of the Southern States which would result from the abolition of slavery might weaken their own political dominance.[FN18] There were two alternatives available-either to limit southern representation, which was unacceptable on a long-term basis,[FN19] or to insure that southern Negroes, sympathetic to the Republican cause, would be enfranchised; but an explicit grant of suffrage to Negroes was thought politically unpalatable at the time.[FN20] Section 2 of the Fourteenth Amendment was the resultant compromise.*74    It put Southern States to a choice-enfranchise Negro voters or lose congressional representation.[FN21]

FN18. Bonfield, The Right to Vote and Judicial Enforcement of Section Two of the Fourteenth Amendment, 46 Cornell L.Q. 108, 109 (1960); H. Flack, The Adoption of the Fourteenth Amendment 98, 126 (1908); B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 290-291 (1914); J. James, The Framing of the Fourteenth Amendment 185 (1956); Van Alstyne, The Fourteenth Amendment, the 'Right' to Vote, and the Understanding of the Thirty-ninth Congress, 1965 Sup.Ct.Rev. 33, 44 (1965).

FN19. James, n. 18, supra, at 138-139.

FN20. Kendrick, n. 18, supra, at 291; cf. Flack, n. 18, supra, at 111, 118.

FN21. Bonfield, n. 18, supra, at 111; James, n. 18, supra, at 185; Van Alstyne, n. 18, supra, at 43-44, 58, 65.

The political motivation behind s 2 was a limited one. It had little to do with the purposes of the rest of the Fourteenth Amendment. As one noted commentator explained:

"It became a part of the Fourteenth Amendment largely through the accident of political exigency

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

rather than through the relation which it bore to the other sections of the Amendment. . . .'"[FN22]'(I)t seems quite impossible to conclude that there was a clear and deliberate understanding in the House that s 2 was the sole source of national authority to protect voting rights, or that it expressly recognized the states' power to deny or abridge the right to vote.'[FN23]

FN22.Id., at 43-44 (quoting from Mathews, Legislative and Judicial History of the Fifteenth Amendment (1909)).

FN23.Id., at 65.

It is clear that s 2 was not intended and should not be construed to be a limitation on the other sections of the Fourteenth Amendment.Section 2 provides a special remedy-reduced representation-to cure a particular form of electoral abuse-the disenfranchisement of Negroes. There is no indication that **2681 the framers of the provisions intended that special penalty to be the exclusive remedy for all forms of electoral discrimination. This Court has repeatedly rejected that rationale. See Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

Rather, a discrimination to which the penalty provision of s 2 is inapplicable must still be judged against the Equal Protection Clause of s 1 to determine whether judicial or congressional remedies should be invoked. *75 That conclusion is compelled by this Court's holding in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). Although s 2 excepts from its terms denial of the franchise not only to ex-felons but also to persons under 21 years of age, we held that the Congress, under s 5, had the power to implement the Equal Protection Clause by lowering the voting age to 18 in federal elections. As Mr. Justice Brennan, joined by Mr. Justice White, as well as myself, there observed, s 2 was intended as no more 'than a remedy supplementary, and in some conceivable circumstances indispensable, to other congressional and judicial remedies available under ss 1 and 5.'400 U.S., at 278, 91 S.Ct., at 341.

The Court's references to congressional enactments contemporaneous to the adoption of the Fourteenth Amendment, such as the Reconstruction Act and the readmission statutes, are inapposite. They do not explain the purpose for the adoption of s 2 of the Fourteenth Amendment. They merely indicate that disenfranchisement for participation in crime was not uncommon in the States at the time of the adoption of the Amendment. Hence, not surprisingly, that form of disenfranchisement was excepted from the application of the special penalty provision of s 2. But because Congress chose to exempt one form of electoral discrimination from the reduction-of-representation remedy provided by s 2 does not necessarily imply congressional approval of this disenfranchisement.[FN24] By providing a special remedy for disenfranchisement*76 of a particular class of voters in s 2, Congress did not approve all election discriminations to which the s 2 remedy was inapplicable, and such discrimination thus are not forever immunized from evolving standards of equal protection scrutiny. Cf. Shapiro v. Thompson, 394 U.S. 618, 638-639, 89 S.Ct. 1322, 1333-1334, 22 L.Ed.2d 600 (1969). There is no basis for concluding that Congress intended by s 2 to freeze the meaning of other clauses of the Fourteenth Amendment to the conception of voting rights prevalent at the time of the adoption of the Amendment. In fact, one form of disenfranchisement-one-year durational residence requirements-specifically authorized by the Reconstruction Act, one of the contemporaneous enactments upon which the Court relies to show the intendment of the framers of the Fourteenth Amendment, has already been declared unconstitutional by this Court in Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

FN24. To say that s 2 of the Fourteenth Amendment is a direct limitation on the protection afforded voting rights by s 1 leads to absurd results. If one accepts the premise that s 2 authorizes disenfranchisement for any crime, the challenged California provision could, as the California Supreme Court has observed, require disenfranchisement for seduction under promise of marriage, or conspiracy to operate a motor vehicle without a muffler.Otsuka v. Hite, 64 Cal.2d 596, 51 Cal.Rptr. 284, 414 P.2d 412 (1966). Disenfranchisement extends to convictions for vagrancy in Alabama or breaking a water pipe in North Dakota, to note but two examples. Note, Disenfranchisement of Ex-felons: A Reassessment, 25 Stan.L.Rev. 845,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655                                                          Page 27
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

846 (1973). Even a jaywalking or traffic conviction could conceivably lead to disfranchisement, since s 2 does not differentiate between felonies and misdemeanors.

Disenfranchisement for participation in crime, like durational residence requirements, was common at the time of the adoption of the Fourteenth Amendment. But 'constitutional concepts of **2682 equal protection are not immutably frozen like insects trapped in Devonian amber.'Dillenburg v. Kramer, 469 F.2d 1222, 1226 (CA9 1972). We have repeatedly observed:

'(T)he Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed *77 to be the limits of fundamental rights.'Harper v. Virginia Board of Elections, 383 U.S. 663, 669, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1966).

Accordingly, neither the fact that several States had ex-felon disenfranchisement laws at the time of the adoption of the Fourteenth Amendment, nor that such disenfranchisement was specifically excepted from the special remedy of s 2, can serve to insulate such disenfranchisement from equal protection scrutiny.

### III

In my view, the disenfranchisement of ex-felons must be measured against the requirements of the Equal Protection Clause of s 1 of the Fourteenth Amendment. That analysis properly begins with the observation that because the right to vote 'is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government,'Reynolds v. Sims, 377 U.S., at 555, 84 S.Ct., at 1378, voting is a 'fundamental' right. As we observed in Dunn v. Blumstein, supra, 405 U.S., at 336, 92 S.Ct., at 999:

'There is no need to repeat now the labors undertaken in earlier cases to analyze (the) right to vote and to explain in detail the judicial role in reviewing state statutes that selectively distribute the franchise. In

decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. See e.g., Evans v. Cornman, 398 U.S. 419, 421-422, 426, 90 S.Ct. 1752, 1754-1755, 1756, 26 L.Ed.2d 370 (1970); Kramer v. Union Free School District, 395 U.S. 621, 626-628, 89 S.Ct. 1886, 1889-1890, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969); Harper v. Virginia Board of Elections, 383 U.S. 663, 667, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966); Carrington v. Rash, 380 U.S. 89, 93-94, 85 S.Ct. 775, 778, 779, 13 L.Ed.2d 675 (1965); Reynolds v. Sims, supra.'

*78 We concluded: '(I)f a challenge statute grants the right to vote to some citizens and denies the franchise to others, 'the Court must determine whether the exclusions are necessary to promote a compelling state interest. " 405 U.S., at 337, 92 S.Ct., at 1000.(Emphasis in original.)

To determine that the compelling-state-interest test applies to the challenged classification is, however, to settle only a threshold question. 'Compelling state interest' is merely a shorthand description of the difficult process of balancing individual and state interests that the Court must embark upon when faced with a classification touching on fundamental rights. Our other equal protection cases give content to the nature of that balance. The State has the heavy burden of showing, first, that the challenged disenfranchisement is necessary to a legitimate and substantial state interest; second, that the classification is drawn with precision-that it does not exclude too many people who should not and need not be excluded; and, third, that there are no other reasonable ways to achieve the State's goal with a lesser burden on the constitutionally protected interest. E.g., Dunn v. Blumstein, supra, at 343, 360, 92 S.Ct., at 1003, 1012;Kramer v. Union Free School District, 395 U.S. 621, 632, 89 S.Ct. 1886, 1892, 23 L.Ed.2d 583 (1969); see **2683Rosario v. Rockefeller, 410 U.S. 752, 770, 93 S.Ct. 1245, 1256, 36 L.Ed.2d 1 (1973) (Powell, J., dissenting); cf. Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

I think it clear that the State has not met its burden of justifying the blanket disenfranchisement of former felons presented by this case. There is certainly no basis for asserting that ex-felons have any less interest in the democratic process than any other citizen. Like everyone else, their daily lives are deeply affected and changed by the decisions of government. See Kramer, supra, 395 U.S., at 627, 89 S.Ct., at 1889. As the Secretary of State of California observed in his *79 memorandum to the Court in support of respondents in this case:

'It is doubtful . . . whether the state can demonstrate either a compelling or rational policy interest in denying former felons the right to vote. The individuals involved in the present case are persons who have fully paid their debt to society. They are as much affected by the actions of government as any other citizens, and have as much of a right to participate in governmental decision-making. Furthermore, the denial of the right to vote to such persons is a hindrance to the efforts of society to rehabilitate former felons and convert them into law-abiding and productive citizens.'[FN25]

> FN25.Memorandum of the Secretary of State of California in Opposition to Certiorari, in Class of County Clerks and Registrars of Voters of California v. Ramirez, No. 73-324.

It is argued that disenfranhisement is necessary to prevent vote frauds. Although the State has a legitimate and, in fact, compelling interest in preventing election fraud, the challenged provision is not sustainable on that ground. First, the disenfranchisement provisions are patently both overinclusive and underinclusive. The provision is not limited to those who have demonstrated a marked propensity for abusing the ballot by violating election laws. Rather, it encompasses all former felons and there has been no showing that ex-felons generally are any more likely to abuse the ballot than the remainder of the population. See Dillenburg v. Kramer, 469 F.2d, at 1225. In contrast, many of those convicted of violating election laws are treated as misdemeanants and are not barred from voting at all. It seems clear that the classification here is not tailored to achieve its articulated goal, since it crudely excludes large numbers of otherwise qualified voters. See *80Kramer v. Union Free

School District, supra, 395 U.S., at 632, 89 S.Ct., at 1892;Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969).

Moreover, there are means available for the State to prevent voting fraud which are far less burdensome on the constitutionally protected right to vote. As we said in Dunn, supra, 405 U.S., at 353, 92 S.Ct., at 1008, the State 'has at its disposal a variety of criminal laws that are more than adequate to detect and deter whatever fraud may be feared.'Cf. Harman v. Forssenius, 380 U.S. 528, 543, 85 S.Ct. 1177, 1186, 14 L.Ed.2d 50 (1965); Schneider v. State, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939). The California court's catalogue of that State's penal sanctions for election fraud surely demonstrates that there are adequate alternatives to disenfranchisement.

'Today . . . the Elections Code punishes at least 76 different acts as felonies, in 33 separate sections; at least 60 additional acts are punished as misdemeanors, in 40 separate sections; and 14 more acts are declared to be felony-misdemeanors. Among this plethora of offenses we take particular note, in the present connection, of the felony sanctions against fraudulent registrations (s 220), buying and selling of votes (ss 12000-12008), **2684 intimidating voters by threat or bribery (ss 29130-29135), voting twice, or fraudulently voting without being entitled to do so, or impersonating another voter (ss 14403, 29430-29431), fraud or forgery in casting absentee ballots (ss 14690-14692), tampering with voting machines (s 15280) or ballot boxes (ss 17090-17092), forging or altering election returns (ss 29100-29103), and so interfering 'with the officers holding an election or conducting a canvass, or with the voters lawfully exercising their rights of voting at an election, as to prevent the election or canvass from being fairly held and lawfully conducted' (s 17093).'*819 Cal.3d, at 215-216, 107 Cal.Rptr., at 147-148, 507 P.2d, at 1355-1356 (1973) (footnotes omitted).

Given the panoply of criminal offenses available to deter and to punish electoral misconduct, as well as the statutory reforms and technological changes which have transformed the electoral process in the last century, election fraud may no longer be a serious danger.[FN26]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

94 S.Ct. 2655

Page 29

418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

FN26.Ramirez v. Brown, 9 Cal.3d 199, 215-216, 107 Cal.Rptr. 137, 147-148, 507 P.2d 1345, 1355-1356 (1973).

Another asserted purpose is to keep former felons from voting because their likely voting pattern might be subversive of the interests of an orderly society. See Green v. Board of Elections, 380 F.2d 445, 451 (CA2 1967). Support for the argument that electors can be kept from the ballot box for fear they might vote to repeal or emasculate provisions of the criminal code, is drawn primarily from this Court's decisions in Murphy v. Ramsey, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47 (1885), and Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890). In Murphy, the Court upheld the disenfranchisement of anyone who had ever entered into a bigamous or polygamous marriage and in Davis, the Court sanctioned, as a condition to the exercise of franchise, the requirement of an oath that the elector did not 'teach, advise, counsel, or encourage any person to commit the crime of bigamy or polygamy.'The Court's intent was clear-'to withdraw all political influence from those who are practically hostile to' the goals of certain criminal laws.Murphy, supra, 114 U.S. at 45, 5 S.Ct., at 764;Davis, supra, 133 U.S., at 334, 10 S.Ct., at 299.

To the extent Murphy and Davis approve the doctrine that citizens can be barred from the ballot box because they would vote to change the existing criminal law, those decisions are surely of minimal continuing precedential value. We have since explicitly held that such 'differences of opinion cannot justify for excluding (any) group *82 from . . . 'the franchise, " Cipriano v. City of Houma, 395 U.S. at 705-706, 89 S.Ct., at 1900-1901; see Communist Party of Indiana v. Whitcomb, 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974); Evans v. Cornman, 398 U.S. 419, 423, 90 S.Ct. 1752, 1755, 26 L.Ed.2d 370 (1970).

'(I)f they are . . . residents, . . . they, as all other qualified residents, have a right to an equal opportunity for political representation. . . . 'Fencing out' from the franchise a sector of the population because of the way they way vote is constitutionally impermissible.'Carrington v. Rash, 380 U.S., at 94, 85 S.Ct., at 779.See Dunn, 405 U.S., at 355, 92 S.Ct. at 1009.

Although, in the last century, this Court may have justified the exclusion of voters from the electoral process for fear that they would vote to change laws considered important by a temporal majority, I have little doubt that we would not countenance such a purpose today. The process of democracy is one of change. Our laws are not frozen into immutable form, they are constantly in the process of revision in response to the needs of a changing society. The public interest, as conceived by a majority**2685 of the voting public, is constantly undergoing reexamination. This Court's holding in Davis, supra, and Murphy, supra, that a State may disenfranchise a class of voters to 'withdraw all political influence from those who are practically hostile' to the existing order, strikes at the very heart of the democratic process. A temporal majority could use such a power to preserve inviolate its view of the social order simply by disenfranchising those with different views. Voters who opposed the repeal of prohibition could have disenfranchised those who advocated repeal 'to prevent persons from being enabled by their votes to defeat the criminal laws of the country.'Davis, supra, 133 U.S., at 348, 10 S.Ct., at 302. Today, presumably those who support the legalization of marihuana could be barred *83 from the ballot box for much the same reason. The ballot is the democratic system's coin of the realm. To condition its exercise on support of the established order is to debase that currency beyond recognition. Rather than resurrect Davis and Murphy, I would expressly disavow any continued adherence to the dangerous notions therein expressed.FN27

FN27. The Court also notes that the disenfranchisement of ex-felons has received support in the dicta of this Court and that we have only recently affirmed without opinion the decisions of two three-judge District Courts upholding disenfranchisement provisions.Fincher v. Scott, 352 F.Supp. 117 (MDNC 1972), aff'd per curiam, 411 U.S. 961,94 S.Ct. 2151,36 L.Ed.2d 681 (1973); Beacham v. Braterman, 300 F.Supp. 182 (SD Fla.), aff'd mem., 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969). But, dictum is not precedent and as Mr. Justice Rehnquist has only recently reminded us, summary affirmances are obviously not of the same precedential value as would be an opinion of this Court treating the question on the merits.Edelman v.

94 S.Ct. 2655                                                                                                                                                         Page 30
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

Jordan, 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974). See F. Frankfurter & J. Landis, The Business of the Supreme Court at October Term, 1929, 44 Harv.L.Rev. 1, 14 (1930).

The public purposes asserted to be served by disenfranchisement have been found wanting in many quarters. When this suit was filed, 23 States allowed ex-felons full access to the ballot. Since that time, four more States have joined their ranks.[FN28] Shortly after lower federal **84 courts sustained New York's and **2686 Florida's disenfranchisement provisions, the legislatures repealed those laws. Congress has recently provided for the restoration of felons' voting rights at the end of sentence or parole in the District of Columbia.D.C.Code s 1-1102(7) (1973). The National Conference on Uniform State *85 Laws,[FN29] the American Law Institute,[FN30] the National Probation and Parole Association,[FN31] the National Advisory Commission on Criminal Justice Standards and Goals,[FN32] the President's Commission on Law Enforcement and the Administration of Justice,[FN33] the California League of Women Voters,[FN34] the National Democratic Party,[FN35] and the Secretary of State of California [FN36] have all strongly endorsed full suffrage rights for former felons.

FN28. The following States do not disenfranchise all former felons: Arkansas, Ark.Stat.Ann. s 3-707 (Supp.1973); Colorado, Colo.Const., Art. VII, s 10, and Colo.Rev.Stat.Ann. s 49-3-2 (Perm.Cum.Supp.1971); Florida, Fla.Stat.Ann. s 940.05 (1973); Hawaii, Hawaii Rev.Stat. s 716-5 (Supp.1972); Illinois, Ill.Rev.Stat., c. 46, s 3-5 (1973); Indiana, IC 1971, 3-1-21-4, Ind.Ann.Stat. s 29-4804 (1969); Kansas, Kan.Stat.Ann. s 22-3722 (Supp.1973); Maine, Me.Rev.Stat.Ann., Tit. 21, s 248 (1964); Massachusetts, Mass.Gen.Laws Ann., c. 51, s 1 (Supp.1974-1975) (except election code offenders); Michigan, Mich.Const., Art. II, s 2 and Mich.Comp.Laws Ann. s 168.10 (1970); Minnesota, Minn.Stat. s 609.165 (1971); Nebraska, Neb.Rev.Stat. s 29-2264 (Supp.1972) and Neb.Rev.Stat. s 83-1118 (1971); New Hampshire, N.H.Rev.Stat.Ann. s 607-A:2 (Supp.1973); New Jersey,

N.J.Stat.Ann. s 19:4-1 (Supp.1974-1975) (except election code offenders); Ohio Rev.Code Ann. s 2967.16 (Supp.1972); Oregon, Ore.Rev.Stat. ss 137.240 and 137.250 (1973); Pennsylvania, Pa.Const., Art. VII, s 1, Pa.Stat.Ann. Tit. 19, s 893 (1964), and Tit. 25, s 3552 (1963) (except election code offenders for four years); South Dakota, S.D.Comp.Laws Ann. ss 24-5-2 and 23-57-7 (1969); Utah, Utah Const., Art. IV, s 6 (except those convicted of treason or election code offenses); Vermont, Vt.Const., c. II, s 51 (except election code offenders); Washington, Wash.Rev.Code Ann. s 9.96.050 (Supp.1972); West Virginia, 51 Op.W.Va.Atty.Gen. No. 42, p. 182 (1965) (construing W.Va.Const., Art. IV, s 1); Wisconsin, Wis.Stat.Ann. s 57-078 (Supp.1974-1975); Wyoming, Wyo.Stat.Ann. s 7-311 (1957).

In 1972 Montana amended its constitution to disenfranchise potential electors only while 'serving a sentence for a felony.'Mont.Const., Art. IV, s 2; Mont.Rev.Codes Ann. s 23-2701 (Supp.1973). In 1973, New York amended its laws to allow former felons whose sentence had expired or who were released from parole to vote.N.Y. Election Law s 152 (Supp.1973-1974). Also in 1973, North Carolina amended its laws to restore all civil rights including the franchise to former felons discharged from prison or parole.N.C.Gen.Stat. s 13-1 (Supp.1973). And, in the same year, the Tennessee Legislature amended its ex-felon disen-Franchisement statutes. See Tenn.Code Ann. s 2-202 (Supp.1973).

The New York ex-felon disenfranchisement provision was upheld in Green v. Board of Elections, 380 F.2d 445 (CA2 1967), and shortly thereafter the New York Legislature repealed that law.N.Y. Election Law s 152 (Supp.1973- 1974). Similarly the Florida disenfranchisement provisions were upheld in Beacham v. Braterman, 300 F.Supp. 182 (SD Fla.), aff'd per curiam, 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969). Subsequently, Florida statutes were amended to provide for the automatic restoration of all civil rights, including the franchise, upon the completion of sentence

or release from parole or probation.Fla.Stat.Ann. s 940.05 (1973).

FN29. National Conference of Commissioners on Uniform State Laws, Uniform Act on Status of Convicted Persons ss 2-3 (1964).

FN30. American Law Institute, Model Penal Code s 306.3 (Proposed Official Draft 1962).

FN31. National Probation and Parole Association, Standard Probation and Parole Act ss 12 and 27 (1955).

FN32. National Advisory Commission on Criminal Justice Standards and Goals, Corrections, Standard 16.17, p. 592 (1973). The Report observed:
'Loss of citizenship rights-(including) the right to vote . . .-inhibits reformative efforts. If correction is to reintegrate an offender into free society, the offender must retain all attributes of citizenship. In addition, his respect for law and the legal system may well depend, in some measure, on his ability to participate in that system. Mandatory denials of that participation serve no legitimate public interest.'Id., at 593.

FN33. President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Corrections 89-90 (1967): '(T)here seems no justification for permanently depriving all convicted felons of the vote . . .. (T)o be deprived of the right to representation in a democratic society is an important symbol. Moreover, rehabilitation might be furthered by encouraging convicted persons to participate in society by exercising the vote.'

FN34. California League of Women Voters, Policy Statement, Feb. 16, 1972.

FN35. National Democratic Party, Party Platform 1972.

FN36.Memorandum of the Secretary of State of California in Opposition to Certiorari in Class of County Clerks and Registrars of Voters of California v. Ramirez, No. 73-324.

The disenfranchisement of ex-felons had 'its origin in the fogs and fictions of feudal jurisprudence and *86 doubtless has been brought forward into modern statutes without fully realizing either the effect of its literal significance or the extent of its infringement upon the spirit of our system of government.'Byers v. Sun Savings Bank, 41 Okl. 728, 731, 139 P. 948, 949 (1914). I think it clear that measured against the standards of this Court's modern equal protection jurisprudence, the blanket disenfranchisement of ex-felons cannot stand.

I respectfully dissent.

Mr. Justice DOUGLAS, agreeing with Part I-A of this opinion, dissents from a reversal of the judgment below as he cannot say that it does not rest on an independent state ground. See Hayakawa v. Brown, 415 U.S. 1304, 94 S.Ct. 1145, 39 L.Ed.2d 457 (Douglas, J., in chambers).
U.S.Cal. 1974.
Richardson v. Ramirez
418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551, 72 O.O.2d 232

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 16**

Westlaw.

118 S.Ct. 1003                                                    Page 1
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

▷Steel Co. v. Citizens for a Better Environment
U.S.,1998.

Supreme Court of the United States
**STEEL COMPANY, aka Chicago Steel and
Pickling Company, petitioner,**
**v.**
CITIZENS FOR A BETTER ENVIRONMENT.
**No. 96-643.**

Argued Oct. 6, 1997.
Decided March 4, 1998.

Environmental group brought action against steel
manufacturer under Emergency Planning and
Community Right-To-Know Act of 1986 (EPCRA)
for failure to make required reporting. Upon
receiving group's statutory notice of intent to sue,
manufacturer filed overdue forms, and manufacturer
subsequently moved for dismissal. The United States
District Court for the Northern District of Illinois,
George M. Marovich, J., dismissed. Group appealed.
The Seventh Circuit Court of Appeals, 90 F.3d 1237,
reversed and remanded. Certiorari was granted. The
Supreme Court, Justice Scalia, held that: (1) EPCRA
section providing that district court has "jurisdiction
in actions brought under" subsection authorizing
certain civil actions does not render elements of
cause of action under referenced subsection
jurisdictional; (2) court may not decide cause of
action before resolving whether court has Article III
jurisdiction; and (3) environmental group failed to
satisfy redressability requirement for standing.

Vacated and remanded with instructions to direct that
complaint be dismissed.

Justice O'Connor filed concurring opinion, in which
Justice Kennedy joined.

Justice Breyer filed opinion concurring in part and
concurring in judgment.

Justice Stevens filed opinion concurring in judgment,
in which Justices Souter and Ginsburg joined in part.

West Headnotes

**[1] Environmental Law 149E ☞634**

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek634 k. Jurisdiction in General. Most
Cited Cases
        (Formerly      199k25.15(3.2)      Health     and
Environment)
Section of Emergency Planning and Community
Right-To-Know Act (EPCRA) providing that district
court has "jurisdiction in actions brought under"
subsection authorizing certain civil actions does not
render elements of cause of action under referenced
subsection jurisdictional, but merely specifies court's
powers to enforce violated requirement and to impose
civil penalties; reference to actions "brought under"
that subsection means suits contending that
subsection    contains    a    certain    requirement.
Emergency Planning and Community Right-To-
Know Act of 1986, § 326(a, c), 42 U.S.C.A. §
11046(a, c).

**[2] Federal Courts 170B ☞3.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk3 Jurisdiction in General; Nature and
Source
            170Bk3.1 k. In General. Most Cited
Cases
Absence of valid, as opposed to arguable, cause of
action    does    not    implicate    "subject-matter
jurisdiction," *i.e.,* courts' statutory or constitutional
power to adjudicate case. U.S.C.A. Const. Art. 3, § 2,
cl. 1.

**[3] Federal Courts 170B ☞31**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk29 Objections to Jurisdiction,
Determination and Waiver
            170Bk31 k. Waiver or Consent. Most
Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                                                              Page 2
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

**Federal Courts 170B 🗝️242.1**

170B Federal Courts
   170BIII Federal Question Jurisdiction
      170BIII(D) Pleading
         170Bk242 Sufficiency of Allegations
            170Bk242.1 k. In General. Most Cited
Cases
Jurisdiction is not defeated by possibility that
averments might fail to state cause of action on which
petitioners could actually recover; rather, district
court has jurisdiction if right of petitioners to recover
under their complaint will be sustained if
Constitution and laws of United States are given one
construction and will be defeated if they are given
another, unless claim clearly appears to be immaterial
and made solely for purpose of obtaining jurisdiction
or claim is wholly insubstantial and frivolous.
U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[4] Federal Civil Procedure 170A 🗝️1742(1)**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)2 Grounds in General
            170Ak1742 Want of Jurisdiction
               170Ak1742(1) k. In General. Most
Cited Cases
Dismissal for lack of subject-matter jurisdiction
because of inadequacy of federal claim is proper only
when claim is so insubstantial, implausible,
foreclosed by prior decisions of Supreme Court, or
otherwise completely devoid of merit as not to
involve federal controversy. U.S.C.A. Const. Art. 3, §
2, cl. 1.

**[5] Constitutional Law 92 🗝️2450**

92 Constitutional Law
   92XX Separation of Powers
      92XX(C) Judicial Powers and Functions
         92XX(C)1 In General
            92k2450 k. Nature and Scope in
General. Most Cited Cases

**Federal Courts 170B 🗝️30**

170B Federal Courts

170BI Jurisdiction and Powers in General
   170BI(A) In General
      170Bk29 Objections to Jurisdiction,
Determination and Waiver
         170Bk30 k. Power and Duty of Court.
Most Cited Cases
Federal court may not, via doctrine of "hypothetical
jurisdiction," decide cause of action before resolving
whether court has Article III jurisdiction; doing so
would carry courts beyond bounds of authorized
judicial action and thus offend fundamental
principles of separation of powers, and would
produce nothing more than hypothetical judgment,
which would come to same thing as advisory opinion,
disapproved by Supreme Court from the beginning;
abrogating *SEC v. American Capital Investments,
Inc.*, 98 F.3d 1133; *Smith v. Avino*, 91 F.3d 105;
*Clow v. Dept. of Housing and Urban Development*,
948 F.2d 614; *Cross-Sound Ferry Services, Inc. v.
ICC*, 934 F.2d 327; *United States v. Parcel of Land*,
928 F.2d 1; *Browning-Ferris Industries v. Muszynski*,
899 F.2d 151. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[6] Courts 106 🗝️40**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction
in General
     106k40 k. Acts and Proceedings Without
Jurisdiction. Most Cited Cases
Without jurisdiction, court cannot proceed at all in
any cause; jurisdiction is power to declare law, and
when it ceases to exist, the only function remaining
to court is that of announcing the fact and dismissing
cause. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[7] Federal Courts 170B 🗝️445**

170B Federal Courts
   170BVII Supreme Court
      170BVII(A) In General
         170Bk445 k. Appellate Jurisdiction and
Procedure in General. Most Cited Cases
On every writ of error or appeal, first and
fundamental question is that of jurisdiction, first, of
Supreme Court, and then of court from which record
comes; this question Supreme Court is bound to ask
and answer for itself, even when not otherwise
suggested, and without respect to relation of parties
to it. U.S.C.A. Const. Art. 3, § 2, cl. 1.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

**[8] Federal Courts 170B ⬅══30**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk29 Objections to Jurisdiction,
Determination and Waiver
            170Bk30 k. Power and Duty of Court.
Most Cited Cases
Requirement that jurisdiction be established as
threshold matter springs from nature and limits of
judicial power of United States, and is inflexible and
without exception. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[9] Federal Courts 170B ⬅══4**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk3 Jurisdiction in General; Nature and
Source
            170Bk4 k. Constitutional and Statutory
Provisions. Most Cited Cases
Statutory and, especially, constitutional elements of
jurisdiction are essential ingredient of separation and
equilibration of powers, restraining courts from
acting at certain times, and even restraining them
from acting permanently regarding certain subjects.
U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[10] Courts 106 ⬅══40**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction
in General
      106k40 k. Acts and Proceedings Without
Jurisdiction. Most Cited Cases
For federal court to pronounce upon meaning or
constitutionality of state or federal law when it has no
jurisdiction to do so is, by very definition, for court to
act ultra vires. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[11] Federal Courts 170B ⬅══12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited
Cases

While every criminal investigation conducted by
Executive is "case," and every policy issue resolved
by congressional legislation involves "controversy,"
these are not the sort of cases and controversies that
Article III, § 2 refers to, since Constitution's central
mechanism of separation of powers depends largely
upon common understanding of what activities are
appropriate to legislatures, to executives, and to
courts. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[12] Federal Civil Procedure 170A ⬅══103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
Standing to sue is part of common understanding of
what it takes to make justiciable case. U.S.C.A.
Const. Art. 3, § 2, cl. 1.

**[13] Constitutional Law 92 ⬅══2450**

92 Constitutional Law
   92XX Separation of Powers
      92XX(C) Judicial Powers and Functions
         92XX(C)1 In General
            92k2450 k. Nature and Scope in
General. Most Cited Cases
   (Formerly 92k67)
Federal courts must stay within their constitutionally
prescribed sphere of action, whether or not exceeding
that sphere will harm one of the other two branches
of government. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[14] Federal Civil Procedure 170A ⬅══103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
Supreme Court's standing jurisprudence, though it
may sometimes have impact on presidential powers,
derives from Article III, not Article II. U.S.C.A.
Const. Art. 2, § 3; U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[15] Federal Civil Procedure 170A ⬅══103.2**

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv. 1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

## Federal Civil Procedure 170A ☞103.3

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.3 k. Causation; Redressability. Most Cited Cases
Irreducible constitutional minimum of standing contains three requirements: first and foremost, there must be alleged, and ultimately proven, an "injury in fact"-a harm suffered by plaintiff that is concrete and actual or imminent, not conjectural or hypothetical; second, there must be "causation"-a fairly traceable connection between plaintiff's injury and complained-of conduct of defendant; third, there must be "redressability"-a likelihood that requested relief will redress alleged injury. U.S.C.A. Const. Art. 3, § 2, cl. 1.

## [16] Federal Courts 170B ☞12.1

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited Cases
Triad of injury in fact, causation, and redressability comprises core of Article III's case-or-controversy requirement, and party invoking federal jurisdiction bears burden of establishing its existence. U.S.C.A. Const. Art. 3, § 2, cl. 1.

## [17] Federal Civil Procedure 170A ☞103.3

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.3 k. Causation; Redressability. Most Cited Cases

Redressability, like other prongs of standing inquiry, does not depend on defendant's status as a governmental entity. U.S.C.A. Const. Art. 3, § 2, cl. 1.

## [18] Declaratory Judgment 118A ☞300

118A Declaratory Judgment
   118AIII Proceedings
      118AIII(C) Parties
         118Ak299 Proper Parties
            118Ak300 k. Subjects of Relief in General. Most Cited Cases
None of relief sought by environmental group alleging violations of Emergency Planning and Community Right-To-Know Act (EPCRA) by steel manufacturer would reimburse group for losses caused manufacturer's late reporting, or eliminate any effects of that late reporting upon group, and thus, group failed to satisfy redressability requirement for standing; complaint asked for declaratory judgment that manufacturer violated EPCRA, authorization to periodically inspect manufacturer's facility and records, order requiring manufacturer to provide group copies of compliance reports, order requiring manufacturer to pay civil penalties to United States Treasury, award of costs of litigation, and any such further relief as court deemed appropriate. Emergency Planning Community Right-To-Know Act of 1986, §§ 312, 313, 326(a, c, f), 42 U.S.C.A. §§ 11022, 11023, 11046(a, c, f).

## [19] Federal Courts 170B ☞460.1

170B Federal Courts
   170BVII Supreme Court
      170BVII(B) Review of Decisions of Courts of Appeals
         170Bk460 Review on Certiorari
            170Bk460.1 k. In General. Most Cited Cases
On appeal from motion to dismiss on pleadings, Supreme Court had to presume that general allegations in complaint encompassed specific facts necessary to support those allegations. Fed.Rules Civ.Proc.Rule 12(b), 28 U.S.C.A.

## [20] Federal Civil Procedure 170A ☞103.3

170A Federal Civil Procedure

118 S.Ct. 1003                                                                Page 5
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

170AII Parties
   170AII(A) In General
      170Ak103.1 Standing
         170Ak103.3    k.    Causation;
Redressability. Most Cited Cases
Although suitor may derive great comfort and joy
from fact that United States Treasury is not cheated,
that wrongdoer gets his just deserts, or that nation's
laws are faithfully enforced, that psychic satisfaction
is not acceptable Article III remedy, for purposes of
redressability requirement for standing, as it does not
redress cognizable Article III injury; essence of
redressability requirement is that relief that does not
remedy injury suffered cannot bootstrap plaintiff into
federal court. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[21] Federal Civil Procedure 170A ☞103.3**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.3    k.    Causation;
Redressability. Most Cited Cases
Plaintiff cannot achieve standing to litigate
substantive issue by bringing suit for cost of bringing
suit; litigation must give plaintiff some other benefit
besides reimbursement of costs that are byproduct of
litigation itself. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[22] Federal Courts 170B ☞12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
      170BI(A) In General
         170Bk12 Case or Controversy Requirement
            170Bk12.1 k. In General. Most Cited
Cases
Interest in attorney's fees is insufficient to create
Article III case or controversy where none exists on
merits of underlying claim. U.S.C.A. Const. Art. 3, §
2, cl. 1.

**[23] Environmental Law 149E ☞650**

149E Environmental Law
   149EXIII Judicial Review or Intervention
      149Ek649 Persons Entitled to Sue or Seek
Review; Standing
         149Ek650 k. In General. Most Cited Cases

(Formerly    199k25.15(4.1)    Health    and
Environment)
Section of Emergency Planning and Community
Right-To-Know Act (EPCRA) providing for recovery
of costs covers only "costs of litigation," which
cannot alone support standing. Emergency Planning
Community Right-To-Know Act of 1986, § 326(f),
42 U.S.C.A. § 11046(f).

**[24] Environmental Law 149E ☞651**

149E Environmental Law
   149EXIII Judicial Review or Intervention
      149Ek649 Persons Entitled to Sue or Seek
Review; Standing
         149Ek651 k. Cognizable Interests and
Injuries, in General. Most Cited Cases
(Formerly    199k25.15(4.1)    Health    and
Environment)
Deterring future violations of Emergency Planning
and Community Right-To-Know Act (EPCRA) can
be "remedial," for purposes of redressability
requirement for Article III standing, when threatened
injury is one of gravamens of complaint. U.S.C.A.
Const. Art. 3, § 2, cl. 1; Emergency Planning
Community Right-To-Know Act of 1986, §
326(a)(1), 42 U.S.C.A. § 11046(a)(1).

**[25] Injunction 212 ☞114(2)**

212 Injunction
   212III Actions for Injunctions
      212k114 Parties
         212k114(2) k. Complainants. Most Cited
Cases
Generalized interest in deterrence supporting claim
for injunctive relief is insufficient to satisfy
redressability requirement for Article III standing.
U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[26] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
Presumption of future injury when defendant has
voluntarily ceased its illegal activity in response to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

Page 6

litigation is not substitute for allegation of present or threatened injury upon which initial standing must be based. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[27] Federal Courts 170B ☜═12.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
                170Bk12.1 k. In General. Most Cited
Cases

**Injunction 212 ☜═114(2)**

212 Injunction
    212III Actions for Injunctions
        212k114 Parties
            212k114(2) k. Complainants. Most Cited
Cases
Past exposure to illegal conduct does not in itself show present case or controversy regarding injunctive relief, as required for standing, if unaccompanied by any continuing, present adverse effects. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**\*\*1006 \*83 Syllabus** [FN\*]

    [FN\*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See _United States v. Detroit Timber & Lumber Co.,_ 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Alleging that petitioner manufacturer had violated the Emergency Planning and \*\*1007 Community Right-To-Know Act of 1986 (EPCRA) by failing to file timely toxic- and hazardous-chemical storage and emission reports for past years, respondent environmental protection organization filed this private enforcement action for declaratory and injunctive relief under EPCRA's citizen-suit provision, 42 U.S.C. § 11046(a)(1). The District Court held that, because petitioner had brought its filings up to date by the time the complaint was filed, the court lacked jurisdiction to entertain a suit for a present violation; and that, because EPCRA does not allow suit for a purely historical violation, respondent's allegation of untimely filing was not a

claim upon which relief could be granted. The Seventh Circuit reversed, concluding that EPCRA authorizes citizen suits for purely past violations.

_Held:_ Because none of the relief sought would likely remedy respondent's alleged injury in fact, respondent lacks standing to maintain this suit, and this Court and the lower courts lack jurisdiction to entertain it. Pp. 1009-1021.

(a) The merits issue in this case-whether § 11046(a) permits citizen suits for purely past violations-is not also "jurisdictional," and so does not occupy the same status as standing to sue as a question that must be resolved first. It is firmly established that a district court's subject-matter jurisdiction is not defeated by the absence of a valid (as opposed to arguable) cause of action, see, e.g., _Bell v. Hood,_ 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939. Subject-matter jurisdiction exists if the right to recover will be sustained under one reading of the Constitution and laws and defeated under another, _id., at 685, 66 S.Ct. at 777-778,_ unless the claim clearly appears to be immaterial, wholly insubstantial and frivolous, or otherwise so devoid of merit as not to involve a federal controversy, see, e.g., _Oneida Indian Nation of N.Y. v. County of Oneida,_ 414 U.S. 661, 666, 94 S.Ct. 772, 776-777, 39 L.Ed.2d 73. Here, respondent wins under one construction of EPCRA and loses under another, and its claim is not frivolous or immaterial. It is unreasonable to read § 11046(c)-which provides that "[t]he district court shall have jurisdiction in actions brought under subsection (a) ... to enforce [an EPCRA] requirement ... and to impose any civil penalty provided for violation of that requirement"-as making all the elements of the § 11046(a) cause of action\*84 jurisdictional, rather than as merely specifying the remedial _powers_ of the court. _Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,_ 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306, as well as cases deciding a statutory standing question before a constitutional standing question, distinguished. In no case has this Court called the existence of a cause of action "jurisdictional," and decided that question before resolving a dispute concerning the existence of an Article III case or controversy. Such a principle would turn every statutory question in an EPCRA citizen suit into a question of jurisdiction that this Court would have to consider-indeed, raise _sua sponte_-even if not raised below. Pp. 1009-1012.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                                                    Page 7
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

(b) This Court declines to endorse the "doctrine of hypothetical jurisdiction," under which several Courts of Appeals have found it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. That doctrine carries the courts beyond the bounds of authorized judicial action and thus offends fundamental separation-of-powers principles. In a long and venerable line of cases, this Court has held that, without proper jurisdiction, a court cannot proceed at all, but can only note the jurisdictional defect and dismiss the suit. See, e.g., _Capron v. Van Noorden,_ 2 Cranch 126, 2 L.Ed. 229; _Arizonans for Official English v. Arizona,_ 520 U.S. 43, 73, 117 S.Ct. 1055, 1071-1072, 137 L.Ed.2d 170._Bell v. Hood, supra;_ _National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,_ 414 U.S. 453, 465, n. 13, 94 S.Ct. 690, 696, n. 13, 38 L.Ed.2d 646; _Norton v. Mathews,_ 427 U.S. 524, 531, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672; _Secretary of Navy v. Avrech,_ 418 U.S. 676, 678, 94 S.Ct. 3039, 3040, 41 L.Ed.2d 1033_(per curiam); United States v. Augenblick,_ 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537; **1008_Philbrook v. Glodgett,_ 421 U.S. 707, 721, 95 S.Ct. 1893, 1902, 44 L.Ed.2d 525; and _Chandler v. Judicial Council of Tenth Circuit,_ 398 U.S. 74, 86-88, 90 S.Ct. 1648, 1654-1656, 26 L.Ed.2d 100, distinguished. For a court to pronounce upon a law's meaning or constitutionality when it has no jurisdiction to do so is, by very definition, an ultra vires act. Pp. 1012-1016.

(c) Respondent lacks standing to sue. Standing is the "irreducible constitutional minimum" necessary to make a justiciable "case" or "controversy" under Article III, § 2. _Lujan v. Defenders of Wildlife,_ 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351. It contains three requirements: injury in fact to the plaintiff, causation of that injury by the defendant's complained-of conduct, and a likelihood that the requested relief will redress that injury. E.g., _ibid._ Even assuming, as respondent asserts, that petitioner's failure to report EPCRA information in a timely manner, and the lingering effects of that failure, constitute a concrete injury in fact to respondent and its members that satisfies Article III, cf. _id.,_ at 578, 112 S.Ct., at 2145-2146, the complaint

nevertheless fails the redressability test: None of the specific items of relief sought-a declaratory judgment that petitioner violated EPCRA; *85 injunctive relief authorizing respondent to make periodic inspections of petitioner's facility and records and requiring petitioner to give respondent copies of its compliance reports; and orders requiring petitioner to pay EPCRA civil penalties to the Treasury and to reimburse respondent's litigation expenses-and no conceivable relief under the complaint's final, general request, would serve to reimburse respondent for losses caused by petitioner's late reporting, or to eliminate any effects of that late reporting upon respondent. Pp. 1016-1020.

90 F.3d 1237, vacated and remanded.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined, and in which BREYER, J., joined as to Parts I and IV. O'CONNOR, J., filed a concurring opinion, in which KENNEDY, J., joined, post, p. 1020. BREYER, J., filed an opinion concurring in part and concurring in the judgment, post, p. 1020. STEVENS, J., filed an opinion concurring in the judgment, in which SOUTER, J., joined as to Parts I, III, and IV, and GINSBURG, J., joined as to Part III, post, p. 1021. GINSBURG, J., filed an opinion concurring in the judgment, post, p. 1032.

Sanford M. Stein, Chicago, IL, for Petitioner.
David A. Strauss, Chicago, IL, for Respondent.
Irving L. Gornstein, Washington, DC, for U.S. as amicus curiae, by special leave of Court.For U.S. Supreme Court briefs, see:1997 WL 221790 (Pet.Brief)1997 WL 348462 (Resp.Brief)1997 WL 429733 (Reply.Brief)

*86 Justice SCALIA delivered the opinion of the Court.
This is a private enforcement action under the citizen-suit provision of the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 100 Stat. 1755, 42 U.S.C. § 11046(a)(1). The case presents the merits question, answered in the affirmative by the United States Court of Appeals for the Seventh Circuit, whether EPCRA authorizes suits for purely past violations. It also presents the jurisdictional question whether respondent, plaintiff below, has standing to bring this action.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                    Page 8
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

I

Respondent, an association of individuals interested in environmental protection, sued petitioner, a small manufacturing company in Chicago, for past violations of EPCRA. EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of health-threatening releases. Central to its operation are reporting requirements compelling users of specified toxic and hazardous chemicals to file annual *87 "emergency and hazardous chemical inventory forms" and "toxic chemical**1009 release forms," which contain, *inter alia*, the name and location of the facility, the name and quantity of the chemical on hand, and, in the case of toxic chemicals, the waste-disposal method employed and the annual quantity released into each environmental medium. 42 U.S.C. §§ 11022 and 11023. The hazardous-chemical inventory forms for any given calendar year are due the following March 1st, and the toxic-chemical release forms the following July 1st. §§ 11022(a)(2) and 11023(a).

Enforcement of EPCRA can take place on many fronts. The Environmental Protection Agency (EPA) has the most powerful enforcement arsenal: it may seek criminal, civil, or administrative penalties. § 11045. State and local governments can also seek civil penalties, as well as injunctive relief. §§ 11046(a)(2) and (c). For purposes of this case, however, the crucial enforcement mechanism is the citizen-suit provision, § 11046(a)(1), which likewise authorizes civil penalties and injunctive relief, see § 11046(c). This provides that "any person may commence a civil action on his own behalf against ... [a]n owner or operator of a facility for failure," among other things, to "[c]omplete and submit an inventory form under section 11022(a) of this title ... [and] section 11023(a) of this title." § 11046(a)(1). As a prerequisite to bringing such a suit, the plaintiff must, 60 days prior to filing his complaint, give notice to the Administrator of the EPA, the State in which the alleged violation occurs, and the alleged violator. § 11046(d). The citizen suit may not go forward if the Administrator "has commenced and is diligently pursuing an administrative order or civil action to enforce the requirement concerned or to

impose a civil penalty." § 11046(e).

In 1995 respondent sent a notice to petitioner, the Administrator, and the relevant Illinois authorities, alleging-accurately, as it turns out-that petitioner had failed since 1988, the first year of EPCRA's filing deadlines, to complete and *88 to submit the requisite hazardous-chemical inventory and toxic-chemical release forms under §§ 11022 and 11023. Upon receiving the notice, petitioner filed all of the overdue forms with the relevant agencies. The EPA chose not to bring an action against petitioner, and when the 60-day waiting period expired, respondent filed suit in Federal District Court. Petitioner promptly filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6), contending that, because its filings were up to date when the complaint was filed, the court had no jurisdiction to entertain a suit for a present violation; and that, because EPCRA does not allow suit for a purely historical violation, respondent's allegation of untimeliness in filing was not a claim upon which relief could be granted.

The District Court agreed with petitioner on both points. App. to Pet. for Cert. A24-A26. The Court of Appeals reversed, concluding that citizens may seek penalties against EPCRA violators who file after the statutory deadline and after receiving notice. 90 F.3d 1237 (C.A.7 1996). We granted certiorari, 519 U.S. 1147, 117 S.Ct. 1079, 137 L.Ed.2d 214 (1997).

II

[1] We granted certiorari in this case to resolve a conflict between the interpretation of EPCRA adopted by the Seventh Circuit and the interpretation previously adopted by the Sixth Circuit in *Atlantic States Legal Foundation, Inc. v. United Musical Instruments, U.S.A., Inc.,* 61 F.3d 473 (1995)-a case relied upon by the District Court, and acknowledged by the Seventh Circuit to be "factually indistinguishable," 90 F.3d, at 1241-1242. Petitioner, however, both in its petition for certiorari and in its briefs on the merits, has raised the issue of respondent's standing to maintain the suit, and hence this Court's jurisdiction to entertain it. Though there is some dispute on this point, see Part III, *infra,* this would normally be considered a threshold question that must be resolved in respondent's favor before proceeding to the *89 merits. Justice STEVENS' opinion concurring in the judgment, however, claims

118 S.Ct. 1003                                                                                                                    Page 9
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

that the question whether § 11046(a) permits this cause of action is *also* "jurisdictional," and so has equivalent claim to being resolved first. Whether that is so has significant implications for this case and for many others, **1010 and so the point warrants extended discussion.

[2][3][4] It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case. See generally 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350, p. 196, n. 8 and cases cited (2d ed.1990). As we stated in *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), "[j]urisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Rather, the district court has jurisdiction if "the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another,"*id.,* at 685, 66 S.Ct., at 777, unless the claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.,* at 682-683, 66 S.Ct., at 776; see also *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 285, 113 S.Ct. 753, 767-768, 122 L.Ed.2d 34 (1993); *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 411-412, 57 L.Ed. 716 (1913). Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Oneida Indian Nation of N.Y. v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974); see also *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 359, 79 S.Ct. 468, 473, 3 L.Ed.2d 368 (1959). Here, respondent wins under one construction of EPCRA and loses under another, and Justice STEVENS does not argue that respondent's claim is frivolous or immaterial- *90 in fact, acknowledges that the language of the citizen-suit provision is ambiguous. *Post,* at 1031.

Justice STEVENS relies on our treatment of a similar issue as jurisdictional in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). *Post,* at 1022. The statute at issue in that case, however, after creating the cause of action, went on to say that "[t]he district courts shall have jurisdiction, *without regard to the amount in controversy or the citizenship of the parties,*" to provide various forms of relief. 33 U.S.C. § 1365(a) (emphasis added). The italicized phrase strongly suggested (perhaps misleadingly) that the provision was addressing genuine subject-matter jurisdiction. The corresponding provision in the present case, however, reads as follows:

> "The district court shall have jurisdiction in actions brought under subsection (a) of this section against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement." 42 U.S.C. § 11046(c).

It is unreasonable to read this as making all the elements of the cause of action under subsection (a) jurisdictional, rather than as merely specifying the remedial *powers* of the court, viz., to enforce the violated requirement and to impose civil penalties. "Jurisdiction," it has been observed, "is a word of many, too many, meanings,"*United States v. Vanness,* 85 F.3d 661, 663, n. 2 (C.A.D.C.1996), and it is commonplace for the term to be used as it evidently was here. See, *e.g.,* 7 U.S.C. § 13a-1(d) ("In any action brought under this section, the Commission may seek and the court shall have jurisdiction to impose ... a civil penalty in the amount of not more than the higher of $100,000 or triple the monetary gain to the person for each violation"); 15 U.S.C. § 2622(d) ("In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief, including injunctive relief and compensatory and exemplary damages"); 42 U.S.C. § 7622(d) ("In actions brought under this subsection, the district courts shall have jurisdiction to grant all appropriate relief *91 including, but not limited to, injunctive relief, compensatory, and exemplary damages").

It is also the case that the *Gwaltney* opinion does not display the slightest awareness that anything *turned upon* whether the existence**1011 of a cause of action for past violations was technically jurisdictional-as indeed nothing of substance did. The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                                  Page 10
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

District Court had statutory jurisdiction over the suit in any event, since continuing violations were also alleged. See 484 U.S., at 64, 108 S.Ct., at 385. It is true, as Justice STEVENS points out, that the issue of Article III standing which is addressed at the end of the opinion should technically have been addressed at the outset if the statutory question was not jurisdictional. But that also did not really matter, since Article III standing was in any event found. The short of the matter is that the jurisdictional character of the elements of the cause of action in Gwaltney made no substantive difference (nor even any procedural difference that the Court seemed aware of), had been assumed by the parties, and was assumed without discussion by the Court. We have often said that drive-by jurisdictional rulings of this sort (if Gwaltney can even be called a ruling on the point rather than a dictum) have no precedential effect. See Lewis v. Casey, 518 U.S. 343, 352, n. 2, 116 S.Ct. 2174, 2180, n. 2, 135 L.Ed.2d 606 (1996); Federal Election Comm'n v. NRA Political Victory Fund, 513 U.S. 88, 97, 115 S.Ct. 537, 542-543, 130 L.Ed.2d 439 (1994); United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38, 73 S.Ct. 67, 69-70, 97 L.Ed. 54 (1952). But even if it is authoritative on the point as to the distinctive statute there at issue, it is fanciful to think that Gwaltney revised our established jurisprudence that the failure of a cause of action does not automatically produce a failure of jurisdiction, or adopted the expansive principle that a statute saying "the district court shall have jurisdiction to remedy violations [in specified ways]" *92 renders the existence of a violation necessary for subject-matter jurisdiction.

Justice STEVENS' concurrence devotes a large portion of its discussion to cases in which a statutory standing question was decided before a question of constitutional standing. See post, at 1022-1024. They also are irrelevant here, because it is not a statutory standing question that Justice STEVENS would have us decide first. He wishes to resolve, not whether EPCRA authorizes this plaintiff to sue (it assuredly does), but whether the scope of the EPCRA right of action includes past violations. Such a question, we have held, goes to the merits and not to statutory standing. See Northwest Airlines, Inc. v. County of Kent, 510 U.S. 355, 365, 114 S.Ct. 855, 862, 127 L.Ed.2d 183 (1994) ("The question whether a federal statute creates a claim for relief is not jurisdictional"); Romero v. International Terminal Operating Co., supra, at 359, 79 S.Ct., at 473;

Montana-Dakota Util. Co. v. Northwestern Public Service Co., 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951).

Though it is replete with extensive case discussions, case citations, rationalizations, and syllogoids, see post, at 1025, n. 12, and n. 2 infra, Justice STEVENS' opinion conspicuously lacks one central feature: a single case in which this Court has done what he proposes, to wit, call the existence of a cause of action "jurisdictional," and decide that question before resolving a dispute concerning the existence of an Article III case or controversy. Of course, even if there were not solid precedent contradicting Justice STEVENS' position, the consequences are alone enough to condemn it. It would turn every statutory question in an EPCRA citizen suit into a question of jurisdiction. Under Justice STEVENS' analysis, § 11046(c)'s grant of "jurisdiction in actions brought under [§ 11046(a) ]" withholds jurisdiction over claims involving purely past violations if past violations are not in fact covered by § 11046(a). By parity of reasoning, if there is a dispute as to whether the omission of a particular item constituted a failure to "complete" the form; or as to *93 whether a particular manner of delivery complied in time with the requirement to "submit" the form; and if the court agreed with the defendant on the point; the action would not be "brought under [§ 11046(a) ]," and would be dismissed for lack of jurisdiction rather than decided on the merits. Moreover, those statutory arguments, since they are "jurisdictional," would have to be considered by this Court even though not raised earlier in the litigation-indeed, this Court would have to raise them sua sponte. See **1012Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 278-279, 97 S.Ct. 568, 571-572, 50 L.Ed.2d 471 (1977); Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453, 20 S.Ct. 690, 691-692, 44 L.Ed. 842 (1900). Congress of course did not create such a strange scheme. In referring to actions "brought under" § 11046(a), § 11046(c) means suits contending that § 11046(a) contains a certain requirement. If Justice STEVENS is correct that all cause-of-action questions may be regarded as jurisdictional, and thus capable of being decided where there is no genuine case or controversy, it is hard to see what is left of that limitation in Article III.

III

[5] In addition to its attempt to convert the merits issue in this case into a jurisdictional one, Justice STEVENS' concurrence proceeds, *post,* at 1023-1027, to argue the bolder point that jurisdiction need not be addressed first anyway. Even if the statutory question is not "fram[ed] ... in terms of 'jurisdiction,' " but is simply "characterize[d] ... as whether respondent's complaint states a 'cause of action,' ""it is also clear that we have the power to decide the statutory question first." *Post,* at 1024. This is essentially the position embraced by several Courts of Appeals, which find it proper to proceed immediately to the merits question, despite jurisdictional objections, at least where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied. See, *e.g.,* \*94 *SEC v. American Capital Investments, Inc.,* 98 F.3d 1133, 1139-1142 (C.A.9 1996), cert. denied, *sub nom. Shelton v. Barnes,* 520 U.S. 1185, 117 S.Ct. 1468, 137 L.Ed.2d 681 (1997); *Smith v. Avino,* 91 F.3d 105, 108 (C.A.11 1996); *Clow v. U.S. Department of Housing and Urban Development,* 948 F.2d 614, 616, n. 2 (C.A.9 1991); *Cross-Sound Ferry Services, Inc. v. ICC,* 934 F.2d 327, 333 (C.A.D.C.1991); *United States v. Parcel of Land,* 928 F.2d 1, 4 (C.A.1 1991); *Browning-Ferris Industries v. Muszynski,* 899 F.2d 151, 154-159 (C.A.2 1990). The Ninth Circuit has denominated this practice-which it characterizes as "assuming" jurisdiction for the purpose of deciding the merits-the "doctrine of hypothetical jurisdiction." See, *e.g., United States v. Troescher,* 99 F.3d 933, 934, n. 1 (1996). [FN1]

> FN1. Our disposition makes it appropriate to address the approach taken by this substantial body of Court of Appeals precedent. The fact that Justice STEVENS' concurrence takes essentially the same approach makes his contention that this discussion is an "excursion," and "unnecessary to an explanation" of our decision, *post,* at 1025, 1026, particularly puzzling.

[6][7][8] We decline to endorse such an approach because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers. This conclusion should come as no surprise, since it is reflected in a long and venerable line of our cases. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 7 Wall. 506, 514, 19 L.Ed. 264 (1868). "On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." *Great Southern Fire Proof Hotel Co. v. Jones, supra,* at 453, 20 S.Ct., at 691-692. The requirement that jurisdiction be established as a threshold matter "spring[s] from the nature and limits of \*95 the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884).

This Court's insistence that proper jurisdiction appear begins at least as early as 1804, when we set aside a judgment for the defendant at the instance of the losing plaintiff *who had himself* failed to allege the basis for federal jurisdiction. *Capron v. Van Noorden,* 2 Cranch 126, 2 L.Ed. 229 (1804). Just last Term, we restated this principle in the clearest fashion, unanimously setting aside the Ninth Circuit's merits decision in a case that had lost the elements of a justiciable controversy:

\*\*1013  " '[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it. *Mitchell v. Maurer,* 293 U.S. 237, 244 [55 S.Ct. 162, 165, 79 L.Ed. 338] (1934). See *Juidice v. Vail,* 430 U.S. 327, 331-332 [97 S.Ct. 1211, 1215-1216, 51 L.Ed.2d 376] (1977) (standing). 'And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it. [When the lower federal court] lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.' *United States v. Corrick,* 298 U.S. 435, 440 [56 S.Ct. 829, 831, 80 L.Ed. 1263] (1936) (footnotes omitted).' " *Arizonans for Official English v. Arizona,* 520 U.S. 43, 73, 117

118 S.Ct. 1003                                                                              Page 12
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

S.Ct. 1055, 1071-1072, 137 L.Ed.2d 170 (1997), quoting from *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (brackets in original).

Justice STEVENS' arguments contradicting all this jurisprudence-and asserting that a court *may* decide the cause of action before resolving Article III jurisdiction-are readily refuted. First, his concurrence seeks to convert *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), into a case in which the cause-of-action question was decided before an Article III standing*96 question. *Post,* at 1024, n. 8. "*Bell*," Justice STEVENS asserts, "held that we have jurisdiction to decide [whether the plaintiff has stated a cause of action] *even when it is unclear whether the plaintiff's injuries can be redressed.*" *Post,* at 1024. The italicized phrase (the italics are his own) invites the reader to believe that Article III redressability was at issue. Not only is this not true, but the whole *point* of *Bell* was that it is not true. In *Bell,* which was decided before *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the District Court had dismissed the case on *jurisdictional* grounds because it believed that (what we would now call) a *Bivens* action would not lie. This Court held that the nonexistence of a cause of action was no proper basis for a jurisdictional dismissal. Thus, the uncertainty about "whether the plaintiff's injuries can be redressed" to which Justice STEVENS refers is simply the uncertainty about whether a cause of action existed-which is precisely what *Bell* holds *not* to be an Article III "redressability" question. It would have been a different matter if the relief *requested* by the plaintiffs in *Bell* (money damages) would not have remedied their injury in fact; but it of course would. Justice STEVENS used to understand the fundamental distinction between arguing no cause of action and arguing no Article III redressability, having written for the Court that the former argument is "not squarely directed at jurisdiction itself, but rather at the existence of a remedy for the alleged violation of ... federal rights," which issue is " 'not of the jurisdictional sort which the Court raises on its own motion.' " *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 398, 99 S.Ct. 1171, 1175-1176, 59 L.Ed.2d 401 (1979) (STEVENS, J.), (quoting *Mt. Healthy Bd. of Ed. v. Doyle,* 429 U.S., at 279, 97 S.Ct., at 572).

Justice STEVENS also relies on *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). *Post,* at 1024-1025. But in that case, we did not determine whether a cause of action existed before determining*97 that the plaintiff had Article III standing; there was no question of injury in fact or effectiveness of the requested remedy. Rather, *National Railroad Passenger Corp.* determined whether a statutory cause of action existed before determining whether (if so) the plaintiff came within the "zone of interests" for which the cause of action was available. 414 U.S., at 465, n. 13, 94 S.Ct., at 696, n. 13. The latter question is an issue of *statutory* standing. It has nothing to do with whether there is case or controversy under Article III.[FN2]

FN2. Justice STEVENS thinks it illogical that a merits question can be given priority over a statutory standing question (*National Railroad Passenger Corp.*) and a statutory standing question can be given priority over an Article III question (the cases discussed *post,* at 1022-1024), but a merits question cannot be given priority over an Article III question. See *post,* at 1025, n. 12. It seems to us no more illogical than many other "broken circles" that appear in life and the law: that Executive agreements may displace state law, for example, see *United States v. Belmont,* 301 U.S. 324, 330-331, 57 S.Ct. 758, 760-761, 81 L.Ed. 1134 (1937), and that unilateral Presidential action (renunciation) may displace Executive agreements, does not produce the "logical" conclusion that unilateral Presidential action may displace state law. The reasons for allowing merits questions to be decided before statutory standing questions do not support allowing merits questions to be decided before Article III questions. As *National Railroad Passenger Corp.* points out, the merits inquiry and the statutory standing inquiry often "overlap," 414 U.S., at 456, 94 S.Ct., at 692. The question whether *this* plaintiff has a cause of action under the statute, and the question whether *any* plaintiff has a cause of action under the statute are closely connected-indeed, depending upon the asserted basis for lack of statutory standing, they are sometimes identical, so that it would be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                                           Page 13
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv. 1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

exceedingly artificial to draw a distinction between the two. The same cannot be said of the Article III requirement of remediable injury in fact, which (except with regard to entirely frivolous claims) has nothing to do with the text of the statute relied upon. Moreover, deciding whether any cause of action exists under a particular statute, rather than whether the particular plaintiff can sue, does not take the court into vast, uncharted realms of judicial opinion giving; whereas the proposition that the court can reach a merits question when there is no Article III jurisdiction opens the door to all sorts of "generalized grievances," _Schlesinger v. Reservists Comm. to Stop the War,_ 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974), that the Constitution leaves for resolution through the political process.

**1014 *98 Much more extensive defenses of the practice of deciding the cause of action before resolving Article III jurisdiction have been offered by the Courts of Appeals. They rely principally upon two cases of ours, _Norton v. Mathews,_ 427 U.S. 524, 96 S.Ct. 2771, 49 L.Ed.2d 672 (1976), and _Secretary of Navy v. Avrech,_ 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974)(per curiam). Both are readily explained, we think, by their extraordinary procedural postures. In _Norton,_ the case came to us on direct appeal from a three-judge District Court, and the jurisdictional question was whether the action was properly brought in that forum rather than in an ordinary district court. We declined to decide that jurisdictional question, because the merits question was decided _in a companion case, Mathews v. Lucas,_ 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), with the consequence that the jurisdictional question could have no effect on the outcome: If the three-judge court had been properly convened, we would have affirmed, and if not, we would have vacated and remanded for a fresh decree from which an appeal could be taken to the Court of Appeals, the outcome of which was foreordained by _Lucas. Norton v. Mathews, supra,_ at 531, 96 S.Ct., at 2775. Thus, _Norton_ did not use the pretermission of the jurisdictional question as a device for reaching a question of law that otherwise would have gone unaddressed. Moreover, the Court seems to have regarded the merits judgment that it entered on the basis of _Lucas_ as equivalent to a jurisdictional dismissal for failure to present a substantial federal question. The Court said: "This disposition _[Lucas]_ renders the merits in the present case a decided issue and thus one no longer substantial in the jurisdictional sense." 427 U.S., at 530-531, 96 S.Ct., at 2774-2775. We think it clear that this peculiar case, involving a merits issue dispositively resolved in a companion case, was not meant to overrule, _sub silentio,_ two centuries of jurisprudence affirming the necessity of determining jurisdiction before proceeding to the merits. See _Clow,_ 948 F.2d, at 627 (O'Scannlain, J., dissenting).

_Avrech_ also involved an instance in which an intervening Supreme Court decision definitively answered the merits *99 question. The jurisdictional question in the case had been raised by the Court _sua sponte_ after oral argument, and supplemental briefing had been ordered. _Secretary of Navy v. Avrech, supra,_ at 677, 94 S.Ct., at 3039-3040. Before the Court came to a decision, however, the merits issue in the case had been conclusively resolved in _Parker v. Levy,_ 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), a case argued the same day as _Avrech._ The Court was unwilling to decide the jurisdictional question without oral argument, 418 U.S., at 677, 94 S.Ct., at 3039-3040, but acknowledged (with some understatement) that **1015 "even the most diligent and zealous advocate could find his ardor somewhat dampened in arguing a jurisdictional issue where the decision on the merits is ... foreordained," _id.,_ at 678, 94 S.Ct., at 3040. Accordingly, the Court disposed of the case on the basis of the intervening decision in _Parker,_ in a minimalist two-page _per curiam_ opinion. The first thing to be observed about _Avrech_ is that the supposed jurisdictional issue was technically not that. The issue was whether a court-martial judgment could be attacked collaterally by a suit for backpay. Although _Avrech,_ like the earlier case of _United States v. Augenblick,_ 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), characterized this question as jurisdictional, we later held squarely that it was not. See _Schlesinger v. Councilman,_ 420 U.S. 738, 753, 95 S.Ct. 1300, 1310-1311, 43 L.Ed.2d 591 (1975). In any event, the peculiar circumstances of _Avrech_ hardly permit it to be cited for the precedent-shattering general proposition that an "easy" merits question may be decided _on the assumption_ of jurisdiction. To the contrary, the fact that the Court ordered briefing on the jurisdictional question _sua sponte_ demonstrates its adherence to traditional and constitutionally dictated requirements. See _Cross-Sound Ferry Services, Inc. v. ICC,_ 934 F.2d, at 344-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                    Page 14
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

345, and n. 10 (Thomas, J., concurring in part and concurring in denial of petition for review).

Other cases sometimes cited by the lower courts to support "hypothetical jurisdiction" are similarly distinguishable. _United States v. Augenblick_ as we have discussed, did not involve a jurisdictional issue. In _Philbrook v. Glodgett,_ 421 U.S. 707, 721, 95 S.Ct. 1893, 1902, 44 L.Ed.2d 525 (1975), the jurisdictional question was whether, *100 in a suit under 28 U.S.C. § 1343(3) against the Commissioner of the Vermont Department of Social Welfare for deprivation of federal rights under color of state law by denying payments under a federally funded welfare program, the plaintiff could join a similar claim against the Secretary of Health, Education, and Welfare. The merits issue of statutory construction involved in the claim against the Secretary was precisely the same as that involved in the claim against the Commissioner, and the Secretary (while challenging jurisdiction) assured the Court that he would comply with any judgment entered against the Commissioner. The Court's disposition of the case was to dismiss the Secretary's appeal under what was then this Court's Rule 40(g), for failure to brief the jurisdictional question adequately. Normally, the Court acknowledged, its obligation to inquire into the jurisdiction of the District Court might prevent this disposition. But here, the Court concluded, "the substantive issue decided by the District Court would have been decided by that court even if it had concluded that the Secretary was not properly a party," and "the only practical difference that resulted ... was that its injunction was directed against him as well as against [the Commissioner]," which the Secretary "has [not] properly contended to be wrongful before this Court." 421 U.S., at 721-722, 95 S.Ct., at 1902-1903. And finally, in _Chandler v. Judicial Council of Tenth Circuit,_ 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970), we reserved the question whether we had jurisdiction to issue a writ of prohibition or mandamus because the petitioner had not exhausted all available avenues before seeking relief under the All Writs Act, 28 U.S.C. § 1651, and because there was no record to review. 398 U.S., at 86-88, 90 S.Ct., at 1654-1656. The exhaustion question _itself_ was at least arguably jurisdictional, and was clearly treated as such. _Id.,_ at 86, 90 S.Ct., at 1654-1655.[FN3]

FN3. Justice STEVENS adds three cases to

the list of those that might support "hypothetical jurisdiction." _Post,_ at 1026, and n. 15. They are all inapposite. In _Moor v. County of Alameda,_ 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), we declined to decide whether a federal court's pendent jurisdiction extended to state-law claims against a new party, because we agreed with the District Court's discretionary declination of pendent jurisdiction. _Id.,_ at 715-716, 93 S.Ct., at 1798-1799. Thus, the case decided not a merits question before a jurisdictional question, but a discretionary jurisdictional question before a nondiscretionary jurisdictional question. Similarly in _Ellis v. Dyson,_ 421 U.S. 426, 436, 95 S.Ct. 1691, 1696-1697, 44 L.Ed.2d 274 (1975), the "authoritative ground of decision" upon which the District Court relied in lieu of determining whether there was a case or controversy was _Younger_ abstention, which we have treated as jurisdictional. And finally, the issue pretermitted in _Neese v. Southern R. Co.,_ 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955) (_per curiam_), was not Article III jurisdiction at all, but the substantive question whether the Seventh Amendment permits an appellate court to review the district court's denial of a Motion for New Trial on the ground that the verdict was excessive. We declined to consider that question because we agreed with the District Court's decision to deny the motion on the facts in the record. The more numerous the look-alike-but-inapposite cases Justice STEVENS cites, the more strikingly clear it becomes: His concurrence cannot identify a single opinion of ours deciding the merits before a disputed question of Article III jurisdiction.

**1016 [9][10] *101 While some of the above cases must be acknowledged to have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question, none of them even approaches approval of a doctrine of "hypothetical jurisdiction" that enables a court to resolve contested questions of law when its jurisdiction is in doubt. Hypothetical jurisdiction produces nothing more than a hypothetical judgment-which comes to the same thing as an advisory opinion, disapproved by this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                      Page 15

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv. 1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

Court from the beginning. *Muskrat v. United States,* 219 U.S. 346, 362, 31 S.Ct. 250, 256, 55 L.Ed. 246 (1911); *Hayburn's Case,* 2 Dall. 409 (1792). Much more than legal niceties are at stake here. The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects. See *United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 2947-2948, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706(1974). For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction*102 to do so is, by very definition, for a court to act ultra vires.

IV

[11][12][13][14] Having reached the end of what seems like a long front walk, we finally arrive at the threshold jurisdictional question: whether respondent, the plaintiff below, has standing to sue. Article III, § 2, of the Constitution extends the "judicial Power" of the United States only to "Cases" and "Controversies." We have always taken this to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process. *Muskrat v. United States, supra,* at 356-357, 31 S.Ct., at 253-254. Such a meaning is fairly implied by the text, since otherwise the purported restriction upon the judicial power would scarcely be a restriction at all. Every criminal investigation conducted by the Executive is a "case," and every policy issue resolved by congressional legislation involves a "controversy." These are not, however, the sort of cases and controversies that Article III, § 2, refers to, since "the Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559-560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Standing to sue is part of the common understanding of what it takes to make a justiciable case. *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990).[FN4]

    FN4. Our opinion is not motivated, as Justice STEVENS suggests, by the more

specific separation-of-powers concern that this citizen's suit "somehow interferes with the Executive's power to 'take Care that the Laws be faithfully executed,'Art. II, § 3,"*post,* at 1029. The courts must stay within their constitutionally prescribed sphere of action, whether or not exceeding that sphere will harm one of the other two branches. This case calls for nothing more than a straightforward application of our standing jurisprudence, which, though it may sometimes have an impact on Presidential powers, derives from Article III and not Article II.

[15][16][17] The "irreducible constitutional minimum of standing" contains three requirements. *103*Lujan v. Defenders of Wildlife, supra,* at 560, 112 S.Ct., at 2136. First and foremost, there must be alleged (and ultimately proved) an "injury in fact"-a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.' " *Whitmore v. Arkansas, supra,* at 149, 155, 110 S.Ct., at 1723 (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 101-102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)). Second, there must be causation-a fairly traceable connection between the plaintiff's**1017 injury and the complained-of conduct of the defendant. *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1925-1926, 48 L.Ed.2d 450 (1976). And third, there must be redressability-a likelihood that the requested relief will redress the alleged injury. *Id.,* at 45-46, 96 S.Ct., at 1927-1928; see also *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975). This triad of injury in fact, causation, and redressability[FN5] constitutes the core of Article III's case-or-controversy requirement, *104 and the party invoking federal jurisdiction bears the burden of establishing its existence. See *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607-608, 107 L.Ed.2d 603 (1990).

    FN5. Contrary to Justice STEVENS' belief that redressability "is a judicial creation of the past 25 years,"*post,* at 1027, the concept has been ingrained in our jurisprudence from the beginning. Although we have packaged the requirements of constitutional "case" or "controversy" somewhat differently in the past 25 years-an era rich in three-part tests-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                Page 16
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

the point has always been the same: whether a plaintiff "personally would benefit in a tangible way from the court's intervention." *Warth,* 422 U.S., at 508, 95 S.Ct., at 2210. For example, in *Marye v. Parsons,* 114 U.S. 325, 328-329, 5 S.Ct. 932, 933-934, 29 L.Ed. 205 (1885), we held that a bill in equity should have been dismissed because it was a clear case of "*damnum absque injuriâ.*" Although the complainant alleged a breach of contract by the State, the complainant "asks no relief as to that, for there is no remedy by suit to compel the State to pay its debts .... The bill as framed, therefore, calls for a declaration of an abstract character." Because courts do not "si[t] to determine questions of law *in thesi,*" we remanded with directions to dismiss the bill. *Id.,* at 328-330, 5 S.Ct., at 933-934.

Also contrary to Justice STEVENS' unprecedented suggestion, *post,* at 1027, redressability-like the other prongs of the standing inquiry-does not depend on the defendant's status as a governmental entity. There is no conceivable reason why it should. If it is true, as Justice STEVENS claims, that all of the cases in which the Court has denied standing because of a lack of redressability happened to involve government action or inaction, that would be unsurprising. Suits that promise no concrete benefit to the plaintiff, and that are brought to have us "determine questions of law *in thesi,*" *Marye, supra,* at 330, 5 S.Ct., at 934, are most often inspired by the psychological smart of perceived official injustice, or by the government-policy preferences of political activists. But the principle of redressability has broader application than that.

[18][19] We turn now to the particulars of respondent's complaint to see how it measures up to Article III's requirements. This case is on appeal from a Rule 12(b) motion to dismiss on the pleadings, so we must presume that the general allegations in the complaint encompass the specific facts necessary to support those allegations. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 3189,

111 L.Ed.2d 695 (1990). The complaint contains claims "on behalf of both [respondent] itself and its members."[FN6]  App. 4. It describes respondent as an organization that seeks, uses, and acquires data reported under EPCRA. It says that respondent "reports to its members and the public about storage and releases of toxic chemicals into the environment, advocates changes in environmental regulations and statutes, prepares reports for its members and the public, seeks the reduction of toxic chemicals and further seeks to promote the effective enforcement of environmental laws." *Id.,* at 5. The complaint asserts that respondent's "right to know about [toxic-chemical] releases and its interests in protecting and improving the environment and the health of its members have been, are being, and will be adversely affected by [petitioner's] actions in failing to provide timely and required information under EPCRA." *Ibid.*  The complaint also alleges that respondent's members, who live in or frequent the area near petitioner's facility, use the EPCRA-reported information "to learn about *105 toxic chemical releases, the use of hazardous substances in their communities, to plan emergency preparedness in the event of accidents, and to attempt to reduce the toxic chemicals in areas in which they live, work and visit." *Ibid.*  The members' "safety, health, recreational, economic, aesthetic and environmental interests"**1018 in the information, it is claimed, "have been, are being, and will be adversely affected by [petitioner's] actions in failing to file timely and required reports under EPCRA." *Ibid.*

FN6. EPCRA states that "any person may commence a civil action *on his own behalf*...."42 U.S.C. § 11046(a)(1) (emphasis added). "[P]erson" includes an association, see § 11049(7), so it is arguable that the statute permits respondent to vindicate only its own interests as an organization, and not the interests of its individual members. Since it makes no difference to our disposition of the case, we assume without deciding that the interests of individual members may be the basis of suit.

As appears from the above, respondent asserts petitioner's failure to provide EPCRA information in a timely fashion, and the lingering effects of that failure, as the injury in fact to itself and its members. We have not had occasion to decide whether being

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                    Page 17
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

deprived of information that is supposed to be disclosed under EPCRA-or at least being deprived of it when one has a particular plan for its use-is a concrete injury in fact that satisfies Article III. Cf. _Lujan v. Defenders of Wildlife,_ 504 U.S., at 578, 112 S.Ct., at 2145-2146. And we need not reach that question in the present case because, assuming injury in fact, the complaint fails the third test of standing, redressability.

The complaint asks for (1) a declaratory judgment that petitioner violated EPCRA; (2) authorization to inspect periodically petitioner's facility and records (with costs borne by petitioner); (3) an order requiring petitioner to provide respondent copies of all compliance reports submitted to the EPA; (4) an order requiring petitioner to pay civil penalties of $25,000 per day for each violation of §§ 11022 and 11023; (5) an award of all respondent's "costs, in connection with the investigation and prosecution of this matter, including reasonable attorney and expert witness fees, as authorized by Section 326(f) of [EPCRA]"; and (6) any such further relief as the court deems appropriate. App. 11. None of the specific items of relief sought, and none that we can envision as "appropriate" under the general request, would serve to reimburse respondent for losses caused by the late reporting,*106 or to eliminate any effects of that late reporting upon respondent.[FN7]

> FN7. Justice STEVENS claims that redressability was found lacking in our prior cases because the relief required action by a party not before the Court. _Post,_ at 1028-1028. Even if that were so, it would not prove that redressability is lacking _only_ when relief depends on the actions of a third party. But in any event, Justice STEVENS has overlooked decisions that destroy his premise. See _Los Angeles v. Lyons,_ 461 U.S. 95, 105, 103 S.Ct. 1660, 1666-1667, 75 L.Ed.2d 675 (1983); _O'Shea v. Littleton,_ 414 U.S. 488, 495-496, 94 S.Ct. 669, 675-676, 38 L.Ed.2d 674 (1974). He also seems to suggest that redressability always exists when the defendant has directly injured the plaintiff. If that were so, the redressability requirement would be entirely superfluous, since the causation requirement asks whether the injury is "fairly ... trace[able] to the challenged action of the defendant, and

not ... th[e] resul[t] [of] the independent action of some third party not before the court." _Simon v. Eastern Ky. Welfare Rights Organization,_ 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976).

The first item, the request for a declaratory judgment that petitioner violated EPCRA, can be disposed of summarily. There being no controversy over whether petitioner failed to file reports, or over whether such a failure constitutes a violation, the declaratory judgment is not only worthless to respondent, it is seemingly worthless to all the world. See _Lewis v. Continental Bank Corp.,_ 494 U.S. 472, 479, 110 S.Ct. 1249, 1254, 108 L.Ed.2d 400 (1990).

[20] Item (4), the civil penalties authorized by the statute, see § 11045(c), might be viewed as a sort of compensation or redress to respondent if they were payable to respondent. But they are not. These penalties-the only damages authorized by EPCRA-are payable to the United States Treasury. In requesting them, therefore, respondent seeks not remediation of its own injury-reimbursement for the costs it incurred as a result of the late filing-but vindication of the rule of law-the "undifferentiated public interest" in faithful execution of EPCRA. _Lujan v. Defenders of Wildlife, supra,_ at 577, 112 S.Ct., at 2145; see also _Fairchild v. Hughes,_ 258 U.S. 126, 129-130, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922). This does not suffice. Justice STEVENS thinks it is enough that respondent will be gratified by seeing petitioner punished for its infractions and that the *107 punishment will deter the risk of future harm. _Post,_ at 1028-1029. If that were so, our holdings in _Linda R.S. v. Richard D.,_ 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), and _Simon v. Eastern Ky. Welfare Rights Organization,_ 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), are inexplicable. Obviously, such a principle would make the redressability requirement **1019 vanish. By the mere bringing of his suit, _every_ plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury. See, _e.g., Allen v. Wright,_ 468 U.S. 737, 754-755, 104 S.Ct. 3315,

118 S.Ct. 1003                                                                    Page 18
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

3326-3327, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 482-483, 102 S.Ct. 752, 763-765, 70 L.Ed.2d 700 (1982). Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.

[21][22][23] Item (5), the "investigation and prosecution" costs "as authorized by Section 326(f)," would assuredly benefit respondent as opposed to the citizenry at large. Obviously, however, a plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself. An "interest in attorney's fees is ... insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Continental Bank Corp., supra,* at 480, 110 S.Ct., at 1255 (citing *Diamond v. Charles,* 476 U.S. 54, 70-71, 106 S.Ct. 1697, 1707-1708, 90 L.Ed.2d 48 (1986)). Respondent asserts that the "investigation costs" it seeks were incurred prior to the litigation, in digging up the emissions and storage information that petitioner should have filed, and that respondent needed for its own purposes. See Brief for Respondent 37-38. The recovery of such expenses unrelated *108 to litigation would assuredly support Article III standing, but the problem is that § 326(f), which is the entitlement to monetary relief that the complaint invokes, covers only the "costs of litigation." FN8 § 11046(f). Respondent finds itself, in other words, impaled upon the horns of a dilemma: For the expenses to be reimbursable under the statute, they must be costs of litigation; but reimbursement of the costs of litigation cannot alone support standing. FN9

FN8. Section 326(f) reads: "The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or the substantially prevailing party whenever the court determines such an award is appropriate." 42 U.S.C. § 11046(f).

FN9. Justice STEVENS contends, *post,* at 1027, n. 16, that this argument involves us

in a construction of the statute, and thus belies our insistence that jurisdictional issues be resolved first. It involves us in a construction of the statute only to the extent of rejecting as frivolous the contention that costs incurred for respondent's own purposes, *not* in preparation for litigation (and hence sufficient to support Article III standing), are nonetheless "costs of litigation" under the statute. As we have described earlier, our cases make clear that frivolous claims are themselves a jurisdictional defect. See *supra,* at 1010.

[24][25] The remaining relief respondent seeks (item (2), giving respondent authority to inspect petitioner's facility and records, and item (3), compelling petitioner to provide respondent copies of EPA compliance reports) is injunctive in nature. It cannot conceivably remedy any past wrong but is aimed at deterring petitioner from violating EPCRA in the future. See Brief for Respondent 36. The latter objective can of course be "remedial" for Article III purposes, when threatened injury is one of the gravamens of the complaint. If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm. But there is no such allegation here-and on the facts of the case, there seems no basis for it. Nothing supports the requested injunctive relief except respondent's generalized interest in deterrence, *109 which is insufficient for purposes of Article III. See *Los Angeles v. Lyons,* 461 U.S., at 111, 103 S.Ct., at 1670.

[26][27] The United States, as *amicus curiae,* argues that the injunctive relief does constitute remediation because "there is a presumption of [future] injury when the defendant has voluntarily ceased its illegal activity in response to litigation," even if that **1020 occurs before a complaint is filed. Brief for United States as *Amicus Curiae* 27-28, and n. 11. This makes a sword out of a shield. The "presumption" the Government refers to has been applied to refute the assertion of mootness by a defendant who, when sued in a complaint that alleges present or threatened injury, ceases the complained-of activity. See, *e.g., United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). It is an immense and unacceptable stretch to call the presumption into service as a substitute for the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv. 1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

allegation of present or threatened injury upon which initial standing must be based. See *Los Angeles v. Lyons, supra,* at 109, 103 S.Ct., at 1669. To accept the Government's view would be to overrule our clear precedent requiring that the allegations of future injury be particular and concrete. *O'Shea v. Littleton,* 414 U.S. 488, 496-497, 94 S.Ct. 669, 676-677, 38 L.Ed.2d 674 (1974). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Id.,* at 495-496, 94 S.Ct., at 676; see also *Renne v. Geary,* 501 U.S. 312, 320, 111 S.Ct. 2331, 2338, 115 L.Ed.2d 288 (1991) ("[T]he mootness exception for disputes capable of repetition yet evading review ... will not revive a dispute which became moot before the action commenced"). Because respondent alleges only past infractions of EPCRA, and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury.

* * *

Having found that none of the relief sought by respondent would likely remedy its alleged injury in fact, we must conclude that respondent lacks standing to maintain this suit, *110 and that we and the lower courts lack jurisdiction to entertain it. However desirable prompt resolution of the merits EPCRA question may be, it is not as important as observing the constitutional limits set upon courts in our system of separated powers. EPCRA will have to await another day.

The judgment is vacated, and the case is remanded with instructions to direct that the complaint be dismissed.

It is so ordered.

Justice O'CONNOR, with whom Justice KENNEDY joins, concurring.

I join the Court's opinion. I agree that our precedent supports the Court's holding that respondent lacks Article III standing because its injuries cannot be redressed by a judgment that would, in effect, require only the payment of penalties to the United States Treasury. As the Court notes, *ante,* at 1019, had respondent alleged a continuing or imminent violation of the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U.S.C. § 11046, the requested injunctive relief may well have

redressed the asserted injury.

I also agree with the Court's statement that federal courts should be certain of their jurisdiction before reaching the merits of a case. As the Court acknowledges, however, several of our decisions "have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question." *Ante,* at 1016. The opinion of the Court adequately describes why the assumption of jurisdiction was defensible in those cases, see *ante,* at 1014-1015, and why it is not in this case, see *ante,* at 1011. I write separately to note that, in my view, the Court's opinion should not be read as cataloging an exhaustive list of circumstances under which federal courts may exercise judgment in "reserv[ing] difficult questions of ... jurisdiction when the case alternatively *111 could be resolved on the merits in favor of the same party," *Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976).

Justice BREYER, concurring in part and concurring in the judgment.

I agree with the Court that the respondent in this case lacks Article III standing. I further agree that federal courts often, and typically should, decide standing questions at the outset of a case. That order of decision (first jurisdiction then the merits) helps better **1021 to restrict the use of the federal courts to those adversarial disputes that Article III defines as the federal judiciary's business. But my qualifying words "often" and "typically" are important. The Constitution, in my view, does not require us to replace those words with the word "always." The Constitution does not impose a rigid judicial "order of operations," when doing so would cause serious practical problems.

This Court has previously made clear that courts may "reserv[e] difficult questions of ... jurisdiction when the case alternatively could be resolved on the merits in favor of the same party." *Norton v. Mathews,* 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d 672 (1976). That rule makes theoretical sense, for the difficulty of the jurisdictional question makes reasonable the court's jurisdictional assumption. And that rule makes enormous practical sense. Whom does it help to have appellate judges spend their time and energy puzzling over the correct answer to an intractable jurisdictional matter, when (assuming an easy answer on the substantive merits) the same party

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv. 1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

would win or lose regardless? More importantly, to insist upon a rigid "order of operations" in today's world of federal-court caseloads that have grown enormously over a generation means unnecessary delay and consequent added cost. See L. Mecham, Judicial Business of the United States Courts: 1996 Report of the Director 16, 18, 23; Report of the Proceedings of the Judicial Conference of the United States **112** 106, 115, 143 (1971) (indicating that between 1971 and 1996, annual appellate court caseloads increased from 132 to 311 cases filed per judgeship, and district court caseloads increased from 341 to 490 cases filed per judgeship). It means a more cumbersome system. It thereby increases, to at least a small degree, the risk of the "justice delayed" that means "justice denied."

For this reason, I would not make the ordinary sequence an absolute requirement. Nor, even though the case before us is ordinary, not exceptional, would I simply reserve judgment about the matter. *Ante* at 1020 (O'CONNOR, J., concurring). I therefore join only Parts I and IV of the Court's opinion.

Justice STEVENS, with whom Justice SOUTER joins as to Parts I, III, and IV, and with whom Justice GINSBURG joins as to Part III, concurring in the judgment.

This case presents two questions: (1) whether the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U.S.C. § 11001 *et seq.,* confers federal jurisdiction over citizen suits for wholly past violations; and (2) if so, whether respondent has standing under Article III of the Constitution. The Court has elected to decide the constitutional question first and, in doing so, has created new constitutional law. Because it is always prudent to avoid passing unnecessarily on an undecided constitutional question, see *Ashwander v. TVA,* 297 U.S. 288, 345-348, 56 S.Ct. 466, 482-484, 80 L.Ed. 688 (1936) (BRANDEIS, J., concurring), the Court should answer the statutory question first. Moreover, because EPCRA, properly construed, does not confer jurisdiction over citizen suits for wholly past violations, the Court should leave the constitutional question for another day.

## I

The statutory issue in this case can be viewed in one of two ways: whether EPCRA confers "jurisdiction" over citizen suits for wholly past violations, or whether the statute **\*113** creates such a "cause of action." Under either analysis, the Court has the power to answer the statutory question first.

EPCRA frames the question in terms of "jurisdiction." Section 326(c) states:

"The district court shall have jurisdiction in actions brought under [§ 326(a) ] against an owner or operator of a facility to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement." 42 U.S.C. § 11046(c).

Thus, if § 326(a) authorizes citizen suits for wholly past violations, the district court has jurisdiction over these actions; if it does not, the court lacks jurisdiction.

Given the text of the statute, it is not surprising that the parties and the District Court framed the question in jurisdictional **\*\*1022** terms. Respondent's complaint alleged that the District Court had "subject matter jurisdiction under Section 326(a) of EPCRA, 42 U.S.C. § 11046(a)." App. 3. The merits questions that were raised by respondent's complaint were whether Steel Company violated EPCRA and, if so, what relief should be granted. The District Court, however, made no ruling on the merits when it granted Steel Company's motion to dismiss. It held that dismissal was required because respondent had merely alleged "a failure to timely file the required reports, a violation of the Act for which there is no jurisdiction for a citizen suit." App. to Pet. for Cert. A26.[FN1] Steel Company has also framed the **\*114** question as a jurisdictional one in its briefs before this Court. [FN2]

FN1. See also *Don't Waste Arizona, Inc. v. McLane Foods, Inc.,* 950 F.Supp. 972, 977-978 (D.Ariz.1997) ("[T]his Court has jurisdiction to hear this citizen suit brought pursuant to 42 U.S.C. § 11046(a) for a wholly past violation of the EPCRA"); *Delaware Valley Toxics Coalition v. Kurz-Hastings,* 813 F.Supp. 1132, 1141 (E.D.Pa.1993) ("This court concludes that 42 U.S.C. § 11046(a)(1) does provide the federal courts with jurisdiction for wholly past violations of the EPCRA"); *Atlantic States Legal Foundation v. Whiting Roll-Up*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                           Page 21
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

*Door Manufacturing Corp., 772 F.Supp. 745, 750 (W.D.N.Y.1991)* ("The plain language of EPCRA's reporting, enforcement and civil penalty provisions, when logically viewed together, compel a conclusion that EPCRA confers federal jurisdiction over citizen lawsuits for past violations").

FN2. Brief for Petitioner 12 ("A statute conferring jurisdiction on the federal courts should ... be strictly construed, and any doubts resolved against jurisdiction. Here there are serious doubts that Congress intended citizens to sue for past EPCRA violations, and all citizen plaintiffs can highlight is a slight difference in language and attempt to stretch that difference into federal jurisdiction"); see also *id.,* at 26, 30.

The threshold issue concerning the meaning of § 326 is virtually identical to the question that we decided in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).* In that case, we considered whether § 505(a) of the Clean Water Act allows suits for wholly past violations.[FN3] We unanimously characterized that question as a matter of "jurisdiction":

FN3. Gwaltney contended that "because its last recorded violation occurred several weeks before respondents filed their complaint, the District Court lacked subject-matter jurisdiction over respondents' action." *Gwaltney,* 484 U.S., at 55, 108 S.Ct., at 380.

"In this case, we must decide whether § 505(a) of the Clean Water Act, also known as the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a), confers federal jurisdiction over citizen suits for wholly past violations." *Id.,* at 52, 108 S.Ct., at 378-379.

See also *Block v. Community Nutrition Institute, 467 U.S. 340, 353, n. 4, 104 S.Ct. 2450, 2457, n. 4, 81 L.Ed.2d 270 (1984)* (citing *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, 414 U.S. 453, 456, 465, n. 13, 94 S.Ct. 690, 692, 696, n. 13, 38 L.Ed.2d 646 (1974).)* If we

resolve the comparable statutory issue in the same way in this case, federal courts will have no jurisdiction to address the merits in future similar cases. Thus, this is not a case in which the choice between resolving the statutory question or the standing question first is a choice between a merits issue and a jurisdictional\*115 issue; rather, it is a choice between two jurisdictional issues.

We have routinely held that when presented with two jurisdictional questions, the Court may choose which one to answer first. In *Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972),* for example, we were presented with a choice between a statutory jurisdictional question and a question of Article III standing. In that case, the United States, as respondent, argued that petitioner lacked standing under the Administrative Procedure Act and under the Constitution.[FN4]    Rather than taking up the constitutional issue, the Court stated:

FN4. *405 U.S., at 753-755, 92 S.Ct., at 1375-1376* (App. to opinion of Douglas, J., dissenting) (Extract from Oral Argument of the Solicitor General); Brief for Respondent in *Sierra Club v. Morton,* O.T.1970, No. 70-34, p. 18 ("The irreducible minimum requirement of standing reflects the constitutional limitation of judicial power to 'Cases' and 'Controversies'-'whether the party invoking federal court jurisdiction has "a personal stake in the outcome of the controversy"'... and whether the dispute touches upon the "legal relations of parties having adverse legal interests." ' *Flast v. Cohen,* 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968)]"); see also Brief for County of Tulare as *Amicus Curiae* in *Sierra Club v. Morton,* O.T.1970, No. 70-34, pp. 13-14 ("This Court long ago held that to have standing ... a party must show he has sustained or is immediately in danger of sustaining some direct injury ... and not merely that he suffers in some indefinite way in common with people generally. This is an outgrowth of Article III of the Constitution which limits the jurisdiction of federal courts to cases and controversies. U.S. CONST. art III, § 2" (citation and internal quotation marks omitted)).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                                    Page 22
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

**\*\*1023** "Where ... Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, *the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.*" *Id., at 732, 92 S.Ct., at 1364-1365* (emphasis added).

The Court concluded that petitioner lacked standing under the statute, *id., at 732-741, 92 S.Ct., at 1364-1369,* and, therefore, did not need to *\*116* decide whether petitioner had suffered a sufficient injury under Article III.

Similarly, in *Block v. Community Nutrition Institute, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984),* the Court was faced with a choice between a statutory jurisdictional issue and a question of Article III standing. The Court of Appeals had held that the respondents had standing under both the statute and the Constitution. *698 F.2d 1239, 1244-1252 (C.A.D.C.1983).* On writ of certiorari to this Court, the United States, as petitioner, argued both issues: that the respondents did not come within the "zone of interests" of the statute, and that they did not have standing under Article III of the Constitution.[FN5] A unanimous Court bypassed the constitutional standing question in order to decide the statutory question. It therefore construed the statute, and concluded that respondents could not bring suit under the statute. The only mention of the constitutional question came in a footnote at the end of the opinion: "Since congressional preclusion of judicial review is in effect jurisdictional, we need not address the standing issue decided by the Court of Appeals in this case." *Block, 467 U.S., at 353, n. 4, 104 S.Ct., at 2457, n. 4* (citing *National Railroad Passenger Corp., 414 U.S., at 456, 465, and n. 13, 94 S.Ct., at 692, 696, and n. 13*).

> FN5. Brief for Petitioners in *Block v. Community Nutrition Institute,* O.T.1983, No. 83-458, pp. 32-50 (arguing that respondents failed to meet the injury-in-fact and redressability requirements of Article III); see also Brief for Respondents in *Block v. Community Nutrition Institute,* O.T.1983, No. 83-458, pp. 17-28; Reply Brief for Petitioners in *Block v. Community Nutrition*

*Institute,* O.T.1983, No. 83-458, pp. 15-17.

Finally, in *Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979),* we were also faced with a choice between a statutory and constitutional jurisdictional question. *Id., at 93, 99 S.Ct., at 1605* ("This case presents both statutory and constitutional questions concerning standing to sue under Title VIII"). The statutory question was whether respondents had standing to sue under § 812 of the Fair Housing Act. The Court, *\*117* reluctant to address the constitutional question, opted to decide the statutory question first so as to avoid the constitutional question if possible:

> "The issue [of the meaning of § 812] is a critical one, for if the District Court correctly understood and applied § 812 [in denying respondents standing under the statute], we do not reach the question whether the minimum requirements of Art. III have been satisfied. If the Court of Appeals is correct [in holding that respondents have statutory standing], however, then the constitutional question is squarely presented." *Id., at 101, 99 S.Ct., at 1608.*

See also *Bennett v. Spear, 520 U.S. 154, 164, 117 S.Ct. 1154, 1162, 137 L.Ed.2d 281 (1997)* (footnote omitted) (opinion of SCALIA, J.) (stating that "[t]he first question in the present case is whether the [Endangered Species Act's] citizen-suit provision ... negates the zone-of-interests test," and turning to the constitutional standing question only after determining that standing existed under the statute); *United Food and Commercial Workers v. Brown Group, Inc., 517 U.S. 544, 548-550, 116 S.Ct. 1529, 1532-1533, 134 L.Ed.2d 758 (1996)* (analyzing the statutory question before turning to the constitutional **\*\*1024** standing question); *Cross-Sound Ferry Services, Inc. v. ICC, 934 F.2d 327, 341 (C.A.D.C.1991)* (THOMAS, J., concurring in part and concurring in denial of petition for review) (courts exceed the scope of their power "only if the ground passed over is jurisdictional and the ground rested upon is non-jurisdictional, for courts properly rest on one jurisdictional ground instead of another"). Thus, our precedents clearly support the proposition that, given a choice between two jurisdictional questions-one statutory and the other constitutional-the Court has the power to answer the statutory question first.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

Rather than framing the question in terms of "jurisdiction," it is also possible to characterize the statutory issue in this case as whether respondent's complaint states a "cause *118 of action."[FN6] Framed this way, it is also clear that we have the power to decide the statutory question first. As our holding in _Bell v. Hood, 327 U.S. 678, 681-685, 66 S.Ct. 773, 775-778, 90 L.Ed. 939 (1946)_, demonstrates, just as a court always has jurisdiction to determine its own jurisdiction, _United States v. Mine Workers, 330 U.S. 258, 290, 67 S.Ct. 677, 694, 91 L.Ed. 884 (1947)_, a federal court also has jurisdiction to decide whether a plaintiff who alleges that she has been injured by a violation of federal law has stated a cause of action.[FN7] Indeed, _Bell_ held that we have jurisdiction to decide this question _even when it is unclear whether the plaintiff's injuries can be redressed._[FN8] Thus, _Bell_ demonstrates that the Court *119 has the power to decide whether a cause of action exists even when it is unclear whether the plaintiff has standing.[FN9]

> FN6. As Justice Cardozo stated, " ' "cause of action" may mean one thing for one purpose and something different for another.' " _Davis v. Passman, 442 U.S. 228, 237, 99 S.Ct. 2264, 2272, 60 L.Ed.2d 846 (1979)_ (quoting _United States v. Memphis Cotton Oil Co., 288 U.S. 62, 67-68, 53 S.Ct. 278, 280, 77 L.Ed. 619 (1933)_). Under one meaning of the term, it is clear that citizens have a "cause of action" to sue under the statute. Under that meaning, "cause of action is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." _Davis, 442 U.S., at 240, and n. 18, 99 S.Ct., at 2274 and n. 18_ (emphasis deleted); see also _id., at 239, 99 S.Ct., at 2274_ ("The concept of a 'cause of action' is employed specifically to determine _who_ may judicially enforce the statutory rights or obligations" (emphasis added)). Since EPCRA expressly gives citizens the right to sue, _42 U.S.C. § 11046(a)(1)_, there is no question that citizens are "member[s] of the class of litigants that may, as a matter of law, appropriately invoke the power of the court," _Davis, 442 U.S., at 240, and n. 18, 99 S.Ct., at 2274 and n. 18._

> FN7. "Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." _Bell, 327 U.S., at 682, 66 S.Ct., at 776._

> FN8. In _Bell_, a precursor to _Bivens v. Six Unknown Named Fed. Narcotics Agents, 403 U.S.388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)_, petitioners brought suit in federal court "to recover damages in excess of $3,000 from ... agents of the Federal Bureau of Investigation" for allegedly violating their Fourth and Fifth Amendment rights. _327 U.S., at 679, 66 S.Ct., at 774._ The question whether petitioners' injuries were redressable-"whether federal courts can grant money recovery for damages said to have been suffered as a result of federal officers violating the Fourth and Fifth Amendments"-was an open one, _id., at 684, 66 S.Ct., at 777_ (which the Court did not decide until _Bivens, 403 U.S., at 389, 91 S.Ct., at 2001_). Nonetheless, even though it was unclear whether there was a remedy, the Court held that federal courts have jurisdiction to determine whether a cause of action exists. _327 U.S., at 685, 66 S.Ct., at 777-778._

> FN9. The Court incorrectly states that I "used to understand the fundamental distinction between arguing no cause of action and arguing no Article III redressability,"_ante,_ at 1013. The Court gives me too much credit. I have never understood any fundamental difference between arguing: (1) plaintiff's complaint does not allege a cause of action because the law does "not provide a remedy" for the plaintiff's injury; and (2) plaintiff's injury is "not redressable." In _Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 398, 99 S.Ct. 1171, 1175-1176, 59 L.Ed.2d 401 (1979)_, we stated that the absence of a remedy, _i.e._ the lack of redressability, was not the sort of jurisdictional issue that the Court raises on its own motion. That was the law when that case was decided, and it would still be the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                                      Page 24
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

law today if the Court had not supplemented the standing analysis set forth in *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), with its current fascination with "redressability." What has changed is not the admittedly imperfect state of my understanding, but rather the state of the Court's standing doctrine.

*National Railroad Passenger Corp.* also makes it clear that we have the power to **1025 decide this question before addressing other threshold issues. In that case, we were faced with the interrelated questions of "whether the Amtrak Act can be read to create a private right of action to enforce compliance with its provisions; whether a federal district court has jurisdiction under the terms of the Act to entertain such a suit [under 28 U.S.C. § 1337[FN10]; and whether respondent has [statutory] standing to bring such a suit." 414 U.S., at 455-456, 94 S.Ct., at 692. In choosing its method of analysis, the Court stated:

> FN10. Section 1337 states, in relevant part: "[D]istrict courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." 28 U.S.C. § 1337(a); see also *Potomac Passengers Assn. v. Chesapeake & Ohio R. Co.,* 475 F.2d 325, 339 (C.A.D.C.1973), rev'd on other grounds, *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

*120 "[H]owever phrased, the *threshold question* clearly is whether the Amtrak Act or any other provision of law *creates a cause of action* whereby a private party such as the respondent can enforce duties and obligations imposed by the Act; for it is only if such a right of action exists that we need consider whether the respondent had standing to bring the action and whether the District Court had jurisdiction to entertain it." *Id.,* at 456, 94 S.Ct., at 692 (emphasis added).[FN11]

> FN11. The Court distinguished this "threshold question" from respondent's claim "on the merits," *id.,* at 455, n. 3, 94

S.Ct., at 692, n. 3.

After determining that there was no cause of action under the statute, the Court concluded: "Since we hold that no right of action exists, questions of standing and jurisdiction become immaterial." *Id.,* at 465, n. 13, 94 S.Ct., at 696 n. 13.[FN12]

> FN12. In insisting that the Article III standing question must be answered first, the Court finds itself in a logical dilemma. For if "A" (whether a cause of action exists) can be decided before "B" (whether there is statutory standing), *id.,* at 456, 465, n. 13, 94 S.Ct., at 692, 696, n. 13; and if "B" (whether there is statutory standing) can be decided before "C" (whether there is Article III standing), *e.g., Block v. Community Nutrition Institute,* 467 U.S. 340, 353, n. 4, 104 S.Ct. 2450, 2458, n. 4, 81 L.Ed.2d 270 (1984); then logic dictates that "A" (whether a cause of action exists) can be decided before "C" (whether there is Article III standing)-precisely the issue of this case.

Thus, regardless of whether we characterize this issue in terms of "jurisdiction" or "causes of action," the Court clearly has the power to address the statutory question first. *Gwaltney* itself powerfully demonstrates this point. As noted, that case involved a statutory question virtually identical to the one presented here-whether the statute permitted citizens to sue for wholly past violations. While the Court framed the question as one of "jurisdiction," *supra,* at 1022, it could also be said that the case presented the question whether the plaintiffs had a "cause of action." Regardless of the label, the Court resolved the statutory question without pausing to consider whether the plaintiffs had standing *121 to sue for wholly past violations.[FN13] Of course, the fact that we did not discuss standing in *Gwaltney* does not establish that the plaintiffs had standing there. Nonetheless, it supports the proposition that-regardless of how the issue is characterized-the Court has the power to address the virtually identical statutory question in this case as well.

> FN13. In *Gwaltney,* in addition to answering the question whether the statute confers jurisdiction over citizen suits for wholly past violations, we considered whether the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                    Page 25
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

allegation of ongoing injury sufficed to support jurisdiction. The fact that we discussed "standing" in connection with that secondary issue, <u>484 U.S., at 65-66, 108 S.Ct., at 385-386</u>, adds significance to the omission of even a passing reference to any standing issue in connection with the principal holding.

The Court disagrees, arguing that the standing question must be addressed first. Ironically, however, before "first" addressing standing, the Court takes a long excursion that entirely loses sight of the basic reason why standing is a matter of such importance to the proper functioning of the judicial process. The "gist of the question of standing" is whether plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for **1026 illumination of difficult constitutional questions."[FN14] The Court completely disregards this core purpose of standing in its discussion of "hypothetical jurisdiction." Not only is that portion of the Court's opinion pure dictum because it is entirely unnecessary to an explanation of the Court's decision; it is also not informed by any adversary submission by either party. Neither the topic of "hypothetical jurisdiction," nor any of the cases analyzed, distinguished, and criticized in Part III, was the subject of any comment in any of the briefs submitted by the parties or their *amici*. It therefore did not benefit from the "concrete adverseness" that the standing doctrine is meant to ensure. The discussion, in short, "comes *122 to the same thing as an advisory opinion, disapproved by this Court from the beginning." *Ante*, at 1016; see also <u>Muskrat v. United States, 219 U.S. 346, 362, 31 S.Ct. 250, 256, 55 L.Ed. 246 (1911)</u> (stressing that Article III limits federal courts to "deciding cases or controversies arising between opposing parties").[FN15]

FN14. <u>Baker v. Carr, 369 U.S., at 204, 82 S.Ct., at 703.</u>

FN15. The Court boldly distinguishes away no fewer than five of our precedents. In each of these five cases, the Court avoided deciding a jurisdictional issue by assuming that jurisdiction existed for the purpose of that case. In <u>Norton v. Mathews, 427 U.S. 524, 532, 96 S.Ct. 2771, 2775, 49 L.Ed.2d</u>

<u>672 (1976)</u>, for example, we stated:

"It ... is evident that, whichever disposition we undertake, the effect is the same. It follows that there is no need to decide the theoretical question of jurisdiction in this case. In the past, we similarly have reserved difficult questions of our jurisdiction when the case alternatively could be resolved on the merits in favor of the same party. See <u>Secretary of the Navy v. Avrech, 418 U.S. 676, 94 S.Ct. 3039, 41 L.Ed.2d 1033 (1974)</u>. The Court has done this even when the original reason for granting certiorari was to resolve the jurisdictional issue. See <u>United States v. Augenblick, 393 U.S. 348, 349-352, 89 S.Ct. 528, 529-532, 21 L.Ed.2d 537 (1969)</u>.... Making the assumption, then, without deciding, that our jurisdiction in this cause is established, we affirm the judgment in favor of the Secretary ...."

See also <u>Philbrook v. Glodgett, 421 U.S. 707, 720-722, 95 S.Ct. 1893, 1901-1903, 44 L.Ed.2d 525 (1975)</u> (opinion of REHNQUIST, J.) (declining to reach "subtle and complex" jurisdictional issue and assuming that jurisdiction existed); <u>Secretary of Navy v. Avrech, 418 U.S. 676, 677-678, 94 S.Ct. 3039, 3039-3040, 41 L.Ed.2d 1033 (1974)</u>(per curiam) ("[a]ssuming, *arguendo*, that the District Court had jurisdiction"; leaving "to a future case the resolution of the jurisdictional issue"); <u>Chandler v. Judicial Council of Tenth Circuit, 398 U.S. 74, 89, 90 S.Ct. 1648, 1656, 26 L.Ed.2d 100 (1970)</u> ("Whether the Council's action was administrative action not reviewable in this Court, or whether it is reviewable here, plainly petitioner has not made a case for the extraordinary relief of mandamus or prohibition"); <u>United States v. Augenblick, 393 U.S. 348, 351-352, 89 S.Ct. 528, 531-532, 21 L.Ed.2d 537 (1969)</u> (assuming, *arguendo*, that jurisdiction existed).

Moreover, in addition to the five cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                Page 26
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

that the Court distinguishes, there are other cases that support the notion that a court can assume jurisdiction. See, e.g., *Moor v. County of Alameda*, 411 U.S. 693, 715, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973) ("Whether there exists judicial power to hear the state law claims against the County is, in short, a subtle and complex question with far-reaching implications. But we do not consider it appropriate to resolve this difficult issue in the present case, for we have concluded that even assuming, *arguendo*, the existence of power to hear the claim, the District Court [did not err]"); *Neese v. Southern R. Co.*, 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955)(*per curiam*) ("We reverse the judgment of the Court of Appeals without reaching the constitutional challenge to that court's jurisdiction.... Even assuming such appellate power to exist ..., [the Court of Appeals erred]"); see also *Ellis v. Dyson*, 421 U.S. 426, 436, 95 S.Ct. 1691, 1697, 44 L.Ed.2d 274 (1975) (REHNQUIST, J., concurring) ("While it would have been more in keeping with conventional adjudication had [the District Court] first inquired as to the existence of a case or controversy, ... I cannot fault the District Court for disposing of the case on what it quite properly regarded at that time as an authoritative ground of decision. Indeed, this Court has on occasion followed essentially the same practice").

Because this case involves a choice between two threshold questions that are intricately interrelated, I do not take a position on the propriety of courts assuming jurisdiction. Nonetheless, I strongly disagree with the Court's decision to reach out and decide this question, especially in light of the fact that we have not had the benefit of briefing and argument. See *Philbrook*, 421 U.S., at 721, 95 S.Ct., at 1902 (opinion of REHNQUIST, J.) (declining to answer a "complex question of federal jurisdiction" because of "the absence of substantial aid from the briefs of either of the parties"); *Avrech*, 418 U.S., at 677, 94 S.Ct., at 3040

("Without the benefit of further oral argument, we are unwilling to decide the difficult jurisdictional issue which the parties have briefed"); *ante,* at 1014 (noting that the *Avrech* Court "was unwilling to decide the jurisdictional question without oral argument" and emphasizing the importance of zealous advocacy to sharpen issues).

*123 The doctrine of "hypothetical jurisdiction" is irrelevant because this case presents **1027 us with a choice between two threshold questions that are intricately interrelated-as there is only a standing problem if the statute confers jurisdiction over suits for wholly past violations. The Court's opinion reflects this fact, as its analysis of the standing issue is predicated on the hypothesis that § 326 may be read to confer jurisdiction over citizen suits for wholly past violations. If, as I think it should, the Court were to reject that hypothesis and construe § 326,[FN16] the standing discussion *124 would be entirely unnecessary. Thus, ironically, the Court is engaged in a version of the "hypothetical jurisdiction" that it has taken pains to condemn at some length.

> FN16. Indeed, the Court acknowledges-as it must-that the Court has the power to construe the statute, as it is impossible to resolve the standing issue without construing some provisions of EPCRA. Thus, in order to determine whether respondent's investigation and prosecution costs are sufficient to confer standing, the Court construes § 326(f) of EPCRA, which authorizes the district court to "award costs of litigation" to the prevailing party. *Ante,* at 1018-1019. Yet if § 326(f) were construed to cover the cost of the investigation that preceded the filing of respondent's complaint, even under the Court's reasoning respondent would have alleged a "redressable" injury and would have standing. See *ibid.*

## II

There is an important reason for addressing the statutory question first: to avoid unnecessarily passing on an undecided constitutional question. *New*

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

*York Transit Authority v. Beazer,* 440 U.S. 568, 582-583, 99 S.Ct. 1355, 1364-1365, 59 L.Ed.2d 587 (1979); *Ashwander v. TVA,* 297 U.S. 288, 345-348, 56 S.Ct. 466, 482-484, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).[FN17]    Whether correct or incorrect, the Court's constitutional holding represents a significant extension of prior case law.

> FN17. There are two other reasons that counsel in favor of answering the statutory question first. First, it is the statutory question that has divided the courts of appeals and that we granted certiorari to resolve. See Pet. for Cert. i. Second, the meaning of the statute is a matter of general and national importance, whereas the Court's answer to the constitutional question depends largely on a construction of the allegations of this particular complaint, *ante,* at 1017 ("We turn now to the particulars of respondent's complaint to see how it measures up to Article III's requirements").

The Court's conclusion that respondent does not have standing comes from a mechanistic application of the "redressability" aspect of our standing doctrine. "Redressability," of course, does not appear anywhere in the text of the Constitution. Instead, it is a judicial creation of the past 25 years, see *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 38, 41-46, 96 S.Ct. 1917, 1924, 1925-1928, 48 L.Ed.2d 450 (1976); *Linda R.S. v. Richard D.,* 410 U.S. 614, 617-618, 93 S.Ct. 1146, 1148-1149, 35 L.Ed.2d 536 (1973)-a judicial interpretation of the "Case" requirement of Article III, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559-561, 112 S.Ct. 2130, 2135-2137, 119 L.Ed.2d 351 (1992).[FN18]

> FN18. In an attempt to demonstrate that redressability has always been a component of the standing doctrine, the Court cites our decision in *Marye v. Parsons,* 114 U.S. 325, 5 S.Ct. 932, 29 L.Ed. 205 (1885), a case in which neither the word "standing" nor the word "redressability" appears.

*125 In every previous case in which the Court has denied standing because of a lack of redressability, the plaintiff was challenging some governmental action or inaction. *Leeke v. Timmerman,* 454 U.S. 83, 85-87, 102 S.Ct. 69, 70-71, 70 L.Ed.2d 65 (1981)(per

curiam) (suit against Director of the Department of Corrections and another prison official); *Simon, 426 U.S., at 28, 96 S.Ct., at 1919-1920 (suit against the Secretary of the Treasury and the Commissioner of Internal Revenue); *Warth v. Seldin,* 422 U.S. 490, 493, 95 S.Ct. 2197, 2202, 45 L.Ed.2d 343 (1975) (suit against the town of Penfield and members of Penfield's Zoning, Planning, and Town Boards); *Linda R.S., 410 U.S., at 615-616, 619, 93 S.Ct., at 1147-1148, 1149-1150 (suit against prosecutor); see also *Renne v. Geary,* 501 U.S. 312, 314, 111 S.Ct. 2331, 2335, 115 L.Ed.2d 288 (1991) (suit against the city and County of San Francisco, its board of supervisors, and other local officials).[FN19]  **1028 None of these cases involved an attempt by one private party to impose a statutory sanction on another private party.[FN20]

> FN19. Although the Court discussed redressability, *Renne* did not in fact turn on that issue. While the Court stated that "[t]here is reason to doubt ... that the injury alleged ... can be redressed" by the relief sought, 501 U.S., at 319, 111 S.Ct., at 2337, it then went on to hold that the claims were nonjusticiable because "respondents have not demonstrated a live controversy ripe for resolution by the federal courts,"*id.,* at 315, 320-324, 111 S.Ct., at 2338-2340.

> FN20. This distinction is significant, as our standing doctrine is rooted in separation-of-powers concerns. *E.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573-578, 112 S.Ct. 2130, 2143-2148, 119 L.Ed.2d 351 (1992); *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); see also *infra,* at 1029-1030.

In addition, in every other case in which this Court has held that there is no standing because of a lack of redressability, the injury to the plaintiff by the defendant was indirect (*e.g.,* dependent on the action of a third party). This is true in the two cases that the Court cites for the "redressability" prong, *ante,* at 1016; see also *Simon, 426 U.S., at 40-46, 96 S.Ct., at 1925-1928 ("[T]he 'case or controversy' limitation of Art. III... requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, *126 and not injury that results from the independent action of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                    Page 28

523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv. 1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

some third party not before the court " (emphasis added)); *Warth*, 422 U.S., at 504-508, 95 S.Ct., at 2207-2210 (stating that "the indirectness of the injury ... may make it substantially more difficult to meet the minimum requirement of Art. III," and holding that the injury at issue was too indirect to be redressable), as well as in every other case in which the Court denied standing because of a lack of redressability, *Leeke*, 454 U.S., at 86-87, 102 S.Ct., at 70-71 (injury indirect because it turned on the action of a prosecutor, a party not before the Court); *Linda R.S.*, 410 U.S., at 617-618, 93 S.Ct., at 1148-1149 (stating that "[t]he party who invokes [judicial] power must be able to show ... that he has sustained or is immediately in danger of sustaining some *direct* injury" (emphasis in original) (internal quotation marks omitted); injury indirect because it turned on the action of the father, a party not before the Court); see also 3 K. Davis & R. Pierce, Administrative Law Treatise 30 (3d ed.1994).[FN21] Thus, as far as I am aware, the Court has never held-until today-that a plaintiff who is *directly injured*[FN22] by a defendant lacks standing to sue because of a lack of redressability.[FN23]

FN21. "It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action...." *Ex parte Lévitt*, 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937).

FN22. Assuming that EPCRA authorizes suits for wholly past violations, then Congress has created a legal right in having EPCRA reports filed on time. Although this is not a traditional injury:

"[W]e must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition .... Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before ...." *Lujan v. Defenders of Wildlife*, 504 U.S., at 580, 112 S.Ct., at 2146 (KENNEDY, J., concurring in part and concurring in

judgment); see also *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-374, 102 S.Ct. 1114, 1121-1122, 71 L.Ed.2d 214 (1982); *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205-2206, 45 L.Ed.2d 343 (1975).

FN23. In another context, the Court has specified that there is a critical distinction between whether a defendant is directly or indirectly harmed. In *Lujan v. Defenders of Wildlife*, a case involving a challenge to Executive action, the Court stated:

"When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction-and perhaps on the response of others as well." 504 U.S., at 561-562, 112 S.Ct., at 2137 (emphasis in original).

**\*127** The Court acknowledges that respondent would have had standing if Congress had authorized some payment to respondent. *Ante*, at 1018 ("[T]he civil penalties authorized by the statute ... might be viewed as a sort of compensation or redress to respondent**\*1029** if they were payable to respondent"). Yet the Court fails to specify why payment to respondent-even if only a peppercorn-would redress respondent's injuries, while payment to the Treasury does not. Respondent clearly believes that the punishment of Steel Company, along with future deterrence of Steel Company and others,

redresses its injury, and there is no basis in our previous standing holdings to suggest otherwise.

When one private party is injured by another, the injury can be redressed in at least two ways: by awarding compensatory damages or by imposing a sanction on the wrongdoer that will minimize the risk that the harm-causing conduct will be repeated. Thus, in some cases a tort is redressed by an award of punitive damages; even when such damages are payable to the sovereign, they provide a form of redress for the individual as well.

History supports the proposition that punishment or deterrence can redress an injury. In past centuries in England,[FN24] in the American Colonies, and in the United *128 States,[FN25] private persons regularly prosecuted criminal cases. The interest in punishing the defendant and deterring violations of law by the defendant and others was sufficient to support the "standing" of the private prosecutor even if the only remedy was the sentencing of the defendant to jail or to the gallows. Given this history, the Framers of Article III surely would have considered such proceedings to be "Cases" that would "redress" an injury even though the party bringing suit did not receive any monetary compensation.[FN26]

FN24. "Several scholars have attempted to trace the historical origins of private prosecution in the United States. Without exception, these scholars have determined that the notion of private prosecutions originated in early common law England, where the legal system primarily relied upon the victim or the victim's relatives or friends to bring a criminal to justice. According to these historians, private prosecutions developed in England as a means of facilitating private vengeance." Bessler, The Public Interest and the Unconstitutionality of Private Prosecutors, 47 Ark.L.Rev. 511, 515 (1994) (footnotes omitted).

FN25. "American citizens continued to privately prosecute criminal cases in many locales during the nineteenth century. In Philadelphia, for example, all types of cases were privately prosecuted, with assault and battery prosecutions being the most common. However, domestic disputes short of assault also came before the court. Thus, 'parents of young women prosecuted men for seduction; husbands prosecuted their wives' paramours for adultery; wives prosecuted their husbands for desertion.' Although many state courts continued to sanction the practice of private prosecutions without significant scrutiny during the nineteenth century, a few state courts outlawed the practice." Id., at 518-519 (footnotes omitted); A. Steinberg, The Transformation of Criminal Justice: Philadelphia, 1800-1880, p. 5 (1989) ("Private prosecution and the minor judiciary were firmly rooted in Philadelphia's colonial past. Both were examples of the creative American adaptation of the English common law. By the 17th century, private prosecution was a fundamental part of English common law"); see also F. Goodnow, Principles of the Administrative Law of the United States 412-413 (1905).

FN26. When such a party obtains a judgment that imposes sanctions on the wrongdoer, it is proper to presume that the wrongdoer will be less likely to repeat the injurious conduct that prompted the litigation. The lessening of the risk of future harm is a concrete benefit.

The Court's expanded interpretation of the redressability requirement has another consequence. Under EPCRA, *129 Congress gave enforcement power to state and local governments. 42 U.S.C. § 11046(a)(2). Under the Court's reasoning, however, state and local governments would not have standing to sue for past violations, as a payment to the Treasury would no more "redress" the injury of these governments than it would redress respondent's injury. This would be true *even if Congress explicitly granted state and local governments this power.* Such a conclusion is unprecedented.

It could be argued that the Court's decision is rooted in another separation-of-powers concern: that this citizen suit somehow interferes with the Executive's power to "take Care that the Laws be faithfully executed," Art. II, § 3. It is hard to see, however, how

118 S.Ct. 1003                                                                                    Page 30
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

EPCRA's citizen-suit provision impinges on the power of the Executive. As an initial matter, this is not a case in which respondent merely possesses the " 'undifferentiated public interest' " in seeing EPCRA enforced. *Ante*, at 1018; see also **1030*Lujan v. Defenders of Wildlife*, 504 U.S., at 577, 112 S.Ct., at 2145. Here, respondent-whose members live near Steel Company-has alleged a sufficiently particularized injury under our precedents. App. 5 (complaint alleges that respondent's members "reside, own property, engage in recreational activities, breathe the air, and/or use areas near [Steel Company's] facility").

Moreover, under the Court's own reasoning, respondent would have had standing if Congress had authorized some payment to respondent. *Ante*, at 1018 ("[T]he civil penalties authorized by the statute ... might be viewed as a sort of compensation or redress to respondent if they were payable to respondent"). This conclusion is unexceptional given that respondent has a more particularized interest than a plaintiff in a *qui tam*, an action that is deeply rooted in our history. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541, n. 4, 63 S.Ct. 379, 383, n. 4, 87 L.Ed. 443 (1943) (" 'Statutes providing for actions by a common informer, who himself has no interest whatever in the controversy other than that given by statute, have been in *130 existence for hundreds of years in England, and in this country ever since the foundation of our Government' ") (quoting *Marvin v. Trout*, 199 U.S. 212, 225, 26 S.Ct. 31, 34-35, 50 L.Ed. 157 (1905)); *Adams v. Woods*, 2 Cranch 336, 341, 2 L.Ed. 297 (1805) (opinion of Marshall, C.J.) ("Almost every fine or forfeiture under a penal statute, may be recovered by an action of debt [*qui tam* ] as well as by information [by a public prosecutor]"); 3 W. Blackstone, Commentaries 160 (1768); Caminker, The Constitutionality of *Qui Tam* Actions, 99 Yale L.J. 341, 342, and n. 3 (1989) (describing *qui tam* actions authorized by First Congress); see also *Lujan v. Defenders of Wildlife*, 504 U.S., at 572-573, 112 S.Ct., at 2142-2143.

Yet it is unclear why the separation of powers question should turn on whether the plaintiff receives monetary compensation. In either instance, a private citizen is enforcing the law. If separation-of-powers does not preclude standing when Congress creates a legal right that authorizes compensation to the plaintiff, it is unclear why separation of powers should dictate a contrary result when Congress has created a legal right but has directed that payment be made to the Federal Treasury.

Indeed, in this case (assuming for present purposes that respondent correctly reads the statute) not only has Congress authorized standing, but the Executive Branch has also endorsed its interpretation of Article III. Brief for United States as *Amicus Curiae* 7-30. It is this Court's decision, not anything that Congress or the Executive has done, that encroaches on the domain of other branches of the Federal Government.[FN27]

FN27. Ironically, although the Court insists that the standing question must be answered first, it relies on the merits when it answers the standing question. Proof that Steel Company repeatedly violated the law by failing to file EPCRA reports for eight years should suffice to establish the District Court's power to impose sanctions, or at least to decide what sanction, if any, is appropriate. Evidence that Steel Company was ignorant of the law and has taken steps to avoid future violations is highly relevant to the merits of the question whether any remedy is necessary, but surely does not deprive the District Court of the power to decide the remedy issue. Cf. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ("Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. Such a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts").

*131 It is thus quite clear that the Court's holding today represents a significant new development in our constitutional jurisprudence. Moreover, it is equally clear that the Court has the power to answer the statutory question first. It is, therefore, not necessary to reject the Court's resolution of the standing issue in order to conclude that it would be prudent to answer the question of statutory construction before announcing new constitutional

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

doctrine.

### III

EPCRA's citizen-suit provision states, in relevant part:

"[A]ny person may commence a civil action on his own behalf against ... [a]n owner or operator of a facility for failure to do **1031 any of the following: ... Complete and submit an inventory form under section 11022(a) of this title ... [or][c]omplete and submit a toxic chemical release form under section 11023(a) of this title." 42 U.S.C. §§ 11046(a)(1)(A)(iii)-(iv).

Unfortunately, this language is ambiguous. It could mean, as the Sixth Circuit has held, that a citizen only has the right to sue for a "failure ... to complete and submit" the required forms. Under this reading, once the owner or operator has filed the forms, the district court no longer has jurisdiction. Atlantic States Legal Foundation v. United Musical, 61 F.3d 473, 475 (1995). Alternatively, it could be, as the Seventh Circuit held, that the phrases "under section 11022(a)" and "under section 11023(a)" incorporate the requirements of those sections, including the requirement that the reports be filed by particular dates. 90 F.3d 1237, 1243 (1996).

**132 Although the language of the citizen-suit provision is ambiguous, other sections of EPCRA indicate that Congress did not intend to confer jurisdiction over citizen suits for wholly past violations. First, EPCRA requires the private litigant to give the alleged violator notice at least 60 days before bringing suit. 42 U.S.C. § 11046(d)(1).[FN28] In Gwaltney, we considered the import of a substantially identical notice requirement, and concluded that it indicated a congressional intent to allow suit only for ongoing and future violations:

> FN28. "No action may be commenced under subsection (a)(1)(A) of this section prior to 60 days after the plaintiff has given notice of the alleged violation to the Administrator, the State in which the alleged violation occurs, and the alleged violator. Notice under this paragraph shall be given in such manner as the Administrator shall prescribe by regulation."

"[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit. If we assume, as respondents urge, that citizen suits may target wholly past violations, the requirement of notice to the alleged violator becomes gratuitous. Indeed, respondents, in propounding their interpretation of the Act, can think of no reason for Congress to require such notice other than that 'it seemed right' to inform an alleged violator that it was about to be sued. Brief for Respondents 14." 484 U.S., at 60, 108 S.Ct., at 383.

Second, EPCRA places a ban on citizen suits once EPA has commenced an enforcement action. 42 U.S.C. § 11046(e).[FN29] In Gwaltney, we considered a similar provision and concluded that it indicated a congressional intent to prohibit citizen suits for wholly past violations:

> FN29. "No action may be commenced under subsection (a) of this section against an owner or operator of a facility if the Administrator has commenced and is diligently pursuing an administrative order or civil action to enforce the requirement concerned or to impose a civil penalty under this Act with respect to the violation of the requirement."

**133 "The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than supplant governmental action. ... Permitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit. This danger is best illustrated by an example. Suppose that the Administrator identified a violator of the Act and issued a compliance order .... Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

118 S.Ct. 1003                                                                                   Page 32
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv.
1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

public interest would be curtailed considerably. The same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive." 484 U.S., at 60-61, 108 S.Ct., at 383.

**1032 Finally, even if these two provisions did not resolve the issue, our settled policy of adopting acceptable constructions of statutory provisions in order to avoid the unnecessary adjudication of constitutional questions-here, the unresolved standing question-strongly supports a construction of the statute that does not authorize suits for wholly past violations. As we stated in _Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,_ 485 U.S. 568, 575, 108 S.Ct. 1392, 1397-1398, 99 L.Ed.2d 645 (1988): "This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in _Murray v. Schooner Charming Betsy,_ 2 Cranch 64, 118 [2 L.Ed. 208] (1804), and has for so long been applied by this Court that it is beyond debate." See also *134_NLRB v. Catholic Bishop of Chicago,_ 440 U.S. 490, 500-501, 99 S.Ct. 1313, 1318-1319, 59 L.Ed.2d 533 (1979); _Machinists v. Street,_ 367 U.S. 740, 749-750, 81 S.Ct. 1784, 1789-1790, 6 L.Ed.2d 1141 (1961); _Crowell v. Benson,_ 285 U.S. 22, 62, 52 S.Ct. 285, 296-297, 76 L.Ed. 598 (1932); _Lucas v. Alexander,_ 279 U.S. 573, 577, 49 S.Ct. 426, 428, 73 L.Ed. 851 (1929); _Panama R. Co. v. Johnson,_ 264 U.S. 375, 390, 44 S.Ct. 391, 395, 68 L.Ed. 748 (1924); _United States ex rel. Attorney General v. Delaware & Hudson Co.,_ 213 U.S. 366, 407-408, 29 S.Ct. 527, 535-536, 53 L.Ed. 836 (1909); _Parsons v. Bedford,_ 3 Pet. 433, 448-449, 7 L.Ed. 732 (1830) (opinion of Story, J.).

IV

For these reasons, I concur in the Court's judgment, but do not join its opinion.
Justice GINSBURG, concurring in the judgment.
Congress has authorized citizen suits to enforce the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11001 et seq. Does that authorization, as Congress designed it, permit citizen suits for wholly past violations? For the reasons stated by Justice STEVENS in Part III of his opinion, I agree that the answer is "No." I would follow the path this Court marked in _Gwaltney of_

_Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,_ 484 U.S. 49, 60-61, 108 S.Ct. 376, 382-383, 98 L.Ed.2d 306 (1987), and resist expounding or offering advice on the constitutionality of what Congress might have done, but did not do.

U.S.,1998.
Steel Co. v. Citizens for a Better Environment
523 U.S. 83, 118 S.Ct. 1003, 46 ERC 1097, 140 L.Ed.2d 210, 28 Envtl. L. Rep. 20,434, 98 Cal. Daily Op. Serv. 1512, 98 Daily Journal D.A.R. 2102, 98 CJ C.A.R. 1025, 11 Fla. L. Weekly Fed. S 369

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 17**

Westlaw.

95 S.Ct. 2197                                                                                      Page 1
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

▷Warth v. Seldin,                              joined.
U.S.N.Y. 1975.

        Supreme Court of the United States                    West Headnotes
   Robert WARTH, etc., et al., Petitioners,
                    v.                         **[1] Federal Civil Procedure 170A ☞103.2**
             Ira SELDIN et al.
               No. 73-2024.                    170A Federal Civil Procedure
                                                   170AII Parties
         Argued March 17, 1975.                        170AII(A) In General
         Decided June 25, 1975.                            170Ak103.1 Standing
                                                               170Ak103.2 k. In General; Injury or
Various organizations and individuals resident in the    Interest. Most Cited Cases
Rochester, New York, metropolitan area brought suit        (Formerly 170Ak103.1, 170Ak103)
against town adjacent to Rochester, and against    In essence, the question of standing is whether the
members of zoning, planning and town boards,       litigant is entitled to have the court decide the merits
claiming that town's zoning ordinance effectively  of the dispute or of particular issues.
excluded persons of low and moderate income from
living in the town, in contravention of petitioners'
constitutional rights and in violation of civil rights  **[2] Federal Civil Procedure 170A ☞103.2**
statutes. The United States District Court for the
Western District of New York granted motion to     170A Federal Civil Procedure
dismiss the complaint for lack of standing and for     170AII Parties
failure to state a claim on which relief could be          170AII(A) In General
granted, and an appeal was taken. The Court of             170Ak103.1 Standing
Appeals, Second Circuit, 495 F.2d 1187, reaching               170Ak103.2 k. In General; Injury or
only the standing question, affirmed, and certiorari  Interest. Most Cited Cases
was granted. The Supreme Court, Mr. Justice Powell,    (Formerly 170Ak103.1, 170Ak103, 170Ak1105)
held that whether the rules of standing are considered  Inquiry as to standing involves both constitutional
as aspects of the constitutional requirement that a  limitations on federal court jurisdiction and
plaintiff must make out a 'case or controversy' within  prudential limitations on its exercise; in both
the meaning of art. III, or as prudential limitations on  dimensions, it is founded in concern about the proper,
the courts' role in resolving disputes involving  and properly limited, role of the courts in a
'generalized grievances,' or third parties' legal rights  democratic society.
or interest, none of the petitioners met the threshold
requirement of such rules that to have standing a
complainant must clearly allege facts demonstrating  **[3] Federal Civil Procedure 170A ☞103.2**
that he is a proper party to invoke judicial resolution
of the dispute and the exercise of the court's remedial  170A Federal Civil Procedure
powers.                                                170AII Parties
                                                           170AII(A) In General
                                                               170Ak103.1 Standing
Affirmed.                                                          170Ak103.2 k. In General; Injury or
                                                   Interest. Most Cited Cases
Mr. Justice Douglas filed a dissenting opinion.        (Formerly 170Ak103.1, 170Ak103)
                                                   In its constitutional dimension, standing imports
Mr. Justice Brennan filed a dissenting opinion in  justiciability-whether the plaintiff has made out a
which Mr. Justice White and Mr. Justice Marshall   "case or controversy" between himself and the
                                                   defendant within the meaning of art. III.
                                                   U.S.C.A.Const. art. 3, § 1 et seq.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**[4] Federal Civil Procedure 170A** 🔑 **103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
     (Formerly 170Ak103)
As an aspect of justiciability, the standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf. U.S.C.A.Const. art. 3, § 1 et seq.

**[5] Federal Civil Procedure 170A** 🔑 **103.3**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
        170Ak103.3    k.    Causation;
Redressability. Most Cited Cases
     (Formerly 170Ak103)
The art. III judicial power exists only to redress or otherwise protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. U.S.C.A.Const. art. 3, § 1 et seq.

**[6] Federal Civil Procedure 170A** 🔑 **103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
     (Formerly 170Ak103)
A federal court's jurisdiction can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action.

**[7] Federal Civil Procedure 170A** 🔑 **103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General

      170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
     (Formerly 170Ak103.1, 170Ak103)
The standing question bears close affinity to questions of ripeness-whether the harm asserted has matured sufficiently to warrant judicial intervention-and of mootness-whether the occasion for judicial intervention persists. U.S.C.A.Const. art. 3, § 1 et seq.

**[8] Federal Civil Procedure 170A** 🔑 **103.4**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
        170Ak103.4 k. Rights of Third Parties
or Public. Most Cited Cases
     (Formerly 170Ak103)
When the asserted harm is a "generalized grievance" shared in substantially equal measure by all or by a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction.

**[9] Federal Civil Procedure 170A** 🔑 **103.4**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
        170Ak103.4 k. Rights of Third Parties
or Public. Most Cited Cases
     (Formerly 170Ak103)
Even when the plaintiff has alleged injury sufficient to meet the "case or controversy" requirement of art. III, the plaintiff generally must assert its own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties. U.S.C.A.Const. art. 3, § 1 et seq.

**[10] Federal Civil Procedure 170A** 🔑 **103.2**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
        170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases
     (Formerly 170Ak103.1, 170Ak103)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Although standing in no way depends on the merits of plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted.

**[11] Federal Civil Procedure 170A 🗝103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
        (Formerly 170Ak103)
The actual or threatened injury required by art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. U.S.C.A.Const. art. 3, § 1 et seq.

**[12] Federal Civil Procedure 170A 🗝103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
        (Formerly 170Ak103.1, 170Ak103)
The source of plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes; essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief. U.S.C.A.Const. art. 3, § 1 et seq.

**[13] Federal Civil Procedure 170A 🗝103.4**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.4 k. Rights of Third Parties or Public. Most Cited Cases
        (Formerly 170Ak103)
When a litigant asserts the rights of third parties defensively, as a bar to judgment against him, there is

no art. III standing problem, but the prudential question is governed by considerations closely related to the question whether a person in the litigant's position would have a right of action on the claim. U.S.C.A.Const. art. 3, § 1 et seq.

**[14] Federal Civil Procedure 170A 🗝103.4**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.4 k. Rights of Third Parties or Public. Most Cited Cases
        (Formerly 170Ak103)
In some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claimed relief rests on the legal rights of third parties; in such instances, it has been found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff.

**[15] Federal Civil Procedure 170A 🗝103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or Interest. Most Cited Cases
        (Formerly 170Ak103.1, 170Ak103)
Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules, but art. III's requirement remains: the plaintiff must still allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants. U.S.C.A.Const. art. 3, § 1 et seq.

**[16] Federal Civil Procedure 170A 🗝103.4**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.4 k. Rights of Third Parties or Public. Most Cited Cases
        (Formerly 170Ak103)
So long as art. III's requirement is satisfied, persons

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197                                                    Page 4
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others and, indeed, may invoke the general public interest in support of their claim. U.S.C.A.Const. art. 3, § 1 et seq.

**[17] Federal Civil Procedure 170A ☞392**

170A Federal Civil Procedure
   170AII Parties
      170AII(J)    Defects,    Objections    and
Amendments
         170Ak392 k. Amendments.  Most Cited Cases
     (Formerly 106k406.5(6))

**Federal Civil Procedure 170A ☞1829**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
        170Ak1827 Determination
         170Ak1829 k. Construction of
Pleadings. Most Cited Cases

**Federal Civil Procedure 170A ☞1835**

170A Federal Civil Procedure
   170AXI Dismissal
     170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
        170Ak1827 Determination
         170Ak1835 k. Matters Deemed
Admitted. Most Cited Cases

**Federal Courts 170B ☞797**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)3 Presumptions
        170Bk797 k. Dismissal. Most Cited Cases
For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party; at the same time, it is

within trial court's power to allow or require plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of standing.

**[18] Zoning and Planning 414 ☞590**

414 Zoning and Planning
   414X Judicial Review or Relief
     414X(B) Proceedings
      414k589 Pleading
        414k590 k. Petition, Complaint, or
Application. Most Cited Cases
City residents, who alleged that town zoning ordinance effectively excluded persons of low and moderate income from living in the town, thereby requiring the city to permit more than its fair share of tax-abated housing projects, and who asserted standing as persons of low or moderate income and, coincidentally, as members of minority racial or ethnic groups, failed to allege facts supporting an actionable causal relationship between town's zoning practices and such residents' alleged injury.

**[19] Federal Civil Procedure 170A ☞103.4**

170A Federal Civil Procedure
   170AII Parties
     170AII(A) In General
      170Ak103.1 Standing
        170Ak103.4 k. Rights of Third Parties
or Public. Most Cited Cases
     (Formerly 170Ak103)
When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights, but it may make it substantially more difficult to meet the minimum requirement of art. III: to establish that, in fact, the asserted injury was the consequence of defendants' actions, or that prospective relief will remove the harm. U.S.C.A.Const. art. 3, § 1 et seq.

**[20] Zoning and Planning 414 ☞590**

414 Zoning and Planning
   414X Judicial Review or Relief
     414X(B) Proceedings

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197                                                         Page 5
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

414k589 Pleading
    414k590 k. Petition, Complaint, or
Application. Most Cited Cases
A plaintiff who seeks to challenge exclusionary
zoning practices must allege specific, concrete facts
demonstrating that the challenged practices harm
him, and that he personally would benefit in a
tangible way from the courts' intervention; absent the
necessary allegations of demonstrable, particularized
injury, there can be no confidence of a real need to
exercise the power of judicial review or that relief
can be framed no broader than required by the precise
facts to which the court's ruling would be applied.

[21] Zoning and Planning 414 ☞571

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(A) In General
            414k571 k. Right of Review. Most Cited
Cases
A plaintiff who challenges a zoning ordinance or
zoning practices need not necessarily have a present
contractual interest in a particular project.

[22] Zoning and Planning 414 ☞571

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(A) In General
            414k571 k. Right of Review. Most Cited
Cases

Zoning and Planning 414 ☞590

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(B) Proceedings
            414k589 Pleading
                414k590 k. Petition, Complaint, or
Application. Most Cited Cases
City taxpayers, who alleged that town zoning
ordinance effectively excluded persons of low and
moderate income from living in the town, and who
alleged that they were suffering economic injury
because said zoning practices forced city to provide
additional tax-abated housing, failed to establish a
line of causation between the town's actions and their
injury; but even assuming that they could establish
that the zoning practices harmed them, the basis of

their claim was that the practices violated the
constitutional and statutory rights of third parties, and
their claim thus fell squarely within the prudential
standing rule that normally bars litigants from
asserting the right or legal interests of others in order
to obtain relief from injury to themselves.

[23] Associations 41 ☞20(1)

41 Associations
    41k20 Actions by or Against Associations
        41k20(1) k. In General. Most Cited Cases
An association may have standing in its own right to
seek judicial relief from injury to itself and to
vindicate whatever rights and immunities the
association itself may enjoy; moreover, in attempting
to secure relief from injury to itself, the association
may assert the rights of its members, at least so long
as the challenged infractions adversely affect its
members' associational ties.

[24] Associations 41 ☞20(1)

41 Associations
    41k20 Actions by or Against Associations
        41k20(1) k. In General. Most Cited Cases

Associations 41 ☞20(5)

41 Associations
    41k20 Actions by or Against Associations
        41k20(5) k. Pleading and Proof. Most Cited
Cases
Even in the absence of injury to itself, an association
may have standing solely as the representative of its
members, but the possibility of such representational
standing does not eliminate or attenuate the
constitutional requirement of a case or controversy;
the association must allege that its members, or any
one of them, are suffering immediate or threatened
injury as a result of the challenged action of the sort
that would make out a justiciable case had the
members themselves brought suit. U.S.C.A.Const.
art. 3, § 1 et seq.

[25] Zoning and Planning 414 ☞571

414 Zoning and Planning
    414X Judicial Review or Relief
        414X(A) In General

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

414k571 k. Right of Review. Most Cited Cases

Not-for-profit New York corporation, one of whose purposes was to inquire into reasons for housing shortage for low and moderate income persons in the Rochester, New York, area, was without standing to challenge the constitutionality of town zoning practices which effectively excluded persons of low and moderate income from living in the town, which was adjacent to Rochester, since, even though 9% of the corporation's membership was composed of town residents, prudential considerations strongly counseled against according such residents or the corporation standing on the basis of their complaint that they had been harmed indirectly by the exclusion of others. U.S.C.A.Const. art. 3, § 1 et seq.

**[26]** Zoning and Planning 414 ⚷⟶571

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(A) In General
         414k571 k. Right of Review. Most Cited Cases

Association of firms engaged in residential construction in the Rochester, New York, metropolitan area was without standing to bring suit for damages based on alleged unconstitutionality of town zoning ordinance which effectively excluded persons of low and moderate income from living in the town, which was adjacent to Rochester, where the association alleged no monetary injury to itself and where any injury suffered was peculiar to the individual association member concerned, thus requiring individualized proof of both the fact and extent of injury and individual awards.

**[27]** Zoning and Planning 414 ⚷⟶571

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(A) In General
         414k571 k. Right of Review. Most Cited Cases

Association of firms engaged in residential construction in the Rochester, New York, metropolitan area, which brought suit challenging the constitutionality of adjacent town's zoning ordinance which effectively excluded persons of low and moderate income from living in the town, was without standing to claim prospective relief, absent

any allegation of facts sufficient to show the existence of any injury to association members of sufficient immediacy and ripeness to warrant judicial intervention.

**[28]** Zoning and Planning 414 ⚷⟶571

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(A) In General
         414k571 k. Right of Review. Most Cited Cases

Housing council, a not-for-profit New York corporation comprised of organizations interested in housing problems, was without standing to challenge the constitutionality of town zoning ordinance which effectively excluded persons of low and moderate income from living in the town, where the complaint and record did not indicate that any of the council's members, with one exception, had made any effort involving the town, had taken any steps toward building there, or had any dealings with respondent town officials; and, with respect to the one exception, the council averred no basis for inferring that an earlier controversy between it and respondents remained a live, concrete dispute.

**[29]** Zoning and Planning 414 ⚷⟶571

414 Zoning and Planning
   414X Judicial Review or Relief
      414X(A) In General
         414k571 k. Right of Review. Most Cited Cases

Whether the rules of standing are considered as aspects of the constitutional requirement that a plaintiff must make out a "case or controversy" or as prudential limitations on the courts' role in resolving disputes involving "generalized grievances" or third parties' legal rights or interests, none of the petitioners, in suit challenging the constitutionality of town zoning ordinance which effectively excluded persons of low and moderate income from living in the town, met the threshold requirement of such rules. U.S.C.A.Const. art. 3, § 1 et seq.

**\*\*2200** Syllabus[FN\*]

    [FN\*] The syllabus constitutes no part of the opinion of the Court but has been prepared

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282-287, 50 L.Ed. 499.

**\*490** This action for declaratory and injunctive relief and damages was brought by certain of the petitioners against respondent town of Penfield (a suburb of Rochester, N.Y.), and respondent members of Penfield's Zoning, Planning, and Town Boards, claiming that the town's **\*\*2201** zoning ordinance, by its terms and as enforced, effectively excluded persons of low and moderate income from living in the town, in violation of petitioners' constitutional rights and of 42 U.S.C. ss 1981, 1982, and 1983. Petitioners consist of both the original plaintiffs-(1) Metro-Act of Rochester, a not-for-profit corporation among whose purposes is fostering action to alleviate the housing shortage for low- and moderate-income persons in the Rochester area; (2) several individual Rochester taxpayers; and (3) several Rochester area residents with low or moderate incomes who are also members of minority racial or ethnic groups-and Rochester Home Builders Association (Home Builders), embracing a number of residential construction firms in the Rochester area, which unsuccessfully sought to intervene as a party-plaintiff, and the Housing Council in the Monroe County Area (Housing Council), a not-for-profit corporation consisting of a number of organization interested in housing problems, which was unsuccessfully sought to be added as a party-plaintiff. The District Court dismissed the complaint on the ground, inter alia, that petitioners lacked standing to prosecute the action, and the Court of Appeals affirmed. Held: Whether the rules of standing are considered as aspects of the constitutional requirement that a plaintiff must make out a 'case or controversy' within the meaning of Art. III, or, apart from such requirement, as prudential limitations on the courts' role in resolving disputes involving 'generalized grievances' or third parties' legal rights or interests, none of the petitioners has met the threshold requirement of such rules that to have standing a complainant must clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. Pp. 2205-2215.

**\*491** (a) As to petitioner Rochester residents who assert standing as persons of low or moderate income

and, coincidentally, as members of minority racial or ethnic groups, the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and these petitioners' alleged injury. A plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that such practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Here, these petitioners rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief. Pp. 2207-2210.

(b) With respect to petitioners who assert standing on the basis of their status as Rochester taxpayers, claiming that they are suffering economic injury through increased taxes resulting from Penfield's zoning practices having forced Rochester to provide more taxabated low- or moderate-cost housing than it otherwise would have done, the line of causation between Penfield's actions and such injury is not apparent. But even assuming that these petitioners could establish that the zoning practices harm them, the basis of their claim is that the practices violate the constitutional and statutory rights of third parties-persons of low and moderate income who allegedly are excluded from Penfield. Hence, their claim falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. Pp. 2210-2211.

(c) Petitioner Metro-Act's claims to standing as a Rochester taxpayer and on behalf of its members who are Rochester taxpayers or persons of low or moderate income, are precluded for the reasons applying to the denial of standing to the individual petitioner Rochester taxpayers and persons of low and moderate income. In addition, with respect to Metro-Act's claim to standing because 9% **\*\*2202** of its membership is composed of Penfield residents, prudential considerations strongly counsel against according such residents or Metro-Act standing, where the complaint is that they have been harmed indirectly by the exclusion of others, thus attempting, in the absence of a showing of any exception allowing such a claim, to raise the putative rights of third parties. Trafficante v. Metro-politan Life Ins., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415,

95 S.Ct. 2197
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

distinguished. Pp. 2212-2213.

*492 (d) Petitioner Home Builders, which alleges no monetary injury to itself, has no standing to claim damages on behalf of its members, since whatever injury may have been suffered is peculiar to the individual member concerned, thus requiring individualized proof of both the fact and extent of injury and individual awards. Nor does Home Builders have standing to claim prospective relief, absent any allegation of facts sufficient to show the existence of any injury to members of sufficient immediacy and ripeness to warrant judicial intervention. Pp. 2213-2214.

(e) Petitioner Housing Council has no standing, where the complaint and record do not indicate that any of its members, with one exception, has made any effort involving Penfield, has taken any steps toward building there, or had any dealings with respondents. With respect to the one exception, this petitioner averred no basis for inferring that an earlier controversy between it and respondents remained a live, concrete dispute. Pp. 2214-2215.

495 F.2d 1187, affirmed.

Emmelyn Logan-Baldwin, Rochester, N.Y., for petitioners.
James M. Hartman, Rochester, N.Y., for respondents.

*493 Mr. Justice POWELL delivered the opinion of the Court.
Petitioners, various organizations and individuals resident in the Rochester, N.Y., metropolitan area, brought this action in the District Court for the Western District of New York against the town of Penfield, an incorporated municipality adjacent to Rochester, and against members of Penfield's Zoning, Planning and Town Boards. Petitioners claimed that the town's zoning ordinance, by its terms and as enforced by the defendant board members, respondents here, effectively excluded persons of low and moderate income from living in the town, in contravention of petitioners' First, Ninth, and Fourteenth Amendment rights and in violation of 42 U.S.C. ss 1981, 1982, and 1983. The District Court dismissed the complaint and denied a motion to add petitioner Housing Council in the Monroe County Area, Inc., as party-plaintiff and also a motion by petitioner Rochester Home Builders Association,

Inc., for leave to intervene as party-plaintiff. The Court of Appeals for the Second Circuit affirmed, holding that none of the plaintiffs, and neither Housing Council nor Home Builders Association, had standing to prosecute the action. 495 F.2d 1187 (1974). We granted the petition for certiorari. 419 U.S. 823, 95 S.Ct. 40, 42 L.Ed.2d 47 (1974). For reasons that differ in certain respects from those upon which the Court of Appeals relied, we affirm.

I

Petitioners Metro-Act of Rochester, Inc., and eight individual plaintiffs, on behalf of themselves and all persons similarly situated,[FN1] filed this action on January 24, *494 1972, averring jurisdiction in the District Court under 28 U.S.C. ss 1331 and 1343. The complaint identified**2203 Metro-Act as a not-for-profit New York corporation, the purposes of which are 'to alert ordinary citizens to problems of social concern; . . . to inquire into the reasons for the critical housing shortage for low and moderate income persons in the Rochester area and to urge action on the part of citizens to alleviate the general housing shortage for low and moderate income persons.'[FN2] Plaintiffs Vinkey, Reichert, Warth, and Harris were described as residents of the city of Rochester, all of whom owned real property in and paid property taxes to that city.[FN3] Plaintiff Ortiz, 'a citizen of Spanish/Puerto Rican extraction,' App. 7, also owned real property in and paid taxes to Rochester. Ortiz, however, resided in Wayland, N.Y., some 42 miles from Penfield where he was employed.[FN4] The complaint described plaintiffs Broadnax, Reyes, and Sinkler as residents of Rochester and 'persons fitting within the classification of low and moderate income as hereinafter defined. . . .'[FN5] Ibid. Although *495 the complaint does not expressly so state, the record shows that Broadnax, Reyes, and Sinkler are members of ethnic or racial minority groups: Reyes is of Puerto Rican ancestry; Broadnax and Sinkler are Negroes.

FN1. Plaintiffs claimed to represent, pursuant to Fed.Rule Civ.Proc. 23(b)(2), classes constituting 'all taxpayers of the City of Rochester, all low and moderate income persons residing in the City of Rochester, all black and/or Puerto Rican/Spanish citizens residing in the City of Rochester and all

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197

Page 9

422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

persons employed but excluded from living in the Town of Penfield who are affected or may in the future be affected by the defendants' policies and practices. . . .' App. 9.

FN2.Id., at 8-9.

FN3. Plaintiff Harris further described in the complaint as 'a negro person who is denied certain rights by virtue of her race. . . .' App. 5. We find no indication in the record that Harris had either the desire or intent to live in Penfield was suitable housing to become available. Indeed, petitioners now appear to claim standing for Harris only on the ground that she is a taxpayer of Rochester. See Brief for Petitioners 9, 12.

FN4. According to Ortiz' affidavit, submitted in answer to respondents' motion to dismiss, he was employed in Penfield from 1966 to May 1972. App. 366-367.

FN5. In fact, however, the complaint nowhere defines the term 'low and moderate income' beyond the parenthetical phrase 'without the capital requirements to purchase real estate.'E.g., id., at 18.In addition to the inadequacy of this definition, the record discloses wide variations in the income, housing needs, and money available for housing among the various 'low and moderate income' plaintiffs. See Part III, infra.

Petitioners' complaint alleged that Penfield's zoning ordinance, adopted in 1962, has the purpose and effect of excluding person of low and moderate income from residing in the town. In particular, the ordinance allocates 98% of the town's vacant land to single-family detached housing, and allegedly by imposing unreasonable requirements relating to lot size, setback, floor area, and habitable space, the ordinance increases the cost of single-family detached housing beyond the means of persons of low and moderate income. Moreover, according to petitioners, only 0.3% of the land available for residential construction is allocated to multifamily structures (apartments, townhouses, and the like), and even on this limited space, housing for low and

moderate income persons is not economically feasible because of low density and other requirements. Petitioners also alleged that 'in furtherance of a policy of exclusionary zoning,'id., at 22, the defendant members of Penfield's Town, Zoning, and Planning Boards had acted in an arbitrary and discriminatory manner: they had delayed action on proposals for low- and moderate-cost housing for inordinate periods of time; denied such proposals for arbitrary and insubstantial reasons; refused to grant necessary variances and permits, or to allow tax abatements; failed to provide necessary support services for low- and moderate-cost housing projects; and had **496 amended the ordinance to make approval of such projects virtually impossible.

In sum, petitioners alleged that, in violation of their 'rights, privileges and immunities secured by the Constitution and laws of the United States,'id., at 17, the town and its officials had made 'practically and economically impossible the construction of sufficient numbers **2204 of low and moderate income . . . housing in the Town of Penfield to satisfy the minimum housing requirements of both the Town of Penfield and the metropolitan Rochester area . . ..'FN6 Petitioners alleged, moreover, that by precluding low- and moderate-cost housing, the town's zoning practices also had the effect of excluding persons of minority racial and ethnic groups, since most such persons have only low or moderate incomes.

FN6. App. 25-26.

Petitioners further alleged certain harm to themselves. The Rochester property owners and taxpayers-Vinkey, Reichert, Warth, Harris, and Ortiz-claimed that because of Penfield's exclusionary practices, the city of Rochester had been forced to impose higher tax rates on them and other similarly situated than would otherwise have been necessary. The low- and moderate-income, minority plaintiffs-Ortiz, Broadnax, Reyes, and Sinkler-claimed that Penfield's zoning practices had prevented them from acquiring, by lease or purchase, residential property in the town, and thus had forced them and their families to reside in less attractive environments. To relieve these various harms, petitioners asked the District Court to declare the Penfield ordinance unconstitutional, to enjoin the defendants from enforcing the ordinance, to order the defendants to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197                                                                    Page 10
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

enact and administer a new ordinance designed to alleviate the effects of their past actions, and to award $750,000 in actual and exemplary damages.

*497 On May 2, 1972, petitioner Rochester Home Builders Association, an association of firms engaged in residential construction in the Rochester metropolitan area, moved the District Court for leave to intervene as a party-plaintiff. In essence, Home Builders' intervenor complaint repeated the allegations of exclusionary zoning practices made by the original plaintiffs. It claimed that these practices arbitrarily and capriciously had prevented its member firms from building low- and moderate-cost housing in Penfield, and thereby had deprived them of potential profits. Home Builders prayed for equitable relief identical in substance to that requested by the original plaintiffs, and also for $750,000 in damages.[FN7] On June 7, 1972, Metro-Act and the other original plaintiffs moved to join petitioner Housing Council in the Monroe County Area, Inc., as a party plaintiff. Housing Council is a not-for-profit New York corporation, its membership comprising some 71 public and private organizations interested in housing problems. An affidavit accompanying the motion stated that 17 of Housing Council's member groups were or hoped to be involved in the development of low- and moderate-cost housing, and that one of its members-the Penfield Better Homes Corp.-'is and has been actively attempting to develop moderate income housing' in Penfield, 'but has been stymied by its inability to secure the necessary approvals . . . .'[FN8]

> FN7. Home Builders also asked the District Court to enjoin the defendants from carrying out threatened retaliation against its members if Home Builders joined this litigation.

> FN8. Id., at 174.

Upon consideration of the complaints and of extensive supportive materials submitted by petitioners, the District Court held that the original plaintiffs, Home Builders, and Housing Council lacked standing to prosecute *498 the action, that the original complaint failed to state a claim upon which relief could be granted, that the suit should not proceed as a class action, and that, in the exercise of discretion, Home Builders should not be permitted to

intervene. The court accordingly denied the motion to add Housing Council as a party-plaintiff, denied Home Builders' motion to intervene, and dismissed the complaint. The Court of Appeals affirmed, reaching only the standing questions.

**2205 II

[1][2] We address first the principles of standing relevant to the claims asserted by the several categories of petitioners in this case. In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise. E.g., Barrows v. Jackson, 346 U.S. 249, 255-256, 73 S.Ct. 1031, 1034-1035, 97 L.Ed. 1586 (1953). In both dimensions it is founded in concern about the proper- and properly limited-role of the courts in a democratic society. See Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 221-227, 94 S.Ct. 2925, 2932-2935, 41 L.Ed.2d 706 (1974); United States v. Richardson, 418 U.S. 166, 188-197, 94 S.Ct. 2940, 2952-2956, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).

[3][4][5][6][7] In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on *499 his behalf. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).[FN9] The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .' Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). See Data Processing Service v. Camp, 397 U.S. 150, 151-154, 90 S.Ct., 827, 829-830, 25 L.Ed.2d 184 (1970).[FN10]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN9. See P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 156 (2d ed. 1973).

FN10. The standing question thus bears close affinity to questions of ripeness-whether the harm asserted has matured sufficiently to warrant judicial intervention-and of mootness-whether the occasion for judicial intervention persists. E.g., Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). See Committee Anti-Fascist v. McGrath, 341 U.S. 123, 154-156, 71 S.Ct. 624, 639-640, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

[8][9] Apart from this minimum constitutional mandate, this Court has recognized other limits on the class of persons who may invoke the courts' decisional and remedial powers. First, the Court has held that when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction. E.g., Schlesinger v. Reservists to Stop the War, supra;United States v. Richardson, supra; Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937), Second, even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. E.g., Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). See United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); Barrows v. *500 Jackson, ' supra.Without such limitations-closely related to Art. III concerns but essentially matters of judicial self-governance-the courts would **2206 be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights. See, e.g., Schlesinger v. Reservists to Stop the War, 418 U.S., at 222,94 S.Ct. at 2932.[FN11]

FN11. Cf. Scott, Standing in the Supreme Court-A Functional Analysis, 86 Harv.L.Rev. 645 (1973).

[10][11][12][13][14][15][16] Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, e.g., Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), it often turns on the nature and source of the claim asserted. The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . ..' See Linda R.S. v. Richard D., supra, 410 U.S., at 617 n. 3, 93 S.Ct., at 1148;Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). Moreover, the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.[FN12]In some circumstances, countervailing*501 considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties. See United States v. Raines, 362 U.S., at 22-23, 80 S.Ct., at 523-524.In such instances, the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff. See Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969). See generally Part IV, infra.Moreover, Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Art. III' s requirement remains: the plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants. E.g., United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). But so long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim. E.g., Sierra Club v. Morton,

95 S.Ct. 2197                                                                                                    Page 12
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

supra, 405 U.S., at 737, 92 S.Ct., at 1367;FCC v.
Sanders Radio Station, 309 U.S. 470, 477, 60 S.Ct.
693, 698, 84 L.Ed. 869 (1940).

> FN12. A similar standing issue arises when
> the litigant asserts the rights of third parties
> defensively, as a bar to judgment against
> him. E.g., Barrows v. Jackson, 346 U.S. 249,
> 73 S.Ct. 1031, 97 L.Ed. 1586 (1953);
> McGowan v. Maryland, 366 U.S. 420, 429-
> 430, 81 S.Ct. 1101, 1106-1107, 6 L.Ed.2d
> 393 (1961). In such circumstances, there is
> no Art. III standing problem; but the
> prudential question is governed by
> considerations closely related to the question
> whether a person in the litigant's position
> would have a right of action on the claim.
> See Part IV, infra.

[17] One further preliminary matter requires
discussion. For purposes of ruling on a motion to
dismiss for want of standing, both the trial and
reviewing courts must accept as true all material
allegations of the complaint, and must construe the
complaint in favor of the complaining party. E.g.,
Jenkins v. McKeithen, 395 U.S. 411, 421-422, 89
S.Ct. 1843, 1848-1849, 23 L.Ed.2d 404 (1969). At
the same time, it is within the trial court's power to
allow or to require**2207 the plaintiff to supply, by
amendment to the complaint or by affidavits, further
particularized allegations of fact deemed supportive
of plaintiff's standing. If, after this opportunity,*502
the plaintiff's standing does not adequately appear
from all materials of record, the complaint must be
dismissed.

III

[18] With these general considerations in mind, we
turn first to the claims of petitioners Ortiz, Reyes,
Sinkler, and Broadnax, each of whom asserts
standing as a person of low or moderate income and,
coincidentally, as a member of a minority racial or
ethnic group. We must assume, taking the allegations
of the complaint as true, that Penfield's zoning
ordinance and the pattern of enforcement by
respondent officials have had the purpose and effect
of excluding persons of low and moderate income,
many of whom are members of racial or ethnic
minority groups. We also assume, for purposes here,
that such intentional exclusionary practices, if proved

in a proper case, would be adjudged violative of the
constitutional and statutory rights of the persons
excluded.

But the fact that these petitioners share attributes
common to persons who may have been excluded
from residence in the town is an insufficient predicate
for the conclusion that petitioners themselves have
been excluded, or that the respondents' assertedly
illegal actions have violated their rights. Petitioners
must allege and show that they personally have been
injured, not that injury has been suffered by other,
unidentified members of the class to which they
belong and which they purport to represent. Unless
these petitioners can thus demonstrate the requisite
case or controversy between themselves personally
and respondents, 'none may seek relief on behalf of
himself or any other member of the class.'O'Shea v.
Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38
L.Ed.2d 674 (1974). See, e.g., Bailey v. Patterson,
369 U.S. 31, 32-33, 82 S.Ct. 549, 550-551, 7 L.Ed.2d
512 (1962).

*503 In their complaint, petitioners Ortiz, Reyes,
Sinkler, and Broadnax alleged in conclusory terms
that they are among the persons excluded by
respondents' actions.[FN13]None of them has ever
resided in Penfield; each claims at least implicitly
that he desires, or has desired, to do so. Each asserts,
moreover, that he made some effort, at some time, to
locate housing in Penfield that was at once within his
means and adequate for his family's needs. Each
claims that his efforts proved fruitless.[FN14] *504 We
may assume,**2208 as petitioners allege, that
respondents' actions have contributed, perhaps
substantially, to the cost of housing in Penfield. But
there remains the question whether petitioners'
inability to locate suitable housing in Penfield
reasonably can be said to have resulted, in any
concretely demonstrable way, from respondents'
alleged constitutional and statutory infractions.
Petitioners must allege facts from which it reasonably
could be inferred that, absent the respondents'
restrictive zoning practices, there is a substantial
probability that they would have been able to
purchase or lease in Penfield and that, if the court
affords the relief requested, the asserted inability of
petitioners will be removed. Linda R.S. v. Richard
D., supra.

> FN13. Petitioner Ortiz also alleged that as a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

result of such exclusion he had to incur substantial communting expenses between his residence and his former place of employment in Penfield; and, in supporting affidavits, each petitioner recites at some length the disadvantages of his or her present housing situation and how that situation might be improved were residence in Penfield possible. For purposes of standing, however, it is the exclusion itself that is of critical importance, since exclusion alone would violate the asserted rights quite apart from any objective or subjective disadvantage that may flow from it.

FN14. In his affidavit submitted in opposition to respondents' motion to dismiss, petitioner Ortiz stated:
'Since my job at that time and continuing until May of 1972 was in the Town of Penfield, I initiated inquiries about renting and/or buying a home in the Town of Penfield. However, because of my income being low or moderate, I found that there were no apartment units large enough to house my family of wife and seven children, nor were there apartment units that were available reasonably priced so that I could even afford to rent the largest apartment unit. I have been reading ads in the Rochester metropolitan newspapers since coming to Rochester in 1966 and during that time and to the present time, I have not located either rental housing or housing to buy in Penfield.'App. 37.
Petitioner Reyes averred that, for some time before locating and purchasing their present residence in Rochester, she and her husband had searched for a suitable residence in suburban communities: '(O)ur investigation for housing included the Rochester bedroom communities of Webster, Irondequoit, Penfield and Perinton. Our search of a period of two years led us to no possible purchase in any of these towns.'Id., at 428.Petitioner Sinkler stated that she had 'searched for alternate housing in the Rochester metropolitan area, and has found that 'a black person has no choice of housing . . ..'
In particular, 'there are no apartments available in the town of Penfield which a

person of my income level can afford.'Id., at 452-453.Petitioner Broadnax said only that she had 'bought newspapers and read ads and walked to look for apartments until I found the place where I now reside. I found that there was virtually no choice of housing in the Rochester area.'Id., at 407.

[19] We find the record devoid of the necessary allegations. As the Court of Appeals noted, none of these petitioners has a present interest in any Penfield property; none is himself subject to the ordinance's strictures; and none has even been denied a variance or permit by respondent officials. 495 F.2d, at 1191.Instead, petitioners claim that respondents' enforcement of the ordinance against third parties-developers, builders, and the like-has had the consequence of precluding the construction of housing suitable to their needs at prices they might be able to afford. The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing.*505 When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights. E.g., Roe v. Wade, 410 U.S. 113, 124, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm.

Here, by their own admission, realization of petitioners' desire to live in Penfield always has depended on the efforts and willingness of third parties to build low- and moderate-cost housing. The record specifically refers to only two such efforts: that of Penfield Better Homes Corp., in late 1969, to obtain the rezoning of certain land in Penfield to allow the construction of subsidized cooperative townhouses that could be purchased by persons of moderate income; and a similar effort by O'Brien Homes, Inc., in late 1971.FN15 But *506 the record**2209 is devoid of any indication that these projects, or other like projects, would have satisfied petitioners' needs at prices they could afford, or that, were the court to remove the obstructions attributable to respondents, such relief would benefit petitioners.

95 S.Ct. 2197                                                                  Page 14
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

Indeed, petitioners' descriptions of their individual financial situations and housing needs suggest precisely the contrary-that their inability to reside in Penfield is the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts.[FN16]In **507** short, the facts alleged fail to support an actionable causal relationship between Penfield's zoning practices and petitioners' asserted injury.

FN15. Penfield Better Homes contemplated a series of one- to three-bedroom units and hoped to sell them-at that time-to persons who earned from $5,000 to $8,000 per year. The Penfield Planning Board denied the necessary variance on September 9, 1969, because of incompatibility with the surrounding neighborhood, projected traffic congestion, and problems of severe soil erosion during construction. Id., at 629-633, 849-859, 883-884.O'Brien Homes, Inc., projected 51 buildings, each containing four family units, designed for single people and small families, and capable of being purchased by persons 'of low income and accumulated funds' and 'of moderate income with limited funds for down payment . . ..'Id., at 634.The variance for this project was denied by the Planning Board on October 12, 1971; a revision of the proposal was reconsidered by the Planning Board in April 1972, and, from all indications of record, apparently remains under consideration. The record also indicates the existence of several proposals for 'planned unit developments'; but we are not told whether these projects would allow sale at prices that persons of low or moderate income are likely to be able to afford. There is, more importantly, not the slightest suggestion that they would be adequate, and of sufficiently low cost, to meet these petitioners' needs.

FN16. Ortiz states in his affidavit that he is now purchasing and resides in a six-bedroom dwelling in Wayland, N.Y.; and that he owns and receives rental income from a house in Rochester. He is concerned with finding a house or apartment large enough for himself, his wife, and seven children, but states that he can afford to spend a maximum of $120 per month for housing. Id., at 370.Broadnax seeks a four-bedroom house or apartment for herself and six children, and can spend a maximum of about $120 per month for housing. Id., at 417-418.Sinkler also states that she can spend $120 per month for housing for herself and two children.Id., at 452-453.Thus, at least in the cases of Ortiz and Broadnax, it is doubtful that their stated needs could have been satisfied by the small housing units contemplated in the only moderate-cost projects specifically described in the record. Moreover, there is no indication that any of the petitioners had the resources necessary to acquire the housing available in the projects. The matter is left entirely obscure. The income and housing budget figures supplied in petitioners' affidavits are presumably for the year 1972. The vague description of the proposed O'Brien development strongly suggests that the units, even if adequate for their needs, would have bee beyond the means at least of Sinkler and Broadnax. See n. 15, supra. The Penfield Better Homes projected price figures were for 1969, and must be assumed-even if subsidies might still be available-to have increased substantially by 1972, when the complaint was filed. Petitioner Reyes presents a special case: she states that her family has an income of over $14,000 per year, that she can afford $231 per month for housing, and that, in the past and apparently now, she wants to purchase a residence. As noted above, see n. 5, supra, the term 'low and moderate income' is nowhere defined in the complaint; but Penfield Better Homes defined the term as between $5,000 and $8,000 per year. See n. 15, supra. Since that project was to be subsidized, presumably petitioner Reyes would have been ineligible. There is no indication that in nonsubsidized projects, removal of the challenged zoning restrictions-in 1972-would have reduced the price on new single-family residences to a level that petitioner Reyes thought she could afford.

In support of their position, petitioners refer to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197                                                                                       Page 15
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

several decisions in the District Courts and Courts of Appeals, acknowledging standing in low-income, minority-group plaintiffs to challenge exclusionary zoning practices.[FN17] In those cases, however, the plaintiffs challenged zoning restrictions as applied to particular projects that would supply housing within their means, and of which they were intended residents. The plaintiffs thus were able to demonstrate that unless relief from assertedly illegal actions was forthcoming, their immediate and personal interests would be harmed. Petitioners here assert no like circumstances. Instead, they rely on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and **2210 might improve were the court to afford relief.

FN17. See, e.g., Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (CA8 1972); Crow v. Brown, 457 F.2d 788 (CA5 1972), aff'g 332 F.Supp. 382 (ND Ga.1971); Kennedy Park Homes Assn., v. City of Lackawanna, 436 F.2d 108 (CA2 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, 425 F.2d 1037 (CA10 1970). Cf. United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799 (CA5 1974).

[20][21] *508 We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention.[FN18] Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of 'a real need to exercise the power of judicial review' or that relief can be framed 'no (broader) than required by the precise facts to which the court's ruling would be applied.' Schlesinger v. Reservists to Stop the War, 418 U.S., at 221-222, 94 S.Ct., at 2932.

FN18. This is not to say that the plaintiff who challenges a zoning ordinance or zoning practices must have a present contractual interest in a particular project. A particularized personal interest may be shown in various ways, which we need not

undertake to identify in the abstract. But usually the initial focus should be on a particular project. See, e.g., cases cited in n. 17, supra We also note that zoning laws and their provisions, long considered essential to effective urban planning, are peculiarly within the province of state and local legislative authorities. They are, of course, subject to judicial review in a proper case. But citizens dissatisfied with provisions of such laws need not overlook the availability of the normal democratic process.

IV

[22] The petitioners who assert standing on the basis of their status as taxpayers of the city of Rochester present a different set of problems. These 'taxpayer-petitioners' claim that they are suffering economic injury consequent to Penfield's allegedly discriminatory and exclusionary zoning practices. Their argument, in brief, is that Penfield's persistent refusal to allow or to facilitate construction of low- and moderate-cost housing forces the city of Rochester to provide more such housing than it otherwise would do; that to provide such housing, Rochester must allow certain tax abatements; and *509 that as the amount of tax-abated property increases, Rochester taxpayers are forced to assume an increased tax burden in order to finance essential public services.

'Of course, pleadings must be something more than an ingenious academic exercise in the conceivable.' United States v. SCRAP, 412 U.S., at 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254. We think the complaint of the taxpayer-petitioners is little more than such an exercise. Apart from the conjectural nature of the asserted injury, the line of causation between Penfield's actions and such injury is not apparent from the complaint. Whatever may occur in Penfield, the injury complained of-increases in taxation-results only from decisions made by the appropriate Rochester authorities, who are not parties to this case.

But even if we assume that the taxpayer-petitioners could establish that Penfield's zoning practices harm them,[FN19] their complaint nonetheless was properly dismissed. Petitioners do not, even if they could, assert any personal right under the Constitution or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

any statute to be free of action by a neighboring municipality that may have some incidental adverse effect on Rochester. On the contrary, the only basis of the taxpayer-petitioners' claim is that Penfield's zoning ordinance and practices violate the constitutional and statutory rights of third parties, namely, persons of low and moderate income who are said to be excluded from Penfield. In short the claim of these petitioners falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. As we have observed above, this rule of judicial self-governance is subject **2211 to exceptions, the most prominent of which is that Congress may remove it by statute. Here, however,*510 no statute expressly or by clear implication grants a right of action, and thus standing to seek relief, to persons in petitioners' position. In several cases, this Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights. See, e.g., Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 205 (1973); Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). But the taxpayer-petitioners are not themselves subject to Penfield's zoning practices. Nor do they allege that the challenged zoning ordinance and practices preclude or otherwise adversely affect a relationship existing between them and the persons whose rights assertedly are violated. E.g., Sullivan v. Little Hunting Park, Inc., 396 U.S., at 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386;NAACP v. Alabama, 357 U.S. 449, 458-460, 78 S.Ct. 1163, 1169-1171, 2 L.Ed.2d 1488 (1958); Pierce v. Society of Sisters, 368 U.S., at 534-536, 45 S.Ct. 571, 573-574, 69 L.Ed. 1070.No relationship, other than an incidental congruity of interest, is alleged to exist between the Rochester taxpayers and persons who have been precluded from living in Penfield. Nor do the taxpayer-petitioners show that their prosecution of the suit is necessary to insure protection of the rights asserted, as there is no indication that persons who in fact have been excluded from Penfield are disabled from asserting their own right in a proper case.[FN20]In sum, we discern no justification for recognizing in the Rochester taxpayers a right of action on the asserted claim.

FN19. Cf. United States v. SCRAP, 412

U.S. 669, 688-690, 93 S.Ct. 2405, 2416-2417, 37 L.Ed.2d 254 (1973). But see Roe v. Wade, 410 U.S. 113, 127-129, 93 S.Ct. 705, 714-715, 35 L.Ed.2d 147 (1973).

FN20. See generally Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599 (1962). Cf. Bigelow v. Virginia, 421 U.S. 809, 815-817, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

V

[23] We turn next to the standing problems presented by the petitioner associations-Metro-Act of Rochester, *511 Inc., one of the original plaintiffs; Housing Council in the Monroe County Area, Inc., which the original plaintiffs sought to join as a party-plaintiff; and Rochester Home Builders Association, Inc., which moved in the District Court for leave to intervene as plaintiff. There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties. E.g., NAACP v. Alabama, supra, 357 U.S., at 458-460, 78 S.Ct. 1163, 1169-1171, 2 L.Ed.2d 1488;Anti-Fascist Committee v. McGrath, 341 U.S. 123, 183-187, 71 S.Ct. 624, 654-657, 95 L.Ed. 817 (1951) (Jackson J., concurring). With the limited exception of Metro-Act, however, none of the associational petitioners here has asserted injury to itself.

[24] Even in the absence of injury to itself, an association may have standing solely as the representative of its members. E.g., National Motor Freight Assn. v. United States, 372 U.S. 246, 83 S.Ct. 688,.9 L.Ed.2d 709 (1963). The possibility of such representational standing, however, does not eliminate or attenuate the constitutional requirement of a case or controversy. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The association must allege that its members, or any one of them, are suffering immediate**2212 or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. Id., at 734-741,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197                                                                    Page 17
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

92 S.Ct., at 1365-1369.So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

### *512 A

[25] Petitioner Metro-Act's claims to standing on its own behalf as a Rochester taxpayer, and on behalf of its members who are Rochester taxpayers or persons of low or moderate income, are precluded by our holdings in Parts III and IV, supra, as to the individual petitioners, and require no further discussion. Metro-Act also alleges, however, that 9% of its membership is composed of present residents of Penfield. It claims that, as a result of the persistent pattern of exclusionary zoning practiced by respondents and the consequent exclusion of persons of low and moderate income, those of its members who are Penfield residents are deprived of the benefits of living in a racially and ethnically integrated community. Referring to our decision in Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), Metro-Act argues that such deprivation is a sufficiently palpable injury to satisfy the Art. III case-or-controversy requirement, and that it has standing as the representative of its members to seek redress.

We agree with the Court of Appeals that Trafficante is not controlling here. In that case, two residents of an apartment complex alleged that the owner had discriminated against rental applicants on the basis of race, in violation of s 804 of the Civil Rights Act of 1968, 82 Stat. 83, 42 U.S.C. s 3604. They claimed that, as a result of such discrimination, 'they had been injured in that (1) they had lost the social benefits of living in an integrated community; (2) they had missed business and professional advantages which would have accrued if they had lived with members of minority groups; (3) they had suffered embarrassment and economic damage in social, business, and professional activities from being 'stigmatized' as residents of a 'white ghetto.'"409 U.S., at 208, 93 S.Ct., at 366.In light of the clear congressional purpose *513 in enacting the 1968 Act, and the broad definition of 'person aggrieved' in s 810(a), 42 U.S.C. s 3610(a), we held that petitioners,

as 'person(s) who claim(ed) to have been injured by a discriminatory housing practice,' had standing to litigate violations of the Act. We concluded that Congress had given residents of housing facilities covered by the statute an actionable right to be free from the adverse consequences to them of racially discriminatory practices directed at and immediately harmful to others. 409 U.S., at 212, 93 S.Ct., at 368.

Metro-Act does not assert on behalf of its members any right of action under the 1968 Civil Rights Act, nor can the complaint fairly be read to make out any such claim.[FN21]In this, we think, lies the **2213 critical distinction between Trafficante and the situation here. As we have *514 observed above, Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute. Linda R.S. v. Richard D., 410 U.S., at 617 n. 3, 93 S.Ct., at 1148, citing Trafficante v. Metropolitan Life Ins. Co., supra, 409 U.S., at 212, 93 S.Ct., at 368.(White, J., concurring). No such statute is applicable here.

FN21. The amicus brief of the Lawyers' Committee for Civil Rights under Law argues, to the contrary, that petitioners' allegations do state colorable claims under the 1968 Act, and that Metro-Act's Penfield members are 'person(s) aggrieved' within the meaning of s 810(a). It is significant, we think, that petitioners nowhere adopt this argument. As we read the complaint, petitioners have not alleged that respondents 'refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin,' or that they 'discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, . . . or national origin,'42 U.S.C. s 3604(a) and (b) (emphasis added). Instead, the gravamen of the complaint is that the challenged zoning practices have the purpose and effect of excluding persons of low and moderate income from residing in the town, and that this in turn has the consequence of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

excluding members of racial or ethnic minority groups. This reading of the complaint is confirmed by petitioners' brief in this Court. Brief for Petitioners 41. We intimate no view as to whether, had the complaint alleged purposeful racial or ethnic discrimination, Metro-Act would have stated a claim under s 804. See Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (CA8 1972).

Even if we assume, arguendo, that apart from any statutorily created right the asserted harm to Metro-Act's Penfield members is sufficiently direct and personal to satisfy the case-or-controversy requirement of Art. III, prudential considerations strongly counsel against according them or Metro-Act standing to prosecute this action. We do not understand Metro-Act to argue that Penfield residents themselves have been denied any constitutional rights, affording them a cause of action under 42 U.S.C. s 1983. Instead, their complaint is that they have been harmed indirectly by the exclusion of others. This is an attempt to raise putative rights of third parties, and none of the exceptions that allow such claims is present here.[FN22] In these circumstances, we conclude that it is inappropriate to allow Metro-Act to invoke the judicial process.

> FN22. Metro-Act does not allege that a contractual or other relationship protected under ss 1981 and 1982 existed between its Penfield members and any particular person excluded from residing in the town, nor that any such relationship was either punished or disrupted by respondents. See Sullivan v. Little Hunting Park, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969).

B

[26] Petitioner Home Builders, in its intervenor-complaint, asserted standing to represent its member firms engaged in the development and construction of residential housing in the Rochester area, including Penfield. Home Builders alleged that the Penfield zoning restrictions, *515 together with refusals by the town officials to grant variances and permits for the construction of low- and moderate-cost housing, had deprived some of its members of 'substantial business opportunities and profits.' App. 156. Home

Builders claimed damages of $750,000 and also joined in the original plaintiffs' prayer for declaratory and injunctive relief.

As noted above, to justify any relief the association must show that it has suffered harm, or that one or more of its members are injured. E.g., Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Bt, apart from this, whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind. E.g., National Motor Freight Assn. v. United States, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). See Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Cf. Fed.Rule Civ.Proc. 23(b)(2).

**2214 The present case, however, differs significantly as here an association seeks relief in damages for alleged injuries to its members. Home Builders alleges no monetary injury to itself, nor any assignment of the damages claims of its members. No award therefore can be made to the association as such. Moreover, in the circumstances of this case, the damages claims are not common to the entire membership, nor shared by all in equal degree. To the contrary, whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized*516 proof. Thus, to obtain relief in damages, each member of Home Builders who claims injury as a result of respondents' practices myst be a party to the suit, and Home Builders has no standing to claim damages on his behalf.

[27] Home Builders' prayer for prospective relief fails for a different reason. It can have standing as the representative of its members only if it has alleged facts sufficient to make out a case or controversy had the members themselves brought suit. No such allegations were made. The complaint refers to no specific project of any of its members that is currently precluded either by the ordinance or by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197                                                                                    Page 19
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

respondents' action in enforcing it. There is no averment that any member has applied to respondents for a building permit or a variance with respect to any current project. Indeed, there is no indication that respondents have delayed or thwarted any project currently proposed by Home Builders' members, or that any of its members has taken advantage of the remedial processes available under the ordinance. In short, insofar as the complaint seeks prospective relief, Home Builders has failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention. See, e.g., United Public Workers v. Mitchell, 330 U.S. 75, 86-91, 67 S.Ct. 556, 562-565, 91 L.Ed. 754 (1947); Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

[28] A like problem is presented with respect to petitioner Housing Council. The affidavit accompanying the motion to join it as plaintiff states that the Council includes in its membership 'at lease seventeen' groups that have been, are, or will be involved in the development of low- and moderate-cost housing. But with one exception, the complaint does not suggest that any of these groups has focused its efforts on Penfield or has any specific *517 plan to do so. Again with the same exception, neither the complaint nor any materials of record indicate that any member of Housing Council has taken any step toward building housing in Penfield, or has had dealings of any nature with respondents. The exception is the Penfield Better Homes Corp. As we have observed above, it applied to respondents in late 1969 for a zoning variance to allow construction of a housing project designed for persons of moderate income. The affidavit in support of the motion to join Housing Council refers specifically to this effort, the supporting materials detail at some length the circumstances surrounding the rejection of Better Homes' application. It is therefore possible that in 1969, or within a reasonable time thereafter, Better Homes itself and possibly Housing Council as its representative would have had standing ot seek review of respondents' action. The complaint, however, does not allege that the Penfield Better Homes project remained viable in 1972 when this complaint was filed, or that respondents' actions continued to block a then-current construction project.[FN23]In **2215 short, neither the complaint nor the record supplies any basis from which to infer that the controversy between respondents and Better Homes, however vigorous it may once have been, remained a live, concrete dispute when this complaint was filed.

> FN23. If it had been averred that the zoning ordinance or respondents were unlawfully blocking a pending construction project, there would be a further question as to whether Penfield Better Homes had employed available administrative remedies, and whether it should be required to do so before a federal court can intervene.

VI

[29] The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential*518 considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. We agree with the District Court and the Court of Appeals that none of the petitioners here has met this threshold requirement. Accordingly, the judgment of the Court of Appeals is

Affirmed.

Mr. Justice DOUGLAS, dissenting.
With all respect, I think that the Court reads the complaint and the record with antagonistic eyes. There are in the background of this case continuing strong tides of opinion touching on very sensitive matters, some of which involve race, some class distinctions based on wealth.

A clean, safe, and well-heated home is not enough for some people. Some want to live where the neighbors are congenial and have social and political outlooks similar to their own. This problem of sharing areas of the community is akin to that when one wants to control the kind of person who shares his own abode. Metro-Act of Rochester, Inc., and the Housing Council in the Monroe County Area, Inc.-two of the associations which bring this suit-do in my opinion represent the communal feeling of the actual residents and have standing.

95 S.Ct. 2197                                                                Page 20
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

The associations here are in a position not unlike that confronted by the Court in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Their protest against the creation of this segregated community expresses the desire of their members to live in a desegregated community-a desire which gives standing to sue under the Civil Rights Act *519 of 1968 as we held in Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). Those who voice these views here seek to rely on other Civil Rights Acts and on the Constitution, but they too should have standing, by virtue of the dignity of their claim, to have the case decided on the merits.

Standing has become a barrier to access to the federal courts, must as 'the political question' was in earlier decades. The mounting caseload of federal courts is well known. But cases such as this one reflect festering sores in our society; and the American dream teaches that if one reaches high enough and persists there is a forum where justice is dispensed. I would lower the technical barriers and let the courts serve that ancient need. They can in time be curbed by legislative or constitutional restraints if an emergency arises.

We are today far from facing an emergency. For in all frankness, no Justice of this Court need work more than four days a week to carry his burden. I have found it a comfortable burden carried even in my months of hospitalization.

As Mr. Justice BRENNAN makes clear in his dissent, the alleged purpose of the ordinance under attack was to preclude low- and moderate-income people and nonwhites from living in Penfield. The zoning power is claimed to have been used here to foist an un-American community model on the people of this area. I would let the case go to trial and have all the facts brought **2216 out. Indeed, it would be better practice to decide the question of standing only when the merits have been developed.

I would reverse the Court of Appeals.

Mr. Justice BRENNAN, with whom Mr. Justice WHITE and Mr. Justice MARSHALL join, dissenting.
In this case, a wide range of plaintiffs, alleging various kinds of injuries, claimed to have been affected by the *520 Penfield zoning ordinance, on its face and as applied, and other practices of the defendant officials of Penfield. Alleging that as a result of these laws and practices low- and moderate-income and minority people have been excluded from Penfield, and that this exclusion is unconstitutional, plaintiffs sought injunctive, declaratory, and monetary relief. The Court today, in an opinion that purports to be a 'standing' opinion but that actually, I believe, has overtones of outmoded notions of pleading and of justiciability, refuses to find that any of the variously situated plaintiffs can clear numerous hurdles, some constructed here for the first time, necessary to establish 'standing.' While the Court gives lip service to the principle, oft repeated in recent years,[FN1] that 'standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal,'ante, at 2206, in fact the opinion, which tosses out of court almost every conceivable kind of plaintiff who could be injured by the activity claimed to be unconstitutional, can be explained only by an indefensible hostility to the claim on the merits. I can appreciate the Court's reluctance luctance to adjudicate the complex and difficult legal questions involved in determining the constitutionality of practices which assertedly limit residence in a particular municipality to those who are white and relatively well off, and I also understand that the merits of this case could involve grave sociological and political ramifications. But courts cannot refuse to hear a case on the merits merely because they would prefer not to, and it is quite clear, when the record is viewed with dispassion, that at least three of the groups of plaintiffs have made *521 allegations, and supported them with affidavits and documentary evidence, sufficient to survive a motion to dismiss for lack of standing.[FN2]

FN1.Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); Data Processing Service v. Camp, 397 U.S. 150, 153, 158, 90 S.Ct. 827, 830, 832, 25 L.Ed.2d 184 (1970); Schlesinger v. Reservists to Stop the War, 418 U.S. 208, 225 n. 15, 94 S.Ct. 2925, 2934, 41 L.Ed.2d 706 (1974). See Barlow v. Collins, 397 U.S. 159, 176, 90 S.Ct. 832, 843,25 L.Ed.2d 192 (1970) (Opinion of Brennan, J.).

FN2. Because at least three groups of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

plaintiffs have, in my view, alleged standing sufficient to require this lawsuit to proceed to discovery and trial, I do not deal in this dissent with the standing of the remaining petitioners.

I

Before considering the three groups I believe clearly to have standing-the low-income, minority plaintiffs, Rochester Home Builders Association, Inc., and the Housing Council in the Monroe County Area, Inc.-it will be helpful to review the picture painted by the allegations as a whole, in order better to comprehend the interwoven interests of the various plaintiffs. Indeed, one glaring defect of the Court's opinion is that it views each set of plaintiffs as if it were prosecuting a separate lawsuit, refusing to recognize that the interests are intertwined, and that the standing of any one group must take into account its position vis-a -vis the others. For example, the Court says that the low-income minority plaintiffs have not alleged facts sufficient to show that but for the exclusionary practices claimed, they would be able to reside in Penfield. The Court then intimates that such a causal relationship could be shown only if 'the initial focus (is) on a particular project.'Ante, at 2210 n. 18. Later, the Court objects to the ability of the **2217 Housing Council to prosecute the suit on behalf of its member, Penfield Better Homes Corp., despite the fact that Better Homes had displayed an interest in a particular project, because that project was no longer live. Thus, we must suppose that even if the low-income plaintiffs had alleged a desire to live in the Better Homes project, that allegation would *522 be insufficient because it appears that that particular project might never be built. The rights of low-income minority plaintiffs who desire to live in a locality, then, seem to turn on the willingness of a third party to litigate the legality of preclusion of a particular project, despite the fact that the third party may have no economic incentive to incur the costs of litigation with regard to one project, and despite the fact that the low-income minority plaintiffs' interest is not to live in a particular project but to live somewhere in the town in a dwelling they can afford.

Accepting, as we must, the various allegations and affidavits as true, the following picture emerges: The Penfield zoning ordinance, by virtue of regulations concerning 'lot area, set backs, . . . population density, density of use, units per acre, floor area, sewer requirements, traffic flow, ingress and egress(, and) street location,' makes 'practically and economically impossible the construction of sufficient numbers of low and moderate income'housing. App. 25. The purpose of this ordinance was to preclude low-and moderate-income people and nonwhites from living in Penfield, id., at 15, and, particularly because of refusals to grant zoning variances and building permits and by using special permit procedures and other devices, id., at 17, the defendants succeeded in keeping 'low and moderate income persons . . . and non-white persons . . . from residing within . . . Penfield.'Id., at 18.

As a result of these practices, various of the plaintiffs were affected in different ways. For example, plaintiffs Ortiz, Reyes, Sinkler, and Broadnax, persons of low or moderate income and members of minority groups, alleged that 'as a result' of respondents' exclusionary scheme, at 18, 21, 23-24, 26, 29 (emphasis supplied), they could not live in Penfield, although they *523 desired and attempted to do so, and consequently incurred greater commuting costs, lived in substandard housing, and had fewer services for their families and poorer schools for their children than if they had lived in Penfield. Members of the Rochester Home Builders Association were prevented from constructing homes for low- and moderate-income people in Penfield, id., at 153, harming them economically. And Penfield Better Homes, a member of the Housing Council, was frustrated in its attempt to build moderate-income housing, id., at 174.

Thus, the portrait which emerges from the allegations and affidavits is one of total, purposeful, intransigent exclusion of certain classes of people from the town, pursuant to a conscious scheme never deviated from. Because of this scheme, those interested in building homes for the excluded groups were faced with insurmountable difficulties, and those of the excluded groups seeking homes in the locality quickly learned that their attempts were futile. Yet, the Court turns the very success of the allegedly unconstitutional scheme into a barrier to a lawsuit seeking its invalidation. In effect, the Court tells the lowincome minority and building company plaintiffs they will not be permitted to prove what they have alleged-that they could and would build and live in the town if changes were made in the zoning ordinance and its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

application-because they have not succeeded in breaching, before the suit was filed, the very barriers which are the subject of the suit.

## II

### Low-income and Minority Plaintiffs

As recounted above, plaintiffs Ortiz, Broadnax, Reyes, and Sinkler alleged **2218 that 'as a result' of respondents' exclusionary practices, they were unable, despite attempts,*524 to find the housing they desired in Penfield, and consequently have incurred high commuting expenses, received poorer municipal services,[FN3] and, in some instances, have been relegated to live in substandard housing.[FN4]The Court does not, as it could not, suggest that *525 the injuries, if proved, would be insufficient to give petitioners the requisite 'personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues,'Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Rather, it is abundantly clear that the harm alleged satisfies the 'injury in fact, economic or otherwise,'Data Processing Service v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), requirement which is prerequisite to standing in federal court. The harms claimed-consisting of out-of-pocket losses as well as denial of specifically enumerated services available in Penfield but not in these petitioners' present communities, see nn. 3 and 4, supra-are obviously more palpable and concrete than those held sufficient to sustain standing in other cases. See United States v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 735 n. 8, 738, and n. 13, 92 S.Ct. 1361, 1366, 1368, 31 L.Ed.2d 636 (1972). Cf. Data Processing, supra, 397 U.S., at 154, 90 S.Ct., at 830.

FN3. Specifically, petitioner Ortiz claims, among other things, that the Penfield schools offer a much broader curriculum, including vocational education, than the school his children attend, as well as special tutoring and counseling programs not available to his children. Penfield also provides a comprehensive recreational program, while his community offers very little, and a full-time, comprehensive public library, while his community has only limited library services. App. 377-400.

Petitioner Broadnax claimed that if she lived in Penfield, there would be playgrounds for her children, effective police protection, and adequate garbage disposal, all of which are lacking in her present community.Id., at 419.As a result, her children are not safe and there are mice, rats, and roaches in her house. Id., at 416-417, 419.

Petitioner Reyes stated, similarly, that she is currently living with inadequate police protection, id., at 426, and sending her children to inferior schools, id., at 433.

Finally, petitioner Sinkler also said that in her current home, police protection is inadequate, id., at 443, there are no play areas for children, id., at 449, and the schools are totally inadequate. Id., at 454.

These are only summaries of the affidavits, which are quite specific in detailing the inadequacies of petitioners' current communities and the injuries suffered thereby as well as, in Ortiz' affidavit, the services provided by Penfield which would alleviate many of these problems.

FN4. Petitioner Broadnax said that because of the poor choice of housing available at her income, she was forced to rent an apartment which has 'many leaks in the roof, bad wiring, roach infestation, rat and mice infestation, crumbling house foundation, broken front door, broken hot water heater, etc.'Id., at 410.As a result, aside from the ordinary dangers such conditions obviously present, one son's asthma condition has been exacerbated. Id., at 413.

Petitioner Sinkler stated that, again because only housing in Rochester central city is available to moderate-income, minority people, she is living in a seventh-floor apartment with exposed radiator pipes, no elevator, and no screens, and violence, theft, and sexual attacks are frequent. Id., at 441-446.

Once again, the above are short summaries of long, detailed accounts of the harms suffered.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Instead, the Court insists that these petitioners' allegations are insufficient to show that the harms suffered were caused by respondents' allegedly unconstitutional practices, because 'their inability to reside in Penfield (may be) the consequence of the economics of the area housing market, rather than of respondents' assertedly illegal acts.'Ante, at 2209.

**2219 True, this Court has held that to maintain standing, a plaintiff must not only allege an injury but must also assert a "direct" relationship between the alleged injury *526 and the claim sought to be adjudicated,' Linda R.S. v. Richard D., 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973)-that is '(t) he party who invokes (judicial) power must be able to show . . . that he has sustained or is immediately in danger of sustaining some direct injury as the result of (a statute's) enforcement.'Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078, (1923) (emphasis supplied); Linda R.S., supra, 410 U.S., at 618, 93 S.Ct., at 1149.But, as the allegations recited above show, these petitioners have alleged precisely what our cases require-that because of the exclusionary practices of respondents, they cannot live in Penfield and have suffered harm.[FN5]

> FN5. This case is quite different from Linda R.S. v. Richard D. In Linda R.S., the problem was that even if everything alleged were proved, it was still quite possible that petitioner's husband would not be prosecuted for nonsupport, or that, if prosecuted, he would still not contribute to his children's support. Nothing which could be proved at trial could possibly show otherwise. Here, if these petitioners prove what they have alleged, they will have shown that respondents' actions did cause their injury.

Thus, the Court's real holding is not that these petitioners have not alleged an injury resulting from respondents' action, but that they are not to be allowed to prove one, because 'realization of petitioners' desire to live in Penfield always has depended on the efforts and willingness of third parties to build low- and moderate-cost housing,'ante, at 2208, and 'the record is devoid of any indication that . . . (any) projects, would have

satisfied petitioners' needs at prices they could afford.'Ante, at 2208-2209.

Certainly, this is not the sort of demonstration that can or should be required of petitioners at this preliminary stage. In SCRAP, supra, a similar challenge was made: it was claimed that the allegations were vague, 412 U.S., at 689 n. 15, 93 S.Ct., at 2417, and that the causation theory *527 asserted was untrue, id., at 689, 93 S.Ct., at 2417.We said: 'If * * * these allegations were in fact untrue, then the appellants should have moved for summary judgment on the standing issue and demonstrated to the District Court that the allegations were sham and raised no genuine issue of fact. We cannot say . . . that the appellees could not prove their allegations which, if proved, would place them squarely among those persons injured in fact.'Id., at 689-690, 93 S.Ct., at 2417.[FN6]See also Jenkins v. McKeithen, 395 U.S. 411, 421-422, 89 S.Ct. 1843, 1848-1849, 23 L.Ed.2d 404 (1969).

> FN6. There is some suggestion made in the briefs that, by virtue of the inclusion in the record of affidavits and documents, the motion to dismiss was, under Fed.Rule Civ.Proc. 12(b), converted into a Rule 56 motion for summary judgment. In terms, the portion of Rule 12(b) concerning conversion to a Rule 56 motion applies only to a motion to dismiss for failure to state a cause of action, and not to a motion to dismiss for other reasons. At any rate, respondents filed no counter-affidavits proper under Rule 56(e), so, that even if Rule 56 were applied, respondents have not at this stage disproved the allegations.

Here, the very fact that, as the Court stresses, these petitioner's claim rests in part upon proving the intentions and capabilities of third parties to build in Penfield suitable housing which they can afford, coupled with the exclusionary character of the claim on the merits, makes it particularly inappropriate to assume that these petitioners' lack of specificity reflects a fatal weakness in their theory of causation.[FN7]Obviously **2220 they cannot be expected,*528 prior to discover and trial, to know the future plans of building companies, the precise details of the housing market in Penfield, or everything which has transpired in 15 years of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197

Page 24

422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

application of the Penfield zoning ordinance, including every housing plan suggested and refused. To require them to allege such facts is to require them to prove their case on paper in order to get into court at all, reverting to the form of fact pleading long abjured in the federal courts. This Court has not required such unachievable specificity in standing cases in the past, see SCRAP, supra, and Jenkins, supra, and the fact that it does so now can only be explained by an indefensible determination by the Court to close the doors of the federal courts to claims of this kind. Understandably, today's decision will be read as revealing hostility to breaking down even unconstitutional zoning *529 barriers that frustrate the deep human yearning of low-income and minority groups for decent housing they can afford in decent surroundings, see nn. 3 and 4, supra.

FN7. The Court, glancing at the projects mentioned in the record which might have been built but for the exclusionary practices alleged, concludes that petitioners Ortiz and Broadnax earned too little to afford suitable housing in them, and that petitioner Reyes earned to much.Ante, at 2209, n. 16. As the Court implicitly acknowledges, petitioner Sinkler at least may well have been able to live in the Better Homes Project. Further, there appears in the record as it stands a report of the Penfield Housing Task Force on Moderate Income Housing, App. 487-581, prepared for the Penfield Town Board itself, which defines 'moderate income families as families having incomes between $5,500 and $11,000 per year, depending on the size of the family,'id., at 492, and moderate-income housing as housing 'priced below $20,000 or (carrying) a rental price of less than $150 a month,'id., at 493. See also, with respect to 'low income,' id., at 527. Thus, while the Court might not know what was meant by 'low' and 'moderate' income housing, ante, at 2203 n. 5, and 2209 n. 16, respondents clearly did. The petitioners here under discussion fell within the Board's own definition of moderate-income families, except for petitioner Reyes, who alleges that she could afford a house for $20,000 but not more. App. 428. And the Task Force Report does set out, id., at 503-516, changes in the zoning ordinance and its application which could result in housing which moderate-

income people could afford, even to the extent of setting out a budget provided by a builder for a house costing $18,900, id., at 507. The causation theory which the Court finds improbable, then, was adopted by a task force of the Town Board itself. Of course, we do not know at this stage whether the particular named plaintiffs would certainly have benefited from the changes recommended by the task force, but at least there is a good chance that, after discovery and trial, they could show they would.

III

*Associations Including Building Concerns*

Two of the petitioners are organizations among whose members are building concerns. Both of these organizations, Home Builders and Housing Council, alleged that these concerns have attempted to build in Penfield low- and moderate-income housing, but have been stymied by the zoning ordinance and refusal to grant individual relief therefrom.

Specifically, Home Builders, a trade association of concerns engaged in constructing and maintaining residential housing in the Rochester area, alleged that '(d)uring the past 15 years, over 80% of the private housing units constructed in the Town of Penfield have been constructed by (its) members.'App. 147. Because of respondents' refusal to grant relief from Penfield's restrictive housing statutes, members of Home Builders could not proceed with planned low- and moderate-income housing projects, id., at 157, and thereby lost profits. Id., at 156.

Housing Council numbers among its members at least 17 groups involved in the development and construction of low- and middle-income housing. In particular, one member, Penfield Better Homes, 'is and has been actively attempting to develop moderate income housing in . . . Penfield.'(emphasis supplied), id., at 174, but has been unable to secure the necessary approvals. Ibid.

The Court finds that these two organizations lack standing to seek prospective**2221 relief for basically the same reasons: none of their members is, as far as the allegations show, currently involved in developing a particular *530 project. Thus, Home

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

95 S.Ct. 2197                                                                                        Page 25
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

Builders, has 'failed to show the existence of any
injury to its members of sufficient immediacy and
ripeness to warrant judicial intervention,'ante, at
2214 (emphasis supplied), while 'the controversy
between respondents and Better Homes, however
vigorous it may once have been, (has not) remained a
live, concrete dispute.'Ante, at 2215.

Again, the Court ignores the thrust of the complaints
and asks petitioners to allege the impossible.
According to the allegations, the building concerns'
experience in the past with Penfield officials has
shown any plans for low- and moderate-income
housing to be futile for, again according to the
allegations, the respondents are engaged in a
purposeful, conscious scheme to exclude such
housing. Particularly with regard to a low- or
moderate-income project, the cost of litigating, with
respect to any particular project, the legality of a
refusal to approve it may well be prohibitive. And the
merits of the exclusion of this or that project is not at
the heart of the complaint; the claim is that
respondents will not approve any project which will
provide residences for low-and moderate-income
people.

When this sort of pattern-and-practice claim is at the
heart of the controversy, allegations of past injury,
which members of both of these organizations have
clearly made, and of a future intent, if the barriers are
cleared, again to develop suitable housing for
Penfield, should be more than sufficient. The past
experiences, if proved at trial, will give credibility
and substance to the claim of interest in future
building activity in Penfield. These parties, if their
allegations are proved, certainly have the requisite
personal stake in the outcome of this controversy, and
the Court's conclusion otherwise is only a conclusion
that this controversy may not be litigated in a federal
court.

I would reverse the judgment of the Court of
Appeals.

U.S.N.Y. 1975.
Warth v. Seldin
422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.